**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RAVI P. RAWAT, on behalf of himself**<br>**and others similarly situated,** | ) | |
| | ) | **Case No. _____** |
| Plaintiff, | ) | |
| v. | ) | FILED:   JULY 29, 2008 |
| | ) | 08CV4305 |
| **NAVISTAR INTERNATIONAL** | ) | JUDGE BUCKLO |
| **CORPORATION,** | ) | MAGISTRATE JUDGE ASHMAN |
| Defendant. | ) | NF |

## NAVISTAR INTERNATIONAL CORPORATION'S NOTICE OF REMOVAL

Defendant Navistar International Corporation ("Navistar"), by its counsel, hereby gives notice of removal of this action, pursuant to 28 U.S.C. §§ 1332, 1441, 1446 and 1453, from the Circuit Court of Cook County, County Department, Chancery Division, to the United States District Court for the Northern District of Illinois.

### I.     BACKGROUND

1.     On July 18, 2008, Plaintiff Ravi P. Rawat ("Plaintiff") filed a class action complaint in the Circuit Court of Cook County, County Department, Chancery Division styled Ravi P. Rawat, et al. v. Navistar International Corporation, Case No. 08 CH 26042. Plaintiff has not yet served Navistar with service of process, and Navistar reserves all objections to service. A true copy of the Complaint and all exhibits thereto are attached hereto as Exhibit 1.

2.     The Complaint asserts Illinois state law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the Illinois Wage Payment and Collection Act, and for declaratory relief. See Compl., Ex. 1 hereto, at ¶¶ 52-76. The Complaint alleges that Navistar prevented Plaintiff and the putative class from exercising stock options during a "blackout" period imposed when Navistar was not current with its public financial

CH\1043091.3

statements.  See id. at ¶¶ 23-32.  Plaintiff filed this Complaint in state court after filing a similar

class action in federal court.  See Complaint in Rawat, et al. v. Navistar International

Corporation, Case No. 08 CV 3038, currently pending in the United States District Court for the

Northern District of Illinois (the "Original, Federal Complaint").

## II.    GROUNDS FOR REMOVAL

3.    Plaintiff's claims are removable, because the Class Action Fairness Act

("CAFA") provides this Court with jurisdiction.  See 28 U.S.C. §§ 1332(d), 1453.  CAFA

extends federal jurisdiction over class actions where: (1) any member of the proposed class is a

citizen of a state different from any defendant (i.e., minimal diversity exists); (2) the putative

class consists of more than 100 members; and (3) the amount in controversy is $5 million or

more, aggregating all claims and exclusive of interests and costs.  See 28 U.S.C. §§ 1332(d)(2),

1332(d)(5)(B).[1]  Each of these requirements is readily met here.  See disc. infra at 2-4.

### A.    Minimal Diversity

4.    In the Complaint, Plaintiff defines his proposed class as "all Navistar employees

and former employees whose stock options either expired or who were prevented from

exercising their options during the Navistar's 'blackout' period.  (April 6, 2006 – May 29,

2008)."  See Compl., Ex. 1 hereto, at ¶ 46.  Plaintiff's class definition does not restrict the class

to Illinois citizens.  See id.  Courts have held that substantially similar class definitions support

the existence of minimal diversity.  See 28 U.S.C. § 1332(d)(2)(A); McMorris v. TJX

Companies, Inc., 493 F. Supp. 2d 158, 162-64 (D. Mass. 2007); Larsen v. Pioneer Hi-Bred

Intern., Inc., No. 4:06-cv-0077-JAJ, 2007 WL 3341698, at *4-5 (S.D. Iowa Nov. 9, 2007).

Moreover, Navistar's records indicate that at least one putative class member is a citizen of a

---

[1]    A "class action" includes any civil action filed under Federal Rule of Civil Procedure 23
or "similar State statute or rule of judicial procedure."  See 28 U.S.C. § 1332(d)(1)(B).

CH\1043091.3

state other than Illinois or Delaware, and Navistar is a Delaware corporation with its principal place of business in Illinois. <u>See</u> Declaration of Monica Stark, Ex. 2 hereto, at ¶¶ 4-5, 9; 28 U.S.C. § 1332(c)(1). Consequently, minimal diversity exists. <u>See</u> <u>id.</u>

### B.    Number Of Class Members

5.    Plaintiff brings this case on behalf of "[a]ll Navistar employees and former employees whose stock options either expired or who were prevented from exercising their options during the Navistar's 'blackout' period. (April 6, 2006 – May 29, 2008)." <u>See</u> Compl., Ex. 1 hereto, at ¶ 46. As already noted by Navistar in connection with Plaintiff's Original, Federal Complaint, the number of individuals whose vested stock options expired during the "blackout" is fifty-six.[2] <u>See, e.g.</u>, Declaration of Monica Stark, Ex. 2 hereto, at ¶¶ 8-9. However, the number of putative class members who possessed stock options that that "<u>either</u> expired <u>or</u> who were prevented from exercising their options" during the "blackout period" exceeds 100 persons. <u>See</u> <u>id.</u> at ¶¶ 11-12. Therefore, the requirement of CAFA that the putative class consist of more than 100 members is satisfied. <u>See</u> 28 U.S.C. § 1332(d)(5)(B).

### C.    Amount In Controversy

6.    The amount in controversy exceeds $5 million. Plaintiff has expressly plead that he seeks injunctive relief as well as "compensatory damages and exemplary damages" <u>See</u> Compl., Ex. 1 hereto, at ¶¶ 57, 63, 71, 76, Prayer for Relief. Notably, Plaintiff alleges that the

---

[2]    Plaintiff originally brought this action in federal court pursuant to CAFA on behalf of a class of "[a]ll individuals whose vested options expired during Navistar's 'blackout period'" <u>See</u> Original, Federal Compl., Ex. 3 hereto, at ¶ 36. As stated, there are only 56 individuals who fall within that class definition. <u>See</u> Declaration of Monica Stark, Ex. 2 hereto, at ¶¶ 8-9; Navistar's Mot. to Dismiss, Ex. 4 hereto. Accordingly, Navistar moved to dismiss that Complaint for lack of subject matter jurisdiction. <u>See</u> <u>id.</u>; 28 U.S.C. § 1332(d)(5)(B). When he decided to file a second case in state court while the federal case was still pending, however, Plaintiff's lawyer chose to expand his putative class definition to include additional persons, such that this requirement of CAFA is satisfied for the second filing. <u>See</u> <u>id.</u>; Compl., Ex. 1 hereto, at ¶ 46.

3

putative class members should receive $75.90 per share, the price of Navistar's stock on the day the "blackout" purportedly ended. See id. at ¶¶ 41-42. Plaintiff also alleges that "Defendant's attempt to settle the claims of [putative] class members significantly undervalues…their claims." Mem. in Supp. Of Mot. for Prelim. Inj., Ex. 5 hereto, at 13 (emphasis supplied). Navistar need only show a reasonable probability that the amount in controversy exceeds $5 million. Brill v. Countrywide Home Loans, Inc., 427 F.3d 446, 448 (7th Cir. 2005). Given that the allegedly "undervalued" offers to only a sub-set the putative class exceeds $5 million, there is a reasonable probability that the amount in controversy for the more than 100 class members exceeds $5 million. See Stark Decl., Ex. 2 hereto, at ¶ 10.

7.     Moreover, Plaintiff has already conceded in his Original, Federal Complaint that the amount in controversy exceeds $5 million, even for the narrower class proposed in the earlier lawsuit. See Original, Federal Complaint, Ex. 3 hereto, at ¶ 2. In that earlier complaint, Plaintiff alleged that "the amount in controversy exceeds $5,000,000" for a class of persons much narrower than the class in the Complaint Navistar is now removing from state court. See id. Consequently, the amount in controversy here plainly exceeds $5 million. See 28 U.S.C. § 1332(d)(2); Hart v. Fed Ex Group Package Sys. Inc., 457 F.3d 675, 608 (7th Cir. 2006).

### III.   COMPLIANCE WITH THE REMOVAL STATUTE

8.     The Notice of Removal was properly filed in the United States District Court for the Northern District of Illinois, because the Circuit Court of Cook County, County Department, Chancery Division is located in this judicial district. See 28 U.S.C. § 1441(a).

9.     The Notice of Removal is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure. See 28 U.S.C. § 1446(a).

10.     Plaintiff has yet to serve Navistar with the Complaint. Accordingly, this Notice

4

CH\1043091.3

of Removal is timely under 28 U.S.C. § 1446(b) because the 30 day limitation has not yet started

to run. See 28 U.S.C. § 1448; Collins v. Pontikes, 447 F. Supp. 2d 895, 897 (N.D. Ill. 2006) ("a

named defendant's time to remove is triggered by simultaneous service of the summons and

complaint, or receipt of the complaint, 'through service or otherwise,' after and apart from

service of the summons, but not by mere receipt of the complaint unattended by any formal

service"), quoting Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 353-56

(1999).

11.    Consent to federal jurisdiction is not necessary given that the basis for federal

jurisdiction is CAFA. See 28 U.S.C. § 1453(b) ("A class action may be removed to a district

court of the United States in accordance with section 1446 … except that such action may be

removed by any defendant without the consent of all defendants.").

12.    Pursuant to 28 U.S.C. § 1446(a), a copy of all pleadings and orders known to

Navistar in this action, which papers include the Complaint, and other papers, are attached. See

Exs. 1, 5 hereto.

13.    Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served

upon counsel for Plaintiff and a copy, along with a Notice of Filing of the Notice of Removal, is

being filed with the Circuit Court of Cook County, County Department, Chancery Division.

## IV.    CONCLUSION

For the foregoing reasons, Navistar respectfully requests that this Court exercise

jurisdiction over this action and enter orders and grant relief as may be necessary to secure

removal and to prevent further proceedings in this matter in the Circuit Court of Cook County,

County Department, Chancery Division.  Navistar further requests such other and further relief

as the Court deems appropriate.

CH\1043091.3

Dated:  July 29, 2008                              Respectfully submitted,


                                                  /s/Robert C. Levels
                                                  One of the Attorneys for Defendant Navistar
                                                  International Corporation

Laurence H. Levine                                Cary R. Perlman
Maaike S. Almeida                                 Mark S. Mester
LAURENCE H. LEVINE LAW OFFICES                    Robin M. Hulshizer
190 South LaSalle Street, Suite 3120             Robert C. Levels
Chicago, Illinois 60603                          LATHAM & WATKINS LLP
Phone: (312) 291-7000                            Sears Tower, Suite 5800
Fax: (312) 291-7015                              233 South Wacker Drive
                                                  Chicago, Illinois 60606
                                                  Phone: (312) 876-7700
                                                  Fax: (312) 993-9767

CH\1043091.3

## CERTIFICATE OF SERVICE

I, Robert C. Levels, hereby certify that on July 29, 2008, I served a copy of Navistar

International Corporation's NOTICE OF REMOVAL TO UNITED STATES DISTRICT

COURT via hand delivery, upon:

> Clinton A. Krislov
> Jeffrey M. Salas
> KRISLOV & ASSOCIATES, LTD.
> 20 North Wacker Drive, Suite 1350
> Chicago, Illinois 60606

/s/Robert C. Levels
Robert C. Levels

CH\1043091.3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RAVI P. RAWAT, on behalf of himself and others similarly situated,** | ) | |
| | ) | |
| | ) | **Case No. _____** |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **NAVISTAR INTERNATIONAL CORPORATION,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**EXHIBIT LIST FOR NAVISTAR INTERNATIONAL
CORPORATION'S NOTICE OF REMOVAL**

1. Complaint

2. Declaration of Monica Stark

3. Original Federal Complaint

4. Navistar's Motion to Dismiss

5. Other Pleadings and Papers

08CV4305
JUDGE BUCKLO
MAGISTRATE JUDGE ASHMAN
NF

# EXHIBIT #1

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>NAVISTAR INTERNATIONAL CORPORATION,<br><br>　　　　　Defendant. | No.　　**08CH26042** |

## CLASS ACTION COMPLAINT

Plaintiff Ravi P. Rawat, on behalf of himself and those similarly situated, for his

class action complaint based upon the investigation of his counsel, alleges as follows on

information and belief:

### NATURE OF THE ACTION

1. This action is a refiling of a case filed on May 23, 2008 in the Northern

District of Illinois, captioned *Rawat v. Navistar Int'l Corp.*, 08-3038 (N.D. Ill.) for which

Defendant has moved to dismiss for lack of subject matter jurisdiction on the sole

grounds that there are fewer than 100 class members.   Plaintiff does not concede that

federal subject matter jurisdiction does not exist, but for efficiency purposes brings the

action in this Court.

2. Specifically, this action is brought on behalf of employees and former

employees of Navistar International Corporation who owned contractually vested stock

options but were prevented from exercising their options with respect to which the

Company refused to permit exercise prior to expiration, ascribed to a "blackout" period

caused by Navistar's failure to have current financial reporting as required by federal law. Navistar's "blackout" period, as the result of management malfeasance, led to Navistar having to restate its financials. By allowing options to expire and prohibiting employees and former employees from exercising their vested options pursuant to the option contract, Navistar breached the option contract and its implied covenant of good faith and fair dealing. Failing to compensate individuals for their contractually vested rights also violated the Illinois Wage Payment and Collection Act. Further, Plaintiff asks this Court to nullify any releases received by Defendant in connection with an inadequate and coercive settlement offer sent to putative class members after, and as a deceitful response to, the original filing of this lawsuit.

## JURISDICTION AND VENUE

3.    <u>Jurisdiction</u>: This Court has general jurisdiction over Defendant. This Court has jurisdiction over the subject matter of this controversy and the parties pursuant to 735 ILCS 5/2-209 (a)(1)(transacting business in this state), (a)(3)(ownership, use and possession of real estate situated in this state), (a)(7)(the making and performance of a contract or promise substantially connected with this state), and (b)(4) (corporation doing business in Cook County, Illinois).

4.    <u>Venue</u>: is therefore also proper in this county under 735 ILCS 5/2-101 because Navistar is a foreign corporation authorized to transact business in this state, and under 735 ILCS 5/2-101 any foreign corporation authorized to transact business in this state is a resident of any county in which it has its registered office or other office or is doing business. Navistar's Illinois registered agent, CT Corporation System, is located at 208 South LaSalle Street, Chicago, IL 60604. Navistar also does business in Cook

County. Specifically, Navistar has an engine plant located at 10400 W North Ave Melrose Park, IL 60160, which is in Cook County.

## PARTIES

5.    Plaintiff Ravi P. Rawat is a citizen of Illinois and is a former Assistant General Manager of the heavy truck group of Navistar International Corporation.

6.    Defendant Navistar International Corporation is a Delaware Corporation with its principal place of business located at 4201 Winfield Road, Warrenville, Illinois 60555, and has its registered Illinois office in Cook County as well as an office doing business in Cook County.

## BACKGROUND OF THE WRONGDOING

7.    Plaintiff began working for Defendant Navistar in January 1989. Throughout his tenure at Navistar, Plaintiff was granted stock options on seven occasions.

8.    On April 6, 2006, Navistar announced that as a result of its failure to file its Annual Report with the Securities and Exchange Commission (the "SEC") for the fiscal year ended October 31, 2005, the shares of the Company's common stock that were acquired pursuant to the employee benefit plans set forth below would not be available for use until the Annual Report is filed with the SEC.

9.    The Company also announced that it intended to file its Annual Report with the SEC as soon as possible, but could not estimate the date such report would be filed.

10.    Because of the Company's prior conduct and the fact that the Company had to restate its financials, it suspended purchases of its shares by participants

and beneficiaries in the United States in the following plans: (1) International Truck and Engine Corporation 401(k) Retirement Savings Plan; (2) International Truck and Engine Corporation Retirement Accumulation Plan; (3) International Truck and Engine Corporation 401(k) Plan for Represented Employees; and (4) the IC Corporation 401(k) Plan (collectively, the 401(k) Plans).

11.     According to the Company, the blackout period prevented participants and beneficiaries from making additional investments in the company's common stock through the 401(k) Plans.

12.     Further, the Company sent a notice to its directors and executive officers informing them that a blackout period would begin on April 6, 2006 and would end at 4:00 pm Central Time on the day on which the Annual Report was filed with the SEC.

13.     As described by the Company, Navistar's directors and executive officers would generally be prohibited from directly or indirectly acquiring, disposing of, or transferring any equity securities of the company acquired by them in connection with their service and/or employment with the company in such capacities. The notice was allegedly sent to ensure compliance with Section 306(a) of the Sarbanes Oxley Act of 2002.

14.     As of the date this suit was originally filed in the Northern District of Illinois, Navistar had not filed its updated financials with the SEC.

### NAVISTAR'S STOCK OPTION PLANS

15.     Navistar is a holding company whose wholly owned subsidiaries produce International ® brand commercial trucks, MaxxForce brand diesel engines, IC brand school buses, and Workhorse brand chassis for motor homes and step vans. It also is a

private-label designer and manufacturer of diesel engines for the pickup truck, van and

SUV markets. The company also provides truck and diesel engine parts and services.

16.    According to the 2004 Performance Incentive Plan (the "Plan" or "Stock

Option Plan"):

> "The purpose of the Plan is to enable the Corporation and
> its subsidiaries to attract and retain highly qualified
> Employees, Consultants, and Non-Employee Directors, and
> additionally to provide key Employees who hold positions
> of major responsibility the opportunity to earn incentive
> awards commensurate with the quality of individual
> performance, the achievement of performance goals and
> ultimately the increase in shareowner value."

(Ex. A).

17.    An option gives the holder a contractual right to purchase one share of

stock (per option) at a set price, called the "strike" or "exercise" price. The strike price

is determined on the day of the option grant.

18.    If the stock's market price rises above the strike price, the employee can

exercise the option, buying stock at the strike price. The employee can then sell the

stock back at the market price and benefit from the difference.

19.    Under the Plan, the stock options expire ten years after their grant and must

be exercised within 90 day after leave Navistar's employ. Specifically, stating that either

a Incentive or Nonqualified Stock Option is:

> "a right, as evidence by an agreement    between the
> Participant and the Company . . . to purchase a certain
> number of shares of Common Stock at Fair Market Value
> for a period of ten (10) years and one day form the date of
> grant."

Ex. A.

20.    According to Navistar's Stock Option Plan, when employees leave Navistar, they have 90 days to exercise his or her option at the strike price.

21.    Plaintiff and the Class received options pursuant to Navistar's Stock Option Plan.

22.    Navistar's Stock Option Plan provides:

> "The *Committee will document the terms of the Stock Option in an Award Agreement to include the Grant Date and Exercise Price, as well as any other terms that it may desire.* The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Options fixed by the Committee shall not be modified."

> ***

> "Unless otherwise determined by the Committee, a Stock Option granted under the Plan *will become exercisable in whole or in part after the commencement of the second year of the term of the Stock Option* to the extent of one third of the shares, to the extent of one third of the shares after commencement of the third year, and to the extent of one third of the shares after commencement of the fourth year."

## SUBSTANTIVE ALLEGATIONS

23.    Plaintiff Rawat was the Assistant General Manager of the heavy truck group at Navistar's Cantera facility in Naperville, Illinois.

24.    Throughout the time he was employed by Navistar, he was granted options pursuant to the Stock Option Plan on a yearly basis, starting in 1998.

25.    Mr. Rawat separated from Navistar, effective January 5, 2007, while the blackout period was in effect.

26.    Navistar's 1994 Performance Incentive Plan (as amended December 11, 2001) provides that the Company can grant two types of options.  Incentive Stock Options, defined as:

> "*a right, as evidenced by an agreement between the participant and the Company* in a form approved by the Committee, to purchase a certain number of shares of Common Stock at Fair Market Value for a period of ten (10) years from the date of grant which options are designed to meet the requirements set out under Section 422 of the Internal Revenue Code."

The Plan also provides for Nonqualified Stock Options, defined as:

> "*a right, as evidenced by an agreement between the participant and the Company* in a form approved by the Committee, to purchase a certain number of shares of Common Stock at Fair Market Value for a period of ten (10) years from the date of grant on which options are stated not to be qualified as incentive stock options under Section 422 of the Internal Revenue Code."

27.    The difference between these options is merely the tax treatment between the options, and for purposes of this action, the options – as in the stock option plan[1] – should be treated identically.

28.    At the time of his resignation Mr. Rawat had vested options that, according to the Stock Option Plan, were a contractual right and exercisable within 90 days from the date of his effective resignation.

29.    Mr. Rawat made several attempts to exercise within the 90 day period after his separation.  Navistar refused to allow him to exercise his rights under the guise of the Company's unilateral self-imposed blackout period, which continued from the time of Mr. Rawat's resignation until the 90 day period ended on April 5, 2007.

---

[1] The 1994 Stock Option Plan also provides that the term "Stock Option" mean either an Incentive Stock Option or a Nonqualified Stock Option.

30.     During the 90 days between January 5, 2007 and April 5, 2007, Mr. Rawat had numerous discussions with Navistar and Merrill Lynch (Navistar's stock option administrator) in an attempt for Mr. Rawat to rightfully exercise his vested options.

31.     Ultimately, the Company refused to allow Mr. Rawat to exercise his options and breached the option contract.

32.     On January 15, 2008, Navistar sent a letter to "Holders of Navistar International Corporation Stock Options." (Ex. B)

33.     The letter stated that "the Company is not current with its financial filing with the Securities and Exchange Commission. As a result, there are certain limits on your ability to exercise your stock options."

34.     The letter further stated that ". . . some of your stock options may have expired or will expire in the near future. We plan to address this issue but we are unable to do so now. . . [o]ur plan is to discuss this issue with our Board of Directors. We cannot predict what, if any, action our directors will take, but we will communicate with you, no matter what the outcome. . ."

### NAVISTAR'S NOTICE TO CLASS MEMBERS THAT THEIR STOCK OPTIONS WERE TERMINATED/EXPIRED

35.     Further, in a Notice of Cancellation post dated January 29, 2008, Navistar's stock option administrator,  Merrill Lynch, , sent out a Notice of Cancellation and Termination of Stock Options. Ex. C.

36.     The Notice of Cancellation advised option holders whose stock options had expired that they would receive *nothing* in consideration for their contractually vested rights to stock options.

37.     Navistar directed Merrill Lynch to send the Notice of Cancellation and Expiration.  In light of this Notice of Cancellation, the January 29, 2008 letter shows itself as an effort to show option holders expectations downward.  In that light, Navistar's inadequate and coercive offer (as described below) is even more abhorrent because class members who were told they would receive *nothing*, now have an opportunity to receive *something*, albeit inadequate.

### NAVISTAR'S DECEITFUL STRATEGY AND INADEQUATE, COERCIVE OFFER

38.     On May 23, 2008 Mr. Rawat filed a class action in the Northern District of Illinois, titled *Rawat v. Navistar Int'l Corp.*, 08-3038 (N.D. Ill.) and effected service on Navistar May 29, 2008.  The Complaint was to be answered by June 18, 2008.   On June 11, 2008, Defendant's counsel Robin Hulshizer called to introduce her firm and requested Plaintiff counsel's agreement to extend Navistar's time to respond to Plaintiff's complaint, representing that the extension was for "convenience of counsel," ascribed to weddings and vacations. Plaintiff's counsel Krislov readily agreed to the extension.

39.     Less than two weeks later, on June 24, 2008, the hearing date for Defendant's Motion to Extend time to respond, undersigned counsel Clinton A. Krislov received an anonymous call inquiring about the case from a person claiming to be a putative class member who had received a communication from Navistar that asked the recipients to release their claims against the Company and covenant not to sue.  The same day, at 10:14 a.m. Krislov e-mailed Hulshizer with his concerns.  An hour later, Hulshizer returned the call professing not to have seen the e-mail and confirmed that the letter was sent to all option holders not currently in litigation with the Company.

40.    The June 20, 2008 Letter[2]. Review shows that the letter is indeed misleading and coerces class members into precipitously signing releases. Rather than encouraging class members to seek their own counsel and tax advice, they are promised that employees who send releases received before July 3 will receive a check by July 31. All other releases received by August 1, will receive a check by August 31, explicitly precluding them from participating in this action, and directing any questions to the Company. Indeed, the extension was not for convenience of counsel, but a subterfuge to allow the Defendant a sufficient opportunity to contact putative class members in an effort to thwart this litigation and prevent class members from timely and thoughtful evaluation of their rights and make intelligent, informed decisions involving tens if not hundreds of thousands of dollars prematurely and without reasonable time for reflection, counsel and tax advice.

41.    Indeed, the offer is unfairly low considering that it treats each person as having exercised and sold his or her shares immediately on the expiration date. Pegging the consideration to the expiration date is unfair. Because of Navistar's wrongdoing, the financials during this period were not current and the market prices were not a reliable indicia of the value of the stock. Notably, on May 29, 2008, the end of the blackout period, the relisted Navistar shares had a market price of $75.90.

42.    Moreover, other companies faced with similar blackout period expiration have afforded option holders much more generous terms, *e.g.*, either extending the exercise period for the duration of the blackout period or pricing exchange offers at the top of blackout period pricing, or the day it ended for all options holders.

---

[2] Attached hereto as Exhibit D.

43.     On June 25, 2008, Plaintiff filed an emergency motion to correct the notice sent to the putative class.  United States District Judge Darrah ordered that no releases be accepted until at least August 1, 2008 and further ordered Navistar to send corrective notice to putative class members in the form attached as Exhibit E.

44.     In the meantime, Navistar has asserted that there is no federal subject matter jurisdiction because there are fewer than 100 class members.  Accordingly, Plaintiff has filed this action in Illinois State Court where jurisdiction is uncontestable.

45.     Even though putative class members received the "corrective notice," the disinformation conveyed to option holders that their rights are worthless coupled with the severely truncated time to respond and the neutral tone of the corrective notice has still caused many class members to be harmed by signing releases of their legal rights to this action without full information of their rights and the appropriate value, thus making their releases voidable.  Invalidating the releases to class members is an appropriate remedy.

## CLASS ALLEGATIONS

46.     **The Proposed Class**.  Plaintiff brings this case for himself and for the following class:

> all Navistar employees and former employees whose stock options either expired or who were prevented from exercising their options during the Navistar's "blackout" period.  (April 6, 2006 – May 29, 2008).

The Class satisfies all the prerequisites for certification under 735 ILCS 5/2-801.

47.     **Numerosity**.  The Class consists of dozens of individuals and therefore is so numerous that joinder is impracticable.

48.     **Typicality**.  Plaintiff's claims are typical of the claims of the Class because he and the Class sustained damages as a result of Navistar's prohibition of

allowing employees and former employees to exercise their stock options during the Company's blackout period.

49.    **Commonality and Predominance**.  There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including whether:

(a)    Navistar was obligated to institute a blackout period;

(b)    the blackout period option exercise denial was appropriately imposed on all option holders;

(c)    Navistar breached its contractual obligations under the Stock Option contracts;

(d)    Navistar breached its duty of good faith and fair dealing in connection with the Stock Option contracts;

(e)    Navistar's communication to putative class members was coercive and misleading; and

(f)    Navistar is liable to the Plaintiff and the Class in this action, as alleged in the Complaint.

All common questions are able to be resolved through the same factual occurrences as specifically and/or generally alleged herein.

50.    **Adequacy**.  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has no claims antagonistic to those of the Class.  Plaintiff has retained competent and experienced counsel in complex class actions, securities, and corporate litigation.  Counsel is committed to the vigorous prosecution of this action.

51.    _Appropriateness as a Class Action_.  The prosecution of separate actions by the Plaintiff and individual members of the Class against Defendant would create a risk of inconsistent or varying adjudications on the common issues of law and fact related to this action. A Class Action is superior to all other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of litigation would substantially impair the ability of the Class members to pursue individual cases in order to initiate their rights.  In the absence of a class action, Defendant will retain the benefits of their wrongdoing.

### JURY DEMAND

52.    Plaintiff and the Class demand a jury trial on all issues so triable.

### COUNT I
### Breach of Contract

53.    Plaintiff hereby incorporates all of the foregoing paragraphs.

54.    Plaintiff and the Class and Defendant were parties to Stock Option Agreements pursuant to which Defendant agreed to permit Plaintiff and the Class to purchase Navistar shares of stock before the stock options expired, including a 90 day period after termination of employment.

55.    Plaintiff and the Class performed all conditions, covenants and promises to be performed on their part in accordance with the contracts.

56.    Defendant breached the Stock Option Agreements with Plaintiff and the Class by failing to permit them to exercise their options and purchase shares during the term of the option.

57.    As a result of Defendant's breach of the Stock Option Agreements, Plaintiff and the Class have suffered economic losses and other general, consequential

and specific damages, including the amounts they would have received from exercising their stock options.

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to 735 ILCS 5/2-801 on behalf of the Class defined herein, and declaring the Plaintiff to be a proper Class representative, and Plaintiff's counsel as counsel for the Class;

B.    Declaring that the Stock Option Plan's 90 day expiration period for former employees is tolled by the blackout period;

C.    Declaring that the offer made to putative class members is inadequate, coercive and invalid;

D.    Finding that Navistar breached its obligations under the Company's Stock Option Plan and Stock Option contracts;

E.    Finding that Navistar breached its obligation of good faith and fair dealing to Plaintiff and the Class;

F.    Awarding Plaintiff and Class members compensatory damages and exemplary damages in an amount to be proven at trial;

G.    Awarding Plaintiff and the Class pre-judgment interest, as well as reasonable fees and costs; and

H.    Awarding such other relief as this Court may deem just and proper.

## COUNT II
### Breach of the Covenant of Good Faith and Fair Dealing

58.    Plaintiff hereby incorporates all of the foregoing paragraphs.

59.    The Stock Option Agreements entered into between Plaintiff and the Class and Defendant are contracts that contain an implied covenant of good faith and fair dealing, which obligated Defendant to perform the terms and conditions of the contracts fairly and in good faith and to refrain from doing any act that would prevent or impede Plaintiff and the Class from performing any or all conditions of the contracts that they agreed to perform, or any acts that would deprive Plaintiff and the Class of their benefits.

60.    Plaintiff and the Class performed all conditions, covenants and promises to be performed on their part in accordance with the contracts.

61.    Defendant knew Plaintiff and the Class fulfilled all their duties and conditions under the contracts.

62.    Defendant breached the implied covenant of good faith and fair dealing under the contracts by engaging in the conduct complained of herein and by engaging in the conduct that led to the Company's blackout period and thereafter.  While the blackout was no fault of the Plaintiff, the Company refused to extend the exercise period beyond the blackout so that Plaintiff could have a meaningful opportunity to exercise their contractual rights conferred upon them by option grants, thereby preventing Plaintiff from exercising their stock options.

63.    As a result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class have suffered economic losses and other general, consequential and specific damages, including the amounts they would have received from exercising their options.

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to 735 ILCS 5/2-801 on behalf of the Class defined herein, and declaring the Plaintiff to be a proper Class representative, and Plaintiff's counsel as counsel for the Class;

B.      Declaring that the Stock Option Plan's 90 day expiration period for former employees is tolled by the blackout period;

C.      Declaring that the offer made to putative class members is inadequate, coercive and invalid;

D.      Finding that Navistar breached its obligations under the Company's Stock Option Plan and Stock Option contracts;

E.      Finding that Navistar breached its obligation of good faith and fair dealing to Plaintiff and the Class;

F.      Awarding Plaintiff and Class members compensatory damages and exemplary damages in an amount to be proven at trial;

G.      Awarding Plaintiff and the Class pre-judgment interest, as well as reasonable fees and costs; and

H.      Awarding such other relief as this Court may deem just and proper.

## <u>COUNT III</u>
### Violation of the Illinois Wage Payment and Collection Act

64.     Plaintiff hereby incorporates all of the foregoing paragraphs.

65.     At all relevant times, the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.*, is and was in full force and effect.[3]

---

[3] Also, on July 9, 2008, more than three days before this action was filed, Plaintiff made a demand pursuant to the Illinois Attorneys Fees and Wage Actions Act, 705 ILCS 225/1. Ex. F.

66.    820 ILCS 115/1 states that: The Act applies to all employers and employees in this State, including employees of units of local government and school districts, but excepting employees of the State or Federal governments.

67.    820 ILCS 115/4 states that: All wages earned by any employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned. All wages earned by any employee during a weekly pay period shall be paid not later than 7 days after the end of the weekly pay period in which the wages were earned. All wages paid on a daily basis shall be paid insofar as possible on the same day as the wages were earned, or not later in any event than 24 hours after the day on which the wages were earned. Wages of executive, administrative and professional employees, as defined in the Federal Fair Labor Standards Act of 1938, may be paid on or before 21 calendar days after the period during which they are earned.

68.    Under the Act, every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee.

69.    820 ILCS 115/14 of the Act states that: Any employer or any agent of an employer, who, being able to pay wages, final compensation, or wage supplements and being under a duty to pay, wilfully refuses to pay as provided in this Act, or falsely denies the amount or validity thereof or that the same is due, with intent to secure for himself or other person any underpayment of such indebtedness or with intent to annoy, harass, oppress, hinder, delay or defraud the person to whom such indebtedness is due, upon conviction, is guilty of a Class C misdemeanor. Each day during which any

violation of this Act continues shall constitute a separate and distinct offense.

70.    Defendant is an employer in this state as defined under the Illinois Wage Payment and Collection Act.

71.    Defendant violated the Act by refusing to pay owed compensation to current and former employees.

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to 735 ILCS 5/2-801 on behalf of the Class defined herein, and declaring the Plaintiff to be a proper Class representative, and Plaintiff's counsel as counsel for the Class;

B.    Declaring that the Stock Option Plan's 90 day expiration period for former employees is tolled by the blackout period;

C.    Declaring that the offer made to putative class members is inadequate, coercive and invalid;

D.    Finding that Navistar breached its obligations under the Company's Stock Option Plan and Stock Option contracts;

E.    Finding that Navistar breached its obligation of good faith and fair dealing to Plaintiff and the Class;

F.    Enjoining Navistar from allowing putative class members to release their claims;

G.    Awarding Plaintiff and Class members compensatory damages and exemplary damages in an amount to be proven at trial;

H.    Awarding Plaintiff and the Class pre-judgment interest, as well as reasonable fees and costs; and

I.    Awarding such other relief as this Court may deem just and proper.

## COUNT IV
### For Declaratory Relief Finding Releases Invalid

72.    Plaintiff hereby incorporates all of the foregoing paragraphs.

73.    Defendant has attempted to induce option holders to release their claims through an inadequate, coercive and oppressive offer which omits the information necessary for option holders to make a knowing and informed decision, with assistance of appropriate expert advice.

74.    There is an actual controversy regarding whether the releases are invalid.

75.    Putative class members were influenced by duress to accept the offer in exchange for the releases.

76.    Further, it is outside Illinois public policy to uphold releases that waive claims under the Illinois Wage Payment and Collection Act.

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to 735 ILCS 5/2-801 on behalf of the Class defined herein, and declaring the Plaintiff to be a proper Class representative, and Plaintiff's counsel as counsel for the Class;

B.    Preliminarily enjoining Navistar from accepting releases until this matter has been adjudicated;

C.    Declaring that the Stock Option Plan's 90 day expiration period for former employees is tolled by the blackout period;

D.     Declaring that the offer made to putative class members is inadequate, coercive and invalid;

E.     Finding that Navistar breached its obligations under the Company's Stock Option Plan and Stock Option contracts;

F.     Finding that Navistar breached its obligation of good faith and fair dealing to Plaintiff and the Class;

G.     Enjoining Navistar from allowing putative class members to release their claims;

H.     Awarding Plaintiff and Class members compensatory damages and exemplary damages in an amount to be proven at trial;

I.     Awarding Plaintiff and the Class pre-judgment interest, as well as reasonable fees and costs; and

J.     Awarding such other relief as this Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to 735 ILCS 5/2-801 on behalf of the Class defined herein, and declaring the Plaintiff to be a proper Class representative, and Plaintiff's counsel as counsel for the Class;

B.     Declaring that the Stock Option Plan's 90 day expiration period for former employees is tolled by the blackout period;

    C.      Declaring that the offer made to putative class members is inadequate, coercive and invalid;

    D.      Preliminarily enjoining Navistar from accepting releases until this matter has been adjudicated;

    E.      Finding that Navistar breached its obligations under the Company's Stock Option Plan and Stock Option contracts;

    F.      Finding that Navistar breached its obligation of good faith and fair dealing to Plaintiff and the Class;

    G.      Enjoining Navistar from allowing putative class members to release their claims;

    H.      Awarding Plaintiff and Class members compensatory damages and exemplary damages in an amount to be proven at trial;

    I.      Awarding Plaintiff and the Class pre-judgment interest, as well as reasonable fees and costs; and

    J.      Awarding such other relief as this Court may deem just and proper.

Dated:  July 18, 2008

                       Respectfully submitted,

                       Attorney for the Plaintiff

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Dr., Ste. 1350
Chicago, IL 60606
Tel: (312) 606-0500
Fax: (312) 606-0207
Firm ID: 91198

Law Offices of Mark Baiocchi
184 Shuman Blvd.
Suite 250
Naperville, IL 60563
Tel: (630) 983-4200
Fax: (630) 983-4223
Firm ID:  54040

# EXHIBIT A



# NAVISTAR INTERNATIONAL CORPORATION

### 2004 Performance Incentive Plan
### Prospectus and Stock Option Information

**March 24, 2004**



# NAVISTAR INTERNATIONAL CORPORATION

## 2004 Performance Incentive Plan
## Prospectus and Stock Option Information

**March 24, 2004**

NAVISTAR INTERNATIONAL CORPORATION
DOCUMENTS CONSTITUTING A SECTION 10(a) PROSPECTUS
PURSUANT TO A FORM S-8 REGISTRATION STATEMENT

THIS DOCUMENT CONSTITUTES PART OF A PROSPECTUS COVERING
SECURITIES THAT HAVE BEEN REGISTERED UNDER
THE SECURITIES ACT OF 1933, AS AMENDED

---

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.

---

Solely the information included under Tabs 1.0 through 2.0 shall constitute this prospectus. The information and documentation included under Tab 3.0 shall not, nor shall be construed in any manner to, constitute a part of this prospectus.

---

Neither the delivery of this prospectus nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the company since the date hereof. No person has been authorized to give any information or to make any representations, other than those contained in this prospectus, and, if given or made, such other information or representations must not be relied upon as having been authorized by the company. This prospectus does not constitute an offer to sell or solicitation of an offer to buy by anyone in any jurisdiction in which it is unlawful to make such offer or solicitation.

---

Solely the information contained under Tabs 1.0 through 2.0 constitutes a prospectus covering securities that have been registered under the Securities Act of 1933, as amended.

# PROSPECTUS

### Navistar International Corporation

General Information
Regarding the

### 2004 Performance Incentive Plan

This prospectus describes but does not set forth the terms and conditions of Navistar International Corporation's 2004 Performance Incentive Plan. In the event of any conflict between the terms and conditions of the 2004 Performance Incentive Plan and the information contained in this prospectus, the terms and conditions of the 2004 Performance Incentive Plan shall prevail. No person has been authorized to give any information or to make any representations other than those contained in this prospectus in connection with the 2004 Performance Incentive Plan and the offering described in this prospectus, and if given or made, such other information or representations may not be relied upon as having been authorized by Navistar International Corporation.

**This document constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933, as amended.**

**The date of this prospectus is March 24, 2004**

TABLE OF CONTENTS

|  | Page |
|---|---|
| Introduction | -1- |
| What is the Company's purpose in providing the 2004 Plan? | -2- |
| Who is eligible to participate in the 2004 Plan? | -2- |
| How do I benefit under the 2004 Plan? | -2- |
| What does an Award consist of under the 2004 Plan? | -2- |
| What are the general terms of my Award under the 2004 Plan? | -3- |
| Will the Company provide me periodic reports concerning my Awards under the 2004 Plan? | -6- |
| How do I exercise my Award and pay for the shares that I buy under the 2004 Plan? | -6- |
| Can I sell or transfer my Award to someone else? | -6- |
| Can I sell the shares I acquire by exercising my Award? | -7- |
| Can the Company reprice or discount stock options granted under the 2004 Plan? | -8- |
| How would my Award be affected by a future change in the capitalization of the Company? | -8- |
| How would my restricted stock, stock units and stock options be treated in the event of a change in control of the Company? | -8- |
| Does the grant of an Award or ownership of shares give me any special rights? | -8- |
| Under what circumstances can the 2004 Plan or my Award Agreement be modified or termination? | -9- |
| What exactly is the Restoration Stock Option program and how does it work? | -9- |
| What is the Federal Income Tax treatment of an Award? | -9- |
| Risk Factors and Certain Investment Considerations | -12- |
| Additional Information. | -13- |

This prospectus provides information concerning awards granted under the Navistar International Corporation 2004 Performance Incentive Plan (the "2004 Plan"), primarily in question and answer format. The information contained herein is qualified in its entirety by the text of the 2004 Plan.

**Introduction.**

*Principal Office and Telephone Number.* The principal executive office of Navistar International Corporation (the "Company") is located at 4201 Winfield Road, Warrenville, Illinois 60555, and the Company's telephone number is (630) 753-5000.

*The 2004 Performance Incentive Plan.* The 2004 Plan was approved by the Board of Directors (the "Board") and the independent Compensation and Governance Committee (the "Committee") of the Company on October 21, 2003 and by the shareowners of the Company on February 17, 2004. A total of 3,250,000 shares of Common Stock of the Company are reserved for awards under the 2004 Plan. As of February 17, 2004, no awards have been made in respect of any shares of Common Stock reserved for issuance under the 2004 Plan. The 2004 Plan replaces the Company's 1994 Performance Incentive Plan (which expired December 16, 2003), the 1998 Supplemental Stock Plan and accompanying Restoration Stock Option Program (which both expired on December 16, 2003) and the 1998 Non-Employee Director Stock Option Plan (which the Company terminated on February 17, 2004). The 2004 Plan expires on February 16, 2014. The 2004 Plan is governed by and interpreted in accordance with the laws of the State of Delaware. Any cause of action a participant may have in respect of the 2004 Plan must be brought within the three year period set forth in the 2004 Plan or such claim will be barred in accordance with the terms and conditions of the 2004 Plan.

The number of shares authorized and available for issuance under the 2004 Plan will be increased by shares of stock subject to an option or award under the 2004 Plan, or any other plan, including, the 1994 Performance Incentive Plan, the 1998 Supplemental Stock Plan or the 1998 Non-Employee Director Stock Option Plan, that is cancelled, expired, forfeited, settled in cash or otherwise terminated without a delivery of shares to the participant of such plan, including shares used to pay the stock option exercised price of a stock option issued under the 2004 Plan or any other plan or to pay taxes with respect to such stock option.

Unless otherwise specified, a reference herein to the "2004 Plan" refers to the 2004 Performance Incentive Plan. Awards granted under the 2004 Plan may consist of annual incentive awards, stock options, restricted stock, stock units, stock appreciation rights or any other type of award granted by the Committee under the 2004 Plan and such awards may herein after be referred to as an "Award" or collectively as "Awards."

*Administration.* The 2004 Plan is administered by the Committee. All Committee members are non-employee directors of the Company and are appointed to the Committee by the Board for a one-year term and may be removed by the same. All decisions of the Committee will be final, conclusive and binding upon all parties. In administering the 2004 Plan, the Committee's discretionary authority includes, without limitation, determinations as to (1) the approval of participants in the plan, (2) the amount and nature of the Awards and (3) the performance levels at which different percentages of the Awards would be earned and adjusted. For further information about the 2004 Plan, please refer to the 2004 Plan or contact the Company's Corporate Secretary at the Company's principal executive office.

1

*ERISA and Certain Tax Provisions Not Applicable.* The 2004 Plan is not subject to any provisions of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") and is not qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code").

**What is the Company's purpose in providing the 2004 Plan?**

The purpose of the 2004 Plan is to enable the Company and its subsidiaries to attract and retain highly qualified personnel and non-employee directors, and additionally to provide key employees who hold positions of major responsibility in the Company the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value.

**Who is eligible to participate in the 2004 Plan?**

Management will, from time to time, select and recommend to the Committee employees of the Company and its subsidiaries who are to become participants in the 2004 Plan. Such individuals will be selected from those who, in the opinion of management, have substantial responsibility in a managerial or professional capacity. Non-employee directors are also eligible to participate in the 2004 Plan. Non-employee directors participating in the 2004 Plan shall be limited to receiving Awards of non-qualified stock options, restricted stock and stock units under the 2004 Plan.

**How do I benefit under the 2004 Plan?**

You benefit by an Award of cash or stock-based compensation under the 2004 Plan. The grant of a stock-based Award gives you the opportunity to benefit from possible appreciation in the market price of the Company's Common Stock.

**What does an Award consist of under the 2004 Plan?**

Under the 2004 Plan, the Committee may award: (1) annual incentive awards to participants, consisting of awards of cash approved by the Committee based on the level of achievement attained against annual performance goals approved by the Committee within the first ninety days of the applicable fiscal year; (2) stock option awards to employee participants, consisting of either nonqualified stock options or incentive stock options; (3) non-qualified stock option awards to non-employee director participants; (4) restricted stock awards to participants; (5) stock unit awards to participants; (6) stock appreciation right awards to employee participants, whether granted in connection with a related stock option or independent thereof; (7) any other type of Award granted by the Committee under the 2004 Plan; or (8) any combination of the foregoing Awards. All such Awards may be made, subject to the terms of the 2004 Plan, in such amounts (if any) and at such times (if at all) as the Committee may approve; provided, however, that in order to provide a limitation on the number of shares of Common Stock of the Company that may be issued in respect of a particular Award under the 2004 Plan, no more than 1,000,000 shares of Common Stock of the Company may be granted as stock options, restricted stock, stock units, SARs or any other Award under the 2004 Plan; provided, further, that such limitation shall not apply to any Award which is a non-qualified stock option granted to non-director employee participants.

2

08CV4305
JUDGE BUCKLO
MAGISTRATE JUDGE ASHMAN
NF

# EXHIBIT #1

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> NAVISTAR INTERNATIONAL CORPORATION, <br><br> Defendant. | No. **08CH26042** |

## CLASS ACTION COMPLAINT

Plaintiff Ravi P. Rawat, on behalf of himself and those similarly situated, for his

class action complaint based upon the investigation of his counsel, alleges as follows on

information and belief:

### NATURE OF THE ACTION

1. This action is a refiling of a case filed on May 23, 2008 in the Northern

District of Illinois, captioned *Rawat v. Navistar Int'l Corp.*, 08-3038 (N.D. Ill.) for which

Defendant has moved to dismiss for lack of subject matter jurisdiction on the sole

grounds that there are fewer than 100 class members. Plaintiff does not concede that

federal subject matter jurisdiction does not exist, but for efficiency purposes brings the

action in this Court.

2. Specifically, this action is brought on behalf of employees and former

employees of Navistar International Corporation who owned contractually vested stock

options but were prevented from exercising their options with respect to which the

Company refused to permit exercise prior to expiration, ascribed to a "blackout" period

caused by Navistar's failure to have current financial reporting as required by federal law. Navistar's "blackout" period, as the result of management malfeasance, led to Navistar having to restate its financials. By allowing options to expire and prohibiting employees and former employees from exercising their vested options pursuant to the option contract, Navistar breached the option contract and its implied covenant of good faith and fair dealing. Failing to compensate individuals for their contractually vested rights also violated the Illinois Wage Payment and Collection Act. Further, Plaintiff asks this Court to nullify any releases received by Defendant in connection with an inadequate and coercive settlement offer sent to putative class members after, and as a deceitful response to, the original filing of this lawsuit.

## JURISDICTION AND VENUE

3.    Jurisdiction: This Court has general jurisdiction over Defendant. This Court has jurisdiction over the subject matter of this controversy and the parties pursuant to 735 ILCS 5/2-209 (a)(1)(transacting business in this state), (a)(3)(ownership, use and possession of real estate situated in this state), (a)(7)(the making and performance of a contract or promise substantially connected with this state), and (b)(4) (corporation doing business in Cook County, Illinois).

4.    Venue: is therefore also proper in this county under 735 ILCS 5/2-101 because Navistar is a foreign corporation authorized to transact business in this state, and under 735 ILCS 5/2-101 any foreign corporation authorized to transact business in this state is a resident of any county in which it has its registered office or other office or is doing business. Navistar's Illinois registered agent, CT Corporation System, is located at 208 South LaSalle Street, Chicago, IL 60604. Navistar also does business in Cook

County. Specifically, Navistar has an engine plant located at 10400 W North Ave Melrose Park, IL 60160, which is in Cook County.

## PARTIES

5.    Plaintiff Ravi P. Rawat is a citizen of Illinois and is a former Assistant General Manager of the heavy truck group of Navistar International Corporation.

6.    Defendant Navistar International Corporation is a Delaware Corporation with its principal place of business located at 4201 Winfield Road, Warrenville, Illinois 60555, and has its registered Illinois office in Cook County as well as an office doing business in Cook County.

## BACKGROUND OF THE WRONGDOING

7.    Plaintiff began working for Defendant Navistar in January 1989. Throughout his tenure at Navistar, Plaintiff was granted stock options on seven occasions.

8.    On April 6, 2006, Navistar announced that as a result of its failure to file its Annual Report with the Securities and Exchange Commission (the "SEC") for the fiscal year ended October 31, 2005, the shares of the Company's common stock that were acquired pursuant to the employee benefit plans set forth below would not be available for use until the Annual Report is filed with the SEC.

9.    The Company also announced that it intended to file its Annual Report with the SEC as soon as possible, but could not estimate the date such report would be filed.

10.    Because of the Company's prior conduct and the fact that the Company had to restate its financials, it suspended purchases of its shares by participants

3

and beneficiaries in the United States in the following plans: (1) International

Truck and Engine Corporation 401(k) Retirement Savings Plan; (2) International

Truck and Engine Corporation Retirement Accumulation Plan; (3) International

Truck and Engine Corporation 401(k) Plan for Represented Employees; and (4)

the IC Corporation 401(k) Plan (collectively, the 401(k) Plans).

11.    According to the Company, the blackout period prevented participants and

beneficiaries from making additional investments in the company's common stock

through the 401(k) Plans.

12.    Further, the Company sent a notice to its directors and executive officers

informing them that a blackout period would begin on April 6, 2006 and would end at

4:00 pm Central Time on the day on which the Annual Report was filed with the SEC.

13.    As described by the Company, Navistar's directors and executive officers

would generally be prohibited from directly or indirectly acquiring, disposing of, or

transferring any equity securities of the company acquired by them in connection with

their service and/or employment with the company in such capacities. The notice was

allegedly sent to ensure compliance with Section 306(a) of the Sarbanes Oxley Act of

2002.

14.    As of the date this suit was originally filed in the Northern District of

Illinois, Navistar had not filed its updated financials with the SEC.

**NAVISTAR'S STOCK OPTION PLANS**

15.    Navistar is a holding company whose wholly owned subsidiaries produce

International ® brand commercial trucks, MaxxForce brand diesel engines, IC brand

school buses, and Workhorse brand chassis for motor homes and step vans. It also is a

private-label designer and manufacturer of diesel engines for the pickup truck, van and SUV markets. The company also provides truck and diesel engine parts and services.

16.     According to the 2004 Performance Incentive Plan (the "Plan" or "Stock Option Plan"):

> "The purpose of the Plan is to enable the Corporation and its subsidiaries to attract and retain highly qualified Employees, Consultants, and Non-Employee Directors, and additionally to provide key Employees who hold positions of major responsibility the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value."

(Ex. A).

17.     An option gives the holder a contractual right to purchase one share of stock (per option) at a set price, called the "strike" or "exercise" price.  The strike price is determined on the day of the option grant.

18.     If the stock's market price rises above the strike price, the employee can exercise the option, buying stock at the strike price.  The employee can then sell the stock back at the market price and benefit from the difference.

19.     Under the Plan, the stock options expire ten years after their grant and must be exercised within 90 day after leave Navistar's employ. Specifically, stating that either a Incentive or Nonqualified Stock Option is:

> "a right, as evidence by an agreement    between the Participant and the Company . . . to purchase a certain number of shares of Common Stock at Fair Market Value for a period of ten (10) years and one day form the date of grant."

Ex. A.

20.    According to Navistar's Stock Option Plan, when employees leave Navistar, they have 90 days to exercise his or her option at the strike price.

21.    Plaintiff and the Class received options pursuant to Navistar's Stock Option Plan.

22.    Navistar's Stock Option Plan provides:

> "The **Committee will document the terms of the Stock Option in an Award Agreement to include the Grant Date and Exercise Price, as well as any other terms that it may desire.** The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Options fixed by the Committee shall not be modified."

> \*\*\*

> "Unless otherwise determined by the Committee, a Stock Option granted under the Plan **will become exercisable in whole or in part after the commencement of the second year of the term of the Stock Option** to the extent of one third of the shares, to the extent of one third of the shares after commencement of the third year, and to the extent of one third of the shares after commencement of the fourth year."

### SUBSTANTIVE ALLEGATIONS

23.    Plaintiff Rawat was the Assistant General Manager of the heavy truck group at Navistar's Cantera facility in Naperville, Illinois.

24.    Throughout the time he was employed by Navistar, he was granted options pursuant to the Stock Option Plan on a yearly basis, starting in 1998.

25.    Mr. Rawat separated from Navistar, effective January 5, 2007, while the blackout period was in effect.

26.     Navistar's 1994 Performance Incentive Plan (as amended December 11, 2001) provides that the Company can grant two types of options.  Incentive Stock Options, defined as:

> "*a right, as evidenced by an agreement between the participant and the Company* in a form approved by the Committee, to purchase a certain number of shares of Common Stock at Fair Market Value for a period of ten (10) years from the date of grant which options are designed to meet the requirements set out under Section 422 of the Internal Revenue Code."

The Plan also provides for Nonqualified Stock Options, defined as:

> "*a right, as evidenced by an agreement between the participant and the Company* in a form approved by the Committee, to purchase a certain number of shares of Common Stock at Fair Market Value for a period of ten (10) years from the date of grant on which options are stated not to be qualified as incentive stock options under Section 422 of the Internal Revenue Code."

27.     The difference between these options is merely the tax treatment between the options, and for purposes of this action, the options – as in the stock option plan[1] – should be treated identically.

28.     At the time of his resignation Mr. Rawat had vested options that, according to the Stock Option Plan, were a contractual right and exercisable within 90 days from the date of his effective resignation.

29.     Mr. Rawat made several attempts to exercise within the 90 day period after his separation.  Navistar refused to allow him to exercise his rights under the guise of the Company's unilateral self-imposed blackout period, which continued from the time of Mr. Rawat's resignation until the 90 day period ended on April 5, 2007.

---

[1] The 1994 Stock Option Plan also provides that the term "Stock Option" mean either an Incentive Stock Option or a Nonqualified Stock Option.

30.     During the 90 days between January 5, 2007 and April 5, 2007, Mr. Rawat

had numerous discussions with Navistar and Merrill Lynch (Navistar's stock option

administrator) in an attempt for Mr. Rawat to rightfully exercise his vested options.

31.     Ultimately, the Company refused to allow Mr. Rawat to exercise his

options and breached the option contract.

32.     On January 15, 2008, Navistar sent a letter to "Holders of Navistar

International Corporation Stock Options." (Ex. B)

33.     The letter stated that "the Company is not current with its financial filing

with the Securities and Exchange Commission.  As a result, there are certain limits on

your ability to exercise your stock options."

34.     The letter further stated that ". . . some of your stock options may have

expired or will expire in the near future.  We plan to address this issue but we are unable

to do so now. . . [o]ur plan is to discuss this issue with our Board of Directors.  We

cannot predict what, if any, action our directors will take, but we will communicate with

you, no matter what the outcome. . ."

### NAVISTAR'S NOTICE TO CLASS MEMBERS THAT THEIR STOCK OPTIONS WERE TERMINATED/EXPIRED

35.     Further, in a Notice of Cancellation post dated January 29, 2008,

Navistar's stock option administrator,  Merrill Lynch, , sent out a Notice of Cancellation

and Termination of Stock Options. Ex. C.

36.     The Notice of Cancellation advised option holders whose stock options

had expired that they would receive *nothing* in consideration for their contractually

vested rights to stock options.

37.    Navistar directed Merrill Lynch to send the Notice of Cancellation and Expiration. In light of this Notice of Cancellation, the January 29, 2008 letter shows itself as an effort to show option holders expectations downward. In that light, Navistar's inadequate and coercive offer (as described below) is even more abhorrent because class members who were told they would receive *nothing*, now have an opportunity to receive *something*, albeit inadequate.

## NAVISTAR'S DECEITFUL STRATEGY AND INADEQUATE, COERCIVE OFFER

38.    On May 23, 2008 Mr. Rawat filed a class action in the Northern District of Illinois, titled *Rawat v. Navistar Int'l Corp.*, 08-3038 (N.D. Ill.) and effected service on Navistar May 29, 2008. The Complaint was to be answered by June 18, 2008. On June 11, 2008, Defendant's counsel Robin Hulshizer called to introduce her firm and requested Plaintiff counsel's agreement to extend Navistar's time to respond to Plaintiff's complaint, representing that the extension was for "convenience of counsel," ascribed to weddings and vacations. Plaintiff's counsel Krislov readily agreed to the extension.

39.    Less than two weeks later, on June 24, 2008, the hearing date for Defendant's Motion to Extend time to respond, undersigned counsel Clinton A. Krislov received an anonymous call inquiring about the case from a person claiming to be a putative class member who had received a communication from Navistar that asked the recipients to release their claims against the Company and covenant not to sue. The same day, at 10:14 a.m. Krislov e-mailed Hulshizer with his concerns. An hour later, Hulshizer returned the call professing not to have seen the e-mail and confirmed that the letter was sent to all option holders not currently in litigation with the Company.

40.  The June 20, 2008 Letter[2]. Review shows that the letter is indeed misleading and coerces class members into precipitously signing releases. Rather than encouraging class members to seek their own counsel and tax advice, they are promised that employees who send releases received before July 3 will receive a check by July 31. All other releases received by August 1, will receive a check by August 31, explicitly precluding them from participating in this action, and directing any questions to the Company. Indeed, the extension was not for convenience of counsel, but a subterfuge to allow the Defendant a sufficient opportunity to contact putative class members in an effort to thwart this litigation and prevent class members from timely and thoughtful evaluation of their rights and make intelligent, informed decisions involving tens if not hundreds of thousands of dollars prematurely and without reasonable time for reflection, counsel and tax advice.

41.  Indeed, the offer is unfairly low considering that it treats each person as having exercised and sold his or her shares immediately on the expiration date. Pegging the consideration to the expiration date is unfair. Because of Navistar's wrongdoing, the financials during this period were not current and the market prices were not a reliable indicia of the value of the stock. Notably, on May 29, 2008, the end of the blackout period, the relisted Navistar shares had a market price of $75.90.

42.  Moreover, other companies faced with similar blackout period expiration have afforded option holders much more generous terms, *e.g.*, either extending the exercise period for the duration of the blackout period or pricing exchange offers at the top of blackout period pricing, or the day it ended for all options holders.

---

[2] Attached hereto as Exhibit D.

43.     On June 25, 2008, Plaintiff filed an emergency motion to correct the notice sent to the putative class. United States District Judge Darrah ordered that no releases be accepted until at least August 1, 2008 and further ordered Navistar to send corrective notice to putative class members in the form attached as Exhibit E.

44.     In the meantime, Navistar has asserted that there is no federal subject matter jurisdiction because there are fewer than 100 class members. Accordingly, Plaintiff has filed this action in Illinois State Court where jurisdiction is uncontestable.

45.     Even though putative class members received the "corrective notice," the disinformation conveyed to option holders that their rights are worthless coupled with the severely truncated time to respond and the neutral tone of the corrective notice has still caused many class members to be harmed by signing releases of their legal rights to this action without full information of their rights and the appropriate value, thus making their releases voidable. Invalidating the releases to class members is an appropriate remedy.

## CLASS ALLEGATIONS

46.     **The Proposed Class**. Plaintiff brings this case for himself and for the following class:

> all Navistar employees and former employees whose stock options either expired or who were prevented from exercising their options during the Navistar's "blackout" period. (April 6, 2006 – May 29, 2008).

The Class satisfies all the prerequisites for certification under 735 ILCS 5/2-801.

47.     **Numerosity**. The Class consists of dozens of individuals and therefore is so numerous that joinder is impracticable.

48.     **Typicality**. Plaintiff's claims are typical of the claims of the Class because he and the Class sustained damages as a result of Navistar's prohibition of

allowing employees and former employees to exercise their stock options during the Company's blackout period.

49.    **Commonality and Predominance**.  There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including whether:

(a)    Navistar was obligated to institute a blackout period;

(b)    the blackout period option exercise denial was appropriately imposed on all option holders;

(c)    Navistar breached its contractual obligations under the Stock Option contracts;

(d)    Navistar breached its duty of good faith and fair dealing in connection with the Stock Option contracts;

(e)    Navistar's communication to putative class members was coercive and misleading; and

(f)    Navistar is liable to the Plaintiff and the Class in this action, as alleged in the Complaint.

All common questions are able to be resolved through the same factual occurrences as specifically and/or generally alleged herein.

50.    **Adequacy**.  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has no claims antagonistic to those of the Class.  Plaintiff has retained competent and experienced counsel in complex class actions, securities, and corporate litigation.  Counsel is committed to the vigorous prosecution of this action.

51.    <u>Appropriateness as a Class Action</u>. The prosecution of separate actions by the Plaintiff and individual members of the Class against Defendant would create a risk of inconsistent or varying adjudications on the common issues of law and fact related to this action. A Class Action is superior to all other available methods for the fair and efficient adjudication of this controversy. The expense and burden of litigation would substantially impair the ability of the Class members to pursue individual cases in order to initiate their rights. In the absence of a class action, Defendant will retain the benefits of their wrongdoing.

**JURY DEMAND**

52.    Plaintiff and the Class demand a jury trial on all issues so triable.

**<u>COUNT I</u>**
**Breach of Contract**

53.    Plaintiff hereby incorporates all of the foregoing paragraphs.

54.    Plaintiff and the Class and Defendant were parties to Stock Option Agreements pursuant to which Defendant agreed to permit Plaintiff and the Class to purchase Navistar shares of stock before the stock options expired, including a 90 day period after termination of employment.

55.    Plaintiff and the Class performed all conditions, covenants and promises to be performed on their part in accordance with the contracts.

56.    Defendant breached the Stock Option Agreements with Plaintiff and the Class by failing to permit them to exercise their options and purchase shares during the term of the option.

57.    As a result of Defendant's breach of the Stock Option Agreements, Plaintiff and the Class have suffered economic losses and other general, consequential

and specific damages, including the amounts they would have received from exercising their stock options.

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for judgment as follows:

A.　　Declaring this action to be a proper class action pursuant to 735 ILCS 5/2-801 on behalf of the Class defined herein, and declaring the Plaintiff to be a proper Class representative, and Plaintiff's counsel as counsel for the Class;

B.　　Declaring that the Stock Option Plan's 90 day expiration period for former employees is tolled by the blackout period;

C.　　Declaring that the offer made to putative class members is inadequate, coercive and invalid;

D.　　Finding that Navistar breached its obligations under the Company's Stock Option Plan and Stock Option contracts;

E.　　Finding that Navistar breached its obligation of good faith and fair dealing to Plaintiff and the Class;

F.　　Awarding Plaintiff and Class members compensatory damages and exemplary damages in an amount to be proven at trial;

G.　　Awarding Plaintiff and the Class pre-judgment interest, as well as reasonable fees and costs; and

H.　　Awarding such other relief as this Court may deem just and proper.

## COUNT II
### Breach of the Covenant of Good Faith and Fair Dealing

58.　　Plaintiff hereby incorporates all of the foregoing paragraphs.

59.    The Stock Option Agreements entered into between Plaintiff and the Class and Defendant are contracts that contain an implied covenant of good faith and fair dealing, which obligated Defendant to perform the terms and conditions of the contracts fairly and in good faith and to refrain from doing any act that would prevent or impede Plaintiff and the Class from performing any or all conditions of the contracts that they agreed to perform, or any acts that would deprive Plaintiff and the Class of their benefits.

60.    Plaintiff and the Class performed all conditions, covenants and promises to be performed on their part in accordance with the contracts.

61.    Defendant knew Plaintiff and the Class fulfilled all their duties and conditions under the contracts.

62.    Defendant breached the implied covenant of good faith and fair dealing under the contracts by engaging in the conduct complained of herein and by engaging in the conduct that led to the Company's blackout period and thereafter.  While the blackout was no fault of the Plaintiff, the Company refused to extend the exercise period beyond the blackout so that Plaintiff could have a meaningful opportunity to exercise their contractual rights conferred upon them by option grants, thereby preventing Plaintiff from exercising their stock options.

63.    As a result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class have suffered economic losses and other general, consequential and specific damages, including the amounts they would have received from exercising their options.

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to 735 ILCS 5/2-801 on behalf of the Class defined herein, and declaring the Plaintiff to be a proper Class representative, and Plaintiff's counsel as counsel for the Class;

B.      Declaring that the Stock Option Plan's 90 day expiration period for former employees is tolled by the blackout period;

C.      Declaring that the offer made to putative class members is inadequate, coercive and invalid;

D.      Finding that Navistar breached its obligations under the Company's Stock Option Plan and Stock Option contracts;

E.      Finding that Navistar breached its obligation of good faith and fair dealing to Plaintiff and the Class;

F.      Awarding Plaintiff and Class members compensatory damages and exemplary damages in an amount to be proven at trial;

G.      Awarding Plaintiff and the Class pre-judgment interest, as well as reasonable fees and costs; and

H.      Awarding such other relief as this Court may deem just and proper.

## <u>COUNT III</u>
### Violation of the Illinois Wage Payment and Collection Act

64.     Plaintiff hereby incorporates all of the foregoing paragraphs.

65.     At all relevant times, the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.*, is and was in full force and effect.[3]

---

[3] Also, on July 9, 2008, more than three days before this action was filed, Plaintiff made a demand pursuant to the Illinois Attorneys Fees and Wage Actions Act, 705 ILCS 225/1. Ex. F.

66.    820 ILCS 115/1 states that: The Act applies to all employers and employees in this State, including employees of units of local government and school districts, but excepting employees of the State or Federal governments.

67.    820 ILCS 115/4 states that: All wages earned by any employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned. All wages earned by any employee during a weekly pay period shall be paid not later than 7 days after the end of the weekly pay period in which the wages were earned. All wages paid on a daily basis shall be paid insofar as possible on the same day as the wages were earned, or not later in any event than 24 hours after the day on which the wages were earned. Wages of executive, administrative and professional employees, as defined in the Federal Fair Labor Standards Act of 1938, may be paid on or before 21 calendar days after the period during which they are earned.

68.    Under the Act, every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee.

69.    820 ILCS 115/14 of the Act states that: Any employer or any agent of an employer, who, being able to pay wages, final compensation, or wage supplements and being under a duty to pay, wilfully refuses to pay as provided in this Act, or falsely denies the amount or validity thereof or that the same is due, with intent to secure for himself or other person any underpayment of such indebtedness or with intent to annoy, harass, oppress, hinder, delay or defraud the person to whom such indebtedness is due, upon conviction, is guilty of a Class C misdemeanor. Each day during which any

violation of this Act continues shall constitute a separate and distinct offense.

70.　　Defendant is an employer in this state as defined under the Illinois Wage Payment and Collection Act.

71.　　Defendant violated the Act by refusing to pay owed compensation to current and former employees.

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for judgment as follows:

A.　　Declaring this action to be a proper class action pursuant to 735 ILCS 5/2-801 on behalf of the Class defined herein, and declaring the Plaintiff to be a proper Class representative, and Plaintiff's counsel as counsel for the Class;

B.　　Declaring that the Stock Option Plan's 90 day expiration period for former employees is tolled by the blackout period;

C.　　Declaring that the offer made to putative class members is inadequate, coercive and invalid;

D.　　Finding that Navistar breached its obligations under the Company's Stock Option Plan and Stock Option contracts;

E.　　Finding that Navistar breached its obligation of good faith and fair dealing to Plaintiff and the Class;

F.　　Enjoining Navistar from allowing putative class members to release their claims;

G.　　Awarding Plaintiff and Class members compensatory damages and exemplary damages in an amount to be proven at trial;

H.     Awarding Plaintiff and the Class pre-judgment interest, as well as reasonable fees and costs; and

I.     Awarding such other relief as this Court may deem just and proper.

## COUNT IV
### For Declaratory Relief Finding Releases Invalid

72.    Plaintiff hereby incorporates all of the foregoing paragraphs.

73.    Defendant has attempted to induce option holders to release their claims through an inadequate, coercive and oppressive offer which omits the information necessary for option holders to make a knowing and informed decision, with assistance of appropriate expert advice.

74.    There is an actual controversy regarding whether the releases are invalid.

75.    Putative class members were influenced by duress to accept the offer in exchange for the releases.

76.    Further, it is outside Illinois public policy to uphold releases that waive claims under the Illinois Wage Payment and Collection Act.

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to 735 ILCS 5/2-801 on behalf of the Class defined herein, and declaring the Plaintiff to be a proper Class representative, and Plaintiff's counsel as counsel for the Class;

B.     Preliminarily enjoining Navistar from accepting releases until this matter has been adjudicated;

C.     Declaring that the Stock Option Plan's 90 day expiration period for former employees is tolled by the blackout period;

D.      Declaring that the offer made to putative class members is inadequate, coercive and invalid;

E.      Finding that Navistar breached its obligations under the Company's Stock Option Plan and Stock Option contracts;

F.      Finding that Navistar breached its obligation of good faith and fair dealing to Plaintiff and the Class;

G.      Enjoining Navistar from allowing putative class members to release their claims;

H.      Awarding Plaintiff and Class members compensatory damages and exemplary damages in an amount to be proven at trial;

I.      Awarding Plaintiff and the Class pre-judgment interest, as well as reasonable fees and costs; and

J.      Awarding such other relief as this Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to 735 ILCS 5/2-801 on behalf of the Class defined herein, and declaring the Plaintiff to be a proper Class representative, and Plaintiff's counsel as counsel for the Class;

B.      Declaring that the Stock Option Plan's 90 day expiration period for former employees is tolled by the blackout period;

C.    Declaring that the offer made to putative class members is inadequate, coercive and invalid;

D.    Preliminarily enjoining Navistar from accepting releases until this matter has been adjudicated;

E.    Finding that Navistar breached its obligations under the Company's Stock Option Plan and Stock Option contracts;

F.    Finding that Navistar breached its obligation of good faith and fair dealing to Plaintiff and the Class;

G.    Enjoining Navistar from allowing putative class members to release their claims;

H.    Awarding Plaintiff and Class members compensatory damages and exemplary damages in an amount to be proven at trial;

I.    Awarding Plaintiff and the Class pre-judgment interest, as well as reasonable fees and costs; and

J.    Awarding such other relief as this Court may deem just and proper.

Dated:  July 18, 2008

Respectfully submitted,

Attorney for the Plaintiff

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Dr., Ste. 1350
Chicago, IL 60606
Tel: (312) 606-0500
Fax: (312) 606-0207
Firm ID: 91198

Law Offices of Mark Baiocchi
184 Shuman Blvd.
Suite 250
Naperville, IL 60563
Tel: (630) 983-4200
Fax: (630) 983-4223
Firm ID: 54040

# EXHIBIT A



# NAVISTAR INTERNATIONAL CORPORATION

### 2004 Performance Incentive Plan
### Prospectus and Stock Option Information

**March 24, 2004**



# NAVISTAR INTERNATIONAL CORPORATION

### 2004 Performance Incentive Plan
### Prospectus and Stock Option Information

**March 24, 2004**

NAVISTAR INTERNATIONAL CORPORATION
DOCUMENTS CONSTITUTING A SECTION 10(a) PROSPECTUS
PURSUANT TO A FORM S-8 REGISTRATION STATEMENT

THIS DOCUMENT CONSTITUTES PART OF A PROSPECTUS COVERING
SECURITIES THAT HAVE BEEN REGISTERED UNDER
THE SECURITIES ACT OF 1933, AS AMENDED

———————————

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.

———————————

Solely the information included under Tabs 1.0 through 2.0 shall constitute this prospectus. The information and documentation included under Tab 3.0 shall not, nor shall be construed in any manner to, constitute a part of this prospectus.

———————————

Neither the delivery of this prospectus nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the company since the date hereof. No person has been authorized to give any information or to make any representations, other than those contained in this prospectus, and, if given or made, such other information or representations must not be relied upon as having been authorized by the company. This prospectus does not constitute an offer to sell or solicitation of an offer to buy by anyone in any jurisdiction in which it is unlawful to make such offer or solicitation.

———————————

Solely the information contained under Tabs 1.0 through 2.0 constitutes a prospectus covering securities that have been registered under the Securities Act of 1933, as amended.

# PROSPECTUS

Navistar International Corporation

General Information
Regarding the

**2004 Performance Incentive Plan**

This prospectus describes but does not set forth the terms and conditions of Navistar International Corporation's 2004 Performance Incentive Plan. In the event of any conflict between the terms and conditions of the 2004 Performance Incentive Plan and the information contained in this prospectus, the terms and conditions of the 2004 Performance Incentive Plan shall prevail. No person has been authorized to give any information or to make any representations other than those contained in this prospectus in connection with the 2004 Performance Incentive Plan and the offering described in this prospectus, and if given or made, such other information or representations may not be relied upon as having been authorized by Navistar International Corporation.

**This document constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933, as amended.**

**The date of this prospectus is March 24, 2004**

TABLE OF CONTENTS

Page

Introduction                                                                  -1-

What is the Company's purpose in providing the 2004 Plan?                     -2-

Who is eligible to participate in the 2004 Plan?                             -2-

How do I benefit under the 2004 Plan?                                        -2-

What does an Award consist of under the 2004 Plan?                          -2-

What are the general terms of my Award under the 2004 Plan?                 -3-

Will the Company provide me periodic reports concerning my Awards
under the 2004 Plan?                                                         -6-

How do I exercise my Award and pay for the shares that I buy under
the 2004 Plan?                                                               -6-

Can I sell or transfer my Award to someone else?                            -6-

Can I sell the shares I acquire by exercising my Award?                     -7-

Can the Company reprice or discount stock options granted under the 2004 Plan?  -8-

How would my Award be affected by a future change in the capitalization
of the Company?                                                             -8-

How would my restricted stock, stock units and stock options be treated
in the event of a change in control of the Company?                        -8-

Does the grant of an Award or ownership of shares give me any
special rights?                                                             -8-

Under what circumstances can the 2004 Plan or my Award Agreement
be modified or termination?                                                 -9-

What exactly is the Restoration Stock Option program and how does it work?  -9-

What is the Federal Income Tax treatment of an Award?                       -9-

Risk Factors and Certain Investment Considerations                         -12-

Additional Information.                                                     -13-

i

This prospectus provides information concerning awards granted under the Navistar International Corporation 2004 Performance Incentive Plan (the "2004 Plan"), primarily in question and answer format. The information contained herein is qualified in its entirety by the text of the 2004 Plan.

**Introduction.**

*Principal Office and Telephone Number.* The principal executive office of Navistar International Corporation (the "Company") is located at 4201 Winfield Road, Warrenville, Illinois 60555, and the Company's telephone number is (630) 753-5000.

*The 2004 Performance Incentive Plan.* The 2004 Plan was approved by the Board of Directors (the "Board") and the independent Compensation and Governance Committee (the "Committee") of the Company on October 21, 2003 and by the shareowners of the Company on February 17, 2004. A total of 3,250,000 shares of Common Stock of the Company are reserved for awards under the 2004 Plan. As of February 17, 2004, no awards have been made in respect of any shares of Common Stock reserved for issuance under the 2004 Plan. The 2004 Plan replaces the Company's 1994 Performance Incentive Plan (which expired December 16, 2003), the 1998 Supplemental Stock Plan and accompanying Restoration Stock Option Program (which both expired on December 16, 2003) and the 1998 Non-Employee Director Stock Option Plan (which the Company terminated on February 17, 2004). The 2004 Plan expires on February 16, 2014. The 2004 Plan is governed by and interpreted in accordance with the laws of the State of Delaware. Any cause of action a participant may have in respect of the 2004 Plan must be brought within the three year period set forth in the 2004 Plan or such claim will be barred in accordance with the terms and conditions of the 2004 Plan.

The number of shares authorized and available for issuance under the 2004 Plan will be increased by shares of stock subject to an option or award under the 2004 Plan, or any other plan, including, the 1994 Performance Incentive Plan, the 1998 Supplemental Stock Plan or the 1998 Non-Employee Director Stock Option Plan, that is cancelled, expired, forfeited, settled in cash or otherwise terminated without a delivery of shares to the participant of such plan, including shares used to pay the stock option exercised price of a stock option issued under the 2004 Plan or any other plan or to pay taxes with respect to such stock option.

Unless otherwise specified, a reference herein to the "2004 Plan" refers to the 2004 Performance Incentive Plan. Awards granted under the 2004 Plan may consist of annual incentive awards, stock options, restricted stock, stock units, stock appreciation rights or any other type of award granted by the Committee under the 2004 Plan and such awards may herein after be referred to as an "Award" or collectively as "Awards."

*Administration.* The 2004 Plan is administered by the Committee. All Committee members are non-employee directors of the Company and are appointed to the Committee by the Board for a one-year term and may be removed by the same. All decisions of the Committee will be final, conclusive and binding upon all parties. In administering the 2004 Plan, the Committee's discretionary authority includes, without limitation, determinations as to (1) the approval of participants in the plan, (2) the amount and nature of the Awards and (3) the performance levels at which different percentages of the Awards would be earned and adjusted. For further information about the 2004 Plan, please refer to the 2004 Plan or contact the Company's Corporate Secretary at the Company's principal executive office.

*ERISA and Certain Tax Provisions Not Applicable.* The 2004 Plan is not subject to any provisions of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") and is not qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code").

**What is the Company's purpose in providing the 2004 Plan?**

The purpose of the 2004 Plan is to enable the Company and its subsidiaries to attract and retain highly qualified personnel and non-employee directors, and additionally to provide key employees who hold positions of major responsibility in the Company the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value.

**Who is eligible to participate in the 2004 Plan?**

Management will, from time to time, select and recommend to the Committee employees of the Company and its subsidiaries who are to become participants in the 2004 Plan. Such individuals will be selected from those who, in the opinion of management, have substantial responsibility in a managerial or professional capacity. Non-employee directors are also eligible to participate in the 2004 Plan. Non-employee directors participating in the 2004 Plan shall be limited to receiving Awards of non-qualified stock options, restricted stock and stock units under the 2004 Plan.

**How do I benefit under the 2004 Plan?**

You benefit by an Award of cash or stock-based compensation under the 2004 Plan. The grant of a stock-based Award gives you the opportunity to benefit from possible appreciation in the market price of the Company's Common Stock.

**What does an Award consist of under the 2004 Plan?**

Under the 2004 Plan, the Committee may award: (1) annual incentive awards to participants, consisting of awards of cash approved by the Committee based on the level of achievement attained against annual performance goals approved by the Committee within the first ninety days of the applicable fiscal year; (2) stock option awards to employee participants, consisting of either nonqualified stock options or incentive stock options; (3) non-qualified stock option awards to non-employee director participants; (4) restricted stock awards to participants; (5) stock unit awards to participants; (6) stock appreciation right awards to employee participants, whether granted in connection with a related stock option or independent thereof; (7) any other type of Award granted by the Committee under the 2004 Plan; or (8) any combination of the foregoing Awards. All such Awards may be made, subject to the terms of the 2004 Plan, in such amounts (if any) and at such times (if at all) as the Committee may approve; provided, however, that in order to provide a limitation on the number of shares of Common Stock of the Company that may be issued in respect of a particular Award under the 2004 Plan, no more than 1,000,000 shares of Common Stock of the Company may be granted as stock options, restricted stock, stock units, SARs or any other Award under the 2004 Plan; provided, further, that such limitation shall not apply to any Award which is a non-qualified stock option granted to non-director employee participants.

2

**What are the general terms of my Award under the 2004 Plan?**

*General.* The principal terms of your Award will be contained in an award agreement between you and the Company (an "Award Agreement"), which you will enter into, upon the grant to you by the Company of an Award under the 2004 Plan. These terms will include the general nature of the Award, including the number of shares subject to each Award (in the case of a stock-based Award), the number of Awards granted to you, the date each Award is granted and other terms and conditions not expressly provided for in the 2004 Plan.

*Annual Incentive Awards.* If your Award is an annual incentive award, you will be eligible to receive a cash payment from the Company based upon the performance measures (as defined in the 2004 Plan) established by the Committee and set forth in your Award Agreement within the first ninety days of the applicable fiscal year. Only employee participant under the 2004 Plan are eligible to receive annual incentive awards and no participant who is not an employee at the end of the Company's fiscal year shall be entitled to such Award unless the Committee determines otherwise. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your annual incentive award.

*Stock Options.* If your Award is a stock option, the Committee will have the authority to determine certain terms relating to your stock option, including the grant date, the exercise price (which will be the fair market value of the stock on the date of grant of the stock option, as determined by the Committee), the exercise period, the number of shares that may be exercised at any given time, when you may exercise your stock option, any conditions to the exercise of your stock option, any restrictions on your right to sell the shares you purchase through the exercise of your stock option and whether the stock option is intended to be an incentive stock option under Section 422 of the Code. (Please remember that non-employee director participants are not eligible to receive incentive stock option Awards under the 2004 Plan.) Unless otherwise determined by the Committee and set forth in your Award Agreement, stock options granted to participants under the 2004 Plan will become exercisable in whole or in part as follows: after the commencement of the second year of the term of the stock option, to the extent of one third of the shares; after the commencement of the third year of the stock option, to the extent of one third of the shares; and after commencement of the fourth year of the stock option, to the extent of one third of the shares. Generally, except as otherwise provided in the 2004 Plan (see discussion regarding death, total and permanent disability or qualified retirement below), no outstanding stock option may be exercised by a participant unless such participant is an employee or non-employee director of the Company, as the case may be, at the time of exercise; provided, however, that in the event of termination of such relationship (other than on account of death, total and permanent disability or qualified retirement), such participant may exercise the stock option at any time within three months after such termination (but not after the expiration of the term of the grant) to the extent of the number of shares which were exercisable at the date of such termination; provided, further, that with respect to any employee participant, if such employee participant is terminated for cause as defined the International Truck and Engine Corporation Income Protection Plan or if the employee participant is covered by a different severance plan or agreement, then as defined in such plan or agreement, the three-month period shall not apply and the stock option shall cease to be exercisable and shall lapse as of the effective date of such employee participant's termination.

You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your stock option.

*Restricted Stock.* If your Award is restricted stock, you will receive shares of Common Stock of the Company that are restricted with an appropriate legend as to sale or transfer and subject to forfeiture pursuant to terms established by the Committee at the time of issuance. You will be entitled to all dividends paid with respect to all restricted stock granted to you under the 2004 Plan and you will be entitled to vote all such restricted stock granted to you under the 2004 Plan. Restricted stock may be granted to employee participants under the 2004 Plan for meeting their stock ownership requirements as described in the Company's Executive Stock Ownership Program, as amended from time to time (the "ESOP"), or for any other purpose. Restricted stock shall vest, in full or in installments, upon satisfaction of the conditions specified in your Award Agreement. In no event will an Award of restricted stock granted under the 2004 Plan vest in full prior to the commencement of the third anniversary of the grant date. A participant who quits or is involuntarily separated from the Company will forfeit any unvested restricted stock granted under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your restricted stock grant.

*Stock Units.* If your Award is stock units, you will receive without payment units representing shares of Common Stock of the Company. Such units will be restricted as to sale or transfer and subject to forfeiture pursuant to terms established by the Committee at the time of issuance. You will not be entitled to any dividends paid with respect to such stock units granted to you under the 2004 Plan and you will not be entitled to vote any such stock units granted to you under the 2004 Plan until such time as your stock units are converted into shares of Common Stock of the Company. Stock units may be granted to employee participants under the 2004 Plan for meeting their stock ownership requirements as described in the ESOP, or for any other purpose. Stock units shall vest, in full or in installments, upon satisfaction of the conditions specified in your Award Agreement. At the time that you leave the Company, you will receive such number of shares of unrestricted Common Stock of the Company equivalent to the number of vested stock units held by you as of such date (see the discussion regarding death, total and permanent disability or qualified retirement below). In no event will an Award of stock units granted under the 2004 Plan vest in full prior to the commencement of the third anniversary of the grant date. A participant who quits or is involuntarily separated from the Company will forfeit any unvested stock units granted under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your stock units.

*Stock Appreciation Rights or SARs.* If your Award is a stock appreciation right or SAR, the Committee will have the authority to determine certain terms relating to your SAR, including the grant date, the exercise price (which will be, for freestanding SARs, the fair market value of one share of Common Stock of the Company on the date of the grant of the SAR, as determined by the Committee, and for a SAR granted in tandem with a stock option, it will be the exercise price of the related stock option), the exercise period of the SAR (which shall not exceed a term of 10 years), the number of SARs that may be exercised at any given time, when you may exercise your SAR and any conditions to the exercise of your SAR. Upon the exercise of a SAR, you shall be entitled to receive payment in an amount equal to the excess of the fair market value of one share of Common Stock of the Company on the date of exercise over the exercise price of the SAR, multiplied by the number of shares of Common Stock of the Company for which the SAR is exercised. At the discretion of the Committee, the payment due to you upon exercise of the SAR may be in cash, Common Stock of the Company or any combination thereof. Please

remember that non-employee director participants are not eligible to receive SARs under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your SARs.

*Death, Total and Permanent Disability or Qualified Retirement.* In the case of outstanding stock options, if a participant (i) dies, the stock option may be exercised by a legatee, or by the personal representatives or distributees of such participant at any time within a period of two years after such participant's death, but not after the expiration of the term of the stock option grant, (ii) becomes total and permanently disabled (as defined under the Company's long term disability programs for employee participants or as determined by the Committee for non-employee director participants), such participant may exercise the stock option (to the extent it is or becomes exercisable under its terms) at any time within three years after termination or, if later, the date on which the stock option becomes exercisable with respect to such shares, but not after expiration of the term of the stock option grant, or (iii) retires pursuant to a qualified retirement (as defined in the 2004 Plan), such participant may exercise the stock option (to the extent it is or becomes exercisable under its terms) at any time during the term of the stock option grant; provided, however, that no stock option which is not exercisable at the time of qualified retirement shall become exercisable after such qualified retirement if, without the written consent of the Company, such participant engages in a business which is competitive to the business of the Company or its affiliates.

In the case of restricted stock or stock units, if a participant (i) dies while serving the Company or following a total and permanent disabled or qualified retirement, any such previously granted restricted stock or stock units shall vest as of the date of such participant's death and all restrictions thereon shall lapse and the restricted stock or stock units shall be immediately transferable to the name beneficiary or to such participant's estate, (ii) becomes totally and permanently disability or retires from the Company, such restricted stock or stock units will continue to vest according to the terms of grant or (iii) otherwise terminates employment (in the case of an employee participant) or service (in the case of a non-employee director participant), then any restricted stock or stock units not vested as of such date will be forfeited to the Company.

*Award Expiration Date.* The expiration date of your Award will be specified in your Award Agreement. The expiration date for incentive stock options and stock appreciation rights shall be no more than ten years from the date of grant. The expiration date for nonqualified stock options shall be no more than ten years from the date of grant. The effective date of the grant of a stock option will be, unless the Committee expressly determines otherwise, the business day on which the Committee approves the grant of such stock option.

*Charges and Deductions.* No charges or deductions (aside from tax or other withholdings) may be made against a participant of the 2004 Plan, or against the securities or assets of the 2004 Plan, nor may any lien be created against any of the funds, securities or other property held by participants under the 2004 Plan.

**Will the Company provide me periodic reports concerning my Awards under the 2004 Plan?**

Although no participant will be provided with periodic or other reports concerning the status of their accounts under the 2004 Plan, the Company will supply information to such participants in response to inquiries addressed to the Corporate Secretary of the Company.

**How do I exercise my Award and pay for the shares that I buy under the 2004 Plan?**

*General.* The Committee has the authority to determine the procedures you must follow to exercise your Award and pay for any shares you acquire under the 2004 Plan. The following description of payment procedures is qualified in its entirety by reference to the 2004 Plan for a full description of such procedures:

*Withholding Taxes.* Subject to certain limitations, including limitations applicable to officers and directors subject to Section 16(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), a participant may elect to pay any withholding tax due on an Award granted pursuant to the 2004 Plan either in cash (including a personal check), or by delivery at "fair market value" (as defined in the 2004 Plan) of unrestricted Common Stock already owned by such participant, or by a combination of the foregoing. In addition, a participant settling an Award granted pursuant to the 2004 Plan may elect to have the Company withhold a portion of the shares of Common Stock of the Company otherwise to be issued upon settlement of the Award equal in value to the minimum required withholding taxes.

*Exercise Price of Stock Options.* Stock options can be exercised in whole or in part through cashless exercises or other arrangements through agents (including stock brokers) established by the Company by paying the amounts required by instructions issued by the Company's Corporate Secretary. If an exercise is not covered by such instructions, the purchase price, subject to certain limitations, is to be paid in full to the Company upon exercise of a stock option either in cash (including a personal check), or by delivery at "fair market value" of unrestricted Common Stock already owned by such participant (which Common Stock, if acquired from the Company, must have been held for at least six months), or by a combination of the foregoing. In no event may successive simultaneous pyramiding be used to exercise a stock option.

*Other Limitations on Exercise.* Before you can exercise your Award, the Committee must be satisfied that such exercise will not violate any securities laws or other law or requirement of any government authority.

**Can I sell or transfer my Award to someone else?**

Awards under the 2004 Plan may not be assigned or alienated. In case of a participant's death, the amounts distributable to the deceased participant under the 2004 Plan with respect to which a designation of beneficiary has been made (to the extent it is valid and enforceable under applicable law) shall be distributed in accordance with the 2004 Plan to the designated beneficiary or beneficiaries. The amount distributable to a participant upon death and not subject to such a designation shall be distributed to such participant's estate. If there is any question as to the right of any beneficiary to receive a distribution under the 2004 Plan, the amount in question may be paid to the estate of such participant, in which event the Company will have no

6

further liability to anyone with respect to such amount.

**Can I sell the shares I acquire by exercising my Award?**

*General.* Any shares of Common Stock of the Company you acquire under the 2004 Plan, including shares acquired by exercising your right to purchase shares under your Award, can be sold or transferred only as permitted by the 2004 Plan and/or your Award Agreement and subject to any securities law restrictions.

*Securities Law Restrictions.* The Company filed a registration statement under the Securities Act of 1933, as amended (the "Securities Act"), which became effective on March 24, 2004 (the "Effective Date"), pursuant to which the Company registered the Common Stock issued after the Effective Date to participants under the 2004 Plan (the "Registration Statement"). Subject to the terms of the 2004 Plan and applicable Award Agreements, participants who are not Affiliates (as defined below) of the Company and who acquire the Common Stock under the 2004 Plan after the Effective Date generally will be entitled to resell such Common Stock in the public market without restrictions under the Securities Act. An "Affiliate" of an entity is defined in Rule 144 under the Securities Act as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with" such entity. An employee of the Company who is not an executive officer or director of the Company generally would not be deemed to be an Affiliate of the Company.

Resales by participants who are Affiliates of the Company or who acquired Common Stock under the 2004 Plan prior to the Effective Date of the Registration Statement are not covered by this prospectus (such participants are herein collectively referred to as "Restricted Participants"). Resales by such Restricted Participants are subject to certain restrictions under the Securities Act. An Affiliate of the Company may not offer or resell any shares of Common Stock acquired by them under the 2004 Plan (whether acquired before or after the Effective Date of the Registration Statement) unless the offer and resale of such shares are registered by the Company under the Securities Act or unless an exemption from registration is available. Participants who acquired shares of Common Stock under the 2004 Plan prior to the Effective Date of the Registration Statement (such shares being herein referred to as "Subject Shares") may not offer or resell the Subject Shares unless the offer and resale of the Subject Shares are registered by the Company under the Securities Act or unless an exemption from registration is available. In the absence of an effective registration statement, Affiliates may resell the Common Stock acquired under the 2004 Plan and participants holding Subject Shares may resell such Subject Shares only by complying with the requirements and limitations of Rule 144 under the Securities Act or other available exemption. Under Rule 144 offers or resales by Restricted Participants may be made without registration under the Securities Act where certain limitations are met as to the number of shares which may be sold over specified periods of time, the selling price thereof, the manner in which sales may be made and the minimum period of time which the shares must have been held (except that the holding period will not be applicable to Affiliates with respect to Common Stock acquired by them under the 2004 Plan after the Effective Date of the Registration Statement).

Executive officers and directors of the Company and holders of 10% or more of the outstanding Common Stock are also subject to the provisions of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder, which, among other things, permit recovery by or on behalf of the Company of so-called "short-swing" profits arising from

purchases and sales (or sales and purchases) of the Common Stock by such persons within any six-month period.

The foregoing is not intended to be a complete statement of applicable law, and participants, particularly executive officers and directors of the Company, should consult their own counsel for information regarding restrictions on resale of the Common Stock acquired pursuant to the 2004 Plan under the Securities Act and the Exchange Act.

**Can the Company reprice or discount stock options granted under the 2004 Plan?**

No stock option issued under the 2004 Plan may be amended or modified in any way that changes the exercise price of the stock option, and no stock option may be issued with an exercise price that is less than the fair market value (as defined in the 2004 Plan) of one share of the Common Stock of the Company on the grant date of the stock option, or in any other way discounted. Such limitation, however, shall not apply to any future changes in the capitalization of the Company as discussed below.

**How would my Award be affected by a future change in the capitalization of the Company?**

The Award Agreements may contain such provisions as the Committee may determine to be appropriate for the adjustment of the number and class of shares subject to each outstanding stock option or SAR, the exercise price in the event of changes in, or distributions with respect to, the outstanding Common Stock of the Company by reason of stock dividends, recapitalizations, mergers, consolidations, split-ups, combinations or exchanges of shares, spinoffs and the like.

**How would my restricted stock, stock units and stock options be treated in the event of a change in control of the Company?**

In the event of a "Change in Control" (as defined the 2004 Plan) all awarded restricted stock and stock units will immediately be free of all restrictions and fully earned, and all outstanding stock options will be immediately exercisable and shall continue to be exercisable for a period of three years from the date of the Change in Control regardless of the original term or employment status (except that the term of any incentive stock option shall not be extended beyond ten years from the date of grant).

**Does the grant of an Award or ownership of shares give me any special rights?**

Neither the grant of an Award by the Company nor ownership of shares by you obligates the Company or any of its subsidiaries to retain you as an employee, officer or director. The Company and its subsidiaries reserve the same right to terminate your employment or service as existed before the establishment of the 2004 Plan or the grant of any Awards under the 2004 Plan.

The grant of an Award of a stock option or stock unit does not give you any rights of a shareowner of the Company with respect to the shares covered by your Award until you actually own the shares. The grant of an Award of restricted stock will during the period of restriction

entitle you to all dividends paid with respect to such restricted stock and to vote such restricted stock.

**Under what circumstances can the 2004 Plan or my Award Agreement be modified or terminated?**

Under the terms of the 2004 Plan, the Committee may modify, amend, or terminate the 2004 Plan at any time; provided, however, that unless the requisite approval of the shareowners of the Company is obtained, no amendment shall be effective if such amendment would (i) increase the number of shares of Common Stock of the Company available for issuance under the 2004 Plan or increase the limits applicable to Awards under the 2004 Plan (except as in the case of a change in the capitalization of the Company as discussed above), (ii) lower the exercise price of a stock option or SAR grant value below 100% of the fair market value of one share of Common Stock of the Company on the grant date (except as in the case of a change in the capitalization of the Company as discussed above), (iii) remove the repricing restrictions set forth in the 2004 Plan, or (iv) require shareowner approval as a matter of law or under rules of the New York Stock Exchange. No 2004 Plan amendment shall, without the affected participant's consent, terminate or adversely affect any right or obligation under any Award previously granted under the Plan. The Committee may terminate the 2004 Plan at any time.

**What exactly is the Restoration Stock Option program and how does it work?**

The Restoration Stock Option program is a feature of the 2004 Plan available to employee participants who have been granted a non-qualified stock option under the 2004 Plan. In essence, the Restoration Stock Option program allows employee participants to exercise vested non-qualified stock options by presenting shares of Common Stock of the Company that (1) either (i) have been held for at least six months if such shares were obtained from the Company or (ii) have been purchased in the open market and (2) have a total market value equal to the exercise price of the stock option times the number of stock options being exercised. To account for the withholding of federal, state and local income taxes and Social Security taxes liabilities on the stock option gain, shares of Common Stock may be withheld from the stock option exercise. Restoration stock options are then granted to the employee participant at the market price of the Common Stock of the Company in an amount equal to the number of mature shares of Common Stock of the Company that were used to exercise the original stock option, plus the number of shares of Common Stock of the Company that are withheld for the tax liability on the stock option gain. For more information on this subject, please refer to the 2004 Plan.

**What is the Federal Income Tax treatment of an Award?**

*The following is a brief summary of the principal federal income tax consequences to participants in the 2004 Plan and does not purport to address all aspects of Federal income tax treatment. You should consult your tax advisor because the specific federal, state and local tax treatment will vary depending upon your individual circumstances. In addition, the following discussion is limited to United States federal income tax laws applicable to participants who are both citizens and residents of the United States. The United States federal income tax treatment of Awards granted to a participant who is not both a citizen and resident of the United States may differ. The tax laws of other countries may provide for different tax consequences to*

*participants who are subject to such laws. In addition, the tax laws of the United States are subject to change and such changes could apply retroactively.*

*Annual Incentive Awards.* Annual incentive awards granted under the 2004 Plan would generally be taxable to you as ordinary income in the year paid. The current maximum federal income tax rate for ordinary income is 35%. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

*Stock Options.* Stock options granted under the 2004 Plan may be either nonqualified stock options ("NQOs") or Incentive Stock Options ("ISOs") for federal income tax purposes; provided, however, that non-employee director participants are not eligible to receive ISOs under the 2004 Plan.

*NQOs.* Generally, if you are awarded a NQO you do not recognize any taxable income for federal income tax purposes at the time of grant. Upon exercise of your NQO, the excess of the fair market value of the Common Stock of the Company on the date of exercise over the NQO exercise price will be taxable to you as ordinary income. You will have a capital gain (or loss) upon the subsequent sale of the Common Stock of the Company in an amount equal to the sale price reduced by the fair market value of the Common Stock of the Company on the date you exercised your NQO. The holding period for purposes of determining whether the capital gain (or loss) is a long- or short-term gain (or loss) will commence on the date you exercise your NQO. The capital gain will be long-term or short-term depending on whether you have held the shares of Common Stock you acquired upon the exercise of your NQO for more than one year after the exercise date. Short-term capital gains are generally subject to the same federal income tax rate as ordinary income (the current maximum rate is 35%), while long-term capital gains are generally subject to a maximum rate of 15%. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

*ISOs.* If the stock option is intended to qualify as an ISO, the Award Agreement will state it is for an ISO. If you are awarded an ISO you do not recognize any taxable income for federal income tax purposes at the time of grant or exercise. If you hold the stock for the ISO holding periods of two years from the date of the grant and one year from the date of exercise, and if you exercise the stock option while you are employed by the Company or within three months of termination of employment, any gain realized on the sale (measured by the difference between the stock option price paid for the stock and the amount received on the sale), will be taxed as capital gain. If the stock was held for the long-term capital gain holding period, which is currently more than one year from the date of exercise, the capital gain will be long-term gain eligible for the maximum 15% rate. If the stock is disposed of before the expiration of the ISO holding periods, you will recognize ordinary income to the extent the value of the stock on the date of exercise exceeds the stock option exercise price and the Company will generally be entitled to take a deduction for such amount. Upon exercise of your ISO, the excess of the fair market value of the shares you acquire over the exercise price of the stock option will be included in your alternative minimum taxable income and may cause or increase a liability for alternative minimum tax. There is an annual $100,000 limitation on the amount of stock options that can qualify as ISOs. Each calendar year is tested separately. All stock options held by an employee that first become exercisable in the year are tested. Stock options cannot qualify as ISOs to the extent that the value of the stock covered by

the stock options exceeds $100,000. The value of the stock for this purpose is the value of the stock on the date of the grant of the stock option.

*Effect of Section 16(b) of the Exchange Act.* The tax consequences upon the exercise of either NQOs or ISOs may vary for those directors and executive officers who are subject to liability under Section 16(b) of the Exchange Act. In general, such participants will not recognize income on the Common Stock acquired under the 2004 Plan until they are no longer subject to liability under Section 16(b) with respect to the disposition of such Common Stock. However, a participant may elect to be taxed based on the fair market value of the shares on the exercise date (and have a holding period beginning on the exercise date) by filing an election under Section 83(b) of the Code within thirty days of the exercise date. If such participant later sells such shares, he or she will recognize capital gain or loss on the difference between the selling price and the exercise price.

*Restricted Stock.* If you are awarded Common Stock of the Company that is subject to restrictions on transfer and is subject to a "substantial risk of forfeiture" as defined in Section 83 of the Code, you may make a Section 83(b) election to have your Award taxed as ordinary income at the time of grant on the excess of the fair market value of the shares on the grant date over the amount you paid for the shares. If you do not make a timely Section 83(b) election, the Award will generally be taxed as ordinary income at the date(s) that the restrictions creating the risk of forfeiture expire. The amount of tax on each such date will equal the fair market value of such shares on such date less the amount paid by you for the shares. During any period when a participant is subject to liability under Section 16(b) of the Exchange Act with respect to the disposition of Common Stock acquired under the 2004 Plan, such Common Stock is treated as subject to a restriction on transfer and a substantial risk of forfeiture. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

*Stock Units.* If you are awarded stock units under the 2004 Plan you generally would have no federal income tax consequence at the time of grant. At the time your stock units are converted into unrestricted shares of Common Stock of the Company (i.e., the shares are not subject to a "substantial risk of forfeiture"), then, at such time, you will generally recognize ordinary income to the extent of the excess of the fair market value of the stock on the date of conversion over the cost for such stock, if any. The Company is generally entitled to a deduction at the time and in the amount taxed to you as ordinary income.

*SAR and Other Awards.* If you are awarded stock appreciation rights under the 2004 Plan you generally would have no federal income tax consequence at the time of grant. Upon exercise of the SAR, the amount of cash or other property received by you will generally be subject to ordinary income tax in the year of receipt and the Company will generally be entitled to a deduction at the time and in the amount taxed to you as ordinary income.

*Withholding Taxes.* Because the amount you realize upon the exercise of your Award may be treated as compensation subject to applicable withholding or federal, state and local income taxes and Social Security taxes, the Company or one of its subsidiaries may make other arrangements with you to pay the amount required to be withheld by the Company or such subsidiary before delivering any shares to you purchased under the 2004 Plan. These arrangements may include withholding the amount of any withholding or other tax due and/or withholding a certain number of shares issuable under the 2004 Plan. The Company will defer

delivery under your Award until arrangements are made to its satisfaction with respect to withholding and other taxes.

## Risk Factors and Certain Investment Considerations.

This prospectus and the information incorporated by reference in this prospectus may include forward-looking statements within the meaning of Section 27A of the Securities Act, Section 21E of the Exchange Act, and the Private Securities Litigation Reform Act of 1995 that are subject to risks and uncertainties. You should not place undue reliance on those statements because they are subject to numerous uncertainties and factors relating to our operations and business environment, all of which are difficult to predict and many of which are beyond our control. Such forward-looking statements only speak as of the date of this prospectus and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which the statement is made or to reflect the occurrence of unanticipated events. Forward-looking statements include information concerning our possible or assumed future results of operations, including descriptions of our business strategy. These statements often include words such as "believe," "expect," "anticipate," "intend," "plan," "estimate" or similar expressions. These statements are based on assumptions that we have made in light of our experience in the industry as well as our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. As you read and consider this prospectus, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties and assumptions. Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results or results of operations and could cause actual results to differ materially from those in the forward-looking statements. Some of these factors include:

- The markets in which we compete are subject to considerable cyclicality.
- We operate in the highly competitive North American truck market.
- Our business may be adversely impacted by work stoppages and other labor relations matters.
- The loss of business from Ford Motor Company, or "Ford," our largest customer, could have a negative impact on our business, financial condition and results of operations.
- The costs associated with complying with environmental and safety regulations could lower our margins.
- Our liquidity position may be adversely affected by a continued downturn in our industry.
- Our business could be negatively impacted in the event Navistar Financial Corporation, our financing subsidiary, is unable to access sufficient capital to engage in its financing activities.
- We have significant underfunded postretirement obligations.
- Our manufacturing operations are dependent upon third-party suppliers, making us vulnerable to a supply shortage.
- Our ability to use net operating loss carryovers to reduce future tax payments if there is a change in ownership of the Company.

- We are exposed to political, economic and other risks that arise from operating a multinational business.

- Our substantial debt could require us to use a significant portion of our cash flow to satisfy our debt obligations and may limit our operating flexibility.

Other factors and assumptions not identified above are also relevant to the forward-looking statements, and if they prove incorrect, could also cause actual results to differ materially from those projected. For a further and more detailed description of these factors, please refer to Exhibit 99.1 to our Form 10-K. Participants should carefully consider all of these factors before making an investment in the stock offered under the 2004 Plan.

In addition, the market price of our Common Stock may fluctuate from time to time. For this reason, the value of any stock-based Awards granted under the 2004 Plan may decrease or increase in value depending upon the market price of our Common Stock.

**Additional Information.**

The Company is subject to the informational requirements of the Exchange Act and files reports and other information with the Securities and Exchange Commission (the "Commission"). Such reports and information can be inspected and copied at the public reference facility maintained by the Commission located at 450 Fifth Street, N.W., Room 1024, Washington, D.C. 20549. Please call the Commission at 1-800-SEC-0330 for further information on the public reference room. Copies of such material can also be accessed electronically by means of the Commission's home page on the Internet at www.sec.gov. Our Common Stock is listed on the New York Stock Exchange, The Chicago Stock Exchange and The Pacific Exchange, and such reports and other information can also be inspected and copied at the offices of the New York Stock Exchange, Inc., at 20 Broad Street, New York, NY 10005, the Chicago Stock Exchange, Inc., at One Financial Plaza, 440 South LaSalle Street, Chicago, IL, 60605, and the Pacific Exchange, Inc., at 301 Pine Street, San Francisco, CA, 94104.

This prospectus constitutes part of the Registration Statement filed with the Commission. The Registration Statement and this prospectus incorporate by reference certain documents, including the Company's Annual Report on Form 10-K and all documents subsequently filed by the Company with the Commission under the Exchange Act. These documents, as well as other documents required to be delivered to you upon your request pursuant to Rule 428(b) of the Securities Act, will be provided to you without charge upon your written or oral request. In general, Rule 428(b) requires that participants receive, concurrently with this prospectus, a copy of either the Company's latest annual report to shareowners, Annual Report on Form 10-K or prospectus containing audited financial statements, and that you receive annually copies of all reports, proxy statements and other materials distributed to shareowners. Requests for any of these documents should be directed to the Company, 4201 Winfield Road, Warrenville, Illinois 60555 Attention: Corporate Secretary (telephone number (630) 753-5000).

The information in this prospectus will be updated regularly by a supplement, a revised prospectus or by including information in the most recent annual report to shareowners or the most recent proxy statement of the Company. If a significant period of time has elapsed from the date of publication of this prospectus, you should obtain and refer to all supplements. If you receive a supplement after you receive this prospectus, you should keep it with this prospectus and refer to it whenever you refer to this prospectus.

NAVISTAR INTERNATIONAL CORPORATION

2004 PERFORMANCE INCENTIVE PLAN

SECTION I

ESTABLISHMENT OF THE PLAN

The Board of Directors of Navistar International Corporation approved the establishment of the Navistar International Corporation 2004 Performance Incentive Plan ("Plan") on October 21, 2003, subject to approval by the Stockholders at the Corporation's annual meeting to be held on February 17, 2004, or any adjournment thereof. The Plan replaces the Navistar 1994 Performance Incentive Plan and the Navistar 1998 Supplemental Stock Plan, each of which terminate December 16, 2003 under the terms of the plans, and the Plan will replace and supercede the Navistar 1988 Non-Employee Directors Stock Option Plan.

SECTION II

PURPOSE OF THE PLAN

The purpose of the Plan is to enable the Corporation and its subsidiaries to attract and retain highly qualified personnel and non-employee directors, and additionally to provide key employees who hold positions of major responsibility the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value.

SECTION III

DEFINITIONS

For the purposes of the Plan, the following words and phrases shall have the meanings described below in this Section III unless a different meaning is plainly required by the context.

(1) "Annual Incentive Award" means an award of cash determined by the Committee after the end of the Fiscal Year.

(2) "Award" means an award made under the Plan.

(3) "Award Agreement" means an agreement entered into by the Corporation and a Participant setting forth the terms and provisions applicable to an Award granted to a Participant.

(4) "Board of Directors" means the Board of Directors of Navistar International Corporation.

(5) "Change in Control" shall be deemed to have occurred if (i) any "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934), other than employee or retiree benefit plans or trusts sponsored or established by the Corporation or International Truck and Engine Corporation, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934), directly or indirectly, of securities of the Corporation representing 25% or more of the combined voting power of the Corporation's then outstanding securities, (ii) the following individuals cease for any reason to constitute more than three-fourths of the number of directors then serving on the Board of Directors of the Corporation: individuals who, on the date hereof, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Corporation) whose appointment or election by the Board or nomination for election by the Corporation's stockholders was approved by the vote of at least two-thirds (2/3) of the directors then still in office or whose appointment, election or nomination was previously so approved or recommended; (iii) any dissolution or liquidation of the Corporation or International Truck and Engine Corporation or sale or disposition of all or substantially all (more than 50%) of the assets of the Corporation or of International Truck and Engine Corporation occurs; or (iv) as the result of, or in connection with, any cash tender offer, exchange offer, merger or other business combination, sale of assets, proxy or consent solicitation, contested election or substantial stock accumulation (a "Control Transaction"), the members of the Board of Directors of the Corporation immediately prior to the first public announcement relating

to such Control Transaction shall immediately thereafter, or with two (2) years, cease to constitute a majority of the Board of Directors of the Corporation. Notwithstanding the foregoing, the sale or disposition of any or all of the assets or stock of Navistar Financial Corporation shall not be deemed a Change in Control.

(6) "Code" or "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time.

(7) "Committee" means the Committee on Compensation and Governance of the Board of Directors.

(8) "Common Stock" means the common stock of the Corporation.

(9) "Corporation" means Navistar International Corporation.

(10) "Employee" means a person regularly employed by the Corporation or any subsidiary of the Corporation, including its officers.

(11) "Exercise Price" means the amount for which one share of Common Stock may be purchased upon exercise of a Stock Option, as specified in the applicable Award Agreement.

(12) "Fair Market Value" means the average of the high and the low prices of a share of Common Stock on the Grant Date as set forth in the New York Stock Exchange — Composite Transactions listing published in the Midwest Edition of *The Wall Street Journal* or equivalent financial publication.

(13) "Fiscal Year" means the fiscal year of the Corporation.

(14) "Freestanding SAR" means any SAR that is granted independently of any Stock Option.

(15) "Grant Date" means, as determined by the Board or authorized Committee, (i) the date as of which the Board or such Committee approves an Award, or (ii) such other date as may be specified by the Board or such Committee. The Grant Date of a Stock Option will, unless the Committee expressly determines otherwise, be the business day on which the Committee approves the grant of such Stock Option.

(16) "Incentive Stock Option" means a right, as evidenced by an Award Agreement to purchase a certain number of shares of Common Stock at Fair Market Value for a period of no longer than ten (10) years from the date of grant which options are designed to meet the requirements set out under Section 422 of the Code.

(17) "Non-Employee Director" means as of the Grant Date of an Award an individual who is a director of the Corporation and not an employee of the Corporation or any of its subsidiaries.

(18) "Nonqualified Stock Option" means a right, as evidenced by an Award Agreement to purchase a certain number of shares of Common Stock at Fair Market Value for a period of not more than ten (10) years which options are stated not to be Incentive Stock Options under the Code.

(19) "Participant" means an Employee selected by the Corporation for participation in the Plan and, with respect to Stock Options, Restricted Stock and Stock Units, a Non-Employee Director.

(20) "Performance-Based Exception" means the performance-based exception from the tax deductibility limitation imposed by Code Section 162(m) as set forth in Section 162(m)(4)(C).

(21) "Performance Measure" means the performance measurement provided by Section VI.

(22) "Performance Period" means the period during which performance goals must be met for purposes of the Performance Measure.

(23) "Plan" means the Navistar International Corporation 2004 Performance Incentive Plan as set forth herein and as it may be amended hereafter from time to time.

(24) "Qualified Retirement" means with respect to an Employee a termination from employment from the Corporation or any of its subsidiaries that occurs after the Employee attains age 55 and at the time of the termination the Employee has either: (i) 10 or more years of continuous service, or (ii) 10 or more years of service that would constitute credited service under the definition contained in the International Truck and Engine Corporation Retirement Plan for Salaried Employees ("RPSE"). Qualified Retirement for a Non-Employee Director means retirement under a retirement policy of the Board for Non-Employee Directors.

(25) "Restoration Stock Option" means a Nonqualified Stock Option granted pursuant to Section VII(7) and which is awarded upon the exercise of a Stock Option earlier awarded under the Plan or any other plan of the Corporation, including an earlier awarded Restoration Stock Option (an "Underlying Option").

(26) "Restricted Stock" means a right to acquire one or more shares of Common Stock, as evidenced by an Award Agreement, that is restricted as to sale or transfer and subject to forfeiture.

(27) "Stock Appreciation Right" or "SAR" means an Award, granted either alone or in connection with a related Stock Option, pursuant to the terms of Section X of the Plan.

(28) "Stock Option" means either an Incentive Stock Option or a Nonqualified Stock Option.

(29) "Stock Units" mean units for Restricted Stock granted pursuant to Section XI.

(30) "Tandem SAR" means an SAR granted with respect to a share pursuant to Section X hereof in connection with a related Stock Option, under which: (a) the exercise of the SAR with respect to the share shall cancel the right to purchase such share under the related Stock Option, and (b) the purchase of the share under the related Stock Option shall cancel the right to exercise the SAR with respect to such share.

## SECTION IV

## ELIGIBILITY

Management will, from time to time, select and recommend to the Committee Employees who are to become Participants in the Plan. Such Employees will be selected from those who, in the opinion of management, have substantial responsibility in a managerial or professional capacity. Non-Employee Directors shall also be Participants in the Plan for the purpose of Nonqualified Stock Option Awards, Restricted Stock and Stock Units.

## SECTION V

## ANNUAL INCENTIVE AWARDS

(1) As soon as practical following the end of the Fiscal Year, the Committee will certify performance achieved against the performance criteria established at the beginning of the Fiscal Year. The performance criteria shall be determined in the discretion of the Committee considering all factors relevant to the management of the Corporation, provided that an Award under this Section that is intended to qualify for the Performance-Based Exception shall satisfy the Performance Measures and the requirements of Section 162(m) of the Internal Revenue Code.

(2) The Committee, in its sole discretion, may reduce or eliminate any Award otherwise earned based on an assessment of individual performance, but in no event may any such reduction result in an increase of the Award. The Committee shall determine the amount of any such reduction by taking into account such factors as it deems relevant including, without limitation: (a) performance against other financial or strategic objectives; (b) its subjective assessment of the Participant's overall performance for the year; and (c) prevailing levels of total compensation among similar companies.

(3) Performance criteria for Annual Incentive Awards will not be increased or decreased within a Fiscal Year except for extraordinary circumstances approved by the Committee.

(4) Payment of an Annual Incentive Award will be made in cash to the Participant as soon as practicable after an Annual Incentive Award determination has been made by the Committee. A Participant who is not an Employee at the end of a Fiscal Year will not be entitled to an Award for that Fiscal Year unless the Committee determines otherwise.

(5) The Committee may permit the deferral of any Award and may permit payment on deferrals to be made subject to rules and procedures it may establish. These rules may include provisions crediting interest on deferred cash accounts.

(6) The Committee shall set the performance criteria for each year's Annual Incentive Awards no later than the first 90 days of the Fiscal Year.

(7) Its shall be presumed unless the Committee determines to the contrary, that all Awards to Employees under this Section are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rules of Section 162(m) of the Internal Revenue Code, the maximum Award under this Section of the Plan to any one Employee during any one Fiscal Year shall not exceed $4,000,000.

## SECTION VI

## PERFORMANCE MEASUREMENT

(1) Unless and until the Corporation's stockholders approve a change in the general Performance Measures set forth in this Section VI, the attainment of which may determine the degree of payout and/or vesting with respect to Awards that are designed to qualify for the Performance-Based Exception, the Performance Measures to be used for purposes of such Awards may be measured at the Corporation level, at a subsidiary level, or at an operating unit level and shall be chosen from among: (a) income measures (including, but not limited to, gross profits, operation income, earnings before or after taxes, earnings per share, cost reductions); (b) return measures (including, but not limited to, return on assets, capital, investment, equity, or sales); (c) cash flow, cash flow return on investments, which equals net cash flows divided by owners equity; (d) gross revenues from operations; (e) total revenue; (f) cash value added; (g) economic value added; (h) share price (including, but not limited to, growth measures and total shareholder return); (i) sales growth; (j) market share; (k) the achievement of certain quantitatively and objectively determinable non-financial performance measures (including, but not limited to, growth strategies, strategic initiatives, product development, product quality, corporate development, and leadership development); and (l) any combination of, or a specified increase in, any of the foregoing.

(2) The Committee shall set the Performance Measures for each year's Annual Incentive Awards no later than the first 90 days of the Fiscal Year.

(3) The Committee shall have the discretion to adjust the determination of the degree of attainment of the preestablished goals; provided that the Awards that are designated to qualify for Performance-Based Exception may not be adjusted upward (although the Committee shall retain the discretion to adjust such Awards downward).

(4) In the case of any Award that is granted subject to the condition that a specific Performance Measure be achieved, no payment under such Award shall be made prior to the time the Committee certifies in writing that that the Performance Measure has been achieved. For this purpose, approved minutes of the Committee meeting at which the certification is made shall be treated as a written certification. No such certification is required, however, in the case of an Award that is based solely on an increase in the value of a share of Common Stock from the date the Award is made.

## SECTION VII

## STOCK OPTIONS FOR EMPLOYEES

(1) The Committee may grant Nonqualified Stock Options or Incentive Stock Options or a combination of both to Employee Participants in the amount and at the time that the Committee approves. In order to provide a limitation on the number of shares as provided for in Section 162(m) of the Internal Revenue Code and the regulations thereunder, Stock Option grants shall be limited to a maximum of 1,000,000 shares per year for any Participant.

(2) The Committee will document the terms of the Stock Option in an Award Agreement to include the Grant Date and Exercise Price, as well as any other terms that it may desire. The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Options fixed by the Committee shall not be modified.

4

(3) Unless otherwise determined by the Committee, a Stock Option granted under the Plan will become exercisable in whole or in part after the commencement of the second year of the term of the Stock Option to the extent of one third of the shares, to the extent of one third of the shares after commencement of the third year, and to the extent of one third of the shares after commencement of the fourth year.

(4) A Stock Option granted under the Plan will be exercisable during such period as the Committee may determine, and will be subject to earlier termination as hereinafter provided. In no event, however, may a Stock Option governed by the Plan be exercised after the expiration of its term. Except as provided herein, no Stock Option may be exercised at any time unless the Participant who holds the Stock Option is then an Employee. The option can be exercised in whole or in part through cashless exercises or other arrangements through agents, including stockbrokers, under arrangements established by the Corporation by paying the amounts required by instructions issued by the Secretary of the Corporation for the exercise of the Stock Options. If an exercise is not covered by instructions issued by the Corporate Secretary, the purchase price is to be paid in full to the Corporation upon the exercise of a Stock Option either (i) by cash including a personal check made payable to the Corporation, (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant, for six months or more if acquired from the Corporation, or (iii) by any combination of cash and unrestricted Common Stock, and in either case, by payment to the Corporation of any withholding tax. In no event may successive simultaneous pyramiding be used to exercise a Stock Option. Shares which otherwise would be delivered to the holder of a Stock Option may be delivered, at the election of the holder, to the Corporation in payment of federal, state and/or local withholding taxes payable in connection with an exercise.

(5) The Participant who holds a Stock Option will have none of the rights of a shareowner with respect to the shares subject to a Stock Option until such shares are issued upon the exercise of a Stock Option.

(6) Neither the Corporation nor any subsidiary may directly or indirectly lend money to any Participant for the purpose of assisting the individual to acquire shares of Common Stock issued upon the exercise of Stock Options granted under the Plan.

(7) Provisions for Restoration Stock Options may be contained in the terms of options granted under the Plan. Restoration Stock Options may be granted under the Plan pursuant to the following terms: (a) Restoration Stock Options may be granted if the Participant elects to make a restoration option exercise of an Underlying Option, pays the exercise price by transferring to the Corporation Common Stock of the Corporation held by the Participant, for six months or more if acquired from the Corporation, and pays the withholding tax by transferring Common Stock or cash. The number of Restoration Stock Options that will be granted is equal to the number of shares used to pay the exercise price and the number of shares with value equal to the tax liability; (b) The Restoration Stock Options will have a term equal to the remaining term of the Underlying Option, will have an Exercise Price equal to the Fair Market Value of the stock on the date of grant of the Restoration Option, and will become exercisable in six months after grant (or, if sooner, one month before the end of the term of the Underlying Option), and otherwise will have the same general terms and conditions Nonqualified Stock Options granted by the Corporation; (c) The shares that represent the difference between the Exercise Price of the Underlying Option and the value of the shares on the date of exercise, less withholding taxes, generally cannot be transferred for a period of three (3) years; and (d) At the election of the Participant delivery of the shares may be deferred.

(8) In the event of the termination of the employment of a Participant who holds an outstanding Stock Option, other than by reason of death, total and permanent disability or a Qualified Retirement, the Participant may (unless the Stock Option shall have been previously terminated) exercise the Stock Option at any time within three (3) months after such termination, but not after the expiration of the term of the grant, to the extent of the number of shares which were exercisable at the date of the termination of employment. Stock Options governed by the Plan will not be affected by any change of employment so long as the Participant continues to be an Employee. Provided, however, if the Participant is terminated for cause as defined in the International Truck and Engine Corporation Income Protection Plan, or if the Participant is covered by a different severance plan or agreement, then as defined in such plan or agreement, the three-month period provided by this subsection shall not apply and the Stock Option shall cease to be exercisable and shall lapse as of the effective date of the termination of the Employee.

(9) Except as provided in Section VII(12), in the event of a Qualified Retirement a Participant who holds an outstanding Stock Option may exercise the Stock Option to the extent the option is exercisable or becomes exercisable under its terms, at any time during the term of the option grant.

(10) In the event of a total and permanent disability, as defined by the Corporation's long term disability programs, a Participant who holds an outstanding Stock Option may exercise the Stock Option, to the extent the Stock Option is exercisable or becomes exercisable under its terms, at any time within three (3) years after such termination or, if later, the date on which the option becomes exercisable with respect to such shares, but not after the expiration of the term of the option grant.

(11) In the event of the death of a Participant who holds an outstanding Stock Option, the Stock Option may be exercised by a legatee, or by the personal representatives or distributees, at any time within a period of two (2) years after death, but not after the expiration of the term of the grant. If death occurs while employed by the Corporation or a subsidiary, or after a Qualified Retirement, or during the three- year period specified in Section VII(10), Stock Options may be exercised to the extent of the remaining shares covered by Stock Options whether or not such shares were exercisable at the date of death. If death occurs during the three-month period specified in Section VII(8), Stock Options may be exercised to the extent of the number of shares that were exercisable at the date of death.

(12) Notwithstanding the other provisions of Sections VII(9) or VII(11), no Stock Option which is not exercisable at the time of a Qualified Retirement shall become exercisable after such Qualified Retirement if, without the written consent of the Corporation, a Participant engages in a business, whether as owner, partner, officer, employee, or otherwise, which is in competition with the Corporation or one of its affiliates, and if the Participant's participation in such business is deemed by the Corporation to be detrimental to the best interests of the Corporation. The determination as to whether such business is in competition with the Corporation or any of its affiliates, and whether such participation by such person is detrimental to the best interests of the Corporation, shall be made by the Corporation in its absolute discretion, and the decision of the Corporation with respect thereto, including its determination as to when the participation in such competitive business commenced, shall be conclusive.

## SECTION VIII

### STOCK OPTIONS NON-EMPLOYEE DIRECTORS

(1) The Committee may grant Nonqualified Stock Options to Non-Employee Directors.

(2) The Committee will document the terms of the Stock Option to include the Grant Date and Exercise Price, as well as any other terms that it may desire. The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Stock Options fixed by the Committee shall not be modified.

(3) Unless otherwise determined by the Committee, a Stock Option granted under this Section of the Plan will become exercisable in whole or in part after the commencement of the second year of the term of the Stock Option to the extent of one third of the shares, to the extent of one third of the shares after commencement of the third year, and to the extent of one third of the shares after commencement of the fourth year.

(4) A Stock Option granted this Section of the Plan will be exercisable during such period as the Committee may determine, and will be subject to earlier termination as hereinafter provided. In no event, however, may a Stock Option governed by the Plan be exercised after the expiration of its term.

(5) Except as provided herein, no Stock Option granted under this Section of the Plan may be exercised at any time unless the Participant who holds the Stock Option is then a Non-Employee Director.

(6) A Stock Option granted under this Section of the Plan can be exercised in whole or in part through cashless exercises or other arrangements through agents, including stockbrokers, under arrangements established by the Corporation by paying the amounts required by instructions issued by the Secretary of the Corporation for the exercise of the options. If an exercise is not covered by instructions issued by the Corporate Secretary, the purchase price is to be paid in full to the Corporation upon the exercise of a Stock Option either (i) by cash including a personal check made payable to the Corporation; (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant, for six months or more if acquired from the Corporation, or (iii) by any combination of cash and unrestricted Common Stock, and in either case, by payment to the Corporation of any withholding tax. In no event may successive simultaneous pyramiding be used to exercise a Stock Option. Shares which otherwise would be delivered to the holder of a Stock Option may be delivered, at the election of the holder, to the Corporation in payment of federal, state and/or local withholding taxes payable in connection with an exercise.

(7) The Non-Employee Director who holds a Stock Option will have none of the rights of a shareowner with respect to the shares subject to a Stock Option until such shares are issued upon the exercise of a Stock Option.

(8) Neither the Corporation nor any subsidiary may directly or indirectly lend money to any Non-Employee Director for the

purpose of assisting the individual to acquire shares of Common Stock issued upon the exercise of Stock Options granted under the Plan.

(9) In the event of the termination of service as a Non-Employee Director, other than by reason of death, total and permanent disability or a Qualified Retirement, a Non-Employee Director who holds an outstanding Stock Option may (unless the Stock Option shall have been previously terminated) exercise the Stock Option at any time within three (3) months after such termination, but not after the expiration of the term of the grant, to the extent of the number of shares which were exercisable at the date of the termination of service.

(10) Except as provided in Section VII(13), in the event of Qualified Retirement a Non-Employee Director who holds an outstanding Stock Option may exercise the Stock Option to the extent the Stock Option is exercisable or becomes exercisable under its terms, at any time during the term of the option grant.

(11) In the event of a total and permanent disability, as determined by the Committee, a Non-Employee Director who holds an outstanding Stock Option may exercise the Stock Option, to the extent the option is exercisable or becomes exercisable under its terms, at any time within three (3) years after such termination or, if later, the date on which the Stock Option becomes exercisable with respect to such shares, but not after the expiration of the term of the option grant.

(12) In the event of the death of a Non-Employee Director who holds an outstanding Stock Option, the Stock Option may be exercised by a legatee, or by the personal representatives or distributees, at any time within a period of two (2) years after death, but not after the expiration of the term of the grant. If death occurs while the Participant is serving as a Non-Employee Director, or after a Qualified Retirement, or during the three-year period specified in Section VIII(11), Stock Options may be exercised to the extent of the remaining shares covered by the Stock Options whether or not such shares were exercisable at the date of death. If death occurs during the three-month period specified in Section VIII(9), Stock Options may be exercised to the extent of the number of shares that were exercisable at the date of death.

(13) Notwithstanding the other provisions of Sections VIII(10) or VIII(12), no option which is not exercisable at the time of a Qualified Retirement shall become exercisable after such Qualified Retirement if, without the written consent of the Corporation, a Non-Employee Director engages in a business, whether as owner, partner, officer, employee, or otherwise, or serves as a director for such business, which is in competition with the Corporation or one of its affiliates, and if the Non-Employee Director's participation in such business is deemed by the Corporation to be detrimental to the best interests of the Corporation. The determination as to whether such business is in competition with the Corporation or any of its affiliates, and whether such participation by such person is detrimental to the best interests of the Corporation, shall be made by the Corporation in its absolute discretion, and the decision of the Corporation with respect thereto, including its determination as to when the participation in such competitive business commenced, shall be conclusive.

SECTION IX

PROHIBITION ON REPRICING AND DISCOUNTED OPTIONS

Notwithstanding any other provision in the Plan, no Stock Option issued under the Plan may be amended or modified in any way that changes the Exercise Price of the Stock Option, and no Stock Option may be issued with an Exercise Price that is less than the Fair Market Value of one share of Common Stock on the Grant Date of the Stock Option or in any other way discounted. This provision shall not limit any adjustments provided by Section XII relating to adjustments upon changes in capitalization.

SECTION X

STOCK APPRECIATION RIGHTS AND OTHER AWARDS

(1) Subject to the terms of the Plan, the Committee may grant any types of Awards other than Stock Options provided for in Sections VII and VIII, and Restricted Stock provided for in Section XI, including but not limited to SARs. The Committee shall determine the terms and conditions of such Awards.

(2) The Committee may, subject to the terms of the Plan, grant SARs to Employee Participants at any time and from time to time as shall be determined by the Committee. The Committee may grant Freestanding SARs, Tandem SARs, or any combination thereof. The Committee shall have complete discretion in determining the number of SARs, subject to the terms of the Plan, and to determine

the terms of the SARs. The grant price of a Freestanding SAR shall equal the Fair Market Value of one share of Common Stock on the Grant Date. The Exercise Price of Tandem SARs shall equal the Exercise Price of the related Stock Option.

(3) Tandem SARs may be exercised for all or part of the shares subject to the related Stock Option upon the surrender of the right to exercise the equivalent portion of the related Stock Option. A related Stock Option is then exercisable.

(4) Notwithstanding any other provision of the Plan to the contrary, with respect to a Tandem SAR granted in connection with an Incentive Stock Option: (a) The Tandem SAR shall expire no later than the expiration than the expiration of the Incentive Stock Option; (b) The value of the payout with respect to the Tandem SAR shall not exceed the excess of the fair market value of the shares subject to Incentive Stock Option at the time the Tandem SAR is exercised over the Exercise Price under the Incentive Stock Option; and (c) The Tandem SAR may be exercised only when the Fair Market Value of the shares subject to the Incentive Stock Option exceed the Exercise Price of the Incentive Stock Option.

(5) Freestanding SARs may be exercised upon whatever terms and conditions the Committee, in its discretion, impose upon them, subject, however, to the terms of the Plan.

(6) The term of SARs shall be determined by the Committee, in its discretion; provided that such term shall not exceed 10 years.

(7) Upon exercise of a SAR, a Participant shall be entitled to receive payment from the Corporation in an amount determined by multiplying: (a) the excess of fair market value of one share of Common Stock on the date of exercise over the Exercise Price, by (b) the number of shares with respect to which the SAR is exercised. At the discretion of the Committee, the payment upon exercise of a SAR may be in cash, in share equivalent fair market value, or in a combination thereof.

(8) Its shall be presumed unless the Company determines to the contrary, that all awards to Employees under this Section are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to an Employee to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rule of Section 162(m) of the Internal Revenue Code, the number of SARs that can be granted to any one Employee in any Fiscal Year shall not exceed 1,000,000 shares, less the number of stock options grant to such Employee during the year. Any Award the value of which is not solely dependent on value of the stock on which the award is based shall not exceed $4,000,000 for any Employee for the year.

SECTION XI

RESTRICTED STOCK

(1) Restricted Stock, or Stock Units, may be granted during a Fiscal Year or at any time thereafter. Awards under the Plan may be granted in the form of Restricted Stock, in the form of Stock Units, or in any combination of both. Restricted Stock or Stock Units may also be awarded in combination with Stock Options, and such an Award may provide that the Restricted Shares or Stock Units will be forfeited in the event that the terms of the Award Agreement are not fulfilled.

(2) Awards of Restricted Stock or Stock Units may be made under the Plan to Participants for meeting the stock ownership requirements as described in the Navistar Executive Stock Ownership Program, as may be amended from time to time by the Board of Directors, in their sole discretion, or for any other purpose.

(3) Each Award of Restricted Stock or Stock Units shall become vested, in full or in installments, upon satisfaction of the conditions specified in the Award Agreement. In no event will an Award of Restricted Stock or Stock Units granted under the Plan vest in full prior to the commencement of the third year anniversary of the Grant Date.

(4) The Participant will be entitled to all dividends paid with respect to all Restricted Stock awarded under the Plan during the period of restriction and will not be required to return any such dividends to the Corporation in the event of the forfeiture of the Restricted Stock. The Participant also will be entitled to vote Restricted Stock during the period of restriction.

(5) All Restricted Stock certificates awarded under the Plan are to be delivered to the Participant with an appropriate legend imprinted on the certificate.

(6) In the event a Participant dies while employed by or as serving as a Non-Employee-Director of the Corporation or following a

8

Qualified Retirement or total or permanent disability, the Restricted Stock or Stock Units will vest as of the date of death and all restrictions shall lapse and the Restricted Stock or Stock Units will be immediately transferable to the named beneficiary or to the Participant's estate. Any Restricted Stock or Stock Units that becomes payable after the Participant's death shall be distributed to the Participant's beneficiary or beneficiaries. A beneficiary designation may be changed by filing the prescribed form with the Secretary of the Corporation at any time before the Participant's death. If no beneficiary was designated or if no designated beneficiary survives the Participant, then any Restricted Stock or Stock Units that becomes payable after the Participant's death shall be distributed to the Participant's estate.

(7) In the event a Participant who holds unvested Restricted Stock or Stock Units, terminates employment or service as a Non-Employee Director with the Corporation by reason of Qualified Retirement or total and permanent disability, the Restricted Stock or Stock Units will continue to vest according to the terms of the Restricted Stock.

(8) In the event a Participant otherwise terminates employment or service as a Non-Employee Director, any Restricted Stock or Stock Units that is not vested forfeits to the Corporation.

(9) Its shall be presumed unless the Committee determines to the contrary, that all awards to Employees under this Section of the Plan are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to an Employee to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rules of Section 162(m) of the Internal Revenue Code, the maximum Award under this Section of the Plan to any one Employee during any one Fiscal Year shall not exceed 1,000,000 shares.

## SECTION XII

## ADJUSTMENTS UPON CHANGES IN CAPITALIZATION

Notwithstanding any other provision of the Plan, the Award Agreements may contain such provisions as the Committee determines to be appropriate for the adjustment of the number and class of shares, subject to each outstanding Stock Option or SAR, the exercise prices in the event of changes in, or distributions with respect to, the outstanding Common Stock by reason of stock dividends, recapitalizations, mergers, consolidations, split-ups, combinations or exchanges of shares, spinoffs and the like, and, in the event of any such changes in, or distribution with respect to, the outstanding Common Stock, the aggregate number and class of shares available under the Plan and the limits applicable to Awards under the Plan, in each case, shall be appropriately adjusted by the Committee, whose determination shall be conclusive.

## SECTION XIII

## ADMINISTRATION OF THE PLAN

Full power and authority to construe, interpret and administer the Plan is vested in the Committee. Decisions of the Committee will be final, conclusive and binding upon all parties, including the Corporation, shareowners, Non-Employee Directors and Employees. The foregoing will include, but will not be limited to, all determinations by the Committee as to (a) the approval of Employees and Non-Employee Directors for participation in the Plan, (b) the amount of the Awards, (c) the performance levels at which different percentages of the Awards would be earned and all subsequent adjustments to such levels and (d) the determination of all Awards. Any person who accepts any Award hereunder agrees to accept as final, conclusive and binding all determinations of the Committee. The Committee will have the right, in the case of Employees not employed in the United States, or Non-Employee Directors not resident in the United States, to vary from the provision of the Plan to the extent the Committee deems appropriate in order to preserve the incentive features of the Plan.

## SECTION XIV

## NON-ASSIGNMENT

Awards under the Plan may not be assigned or alienated. In case of a Participant's death, the amounts distributable to the deceased Participant under the Plan with respect to which a designation of beneficiary has been made (to the extent it is valid and enforceable under applicable law) shall be distributed in accordance with the Plan to the designated beneficiary or beneficiaries. The amount distributable to a Participant upon death and not subject to such a designation shall be distributed to the Participant's estate. If there is

any question as to the right of any beneficiary to receive a distribution under the Plan, the amount in question may be paid to the estate of the Participant, in which event the Corporation will have no further liability to anyone with respect to such amount.

## SECTION XV

## WITHHOLDING TAXES

A Participant may elect, subject to the provisions of the applicable Sections of the Plan and the terms of the Award, to pay any withholding tax due in connection with the exercise of any Stock Option or SAR or upon the vesting of Restricted Stock or the settlement of any other Award either (i) by cash including a personal check made payable to the Corporation or (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant and if acquired from the Corporation owned for at least six months, or (iii) by any combination of cash or unrestricted Common Stock. The Committee may provide, in the Award Agreement, that in the event that a Participant is required to pay to the Corporation any amount to be withheld in connection with the exercise, vesting or settlement of an Award denominated in shares, the Participant may satisfy such obligation (in whole or in part) by electing to have the Corporation withhold a portion of the shares of Common Stock otherwise to be issued upon exercise, vesting or settlement of such Award equal in value to the minimum amount required to be withheld. The value of the shares to be withheld shall be the Fair Market Value on the date that the amount of tax to be withheld is determined.

## SECTION XVI

## RIGHTS OF PARTICIPANT

To the extent that any Participant, beneficiary or estate acquires a right to receive payments or distributions under the Plan, such right will be no greater than the right of a general unsecured creditor of the Corporation. All payments and distributions to be made hereunder will be paid from the general assets of the Corporation. Nothing contained in the Plan, and no action taken pursuant to its provisions, shall create or be construed to create any contracted right or trust of any kind or fiduciary relationship between the Corporation and any Participant, beneficiary or estate.

## SECTION XVII

## MODIFICATION, AMENDMENT OR TERMINATION

The Committee may modify, amend, or terminate the Plan at any time, provided that, unless the requisite approval of stockholders is obtained, no amendment shall be made to the Plan if such amendment would (i) increase the number of shares of Common Stock available for issuance under the Plan or increase the limits applicable to Awards under the Plan, in each case, except as provided in Section XII; (ii) lower the Exercise Price of the Stock Option or SAR grant value below 100% of the Fair Market Value of one share of Common Stock on the Grant Date, except as provided in Section XII; (iii) remove the repricing restriction set forth in Section IX; or (iv) require stockholder approval as a matter of law or under rules of the New York Stock Exchange. No Plan amendment shall, without the affected Participant's consent, terminate or adversely affect any right or obligation under any Stock Option or other Award previously granted under the Plan.

## SECTION XVIII

## RESERVATION OF SHARES

(1) The total number of shares of Common Stock reserved and available for delivery pursuant to this Plan is 3,250,000 shares of Common Stock. The number of shares authorized and available shall be increased by shares of Common Stock subject to an option or award under this Plan or any other plan, including the Navistar 1994 Performance Incentive Plan, the Navistar 1998 Supplemental Stock Plan, or the 1998 Non-Employee Director Stock Option Plan, that is cancelled, expired, forfeited, settled in cash or otherwise terminated without a delivery of shares to the Participant of the plan, including shares used to pay the option exercise price of an option issued under the Plan or any other plan or to pay taxes with respect to such an option.

(2) In order to provide a limitation on the number of shares that may be issued as Incentive Stock Options as provided by the Code, no more than 1,000,000 shares of Common Stock, or if less the number of shares that may be issued under the Plan, shall be granted as Incentive Stock Options in any calendar year. Such shares may be in whole or in part, as the Board of Directors shall from time to time determine, authorized and unissued shares of Common Stock or issued shares of Common Stock which shall have been

reacquired by the Corporation.

(3) In order to provide a limitation on the number of shares that may be issued as Restricted Stock, Stock Units, SARs, and Awards other than Stock Options, no more than 1,000,000 shares of Common Stock that may be issued under the Plan shall be granted as Restricted Stock, Stock Units, SARs, or Awards other than Stock Options.

## SECTION XIX

### RIGHTS OF EMPLOYEES

Status as an Employee shall not be construed as a commitment that any one or more Awards will be made under this Plan to an Employee or to Employees generally. Status as a Participant shall not entitle the Participant to any additional future Awards. Nothing in the Plan will confer on any Employee or Participant any right to continue in the employ of the Corporation or any of its subsidiaries or interfere with or prevent in any way the right of the Corporation or any of its subsidiaries to terminate an Employee or Participant's employment at any time for any reason.

## SECTION XX

### CHANGE IN CONTROL

Notwithstanding any provision contained herein to the contrary, in the event of a Change in Control, all awarded Restricted Stock and Stock Units will immediately be free of all restrictions and performance contingencies and will be deemed fully earned and not subject to forfeiture and all outstanding Stock Options governed by the Plan will be immediately exercisable and shall continue to be exercisable for a period of three (3) years from the date of the Change in Control regardless of the original term or employment status, except that the term of any Incentive Stock Option shall not be extended beyond ten (10) years from the date of grant.

## SECTION XXI

### LIMITATION OF ACTIONS

Every right of action by or on behalf of the Corporation or any shareowner against any past, present or future member of the Board of Directors, officer or Employee arising out of or in connection with the Plan will, irrespective of the place where action may be brought and irrespective of the place of residence of any such director, officer or employee, cease and be barred by the expiration of three (3) years from whichever is the later of (a) the date of the act or omission in respect of which such right of action arises or (b) the first date upon which there has been made generally available to shareowners an annual report of the Corporation and a proxy statement for the annual meeting of shareowners following the issuance of such annual report, which annual report and proxy statement alone or together set forth, for the related period, the aggregate amount of Awards under the Plan during such period; and any and all right of action by an Employee or Non-Employee Director (past, present or future) against the Corporation arising out of or in connection with the Plan shall, irrespective of the place where action may be brought, cease and be barred by the expiration of three (3) years from the date of the act or omission in respect of which such right of action arises.

## SECTION XXII

### GOVERNING LAW

The Plan will be governed by and interpreted pursuant to the laws of the State of Delaware, the place of incorporation of the Corporation, without giving effect to the principals of conflict of laws.

## SECTION XXIII

### EFFECTIVE DATE

The effective date of the Plan shall be February 17, 2004 (the "Effective Date"), subject to approval by the stockholders at the Corporation's Annual Meeting to be held on February 17, 2004, or any adjournment thereof. The Plan shall continue in effect for ten (10) years from the Effective Date, expiring February 16, 2014. No Awards may be granted under the Plan subsequent to February 16, 2014, but Awards theretofore granted may extend beyond that date in accordance with their terms.

## TAXATION OF NAVISTAR STOCK OPTIONS
### (February 2004)

*Summary*

The Company grants two types of stock options to employees, non-qualified stock options ("NQO") and incentive stock options ("ISO"). ISOs may be eligible for more favorable tax treatment because more of the income is potentially eligible for long-term capital gain treatment. Only non-qualified options are granted to Non-Employee Directors, and these are generally tax the same as non-qualified options granted to employees, except that directors are independent contractors and therefore not subject to FICA or general income tax withholding by the Company.

Stock options granted under the Restoration Program are non-qualified stock options. However, the Company's restoration stock option program can provide for the deferral of the delivery of the shares in a restoration type exercise. In this case the income is recognized for tax purposes at the time the shares are delivered, and the amount of the income is determined bases on the value of the stock on the date of delivery.

When ordinary income is realized on a stock option, the income is taxable at the employee's marginal tax rate. The highest federal tax rate is currently 35%, after the reductions made by the recent tax legislation. Hospital insurance tax at 1.45% also applies, since there is no wage base limitation as there is for the Social Security tax of 6.2%. Long-term capital gains, on the other hand, are generally taxable at a maximum federal rate that has been reduced from 20% to 15%. Capital gains are now considered long term if the stock was held for more than one year. The rate reductions apply for a limited number of years under the current law, however it is assumed in this memorandum the reduced rates will continue indefinitely.

Several years ago the IRS took the position that ISOs would not be subject to FICA tax or income tax withholding pending review by the IRS. The IRS has maintained the position that ISOs are not subject to FICA or withholding and indicated it would not impose FICA on ISO before the second taxable year after final regulations were adopted. It is generally assumed that the IRS will request that Congress adopt legislation to deal with FICA and withholding on ISOs. At this time there is no FICA or required withholding on ISO and likely will not be at least through 2004.

**NQOs.** When an employee exercises a NQO, the spread (the difference between the exercise price and the value of the stock on the date of exercise) is taxable as ordinary income. If the employee holds the stock for more than one year, any gain realized on the subsequent sale of the stock will be eligible for the 20% long-term capital gain rate. (If an officer could not sell the stock because of the insider trading rules under Section 16b, he would not recognize income during the Section 16b period, unless he filed an election to recognize income under §83(b) of the Code.)

**ISOs.** If an employee exercises an ISO and continues to hold the stock, no income is recognized at the time of the exercise. When the employee subsequently sells the stock, he will generally be eligible for the 15% long-term capital gain rate on all of the gain, both the spread that existed at the time of exercise and any increase in value after the exercise. To get the 15% rate, the

employee must hold the stock for two years from the date of the grant or the option, he most hold the stock for more than one year from the date of exercise of the option, and the employee most exercise the option within three (3) months of retirement or other termination of employment from the Company (one year in the case of disability). The employee needs to consider the alternative minimum tax implications of holding ISO stock. The spread (the excess of the value of the stock over the option price) at the time of exercise is a tax preference, and some employees could incur a minimum tax liability, which may require the payment of tax to the IRS. Generally when the employee sells the stock there is a negative adjustment to income for ATM purposes and this usually will entitle the employee to get the AMT back for the year in which he sells the stock.

**Exchange of shares.** If an employee uses Company stock that he owns to pay the exercise price of a stock option, generally he will not recognize gain on his use of the old stock. He will be treated as having exchanged old shares of Company stock for an equal number of new shares of Company stock. He does not recognize gain on the exchange and his basis and holding period will carryover to the new stock. (There are limitations on using ISO stock for this purpose.)

**The details.** Stock options are often subject to tax planing opportunities because the employee has some control over the timing and method of exercise and the holding of disposition of the stock. The tax rules are often complex. Some of the rules are summarized in this memorandum. Employees are advised to consult their tax and financial advisors to review the considerations involved in holding or exercising stock options.

## CAPITAL GAINS TAXATION

The Jobs and Growth Tax Relief Reconciliation Act of 2003 (the "Act") reduced the potential tax rate that applies to long-term capital gain. Generally the maximum federal rate was reduced from 20% to 15%. The Act also accelerated ordinary income tax rate reductions that had previously been adopted during the Bush Administration. The maximum federal rate is generally 35% and each person must consider what his marginal rate is based on his income for income tax purposes. The differential in tax rates could affect the relative value of ISOs compared to NQOs. It may also affect the relative advantage of using restoration options since the future gain on the shares acquired through a restoration option exercise is potentially eligible for capital gain treatment. Generally, stock acquire by exercise of an ISO or otherwise must be held for <u>more than one year</u> to be taxed at the lower long-term capital gains rates.

As discussed in the ISO section of this memorandum, there is a one-year and a two-year holding period that must be met for favorable tax treatment of an ISO. These holding periods are in addition to the capital gains holding period rules.

## NON-QUALIFIED STOCK OPTIONS

Options granted under the Company's 2004 Performance Incentive Plan will state whether the options are intended to be NQOs or ISOs. All options that will be granted as restoration options will be NQOs.

2

Income is recognized at the time of exercise of the option. (If a Section 16(b) holding period applied under the Securities laws, the income would be recognized at the end of the 16(b) period, unless the employee elected to recognize the income at the time of exercise by filing a section 83(b) election). The amount of the income is the difference between the option price paid to the Company to exercise the option and the market value of the stock. This difference between the price and value is often referred to as the spread. The income is taxable as ordinary income. The employee's basis in the stock received is equal to the sum of the amount paid for the shares and the amount of income recognized. Gain or loss on the subsequent sale of the stock is capital gain or loss. The rate that applies to the capital gain depends on the length of the period for which the stock was held from the date of exercise. Generally, the stock must be held for more than one year to qualify for the 15% long-term capital gains rate. If previously owned stock is used to pay the exercise price (as it would be if a restoration option exercise is made), gain or loss on the old stock is not recognized, and the basis of the new stock is adjusted for the non-recognized gain or loss.

The income realized on a NQO is subject to FICA taxes.

**Example 1, NQO cash exercise.** The employee exercises an option to purchase 150 shares at $25 per share. He pays the option price in cash using a cashless exercise program the company established with a stockbroker. Under the cashless exercise program the employee does not have to advance any part of the option price. The value of the stock at the time of exercise is $30. The employee recognizes income of $750, which is taxed as ordinary income at the employee's marginal rate. The employee's basis in the stock would be $4,500, the price paid at $25 per share times 150 shares plus the income recognized of $750. If the stock were sold in two years at $40 per share, there would be a capital gain of $10 per share, or $1,500. The capital gain would be long-term because the stock was held for more than one year. Any net long-term gain would be taxed at a maximum rate of 15%.

**Example 2, NQO exercised with previously owned stock held at a gain.** In April 2004 the value of the stock is $50 per share. The employee exercises an option granted in 2003 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) previously acquired in the market for $25 per share. The employee will be treated as having exchanged 80 old shares for 80 new shares. This exchange is non-recognized for tax purposes. The transaction is not recognized because a special rule of the Internal Revenue Code provides that an exchange of common stock for common stock in the same corporation is not recognized (§1036). Gain or loss is not recognized and the taxpayer's basis carries over. As a result, the employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $25 per share ($2,000). The employee's basis in the other 20 shares is $1,000, or $50 per share. This is the amount of income recognized on the exercise of the 100 options ($50 less $40 times 100 shares). On the subsequent sale of the 80 shares or the 20 shares, the employee will recognize gain to the extent the sale price exceeds the basis. For the purpose of the holding period required for long-term capital gain treatment, the 80 exchanged shares will be considered to be acquired on the date the old 80 shares were acquired, and the new 20 shares will be considered to be acquired on the date the shares are transferred to the

3

employee.

**Example 3, NQO exercised with previously acquired NQO stock held at a gain.** The facts are the same as in Example 2 except that the employee uses stock acquired by exercise of a NQO to pay the option price. The results are the same as in Example 2 in that the gain on the old shares is non-recognized.

**Example 4, NQO exercised with previously acquired ISO post-holding period stock held at a gain.** The facts are the same as in Example 2, except that the employee uses stock acquired by exercise of an ISO and the employee held the stock for the ISO holding periods (two years from grant, one year from transfer on exercise, as described in Example 12). The result is the same as in Example 2 in that the gain on the old stock is not recognized. However, in this Example 4 the non-recognized gain is likely to be larger because the gain includes the non-recognized gain that was realized on exercise of the ISO (see Examples 9 and 17) regarding exercise of an ISO).

**Example 5, NQO exercised with previously acquired ISO pre-holding period stock held at a gain.** The facts are the same as in Example 2, except that the employee uses stock acquired by exercise of an ISO, and the employee had not held that stock for the ISO holding periods (two years from grant, one year from transfer on exercise, as described in Example 12). The result is the same as in Example 2 in that gain on the 80 old shares will not be recognized. However, there are two differences. The non-recognized gain is likely to be larger because the gain includes the non-recognized gain that was realized on exercise of the ISO (see Examples 9 and 17 regarding exercise of an ISO). Secondly, there are special disqualifying disposition rules that apply when ISO stock is disposed of before the two-year and one-year holding periods are satisfied. These requirements will carry over to the new 80 shares of stock. These rules are described in Example 12. To illustrate, if the employee sold the new 80 shares within two years from the grant of the ISO, or within one year from the transfer of the ISO stock on exercise of the ISO, the gain recognized would be taxable as ordinary income to the extent that the market value of the ISO stock on the date of the grant of the ISO exceeded the ISO option price.

**Example 6, NQO exercised with previously owned stock held at a loss.** In April 2004 the value of the stock is $50 per share. The employee exercises an option granted in 2003 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) previously acquired in the market for $75 per share. The employee will be treated as having exchanged 80 old shares for 80 new shares. This exchange is non-recognized as an exchange of common stock for common stock in the same corporation. The employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $75 per share ($6,000). The employee's basis in the other 20 shares is $1,000 or $50 per share. This is the amount of income recognized on the exercise of the 100 options ($50 - $40 times 100 shares). For the purpose of the more than one year holding period required for lower capital gains rates, the 80 exchanged shares will be considered to be acquired on the date the 80 old shares were acquired, and the 20 new shares will be considered to be acquired on the date the shares are transferred to the employee.

4

**Example 7, NQO, cash exercise with proceeds from sale of old shares sold at a loss, wash sale.** The facts are the same as in Example 6 except instead of transferring the old shares to the company to pay the exercise price, the employee sells 80 old shares on the stock market for $50 per shares, and on the settlement date pays the proceeds to the company to pay the option price. Under the wash sale rules, the employee is not allowed to recognize the capital loss on the shares because he purchased identical shares within 30 days of the sale. His basis in the old shares will carry over and become his basis in the 80 new shares. If he sold the old shares more than 30 days before, or more than 30 days after, the exercise of the option, he would be allowed a capital loss on the sale. In general, a capital loss can be used to offset capital gain, and a net loss can be deducted, subject to a $3,000 per year limitation. A capital loss not used in a year can be carried over and used in subsequent years.

## INCENTIVE STOCK OPTIONS (ISO)

### *ISO requirements*

An option must meet certain requirements to qualify as an incentive stock option. Each option that will be issued by the Company under the Company's 2004 Performance Incentive Plan will state whether the option is intended to qualify as an ISO, or is intended to be a non-qualified option. Generally, the requirements for an ISO include that the option price is not less than the value of the stock on the date of grant, the option is non-transferable, the term is not longer than 10 years, the plan under which the options are granted is approved by the shareowners, and the option does not contain a statement that it is intended to be a non-qualified option.

If the option qualifies as an ISO, and if certain requirements are met, the employee will receive ISO tax treatment. In general, these requirements are that the amount of stock covered by the option is within the annual limitation, the stock is held for the required ISO holding period, and the employment test is met.

If the requirements for ISO treatment are met, no income is recognized on exercise of the option (except for the purpose of the AMT). The employee's basis in the acquired stock is equal to the price paid for the stock. On the subsequent sale of the stock, the employee recognizes gain to the extent that the amount received exceeds his basis in the stock. The gain is taxed as capital gain. The capital gain rate that applies depends on the holding period. If the stock is held for more than one year from the date of exercise, the gain will be taxed at 15%.

**Example 8, ISO cash exercise.** On December 15, 2003, the employee is granted an ISO to purchase 150 shares at $25 per share. On December 16, 2004, the employee exercises the ISO for 150 shares, which are transferred to him on that date, and he pays the option price of $25 per share in cash. The market value of the stock at the time of exercise is $30. On January 20, 2006, the employee sells the stock for $40 per share. The employee does not recognize income at the time of exercise (except for the purpose of the AMT). His basis in the shares is $25, the price he paid. On the sale of the stock he recognizes gain of $15 per share ($40 sale price less $25 basis). The total gain of $2,250 ($15 per share times 150 shares) is taxable as a long-term capital gain at the 15% rate

5

because the stock was held for more than one year.

### Example 9 (Omitted)

### *Alternative Minimum Tax (AMT)*

The alternative minimum tax or AMT is tax policy affected by schizophrenia. If a taxpayer would pay too little income tax because of the use of special tax provisions that provide favorable treatment of expenses or income items, the taxpayer might incur a liability under the AMT. The AMT is intended to prevent Congress from being embarrassed by newspaper reports of high-income taxpayers paying little of no tax. To prevent this, the AMT provides an overriding tax structure that applies if it produces a higher tax in any year than the regular tax. The 2003 tax legislation increases the exemption amount for some taxpayers.

The concept is this. The taxpayer computes his income in the regular way and than computes his regular income tax. He then computes his alternative minimum taxable income by adjusting his regular income for special items, sometimes called tax preferences. Then he computes his alternative minimum tax by applying the special AMT rates. To the extent that the AMT exceeds the regular tax, the taxpayer must pay the excess. However, he can get the AMT payment back in later years; he can claim a credit for the AMT payment in a subsequent year to the extent that the regular tax exceed the AMT in the subsequent year. Further, there may be offsetting adjustments to income in a subsequent year.

For the purpose of the AMT, the spread on an ISO (the difference between the option price and value of the stock on the date of exercise of the option) is an item of tax preference. This means that in computing alternative minimum taxable income for the year of exercise of an ISO, the taxpayer must include in income for AMT purposes the amount of the spread. However, in the case of the ISO preference, an offsetting adjustment will occur when the taxpayer sells the stock he acquired by exercising the ISO. More particularly, in the year of sale, for the purpose of computing the alternative minimum taxable income, the taxpayer increases his basis in the stock by the amount of the spread that was include in income as a preference, and takes a negative adjustment to alternative minimum taxable income for the year of sale. This will tend to make ATM less than the regular tax in the year of sale, thus supporting the taxpayer taking a credit in the year of sale for any AMT that was paid in the year of exercise of the option.

Whether the employee will incur an AMT liability in the year of exercise, and when he will be able to recover any AMT that had to be paid, depends on numerous factors affecting the returns for the year involved. It is often difficult to predict the outcome without reviewing all of the facts. Preparing pro-forma AMT calculations to show the amount of liability for the tax and the timing of the expected recover of any AMT payments is often helpful. Even if some AMT tax is incurred and it not recoverable for a period of time, there may still be substantial overall saving to an employee by exercising an ISO and holding the stock for the requisite holding period.

As a generalization, among the items includable in alternative minimum taxable income are

state taxes and ISO spread. There is an exempt amount which functions as a deduction against alternative minimum taxable income. The exempt amount varies with marital status and phases out as income exceeds specified levels. The tax rates for the AMT are 26% stepping up to 28%, with a 15% rate on long-term gains. Factors that help to avoid the AMT are low levels of preferences, lower income levels that preserve the exempt amount, or higher regular income tax rates that cause the total to exceed the AMT.

## *Annual limitation*

There is an annual $100,000 limitation on the amount of options that can qualify as ISOs. Each calendar year is tested separately. All options held by an employee that first become exercisable in the year are tested. Options cannot qualify as ISOs to the extent that the value of the stock covered by the options exceeds $100,000. The value of the stock for this purpose is the value of the stock on the date of the grant of the option.

The $100,000 limitation is applied separately for each year, but it is applies to all options regardless of when the option was granted, if the option first becomes exercisable in the testing year for all or any portion of the stock covered by the option. For example, a company granted an option in year one for 3,000 shares at $25, which is exercisable for 1,000 shares in year 2, 1,000 shares in year 3, and 1,000 shares in year 4. In year 2 the company granted an option for 3,000 shares at $30 which is exercisable for 1,000 shares in year 3, 1,000 shares in year 4, and 1,000 shares in year 5. In applying the $100,000 limitation, in year 2 there would be 1,000 shares valued at $25 for which the options first became exercisable ($25,000). In year 3 there would be would be two relevant options: i) the year 1 option that becomes exercisable for 1,000 shares at $25 ($25,000), and ii) the year 2 options that becomes exercisable for 1,000 share valued at $30 ($30,000), for a total for year 3 of $55,000.

**Example 10, $100,000 limitation.** To simplify this example, it is assumed the options become exercisable for all shares one year after the grant, rather than one third of the shares become exercisable each year. The company issues options meeting the ISO requirements to an employee in December 2003 covering $75,000 in stock valued as of December 2003. In December 2004 the 1998 options first become exercisable under the terms of the options that provide for exercise one year after grant. In December 2004 the Company issues options to the same employee covering $100,000 of stock, valued as of December 2004. In December 2004 there is a change of control of the company that causes the 2004 options to become immediately exercisable. As a result, $175,000 of purported ISOs would first become exercisable in 2004. The limitation would provide that the 2003 options covering $75,000 of stock continue to be eligible for ISO treatment. Only $25,000 of the 2004 options qualifies for ISO treatment. The $75,000 of excess 2004 options is treated as non-qualified options. The same result would occur if the company inadvertently issued options in excess of the $100,000 limitation.

## *Employment requirement*

To receive ISO treatment, the employee must have been an employee of the Company or a

subsidiary thereof from the date of grant of the option until at least within three (3) months of exercise of the option. If the employee were disabled, a one-year period would apply rather than a three-month period. For this purpose disabled means that the employee is unable to engage in any gainful employment by reason of physical or mental impairment which can be expected to result in death or last for a continuous period of at least 12 months.

**Example 11, employment test.** The employee is granted an ISO on December 16, 2002 to purchase 100 shares at $25 per share. On January 31, 2007, the employee retires from the company. On June 1, 2007, when the value of the stock is $95 per share, the employee exercises the ISO, paying the option price in cash. The employee recognizes ordinary income in the amount of $7,000 ($95 value less $25 option price times 100 shares). The exercise of the option does not comply with the ISO requirements because the option was not exercised within three months of the employee's termination of employment. The employee's basis in the shares is $9,500 ($25 option price plus $70 income times 100 shares).

### Holding periods

In order to receive ISO treatment, the employee must hold the stock both: i) for two years from the date of grant of the option, and ii) one year from the date the stock is transferred to the employee on exercise of the option. If the stock is disposed of before this time, the disposition is a disqualifying disposition and generally results in the employee recognizing ordinary income for the difference between the option price and value of the stock on the date of exercise, and capital gain for any increase in value after the date of exercise. For this purpose, stock is considered disposed of if it is sold, given away, or used to pay the option price on exercise of another ISO. (It may not be a disqualifying disposition for ISO stock to be used to pay the option price on an NQO. See Example 5.)

**Example 12, ISO disqualifying disposition by sale at a gain over value on date of exercise.** On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 1, 2004, the employee sells the stock on the stock exchange for $40 per share. The sale is a disqualifying disposition for two reasons. The stock was sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee recognizes ordinary income in the amount of $750 (the difference between the option price of $25 and the $30 value of the stock on the date of exercise, times 150 shares) and $1,500 of capital gains (the difference between the $40 sale price and the basis of $30 per share, which is the option price plus the amount of ordinary income recognized, times 150 shares). Both the ordinary income and the capital gain are recognized for the employee's 2004-tax year. The capital gain is short-term because the stock was not held for more than one year.

**Example 13, ISO disqualifying dispositions by sale at less than the stock value on date of exercise.** On December 16, 2002, an employee is granted an ISO. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On

8

December 1, 2004, the employee sells the stock on the stock exchange for $28 per share. The sale is a disqualifying disposition for two reasons. The stock was sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee recognizes ordinary income in the amount of $450 (the difference between the option price of $25 and the $28 value of the stock on the date of sale, times 150 shares). He does not realize any capital gain because the employee's basis would be the same as the sale price. (The income would be limited to the amount that the sale price exceeded the exercise price because of a special rule that applies when the stock is disposed of in a transaction in which a loss would be recognized, such as a sale to a third party.)

If, however, the stock was disposed of in a transaction in which a loss would not be recognized, for example, the property was given away, sold to a spouse, or sold in a wash sale, the ordinary income amount would be equal to the spread between the option price and the value or the stock at the time of exercise ($30-$25). See Example 15. The income is recognized for the employee's 2004-tax year.

**Example 14, ISO disqualifying dispositions by sale at less than option prices.** On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 1, 2004, the employee sells the stock on the stock exchange for $23 per share. The sale is a disqualifying disposition for two reasons. The stock was sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee would not recognize any ordinary income since the sale price is less than the option price, and the employee would recognize a capital loss of $300, the difference between the option price paid for the shares and the sale price ($25 less $23 times 150 shares). No ordinary income was recognized because of a special rule that applies when the stock is disposed of in a transaction in which a loss would be recognized. If, on the other hand, the property were disposed of in a transaction on which a loss would not be recognized, for example, the property was given away, sold to a spouse, or sold in a wash sale, the ordinary income amount would be equal to the spread between the option price and the value at the time of exercise. See Example 15. The capital loss would be recognized for the employee's 2004-tax year.

**Example 15, ISO disqualifying disposition by gift.** On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 2, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 2, 2004, the employee gives the stock to his son. The gift constitutes a disqualifying disposition for two reasons. The stock was disposed of within two years of the grant of the option, and the stock was disposed of within one year from the exercise of the option and the transfer of the stock to the employee. The effect of the gift would be as follows:

      i) If the value of the stock on the date of the gift were $40 per share, the employee would recognize ordinary income of $750 (the difference between the $30 value of the stock on the date of exercise of the option and the $25 exercise price). The son's basis in the stock would be the same as the employee's basis, $30 per share, the option price, plus the income recognized.

ii) If the value of the stock on the date of the gift were $20 per share, the employee would recognize ordinary income of $750 (the difference between the $30 value of the stock on the date of exercise of the option and the $25 exercise price). The employee's basis in the stock would be $30 per share. The employee would not be allowed to recognize a capital loss because the disposition was a gift. The son's basis in the stock would depend on subsequent circumstances. For determining gain on sale of the stock, the employee's basis of $30 per share would carry over and become the son's basis. For determining a loss on the sale of the stock, the son's basis would be $20 per share, the value of the stock on the date of the gift.

**Example 16, ISO exercise with pre-holding period ISO stock.** In November 2005, the value of the stock is $50 per share. The employee exercises an ISO granted in 2004 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) acquired in December 2004 for $25 per share by exercise of an ISO that had been granted in December 2003. In December 2004 the value of the stock was $30 per share. The two-year holding period would not be met for the 2003 ISO stock, and therefore there is a disqualifying disposition of the 2003 ISO stock. For tax purposes, two transactions will occur in 2000: the exchange of 80 old shares for 80 new shares, and the transfer of 20 additional new shares to the employee.

Exchange of 80 shares. A special rule applies in this case where and ISO is exercised with ISO stock that was not held for the ISO holding periods. Gain is recognized on the exchange of old ISO stock for new ISO stock, although a loss would not be recognized because of the wash sale rules. As a result, the employee recognizes gain in the amount of $2,000, the difference between his basis in the old stock ($25 times 80 shares equals $2,000) and the value of the new stock ($50 times 80 shares equals $4,000). This $2,000 gain consists of two elements:

i) $400 will be taxed as ordinary income, the difference between the option price for the old stock and the value of the stock on the date of exercise of the first option ($30 less $25 times 80 shares);

ii) $1,600 will be taxed as capital gain, the difference between the value of the stock on the date of exercise of the second option, and the sum of the employee's basis in the old stock and the ordinary income recognized on the exchange [$50 less ($25 plus $5) times 80 shares]. The capital gain would be short-term because the stock did not satisfy the more than one-year holding period.

The employee's basis in the 80 new shares will be $50 per share, reflecting his cost of $25 for the old shares, and the $25 of ordinary income and gain recognized on the exchange for the new shares. For the purpose of the more than one-year holding period required for the lower capital gains rates, the 80 exchanged shares will be considered to be acquired on the date the new shares are transferred to the employee.

20 additional new shares. The 20 additional new shares that the employee receives on

10

exercise of the second ISO will be eligible for ISO treatment. Therefore the employee will not recognize income at the time of exercise, and he will be eligible for capital gain treatment on the sale of the stock if the holding periods and employment tests are satisfied. The employee's basis in the 20 shares will be zero since he will have recognized no income with respect to the shares. For the purpose of the more than one-year period required for lower capital gain rates, the new 20 shares will be considered to be acquired on the date the shares are transferred to the employee.

**Example 17, ISO exercise with post holding period ISO stock.** In April 2005 the value of the stock is $50 per share. The employee exercises an ISO granted in 2003 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) acquired in December 2002 for $25 per share by exercise of an ISO that had been granted in December 2001. Because both holding periods are met for the 1995 ISO stock, use of the stock to pay the option price is not a disqualifying disposition. The employee will be treated as having exchanged 80 old shares for 80 new shares. This exchange is non-recognized as an exchange of common stock for common stock in the same corporation. The employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $25 per share ($2,000). The employee's basis in the other 20 shares is zero, because he did not recognize any income on exercise of the ISO. For the purpose of the more than one year holding period required for the lower capital gain rates, the 80 exchanged shares will be considered to be acquired on the date the old 80 shares were acquired, and the new 20 shares will be considered to be acquired on the date the shares are transferred to the employee.

**Example 18, ISO exercise with NQO stock.** The facts are the same as Example 17 except the stock used to pay the exercise price was acquired by exercise of a NQO. The result is the same as Example 17 except there is no issue of a disqualifying disposition because no ISO stock was used to pay the exercise price.

R. G. Martinell

N:\CAK\Stock Option File\Tax memo re stock options for 2004 PIP.doc

11

# EXHIBIT B

INTERNATIONAL TRUCK AND ENGINE CORPORATION
4201 WINFIELD ROAD, WARRENVILLE, IL 60555

T 630-753-3052
F 630-753-3150

ARNETTE FREUND – VICE PRESIDENT, COMPENSATION, BENEFITS AND HR SUPPORTS

January 15, 2008

To:  Holders of Navistar International Corporation
　　 Stock Options

Re:  Stock Option Statement

Enclosed is your Navistar International Corporation (the "Company") Stock Option Statement as of December 31, 2007.

As you may already know, the Company is not current with its financial filings with the Securities and Exchange Commission. As a result, there are certain limits on your ability to exercise your stock options.

In addition, some of your stock options may have expired or will expire in the near future. We plan to address this issue but we are unable to do so now. Once we file our Form 10-K for the 2006 fiscal year and the 2007 fiscal year, and become current with our quarterly reports for fiscal year 2008, our plan is to discuss this issue with our Board of Directors. We cannot predict what, if any, action our directors will take, but we will communicate with you, no matter what the outcome, once that process is completed.

The attached page summarizes how certain stock option transactions will be handled until the Company becomes current with its financial reporting.

In the meantime, if you have any questions that are not answered here or if you plan to conduct any stock option transactions during this time, please contact Howard Kuppler at (630) 753-2149.

Sincerely,

*Annette*

Attachments

XOP1255NAV

## TRANSACTION SUMMARY

| Transaction Type | Action that Can be Taken |
|---|---|
| Cashless Exercise of Stock Options | NOT ALLOWED until the Company is current with its public filings. |
| Cash Exercise of Stock Options | Allowed if optionee exercising stock options is an accredited investor see below for definition of accredited investor), however shares issued would be restricted and any sale of the shares would be governed by Rule 144 (See Rule 144 below). |
| Stock Swap Exercise of Stock Options | Allowed if optionee exercising the options is an accredited investor (see below for definition of accredited investor), however shares issued would be restricted and any sale of the shares would be governed by Rule 144 (See Rule 144 below). |

1.  Definition of Accredited Investor:  (i) is a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of the purchase of the securities exceeds $1,000,000; or (ii) is a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

2.  Summary of Rule 144:  Shares can only be sold after 2 years if not an affiliate of the Company *or* until 1 year has passed and all of the Company's financial statement filings are current.  Any sale must also comply with the other limitations of Rule 144.

XOP1255NAV

# EXHIBIT C

# Notice of Cancellation and Expiration of All Employee Stock Options – Ravi Rawat    Page 1 of 2

Post Dated: January 29, 2008

Sent By: Executive and Equity Plan Services, 1400 Merrill Lynch Drive, Mail Stop 04-03C; Pennington, NJ 08534

| Key Facts | | Navistar International Corporation | Prepared For: |
|---|---|---|---|
| Statement Period (MM/DD/YYYY): | 01/01/2007 to 12/31/2007 | NAV2 - $54.100000 | Stmt 166 RAVI P RAWAT 24714 CHAMPION DRIVE PLAINFIELD, IL 60544 |

Page 1 of 4

Market Price: as of 12/31/2007

## Option Balance

Potential Income @ $54.100000

| Grant Date | Option Price | Grant Type | Options Granted | Beginning Balance for Period | +/- Activity | Current Balance | Last Date to Exercise | Vest Date | Options Vesting | Options Vested | X | Income per Option | = | Total Income | Exercisable Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/14/1999 | $40.406300 | ISO | 2,241 | 2,241 | 2,241 | 2,241 | 0 | 04/05/2007 | | | 0 | $0.000000 | | $0.00 | $0.00 |
| 12/14/1999 | $40.406300 | NQO | 659 | 659 | 659 | 659 | 0 | 04/05/2007 | | | 0 | $0.000000 | | $0.00 | $0.00 |
| 12/12/2000 | $21.120000 | ISO | 2,133 | 1,067 | 1,067 | 1,067 | 0 | 04/05/2007 | | | 0 | $0.000000 | | $0.00 | $0.00 |
| 12/11/2001 | $38.200000 | ISO | 3,202 | 3,202 | 3,202 | 3,202 | 0 | 04/05/2007 | | | 0 | $0.000000 | | $0.00 | $0.00 |
| 12/11/2001 | $38.200000 | NQO | 98 | 98 | 98 | 98 | 0 | 04/05/2007 | | | 0 | $0.000000 | | $0.00 | $0.00 |
| 12/10/2002 | $26.385000 | ISO | 2,982 | 2,982 | 2,982 | 2,982 | 0 | 04/05/2007 | | | 0 | $0.000000 | | $0.00 | $0.00 |
| 12/10/2002 | $26.385000 | NQO | 918 | 918 | 918 | 918 | 0 | 04/05/2007 | | | 0 | $0.000000 | | $0.00 | $0.00 |
| 12/09/2003 | $42.385000 | NQO | 282 | 282 | 282 | 282 | 0 | 04/05/2007 | | | 0 | $0.000000 | | $0.00 | $0.00 |
| 12/09/2003 | $42.485000 | ISO | 2,218 | 2,218 | 2,218 | 2,218 | 0 | 04/05/2007 | | | 0 | $0.000000 | | $0.00 | $0.00 |
| 12/24/2004 | $40.915000 | ISO | 2,500 | 2,500 | 2,500 | 2,500 | 0 | 04/05/2007 | | | 0 | $0.000000 | | $0.00 | $0.00 |
| 10/18/2005 | $26.150000 | ISO | 2,500 | 2,500 | 2,500 | 2,500 | 0 | 04/05/2007 | | | 0 | $0.000000 | | $0.00 | $0.00 |
| Total: | | | 19,733 | 18,667 | 18,667 | 18,667 | 0 | | | | 0 | | | $0.00 | |

Please log on to www.benefits.ml.com to view your equity award activity. If you have any questions, please contact a Merrill Lynch Representative at 1-877-767-2404. If you reside outside of the U.S., Canada or Puerto Rico, please contact a Merrill Lynch Representative at 1-609-818-8894.

Values within this statement utilize standard rounding; actual numbers may vary.

The data presented on this section of your statement is for record keeping purposes only. This section does not reflect the holding of securities, cash, or cash equivalents by Merrill Lynch, Pierce, Fenner & Smith Incorporated. Accordingly, the options shown on this section of your statement are not subject to the provisions of the Securities Investor Protection Act of 1970, and brokerage account terms and conditions do not apply.

# Notice of Cancellation and Expiration of All Employee Stock Options – Ravi Rawat    Page 2 of 2

Post Dated: January 29, 2008

Sent By: Executive and Equity Plan Services, 1400 Merrill Lynch Drive, Mail Stop 04-03C; Pennington, NJ 08534

| Key Facts | | Navistar International Corporation | | Prepared For: |
|---|---|---|---|---|
| Statement Period (MM/DD/YYYY) | 01/01/2007 to 12/31/2007 | NAVZ - $54.100000 | | Sent 165    2 |
| Page 2 of 4 | | Market Price as of 12/31/2007 | | RAVI P RAWAT 24714 CHAMPION DRIVE PLAINFIELD, IL 60544 |

## Cancellations/Transfers

| Date | Grant Type | Grant Date | Number of Options/Shares/Units | Activity |
|---|---|---|---|---|
| 01/05/2007 | ISO | 12/14/2004 | 833 | Cancelled (Terminated) |
| 01/05/2007 | ISO | 10/18/2005 | 1,666 | Cancelled (Terminated) |
| 04/05/2007 | NQO | 12/14/1999 | 659 | Cancelled (Expired) |
| 04/05/2007 | NQO | 12/11/2001 | 98 | Cancelled (Expired) |
| 04/05/2007 | NQO | 12/10/2002 | 918 | Cancelled (Expired) |
| 04/05/2007 | ISO | 12/14/1999 | 2,241 | Cancelled (Expired) |
| 04/05/2007 | ISO | 12/09/2003 | 2,210 | Cancelled (Expired) |
| 04/05/2007 | ISO | 12/10/2002 | 2,982 | Cancelled (Expired) |
| 04/05/2007 | ISO | 12/11/2001 | 3,252 | Cancelled (Expired) |
| 04/05/2007 | ISO | 12/12/2000 | 1,097 | Cancelled (Expired) |
| 04/05/2007 | NQO | 12/09/2003 | 282 | Cancelled (Expired) |
| 04/05/2007 | ISO | 12/14/2004 | 1,667 | Cancelled (Expired) |
| 04/05/2007 | ISO | 10/18/2005 | 834 | Cancelled (Expired) |
| **Total** | | | **18,667** | |

The data presented on this section of your statement is for record keeping purposes only. This section does not reflect the holding of securities, cash, or cash equivalents by Merrill Lynch, Pierce, Fenner & Smith Incorporated. Accordingly, the options reflected on this section of your statement are not subject to the provisions of the Securities Investor Protection Act of 1970, and brokerage account terms and conditions do not apply.

# EXHIBIT D

Cary R. Perlman

Sears Tower, Suite 5800
233 S. Wacker Dr.
Chicago, Illinois 60606
Tel: +1.312.876.7700  Fax: +1.312.993.9767
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

File No. 010255-0330

## By Email and U.S. Mail

June 24, 2008

Mr. Clinton A. Krislov
Krislov & Associates, Ltd.
20 North Wacker Drive, Suite 1350
Chicago, IL 60606

Re:    Rawat v. Navistar International Corporation

Dear Mr. Krislov:

Pursuant to our telephone call this morning, please find attached a courtesy copy of the form of letter and the form of release mailed last Friday to certain current and former employees of Navistar.

Sincerely,

Cary R. Perlman
of LATHAM & WATKINS LLP

cc: Robin Hulshizer

CH\1036042.1



Navistar, Inc.
4201 Winfield Road
Warrenville, IL 60555  USA

P : 630-753-3052
W : navistar.com

Annette M. Freund
Vice President,
Compensation, Benefits
and HR Support

June 20, 2008

Re:  Expired Stock Options

Dear _____:

As you know, until recently Navistar International Corporation (the "Company") has not been current with its Form 10-K filings with the Securities and Exchange Commission ("SEC").  During the time the Company was not current, there were limits on your ability to exercise your stock options.  The expiration date for certain stock options fell within the period when these limits were in effect.  In my letter to you of January 15, 2008, the Company identified the option expiration issue, informed you that we planned to address the issue with the Board of Directors, and promised to communicate with you again regarding the Board's decision.

On June 16, 2008, we raised these matters with the Board.  We are pleased to report that the Board has authorized us to extend to you a one-time opportunity to obtain a cash payment from the Company in resolution of any and all issues in connection with vested stock options that expired during the period when the above-described trading restrictions were in place (the "Expired Options").

The amount of your cash payment will be the difference between the closing price on the date your option expired and the exercise price for all of your options "in the money" on the option expiration date – *i.e.*, your payment will match the profit you would have made had you sold the shares at the end of the day the option expired, subject to applicable withholding taxes.  For example, if you had vested stock options exercisable at $25.00, and the stock closing price on the date those options expired was $65.00, we will pay you $40.00 times the number of Expired Options.  The payments available to **you** individually are set forth on the enclosed Statement of Offer (*Exhibit A*).  For your convenience, we have enclosed publicly available data reflecting the closing price of the Company's common stock on the option expiration date.

As consideration for the payment described in this letter, you must execute and return to the Company a release of claims in the form attached as *Exhibit B* to this letter ("Payment and Release").  The Payment and Release makes clear that your choice to accept the cash payment is a full and complete resolution of any and all claims you may have associated with the Expired Options.  Because the Payment and Release affects your rights and precludes litigation with the Company (including preclusion of your participation in the lawsuit described below), you should review it carefully before signing it.

On or about May 23, 2008, Mr. Ravi P. Rawat filed a putative class action complaint against the Company (the "Complaint") related to the option expiration issue. Mr. Rawat's Complaint was filed in the United States District Court for the Northern District of Illinois (Case No. 1:08-cv-03038), and it alleges that the Company breached stock option agreements with those who hold Expired Options. The Complaint also alleges that the Company breached "an implied covenant of good faith and fair dealing" in connection with the Expired Options. The Company does not believe that it has an obligation to compensate individuals for the Expired Options or that the claims set forth in the Complaint are valid, and we intend to vigorously contest all of the relief Mr. Rawat seeks.

This one-time opportunity will be available to you until August 1, 2008. If you choose to take advantage of this offer, the process will be as follows: *Execute the Payment and Release. Return it to Mr. Howard Kuppler, Navistar International Corporation, 4201 Winfield Road, P.O. Box 1488, Warrenville, IL 60555 **no later than August 1, 2008.** If we receive the executed Payment and Release on or before July 3, 2008, unless you direct otherwise we will mail a check in the amount of your payment, less applicable withholding taxes, to your home address on or before July 31, 2008. If we receive the executed Payment and Release on or before August 1, 2008, unless you direct otherwise we will mail a check in the amount of your payment, less applicable withholding taxes, to your home address on or before August 29, 2008.*

Your execution and return of the Payment and Release constitutes your acceptance of this offer.

If you have questions not answered in this letter, please contact Howard Kuppler at (630) 753-2149.

*Annette*

Attachments:

Exhibit A – Statement of Offer
Exhibit B – Payment and Release

Exhibit B

## PAYMENT AND RELEASE

Execution of this Payment and Release constitutes acceptance of the offer reflected in that certain letter dated June 20, 2008, from Annette Freund (the "Freund Letter").

**General Release.** For adequate and valuable consideration exchanged between the parties, the sufficiency of which is hereby acknowledged, _____ ("Releasor"), on behalf of Releasor and on behalf of Releasor's past, present and future respective predecessors, successors, heirs, assigns and any of the respective owners, members, managers, partners, principals, directors, officers, agents and employees of any of the foregoing, with full understanding of the contents and legal effect of this release, and having the right and opportunity to consult with counsel and a tax advisor, hereby releases and forever discharges Navistar International Corporation. (the "Company" or "Releasee") and its parents, subsidiaries, affiliates, related companies, agents, heirs, assigns, attorneys, lenders, and insurers, and any of the respective owners, members, managers, partners, principals, directors, officers, agents and employees of any of the foregoing, from any and all judgments, claims, demands, grievances, damages or causes of action of any kind or nature whatsoever, whether in contract (express or implied), covenant of good faith and fair dealing (express or implied), tort, statutory, or otherwise, whether legal or equitable, that Releasor has or may have in any way related to Releasor's stock options, whether in the money or out of the money, that expired during the period when there were certain limits on Releasor's ability to exercise Releasor's vested stock options ("Expired Options"), including but not limited to the claims described in the putative class action complaint filed against the Company by attorney Clinton A. Krislov on behalf of Mr. Ravi P. Rawat in the United States District Court for the Northern District of Illinois (Case No. 1:08-cv-03038), and as described in the Freund Letter.

**Covenant Not to Sue.** A "covenant not to sue" is a legal term which creates a promise not to file a lawsuit in court. It is different from the General Release of claims contained above. Besides waiving and releasing the claims covered by the General Release, Releasor further agrees never to sue the Company in any forum for any reason covered by the General Release language in the above paragraph. Notwithstanding this Covenant Not to Sue, Releasor may bring a claim against the Company to enforce this Payment and Release.

**Payment/Consideration.** In consideration for this Release, the Company shall pay Releasor a cash payment in the amount set forth in the Statement of Offer attached as Exhibit A to the Freund Letter, which Exhibit A is incorporated by reference as if fully set forth herein. Releasor acknowledges and agrees that the Company has no obligation to compensate Releasor for the Expired Options.

**Taxes.** Releasor agrees that all tax liability which may result from the payment of money as set forth herein rests with Releasor alone.

**Consultation With Legal Counsel, Advisors.** By signing this Release, Releasor expressly acknowledges that Releasor has had the opportunity to consult with legal counsel and a tax advisor of Releasor's choosing prior to signing this Release if Releasor so desires.

**Governing Law.** This Release will be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and/or to be performed in that State, without regard to any choice of law provisions thereof.

**Complete Agreement.** Except as provided herein, this Agreement supersedes all prior and contemporaneous agreements of any kind between the parties relating to the Expired Options.

**Severability.** If any provision of this Release is invalid or unenforceable, the balance of this Release will remain in effect, and if such provision is inapplicable to any person or circumstance, it will nevertheless remain applicable to all other persons and circumstances.

THIS IS A FULL AND FINAL RELEASE – I HAVE READ, UNDERSTOOD AND VOLUNTARILY AGREED TO THE TERMS OF THIS RELEASE BEFORE SIGNING.

Executed this _____ day of _____, 2008.


_____
Releasor

2

# EXHIBIT E

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 C 3038 | **DATE** | 6/30/2008 |
| **CASE TITLE** | Ravi B. Rawat vs. Navistar International Corp. | | |

**DOCKET ENTRY TEXT**

Plaintiff's emergency motion for a protective order [18] is granted in part and denied in part. Enter Order.

■ [ For further detail see separate order(s).]    Docketing to mail notices.

| | Courtroom Deputy Initials: | MF |
|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | ) ) ) |
| | ) Case No. 08-cv-03038 |
| Plaintiff, | ) ) |
| v. | ) Judge John W. Darrah |
| | ) |
| NAVISTAR INTERNATIONAL CORPORATION, | ) Magistrate Judge Nan R. Nolan ) |
| | ) |
| Defendant. | ) ) |

## ORDER

WHEREAS, having considered Ravi P. Rawat's Emergency Motion for a

Protective Order to Prevent Defendant from Contacting Putative Class Members and

Soliciting Releases, it is HEREBY ORDERED:

The motion is granted in part and denied in part. Defendant is to send corrective notice to

the putative class in the form attached hereto as Exhibit A.

SO ORDERED this 30th day of June, 2008.

John W. Darrah
United States District Court Judge

# EXHIBIT A



Navistar, Inc.
4201 Winfield Road
Warrenville, IL 60555  USA

P : 630-753-3052
W : navistar.com

Annette M. Freund
Vice President,
Compensation, Benefits
and HR Support

June 27, 2008

## NOTICE:  THIS MAY AFFECT YOUR LEGAL RIGHTS

To all recipients of the June 20, 2008 letter from Annette Freund, Vice President,
Compensation, Benefits and HR Support of Navistar International Corporation:

Dear _____ :

You received a letter offering a cash payment and soliciting your release of claims
relating to Navistar Stock Options.

Releases sent to the Company before August 1, 2008 will not be effective until August
1, 2008.  Anyone who had previously sent releases to the Company may reconsider your release
until August 1, 2008.  If you choose to reconsider, you have until August 1, 2008 to deliver a
revocation to Mr. Howard Kuppler, Navistar International Corporation, 4201 Winfield Road,
P.O. Box 1488, Warrenville, IL 60555.

A class action case, *Rawat v. Navistar Int'l Corp.*, 08cv3038 (N.D. Ill.), seeks to certify
a class consisting of persons with vested stock options that expired during the period when
trading restrictions were in place.  The lawsuit claims that Navistar is obligated to compensate
you for any resulting harm because of your inability to exercise your options before they
expired.

For any inquires regarding *Rawat v. Navistar Int'l Corp.*, you may contact the following
counsel:

**Clinton A. Krislov, Esq.**
**KRISLOV & ASSOCIATES, LTD**
**Civic Opera Building**
**20 North Wacker Drive, Suite 1350**
**Chicago, IL 60606**
**Phone: (312) 606-0500**
**Fax:    (312) 606-0207**
clint@krislovlaw.com

You may also contact legal counsel of your choice.

# EXHIBIT F

# KRISLOV & ASSOCIATES, LTD.
## *Attorneys at Law*

CIVIC OPERA BUILDING, SUITE 1350
20 NORTH WACKER DRIVE
CHICAGO, ILLINOIS 60606

FAX (312) 606-0207
TELEPHONE (312) 606-0500

July 9, 2008

<u>VIA E-MAIL AND U.S. MAIL</u>
Navistar International Corporation
c/o Cary Perlman
Latham & Watkins, LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Fax: 312.993.9767

     *Re:*    *Demand pursuant to 705 ILCS 225/1 et seq.,*
           *Attorneys Fees in Wage Actions Act*

Dear Cary:

I write on behalf of Ravi P. Rawat and all Navistar employees and former employees who were unable to exercise vested stock options during the Navistar's blackout period, which began April 6, 2006 and ended May 29, 2008 (herein referred to as the "putative class" or "putative class members").

During Navistar's blackout period, putative class members were unable to exercise vested stock options granted pursuant to Navistar's Stock Option Plan(s). Therefore, Navistar is contractually and legally obligated to: 1) allow putative class members to exercise their options; 2) toll the expiration date on each option to allow putative class members a reasonable period to exercise options after the blackout period ended; and/or 3) fully compensate the putative class based on the expiration of those options at an appropriate price.

Instead, Navistar allowed the putative class' vested stock options to expire. We believe that Navistar's coercive and misleading June 20, 2008 offer, sent to class members other than Mr. Rawat, is wholly inadequate. Rather, full compensation to the putative class should be measured by the difference between the options' strike price and Navistar's common stock price on the date the blackout period ended, May 29, 2008 (NAV common stock closed at $75.90).

KRISLOV & ASSOCIATES, LTD.

Letter to Navistar International Corporation
Page 2

As such, Mr. Rawat demands payment to himself and the putative class in the amount of the difference between the strike price of each particular vested option that expired and the price of Navistar's common stock on the day that the Company's blackout period ended. Under this formula, Mr. Rawat alone is owed $661,142.80. We demand payment in the amount of $661,142.80 for Mr. Rawat and also demand that putative class members be paid under the same formula, in an amount calculated based on their specific option strike prices.

Please be advised as well, that Mr. Rawat's and the putative class' stock options are wages that are earned and due and owing according to the terms of Mr. Rawat's and the putative class' terms of employment, as well as Navistar's Stock Option Plan and the Illinois Wage Payment and Collection Act.

This demand is made pursuant to 705 ILCS 225/1 *et seq.*, the Attorneys Fees in Wage Actions Act.

We look forward to hearing from you.

Very truly yours,

Clinton A. Krislov

CAK/js
cc:    Mark Baiocchi, Esq.
       Lawrence Levine, Esq.

# EXHIBIT G



## NAVISTAR INTERNATIONAL CORPORATION

### 2004 Performance Incentive Plan
### Prospectus and Stock Option Information

March 24, 2004



# NAVISTAR INTERNATIONAL CORPORATION

### 2004 Performance Incentive Plan
### Prospectus and Stock Option Information

**March 24, 2004**

NAVISTAR INTERNATIONAL CORPORATION
DOCUMENTS CONSTITUTING A SECTION 10(a) PROSPECTUS
PURSUANT TO A FORM S-8 REGISTRATION STATEMENT

THIS DOCUMENT CONSTITUTES PART OF A PROSPECTUS COVERING
SECURITIES THAT HAVE BEEN REGISTERED UNDER
THE SECURITIES ACT OF 1933, AS AMENDED

---

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.

---

Solely the information included under Tabs 1.0 through 2.0 shall constitute this prospectus. The information and documentation included under Tab 3.0 shall not, nor shall be construed in any manner to, constitute a part of this prospectus.

---

Neither the delivery of this prospectus nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the company since the date hereof. No person has been authorized to give any information or to make any representations, other than those contained in this prospectus, and, if given or made, such other information or representations must not be relied upon as having been authorized by the company. This prospectus does not constitute an offer to sell or solicitation of an offer to buy by anyone in any jurisdiction in which it is unlawful to make such offer or solicitation.

---

Solely the information contained under Tabs 1.0 through 2.0 constitutes a prospectus covering securities that have been registered under the Securities Act of 1933, as amended.

# PROSPECTUS

Navistar International Corporation

General Information
Regarding the

### 2004 Performance Incentive Plan

This prospectus describes but does not set forth the terms and conditions of Navistar International Corporation's 2004 Performance Incentive Plan. In the event of any conflict between the terms and conditions of the 2004 Performance Incentive Plan and the information contained in this prospectus, the terms and conditions of the 2004 Performance Incentive Plan shall prevail. No person has been authorized to give any information or to make any representations other than those contained in this prospectus in connection with the 2004 Performance Incentive Plan and the offering described in this prospectus, and if given or made, such other information or representations may not be relied upon as having been authorized by Navistar International Corporation.

**This document constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933, as amended.**

**The date of this prospectus is March 24, 2004**

TABLE OF CONTENTS

Page

Introduction                                                                                           -1-

What is the Company's purpose in providing the 2004 Plan?                                              -2-

Who is eligible to participate in the 2004 Plan?                                                       -2-

How do I benefit under the 2004 Plan?                                                                  -2-

What does an Award consist of under the 2004 Plan?                                                     -2-

What are the general terms of my Award under the 2004 Plan?                                            -3-

Will the Company provide me periodic reports concerning my Awards
under the 2004 Plan?                                                                                   -6-

How do I exercise my Award and pay for the shares that I buy under
the 2004 Plan?                                                                                         -6-

Can I sell or transfer my Award to someone else?                                                      -6-

Can I sell the shares I acquire by exercising my Award?                                               -7-

Can the Company reprice or discount stock options granted under the 2004 Plan?   -8-

How would my Award be affected by a future change in the capitalization
of the Company?                                                                                        -8-

How would my restricted stock, stock units and stock options be treated
in the event of a change in control of the Company?                                                   -8-

Does the grant of an Award or ownership of shares give me any
special rights?                                                                                        -8-

Under what circumstances can the 2004 Plan or my Award Agreement
be modified or termination?                                                                            -9-

What exactly is the Restoration Stock Option program and how does it work?                             -9-

What is the Federal Income Tax treatment of an Award?                                                  -9-

Risk Factors and Certain Investment Considerations                                                    -12-

Additional Information.                                                                                -13-

i

This prospectus provides information concerning awards granted under the Navistar International Corporation 2004 Performance Incentive Plan (the "2004 Plan"), primarily in question and answer format. The information contained herein is qualified in its entirety by the text of the 2004 Plan.

**Introduction.**

    *Principal Office and Telephone Number.*  The principal executive office of Navistar International Corporation (the "Company") is located at 4201 Winfield Road, Warrenville, Illinois 60555, and the Company's telephone number is (630) 753-5000.

    *The 2004 Performance Incentive Plan.*  The 2004 Plan was approved by the Board of Directors (the "Board") and the independent Compensation and Governance Committee (the "Committee") of the Company on October 21, 2003 and by the shareowners of the Company on February 17, 2004. A total of 3,250,000 shares of Common Stock of the Company are reserved for awards under the 2004 Plan. As of February 17, 2004, no awards have been made in respect of any shares of Common Stock reserved for issuance under the 2004 Plan. The 2004 Plan replaces the Company's 1994 Performance Incentive Plan (which expired December 16, 2003), the 1998 Supplemental Stock Plan and accompanying Restoration Stock Option Program (which both expired on December 16, 2003) and the 1998 Non-Employee Director Stock Option Plan (which the Company terminated on February 17, 2004). The 2004 Plan expires on February 16, 2014. The 2004 Plan is governed by and interpreted in accordance with the laws of the State of Delaware. Any cause of action a participant may have in respect of the 2004 Plan must be brought within the three year period set forth in the 2004 Plan or such claim will be barred in accordance with the terms and conditions of the 2004 Plan.

    The number of shares authorized and available for issuance under the 2004 Plan will be increased by shares of stock subject to an option or award under the 2004 Plan, or any other plan, including, the 1994 Performance Incentive Plan, the 1998 Supplemental Stock Plan or the 1998 Non-Employee Director Stock Option Plan, that is cancelled, expired, forfeited, settled in cash or otherwise terminated without a delivery of shares to the participant of such plan, including shares used to pay the stock option exercised price of a stock option issued under the 2004 Plan or any other plan or to pay taxes with respect to such stock option.

    Unless otherwise specified, a reference herein to the "2004 Plan" refers to the 2004 Performance Incentive Plan. Awards granted under the 2004 Plan may consist of annual incentive awards, stock options, restricted stock, stock units, stock appreciation rights or any other type of award granted by the Committee under the 2004 Plan and such awards may herein after be referred to as an "Award" or collectively as "Awards."

    *Administration.*  The 2004 Plan is administered by the Committee. All Committee members are non-employee directors of the Company and are appointed to the Committee by the Board for a one-year term and may be removed by the same. All decisions of the Committee will be final, conclusive and binding upon all parties. In administering the 2004 Plan, the Committee's discretionary authority includes, without limitation, determinations as to (1) the approval of participants in the plan, (2) the amount and nature of the Awards and (3) the performance levels at which different percentages of the Awards would be earned and adjusted. For further information about the 2004 Plan, please refer to the 2004 Plan or contact the Company's Corporate Secretary at the Company's principal executive office.

*ERISA and Certain Tax Provisions Not Applicable.* The 2004 Plan is not subject to any provisions of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") and is not qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code").

**What is the Company's purpose in providing the 2004 Plan?**

The purpose of the 2004 Plan is to enable the Company and its subsidiaries to attract and retain highly qualified personnel and non-employee directors, and additionally to provide key employees who hold positions of major responsibility in the Company the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value.

**Who is eligible to participate in the 2004 Plan?**

Management will, from time to time, select and recommend to the Committee employees of the Company and its subsidiaries who are to become participants in the 2004 Plan. Such individuals will be selected from those who, in the opinion of management, have substantial responsibility in a managerial or professional capacity. Non-employee directors are also eligible to participate in the 2004 Plan. Non-employee directors participating in the 2004 Plan shall be limited to receiving Awards of non-qualified stock options, restricted stock and stock units under the 2004 Plan.

**How do I benefit under the 2004 Plan?**

You benefit by an Award of cash or stock-based compensation under the 2004 Plan. The grant of a stock-based Award gives you the opportunity to benefit from possible appreciation in the market price of the Company's Common Stock.

**What does an Award consist of under the 2004 Plan?**

Under the 2004 Plan, the Committee may award: (1) annual incentive awards to participants, consisting of awards of cash approved by the Committee based on the level of achievement attained against annual performance goals approved by the Committee within the first ninety days of the applicable fiscal year; (2) stock option awards to employee participants, consisting of either nonqualified stock options or incentive stock options; (3) non-qualified stock option awards to non-employee director participants; (4) restricted stock awards to participants; (5) stock unit awards to participants; (6) stock appreciation right awards to employee participants, whether granted in connection with a related stock option or independent thereof; (7) any other type of Award granted by the Committee under the 2004 Plan; or (8) any combination of the foregoing Awards. All such Awards may be made, subject to the terms of the 2004 Plan, in such amounts (if any) and at such times (if at all) as the Committee may approve; provided, however, that in order to provide a limitation on the number of shares of Common Stock of the Company that may be issued in respect of a particular Award under the 2004 Plan, no more than 1,000,000 shares of Common Stock of the Company may be granted as stock options, restricted stock, stock units, SARs or any other Award under the 2004 Plan; provided, further, that such limitation shall not apply to any Award which is a non-qualified stock option granted to non-director employee participants.

**What are the general terms of my Award under the 2004 Plan?**

*General.* The principal terms of your Award will be contained in an award agreement between you and the Company (an "Award Agreement"), which you will enter into, upon the grant to you by the Company of an Award under the 2004 Plan. These terms will include the general nature of the Award, including the number of shares subject to each Award (in the case of a stock-based Award), the number of Awards granted to you, the date each Award is granted and other terms and conditions not expressly provided for in the 2004 Plan.

*Annual Incentive Awards.* If your Award is an annual incentive award, you will be eligible to receive a cash payment from the Company based upon the performance measures (as defined in the 2004 Plan) established by the Committee and set forth in your Award Agreement within the first ninety days of the applicable fiscal year. Only employee participant under the 2004 Plan are eligible to receive annual incentive awards and no participant who is not an employee at the end of the Company's fiscal year shall be entitled to such Award unless the Committee determines otherwise. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your annual incentive award.

*Stock Options.* If your Award is a stock option, the Committee will have the authority to determine certain terms relating to your stock option, including the grant date, the exercise price (which will be the fair market value of the stock on the date of grant of the stock option, as determined by the Committee), the exercise period, the number of shares that may be exercised at any given time, when you may exercise your stock option, any conditions to the exercise of your stock option, any restrictions on your right to sell the shares you purchase through the exercise of your stock option and whether the stock option is intended to be an incentive stock option under Section 422 of the Code. (Please remember that non-employee director participants are not eligible to receive incentive stock option Awards under the 2004 Plan.) Unless otherwise determined by the Committee and set forth in your Award Agreement, stock options granted to participants under the 2004 Plan will become exercisable in whole or in part as follows: after the commencement of the second year of the term of the stock option, to the extent of one third of the shares; after the commencement of the third year of the stock option, to the extent of one third of the shares; and after commencement of the fourth year of the stock option, to the extent of one third of the shares. Generally, except as otherwise provided in the 2004 Plan (see discussion regarding death, total and permanent disability or qualified retirement below), no outstanding stock option may be exercised by a participant unless such participant is an employee or non-employee director of the Company, as the case may be, at the time of exercise; provided, however, that in the event of termination of such relationship (other than on account of death, total and permanent disability or qualified retirement), such participant may exercise the stock option at any time within three months after such termination (but not after the expiration of the term of the grant) to the extent of the number of shares which were exercisable at the date of such termination; provided, further, that with respect to any employee participant, if such employee participant is terminated for cause as defined the International Truck and Engine Corporation Income Protection Plan or if the employee participant is covered by a different severance plan or agreement, then as defined in such plan or agreement, the three-month period shall not apply and the stock option shall cease to be exercisable and shall lapse as of the effective date of such employee participant's termination.

3

You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your stock option.

*Restricted Stock.* If your Award is restricted stock, you will receive shares of Common Stock of the Company that are restricted with an appropriate legend as to sale or transfer and subject to forfeiture pursuant to terms established by the Committee at the time of issuance. You will be entitled to all dividends paid with respect to all restricted stock granted to you under the 2004 Plan and you will be entitled to vote all such restricted stock granted to you under the 2004 Plan. Restricted stock may be granted to employee participants under the 2004 Plan for meeting their stock ownership requirements as described in the Company's Executive Stock Ownership Program, as amended from time to time (the "ESOP"), or for any other purpose. Restricted stock shall vest, in full or in installments, upon satisfaction of the conditions specified in your Award Agreement. In no event will an Award of restricted stock granted under the 2004 Plan vest in full prior to the commencement of the third anniversary of the grant date. A participant who quits or is involuntarily separated from the Company will forfeit any unvested restricted stock granted under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your restricted stock grant.

*Stock Units.* If your Award is stock units, you will receive without payment units representing shares of Common Stock of the Company. Such units will be restricted as to sale or transfer and subject to forfeiture pursuant to terms established by the Committee at the time of issuance. You will not be entitled to any dividends paid with respect to such stock units granted to you under the 2004 Plan and you will not be entitled to vote any such stock units granted to you under the 2004 Plan until such time as your stock units are converted into shares of Common Stock of the Company. Stock units may be granted to employee participants under the 2004 Plan for meeting their stock ownership requirements as described in the ESOP, or for any other purpose. Stock units shall vest, in full or in installments, upon satisfaction of the conditions specified in your Award Agreement. At the time that you leave the Company, you will receive such number of shares of unrestricted Common Stock of the Company equivalent to the number of vested stock units held by you as of such date (see the discussion regarding death, total and permanent disability or qualified retirement below). In no event will an Award of stock units granted under the 2004 Plan vest in full prior to the commencement of the third anniversary of the grant date. A participant who quits or is involuntarily separated from the Company will forfeit any unvested stock units granted under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your stock units.

*Stock Appreciation Rights or SARs.* If your Award is a stock appreciation right or SAR, the Committee will have the authority to determine certain terms relating to your SAR, including the grant date, the exercise price (which will be, for freestanding SARs, the fair market value of one share of Common Stock of the Company on the date of the grant of the SAR, as determined by the Committee, and for a SAR granted in tandem with a stock option, it will be the exercise price of the related stock option), the exercise period of the SAR (which shall not exceed a term of 10 years), the number of SARs that may be exercised at any given time, when you may exercise your SAR and any conditions to the exercise of your SAR. Upon the exercise of a SAR, you shall be entitled to receive payment in an amount equal to the excess of the fair market value of one share of Common Stock of the Company on the date of exercise over the exercise price of the SAR, multiplied by the number of shares of Common Stock of the Company for which the SAR is exercised. At the discretion of the Committee, the payment due to you upon exercise of the SAR may be in cash, Common Stock of the Company or any combination thereof. Please

4

remember that non-employee director participants are not eligible to receive SARs under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your SARs.

*Death, Total and Permanent Disability or Qualified Retirement.* In the case of outstanding stock options, if a participant (i) dies, the stock option may be exercised by a legatee, or by the personal representatives or distributees of such participant at any time within a period of two years after such participant's death, but not after the expiration of the term of the stock option grant, (ii) becomes total and permanently disabled (as defined under the Company's long term disability programs for employee participants or as determined by the Committee for non-employee director participants), such participant may exercise the stock option (to the extent it is or becomes exercisable under its terms) at any time within three years after termination or, if later, the date on which the stock option becomes exercisable with respect to such shares, but not after expiration of the term of the stock option grant, or (iii) retires pursuant to a qualified retirement (as defined in the 2004 Plan), such participant may exercise the stock option (to the extent it is or becomes exercisable under its terms) at any time during the term of the stock option grant; provided, however, that no stock option which is not exercisable at the time of qualified retirement shall become exercisable after such qualified retirement if, without the written consent of the Company, such participant engages in a business which is competitive to the business of the Company or its affiliates.

In the case of restricted stock or stock units, if a participant (i) dies while serving the Company or following a total and permanent disabled or qualified retirement, any such previously granted restricted stock or stock units shall vest as of the date of such participant's death and all restrictions thereon shall lapse and the restricted stock or stock units shall be immediately transferable to the name beneficiary or to such participant's estate, (ii) becomes totally and permanently disability or retires from the Company, such restricted stock or stock units will continue to vest according to the terms of grant or (iii) otherwise terminates employment (in the case of an employee participant) or service (in the case of a non-employee director participant), then any restricted stock or stock units not vested as of such date will be forfeited to the Company.

*Award Expiration Date.* The expiration date of your Award will be specified in your Award Agreement. The expiration date for incentive stock options and stock appreciation rights shall be no more than ten years from the date of grant. The expiration date for nonqualified stock options shall be no more than ten years from the date of grant. The effective date of the grant of a stock option will be, unless the Committee expressly determines otherwise, the business day on which the Committee approves the grant of such stock option.

*Charges and Deductions.* No charges or deductions (aside from tax or other withholdings) may be made against a participant of the 2004 Plan, or against the securities or assets of the 2004 Plan, nor may any lien be created against any of the funds, securities or other property held by participants under the 2004 Plan.

**Will the Company provide me periodic reports concerning my Awards under the 2004 Plan?**

Although no participant will be provided with periodic or other reports concerning the status of their accounts under the 2004 Plan, the Company will supply information to such participants in response to inquiries addressed to the Corporate Secretary of the Company.

**How do I exercise my Award and pay for the shares that I buy under the 2004 Plan?**

*General.* The Committee has the authority to determine the procedures you must follow to exercise your Award and pay for any shares you acquire under the 2004 Plan. The following description of payment procedures is qualified in its entirety by reference to the 2004 Plan for a full description of such procedures:

*Withholding Taxes.* Subject to certain limitations, including limitations applicable to officers and directors subject to Section 16(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), a participant may elect to pay any withholding tax due on an Award granted pursuant to the 2004 Plan either in cash (including a personal check), or by delivery at "fair market value" (as defined in the 2004 Plan) of unrestricted Common Stock already owned by such participant, or by a combination of the foregoing. In addition, a participant settling an Award granted pursuant to the 2004 Plan may elect to have the Company withhold a portion of the shares of Common Stock of the Company otherwise to be issued upon settlement of the Award equal in value to the minimum required withholding taxes.

*Exercise Price of Stock Options.* Stock options can be exercised in whole or in part through cashless exercises or other arrangements through agents (including stock brokers) established by the Company by paying the amounts required by instructions issued by the Company's Corporate Secretary. If an exercise is not covered by such instructions, the purchase price, subject to certain limitations, is to be paid in full to the Company upon exercise of a stock option either in cash (including a personal check), or by delivery at "fair market value" of unrestricted Common Stock already owned by such participant (which Common Stock, if acquired from the Company, must have been held for at least six months), or by a combination of the foregoing. In no event may successive simultaneous pyramiding be used to exercise a stock option.

*Other Limitations on Exercise.* Before you can exercise your Award, the Committee must be satisfied that such exercise will not violate any securities laws or other law or requirement of any government authority.

**Can I sell or transfer my Award to someone else?**

Awards under the 2004 Plan may not be assigned or alienated. In case of a participant's death, the amounts distributable to the deceased participant under the 2004 Plan with respect to which a designation of beneficiary has been made (to the extent it is valid and enforceable under applicable law) shall be distributed in accordance with the 2004 Plan to the designated beneficiary or beneficiaries. The amount distributable to a participant upon death and not subject to such a designation shall be distributed to such participant's estate. If there is any question as to the right of any beneficiary to receive a distribution under the 2004 Plan, the amount in question may be paid to the estate of such participant, in which event the Company will have no

6

further liability to anyone with respect to such amount.

Can I sell the shares I acquire by exercising my Award?

*General.* Any shares of Common Stock of the Company you acquire under the 2004 Plan, including shares acquired by exercising your right to purchase shares under your Award, can be sold or transferred only as permitted by the 2004 Plan and/or your Award Agreement and subject to any securities law restrictions.

*Securities Law Restrictions.* The Company filed a registration statement under the Securities Act of 1933, as amended (the "Securities Act"), which became effective on March 24, 2004 (the "Effective Date"), pursuant to which the Company registered the Common Stock issued after the Effective Date to participants under the 2004 Plan (the "Registration Statement"). Subject to the terms of the 2004 Plan and applicable Award Agreements, participants who are not Affiliates (as defined below) of the Company and who acquire the Common Stock under the 2004 Plan after the Effective Date generally will be entitled to resell such Common Stock in the public market without restrictions under the Securities Act. An "Affiliate" of an entity is defined in Rule 144 under the Securities Act as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with" such entity. An employee of the Company who is not an executive officer or director of the Company generally would not be deemed to be an Affiliate of the Company.

Resales by participants who are Affiliates of the Company or who acquired Common Stock under the 2004 Plan prior to the Effective Date of the Registration Statement are not covered by this prospectus (such participants are herein collectively referred to as "Restricted Participants"). Resales by such Restricted Participants are subject to certain restrictions under the Securities Act. An Affiliate of the Company may not offer or resell any shares of Common Stock acquired by them under the 2004 Plan (whether acquired before or after the Effective Date of the Registration Statement) unless the offer and resale of such shares are registered by the Company under the Securities Act or unless an exemption from registration is available. Participants who acquired shares of Common Stock under the 2004 Plan prior to the Effective Date of the Registration Statement (such shares being herein referred to as "Subject Shares") may not offer or resell the Subject Shares unless the offer and resale of the Subject Shares are registered by the Company under the Securities Act or unless an exemption from registration is available. In the absence of an effective registration statement, Affiliates may resell the Common Stock acquired under the 2004 Plan and participants holding Subject Shares may resell such Subject Shares only by complying with the requirements and limitations of Rule 144 under the Securities Act or other available exemption. Under Rule 144 offers or resales by Restricted Participants may be made without registration under the Securities Act where certain limitations are met as to the number of shares which may be sold over specified periods of time, the selling price thereof, the manner in which sales may be made and the minimum period of time which the shares must have been held (except that the holding period will not be applicable to Affiliates with respect to Common Stock acquired by them under the 2004 Plan after the Effective Date of the Registration Statement).

Executive officers and directors of the Company and holders of 10% or more of the outstanding Common Stock are also subject to the provisions of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder, which, among other things, permit recovery by or on behalf of the Company of so-called "short-swing" profits arising from

purchases and sales (or sales and purchases) of the Common Stock by such persons within any six-month period.

The foregoing is not intended to be a complete statement of applicable law, and participants, particularly executive officers and directors of the Company, should consult their own counsel for information regarding restrictions on resale of the Common Stock acquired pursuant to the 2004 Plan under the Securities Act and the Exchange Act.

### Can the Company reprice or discount stock options granted under the 2004 Plan?

No stock option issued under the 2004 Plan may be amended or modified in any way that changes the exercise price of the stock option, and no stock option may be issued with an exercise price that is less than the fair market value (as defined in the 2004 Plan) of one share of the Common Stock of the Company on the grant date of the stock option, or in any other way discounted. Such limitation, however, shall not apply to any future changes in the capitalization of the Company as discussed below.

### How would my Award be affected by a future change in the capitalization of the Company?

The Award Agreements may contain such provisions as the Committee may determine to be appropriate for the adjustment of the number and class of shares subject to each outstanding stock option or SAR, the exercise price in the event of changes in, or distributions with respect to, the outstanding Common Stock of the Company by reason of stock dividends, recapitalizations, mergers, consolidations, split-ups, combinations or exchanges of shares, spinoffs and the like.

### How would my restricted stock, stock units and stock options be treated in the event of a change in control of the Company?

In the event of a "Change in Control" (as defined the 2004 Plan) all awarded restricted stock and stock units will immediately be free of all restrictions and fully earned, and all outstanding stock options will be immediately exercisable and shall continue to be exercisable for a period of three years from the date of the Change in Control regardless of the original term or employment status (except that the term of any incentive stock option shall not be extended beyond ten years from the date of grant).

### Does the grant of an Award or ownership of shares give me any special rights?

Neither the grant of an Award by the Company nor ownership of shares by you obligates the Company or any of its subsidiaries to retain you as an employee, officer or director. The Company and its subsidiaries reserve the same right to terminate your employment or service as existed before the establishment of the 2004 Plan or the grant of any Awards under the 2004 Plan.

The grant of an Award of a stock option or stock unit does not give you any rights of a shareowner of the Company with respect to the shares covered by your Award until you actually own the shares. The grant of an Award of restricted stock will during the period of restriction

8

entitle you to all dividends paid with respect to such restricted stock and to vote such restricted stock.

**Under what circumstances can the 2004 Plan or my Award Agreement be modified or terminated?**

Under the terms of the 2004 Plan, the Committee may modify, amend, or terminate the 2004 Plan at any time; provided, however, that unless the requisite approval of the shareowners of the Company is obtained, no amendment shall be effective if such amendment would (i) increase the number of shares of Common Stock of the Company available for issuance under the 2004 Plan or increase the limits applicable to Awards under the 2004 Plan (except as in the case of a change in the capitalization of the Company as discussed above), (ii) lower the exercise price of a stock option or SAR grant value below 100% of the fair market value of one share of Common Stock of the Company on the grant date (except as in the case of a change in the capitalization of the Company as discussed above), (iii) remove the repricing restrictions set forth in the 2004 Plan, or (iv) require shareowner approval as a matter of law or under rules of the New York Stock Exchange. No 2004 Plan amendment shall, without the affected participant's consent, terminate or adversely affect any right or obligation under any Award previously granted under the Plan. The Committee may terminate the 2004 Plan at any time.

**What exactly is the Restoration Stock Option program and how does it work?**

The Restoration Stock Option program is a feature of the 2004 Plan available to employee participants who have been granted a non-qualified stock option under the 2004 Plan. In essence, the Restoration Stock Option program allows employee participants to exercise vested non-qualified stock options by presenting shares of Common Stock of the Company that (1) either (i) have been held for at least six months if such shares were obtained from the Company or (ii) have been purchased in the open market and (2) have a total market value equal to the exercise price of the stock option times the number of stock options being exercised. To account for the withholding of federal, state and local income taxes and Social Security taxes liabilities on the stock option gain, shares of Common Stock may be withheld from the stock option exercise. Restoration stock options are then granted to the employee participant at the market price of the Common Stock of the Company in an amount equal to the number of mature shares of Common Stock of the Company that were used to exercise the original stock option, plus the number of shares of Common Stock of the Company that are withheld for the tax liability on the stock option gain. For more information on this subject, please refer to the 2004 Plan.

**What is the Federal Income Tax treatment of an Award?**

*The following is a brief summary of the principal federal income tax consequences to participants in the 2004 Plan and does not purport to address all aspects of Federal income tax treatment. You should consult your tax advisor because the specific federal, state and local tax treatment will vary depending upon your individual circumstances. In addition, the following discussion is limited to United States federal income tax laws applicable to participants who are both citizens and residents of the United States. The United States federal income tax treatment of Awards granted to a participant who is not both a citizen and resident of the United States may differ. The tax laws of other countries may provide for different tax consequences to*

9

*participants who are subject to such laws. In addition, the tax laws of the United States are subject to change and such changes could apply retroactively.*

*Annual Incentive Awards.* Annual incentive awards granted under the 2004 Plan would generally be taxable to you as ordinary income in the year paid. The current maximum federal income tax rate for ordinary income is 35%. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

*Stock Options.* Stock options granted under the 2004 Plan may be either nonqualified stock options ("NQOs") or Incentive Stock Options ("ISOs") for federal income tax purposes; provided, however, that non-employee director participants are not eligible to receive ISOs under the 2004 Plan.

*NQOs.* Generally, if you are awarded a NQO you do not recognize any taxable income for federal income tax purposes at the time of grant. Upon exercise of your NQO, the excess of the fair market value of the Common Stock of the Company on the date of exercise over the NQO exercise price will be taxable to you as ordinary income. You will have a capital gain (or loss) upon the subsequent sale of the Common Stock of the Company in an amount equal to the sale price reduced by the fair market value of the Common Stock of the Company on the date you exercised your NQO. The holding period for purposes of determining whether the capital gain (or loss) is a long- or short-term gain (or loss) will commence on the date you exercise your NQO. The capital gain will be long-term or short-term depending on whether you have held the shares of Common Stock you acquired upon the exercise of your NQO for more than one year after the exercise date. Short-term capital gains are generally subject to the same federal income tax rate as ordinary income (the current maximum rate is 35%), while long-term capital gains are generally subject to a maximum rate of 15%. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

*ISOs.* If the stock option is intended to qualify as an ISO, the Award Agreement will state it is for an ISO. If you are awarded an ISO you do not recognize any taxable income for federal income tax purposes at the time of grant or exercise. If you hold the stock for the ISO holding periods of two years from the date of the grant and one year from the date of exercise, and if you exercise the stock option while you are employed by the Company or within three months of termination of employment, any gain realized on the sale (measured by the difference between the stock option price paid for the stock and the amount received on the sale), will be taxed as capital gain. If the stock was held for the long-term capital gain holding period, which is currently more than one year from the date of exercise, the capital gain will be long-term gain eligible for the maximum 15% rate. If the stock is disposed of before the expiration of the ISO holding periods, you will recognize ordinary income to the extent the value of the stock on the date of exercise exceeds the stock option exercise price and the Company will generally be entitled to take a deduction for such amount. Upon exercise of your ISO, the excess of the fair market value of the shares you acquire over the exercise price of the stock option will be included in your alternative minimum taxable income and may cause or increase a liability for alternative minimum tax. There is an annual $100,000 limitation on the amount of stock options that can qualify as ISOs. Each calendar year is tested separately. All stock options held by an employee that first become exercisable in the year are tested. Stock options cannot qualify as ISOs to the extent that the value of the stock covered by

the stock options exceeds $100,000. The value of the stock for this purpose is the value of the stock on the date of the grant of the stock option.

*Effect of Section 16(b) of the Exchange Act.* The tax consequences upon the exercise of either NQOs or ISOs may vary for those directors and executive officers who are subject to liability under Section 16(b) of the Exchange Act. In general, such participants will not recognize income on the Common Stock acquired under the 2004 Plan until they are no longer subject to liability under Section 16(b) with respect to the disposition of such Common Stock. However, a participant may elect to be taxed based on the fair market value of the shares on the exercise date (and have a holding period beginning on the exercise date) by filing an election under Section 83(b) of the Code within thirty days of the exercise date. If such participant later sells such shares, he or she will recognize capital gain or loss on the difference between the selling price and the exercise price.

*Restricted Stock.* If you are awarded Common Stock of the Company that is subject to restrictions on transfer and is subject to a "substantial risk of forfeiture" as defined in Section 83 of the Code, you may make a Section 83(b) election to have your Award taxed as ordinary income at the time of grant on the excess of the fair market value of the shares on the grant date over the amount you paid for the shares. If you do not make a timely Section 83(b) election, the Award will generally be taxed as ordinary income at the date(s) that the restrictions creating the risk of forfeiture expire. The amount of tax on each such date will equal the fair market value of such shares on such date less the amount paid by you for the shares. During any period when a participant is subject to liability under Section 16(b) of the Exchange Act with respect to the disposition of Common Stock acquired under the 2004 Plan, such Common Stock is treated as subject to a restriction on transfer and a substantial risk of forfeiture. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

*Stock Units.* If you are awarded stock units under the 2004 Plan you generally would have no federal income tax consequence at the time of grant. At the time your stock units are converted into unrestricted shares of Common Stock of the Company (i.e., the shares are not subject to a "substantial risk of forfeiture"), then, at such time, you will generally recognize ordinary income to the extent of the excess of the fair market value of the stock on the date of conversion over the cost for such stock, if any. The Company is generally entitled to a deduction at the time and in the amount taxed to you as ordinary income.

*SAR and Other Awards.* If you are awarded stock appreciation rights under the 2004 Plan you generally would have no federal income tax consequence at the time of grant. Upon exercise of the SAR, the amount of cash or other property received by you will generally be subject to ordinary income tax in the year of receipt and the Company will generally be entitled to a deduction at the time and in the amount taxed to you as ordinary income.

*Withholding Taxes.* Because the amount you realize upon the exercise of your Award may be treated as compensation subject to applicable withholding or federal, state and local income taxes and Social Security taxes, the Company or one of its subsidiaries may make other arrangements with you to pay the amount required to be withheld by the Company or such subsidiary before delivering any shares to you purchased under the 2004 Plan. These arrangements may include withholding the amount of any withholding or other tax due and/or withholding a certain number of shares issuable under the 2004 Plan. The Company will defer

delivery under your Award until arrangements are made to its satisfaction with respect to withholding and other taxes.

Risk Factors and Certain Investment Considerations.

This prospectus and the information incorporated by reference in this prospectus may include forward-looking statements within the meaning of Section 27A of the Securities Act, Section 21E of the Exchange Act, and the Private Securities Litigation Reform Act of 1995 that are subject to risks and uncertainties. You should not place undue reliance on those statements because they are subject to numerous uncertainties and factors relating to our operations and business environment, all of which are difficult to predict and many of which are beyond our control. Such forward-looking statements only speak as of the date of this prospectus and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which the statement is made or to reflect the occurrence of unanticipated events. Forward-looking statements include information concerning our possible or assumed future results of operations, including descriptions of our business strategy. These statements often include words such as "believe," "expect," "anticipate," "intend," "plan," "estimate" or similar expressions. These statements are based on assumptions that we have made in light of our experience in the industry as well as our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. As you read and consider this prospectus, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties and assumptions. Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results or results of operations and could cause actual results to differ materially from those in the forward-looking statements. Some of these factors include:

- The markets in which we compete are subject to considerable cyclicality.

- We operate in the highly competitive North American truck market.

- Our business may be adversely impacted by work stoppages and other labor relations matters.

- The loss of business from Ford Motor Company, or "Ford," our largest customer, could have a negative impact on our business, financial condition and results of operations.

- The costs associated with complying with environmental and safety regulations could lower our margins.

- Our liquidity position may be adversely affected by a continued downturn in our industry.

- Our business could be negatively impacted in the event Navistar Financial Corporation, our financing subsidiary, is unable to access sufficient capital to engage in its financing activities.

- We have significant underfunded postretirement obligations.

- Our manufacturing operations are dependent upon third-party suppliers, making us vulnerable to a supply shortage.

- Our ability to use net operating loss carryovers to reduce future tax payments if there is a change in ownership of the Company.

- We are exposed to political, economic and other risks that arise from operating a multinational business.

- Our substantial debt could require us to use a significant portion of our cash flow to satisfy our debt obligations and may limit our operating flexibility.

Other factors and assumptions not identified above are also relevant to the forward-looking statements, and if they prove incorrect, could also cause actual results to differ materially from those projected. For a further and more detailed description of these factors, please refer to Exhibit 99.1 to our Form 10-K. Participants should carefully consider all of these factors before making an investment in the stock offered under the 2004 Plan.

In addition, the market price of our Common Stock may fluctuate from time to time. For this reason, the value of any stock-based Awards granted under the 2004 Plan may decrease or increase in value depending upon the market price of our Common Stock.

**Additional Information.**

The Company is subject to the informational requirements of the Exchange Act and files reports and other information with the Securities and Exchange Commission (the "Commission"). Such reports and information can be inspected and copied at the public reference facility maintained by the Commission located at 450 Fifth Street, N.W., Room 1024, Washington, D.C. 20549. Please call the Commission at 1-800-SEC-0330 for further information on the public reference room. Copies of such material can also be accessed electronically by means of the Commission's home page on the Internet at www.sec.gov. Our Common Stock is listed on the New York Stock Exchange, The Chicago Stock Exchange and The Pacific Exchange, and such reports and other information can also be inspected and copied at the offices of the New York Stock Exchange, Inc., at 20 Broad Street, New York, NY 10005, the Chicago Stock Exchange, Inc., at One Financial Plaza, 440 South LaSalle Street, Chicago, IL, 60605, and the Pacific Exchange, Inc., at 301 Pine Street, San Francisco, CA, 94104.

This prospectus constitutes part of the Registration Statement filed with the Commission. The Registration Statement and this prospectus incorporate by reference certain documents, including the Company's Annual Report on Form 10-K and all documents subsequently filed by the Company with the Commission under the Exchange Act. These documents, as well as other documents required to be delivered to you upon your request pursuant to Rule 428(b) of the Securities Act, will be provided to you without charge upon your written or oral request. In general, Rule 428(b) requires that participants receive, concurrently with this prospectus, a copy of either the Company's latest annual report to shareowners, Annual Report on Form 10-K or prospectus containing audited financial statements, and that you receive annually copies of all reports, proxy statements and other materials distributed to shareowners. Requests for any of these documents should be directed to the Company, 4201 Winfield Road, Warrenville, Illinois 60555 Attention: Corporate Secretary (telephone number (630) 753-5000).

The information in this prospectus will be updated regularly by a supplement, a revised prospectus or by including information in the most recent annual report to shareowners or the most recent proxy statement of the Company. If a significant period of time has elapsed from the date of publication of this prospectus, you should obtain and refer to all supplements. If you receive a supplement after you receive this prospectus, you should keep it with this prospectus and refer to it whenever you refer to this prospectus.

NAVISTAR INTERNATIONAL CORPORATION

2004 PERFORMANCE INCENTIVE PLAN

SECTION I

ESTABLISHMENT OF THE PLAN

The Board of Directors of Navistar International Corporation approved the establishment of the Navistar International Corporation 2004 Performance Incentive Plan ("Plan") on October 21, 2003, subject to approval by the Stockholders at the Corporation's annual meeting to be held on February 17, 2004, or any adjournment thereof. The Plan replaces the Navistar 1994 Performance Incentive Plan and the Navistar 1998 Supplemental Stock Plan, each of which terminate December 16, 2003 under the terms of the plans, and the Plan will replace and supercede the Navistar 1988 Non-Employee Directors Stock Option Plan.

SECTION II

PURPOSE OF THE PLAN

The purpose of the Plan is to enable the Corporation and its subsidiaries to attract and retain highly qualified personnel and non-employee directors, and additionally to provide key employees who hold positions of major responsibility the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value.

SECTION III

DEFINITIONS

For the purposes of the Plan, the following words and phrases shall have the meanings described below in this Section III unless a different meaning is plainly required by the context.

(1) "Annual Incentive Award" means an award of cash determined by the Committee after the end of the Fiscal Year.

(2) "Award" means an award made under the Plan.

(3) "Award Agreement" means an agreement entered into by the Corporation and a Participant setting forth the terms and provisions applicable to an Award granted to a Participant.

(4) "Board of Directors" means the Board of Directors of Navistar International Corporation.

(5) "Change in Control" shall be deemed to have occurred if (i) any "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934), other than employee or retiree benefit plans or trusts sponsored or established by the Corporation or International Truck and Engine Corporation, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934), directly or indirectly, of securities of the Corporation representing 25% or more of the combined voting power of the Corporation's then outstanding securities, (ii) the following individuals cease for any reason to constitute more than three-fourths of the number of directors then serving on the Board of Directors of the Corporation: individuals who, on the date hereof, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Corporation) whose appointment or election by the Board or nomination for election by the Corporation's stockholders was approved by the vote of at least two-thirds (2/3) of the directors then still in office or whose appointment, election or nomination was previously so approved or recommended; (iii) any dissolution or liquidation of the Corporation or International Truck and Engine Corporation or sale or disposition of all or substantially all (more than 50%) of the assets of the Corporation or of International Truck and Engine Corporation occurs; or (iv) as the result of, or in connection with, any cash tender offer, exchange offer, merger or other business combination, sale of assets, proxy or consent solicitation, contested election or substantial stock accumulation (a "Control Transaction"), the members of the Board of Directors of the Corporation immediately prior to the first public announcement relating

to such Control Transaction shall immediately thereafter, or with two (2) years, cease to constitute a majority of the Board of Directors of the Corporation. Notwithstanding the foregoing, the sale or disposition of any or all of the assets or stock of Navistar Financial Corporation shall not be deemed a Change in Control.

(6) "Code" or "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time.

(7) "Committee" means the Committee on Compensation and Governance of the Board of Directors.

(8) "Common Stock" means the common stock of the Corporation.

(9) "Corporation" means Navistar International Corporation.

(10) "Employee" means a person regularly employed by the Corporation or any subsidiary of the Corporation, including its officers.

(11) "Exercise Price" means the amount for which one share of Common Stock may be purchased upon exercise of a Stock Option, as specified in the applicable Award Agreement.

(12) "Fair Market Value" means the average of the high and the low prices of a share of Common Stock on the Grant Date as set forth in the New York Stock Exchange — Composite Transactions listing published in the Midwest Edition of *The Wall Street Journal* or equivalent financial publication.

(13) "Fiscal Year" means the fiscal year of the Corporation.

(14) "Freestanding SAR" means any SAR that is granted independently of any Stock Option.

(15) "Grant Date" means, as determined by the Board or authorized Committee, (i) the date as of which the Board or such Committee approves an Award, or (ii) such other date as may be specified by the Board or such Committee. The Grant Date of a Stock Option will, unless the Committee expressly determines otherwise, be the business day on which the Committee approves the grant of such Stock Option.

(16) "Incentive Stock Option" means a right, as evidenced by an Award Agreement to purchase a certain number of shares of Common Stock at Fair Market Value for a period of no longer than ten (10) years from the date of grant which options are designed to meet the requirements set out under Section 422 of the Code.

(17) "Non-Employee Director" means as of the Grant Date of an Award an individual who is a director of the Corporation and not an employee of the Corporation or any of its subsidiaries.

(18) "Nonqualified Stock Option" means a right, as evidenced by an Award Agreement to purchase a certain number of shares of Common Stock at Fair Market Value for a period of not more than ten (10) years which options are stated not to be Incentive Stock Options under the Code.

(19) "Participant" means an Employee selected by the Corporation for participation in the Plan and, with respect to Stock Options, Restricted Stock and Stock Units, a Non-Employee Director.

(20) "Performance-Based Exception" means the performance-based exception from the tax deductibility limitation imposed by Code Section 162(m) as set forth in Section 162(m)(4)(C).

(21) "Performance Measure" means the performance measurement provided by Section VI.

(22) "Performance Period" means the period during which performance goals must be met for purposes of the Performance Measure.

(23) "Plan" means the Navistar International Corporation 2004 Performance Incentive Plan as set forth herein and as it may be amended hereafter from time to time.

(24) "Qualified Retirement" means with respect to an Employee a termination from employment from the Corporation or any of its subsidiaries that occurs after the Employee attains age 55 and at the time of the termination the Employee has either: (i) 10 or more years of continuous service, or (ii) 10 or more years of service that would constitute credited service under the definition contained in the International Truck and Engine Corporation Retirement Plan for Salaried Employees ("RPSE"). Qualified Retirement for a Non-Employee Director means retirement under a retirement policy of the Board for Non-Employee Directors.

(25) "Restoration Stock Option" means a Nonqualified Stock Option granted pursuant to Section VII(7) and which is awarded upon the exercise of a Stock Option earlier awarded under the Plan or any other plan of the Corporation, including an earlier awarded Restoration Stock Option (an "Underlying Option").

(26) "Restricted Stock" means a right to acquire one or more shares of Common Stock, as evidenced by an Award Agreement, that is restricted as to sale or transfer and subject to forfeiture.

(27) "Stock Appreciation Right" or "SAR" means an Award, granted either alone or in connection with a related Stock Option, pursuant to the terms of Section X of the Plan.

(28) "Stock Option" means either an Incentive Stock Option or a Nonqualified Stock Option.

(29) "Stock Units" mean units for Restricted Stock granted pursuant to Section XI.

(30) "Tandem SAR" means an SAR granted with respect to a share pursuant to Section X hereof in connection with a related Stock Option, under which: (a) the exercise of the SAR with respect to the share shall cancel the right to purchase such share under the related Stock Option, and (b) the purchase of the share under the related Stock Option shall cancel the right to exercise the SAR with respect to such share.

## SECTION IV

## ELIGIBILITY

Management will, from time to time, select and recommend to the Committee Employees who are to become Participants in the Plan. Such Employees will be selected from those who, in the opinion of management, have substantial responsibility in a managerial or professional capacity. Non-Employee Directors shall also be Participants in the Plan for the purpose of Nonqualified Stock Option Awards, Restricted Stock and Stock Units.

## SECTION V

## ANNUAL INCENTIVE AWARDS

(1) As soon as practical following the end of the Fiscal Year, the Committee will certify performance achieved against the performance criteria established at the beginning of the Fiscal Year. The performance criteria shall be determined in the discretion of the Committee considering all factors relevant to the management of the Corporation, provided that an Award under this Section that is intended to qualify for the Performance-Based Exception shall satisfy the Performance Measures and the requirements of Section 162(m) of the Internal Revenue Code.

(2) The Committee, in its sole discretion, may reduce or eliminate any Award otherwise earned based on an assessment of individual performance, but in no event may any such reduction result in an increase of the Award. The Committee shall determine the amount of any such reduction by taking into account such factors as it deems relevant including, without limitation: (a) performance against other financial or strategic objectives; (b) its subjective assessment of the Participant's overall performance for the year; and (c) prevailing levels of total compensation among similar companies.

(3) Performance criteria for Annual Incentive Awards will not be increased or decreased within a Fiscal Year except for extraordinary circumstances approved by the Committee.

(4) Payment of an Annual Incentive Award will be made in cash to the Participant as soon as practicable after an Annual Incentive Award determination has been made by the Committee. A Participant who is not an Employee at the end of a Fiscal Year will not be entitled to an Award for that Fiscal Year unless the Committee determines otherwise.

3

(5) The Committee may permit the deferral of any Award and may permit payment on deferrals to be made subject to rules and procedures it may establish. These rules may include provisions crediting interest on deferred cash accounts.

(6) The Committee shall set the performance criteria for each year's Annual Incentive Awards no later than the first 90 days of the Fiscal Year.

(7) Its shall be presumed unless the Committee determines to the contrary, that all Awards to Employees under this Section are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rules of Section 162(m) of the Internal Revenue Code, the maximum Award under this Section of the Plan to any one Employee during any one Fiscal Year shall not exceed $4,000,000.

## SECTION VI

### PERFORMANCE MEASUREMENT

(1) Unless and until the Corporation's stockholders approve a change in the general Performance Measures set forth in this Section VI, the attainment of which may determine the degree of payout and/or vesting with respect to Awards that are designed to qualify for the Performance-Based Exception, the Performance Measures to be used for purposes of such Awards may be measured at the Corporation level, at a subsidiary level, or at an operating unit level and shall be chosen from among: (a) income measures (including, but not limited to, gross profits, operation income, earnings before or after taxes, earnings per share, cost reductions); (b) return measures (including, but not limited to, return on assets, capital, investment, equity, or sales); (c) cash flow, cash flow return on investments, which equals net cash flows divided by owners equity; (d) gross revenues from operations; (e) total revenue; (f) cash value added; (g) economic value added; (h) share price (including, but not limited to, growth measures and total shareholder return); (i) sales growth; (j) market share; (k) the achievement of certain quantitatively and objectively determinable non-financial performance measures (including, but not limited to, growth strategies, strategic initiatives, product development, product quality, corporate development, and leadership development); and (l) any combination of, or a specified increase in, any of the foregoing.

(2) The Committee shall set the Performance Measures for each year's Annual Incentive Awards no later than the first 90 days of the Fiscal Year.

(3) The Committee shall have the discretion to adjust the determination of the degree of attainment of the preestablished goals; provided that the Awards that are designated to qualify for Performance-Based Exception may not be adjusted upward (although the Committee shall retain the discretion to adjust such Awards downward).

(4) In the case of any Award that is granted subject to the condition that a specific Performance Measure be achieved, no payment under such Award shall be made prior to the time the Committee certifies in writing that that the Performance Measure has been achieved. For this purpose, approved minutes of the Committee meeting at which the certification is made shall be treated as a written certification. No such certification is required, however, in the case of an Award that is based solely on an increase in the value of a share of Common Stock from the date the Award is made.

## SECTION VII

### STOCK OPTIONS FOR EMPLOYEES

(1) The Committee may grant Nonqualified Stock Options or Incentive Stock Options or a combination of both to Employee Participants in the amount and at the time that the Committee approves. In order to provide a limitation on the number of shares as provided for in Section 162(m) of the Internal Revenue Code and the regulations thereunder, Stock Option grants shall be limited to a maximum of 1,000,000 shares per year for any Participant.

(2) The Committee will document the terms of the Stock Option in an Award Agreement to include the Grant Date and Exercise Price, as well as any other terms that it may desire. The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Options fixed by the Committee shall not be modified.

4

(3) Unless otherwise determined by the Committee, a Stock Option granted under the Plan will become exercisable in whole or in part after the commencement of the second year of the term of the Stock Option to the extent of one third of the shares, to the extent of one third of the shares after commencement of the third year, and to the extent of one third of the shares after commencement of the fourth year.

(4) A Stock Option granted under the Plan will be exercisable during such period as the Committee may determine, and will be subject to earlier termination as hereinafter provided. In no event, however, may a Stock Option governed by the Plan be exercised after the expiration of its term. Except as provided herein, no Stock Option may be exercised at any time unless the Participant who holds the Stock Option is then an Employee. The option can be exercised in whole or in part through cashless exercises or other arrangements through agents, including stockbrokers, under arrangements established by the Corporation by paying the amounts required by instructions issued by the Secretary of the Corporation for the exercise of the Stock Options. If an exercise is not covered by instructions issued by the Corporate Secretary, the purchase price is to be paid in full to the Corporation upon the exercise of a Stock Option either (i) by cash including a personal check made payable to the Corporation, (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant, for six months or more if acquired from the Corporation, or (iii) by any combination of cash and unrestricted Common Stock, and in either case, by payment to the Corporation of any withholding tax. In no event may successive simultaneous pyramiding be used to exercise a Stock Option. Shares which otherwise would be delivered to the holder of a Stock Option may be delivered, at the election of the holder, to the Corporation in payment of federal, state and/or local withholding taxes payable in connection with an exercise.

(5) The Participant who holds a Stock Option will have none of the rights of a shareowner with respect to the shares subject to a Stock Option until such shares are issued upon the exercise of a Stock Option.

(6) Neither the Corporation nor any subsidiary may directly or indirectly lend money to any Participant for the purpose of assisting the individual to acquire shares of Common Stock issued upon the exercise of Stock Options granted under the Plan.

(7) Provisions for Restoration Stock Options may be contained in the terms of options granted under the Plan. Restoration Stock Options may be granted under the Plan pursuant to the following terms: (a) Restoration Stock Options may be granted if the Participant elects to make a restoration option exercise of an Underlying Option, pays the exercise price by transferring to the Corporation Common Stock of the Corporation held by the Participant, for six months or more if acquired from the Corporation, and pays the withholding tax by transferring Common Stock or cash. The number of Restoration Stock Options that will be granted is equal to the number of shares used to pay the exercise price and the number of shares with value equal to the tax liability; (b) The Restoration Stock Options will have a term equal to the remaining term of the Underlying Option, will have an Exercise Price equal to the Fair Market Value of the stock on the date of grant of the Restoration Option, and will become exercisable in six months after grant (or, if sooner, one month before the end of the term of the Underlying Option), and otherwise will have the same general terms and conditions Nonqualified Stock Options granted by the Corporation; (c) The shares that represent the difference between the Exercise Price of the Underlying Option and the value of the shares on the date of exercise, less withholding taxes, generally cannot be transferred for a period of three (3) years; and (d) At the election of the Participant delivery of the shares may be deferred.

(8) In the event of the termination of the employment of a Participant who holds an outstanding Stock Option, other than by reason of death, total and permanent disability or a Qualified Retirement, the Participant may (unless the Stock Option shall have been previously terminated) exercise the Stock Option at any time within three (3) months after such termination, but not after the expiration of the term of the grant, to the extent of the number of shares which were exercisable at the date of the termination of employment. Stock Options governed by the Plan will not be affected by any change of employment so long as the Participant continues to be an Employee. Provided, however, if the Participant is terminated for cause as defined in the International Truck and Engine Corporation Income Protection Plan, or if the Participant is covered by a different severance plan or agreement, then as defined in such plan or agreement, the three-month period provided by this subsection shall not apply and the Stock Option shall cease to be exercisable and shall lapse as of the effective date of the termination of the Employee.

(9) Except as provided in Section VII(12), in the event of a Qualified Retirement a Participant who holds an outstanding Stock Option may exercise the Stock Option to the extent the option is exercisable or becomes exercisable under its terms, at any time during the term of the option grant.

(10) In the event of a total and permanent disability, as defined by the Corporation's long term disability programs, a Participant who holds an outstanding Stock Option may exercise the Stock Option, to the extent the Stock Option is exercisable or becomes exercisable under its terms, at any time within three (3) years after such termination or, if later, the date on which the option becomes exercisable with respect to such shares, but not after the expiration of the term of the option grant.

(11) In the event of the death of a Participant who holds an outstanding Stock Option, the Stock Option may be exercised by a legatee, or by the personal representatives or distributees, at any time within a period of two (2) years after death, but not after the expiration of the term of the grant. If death occurs while employed by the Corporation or a subsidiary, or after a Qualified Retirement, or during the three- year period specified in Section VII(10), Stock Options may be exercised to the extent of the remaining shares covered by Stock Options whether or not such shares were exercisable at the date of death. If death occurs during the three-month period specified in Section VII(8), Stock Options may be exercised to the extent of the number of shares that were exercisable at the date of death.

(12) Notwithstanding the other provisions of Sections VII(9) or VII(11), no Stock Option which is not exercisable at the time of a Qualified Retirement shall become exercisable after such Qualified Retirement if, without the written consent of the Corporation, a Participant engages in a business, whether as owner, partner, officer, employee, or otherwise, which is in competition with the Corporation or one of its affiliates, and if the Participant's participation in such business is deemed by the Corporation to be detrimental to the best interests of the Corporation. The determination as to whether such business is in competition with the Corporation or any of its affiliates, and whether such participation by such person is detrimental to the best interests of the Corporation, shall be made by the Corporation in its absolute discretion, and the decision of the Corporation with respect thereto, including its determination as to when the participation in such competitive business commenced, shall be conclusive.

## SECTION VIII

## STOCK OPTIONS NON-EMPLOYEE DIRECTORS

(1) The Committee may grant Nonqualified Stock Options to Non-Employee Directors.

(2) The Committee will document the terms of the Stock Option to include the Grant Date and Exercise Price, as well as any other terms that it may desire. The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Stock Options fixed by the Committee shall not be modified.

(3) Unless otherwise determined by the Committee, a Stock Option granted under this Section of the Plan will become exercisable in whole or in part after the commencement of the second year of the term of the Stock Option to the extent of one third of the shares, to the extent of one third of the shares after commencement of the third year, and to the extent of one third of the shares after commencement of the fourth year.

(4) A Stock Option granted this Section of the Plan will be exercisable during such period as the Committee may determine, and will be subject to earlier termination as hereinafter provided. In no event, however, may a Stock Option governed by the Plan be exercised after the expiration of its term.

(5) Except as provided herein, no Stock Option granted under this Section of the Plan may be exercised at any time unless the Participant who holds the Stock Option is then a Non-Employee Director.

(6) A Stock Option granted under this Section of the Plan can be exercised in whole or in part through cashless exercises or other arrangements through agents, including stockbrokers, under arrangements established by the Corporation by paying the amounts required by instructions issued by the Secretary of the Corporation for the exercise of the options. If an exercise is not covered by instructions issued by the Corporate Secretary, the purchase price is to be paid in full to the Corporation upon the exercise of a Stock Option either (i) by cash including a personal check made payable to the Corporation; (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant, for six months or more if acquired from the Corporation, or (iii) by any combination of cash and unrestricted Common Stock, and in either case, by payment to the Corporation of any withholding tax. In no event may successive simultaneous pyramiding be used to exercise a Stock Option. Shares which otherwise would be delivered to the holder of a Stock Option may be delivered, at the election of the holder, to the Corporation in payment of federal, state and/or local withholding taxes payable in connection with an exercise.

(7) The Non-Employee Director who holds a Stock Option will have none of the rights of a shareowner with respect to the shares subject to a Stock Option until such shares are issued upon the exercise of a Stock Option.

(8) Neither the Corporation nor any subsidiary may directly or indirectly lend money to any Non-Employee Director for the

purpose of assisting the individual to acquire shares of Common Stock issued upon the exercise of Stock Options granted under the Plan.

(9) In the event of the termination of service as a Non-Employee Director, other than by reason of death, total and permanent disability or a Qualified Retirement, a Non-Employee Director who holds an outstanding Stock Option may (unless the Stock Option shall have been previously terminated) exercise the Stock Option at any time within three (3) months after such termination, but not after the expiration of the term of the grant, to the extent of the number of shares which were exercisable at the date of the termination of service.

(10) Except as provided in Section VII(13), in the event of Qualified Retirement a Non-Employee Director who holds an outstanding Stock Option may exercise the Stock Option to the extent the Stock Option is exercisable or becomes exercisable under its terms, at any time during the term of the option grant.

(11) In the event of a total and permanent disability, as determined by the Committee, a Non-Employee Director who holds an outstanding Stock Option may exercise the Stock Option, to the extent the option is exercisable or becomes exercisable under its terms, at any time within three (3) years after such termination or, if later, the date on which the Stock Option becomes exercisable with respect to such shares, but not after the expiration of the term of the option grant.

(12) In the event of the death of a Non-Employee Director who holds an outstanding Stock Option, the Stock Option may be exercised by a legatee, or by the personal representatives or distributees, at any time within a period of two (2) years after death, but not after the expiration of the term of the grant. If death occurs while the Participant is serving as a Non-Employee Director, or after a Qualified Retirement, or during the three-year period specified in Section VIII(11), Stock Options may be exercised to the extent of the remaining shares covered by the Stock Options whether or not such shares were exercisable at the date of death. If death occurs during the three-month period specified in Section VIII(9), Stock Options may be exercised to the extent of the number of shares that were exercisable at the date of death.

(13) Notwithstanding the other provisions of Sections VIII(10) or VIII(12), no option which is not exercisable at the time of a Qualified Retirement shall become exercisable after such Qualified Retirement if, without the written consent of the Corporation, a Non-Employee Director engages in a business, whether as owner, partner, officer, employee, or otherwise, or serves as a director for such business, which is in competition with the Corporation or one of its affiliates, and if the Non-Employee Director's participation in such business is deemed by the Corporation to be detrimental to the best interests of the Corporation. The determination as to whether such business is in competition with the Corporation or any of its affiliates, and whether such participation by such person is detrimental to the best interests of the Corporation, shall be made by the Corporation in its absolute discretion, and the decision of the Corporation with respect thereto, including its determination as to when the participation in such competitive business commenced, shall be conclusive.

SECTION IX

PROHIBITION ON REPRICING AND DISCOUNTED OPTIONS

Notwithstanding any other provision in the Plan, no Stock Option issued under the Plan may be amended or modified in any way that changes the Exercise Price of the Stock Option, and no Stock Option may be issued with an Exercise Price that is less than the Fair Market Value of one share of Common Stock on the Grant Date of the Stock Option or in any other way discounted. This provision shall not limit any adjustments provided by Section XII relating to adjustments upon changes in capitalization.

SECTION X

STOCK APPRECIATION RIGHTS AND OTHER AWARDS

(1) Subject to the terms of the Plan, the Committee may grant any types of Awards other than Stock Options provided for in Sections VII and VIII, and Restricted Stock provided for in Section XI, including but not limited to SARs. The Committee shall determine the terms and conditions of such Awards.

(2) The Committee may, subject to the terms of the Plan, grant SARs to Employee Participants at any time and from time to time as shall be determined by the Committee. The Committee may grant Freestanding SARs, Tandem SARs, or any combination thereof. The Committee shall have complete discretion in determining the number of SARs, subject to the terms of the Plan, and to determine

7

the terms of the SARs. The grant price of a Freestanding SAR shall equal the Fair Market Value of one share of Common Stock on the Grant Date. The Exercise Price of Tandem SARs shall equal the Exercise Price of the related Stock Option.

(3) Tandem SARs may be exercised for all or part of the shares subject to the related Stock Option upon the surrender of the right to exercise the equivalent portion of the related Stock Option. A related Stock Option is then exercisable.

(4) Notwithstanding any other provision of the Plan to the contrary, with respect to a Tandem SAR granted in connection with an Incentive Stock Option: (a) The Tandem SAR shall expire no later than the expiration than the expiration of the Incentive Stock Option; (b) The value of the payout with respect to the Tandem SAR shall not exceed the excess of the fair market value of the shares subject to Incentive Stock Option at the time the Tandem SAR is exercised over the Exercise Price under the Incentive Stock Option; and (c) The Tandem SAR may be exercised only when the Fair Market Value of the shares subject to the Incentive Stock Option exceed the Exercise Price of the Incentive Stock Option.

(5) Freestanding SARs may be exercised upon whatever terms and conditions the Committee, in its discretion, impose upon them, subject, however, to the terms of the Plan.

(6) The term of SARs shall be determined by the Committee, in its discretion; provided that such term shall not exceed 10 years.

(7) Upon exercise of a SAR, a Participant shall be entitled to receive payment from the Corporation in an amount determined by multiplying: (a) the excess of fair market value of one share of Common Stock on the date of exercise over the Exercise Price, by (b) the number of shares with respect to which the SAR is exercised. At the discretion of the Committee, the payment upon exercise of a SAR may be in cash, in share equivalent fair market value, or in a combination thereof.

(8) Its shall be presumed unless the Company determines to the contrary, that all awards to Employees under this Section are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to an Employee to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rule of Section 162(m) of the Internal Revenue Code, the number of SARs that can be granted to any one Employee in any Fiscal Year shall not exceed 1,000,000 shares, less the number of stock options grant to such Employee during the year. Any Award the value of which is not solely dependent on value of the stock on which the award is based shall not exceed $4,000,000 for any Employee for the year.

SECTION XI

RESTRICTED STOCK

(1) Restricted Stock, or Stock Units, may be granted during a Fiscal Year or at any time thereafter. Awards under the Plan may be granted in the form of Restricted Stock, in the form of Stock Units, or in any combination of both. Restricted Stock or Stock Units may also be awarded in combination with Stock Options, and such an Award may provide that the Restricted Shares or Stock Units will be forfeited in the event that the terms of the Award Agreement are not fulfilled.

(2) Awards of Restricted Stock or Stock Units may be made under the Plan to Participants for meeting the stock ownership requirements as described in the Navistar Executive Stock Ownership Program, as may be amended from time to time by the Board of Directors, in their sole discretion, or for any other purpose.

(3) Each Award of Restricted Stock or Stock Units shall become vested, in full or in installments, upon satisfaction of the conditions specified in the Award Agreement. In no event will an Award of Restricted Stock or Stock Units granted under the Plan vest in full prior to the commencement of the third year anniversary of the Grant Date.

(4) The Participant will be entitled to all dividends paid with respect to all Restricted Stock awarded under the Plan during the period of restriction and will not be required to return any such dividends to the Corporation in the event of the forfeiture of the Restricted Stock. The Participant also will be entitled to vote Restricted Stock during the period of restriction.

(5) All Restricted Stock certificates awarded under the Plan are to be delivered to the Participant with an appropriate legend imprinted on the certificate.

(6) In the event a Participant dies while employed by or as serving as a Non-Employee-Director of the Corporation or following a

Qualified Retirement or total or permanent disability, the Restricted Stock or Stock Units will vest as of the date of death and all restrictions shall lapse and the Restricted Stock or Stock Units will be immediately transferable to the named beneficiary or to the Participant's estate. Any Restricted Stock or Stock Units that becomes payable after the Participant's death shall be distributed to the Participant's beneficiary or beneficiaries. A beneficiary designation may be changed by filing the prescribed form with the Secretary of the Corporation at any time before the Participant's death. If no beneficiary was designated or if no designated beneficiary survives the Participant, then any Restricted Stock or Stock Units that becomes payable after the Participant's death shall be distributed to the Participant's estate.

(7) In the event a Participant who holds unvested Restricted Stock or Stock Units, terminates employment or service as a Non-Employee Director with the Corporation by reason of Qualified Retirement or total and permanent disability, the Restricted Stock or Stock Units will continue to vest according to the terms of the Restricted Stock.

(8) In the event a Participant otherwise terminates employment or service as a Non-Employee Director, any Restricted Stock or Stock Units that is not vested forfeits to the Corporation.

(9) Its shall be presumed unless the Committee determines to the contrary, that all awards to Employees under this Section of the Plan are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to an Employee to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rules of Section 162(m) of the Internal Revenue Code, the maximum Award under this Section of the Plan to any one Employee during any one Fiscal Year shall not exceed 1,000,000 shares.

## SECTION XII

## ADJUSTMENTS UPON CHANGES IN CAPITALIZATION

Notwithstanding any other provision of the Plan, the Award Agreements may contain such provisions as the Committee determines to be appropriate for the adjustment of the number and class of shares, subject to each outstanding Stock Option or SAR, the exercise prices in the event of changes in, or distributions with respect to, the outstanding Common Stock by reason of stock dividends, recapitalizations, mergers, consolidations, split-ups, combinations or exchanges of shares, spinoffs and the like, and, in the event of any such changes in, or distribution with respect to, the outstanding Common Stock, the aggregate number and class of shares available under the Plan and the limits applicable to Awards under the Plan, in each case, shall be appropriately adjusted by the Committee, whose determination shall be conclusive.

## SECTION XIII

## ADMINISTRATION OF THE PLAN

Full power and authority to construe, interpret and administer the Plan is vested in the Committee. Decisions of the Committee will be final, conclusive and binding upon all parties, including the Corporation, shareowners, Non-Employee Directors and Employees. The foregoing will include, but will not be limited to, all determinations by the Committee as to (a) the approval of Employees and Non-Employee Directors for participation in the Plan, (b) the amount of the Awards, (c) the performance levels at which different percentages of the Awards would be earned and all subsequent adjustments to such levels and (d) the determination of all Awards. Any person who accepts any Award hereunder agrees to accept as final, conclusive and binding all determinations of the Committee. The Committee will have the right, in the case of Employees not employed in the United States, or Non-Employee Directors not resident in the United States, to vary from the provision of the Plan to the extent the Committee deems appropriate in order to preserve the incentive features of the Plan.

## SECTION XIV

## NON-ASSIGNMENT

Awards under the Plan may not be assigned or alienated. In case of a Participant's death, the amounts distributable to the deceased Participant under the Plan with respect to which a designation of beneficiary has been made (to the extent it is valid and enforceable under applicable law) shall be distributed in accordance with the Plan to the designated beneficiary or beneficiaries. The amount distributable to a Participant upon death and not subject to such a designation shall be distributed to the Participant's estate. If there is

any question as to the right of any beneficiary to receive a distribution under the Plan, the amount in question may be paid to the estate of the Participant, in which event the Corporation will have no further liability to anyone with respect to such amount.

SECTION XV

WITHHOLDING TAXES

A Participant may elect, subject to the provisions of the applicable Sections of the Plan and the terms of the Award, to pay any withholding tax due in connection with the exercise of any Stock Option or SAR or upon the vesting of Restricted Stock or the settlement of any other Award either (i) by cash including a personal check made payable to the Corporation or (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant and if acquired from the Corporation owned for at least six months, or (iii) by any combination of cash or unrestricted Common Stock. The Committee may provide, in the Award Agreement, that in the event that a Participant is required to pay to the Corporation any amount to be withheld in connection with the exercise, vesting or settlement of an Award denominated in shares, the Participant may satisfy such obligation (in whole or in part) by electing to have the Corporation withhold a portion of the shares of Common Stock otherwise to be issued upon exercise, vesting or settlement of such Award equal in value to the minimum amount required to be withheld. The value of the shares to be withheld shall be the Fair Market Value on the date that the amount of tax to be withheld is determined.

SECTION XVI

RIGHTS OF PARTICIPANT

To the extent that any Participant, beneficiary or estate acquires a right to receive payments or distributions under the Plan, such right will be no greater than the right of a general unsecured creditor of the Corporation. All payments and distributions to be made hereunder will be paid from the general assets of the Corporation. Nothing contained in the Plan, and no action taken pursuant to its provisions, shall create or be construed to create any contracted right or trust of any kind or fiduciary relationship between the Corporation and any Participant, beneficiary or estate.

SECTION XVII

MODIFICATION, AMENDMENT OR TERMINATION

The Committee may modify, amend, or terminate the Plan at any time, provided that, unless the requisite approval of stockholders is obtained, no amendment shall be made to the Plan if such amendment would (i) increase the number of shares of Common Stock available for issuance under the Plan or increase the limits applicable to Awards under the Plan, in each case, except as provided in Section XII; (ii) lower the Exercise Price of the Stock Option or SAR grant value below 100% of the Fair Market Value of one share of Common Stock on the Grant Date, except as provided in Section XII; (iii) remove the repricing restriction set forth in Section IX; or (iv) require stockholder approval as a matter of law or under rules of the New York Stock Exchange. No Plan amendment shall, without the affected Participant's consent, terminate or adversely affect any right or obligation under any Stock Option or other Award previously granted under the Plan.

SECTION XVIII

RESERVATION OF SHARES

(1) The total number of shares of Common Stock reserved and available for delivery pursuant to this Plan is 3,250,000 shares of Common Stock. The number of shares authorized and available shall be increased by shares of Common Stock subject to an option or award under this Plan or any other plan, including the Navistar 1994 Performance Incentive Plan, the Navistar 1998 Supplemental Stock Plan, or the 1998 Non-Employee Director Stock Option Plan, that is cancelled, expired, forfeited, settled in cash or otherwise terminated without a delivery of shares to the Participant of the plan, including shares used to pay the option exercise price of an option issued under the Plan or any other plan or to pay taxes with respect to such an option.

(2) In order to provide a limitation on the number of shares that may be issued as Incentive Stock Options as provided by the Code, no more than 1,000,000 shares of Common Stock, or if less the number of shares that may be issued under the Plan, shall be granted as Incentive Stock Options in any calendar year. Such shares may be in whole or in part, as the Board of Directors shall from time to time determine, authorized and unissued shares of Common Stock or issued shares of Common Stock which shall have been

reacquired by the Corporation.

(3) In order to provide a limitation on the number of shares that may be issued as Restricted Stock, Stock Units, SARs, and Awards other than Stock Options, no more than 1,000,000 shares of Common Stock that may be issued under the Plan shall be granted as Restricted Stock, Stock Units, SARs, or Awards other than Stock Options.

SECTION XIX

RIGHTS OF EMPLOYEES

Status as an Employee shall not be construed as a commitment that any one or more Awards will be made under this Plan to an Employee or to Employees generally. Status as a Participant shall not entitle the Participant to any additional future Awards. Nothing in the Plan will confer on any Employee or Participant any right to continue in the employ of the Corporation or any of its subsidiaries or interfere with or prevent in any way the right of the Corporation or any of its subsidiaries to terminate an Employee or Participant's employment at any time for any reason.

SECTION XX

CHANGE IN CONTROL

Notwithstanding any provision contained herein to the contrary, in the event of a Change in Control, all awarded Restricted Stock and Stock Units will immediately be free of all restrictions and performance contingencies and will be deemed fully earned and not subject to forfeiture and all outstanding Stock Options governed by the Plan will be immediately exercisable and shall continue to be exercisable for a period of three (3) years from the date of the Change in Control regardless of the original term or employment status, except that the term of any Incentive Stock Option shall not be extended beyond ten (10) years from the date of grant.

SECTION XXI

LIMITATION OF ACTIONS

Every right of action by or on behalf of the Corporation or any shareowner against any past, present or future member of the Board of Directors, officer or Employee arising out of or in connection with the Plan will, irrespective of the place where action may be brought and irrespective of the place of residence of any such director, officer or employee, cease and be barred by the expiration of three (3) years from whichever is the later of (a) the date of the act or omission in respect of which such right of action arises or (b) the first date upon which there has been made generally available to shareowners an annual report of the Corporation and a proxy statement for the annual meeting of shareowners following the issuance of such annual report, which annual report and proxy statement alone or together set forth, for the related period, the aggregate amount of Awards under the Plan during such period; and any and all right of action by an Employee or Non-Employee Director (past, present or future) against the Corporation arising out of or in connection with the Plan shall, irrespective of the place where action may be brought, cease and be barred by the expiration of three (3) years from the date of the act or omission in respect of which such right of action arises.

SECTION XXII

GOVERNING LAW

The Plan will be governed by and interpreted pursuant to the laws of the State of Delaware, the place of incorporation of the Corporation, without giving effect to the principals of conflict of laws.

SECTION XXIII

EFFECTIVE DATE

The effective date of the Plan shall be February 17, 2004 (the "Effective Date"), subject to approval by the stockholders at the Corporation's Annual Meeting to be held on February 17, 2004, or any adjournment thereof. The Plan shall continue in effect for ten (10) years from the Effective Date, expiring February 16, 2014. No Awards may be granted under the Plan subsequent to February 16, 2014, but Awards theretofore granted may extend beyond that date in accordance with their terms.

### TAXATION OF NAVISTAR STOCK OPTIONS
(February 2004)

*Summary*

The Company grants two types of stock options to employees, non-qualified stock options ("NQO") and incentive stock options ("ISO"). ISOs may be eligible for more favorable tax treatment because more of the income is potentially eligible for long-term capital gain treatment. Only non-qualified options are granted to Non-Employee Directors, and these are generally tax the same as non-qualified options granted to employees, except that directors are independent contractors and therefore not subject to FICA or general income tax withholding by the Company.

Stock options granted under the Restoration Program are non-qualified stock options. However, the Company's restoration stock option program can provide for the deferral of the delivery of the shares in a restoration type exercise. In this case the income is recognized for tax purposes at the time the shares are delivered, and the amount of the income is determined bases on the value of the stock on the date of delivery.

When ordinary income is realized on a stock option, the income is taxable at the employee's marginal tax rate. The highest federal tax rate is currently 35%, after the reductions made by the recent tax legislation. Hospital insurance tax at 1.45% also applies, since there is no wage base limitation as there is for the Social Security tax of 6.2%. Long-term capital gains, on the other hand, are generally taxable at a maximum federal rate that has been reduced from 20% to 15%. Capital gains are now considered long term if the stock was held for more than one year. The rate reductions apply for a limited number of years under the current law, however it is assumed in this memorandum the reduced rates will continue indefinitely.

Several years ago the IRS took the position that ISOs would not be subject to FICA tax or income tax withholding pending review by the IRS. The IRS has maintained the position that ISOs are not subject to FICA or withholding and indicated it would not impose FICA on ISO before the second taxable year after final regulations were adopted. It is generally assumed that the IRS will request that Congress adopt legislation to deal with FICA and withholding on ISOs. At this time there is no FICA or required withholding on ISO and likely will not be at least through 2004.

**NQOs.** When an employee exercises a NQO, the spread (the difference between the exercise price and the value of the stock on the date of exercise) is taxable as ordinary income. If the employee holds the stock for more than one year, any gain realized on the subsequent sale of the stock will be eligible for the 20% long-term capital gain rate. (If an officer could not sell the stock because of the insider trading rules under Section 16b, he would not recognize income during the Section 16b period, unless he filed an election to recognize income under §83(b) of the Code.)

**ISOs.** If an employee exercises an ISO and continues to hold the stock, no income is recognized at the time of the exercise. When the employee subsequently sells the stock, he will generally be eligible for the 15% long-term capital gain rate on all of the gain, both the spread that existed at the time of exercise and any increase in value after the exercise. To get the 15% rate, the

employee must hold the stock for two years from the date of the grant or the option, he most hold the stock for more than one year from the date of exercise of the option, and the employee most exercise the option within three (3) months of retirement or other termination of employment from the Company (one year in the case of disability). The employee needs to consider the alternative minimum tax implications of holding ISO stock. The spread (the excess of the value of the stock over the option price) at the time of exercise is a tax preference, and some employees could incur a minimum tax liability, which may require the payment of tax to the IRS. Generally when the employee sells the stock there is a negative adjustment to income for ATM purposes and this usually will entitle the employee to get the AMT back for the year in which he sells the stock.

**Exchange of shares.** If an employee uses Company stock that he owns to pay the exercise price of a stock option, generally he will not recognize gain on his use of the old stock. He will be treated as having exchanged old shares of Company stock for an equal number of new shares of Company stock. He does not recognize gain on the exchange and his basis and holding period will carryover to the new stock. (There are limitations on using ISO stock for this purpose.)

**The details.** Stock options are often subject to tax planing opportunities because the employee has some control over the timing and method of exercise and the holding of disposition of the stock. The tax rules are often complex. Some of the rules are summarized in this memorandum. Employees are advised to consult their tax and financial advisors to review the considerations involved in holding or exercising stock options.

## CAPITAL GAINS TAXATION

The Jobs and Growth Tax Relief Reconciliation Act of 2003 (the "Act") reduced the potential tax rate that applies to long-term capital gain. Generally the maximum federal rate was reduced from 20% to 15%. The Act also accelerated ordinary income tax rate reductions that had previously been adopted during the Bush Administration. The maximum federal rate is generally 35% and each person must consider what his marginal rate is based on his income for income tax purposes. The differential in tax rates could affect the relative value of ISOs compared to NQOs. It may also affect the relative advantage of using restoration options since the future gain on the shares acquired through a restoration option exercise is potentially eligible for capital gain treatment. Generally, stock acquire by exercise of an ISO or otherwise must be held for more than one year to be taxed at the lower long-term capital gains rates.

As discussed in the ISO section of this memorandum, there is a one-year and a two-year holding period that must be met for favorable tax treatment of an ISO. These holding periods are in addition to the capital gains holding period rules.

## NON-QUALIFIED STOCK OPTIONS

Options granted under the Company's 2004 Performance Incentive Plan will state whether the options are intended to be NQOs or ISOs. All options that will be granted as restoration options will be NQOs.

2

Income is recognized at the time of exercise of the option. (If a Section 16(b) holding period applied under the Securities laws, the income would be recognized at the end of the 16(b) period, unless the employee elected to recognize the income at the time of exercise by filing a section 83(b) election). The amount of the income is the difference between the option price paid to the Company to exercise the option and the market value of the stock. This difference between the price and value is often referred to as the spread. The income is taxable as ordinary income. The employee's basis in the stock received is equal to the sum of the amount paid for the shares and the amount of income recognized. Gain or loss on the subsequent sale of the stock is capital gain or loss. The rate that applies to the capital gain depends on the length of the period for which the stock was held from the date of exercise. Generally, the stock must be held for more than one year to qualify for the 15% long-term capital gains rate. If previously owned stock is used to pay the exercise price (as it would be if a restoration option exercise is made), gain or loss on the old stock is not recognized, and the basis of the new stock is adjusted for the non-recognized gain or loss.

The income realized on a NQO is subject to FICA taxes.

**Example 1, NQO cash exercise.** The employee exercises an option to purchase 150 shares at $25 per share. He pays the option price in cash using a cashless exercise program the company established with a stockbroker. Under the cashless exercise program the employee does not have to advance any part of the option price. The value of the stock at the time of exercise is $30. The employee recognizes income of $750, which is taxed as ordinary income at the employee's marginal rate. The employee's basis in the stock would be $4,500, the price paid at $25 per share times 150 shares plus the income recognized of $750. If the stock were sold in two years at $40 per share, there would be a capital gain of $10 per share, or $1,500. The capital gain would be long-term because the stock was held for more than one year. Any net long-term gain would be taxed at a maximum rate of 15%.

**Example 2, NQO exercised with previously owned stock held at a gain.** In April 2004 the value of the stock is $50 per share. The employee exercises an option granted in 2003 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) previously acquired in the market for $25 per share. The employee will be treated as having exchanged 80 old shares for 80 new shares. This exchange is non-recognized for tax purposes. The transaction is not recognized because a special rule of the Internal Revenue Code provides that an exchange of common stock for common stock in the same corporation is not recognized (§1036). Gain or loss is not recognized and the taxpayer's basis carries over. As a result, the employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $25 per share ($2,000). The employee's basis in the other 20 shares is $1,000, or $50 per share. This is the amount of income recognized on the exercise of the 100 options ($50 less $40 times 100 shares). On the subsequent sale of the 80 shares or the 20 shares, the employee will recognize gain to the extent the sale price exceeds the basis. For the purpose of the holding period required for long-term capital gain treatment, the 80 exchanged shares will be considered to be acquired on the date the old 80 shares were acquired, and the new 20 shares will be considered to be acquired on the date the shares are transferred to the

3

employee.

**Example 3, NQO exercised with previously acquired NQO stock held at a gain.** The facts are the same as in Example 2 except that the employee uses stock acquired by exercise of a NQO to pay the option price. The results are the same as in Example 2 in that the gain on the old shares is non-recognized.

**Example 4, NQO exercised with previously acquired ISO post-holding period stock held at a gain.** The facts are the same as in Example 2, except that the employee uses stock acquired by exercise of an ISO and the employee held the stock for the ISO holding periods (two years from grant, one year from transfer on exercise, as described in Example 12). The result is the same as in Example 2 in that the gain on the old stock is not recognized. However, in this Example 4 the non-recognized gain is likely to be larger because the gain includes the non-recognized gain that was realized on exercise of the ISO (see Examples 9 and 17) regarding exercise of an ISO).

**Example 5, NQO exercised with previously acquired ISO pre-holding period stock held at a gain.** The facts are the same as in Example 2, except that the employee uses stock acquired by exercise of an ISO, and the employee had not held that stock for the ISO holding periods (two years from grant, one year from transfer on exercise, as described in Example 12). The result is the same as in Example 2 in that gain on the 80 old shares will not be recognized. However, there are two differences. The non-recognized gain is likely to be larger because the gain includes the non-recognized gain that was realized on exercise of the ISO (see Examples 9 and 17 regarding exercise of an ISO). Secondly, there are special disqualifying disposition rules that apply when ISO stock is disposed of before the two-year and one-year holding periods are satisfied. These requirements will carry over to the new 80 shares of stock. These rules are described in Example 12. To illustrate, if the employee sold the new 80 shares within two years from the grant of the ISO, or within one year from the transfer of the ISO stock on exercise of the ISO, the gain recognized would be taxable as ordinary income to the extent that the market value of the ISO stock on the date of the grant of the ISO exceeded the ISO option price.

**Example 6, NQO exercised with previously owned stock held at a loss.** In April 2004 the value of the stock is $50 per share. The employee exercises an option granted in 2003 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) previously acquired in the market for $75 per share. The employee will be treated as having exchanged 80 old shares for 80 new shares. This exchange is non-recognized as an exchange of common stock for common stock in the same corporation. The employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $75 per share ($6,000). The employee's basis in the other 20 shares is $1,000 or $50 per share. This is the amount of income recognized on the exercise of the 100 options ($50 - $40 times 100 shares). For the purpose of the more than one year holding period required for lower capital gains rates, the 80 exchanged shares will be considered to be acquired on the date the 80 old shares were acquired, and the 20 new shares will be considered to be acquired on the date the shares are transferred to the employee.

4

Example 7, NQO, cash exercise with proceeds from sale of old shares sold at a loss, wash sale. The facts are the same as in Example 6 except instead of transferring the old shares to the company to pay the exercise price, the employee sells 80 old shares on the stock market for $50 per shares, and on the settlement date pays the proceeds to the company to pay the option price. Under the wash sale rules, the employee is not allowed to recognize the capital loss on the shares because he purchased identical shares within 30 days of the sale. His basis in the old shares will carry over and become his basis in the 80 new shares. If he sold the old shares more than 30 days before, or more than 30 days after, the exercise of the option, he would be allowed a capital loss on the sale. In general, a capital loss can be used to offset capital gain, and a net loss can be deducted, subject to a $3,000 per year limitation. A capital loss not used in a year can be carried over and used in subsequent years.

## INCENTIVE STOCK OPTIONS (ISO)

### *ISO requirements*

An option must meet certain requirements to qualify as an incentive stock option. Each option that will be issued by the Company under the Company's 2004 Performance Incentive Plan will state whether the option is intended to qualify as an ISO, or is intended to be a non-qualified option. Generally, the requirements for an ISO include that the option price is not less than the value of the stock on the date of grant, the option is non-transferable, the term is not longer than 10 years, the plan under which the options are granted is approved by the shareowners, and the option does not contain a statement that it is intended to be a non-qualified option.

If the option qualifies as an ISO, and if certain requirements are met, the employee will receive ISO tax treatment. In general, these requirements are that the amount of stock covered by the option is within the annual limitation, the stock is held for the required ISO holding period, and the employment test is met.

If the requirements for ISO treatment are met, no income is recognized on exercise of the option (except for the purpose of the AMT). The employee's basis in the acquired stock is equal to the price paid for the stock. On the subsequent sale of the stock, the employee recognizes gain to the extent that the amount received exceeds his basis in the stock. The gain is taxed as capital gain. The capital gain rate that applies depends on the holding period. If the stock is held for more than one year from the date of exercise, the gain will be taxed at 15%.

Example 8, ISO cash exercise. On December 15, 2003, the employee is granted an ISO to purchase 150 shares at $25 per share. On December 16, 2004, the employee exercises the ISO for 150 shares, which are transferred to him on that date, and he pays the option price of $25 per share in cash. The market value of the stock at the time of exercise is $30. On January 20, 2006, the employee sells the stock for $40 per share. The employee does not recognize income at the time of exercise (except for the purpose of the AMT). His basis in the shares is $25, the price he paid. On the sale of the stock he recognizes gain of $15 per share ($40 sale price less $25 basis). The total gain of $2,250 ($15 per share times 150 shares) is taxable as a long-term capital gain at the 15% rate

because the stock was held for more than one year.

Example 9 (Omitted)

*Alternative Minimum Tax (AMT)*

The alternative minimum tax or AMT is tax policy affected by schizophrenia. If a taxpayer would pay too little income tax because of the use of special tax provisions that provide favorable treatment of expenses or income items, the taxpayer might incur a liability under the AMT. The AMT is intended to prevent Congress from being embarrassed by newspaper reports of high-income taxpayers paying little of no tax. To prevent this, the AMT provides an overriding tax structure that applies if it produces a higher tax in any year than the regular tax. The 2003 tax legislation increases the exemption amount for some taxpayers.

The concept is this. The taxpayer computes his income in the regular way and than computes his regular income tax. He then computes his alternative minimum taxable income by adjusting his regular income for special items, sometimes called tax preferences. Then he computes his alternative minimum tax by applying the special AMT rates. To the extent that the AMT exceeds the regular tax, the taxpayer must pay the excess. However, he can get the AMT payment back in later years; he can claim a credit for the AMT payment in a subsequent year to the extent that the regular tax exceed the AMT in the subsequent year. Further, there may be offsetting adjustments to income in a subsequent year.

For the purpose of the AMT, the spread on an ISO (the difference between the option price and value of the stock on the date of exercise of the option) is an item of tax preference. This means that in computing alternative minimum taxable income for the year of exercise of an ISO, the taxpayer must include in income for AMT purposes the amount of the spread. However, in the case of the ISO preference, an offsetting adjustment will occur when the taxpayer sells the stock he acquired by exercising the ISO. More particularly, in the year of sale, for the purpose of computing the alternative minimum taxable income, the taxpayer increases his basis in the stock by the amount of the spread that was include in income as a preference, and takes a negative adjustment to alternative minimum taxable income for the year of sale. This will tend to make ATM less than the regular tax in the year of sale, thus supporting the taxpayer taking a credit in the year of sale for any AMT that was paid in the year of exercise of the option.

Whether the employee will incur an AMT liability in the year of exercise, and when he will be able to recover any AMT that had to be paid, depends on numerous factors affecting the returns for the year involved. It is often difficult to predict the outcome without reviewing all of the facts. Preparing pro-forma AMT calculations to show the amount of liability for the tax and the timing of the expected recover of any AMT payments is often helpful. Even if some AMT tax is incurred and it not recoverable for a period of time, there may still be substantial overall saving to an employee by exercising an ISO and holding the stock for the requisite holding period.

As a generalization, among the items includable in alternative minimum taxable income are

state taxes and ISO spread. There is an exempt amount which functions as a deduction against alternative minimum taxable income. The exempt amount varies with marital status and phases out as income exceeds specified levels. The tax rates for the AMT are 26% stepping up to 28%, with a 15% rate on long-term gains. Factors that help to avoid the AMT are low levels of preferences, lower income levels that preserve the exempt amount, or higher regular income tax rates that cause the total to exceed the AMT.

*Annual limitation*

There is an annual $100,000 limitation on the amount of options that can qualify as ISOs. Each calendar year is tested separately. All options held by an employee that first become exercisable in the year are tested. Options cannot qualify as ISOs to the extent that the value of the stock covered by the options exceeds $100,000. The value of the stock for this purpose is the value of the stock on the date of the grant of the option.

The $100,000 limitation is applied separately for each year, but it is applies to all options regardless of when the option was granted, if the option first becomes exercisable in the testing year for all or any portion of the stock covered by the option. For example, a company granted an option in year one for 3,000 shares at $25, which is exercisable for 1,000 shares in year 2, 1,000 shares in year 3, and 1,000 shares in year 4. In year 2 the company granted an option for 3,000 shares at $30 which is exercisable for 1,000 shares in year 3, 1,000 shares in year 4, and 1,000 shares in year 5. In applying the $100,000 limitation, in year 2 there would be 1,000 shares valued at $25 for which the options first became exercisable ($25,000). In year 3 there would be would be two relevant options: i) the year 1 option that becomes exercisable for 1,000 shares at $25 ($25,000), and ii) the year 2 options that becomes exercisable for 1,000 share valued at $30 ($30,000), for a total for year 3 of $55,000.

**Example 10, $100,000 limitation.** To simplify this example, it is assumed the options become exercisable for all shares one year after the grant, rather than one third of the shares become exercisable each year. The company issues options meeting the ISO requirements to an employee in December 2003 covering $75,000 in stock valued as of December 2003. In December 2004 the 1998 options first become exercisable under the terms of the options that provide for exercise one year after grant. In December 2004 the Company issues options to the same employee covering $100,000 of stock, valued as of December 2004. In December 2004 there is a change of control of the company that causes the 2004 options to become immediately exercisable. As a result, $175,000 of purported ISOs would first become exercisable in 2004. The limitation would provide that the 2003 options covering $75,000 of stock continue to be eligible for ISO treatment. Only $25,000 of the 2004 options qualifies for ISO treatment. The $75,000 of excess 2004 options is treated as non-qualified options. The same result would occur if the company inadvertently issued options in excess of the $100,000 limitation.

*Employment requirement*

To receive ISO treatment, the employee must have been an employee of the Company or a

subsidiary thereof from the date of grant of the option until at least within three (3) months of exercise of the option. If the employee were disabled, a one-year period would apply rather than a three-month period. For this purpose disabled means that the employee is unable to engage in any gainful employment by reason of physical or mental impairment which can be expected to result in death or last for a continuous period of at least 12 months.

Example 11, employment test. The employee is granted an ISO on December 16, 2002 to purchase 100 shares at $25 per share. On January 31, 2007, the employee retires from the company. On June 1, 2007, when the value of the stock is $95 per share, the employee exercises the ISO, paying the option price in cash. The employee recognizes ordinary income in the amount of $7,000 ($95 value less $25 option price times 100 shares). The exercise of the option does not comply with the ISO requirements because the option was not exercised within three months of the employee's termination of employment. The employee's basis in the shares is $9,500 ($25 option price plus $70 income times 100 shares).

*Holding periods*

In order to receive ISO treatment, the employee must hold the stock both: i) for two years from the date of grant of the option, and ii) one year from the date the stock is transferred to the employee on exercise of the option. If the stock is disposed of before this time, the disposition is a disqualifying disposition and generally results in the employee recognizing ordinary income for the difference between the option price and value of the stock on the date of exercise, and capital gain for any increase in value after the date of exercise. For this purpose, stock is considered disposed of if it is sold, given away, or used to pay the option price on exercise of another ISO. (It may not be a disqualifying disposition for ISO stock to be used to pay the option price on an NQO. See Example 5.)

Example 12, ISO disqualifying disposition by sale at a gain over value on date of exercise. On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 1, 2004, the employee sells the stock on the stock exchange for $40 per share. The sale is a disqualifying disposition for two reasons. The stock was sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee recognizes ordinary income in the amount of $750 (the difference between the option price of $25 and the $30 value of the stock on the date of exercise, times 150 shares) and $1,500 of capital gains (the difference between the $40 sale price and the basis of $30 per share, which is the option price plus the amount of ordinary income recognized, times 150 shares). Both the ordinary income and the capital gain are recognized for the employee's 2004-tax year. The capital gain is short-term because the stock was not held for more than one year.

Example 13, ISO disqualifying dispositions by sale at less than the stock value on date of exercise. On December 16, 2002, an employee is granted an ISO. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On

December 1, 2004, the employee sells the stock on the stock exchange for $28 per share. The sale is a disqualifying disposition for two reasons. The stock was sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee recognizes ordinary income in the amount of $450 (the difference between the option price of $25 and the $28 value of the stock on the date of sale, times 150 shares). He does not realize any capital gain because the employee's basis would be the same as the sale price. (The income would be limited to the amount that the sale price exceeded the exercise price because of a special rule that applies when the stock is disposed of in a transaction in which a loss would be recognized, such as a sale to a third party.)

If, however, the stock was disposed of in a transaction in which a loss would not be recognized, for example, the property was given away, sold to a spouse, or sold in a wash sale, the ordinary income amount would be equal to the spread between the option price and the value or stock at the time of exercise ($30-$25). See Example 15. The income is recognized for the employee's 2004-tax year.

**Example 14, ISO disqualifying dispositions by sale at less than option prices.** On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 1, 2004, the employee sells the stock on the stock exchange for $23 per share. The sale is a disqualifying disposition for two reasons. The stock was sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee would not recognize any ordinary income since the sale price is less than the option price, and the employee would recognize a capital loss of $300, the difference between the option price paid for the shares and the sale price ($25 less $23 times 150 shares). No ordinary income was recognized because of a special rule that applies when the stock is disposed of in a transaction in which a loss would be recognized. If, on the other hand, the property were disposed of in a transaction on which a loss would not be recognized, for example, the property was given away, sold to a spouse, or sold in a wash sale, the ordinary income amount would be equal to the spread between the option price and the value at the time of exercise. See Example 15. The capital loss would be recognized for the employee's 2004-tax year.

**Example 15, ISO disqualifying disposition by gift.** On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 2, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 2, 2004, the employee gives the stock to his son. The gift constitutes a disqualifying disposition for two reasons. The stock was disposed of within two years of the grant of the option, and the stock was disposed of within one year from the exercise of the option and the transfer of the stock to the employee. The effect of the gift would be as follows:

      i) If the value of the stock on the date of the gift were $40 per share, the employee would recognize ordinary income of $750 (the difference between the $30 value of the stock on the date of exercise of the option and the $25 exercise price). The son's basis in the stock would be the same as the employee's basis, $30 per share, the option price, plus the income recognized.

ii) If the value of the stock on the date of the gift were $20 per share, the employee would recognize ordinary income of $750 (the difference between the $30 value of the stock on the date of exercise of the option and the $25 exercise price). The employee's basis in the stock would be $30 per share. The employee would not be allowed to recognize a capital loss because the disposition was a gift. The son's basis in the stock would depend on subsequent circumstances. For determining gain on sale of the stock, the employee's basis of $30 per share would carry over and become the son's basis. For determining a loss on the sale of the stock, the son's basis would be $20 per share, the value of the stock on the date of the gift.

**Example 16, ISO exercise with pre-holding period ISO stock.** In November 2005, the value of the stock is $50 per share. The employee exercises an ISO granted in 2004 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) acquired in December 2004 for $25 per share by exercise of an ISO that had been granted in December 2003. In December 2004 the value of the stock was $30 per share. The two-year holding period would not be met for the 2003 ISO stock, and therefore there is a disqualifying disposition of the 2003 ISO stock. For tax purposes, two transactions will occur in 2000: the exchange of 80 old shares for 80 new shares, and the transfer of 20 additional new shares to the employee.

Exchange of 80 shares. A special rule applies in this case where and ISO is exercised with ISO stock that was not held for the ISO holding periods. Gain is recognized on the exchange of old ISO stock for new ISO stock, although a loss would not be recognized because of the wash sale rules. As a result, the employee recognizes gain in the amount of $2,000, the difference between his basis in the old stock ($25 times 80 shares equals $2,000) and the value of the new stock ($50 times 80 shares equals $4,000). This $2,000 gain consists of two elements:

i) $400 will be taxed as ordinary income, the difference between the option price for the old stock and the value of the stock on the date of exercise of the first option ($30 less $25 times 80 shares);

ii) $1,600 will be taxed as capital gain, the difference between the value of the stock on the date of exercise of the second option, and the sum of the employee's basis in the old stock and the ordinary income recognized on the exchange [$50 less ($25 plus $5) times 80 shares]. The capital gain would be short-term because the stock did not satisfy the more than one-year holding period.

The employee's basis in the 80 new shares will be $50 per share, reflecting his cost of $25 for the old shares, and the $25 of ordinary income and gain recognized on the exchange for the new shares. For the purpose of the more than one-year holding period required for the lower capital gains rates, the 80 exchanged shares will be considered to be acquired on the date the new shares are transferred to the employee.

20 additional new shares. The 20 additional new shares that the employee receives on

exercise of the second ISO will be eligible for ISO treatment. Therefore the employee will not recognize income at the time of exercise, and he will be eligible for capital gain treatment on the sale of the stock if the holding periods and employment tests are satisfied. The employee's basis in the 20 shares will be zero since he will have recognized no income with respect to the shares. For the purpose of the more than one-year period required for lower capital gain rates, the new 20 shares will be considered to be acquired on the date the shares are transferred to the employee.

**Example 17, ISO exercise with post holding period ISO stock.** In April 2005 the value of the stock is $50 per share. The employee exercises an ISO granted in 2003 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) acquired in December 2002 for $25 per share by exercise of an ISO that had been granted in December 2001. Because both holding periods are met for the 1995 ISO stock, use of the stock to pay the option price is not a disqualifying disposition. The employee will be treated as having exchanged 80 old shares for 80 new shares. This exchange is non-recognized as an exchange of common stock for common stock in the same corporation. The employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $25 per share ($2,000). The employee's basis in the other 20 shares is zero, because he did not recognize any income on exercise of the ISO. For the purpose of the more than one year holding period required for the lower capital gain rates, the 80 exchanged shares will be considered to be acquired on the date the old 80 shares were acquired, and the new 20 shares will be considered to be acquired on the date the shares are transferred to the employee.

**Example 18, ISO exercise with NQO stock.** The facts are the same as Example 17 except the stock used to pay the exercise price was acquired by exercise of a NQO. The result is the same as Example 17 except there is no issue of a disqualifying disposition because no ISO stock was used to pay the exercise price.

R. G. Martinell

N:\CAK\Stock Option File\Tax memo re stock options for 2004 PIP.doc

08CV4305
JUDGE BUCKLO
MAGISTRATE JUDGE ASHMAN
NF

# EXHIBIT #2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | ) )  ) |
| Plaintiff, | ) |
| v. | ) ) |
| NAVISTAR INTERNATIONAL CORPORATION, | ) ) ) |
| Defendant. | ) |

## DECLARATION OF MONICA L. STARK IN SUPPORT OF REMOVAL

Pursuant to 28 U.S.C. § 1746, Monica L. Stark, hereby declares and states as follows:

1.    I have been employed by Navistar, Inc., a wholly-owned and primary operating subsidiary of Navistar International Corporation ("Navistar"), for approximately six years.

2.    I am currently the Director, Corporate Compensation and Human Resources Policy at Navistar, Inc.

3.    I have personal knowledge of the facts set forth herein and am competent to testify with respect thereto.

4.    Navistar is a corporation organized under the laws of the State of Delaware.

5.    Navistar's principal place of business is located in Warrenville, Illinois.

6.    In my position at Navistar, Inc., I work on matters relating to stock options.

7.    In certain circumstances, Navistar grants stock options to high-level executives and senior members of management.

8.    I have reviewed Navistar's records pertaining to the individuals whose vested stock options expired during Navistar's trading restriction "blackout period" in effect while

Navistar was not current with its financial filings with the Securities and Exchange Commission ("SEC"), beginning in 2006.

9.    There are fifty-six (56) individuals whose vested stock options expired during the period when trading restrictions were in effect while Navistar was not current with its financial filings with the SEC.  One or more of these individuals is a citizen of a state other than Illinois or Delaware.

10.    The cash payment offers previously extended to certain individuals whose stock options expired during the "blackout" period is in excess of $5 million.

11.    I have also reviewed Navistar's records pertaining to the individuals whose vested stock options did not expire but who were unable to exercise stock options during Navistar's trading restriction "blackout period" in effect while Navistar was not current with its financial filings with the Securities and Exchange Commission ("SEC").

12.    The total number of individuals who were unable to exercise stock options during Navistar's trading restriction "blackout period" in effect while Navistar was not current with its financial filings with the Securities and Exchange Commission ("SEC"), beginning in 2006, whether such options expired during the "blackout period" or not, exceeds 100 individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 29, 2008.

Monica L. Stark

08CV4305
JUDGE BUCKLO
MAGISTRATE JUDGE ASHMAN
NF

# EXHIBIT #3

## IN THE UNITED STATES COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>NAVISTAR INTERNATIONAL CORPORATION,<br><br>        Defendant. | No.    FILED: MAY 23, 2008<br>       08CV3038      TG<br>       JUDGE DARRAH<br>       MAGISTRATE JUDGE NOLAN |

### CLASS ACTION COMPLAINT

Plaintiff Ravi P. Rawat on behalf of himself and those similarly situated, for his class action complaint based upon the investigation of his counsel, alleges as follows on information and belief:

### NATURE OF THE ACTION

1.    This action is brought on behalf of employees and former employees of Navistar International who were unable to exercise their vested stock options due to a "blackout" period imposed by Navistar. Navistar's "blackout" period as the result of management malfeasance led to Navistar's having to restate its financials. By allowing options to expire and prohibiting former employees from exercising their vested options pursuant to the option contract, Navistar breached the option contract and its implied covenant of good faith and fair dealing.

## JURISDICTION AND VENUE

2.      <u>Jurisdiction</u>: This Court has jurisdiction over all claims asserted herein
pursuant to 28 U.S.C. §1332(d), because diversity exists between members of the
Plaintiff Class and defendants, and the amount in controversy exceeds $5,000,000.  This
action is not a collusive action designed to confer jurisdiction on a court of the United
States that it would not otherwise have.

3.      This Court retains general jurisdiction over each named defendant who is
a resident of Illinois.  Additionally, this Court has specific jurisdiction over each named
non-resident defendant because these defendants maintain sufficient minimum contacts
with Illinois to render jurisdiction by this Court permissible under traditional notions of
fair play and substantial justice.  Defendants' conduct arose out of Illinois, where Navistar
International maintains its corporate headquarters.  Finally, exercising jurisdiction over
the named non-resident defendants is reasonable.

4.      <u>Venue</u> is proper in this Court pursuant to 28 U.S.C. §1391(a) because one
or more of the defendants either resides in or maintains executive offices in this District,
and a substantial portion of the transactions and wrongs that are the subject of this
complaint, including the defendants' primary participation in the wrongful acts detailed
herein, breach of contract, breach of implied obligation of good faith and fair dealing
occurred in substantial part in this District. Finally, defendants have received substantial
compensation in this District by doing business here and engaging in numerous activities
that had an effect in this District.

2

## PARTIES

5.     Plaintiff Ravi P. Rawat is a citizen of Illinois and is a former Assistant

General Manager of the heavy truck group of Navistar International Corporation.

6.     Defendant Navistar International Corporation is a Delaware Corporation

with its principal place of business located at  4201 Winfield Road, Warrenville, Illinois

60555.

### BACKGROUND OF THE WRONGDOING

7.     Plaintiff began working for Defendant Navistar in January 1989.

Throughout his tenure at Navistar, Plaintiff was granted stock options on seven

occasions.

8.     On April 6, 2006, Navistar announced that as a result of its failure to file

with the Securities and Exchange Commission (the "SEC") its Annual Report for the

fiscal year ended October 31, 2005 (the Annual Report), the shares of the Company's

common stock that were acquired pursuant to the employee benefit plans set forth below

would not be available for use until the Annual Report is filed with the SEC.

9.     The Company also announced that it intended to file its Annual Report

with the SEC as soon as possible but could not estimate the date such report would be

filed.

10.     Because of the Company's prior conduct and the fact that the Company

had to restate its financials, it suspended purchases of its shares by participants and

beneficiaries in the United States in the following plans: (1) International Truck and

Engine Corporation 401(k) Retirement Savings Plan; (2) International Truck and Engine

Corporation Retirement Accumulation Plan; (3) International Truck and Engine

Corporation 401(k) Plan for Represented Employees; and (4) the IC Corporation 401(k) Plan (collectively, the 401(k) Plans).

11.    According to the Company, the blackout only prevented participants and beneficiaries from making additional investments in the company's common stock through the 401(k) Plans.

12.    Further, the Company sent a notice to its directors and executive officers informing them that a blackout period would begin on April 6, 2006 and would end at 4:00 pm Central Time on the day on which the Annual Report was filed with the SEC.

13.    The Company's directors and executive officers would generally be prohibited from directly or indirectly acquiring, disposing of, or transferring any equity securities of the company acquired by them in connection with their service and/or employment with the company in such capacities. The notice was allegedly sent to ensure compliance with Section 306(a) of the Sarbanes Oxley Act of 2002.

14.    As of the date of this filing, Navistar has not filed its Annual Report with the SEC.

### NAVISTAR'S STOCK OPTION PLANS

15.    According to a recent press release, Navistar is a holding company whose wholly owned subsidiaries produce International ® brand commercial trucks, MaxxForce brand diesel engines, IC brand school buses, and Workhorse brand chassis for motor homes and step vans. It also is a private-label designer and manufacturer of diesel engines for the pickup truck, van and SUV markets. The company also provides truck and diesel engine parts and services.

16.    According to the Plan document:

4

"The purpose of the Plan is to enable the Corporation and its subsidiaries to attract and retain highly qualified Employees, Consultants, and Non-Employee Directors, and additionally to provide key Employees who hold positions of major responsibility the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value."

(Ex. A).

17.　An option gives the holder a contractual right to purchase one share of stock (per option) at a set price, called the strike price. If the stock's market price rises above the strike price, the employee can exercise the option, buying stock at the strike price. The employee can then sell the stock back at the market price and benefit from the difference.

18.　Employees typically have ten years to exercise their options once they are vested. After the ten years, the options expire.

19.　According to Navistar's Stock Option Plan, when employees leave Navistar, they have 90 days to exercise his or her options at the strike price, which is determined on the day of the option grant.

20.　Plaintiff and the Class received options pursuant to Navistar's Stock Option Plan.

21.　Navistar's Stock Option Plan provides:

"The **Committee will document the terms of the Stock Option in an Award Agreement to include the Grant Date and Exercise Price, as well as any other terms that it may desire**. The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Options fixed by the Committee shall not be modified."

\*\*\*

"Unless otherwise determined by the Committee, a Stock Option granted under the Plan *will become exercisable in whole or in part after the commencement of the second year of the term of the Stock Option* to the extent of one third of the shares, to the extent of one third of the shares after commencement of the third year, and to the extent of one third of the shares after commencement of the fourth year."

\*\*\*

## SUBSTANTIVE ALLEGATIONS

22.    Plaintiff Rawat was the Assistant General Manager of the heavy truck group at Navistar's Cantera facility in Naperville, Illinois.

23.    Throughout the time he was employed by Navistar, he was granted options pursuant to the Stock Option Plan on a yearly basis, starting in 1998.

24.    Mr. Rawat separated from Navistar, effective January 5, 2007, while the "blackout" was in effect.

25.    Navistar's 1994 Performance Incentive Plan (as amended December 11, 2001) provides that the Company can grant two types of options.  Incentive Stock Options, defined as:

> "*a right, as evidenced by an agreement between the participant and the Company* in a form approved by the Committee, to purchase a certain number of shares of Common Stock at Fair Market Value for a period of ten (10) years from the date of grant which options are designed to the meet the requirements set out under Section 422 of the Internal Revenue Code."

The Plan also provides for Nonqualified Stock Options, defined as:

> "*a right, as evidenced by an agreement between the participant and the Company* in a form approved by the Committee, to purchase a certain number of shares of Common Stock at Fair Market Value for a period of ten (10) years from the date of grant  on which options are stated not to be qualified as incentive stock options under Section 422 of the Internal Revenue Code."

The difference between these options is merely the tax treatment between the options, and for purposes of this action, the options – as in the stock option plan[1] – should be treated identically.

26.     At the time of his resignation Mr. Rawat had vested options that, according to the Stock Option Plan, were a contractual right and exercisable within 90 days from the date of his effective resignation.  The 90 days time period ended on April 5, 2007.  The Navistar common stock closed at $48.10.

27.     However, the Company's self-imposed blackout period continued from the time of Mr. Rawat's resignation until the 90 day period ending on April 5, 2007.

28.     During the 90 days between January 5, 2007 and April 5, 2007, Mr. Rawat and his representatives had numerous discussions with Navistar in an attempt for Mr. Rawat to rightfully exercise his vested options.

29.     Ultimately, the Company refused to allow Mr. Rawat to exercise his options and breached the option contract.

30.     The table below shows Mr. Rawat's option status as of his date of resignation:

| Grant Date | Strike Price | No. of Vested Options | Loss as of April 5, 2007 close @ 48.10 |
|---|---|---|---|
| 12/14/1999 | $40.41 | 2900 | $22,311.73 |
| 12/12/2000 | $21.22 | 2133 | $57,335.04 |
| 12/11/2001 | $38.20 | 3300 | $32,670 |
| 12/10/2002 | $26.39 | 3900 | $84,688.50 |
| 12/9/2003 | $42.89 | 1501.5 | $7,830.32 |
| 12/14/2004 | $40.92 | 750.75 | $5,394.14 |
| **Total** | | **14485.25** | **$210,229.73** |

---

[1] The 1994 Stock Option Plan also provides that the term "Stock Option" mean either an Incentive Stock Option or a Nonqualified Stock Option.

31.    The table shows Mr. Rawat's unexercised, yet vested options at the time of his resignation, the strike price of those options, and what the options would have been worth at the end of the 90 days expiration period.

32.    On January 15, 2008, Navistar sent a letter to "Holders of Navistar International Corporation Stock Options." (Ex. B)

33.    The letter stated that "the Company is not current with its financial filing with the Securities and Exchange Commission.  As a result, there are certain limits on your ability to exercise your stock options."

34.    The letter further stated that ". . . some of your stock options may have expired or will expire in the near future.  We plan to address this issue but we are unable to do so now. . . [o]ur plan is to discuss this issue with our Board of Directors.  We cannot predict what, if any, action our directors will take, but we will communicate with you, not matter what the outcome. . ."

## CLASS ALLEGATIONS

35.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

36.    Class Definition.  The proposed class ("the Class") so represented by Plaintiff in this action, and of which the Plaintiff is a member is tentatively defined as:

> All individuals whose vested options expired during
> Navistar's "blackout period."

The Rule 23(a) Criteria are all met.

37.    Numerosity.  While the exact number of the members of the Class herein defined and described is unknown to Plaintiff at this time, employees whose stock options expired during the blackout period is in the thousands.  The Class is so numerous

that joinder is rendered impracticable.

38.    <u>Commonality</u>.  Questions of law or fact exist arising from the Defendants'
breach of contract and breach of implied duty of good faith and fair dealing.  Such
questions are common to all class members and predominate over any questions
affecting only individual members of the Class.  The myriad of questions of law or fact
common to the Class includes, *inter alia*:

> (a)    Whether the blackout period was necessary for non-executive
> employees under the Sarbanes-Oxley Act.

> (b)    Whether Defendants' denial of Plaintiffs' vested contractual right
> was a breach of contract.

> (c)    Whether Defendants' conduct constituted a breach of the implied
> duty of good faith and fair dealing.

39.    <u>Typicality</u>.  Plaintiff's claims are typical of the Class.  Each class member
has suffered damages as a result of the Defendants' conduct.

40.    <u>Adequacy of Representation</u>.  Plaintiff will fairly and adequately protect
the interests of the Class.  Plaintiff's interest in obtaining declaratory and injunctive
relief for the restrictions on his contractual rights is consistent with and not antagonistic
to the interests of any member of the Class.  Plaintiff is committed to the vigorous
prosecution of this action and his proposed class counsel is experienced in class actions
and complex litigation.

41.    <u>The Rule 23(b) Categories</u>.  Additionally, because all employees who have
vested options that expired within the blackout period, common questions predominate
over any individual questions.

**JURY DEMAND**

9

42.     Plaintiff and the Class demand a jury trial on all issues so triable.

**COUNT I**
**Breach of Contract**

43.     Plaintiff hereby incorporates all of the foregoing paragraphs.

44.     Plaintiff and the Class and Defendants were parties to Stock Option

Agreements pursuant to which Defendants agreed to permit Plaintiff and the Class to

purchase Navistar shares of stock before the stock options expired, including a 90 day

period after termination of employment.

45.     Plaintiff and the Class performed all conditions, covenants and promises

to be performed on their part in accordance with the contracts.

46.     Defendants breached the Stock Option Agreements with Plaintiff and the

Class by failing to permit them to exercise their options and purchase shares during the

term of the option.

47.     As a result of Defendants' breach of the Stock Option Agreements,

Plaintiff and the Class have suffered economic losses and other general, consequential

and specific damages, including the amounts they would have received from exercising

their stock options.

**COUNT II**
**Breach of the Covenant of Good Faith and Fair Dealing**

48.     Plaintiff hereby incorporates all of the foregoing paragraphs.

49.     The Stock Option Agreements entered into between Plaintiff and the Class

and Defendants are contracts that contain an implied covenant of good faith and fair

dealing, which obligated Defendants to perform the terms and conditions of the contracts

fairly and in good faith and to refrain from doing any act that would prevent or impede

10

Plaintiff and the Class from performing any or all conditions of the contracts that they agreed to perform, or any acts that would deprive Plaintiff and the Class of their benefits.

50.     Plaintiff and the Class performed all conditions, covenants and promises to be performed on their part in accordance with the contracts.

51.     Defendants knew Plaintiff and the Class fulfilled all their duties and conditions under the contracts.

52.     Defendants breached the implied covenant of good faith and fair dealing under the contracts by engaging in the conduct complained of herein and by engaging in the conduct that led to the Company's blackout period and thereafter. While the blackout was no fault of the Plaintiff, the Company refused to extend the exercise period beyond the blackout so that Plaintiff could have a meaningful opportunity to exercise their contractual rights conferred upon them by option grants, thereby preventing Plaintiff from exercising their stock options.

53.     As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class have suffered economic losses and other general, consequential and specific damages, including the amounts they would have received from exercising their options.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the Class defined herein, and declaring the

Plaintiff to be a proper Class representative, and Plaintiff's counsel as counsel for the

Class;

B.      Declaring that the Stock Option Plan's 90 day expiration period for

former employees is tolled by the blackout period;

C.      Awarding Plaintiff and Class members compensatory damages and

exemplary damages in an amount to be proven at trial;

D.      Awarding Plaintiff and the Class pre-judgment interest, as well as

reasonable fees and costs; and

E.      Awarding such other relief as this Court may deem just and proper.


Dated: May 23, 2008

                                        Respectfully submitted,


                                        ____/s/Clinton A. Krislov_____
                                        Attorney for the Plaintiff

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Dr., Ste. 1350
Chicago, IL 60606
Tel: (312) 606-0500
Fax: (312) 606-0207

Law Offices of Mark Baiocchi
184 Shuman Blvd.
Suite 250
Naperville, IL 60563
Tel: (630) 983-4200
Fax: (630) 983-4223

08CV3038            TG
JUDGE DARRAH
MAGISTRATE JUDGE NOLAN



# NAVISTAR INTERNATIONAL CORPORATION

### 2004 Performance Incentive Plan
### Prospectus and Stock Option Information

**March 24, 2004**

# NAVISTAR INTERNATIONAL CORPORATION
## DOCUMENTS CONSTITUTING A SECTION 10(a) PROSPECTUS PURSUANT TO A FORM S-8 REGISTRATION STATEMENT

### THIS DOCUMENT CONSTITUTES PART OF A PROSPECTUS COVERING SECURITIES THAT HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED

---

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.

---

Solely the information included under Tabs 1.0 through 2.0 shall constitute this prospectus. The information and documentation included under Tab 3.0 shall not, nor shall be construed in any manner to, constitute a part of this prospectus.

---

Neither the delivery of this prospectus nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the company since the date hereof. No person has been authorized to give any information or to make any representations, other than those contained in this prospectus, and, if given or made, such other information or representations must not be relied upon as having been authorized by the company. This prospectus does not constitute an offer to sell or solicitation of an offer to buy by anyone in any jurisdiction in which it is unlawful to make such offer or solicitation.

---

Solely the information contained under Tabs 1.0 through 2.0 constitutes a prospectus covering securities that have been registered under the Securities Act of 1933, as amended.

# PROSPECTUS

**Navistar International Corporation**

General Information
Regarding the

**2004 Performance Incentive Plan**

This prospectus describes but does not set forth the terms and conditions of Navistar International Corporation's 2004 Performance Incentive Plan. In the event of any conflict between the terms and conditions of the 2004 Performance Incentive Plan and the information contained in this prospectus, the terms and conditions of the 2004 Performance Incentive Plan shall prevail. No person has been authorized to give any information or to make any representations other than those contained in this prospectus in connection with the 2004 Performance Incentive Plan and the offering described in this prospectus, and if given or made, such other information or representations may not be relied upon as having been authorized by Navistar International Corporation.

**This document constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933, as amended.**

**The date of this prospectus is March 24, 2004**

# TABLE OF CONTENTS

Page

Introduction    -1-

What is the Company's purpose in providing the 2004 Plan?    -2-

Who is eligible to participate in the 2004 Plan?    -2-

How do I benefit under the 2004 Plan?    -2-

What does an Award consist of under the 2004 Plan?    -2-

What are the general terms of my Award under the 2004 Plan?    -3-

Will the Company provide me periodic reports concerning my Awards
under the 2004 Plan?    -6-

How do I exercise my Award and pay for the shares that I buy under
the 2004 Plan?    -6-

Can I sell or transfer my Award to someone else?    -6-

Can I sell the shares I acquire by exercising my Award?    -7-

Can the Company reprice or discount stock options granted under the 2004 Plan?    -8-

How would my Award be affected by a future change in the capitalization
of the Company?    -8-

How would my restricted stock, stock units and stock options be treated
in the event of a change in control of the Company?    -8-

Does the grant of an Award or ownership of shares give me any
special rights?    -8-

Under what circumstances can the 2004 Plan or my Award Agreement
be modified or termination?    -9-

What exactly is the Restoration Stock Option program and how does it work?    -9-

What is the Federal Income Tax treatment of an Award?    -9-

Risk Factors and Certain Investment Considerations    -12-

Additional Information.    -13-

i

This prospectus provides information concerning awards granted under the Navistar International Corporation 2004 Performance Incentive Plan (the "2004 Plan"), primarily in question and answer format. The information contained herein is qualified in its entirety by the text of the 2004 Plan.

**Introduction.**

    *Principal Office and Telephone Number.* The principal executive office of Navistar International Corporation (the "Company") is located at 4201 Winfield Road, Warrenville, Illinois 60555, and the Company's telephone number is (630) 753-5000.

    *The 2004 Performance Incentive Plan.* The 2004 Plan was approved by the Board of Directors (the "Board") and the independent Compensation and Governance Committee (the "Committee") of the Company on October 21, 2003 and by the shareowners of the Company on February 17, 2004. A total of 3,250,000 shares of Common Stock of the Company are reserved for awards under the 2004 Plan. As of February 17, 2004, no awards have been made in respect of any shares of Common Stock reserved for issuance under the 2004 Plan. The 2004 Plan replaces the Company's 1994 Performance Incentive Plan (which expired December 16, 2003), the 1998 Supplemental Stock Plan and accompanying Restoration Stock Option Program (which both expired on December 16, 2003) and the 1998 Non-Employee Director Stock Option Plan (which the Company terminated on February 17, 2004). The 2004 Plan expires on February 16, 2014. The 2004 Plan is governed by and interpreted in accordance with the laws of the State of Delaware. Any cause of action a participant may have in respect of the 2004 Plan must be brought within the three year period set forth in the 2004 Plan or such claim will be barred in accordance with the terms and conditions of the 2004 Plan.

    The number of shares authorized and available for issuance under the 2004 Plan will be increased by shares of stock subject to an option or award under the 2004 Plan, or any other plan, including, the 1994 Performance Incentive Plan, the 1998 Supplemental Stock Plan or the 1998 Non-Employee Director Stock Option Plan, that is cancelled, expired, forfeited, settled in cash or otherwise terminated without a delivery of shares to the participant of such plan, including shares used to pay the stock option exercised price of a stock option issued under the 2004 Plan or any other plan or to pay taxes with respect to such stock option.

    Unless otherwise specified, a reference herein to the "2004 Plan" refers to the 2004 Performance Incentive Plan. Awards granted under the 2004 Plan may consist of annual incentive awards, stock options, restricted stock, stock units, stock appreciation rights or any other type of award granted by the Committee under the 2004 Plan and such awards may herein after be referred to as an "Award" or collectively as "Awards."

    *Administration.* The 2004 Plan is administered by the Committee. All Committee members are non-employee directors of the Company and are appointed to the Committee by the Board for a one-year term and may be removed by the same. All decisions of the Committee will be final, conclusive and binding upon all parties. In administering the 2004 Plan, the Committee's discretionary authority includes, without limitation, determinations as to (1) the approval of participants in the plan, (2) the amount and nature of the Awards and (3) the performance levels at which different percentages of the Awards would be earned and adjusted. For further information about the 2004 Plan, please refer to the 2004 Plan or contact the Company's Corporate Secretary at the Company's principal executive office.

1

*ERISA and Certain Tax Provisions Not Applicable.* The 2004 Plan is not subject to any provisions of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") and is not qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code").

**What is the Company's purpose in providing the 2004 Plan?**

The purpose of the 2004 Plan is to enable the Company and its subsidiaries to attract and retain highly qualified personnel and non-employee directors, and additionally to provide key employees who hold positions of major responsibility in the Company the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value.

**Who is eligible to participate in the 2004 Plan?**

Management will, from time to time, select and recommend to the Committee employees of the Company and its subsidiaries who are to become participants in the 2004 Plan. Such individuals will be selected from those who, in the opinion of management, have substantial responsibility in a managerial or professional capacity. Non-employee directors are also eligible to participate in the 2004 Plan. Non-employee directors participating in the 2004 Plan shall be limited to receiving Awards of non-qualified stock options, restricted stock and stock units under the 2004 Plan.

**How do I benefit under the 2004 Plan?**

You benefit by an Award of cash or stock-based compensation under the 2004 Plan. The grant of a stock-based Award gives you the opportunity to benefit from possible appreciation in the market price of the Company's Common Stock.

**What does an Award consist of under the 2004 Plan?**

Under the 2004 Plan, the Committee may award: (1) annual incentive awards to participants, consisting of awards of cash approved by the Committee based on the level of achievement attained against annual performance goals approved by the Committee within the first ninety days of the applicable fiscal year; (2) stock option awards to employee participants, consisting of either nonqualified stock options or incentive stock options; (3) non-qualified stock option awards to non-employee director participants; (4) restricted stock awards to participants; (5) stock unit awards to participants; (6) stock appreciation right awards to employee participants, whether granted in connection with a related stock option or independent thereof; (7) any other type of Award granted by the Committee under the 2004 Plan; or (8) any combination of the foregoing Awards. All such Awards may be made, subject to the terms of the 2004 Plan, in such amounts (if any) and at such times (if at all) as the Committee may approve; provided, however, that in order to provide a limitation on the number of shares of Common Stock of the Company that may be issued in respect of a particular Award under the 2004 Plan, no more than 1,000,000 shares of Common Stock of the Company may be granted as stock options, restricted stock, stock units, SARs or any other Award under the 2004 Plan; provided, further, that such limitation shall not apply to any Award which is a non-qualified stock option granted to non-director employee participants.

2

**What are the general terms of my Award under the 2004 Plan?**

*General.* The principal terms of your Award will be contained in an award agreement between you and the Company (an "Award Agreement"), which you will enter into, upon the grant to you by the Company of an Award under the 2004 Plan. These terms will include the general nature of the Award, including the number of shares subject to each Award (in the case of a stock-based Award), the number of Awards granted to you, the date each Award is granted and other terms and conditions not expressly provided for in the 2004 Plan.

*Annual Incentive Awards.* If your Award is an annual incentive award, you will be eligible to receive a cash payment from the Company based upon the performance measures (as defined in the 2004 Plan) established by the Committee and set forth in your Award Agreement within the first ninety days of the applicable fiscal year. Only employee participant under the 2004 Plan are eligible to receive annual incentive awards and no participant who is not an employee at the end of the Company's fiscal year shall be entitled to such Award unless the Committee determines otherwise. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your annual incentive award.

*Stock Options.* If your Award is a stock option, the Committee will have the authority to determine certain terms relating to your stock option, including the grant date, the exercise price (which will be the fair market value of the stock on the date of grant of the stock option, as determined by the Committee), the exercise period, the number of shares that may be exercised at any given time, when you may exercise your stock option, any conditions to the exercise of your stock option, any restrictions on your right to sell the shares you purchase through the exercise of your stock option and whether the stock option is intended to be an incentive stock option under Section 422 of the Code. (Please remember that non-employee director participants are not eligible to receive incentive stock option Awards under the 2004 Plan.) Unless otherwise determined by the Committee and set forth in your Award Agreement, stock options granted to participants under the 2004 Plan will become exercisable in whole or in part as follows: after the commencement of the second year of the term of the stock option, to the extent of one third of the shares; after the commencement of the third year of the stock option, to the extent of one third of the shares; and after commencement of the fourth year of the stock option, to the extent of one third of the shares. Generally, except as otherwise provided in the 2004 Plan (see discussion regarding death, total and permanent disability or qualified retirement below), no outstanding stock option may be exercised by a participant unless such participant is an employee or non-employee director of the Company, as the case may be, at the time of exercise; provided, however, that in the event of termination of such relationship (other than on account of death, total and permanent disability or qualified retirement), such participant may exercise the stock option at any time within three months after such termination (but not after the expiration of the term of the grant) to the extent of the number of shares which were exercisable at the date of such termination; provided, further, that with respect to any employee participant, if such employee participant is terminated for cause as defined the International Truck and Engine Corporation Income Protection Plan or if the employee participant is covered by a different severance plan or agreement, then as defined in such plan or agreement, the three-month period shall not apply and the stock option shall cease to be exercisable and shall lapse as of the effective date of such employee participant's termination.

3

You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your stock option.

*Restricted Stock.* If your Award is restricted stock, you will receive shares of Common Stock of the Company that are restricted with an appropriate legend as to sale or transfer and subject to forfeiture pursuant to terms established by the Committee at the time of issuance. You will be entitled to all dividends paid with respect to all restricted stock granted to you under the 2004 Plan and you will be entitled to vote all such restricted stock granted to you under the 2004 Plan. Restricted stock may be granted to employee participants under the 2004 Plan for meeting their stock ownership requirements as described in the Company's Executive Stock Ownership Program, as amended from time to time (the "ESOP"), or for any other purpose. Restricted stock shall vest, in full or in installments, upon satisfaction of the conditions specified in your Award Agreement. In no event will an Award of restricted stock granted under the 2004 Plan vest in full prior to the commencement of the third anniversary of the grant date. A participant who quits or is involuntarily separated from the Company will forfeit any unvested restricted stock granted under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your restricted stock grant.

*Stock Units.* If your Award is stock units, you will receive without payment units representing shares of Common Stock of the Company. Such units will be restricted as to sale or transfer and subject to forfeiture pursuant to terms established by the Committee at the time of issuance. You will not be entitled to any dividends paid with respect to such stock units granted to you under the 2004 Plan and you will not be entitled to vote any such stock units granted to you under the 2004 Plan until such time as your stock units are converted into shares of Common Stock of the Company. Stock units may be granted to employee participants under the 2004 Plan for meeting their stock ownership requirements as described in the ESOP, or for any other purpose. Stock units shall vest, in full or in installments, upon satisfaction of the conditions specified in your Award Agreement. At the time that you leave the Company, you will receive such number of shares of unrestricted Common Stock of the Company equivalent to the number of vested stock units held by you as of such date (see the discussion regarding death, total and permanent disability or qualified retirement below). In no event will an Award of stock units granted under the 2004 Plan vest in full prior to the commencement of the third anniversary of the grant date. A participant who quits or is involuntarily separated from the Company will forfeit any unvested stock units granted under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your stock units.

*Stock Appreciation Rights or SARs.* If your Award is a stock appreciation right or SAR, the Committee will have the authority to determine certain terms relating to your SAR, including the grant date, the exercise price (which will be, for freestanding SARs, the fair market value of one share of Common Stock of the Company on the date of the grant of the SAR, as determined by the Committee, and for a SAR granted in tandem with a stock option, it will be the exercise price of the related stock option), the exercise period of the SAR (which shall not exceed a term of 10 years), the number of SARs that may be exercised at any given time, when you may exercise your SAR and any conditions to the exercise of your SAR. Upon the exercise of a SAR, you shall be entitled to receive payment in an amount equal to the excess of the fair market value of one share of Common Stock of the Company on the date of exercise over the exercise price of the SAR, multiplied by the number of shares of Common Stock of the Company for which the SAR is exercised. At the discretion of the Committee, the payment due to you upon exercise of the SAR may be in cash, Common Stock of the Company or any combination thereof. Please

4

remember that non-employee director participants are not eligible to receive SARs under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your SARs.

*Death, Total and Permanent Disability or Qualified Retirement.* In the case of outstanding stock options, if a participant (i) dies, the stock option may be exercised by a legatee, or by the personal representatives or distributees of such participant at any time within a period of two years after such participant's death, but not after the expiration of the term of the stock option grant, (ii) becomes total and permanently disabled (as defined under the Company's long term disability programs for employee participants or as determined by the Committee for non-employee director participants), such participant may exercise the stock option (to the extent it is or becomes exercisable under its terms) at any time within three years after termination or, if later, the date on which the stock option becomes exercisable with respect to such shares, but not after expiration of the term of the stock option grant, or (iii) retires pursuant to a qualified retirement (as defined in the 2004 Plan), such participant may exercise the stock option (to the extent it is or becomes exercisable under its terms) at any time during the term of the stock option grant; provided, however, that no stock option which is not exercisable at the time of qualified retirement shall become exercisable after such qualified retirement if, without the written consent of the Company, such participant engages in a business which is competitive to the business of the Company or its affiliates.

In the case of restricted stock or stock units, if a participant (i) dies while serving the Company or following a total and permanent disabled or qualified retirement, any such previously granted restricted stock or stock units shall vest as of the date of such participant's death and all restrictions thereon shall lapse and the restricted stock or stock units shall be immediately transferable to the name beneficiary or to such participant's estate, (ii) becomes totally and permanently disability or retires from the Company, such restricted stock or stock units will continue to vest according to the terms of grant or (iii) otherwise terminates employment (in the case of an employee participant) or service (in the case of a non-employee director participant), then any restricted stock or stock units not vested as of such date will be forfeited to the Company.

*Award Expiration Date.* The expiration date of your Award will be specified in your Award Agreement. The expiration date for incentive stock options and stock appreciation rights shall be no more than ten years from the date of grant. The expiration date for nonqualified stock options shall be no more than ten years from the date of grant. The effective date of the grant of a stock option will be, unless the Committee expressly determines otherwise, the business day on which the Committee approves the grant of such stock option.

*Charges and Deductions.* No charges or deductions (aside from tax or other withholdings) may be made against a participant of the 2004 Plan, or against the securities or assets of the 2004 Plan, nor may any lien be created against any of the funds, securities or other property held by participants under the 2004 Plan.

**Will the Company provide me periodic reports concerning my Awards under the 2004 Plan?**

Although no participant will be provided with periodic or other reports concerning the status of their accounts under the 2004 Plan, the Company will supply information to such participants in response to inquiries addressed to the Corporate Secretary of the Company.

**How do I exercise my Award and pay for the shares that I buy under the 2004 Plan?**

*General.* The Committee has the authority to determine the procedures you must follow to exercise your Award and pay for any shares you acquire under the 2004 Plan. The following description of payment procedures is qualified in its entirety by reference to the 2004 Plan for a full description of such procedures:

*Withholding Taxes.* Subject to certain limitations, including limitations applicable to officers and directors subject to Section 16(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), a participant may elect to pay any withholding tax due on an Award granted pursuant to the 2004 Plan either in cash (including a personal check), or by delivery at "fair market value" (as defined in the 2004 Plan) of unrestricted Common Stock already owned by such participant, or by a combination of the foregoing. In addition, a participant settling an Award granted pursuant to the 2004 Plan may elect to have the Company withhold a portion of the shares of Common Stock of the Company otherwise to be issued upon settlement of the Award equal in value to the minimum required withholding taxes.

*Exercise Price of Stock Options.* Stock options can be exercised in whole or in part through cashless exercises or other arrangements through agents (including stock brokers) established by the Company by paying the amounts required by instructions issued by the Company's Corporate Secretary. If an exercise is not covered by such instructions, the purchase price, subject to certain limitations, is to be paid in full to the Company upon exercise of a stock option either in cash (including a personal check), or by delivery at "fair market value" of unrestricted Common Stock already owned by such participant (which Common Stock, if acquired from the Company, must have been held for at least six months), or by a combination of the foregoing. In no event may successive simultaneous pyramiding be used to exercise a stock option.

*Other Limitations on Exercise.* Before you can exercise your Award, the Committee must be satisfied that such exercise will not violate any securities laws or other law or requirement of any government authority.

**Can I sell or transfer my Award to someone else?**

Awards under the 2004 Plan may not be assigned or alienated. In case of a participant's death, the amounts distributable to the deceased participant under the 2004 Plan with respect to which a designation of beneficiary has been made (to the extent it is valid and enforceable under applicable law) shall be distributed in accordance with the 2004 Plan to the designated beneficiary or beneficiaries. The amount distributable to a participant upon death and not subject to such a designation shall be distributed to such participant's estate. If there is any question as to the right of any beneficiary to receive a distribution under the 2004 Plan, the amount in question may be paid to the estate of such participant, in which event the Company will have no

6

further liability to anyone with respect to such amount.

**Can I sell the shares I acquire by exercising my Award?**

*General.* Any shares of Common Stock of the Company you acquire under the 2004 Plan, including shares acquired by exercising your right to purchase shares under your Award, can be sold or transferred only as permitted by the 2004 Plan and/or your Award Agreement and subject to any securities law restrictions.

*Securities Law Restrictions.* The Company filed a registration statement under the Securities Act of 1933, as amended (the "Securities Act"), which became effective on March 24, 2004 (the "Effective Date"), pursuant to which the Company registered the Common Stock issued after the Effective Date to participants under the 2004 Plan (the "Registration Statement"). Subject to the terms of the 2004 Plan and applicable Award Agreements, participants who are not Affiliates (as defined below) of the Company and who acquire the Common Stock under the 2004 Plan after the Effective Date generally will be entitled to resell such Common Stock in the public market without restrictions under the Securities Act. An "Affiliate" of an entity is defined in Rule 144 under the Securities Act as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with" such entity. An employee of the Company who is not an executive officer or director of the Company generally would not be deemed to be an Affiliate of the Company.

Resales by participants who are Affiliates of the Company or who acquired Common Stock under the 2004 Plan prior to the Effective Date of the Registration Statement are not covered by this prospectus (such participants are herein collectively referred to as "Restricted Participants"). Resales by such Restricted Participants are subject to certain restrictions under the Securities Act. An Affiliate of the Company may not offer or resell any shares of Common Stock acquired by them under the 2004 Plan (whether acquired before or after the Effective Date of the Registration Statement) unless the offer and resale of such shares are registered by the Company under the Securities Act or unless an exemption from registration is available. Participants who acquired shares of Common Stock under the 2004 Plan prior to the Effective Date of the Registration Statement (such shares being herein referred to as "Subject Shares") may not offer or resell the Subject Shares unless the offer and resale of the Subject Shares are registered by the Company under the Securities Act or unless an exemption from registration is available. In the absence of an effective registration statement, Affiliates may resell the Common Stock acquired under the 2004 Plan and participants holding Subject Shares may resell such Subject Shares only by complying with the requirements and limitations of Rule 144 under the Securities Act or other available exemption. Under Rule 144 offers or resales by Restricted Participants may be made without registration under the Securities Act where certain limitations are met as to the number of shares which may be sold over specified periods of time, the selling price thereof, the manner in which sales may be made and the minimum period of time which the shares must have been held (except that the holding period will not be applicable to Affiliates with respect to Common Stock acquired by them under the 2004 Plan after the Effective Date of the Registration Statement).

Executive officers and directors of the Company and holders of 10% or more of the outstanding Common Stock are also subject to the provisions of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder, which, among other things, permit recovery by or on behalf of the Company of so-called "short-swing" profits arising from

7

purchases and sales (or sales and purchases) of the Common Stock by such persons within any six-month period.

The foregoing is not intended to be a complete statement of applicable law, and participants, particularly executive officers and directors of the Company, should consult their own counsel for information regarding restrictions on resale of the Common Stock acquired pursuant to the 2004 Plan under the Securities Act and the Exchange Act.

**Can the Company reprice or discount stock options granted under the 2004 Plan?**

No stock option issued under the 2004 Plan may be amended or modified in any way that changes the exercise price of the stock option, and no stock option may be issued with an exercise price that is less than the fair market value (as defined in the 2004 Plan) of one share of the Common Stock of the Company on the grant date of the stock option, or in any other way discounted. Such limitation, however, shall not apply to any future changes in the capitalization of the Company as discussed below.

**How would my Award be affected by a future change in the capitalization of the Company?**

The Award Agreements may contain such provisions as the Committee may determine to be appropriate for the adjustment of the number and class of shares subject to each outstanding stock option or SAR, the exercise price in the event of changes in, or distributions with respect to, the outstanding Common Stock of the Company by reason of stock dividends, recapitalizations, mergers, consolidations, split-ups, combinations or exchanges of shares, spinoffs and the like.

**How would my restricted stock, stock units and stock options be treated in the event of a change in control of the Company?**

In the event of a "Change in Control" (as defined the 2004 Plan) all awarded restricted stock and stock units will immediately be free of all restrictions and fully earned, and all outstanding stock options will be immediately exercisable and shall continue to be exercisable for a period of three years from the date of the Change in Control regardless of the original term or employment status (except that the term of any incentive stock option shall not be extended beyond ten years from the date of grant).

**Does the grant of an Award or ownership of shares give me any special rights?**

Neither the grant of an Award by the Company nor ownership of shares by you obligates the Company or any of its subsidiaries to retain you as an employee, officer or director. The Company and its subsidiaries reserve the same right to terminate your employment or service as existed before the establishment of the 2004 Plan or the grant of any Awards under the 2004 Plan.

The grant of an Award of a stock option or stock unit does not give you any rights of a shareowner of the Company with respect to the shares covered by your Award until you actually own the shares. The grant of an Award of restricted stock will during the period of restriction

entitle you to all dividends paid with respect to such restricted stock and to vote such restricted stock.

**Under what circumstances can the 2004 Plan or my Award Agreement be modified or terminated?**

Under the terms of the 2004 Plan, the Committee may modify, amend, or terminate the 2004 Plan at any time; provided, however, that unless the requisite approval of the shareowners of the Company is obtained, no amendment shall be effective if such amendment would (i) increase the number of shares of Common Stock of the Company available for issuance under the 2004 Plan or increase the limits applicable to Awards under the 2004 Plan (except as in the case of a change in the capitalization of the Company as discussed above), (ii) lower the exercise price of a stock option or SAR grant value below 100% of the fair market value of one share of Common Stock of the Company on the grant date (except as in the case of a change in the capitalization of the Company as discussed above), (iii) remove the repricing restrictions set forth in the 2004 Plan, or (iv) require shareowner approval as a matter of law or under rules of the New York Stock Exchange. No 2004 Plan amendment shall, without the affected participant's consent, terminate or adversely affect any right or obligation under any Award previously granted under the Plan. The Committee may terminate the 2004 Plan at any time.

**What exactly is the Restoration Stock Option program and how does it work?**

The Restoration Stock Option program is a feature of the 2004 Plan available to employee participants who have been granted a non-qualified stock option under the 2004 Plan. In essence, the Restoration Stock Option program allows employee participants to exercise vested non-qualified stock options by presenting shares of Common Stock of the Company that (1) either (i) have been held for at least six months if such shares were obtained from the Company or (ii) have been purchased in the open market and (2) have a total market value equal to the exercise price of the stock option times the number of stock options being exercised. To account for the withholding of federal, state and local income taxes and Social Security taxes liabilities on the stock option gain, shares of Common Stock may be withheld from the stock option exercise. Restoration stock options are then granted to the employee participant at the market price of the Common Stock of the Company in an amount equal to the number of mature shares of Common Stock of the Company that were used to exercise the original stock option, plus the number of shares of Common Stock of the Company that are withheld for the tax liability on the stock option gain. For more information on this subject, please refer to the 2004 Plan.

**What is the Federal Income Tax treatment of an Award?**

*The following is a brief summary of the principal federal income tax consequences to participants in the 2004 Plan and does not purport to address all aspects of Federal income tax treatment. You should consult your tax advisor because the specific federal, state and local tax treatment will vary depending upon your individual circumstances. In addition, the following discussion is limited to United States federal income tax laws applicable to participants who are both citizens and residents of the United States. The United States federal income tax treatment of Awards granted to a participant who is not both a citizen and resident of the United States may differ. The tax laws of other countries may provide for different tax consequences to*

*participants who are subject to such laws. In addition, the tax laws of the United States are subject to change and such changes could apply retroactively.*

*Annual Incentive Awards.* Annual incentive awards granted under the 2004 Plan would generally be taxable to you as ordinary income in the year paid. The current maximum federal income tax rate for ordinary income is 35%. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

*Stock Options.* Stock options granted under the 2004 Plan may be either nonqualified stock options ("NQOs") or Incentive Stock Options ("ISOs") for federal income tax purposes; provided, however, that non-employee director participants are not eligible to receive ISOs under the 2004 Plan.

*NQOs.* Generally, if you are awarded a NQO you do not recognize any taxable income for federal income tax purposes at the time of grant. Upon exercise of your NQO, the excess of the fair market value of the Common Stock of the Company on the date of exercise over the NQO exercise price will be taxable to you as ordinary income. You will have a capital gain (or loss) upon the subsequent sale of the Common Stock of the Company in an amount equal to the sale price reduced by the fair market value of the Common Stock of the Company on the date you exercised your NQO. The holding period for purposes of determining whether the capital gain (or loss) is a long- or short-term gain (or loss) will commence on the date you exercise your NQO. The capital gain will be long-term or short-term depending on whether you have held the shares of Common Stock you acquired upon the exercise of your NQO for more than one year after the exercise date. Short-term capital gains are generally subject to the same federal income tax rate as ordinary income (the current maximum rate is 35%), while long-term capital gains are generally subject to a maximum rate of 15%. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

*ISOs.* If the stock option is intended to qualify as an ISO, the Award Agreement will state it is for an ISO. If you are awarded an ISO you do not recognize any taxable income for federal income tax purposes at the time of grant or exercise. If you hold the stock for the ISO holding periods of two years from the date of the grant and one year from the date of exercise, and if you exercise the stock option while you are employed by the Company or within three months of termination of employment, any gain realized on the sale (measured by the difference between the stock option price paid for the stock and the amount received on the sale), will be taxed as capital gain. If the stock was held for the long-term capital gain holding period, which is currently more than one year from the date of exercise, the capital gain will be long-term gain eligible for the maximum 15% rate. If the stock is disposed of before the expiration of the ISO holding periods, you will recognize ordinary income to the extent the value of the stock on the date of exercise exceeds the stock option exercise price and the Company will generally be entitled to take a deduction for such amount. Upon exercise of your ISO, the excess of the fair market value of the shares you acquire over the exercise price of the stock option will be included in your alternative minimum taxable income and may cause or increase a liability for alternative minimum tax. There is an annual $100,000 limitation on the amount of stock options that can qualify as ISOs. Each calendar year is tested separately. All stock options held by an employee that first become exercisable in the year are tested. Stock options cannot qualify as ISOs to the extent that the value of the stock covered by

the stock options exceeds $100,000. The value of the stock for this purpose is the value of the stock on the date of the grant of the stock option.

*Effect of Section 16(b) of the Exchange Act.* The tax consequences upon the exercise of either NQOs or ISOs may vary for those directors and executive officers who are subject to liability under Section 16(b) of the Exchange Act. In general, such participants will not recognize income on the Common Stock acquired under the 2004 Plan until they are no longer subject to liability under Section 16(b) with respect to the disposition of such Common Stock. However, a participant may elect to be taxed based on the fair market value of the shares on the exercise date (and have a holding period beginning on the exercise date) by filing an election under Section 83(b) of the Code within thirty days of the exercise date. If such participant later sells such shares, he or she will recognize capital gain or loss on the difference between the selling price and the exercise price.

*Restricted Stock.* If you are awarded Common Stock of the Company that is subject to restrictions on transfer and is subject to a "substantial risk of forfeiture" as defined in Section 83 of the Code, you may make a Section 83(b) election to have your Award taxed as ordinary income at the time of grant on the excess of the fair market value of the shares on the grant date over the amount you paid for the shares. If you do not make a timely Section 83(b) election, the Award will generally be taxed as ordinary income at the date(s) that the restrictions creating the risk of forfeiture expire. The amount of tax on each such date will equal the fair market value of such shares on such date less the amount paid by you for the shares. During any period when a participant is subject to liability under Section 16(b) of the Exchange Act with respect to the disposition of Common Stock acquired under the 2004 Plan, such Common Stock is treated as subject to a restriction on transfer and a substantial risk of forfeiture. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

*Stock Units.* If you are awarded stock units under the 2004 Plan you generally would have no federal income tax consequence at the time of grant. At the time your stock units are converted into unrestricted shares of Common Stock of the Company (i.e., the shares are not subject to a "substantial risk of forfeiture"), then, at such time, you will generally recognize ordinary income to the extent of the excess of the fair market value of the stock on the date of conversion over the cost for such stock, if any. The Company is generally entitled to a deduction at the time and in the amount taxed to you as ordinary income.

*SAR and Other Awards.* If you are awarded stock appreciation rights under the 2004 Plan you generally would have no federal income tax consequence at the time of grant. Upon exercise of the SAR, the amount of cash or other property received by you will generally be subject to ordinary income tax in the year of receipt and the Company will generally be entitled to a deduction at the time and in the amount taxed to you as ordinary income.

*Withholding Taxes.* Because the amount you realize upon the exercise of your Award may be treated as compensation subject to applicable withholding or federal, state and local income taxes and Social Security taxes, the Company or one of its subsidiaries may make other arrangements with you to pay the amount required to be withheld by the Company or such subsidiary before delivering any shares to you purchased under the 2004 Plan. These arrangements may include withholding the amount of any withholding or other tax due and/or withholding a certain number of shares issuable under the 2004 Plan. The Company will defer

11

delivery under your Award until arrangements are made to its satisfaction with respect to withholding and other taxes.

**Risk Factors and Certain Investment Considerations.**

This prospectus and the information incorporated by reference in this prospectus may include forward-looking statements within the meaning of Section 27A of the Securities Act, Section 21E of the Exchange Act, and the Private Securities Litigation Reform Act of 1995 that are subject to risks and uncertainties. You should not place undue reliance on those statements because they are subject to numerous uncertainties and factors relating to our operations and business environment, all of which are difficult to predict and many of which are beyond our control. Such forward-looking statements only speak as of the date of this prospectus and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which the statement is made or to reflect the occurrence of unanticipated events. Forward-looking statements include information concerning our possible or assumed future results of operations, including descriptions of our business strategy. These statements often include words such as "believe," "expect," "anticipate," "intend," "plan," "estimate" or similar expressions. These statements are based on assumptions that we have made in light of our experience in the industry as well as our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. As you read and consider this prospectus, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties and assumptions. Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results or results of operations and could cause actual results to differ materially from those in the forward-looking statements. Some of these factors include:

- The markets in which we compete are subject to considerable cyclicality.

- We operate in the highly competitive North American truck market.

- Our business may be adversely impacted by work stoppages and other labor relations matters.

- The loss of business from Ford Motor Company, or "Ford," our largest customer, could have a negative impact on our business, financial condition and results of operations.

- The costs associated with complying with environmental and safety regulations could lower our margins.

- Our liquidity position may be adversely affected by a continued downturn in our industry.

- Our business could be negatively impacted in the event Navistar Financial Corporation, our financing subsidiary, is unable to access sufficient capital to engage in its financing activities.

- We have significant underfunded postretirement obligations.

- Our manufacturing operations are dependent upon third-party suppliers, making us vulnerable to a supply shortage.

- Our ability to use net operating loss carryovers to reduce future tax payments if there is a change in ownership of the Company.

- We are exposed to political, economic and other risks that arise from operating a multinational business.

- Our substantial debt could require us to use a significant portion of our cash flow to satisfy our debt obligations and may limit our operating flexibility.

Other factors and assumptions not identified above are also relevant to the forward-looking statements, and if they prove incorrect, could also cause actual results to differ materially from those projected. For a further and more detailed description of these factors, please refer to Exhibit 99.1 to our Form 10-K. Participants should carefully consider all of these factors before making an investment in the stock offered under the 2004 Plan.

In addition, the market price of our Common Stock may fluctuate from time to time. For this reason, the value of any stock-based Awards granted under the 2004 Plan may decrease or increase in value depending upon the market price of our Common Stock.

**Additional Information.**

The Company is subject to the informational requirements of the Exchange Act and files reports and other information with the Securities and Exchange Commission (the "Commission"). Such reports and information can be inspected and copied at the public reference facility maintained by the Commission located at 450 Fifth Street, N.W., Room 1024, Washington, D.C. 20549. Please call the Commission at 1-800-SEC-0330 for further information on the public reference room. Copies of such material can also be accessed electronically by means of the Commission's home page on the Internet at www.sec.gov. Our Common Stock is listed on the New York Stock Exchange, The Chicago Stock Exchange and The Pacific Exchange, and such reports and other information can also be inspected and copied at the offices of the New York Stock Exchange, Inc., at 20 Broad Street, New York, NY 10005, the Chicago Stock Exchange, Inc., at One Financial Plaza, 440 South LaSalle Street, Chicago, IL, 60605, and the Pacific Exchange, Inc., at 301 Pine Street, San Francisco, CA, 94104.

This prospectus constitutes part of the Registration Statement filed with the Commission. The Registration Statement and this prospectus incorporate by reference certain documents, including the Company's Annual Report on Form 10-K and all documents subsequently filed by the Company with the Commission under the Exchange Act. These documents, as well as other documents required to be delivered to you upon your request pursuant to Rule 428(b) of the Securities Act, will be provided to you without charge upon your written or oral request. In general, Rule 428(b) requires that participants receive, concurrently with this prospectus, a copy of either the Company's latest annual report to shareowners, Annual Report on Form 10-K or prospectus containing audited financial statements, and that you receive annually copies of all reports, proxy statements and other materials distributed to shareowners. Requests for any of these documents should be directed to the Company, 4201 Winfield Road, Warrenville, Illinois 60555 Attention: Corporate Secretary (telephone number (630) 753-5000).

The information in this prospectus will be updated regularly by a supplement, a revised prospectus or by including information in the most recent annual report to shareowners or the most recent proxy statement of the Company. If a significant period of time has elapsed from the date of publication of this prospectus, you should obtain and refer to all supplements. If you receive a supplement after you receive this prospectus, you should keep it with this prospectus and refer to it whenever you refer to this prospectus.

## NAVISTAR INTERNATIONAL CORPORATION

## 2004 PERFORMANCE INCENTIVE PLAN

### SECTION I

### ESTABLISHMENT OF THE PLAN

The Board of Directors of Navistar International Corporation approved the establishment of the Navistar International Corporation 2004 Performance Incentive Plan ("Plan") on October 21, 2003, subject to approval by the Stockholders at the Corporation's annual meeting to be held on February 17, 2004, or any adjournment thereof. The Plan replaces the Navistar 1994 Performance Incentive Plan and the Navistar 1998 Supplemental Stock Plan, each of which terminate December 16, 2003 under the terms of the plans, and the Plan will replace and supercede the Navistar 1988 Non-Employee Directors Stock Option Plan.

### SECTION II

### PURPOSE OF THE PLAN

The purpose of the Plan is to enable the Corporation and its subsidiaries to attract and retain highly qualified personnel and non-employee directors, and additionally to provide key employees who hold positions of major responsibility the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value.

### SECTION III

### DEFINITIONS

For the purposes of the Plan, the following words and phrases shall have the meanings described below in this Section III unless a different meaning is plainly required by the context.

(1) "Annual Incentive Award" means an award of cash determined by the Committee after the end of the Fiscal Year.

(2) "Award" means an award made under the Plan.

(3) "Award Agreement" means an agreement entered into by the Corporation and a Participant setting forth the terms and provisions applicable to an Award granted to a Participant.

(4) "Board of Directors" means the Board of Directors of Navistar International Corporation.

(5) "Change in Control" shall be deemed to have occurred if (i) any "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934), other than employee or retiree benefit plans or trusts sponsored or established by the Corporation or International Truck and Engine Corporation, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934), directly or indirectly, of securities of the Corporation representing 25% or more of the combined voting power of the Corporation's then outstanding securities, (ii) the following individuals cease for any reason to constitute more than three-fourths of the number of directors then serving on the Board of Directors of the Corporation: individuals who, on the date hereof, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Corporation) whose appointment or election by the Board or nomination for election by the Corporation's stockholders was approved by the vote of at least two-thirds (2/3) of the directors then still in office or whose appointment, election or nomination was previously so approved or recommended; (iii) any dissolution or liquidation of the Corporation or International Truck and Engine Corporation or sale or disposition of all or substantially all (more than 50%) of the assets of the Corporation or of International Truck and Engine Corporation occurs; or (iv) as the result of, or in connection with, any cash tender offer, exchange offer, merger or other business combination, sale of assets, proxy or consent solicitation, contested election or substantial stock accumulation (a "Control Transaction"), the members of the Board of Directors of the Corporation immediately prior to the first public announcement relating

to such Control Transaction shall immediately thereafter, or with two (2) years, cease to constitute a majority of the Board of Directors of the Corporation. Notwithstanding the foregoing, the sale or disposition of any or all of the assets or stock of Navistar Financial Corporation shall not be deemed a Change in Control.

(6) "Code" or "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time.

(7) "Committee" means the Committee on Compensation and Governance of the Board of Directors.

(8) "Common Stock" means the common stock of the Corporation.

(9) "Corporation" means Navistar International Corporation.

(10) "Employee" means a person regularly employed by the Corporation or any subsidiary of the Corporation, including its officers.

(11) "Exercise Price" means the amount for which one share of Common Stock may be purchased upon exercise of a Stock Option, as specified in the applicable Award Agreement.

(12) "Fair Market Value" means the average of the high and the low prices of a share of Common Stock on the Grant Date as set forth in the New York Stock Exchange — Composite Transactions listing published in the Midwest Edition of *The Wall Street Journal* or equivalent financial publication.

(13) "Fiscal Year" means the fiscal year of the Corporation.

(14) "Freestanding SAR" means any SAR that is granted independently of any Stock Option.

(15) "Grant Date" means, as determined by the Board or authorized Committee, (i) the date as of which the Board or such Committee approves an Award, or (ii) such other date as may be specified by the Board or such Committee. The Grant Date of a Stock Option will, unless the Committee expressly determines otherwise, be the business day on which the Committee approves the grant of such Stock Option.

(16) "Incentive Stock Option" means a right, as evidenced by an Award Agreement to purchase a certain number of shares of Common Stock at Fair Market Value for a period of no longer than ten (10) years from the date of grant which options are designed to meet the requirements set out under Section 422 of the Code.

(17) "Non-Employee Director" means as of the Grant Date of an Award an individual who is a director of the Corporation and not an employee of the Corporation or any of its subsidiaries.

(18) "Nonqualified Stock Option" means a right, as evidenced by an Award Agreement to purchase a certain number of shares of Common Stock at Fair Market Value for a period of not more than ten (10) years which options are stated not to be Incentive Stock Options under the Code.

(19) "Participant" means an Employee selected by the Corporation for participation in the Plan and, with respect to Stock Options, Restricted Stock and Stock Units, a Non-Employee Director.

(20) "Performance-Based Exception" means the performance-based exception from the tax deductibility limitation imposed by Code Section 162(m) as set forth in Section 162(m)(4)(C).

(21) "Performance Measure" means the performance measurement provided by Section VI.

(22) "Performance Period" means the period during which performance goals must be met for purposes of the Performance Measure.

(23) "Plan" means the Navistar International Corporation 2004 Performance Incentive Plan as set forth herein and as it may be amended hereafter from time to time.

2

(24) "Qualified Retirement" means with respect to an Employee a termination from employment from the Corporation or any of its subsidiaries that occurs after the Employee attains age 55 and at the time of the termination the Employee has either: (i) 10 or more years of continuous service, or (ii) 10 or more years of service that would constitute credited service under the definition contained in the International Truck and Engine Corporation Retirement Plan for Salaried Employees ("RPSE"). Qualified Retirement for a Non-Employee Director means retirement under a retirement policy of the Board for Non-Employee Directors.

(25) "Restoration Stock Option" means a Nonqualified Stock Option granted pursuant to Section VII(7) and which is awarded upon the exercise of a Stock Option earlier awarded under the Plan or any other plan of the Corporation, including an earlier awarded Restoration Stock Option (an "Underlying Option").

(26) "Restricted Stock" means a right to acquire one or more shares of Common Stock, as evidenced by an Award Agreement, that is restricted as to sale or transfer and subject to forfeiture.

(27) "Stock Appreciation Right" or "SAR" means an Award, granted either alone or in connection with a related Stock Option, pursuant to the terms of Section X of the Plan.

(28) "Stock Option" means either an Incentive Stock Option or a Nonqualified Stock Option.

(29) "Stock Units" mean units for Restricted Stock granted pursuant to Section XI.

(30) "Tandem SAR" means an SAR granted with respect to a share pursuant to Section X hereof in connection with a related Stock Option, under which: (a) the exercise of the SAR with respect to the share shall cancel the right to purchase such share under the related Stock Option, and (b) the purchase of the share under the related Stock Option shall cancel the right to exercise the SAR with respect to such share.

SECTION IV

ELIGIBILITY

Management will, from time to time, select and recommend to the Committee Employees who are to become Participants in the Plan. Such Employees will be selected from those who, in the opinion of management, have substantial responsibility in a managerial or professional capacity. Non-Employee Directors shall also be Participants in the Plan for the purpose of Nonqualified Stock Option Awards, Restricted Stock and Stock Units.

SECTION V

ANNUAL INCENTIVE AWARDS

(1) As soon as practical following the end of the Fiscal Year, the Committee will certify performance achieved against the performance criteria established at the beginning of the Fiscal Year. The performance criteria shall be determined in the discretion of the Committee considering all factors relevant to the management of the Corporation, provided that an Award under this Section that is intended to qualify for the Performance-Based Exception shall satisfy the Performance Measures and the requirements of Section 162(m) of the Internal Revenue Code.

(2) The Committee, in its sole discretion, may reduce or eliminate any Award otherwise earned based on an assessment of individual performance, but in no event may any such reduction result in an increase of the Award. The Committee shall determine the amount of any such reduction by taking into account such factors as it deems relevant including, without limitation: (a) performance against other financial or strategic objectives; (b) its subjective assessment of the Participant's overall performance for the year; and (c) prevailing levels of total compensation among similar companies.

(3) Performance criteria for Annual Incentive Awards will not be increased or decreased within a Fiscal Year except for extraordinary circumstances approved by the Committee.

(4) Payment of an Annual Incentive Award will be made in cash to the Participant as soon as practicable after an Annual Incentive Award determination has been made by the Committee. A Participant who is not an Employee at the end of a Fiscal Year will not be entitled to an Award for that Fiscal Year unless the Committee determines otherwise.

08CV3038    Case 1:08-cv-03038    Document 1-3    Filed 05/23/2008    Page 1 of 19

JUDGE DARRAH
MAGISTRATE JUDGE NOLAN

(5) The Committee may permit the deferral of any Award and may permit payment on deferrals to be made subject to rules and procedures it may establish. These rules may include provisions crediting interest on deferred cash accounts.

(6) The Committee shall set the performance criteria for each year's Annual Incentive Awards no later than the first 90 days of the Fiscal Year.

(7) Its shall be presumed unless the Committee determines to the contrary, that all Awards to Employees under this Section are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rules of Section 162(m) of the Internal Revenue Code, the maximum Award under this Section of the Plan to any one Employee during any one Fiscal Year shall not exceed $4,000,000.

## SECTION VI

### PERFORMANCE MEASUREMENT

(1) Unless and until the Corporation's stockholders approve a change in the general Performance Measures set forth in this Section VI, the attainment of which may determine the degree of payout and/or vesting with respect to Awards that are designed to qualify for the Performance-Based Exception, the Performance Measures to be used for purposes of such Awards may be measured at the Corporation level, at a subsidiary level, or at an operating unit level and shall be chosen from among: (a) income measures (including, but not limited to, gross profits, operation income, earnings before or after taxes, earnings per share, cost reductions); (b) return measures (including, but not limited to, return on assets, capital, investment, equity, or sales); (c) cash flow, cash flow return on investments, which equals net cash flows divided by owners equity; (d) gross revenues from operations; (e) total revenue; (f) cash value added; (g) economic value added; (h) share price (including, but not limited to, growth measures and total shareholder return); (i) sales growth; (j) market share; (k) the achievement of certain quantitatively and objectively determinable non-financial performance measures (including, but not limited to, growth strategies, strategic initiatives, product development, product quality, corporate development, and leadership development); and (l) any combination of, or a specified increase in, any of the foregoing.

(2) The Committee shall set the Performance Measures for each year's Annual Incentive Awards no later than the first 90 days of the Fiscal Year.

(3) The Committee shall have the discretion to adjust the determination of the degree of attainment of the preestablished goals; provided that the Awards that are designated to qualify for Performance-Based Exception may not be adjusted upward (although the Committee shall retain the discretion to adjust such Awards downward).

(4) In the case of any Award that is granted subject to the condition that a specific Performance Measure be achieved, no payment under such Award shall be made prior to the time the Committee certifies in writing that that the Performance Measure has been achieved. For this purpose, approved minutes of the Committee meeting at which the certification is made shall be treated as a written certification. No such certification is required, however, in the case of an Award that is based solely on an increase in the value of a share of Common Stock from the date the Award is made.

## SECTION VII

### STOCK OPTIONS FOR EMPLOYEES

(1) The Committee may grant Nonqualified Stock Options or Incentive Stock Options or a combination of both to Employee Participants in the amount and at the time that the Committee approves. In order to provide a limitation on the number of shares as provided for in Section 162(m) of the Internal Revenue Code and the regulations thereunder, Stock Option grants shall be limited to a maximum of 1,000,000 shares per year for any Participant.

(2) The Committee will document the terms of the Stock Option in an Award Agreement to include the Grant Date and Exercise Price, as well as any other terms that it may desire. The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Options fixed by the Committee shall not be modified.

(3) Unless otherwise determined by the Committee, a Stock Option granted under the Plan will become exercisable in whole or in part after the commencement of the second year of the term of the Stock Option to the extent of one third of the shares, to the extent of one third of the shares after commencement of the third year, and to the extent of one third of the shares after commencement of the fourth year.

(4) A Stock Option granted under the Plan will be exercisable during such period as the Committee may determine, and will be subject to earlier termination as hereinafter provided. In no event, however, may a Stock Option governed by the Plan be exercised after the expiration of its term. Except as provided herein, no Stock Option may be exercised at any time unless the Participant who holds the Stock Option is then an Employee. The option can be exercised in whole or in part through cashless exercises or other arrangements through agents, including stockbrokers, under arrangements established by the Corporation by paying the amounts required by instructions issued by the Secretary of the Corporation for the exercise of the Stock Options. If an exercise is not covered by instructions issued by the Corporate Secretary, the purchase price is to be paid in full to the Corporation upon the exercise of a Stock Option either (i) by cash including a personal check made payable to the Corporation, (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant, for six months or more if acquired from the Corporation, or (iii) by any combination of cash and unrestricted Common Stock, and in either case, by payment to the Corporation of any withholding tax. In no event may successive simultaneous pyramiding be used to exercise a Stock Option. Shares which otherwise would be delivered to the holder of a Stock Option may be delivered, at the election of the holder, to the Corporation in payment of federal, state and/or local withholding taxes payable in connection with an exercise.

(5) The Participant who holds a Stock Option will have none of the rights of a shareowner with respect to the shares subject to a Stock Option until such shares are issued upon the exercise of a Stock Option.

(6) Neither the Corporation nor any subsidiary may directly or indirectly lend money to any Participant for the purpose of assisting the individual to acquire shares of Common Stock issued upon the exercise of Stock Options granted under the Plan.

(7) Provisions for Restoration Stock Options may be contained in the terms of options granted under the Plan. Restoration Stock Options may be granted under the Plan pursuant to the following terms: (a) Restoration Stock Options may be granted if the Participant elects to make a restoration option exercise of an Underlying Option, pays the exercise price by transferring to the Corporation Common Stock of the Corporation held by the Participant, for six months or more if acquired from the Corporation, and pays the withholding tax by transferring Common Stock or cash. The number of Restoration Stock Options that will be granted is equal to the number of shares used to pay the exercise price and the number of shares with value equal to the tax liability; (b) The Restoration Stock Options will have a term equal to the remaining term of the Underlying Option, will have an Exercise Price equal to the Fair Market Value of the stock on the date of grant of the Restoration Option, and will become exercisable in six months after grant (or, if sooner, one month before the end of the term of the Underlying Option), and otherwise will have the same general terms and conditions Nonqualified Stock Options granted by the Corporation; (c) The shares that represent the difference between the Exercise Price of the Underlying Option and the value of the shares on the date of exercise, less withholding taxes, generally cannot be transferred for a period of three (3) years; and (d) At the election of the Participant delivery of the shares may be deferred.

(8) In the event of the termination of the employment of a Participant who holds an outstanding Stock Option, other than by reason of death, total and permanent disability or a Qualified Retirement, the Participant may (unless the Stock Option shall have been previously terminated) exercise the Stock Option at any time within three (3) months after such termination, but not after the expiration of the term of the grant, to the extent of the number of shares which were exercisable at the date of the termination of employment. Stock Options governed by the Plan will not be affected by any change of employment so long as the Participant continues to be an Employee. Provided, however, if the Participant is terminated for cause as defined in the International Truck and Engine Corporation Income Protection Plan, or if the Participant is covered by a different severance plan or agreement, then as defined in such plan or agreement, the three-month period provided by this subsection shall not apply and the Stock Option shall cease to be exercisable and shall lapse as of the effective date of the termination of the Employee.

(9) Except as provided in Section VII(12), in the event of a Qualified Retirement a Participant who holds an outstanding Stock Option may exercise the Stock Option to the extent the option is exercisable or becomes exercisable under its terms, at any time during the term of the option grant.

(10) In the event of a total and permanent disability, as defined by the Corporation's long term disability programs, a Participant who holds an outstanding Stock Option may exercise the Stock Option, to the extent the Stock Option is exercisable or becomes exercisable under its terms, at any time within three (3) years after such termination or, if later, the date on which the option becomes exercisable with respect to such shares, but not after the expiration of the term of the option grant.

5

(11) In the event of the death of a Participant who holds an outstanding Stock Option, the Stock Option may be exercised by a legatee, or by the personal representatives or distributees, at any time within a period of two (2) years after death, but not after the expiration of the term of the grant. If death occurs while employed by the Corporation or a subsidiary, or after a Qualified Retirement, or during the three- year period specified in Section VII(10), Stock Options may be exercised to the extent of the remaining shares covered by Stock Options whether or not such shares were exercisable at the date of death. If death occurs during the three-month period specified in Section VII(8), Stock Options may be exercised to the extent of the number of shares that were exercisable at the date of death.

(12) Notwithstanding the other provisions of Sections VII(9) or VII(11), no Stock Option which is not exercisable at the time of a Qualified Retirement shall become exercisable after such Qualified Retirement if, without the written consent of the Corporation, a Participant engages in a business, whether as owner, partner, officer, employee, or otherwise, which is in competition with the Corporation or one of its affiliates, and if the Participant's participation in such business is deemed by the Corporation to be detrimental to the best interests of the Corporation. The determination as to whether such business is in competition with the Corporation or any of its affiliates, and whether such participation by such person is detrimental to the best interests of the Corporation, shall be made by the Corporation in its absolute discretion, and the decision of the Corporation with respect thereto, including its determination as to when the participation in such competitive business commenced, shall be conclusive.

## SECTION VIII

### STOCK OPTIONS NON-EMPLOYEE DIRECTORS

(1) The Committee may grant Nonqualified Stock Options to Non-Employee Directors.

(2) The Committee will document the terms of the Stock Option to include the Grant Date and Exercise Price, as well as any other terms that it may desire. The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Stock Options fixed by the Committee shall not be modified.

(3) Unless otherwise determined by the Committee, a Stock Option granted under this Section of the Plan will become exercisable in whole or in part after the commencement of the second year of the term of the Stock Option to the extent of one third of the shares, to the extent of one third of the shares after commencement of the third year, and to the extent of one third of the shares after commencement of the fourth year.

(4) A Stock Option granted this Section of the Plan will be exercisable during such period as the Committee may determine, and will be subject to earlier termination as hereinafter provided. In no event, however, may a Stock Option governed by the Plan be exercised after the expiration of its term.

(5) Except as provided herein, no Stock Option granted under this Section of the Plan may be exercised at any time unless the Participant who holds the Stock Option is then a Non-Employee Director.

(6) A Stock Option granted under this Section of the Plan can be exercised in whole or in part through cashless exercises or other arrangements through agents, including stockbrokers, under arrangements established by the Corporation by paying the amounts required by instructions issued by the Secretary of the Corporation for the exercise of the options. If an exercise is not covered by instructions issued by the Corporate Secretary, the purchase price is to be paid in full to the Corporation upon the exercise of a Stock Option either (i) by cash including a personal check made payable to the Corporation; (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant, for six months or more if acquired from the Corporation, or (iii) by any combination of cash and unrestricted Common Stock, and in either case, by payment to the Corporation of any withholding tax. In no event may successive simultaneous pyramiding be used to exercise a Stock Option. Shares which otherwise would be delivered to the holder of a Stock Option may be delivered, at the election of the holder, to the Corporation in payment of federal, state and/or local withholding taxes payable in connection with an exercise.

(7) The Non-Employee Director who holds a Stock Option will have none of the rights of a shareowner with respect to the shares subject to a Stock Option until such shares are issued upon the exercise of a Stock Option.

(8) Neither the Corporation nor any subsidiary may directly or indirectly lend money to any Non-Employee Director for the

purpose of assisting the individual to acquire shares of Common Stock issued upon the exercise of Stock Options granted under the Plan.

(9) In the event of the termination of service as a Non-Employee Director, other than by reason of death, total and permanent disability or a Qualified Retirement, a Non-Employee Director who holds an outstanding Stock Option may (unless the Stock Option shall have been previously terminated) exercise the Stock Option at any time within three (3) months after such termination, but not after the expiration of the term of the grant, to the extent of the number of shares which were exercisable at the date of the termination of service.

(10) Except as provided in Section VII(13), in the event of Qualified Retirement a Non-Employee Director who holds an outstanding Stock Option may exercise the Stock Option to the extent the Stock Option is exercisable or becomes exercisable under its terms, at any time during the term of the option grant.

(11) In the event of a total and permanent disability, as determined by the Committee, a Non-Employee Director who holds an outstanding Stock Option may exercise the Stock Option, to the extent the option is exercisable or becomes exercisable under its terms, at any time within three (3) years after such termination or, if later, the date on which the Stock Option becomes exercisable with respect to such shares, but not after the expiration of the term of the option grant.

(12) In the event of the death of a Non-Employee Director who holds an outstanding Stock Option, the Stock Option may be exercised by a legatee, or by the personal representatives or distributees, at any time within a period of two (2) years after death, but not after the expiration of the term of the grant. If death occurs while the Participant is serving as a Non-Employee Director, or after a Qualified Retirement, or during the three-year period specified in Section VIII(11), Stock Options may be exercised to the extent of the remaining shares covered by the Stock Options whether or not such shares were exercisable at the date of death. If death occurs during the three-month period specified in Section VIII(9), Stock Options may be exercised to the extent of the number of shares that were exercisable at the date of death.

(13) Notwithstanding the other provisions of Sections VIII(10) or VIII(12), no option which is not exercisable at the time of a Qualified Retirement shall become exercisable after such Qualified Retirement if, without the written consent of the Corporation, a Non-Employee Director engages in a business, whether as owner, partner, officer, employee, or otherwise, or serves as a director for such business, which is in competition with the Corporation or one of its affiliates, and if the Non-Employee Director's participation in such business is deemed by the Corporation to be detrimental to the best interests of the Corporation. The determination as to whether such business is in competition with the Corporation or any of its affiliates, and whether such participation by such person is detrimental to the best interests of the Corporation, shall be made by the Corporation in its absolute discretion, and the decision of the Corporation with respect thereto, including its determination as to when the participation in such competitive business commenced, shall be conclusive.

SECTION IX

PROHIBITION ON REPRICING AND DISCOUNTED OPTIONS

Notwithstanding any other provision in the Plan, no Stock Option issued under the Plan may be amended or modified in any way that changes the Exercise Price of the Stock Option, and no Stock Option may be issued with an Exercise Price that is less than the Fair Market Value of one share of Common Stock on the Grant Date of the Stock Option or in any other way discounted. This provision shall not limit any adjustments provided by Section XII relating to adjustments upon changes in capitalization.

SECTION X

STOCK APPRECIATION RIGHTS AND OTHER AWARDS

(1) Subject to the terms of the Plan, the Committee may grant any types of Awards other than Stock Options provided for in Sections VII and VIII, and Restricted Stock provided for in Section XI, including but not limited to SARs. The Committee shall determine the terms and conditions of such Awards.

(2) The Committee may, subject to the terms of the Plan, grant SARs to Employee Participants at any time and from time to time as shall be determined by the Committee. The Committee may grant Freestanding SARs, Tandem SARs, or any combination thereof. The Committee shall have complete discretion in determining the number of SARs, subject to the terms of the Plan, and to determine

the terms of the SARs. The grant price of a Freestanding SAR shall equal the Fair Market Value of one share of Common Stock on the Grant Date. The Exercise Price of Tandem SARs shall equal the Exercise Price of the related Stock Option.

(3) Tandem SARs may be exercised for all or part of the shares subject to the related Stock Option upon the surrender of the right to exercise the equivalent portion of the related Stock Option. A related Stock Option is then exercisable.

(4) Notwithstanding any other provision of the Plan to the contrary, with respect to a Tandem SAR granted in connection with an Incentive Stock Option: (a) The Tandem SAR shall expire no later than the expiration than the expiration of the Incentive Stock Option; (b) The value of the payout with respect to the Tandem SAR shall not exceed the excess of the fair market value of the shares subject to Incentive Stock Option at the time the Tandem SAR is exercised over the Exercise Price under the Incentive Stock Option; and (c) The Tandem SAR may be exercised only when the Fair Market Value of the shares subject to the Incentive Stock Option exceed the Exercise Price of the Incentive Stock Option.

(5) Freestanding SARs may be exercised upon whatever terms and conditions the Committee, in its discretion, impose upon them, subject, however, to the terms of the Plan.

(6) The term of SARs shall be determined by the Committee, in its discretion; provided that such term shall not exceed 10 years.

(7) Upon exercise of a SAR, a Participant shall be entitled to receive payment from the Corporation in an amount determined by multiplying: (a) the excess of fair market value of one share of Common Stock on the date of exercise over the Exercise Price, by (b) the number of shares with respect to which the SAR is exercised. At the discretion of the Committee, the payment upon exercise of a SAR may be in cash, in share equivalent fair market value, or in a combination thereof.

(8) Its shall be presumed unless the Company determines to the contrary, that all awards to Employees under this Section are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to an Employee to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rule of Section 162(m) of the Internal Revenue Code, the number of SARs that can be granted to any one Employee in any Fiscal Year shall not exceed 1,000,000 shares, less the number of stock options grant to such Employee during the year. Any Award the value of which is not solely dependent on value of the stock on which the award is based shall not exceed $4,000,000 for any Employee for the year.

SECTION XI

RESTRICTED STOCK

(1) Restricted Stock, or Stock Units, may be granted during a Fiscal Year or at any time thereafter. Awards under the Plan may be granted in the form of Restricted Stock, in the form of Stock Units, or in any combination of both. Restricted Stock or Stock Units may also be awarded in combination with Stock Options, and such an Award may provide that the Restricted Shares or Stock Units will be forfeited in the event that the terms of the Award Agreement are not fulfilled.

(2) Awards of Restricted Stock or Stock Units may be made under the Plan to Participants for meeting the stock ownership requirements as described in the Navistar Executive Stock Ownership Program, as may be amended from time to time by the Board of Directors, in their sole discretion, or for any other purpose.

(3) Each Award of Restricted Stock or Stock Units shall become vested, in full or in installments, upon satisfaction of the conditions specified in the Award Agreement. In no event will an Award of Restricted Stock or Stock Units granted under the Plan vest in full prior to the commencement of the third year anniversary of the Grant Date.

(4) The Participant will be entitled to all dividends paid with respect to all Restricted Stock awarded under the Plan during the period of restriction and will not be required to return any such dividends to the Corporation in the event of the forfeiture of the Restricted Stock. The Participant also will be entitled to vote Restricted Stock during the period of restriction.

(5) All Restricted Stock certificates awarded under the Plan are to be delivered to the Participant with an appropriate legend imprinted on the certificate.

(6) In the event a Participant dies while employed by or as serving as a Non-Employee-Director of the Corporation or following a

8

Qualified Retirement or total or permanent disability, the Restricted Stock or Stock Units will vest as of the date of death and all restrictions shall lapse and the Restricted Stock or Stock Units will be immediately transferable to the named beneficiary or to the Participant's estate. Any Restricted Stock or Stock Units that becomes payable after the Participant's death shall be distributed to the Participant's beneficiary or beneficiaries. A beneficiary designation may be changed by filing the prescribed form with the Secretary of the Corporation at any time before the Participant's death. If no beneficiary was designated or if no designated beneficiary survives the Participant, then any Restricted Stock or Stock Units that becomes payable after the Participant's death shall be distributed to the Participant's estate.

(7) In the event a Participant who holds unvested Restricted Stock or Stock Units, terminates employment or service as a Non-Employee Director with the Corporation by reason of Qualified Retirement or total and permanent disability, the Restricted Stock or Stock Units will continue to vest according to the terms of the Restricted Stock.

(8) In the event a Participant otherwise terminates employment or service as a Non-Employee Director, any Restricted Stock or Stock Units that is not vested forfeits to the Corporation.

(9) Its shall be presumed unless the Committee determines to the contrary, that all awards to Employees under this Section of the Plan are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to an Employee to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rules of Section 162(m) of the Internal Revenue Code, the maximum Award under this Section of the Plan to any one Employee during any one Fiscal Year shall not exceed 1,000,000 shares.

## SECTION XII

### ADJUSTMENTS UPON CHANGES IN CAPITALIZATION

Notwithstanding any other provision of the Plan, the Award Agreements may contain such provisions as the Committee determines to be appropriate for the adjustment of the number and class of shares, subject to each outstanding Stock Option or SAR, the exercise prices in the event of changes in, or distributions with respect to, the outstanding Common Stock by reason of stock dividends, recapitalizations, mergers, consolidations, split-ups, combinations or exchanges of shares, spinoffs and the like, and, in the event of any such changes in, or distribution with respect to, the outstanding Common Stock, the aggregate number and class of shares available under the Plan and the limits applicable to Awards under the Plan, in each case, shall be appropriately adjusted by the Committee, whose determination shall be conclusive.

## SECTION XIII

### ADMINISTRATION OF THE PLAN

Full power and authority to construe, interpret and administer the Plan is vested in the Committee. Decisions of the Committee will be final, conclusive and binding upon all parties, including the Corporation, shareowners, Non-Employee Directors and Employees. The foregoing will include, but will not be limited to, all determinations by the Committee as to (a) the approval of Employees and Non-Employee Directors for participation in the Plan, (b) the amount of the Awards, (c) the performance levels at which different percentages of the Awards would be earned and all subsequent adjustments to such levels and (d) the determination of all Awards. Any person who accepts any Award hereunder agrees to accept as final, conclusive and binding all determinations of the Committee. The Committee will have the right, in the case of Employees not employed in the United States, or Non-Employee Directors not resident in the United States, to vary from the provision of the Plan to the extent the Committee deems appropriate in order to preserve the incentive features of the Plan.

## SECTION XIV

### NON-ASSIGNMENT

Awards under the Plan may not be assigned or alienated. In case of a Participant's death, the amounts distributable to the deceased Participant under the Plan with respect to which a designation of beneficiary has been made (to the extent it is valid and enforceable under applicable law) shall be distributed in accordance with the Plan to the designated beneficiary or beneficiaries. The amount distributable to a Participant upon death and not subject to such designation shall be distributed to the Participant's estate. If there is

any question as to the right of any beneficiary to receive a distribution under the Plan, the amount in question may be paid to the estate of the Participant, in which event the Corporation will have no further liability to anyone with respect to such amount.

## SECTION XV

## WITHHOLDING TAXES

A Participant may elect, subject to the provisions of the applicable Sections of the Plan and the terms of the Award, to pay any withholding tax due in connection with the exercise of any Stock Option or SAR or upon the vesting of Restricted Stock or the settlement of any other Award either (i) by cash including a personal check made payable to the Corporation or (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant and if acquired from the Corporation owned for at least six months, or (iii) by any combination of cash or unrestricted Common Stock. The Committee may provide, in the Award Agreement, that in the event that a Participant is required to pay to the Corporation any amount to be withheld in connection with the exercise, vesting or settlement of an Award denominated in shares, the Participant may satisfy such obligation (in whole or in part) by electing to have the Corporation withhold a portion of the shares of Common Stock otherwise to be issued upon exercise, vesting or settlement of such Award equal in value to the minimum amount required to be withheld. The value of the shares to be withheld shall be the Fair Market Value on the date that the amount of tax to be withheld is determined.

## SECTION XVI

## RIGHTS OF PARTICIPANT

To the extent that any Participant, beneficiary or estate acquires a right to receive payments or distributions under the Plan, such right will be no greater than the right of a general unsecured creditor of the Corporation. All payments and distributions to be made hereunder will be paid from the general assets of the Corporation. Nothing contained in the Plan, and no action taken pursuant to its provisions, shall create or be construed to create any contracted right or trust of any kind or fiduciary relationship between the Corporation and any Participant, beneficiary or estate.

## SECTION XVII

## MODIFICATION, AMENDMENT OR TERMINATION

The Committee may modify, amend, or terminate the Plan at any time, provided that, unless the requisite approval of stockholders is obtained, no amendment shall be made to the Plan if such amendment would (i) increase the number of shares of Common Stock available for issuance under the Plan or increase the limits applicable to Awards under the Plan, in each case, except as provided in Section XII; (ii) lower the Exercise Price of the Stock Option or SAR grant value below 100% of the Fair Market Value of one share of Common Stock on the Grant Date, except as provided in Section XII; (iii) remove the repricing restriction set forth in Section IX; or (iv) require stockholder approval as a matter of law or under rules of the New York Stock Exchange. No Plan amendment shall, without the affected Participant's consent, terminate or adversely affect any right or obligation under any Stock Option or other Award previously granted under the Plan.

## SECTION XVIII

## RESERVATION OF SHARES

(1) The total number of shares of Common Stock reserved and available for delivery pursuant to this Plan is 3,250,000 shares of Common Stock. The number of shares authorized and available shall be increased by shares of Common Stock subject to an option or award under this Plan or any other plan, including the Navistar 1994 Performance Incentive Plan, the Navistar 1998 Supplemental Stock Plan, or the 1998 Non-Employee Director Stock Option Plan, that is cancelled, expired, forfeited, settled in cash or otherwise terminated without a delivery of shares to the Participant of the plan, including shares used to pay the option exercise price of an option issued under the Plan or any other plan or to pay taxes with respect to such an option.

(2) In order to provide a limitation on the number of shares that may be issued as Incentive Stock Options as provided by the Code, no more than 1,000,000 shares of Common Stock, or if less the number of shares that may be issued under the Plan, shall be granted as Incentive Stock Options in any calendar year. Such shares may be in whole or in part, as the Board of Directors shall from time to time determine, authorized and unissued shares of Common Stock or issued shares of Common Stock which shall have been

reacquired by the Corporation.

(3) In order to provide a limitation on the number of shares that may be issued as Restricted Stock, Stock Units, SARs, and Awards other than Stock Options, no more than 1,000,000 shares of Common Stock that may be issued under the Plan shall be granted as Restricted Stock, Stock Units, SARs, or Awards other than Stock Options.

## SECTION XIX

### RIGHTS OF EMPLOYEES

Status as an Employee shall not be construed as a commitment that any one or more Awards will be made under this Plan to an Employee or to Employees generally. Status as a Participant shall not entitle the Participant to any additional future Awards. Nothing in the Plan will confer on any Employee or Participant any right to continue in the employ of the Corporation or any of its subsidiaries or interfere with or prevent in any way the right of the Corporation or any of its subsidiaries to terminate an Employee or Participant's employment at any time for any reason.

## SECTION XX

### CHANGE IN CONTROL

Notwithstanding any provision contained herein to the contrary, in the event of a Change in Control, all awarded Restricted Stock and Stock Units will immediately be free of all restrictions and performance contingencies and will be deemed fully earned and not subject to forfeiture and all outstanding Stock Options governed by the Plan will be immediately exercisable and shall continue to be exercisable for a period of three (3) years from the date of the Change in Control regardless of the original term or employment status, except that the term of any Incentive Stock Option shall not be extended beyond ten (10) years from the date of grant.

## SECTION XXI

### LIMITATION OF ACTIONS

Every right of action by or on behalf of the Corporation or any shareowner against any past, present or future member of the Board of Directors, officer or Employee arising out of or in connection with the Plan will, irrespective of the place where action may be brought and irrespective of the place of residence of any such director, officer or employee, cease and be barred by the expiration of three (3) years from whichever is the later of (a) the date of the act or omission in respect of which such right of action arises or (b) the first date upon which there has been made generally available to shareowners an annual report of the Corporation and a proxy statement for the annual meeting of shareowners following the issuance of such annual report, which annual report and proxy statement alone or together set forth, for the related period, the aggregate amount of Awards under the Plan during such period; and any and all right of action by an Employee or Non-Employee Director (past, present or future) against the Corporation arising out of or in connection with the Plan shall, irrespective of the place where action may be brought, cease and be barred by the expiration of three (3) years from the date of the act or omission in respect of which such right of action arises.

## SECTION XXII

### GOVERNING LAW

The Plan will be governed by and interpreted pursuant to the laws of the State of Delaware, the place of incorporation of the Corporation, without giving effect to the principals of conflict of laws.

## SECTION XXIII

### EFFECTIVE DATE

The effective date of the Plan shall be February 17, 2004 (the "Effective Date"), subject to approval by the stockholders at the Corporation's Annual Meeting to be held on February 17, 2004, or any adjournment thereof. The Plan shall continue in effect for ten (10) years from the Effective Date, expiring February 16, 2014. No Awards may be granted under the Plan subsequent to February 16, 2014, but Awards theretofore granted may extend beyond that date in accordance with their terms.

# TAXATION OF NAVISTAR STOCK OPTIONS
## (February 2004)

### *Summary*

The Company grants two types of stock options to employees, non-qualified stock options ("NQO") and incentive stock options ("ISO"). ISOs may be eligible for more favorable tax treatment because more of the income is potentially eligible for long-term capital gain treatment. Only non-qualified options are granted to Non-Employee Directors, and these are generally tax the same as non-qualified options granted to employees, except that directors are independent contractors and therefore not subject to FICA or general income tax withholding by the Company.

Stock options granted under the Restoration Program are non-qualified stock options. However, the Company's restoration stock option program can provide for the deferral of the delivery of the shares in a restoration type exercise. In this case the income is recognized for tax purposes at the time the shares are delivered, and the amount of the income is determined bases on the value of the stock on the date of delivery.

When ordinary income is realized on a stock option, the income is taxable at the employee's marginal tax rate. The highest federal tax rate is currently 35%, after the reductions made by the recent tax legislation. Hospital insurance tax at 1.45% also applies, since there is no wage base limitation as there is for the Social Security tax of 6.2%. Long-term capital gains, on the other hand, are generally taxable at a maximum federal rate that has been reduced from 20% to 15%. Capital gains are now considered long term if the stock was held for more than one year. The rate reductions apply for a limited number of years under the current law, however it is assumed in this memorandum the reduced rates will continue indefinitely.

Several years ago the IRS took the position that ISOs would not be subject to FICA tax or income tax withholding pending review by the IRS. The IRS has maintained the position that ISOs are not subject to FICA or withholding and indicated it would not impose FICA on ISO before the second taxable year after final regulations were adopted. It is generally assumed that the IRS will request that Congress adopt legislation to deal with FICA and withholding on ISOs. At this time there is no FICA or required withholding on ISO and likely will not be at least through 2004.

**NQOs.** When an employee exercises a NQO, the spread (the difference between the exercise price and the value of the stock on the date of exercise) is taxable as ordinary income. If the employee holds the stock for <u>more than</u> one year, any gain realized on the subsequent sale of the stock will be eligible for the 20% long-term capital gain rate. (If an officer could not sell the stock because of the insider trading rules under Section 16b, he would not recognize income during the Section 16b period, unless he filed an election to recognize income under §83(b) of the Code.)

**ISOs.** If an employee exercises an ISO and continues to hold the stock, no income is recognized at the time of the exercise. When the employee subsequently sells the stock, he will generally be eligible for the 15% long-term capital gain rate on all of the gain, both the spread that existed at the time of exercise and any increase in value after the exercise. To get the 15% rate, the

employee must hold the stock for two years from the date of the grant or the option, he most hold the stock for more than one year from the date of exercise of the option, and the employee most exercise the option within three (3) months of retirement or other termination of employment from the Company (one year in the case of disability). The employee needs to consider the alternative minimum tax implications of holding ISO stock. The spread (the excess of the value of the stock over the option price) at the time of exercise is a tax preference, and some employees could incur a minimum tax liability, which may require the payment of tax to the IRS. Generally when the employee sells the stock there is a negative adjustment to income for ATM purposes and this usually will entitle the employee to get the AMT back for the year in which he sells the stock.

**Exchange of shares.** If an employee uses Company stock that he owns to pay the exercise price of a stock option, generally he will not recognize gain on his use of the old stock. He will be treated as having exchanged old shares of Company stock for an equal number of new shares of Company stock. He does not recognize gain on the exchange and his basis and holding period will carryover to the new stock. (There are limitations on using ISO stock for this purpose.)

**The details.** Stock options are often subject to tax planing opportunities because the employee has some control over the timing and method of exercise and the holding of disposition of the stock. The tax rules are often complex. Some of the rules are summarized in this memorandum. Employees are advised to consult their tax and financial advisors to review the considerations involved in holding or exercising stock options.

## CAPITAL GAINS TAXATION

The Jobs and Growth Tax Relief Reconciliation Act of 2003 (the "Act") reduced the potential tax rate that applies to long-term capital gain. Generally the maximum federal rate was reduced from 20% to 15%. The Act also accelerated ordinary income tax rate reductions that had previously been adopted during the Bush Administration. The maximum federal rate is generally 35% and each person must consider what his marginal rate is based on his income for income tax purposes. The differential in tax rates could affect the relative value of ISOs compared to NQOs. It may also affect the relative advantage of using restoration options since the future gain on the shares acquired through a restoration option exercise is potentially eligible for capital gain treatment. Generally, stock acquire by exercise of an ISO or otherwise must be held for more than one year to be taxed at the lower long-term capital gains rates.

As discussed in the ISO section of this memorandum, there is a one-year and a two-year holding period that must be met for favorable tax treatment of an ISO. These holding periods are in addition to the capital gains holding period rules.

## NON-QUALIFIED STOCK OPTIONS

Options granted under the Company's 2004 Performance Incentive Plan will state whether the options are intended to be NQOs or ISOs. All options that will be granted as restoration options will be NQOs.

Income is recognized at the time of exercise of the option. (If a Section 16(b) holding period applied under the Securities laws, the income would be recognized at the end of the 16(b) period, unless the employee elected to recognize the income at the time of exercise by filing a section 83(b) election). The amount of the income is the difference between the option price paid to the Company to exercise the option and the market value of the stock. This difference between the price and value is often referred to as the spread. The income is taxable as ordinary income. The employee's basis in the stock received is equal to the sum of the amount paid for the shares and the amount of income recognized. Gain or loss on the subsequent sale of the stock is capital gain or loss. The rate that applies to the capital gain depends on the length of the period for which the stock was held from the date of exercise. Generally, the stock must be held for more than one year to qualify for the 15% long-term capital gains rate. If previously owned stock is used to pay the exercise price (as it would be if a restoration option exercise is made), gain or loss on the old stock is not recognized, and the basis of the new stock is adjusted for the non-recognized gain or loss.

The income realized on a NQO is subject to FICA taxes.

**Example 1, NQO cash exercise.** The employee exercises an option to purchase 150 shares at $25 per share. He pays the option price in cash using a cashless exercise program the company established with a stockbroker. Under the cashless exercise program the employee does not have to advance any part of the option price. The value of the stock at the time of exercise is $30. The employee recognizes income of $750, which is taxed as ordinary income at the employee's marginal rate. The employee's basis in the stock would be $4,500, the price paid at $25 per share times 150 shares plus the income recognized of $750. If the stock were sold in two years at $40 per share, there would be a capital gain of $10 per share, or $1,500. The capital gain would be long-term because the stock was held for more than one year. Any net long-term gain would be taxed at a maximum rate of 15%.

**Example 2, NQO exercised with previously owned stock held at a gain.** In April 2004 the value of the stock is $50 per share. The employee exercises an option granted in 2003 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) previously acquired in the market for $25 per share. The employee will be treated as having exchanged 80 old shares for 80 new shares. This exchange is non-recognized for tax purposes. The transaction is not recognized because a special rule of the Internal Revenue Code provides that an exchange of common stock for common stock in the same corporation is not recognized (§1036). Gain or loss is not recognized and the taxpayer's basis carries over. As a result, the employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $25 per share ($2,000). The employee's basis in the other 20 shares is $1,000, or $50 per share. This is the amount of income recognized on the exercise of the 100 options ($50 less $40 times 100 shares). On the subsequent sale of the 80 shares or the 20 shares, the employee will recognize gain to the extent the sale price exceeds the basis. For the purpose of the holding period required for long-term capital gain treatment, the 80 exchanged shares will be considered to be acquired on the date the old 80 shares were acquired, and the new 20 shares will be considered to be acquired on the date the shares are transferred to the

3

employee.

**Example 3, NQO exercised with previously acquired NQO stock held at a gain.** The facts are the same as in Example 2 except that the employee uses stock acquired by exercise of a NQO to pay the option price. The results are the same as in Example 2 in that the gain on the old shares is non-recognized.

**Example 4, NQO exercised with previously acquired ISO post-holding period stock held at a gain.** The facts are the same as in Example 2, except that the employee uses stock acquired by exercise of an ISO and the employee held the stock for the ISO holding periods (two years from grant, one year from transfer on exercise, as described in Example 12). The result is the same as in Example 2 in that the gain on the old stock is not recognized. However, in this Example 4 the non-recognized gain is likely to be larger because the gain includes the non-recognized gain that was realized on exercise of the ISO (see Examples 9 and 17) regarding exercise of an ISO).

**Example 5, NQO exercised with previously acquired ISO pre-holding period stock held at a gain.** The facts are the same as in Example 2, except that the employee uses stock acquired by exercise of an ISO, and the employee had not held that stock for the ISO holding periods (two years from grant, one year from transfer on exercise, as described in Example 12). The result is the same as in Example 2 in that gain on the 80 old shares will not be recognized. However, there are two differences. The non-recognized gain is likely to be larger because the gain includes the non-recognized gain that was realized on exercise of the ISO (see Examples 9 and 17 regarding exercise of an ISO). Secondly, there are special disqualifying disposition rules that apply when ISO stock is disposed of before the two-year and one-year holding periods are satisfied. These requirements will carry over to the new 80 shares of stock. These rules are described in Example 12. To illustrate, if the employee sold the new 80 shares within two years from the grant of the ISO, or within one year from the transfer of the ISO stock on exercise of the ISO, the gain recognized would be taxable as ordinary income to the extent that the market value of the ISO stock on the date of the grant of the ISO exceeded the ISO option price.

**Example 6, NQO exercised with previously owned stock held at a loss.** In April 2004 the value of the stock is $50 per share. The employee exercises an option granted in 2003 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) previously acquired in the market for $75 per share. The employee will be treated as having exchanged 80 old shares for 80 new shares. This exchange is non-recognized as an exchange of common stock for common stock in the same corporation. The employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $75 per share ($6,000). The employee's basis in the other 20 shares is $1,000 or $50 per share. This is the amount of income recognized on the exercise of the 100 options ($50 - $40 times 100 shares). For the purpose of the more than one year holding period required for lower capital gains rates, the 80 exchanged shares will be considered to be acquired on the date the 80 old shares were acquired, and the 20 new shares will be considered to be acquired on the date the shares are transferred to the employee.

4

**Example 7, NQO, cash exercise with proceeds from sale of old shares sold at a loss, wash sale.** The facts are the same as in Example 6 except instead of transferring the old shares to the company to pay the exercise price, the employee sells 80 old shares on the stock market for $50 per shares, and on the settlement date pays the proceeds to the company to pay the option price. Under the wash sale rules, the employee is not allowed to recognize the capital loss on the shares because he purchased identical shares within 30 days of the sale. His basis in the old shares will carry over and become his basis in the 80 new shares. If he sold the old shares more than 30 days before, or more than 30 days after, the exercise of the option, he would be allowed a capital loss on the sale. In general, a capital loss can be used to offset capital gain, and a net loss can be deducted, subject to a $3,000 per year limitation. A capital loss not used in a year can be carried over and used in subsequent years.

## INCENTIVE STOCK OPTIONS (ISO)

### ISO requirements

An option must meet certain requirements to qualify as an incentive stock option. Each option that will be issued by the Company under the Company's 2004 Performance Incentive Plan will state whether the option is intended to qualify as an ISO, or is intended to be a non-qualified option. Generally, the requirements for an ISO include that the option price is not less than the value of the stock on the date of grant, the option is non-transferable, the term is not longer than 10 years, the plan under which the options are granted is approved by the shareowners, and the option does not contain a statement that it is intended to be a non-qualified option.

If the option qualifies as an ISO, and if certain requirements are met, the employee will receive ISO tax treatment. In general, these requirements are that the amount of stock covered by the option is within the annual limitation, the stock is held for the required ISO holding period, and the employment test is met.

If the requirements for ISO treatment are met, no income is recognized on exercise of the option (except for the purpose of the AMT). The employee's basis in the acquired stock is equal to the price paid for the stock. On the subsequent sale of the stock, the employee recognizes gain to the extent that the amount received exceeds his basis in the stock. The gain is taxed as capital gain. The capital gain rate that applies depends on the holding period. If the stock is held for more than one year from the date of exercise, the gain will be taxed at 15%.

**Example 8, ISO cash exercise.** On December 15, 2003, the employee is granted an ISO to purchase 150 shares at $25 per share. On December 16, 2004, the employee exercises the ISO for 150 shares, which are transferred to him on that date, and he pays the option price of $25 per share in cash. The market value of the stock at the time of exercise is $30. On January 20, 2006, the employee sells the stock for $40 per share. The employee does not recognize income at the time of exercise (except for the purpose of the AMT). His basis in the shares is $25, the price he paid. On the sale of the stock he recognizes gain of $15 per share ($40 sale price less $25 basis). The total gain of $2,250 ($15 per share times 150 shares) is taxable as a long-term capital gain at the 15% rate

5

because the stock was held for more than one year.

**Example 9 (Omitted)**

*Alternative Minimum Tax (AMT)*

The alternative minimum tax or AMT is tax policy affected by schizophrenia. If a taxpayer would pay too little income tax because of the use of special tax provisions that provide favorable treatment of expenses or income items, the taxpayer might incur a liability under the AMT. The AMT is intended to prevent Congress from being embarrassed by newspaper reports of high-income taxpayers paying little of no tax. To prevent this, the AMT provides an overriding tax structure that applies if it produces a higher tax in any year than the regular tax. The 2003 tax legislation increases the exemption amount for some taxpayers.

The concept is this. The taxpayer computes his income in the regular way and than computes his regular income tax. He then computes his alternative minimum taxable income by adjusting his regular income for special items, sometimes called tax preferences. Then he computes his alternative minimum tax by applying the special AMT rates. To the extent that the AMT exceeds the regular tax, the taxpayer must pay the excess. However, he can get the AMT payment back in later years; he can claim a credit for the AMT payment in a subsequent year to the extent that the regular tax exceed the AMT in the subsequent year. Further, there may be offsetting adjustments to income in a subsequent year.

For the purpose of the AMT, the spread on an ISO (the difference between the option price and value of the stock on the date of exercise of the option) is an item of tax preference. This means that in computing alternative minimum taxable income for the year of exercise of an ISO, the taxpayer must include in income for AMT purposes the amount of the spread. However, in the case of the ISO preference, an offsetting adjustment will occur when the taxpayer sells the stock he acquired by exercising the ISO. More particularly, in the year of sale, for the purpose of computing the alternative minimum taxable income, the taxpayer increases his basis in the stock by the amount of the spread that was include in income as a preference, and takes a negative adjustment to alternative minimum taxable income for the year of sale. This will tend to make ATM less than the regular tax in the year of sale, thus supporting the taxpayer taking a credit in the year of sale for any AMT that was paid in the year of exercise of the option.

Whether the employee will incur an AMT liability in the year of exercise, and when he will be able to recover any AMT that had to be paid, depends on numerous factors affecting the returns for the year involved. It is often difficult to predict the outcome without reviewing all of the facts. Preparing pro-forma AMT calculations to show the amount of liability for the tax and the timing of the expected recover of any AMT payments is often helpful. Even if some AMT tax is incurred and it not recoverable for a period of time, there may still be substantial overall saving to an employee by exercising an ISO and holding the stock for the requisite holding period.

As a generalization, among the items includable in alternative minimum taxable income are

6

state taxes and ISO spread. There is an exempt amount which functions as a deduction against alternative minimum taxable income. The exempt amount varies with marital status and phases out as income exceeds specified levels. The tax rates for the AMT are 26% stepping up to 28%, with a 15% rate on long-term gains. Factors that help to avoid the AMT are low levels of preferences, lower income levels that preserve the exempt amount, or higher regular income tax rates that cause the total to exceed the AMT.

*Annual limitation*

There is an annual $100,000 limitation on the amount of options that can qualify as ISOs. Each calendar year is tested separately. All options held by an employee that first become exercisable in the year are tested. Options cannot qualify as ISOs to the extent that the value of the stock covered by the options exceeds $100,000. The value of the stock for this purpose is the value of the stock on the date of the grant of the option.

The $100,000 limitation is applied separately for each year, but it is applies to all options regardless of when the option was granted, if the option first becomes exercisable in the testing year for all or any portion of the stock covered by the option. For example, a company granted an option in year one for 3,000 shares at $25, which is exercisable for 1,000 shares in year 2, 1,000 shares in year 3, and 1,000 shares in year 4. In year 2 the company granted an option for 3,000 shares at $30 which is exercisable for 1,000 shares in year 3, 1,000 shares in year 4, and 1,000 shares in year 5. In applying the $100,000 limitation, in year 2 there would be 1,000 shares valued at $25 for which the options first became exercisable ($25,000). In year 3 there would be would be two relevant options: i) the year 1 option that becomes exercisable for 1,000 shares at $25 ($25,000), and ii) the year 2 options that becomes exercisable for 1,000 share valued at $30 ($30,000), for a total for year 3 of $55,000.

**Example 10, $100,000 limitation.** To simplify this example, it is assumed the options become exercisable for <u>all shares</u> one year after the grant, rather than one third of the shares become exercisable each year. The company issues options meeting the ISO requirements to an employee in December 2003 covering $75,000 in stock valued as of December 2003. In December 2004 the 1998 options first become exercisable under the terms of the options that provide for exercise one year after grant. In December 2004 the Company issues options to the same employee covering $100,000 of stock, valued as of December 2004. In December 2004 there is a change of control of the company that causes the 2004 options to become immediately exercisable. As a result, $175,000 of purported ISOs would first become exercisable in 2004. The limitation would provide that the 2003 options covering $75,000 of stock continue to be eligible for ISO treatment. Only $25,000 of the 2004 options qualifies for ISO treatment. The $75,000 of excess 2004 options is treated as non-qualified options. The same result would occur if the company inadvertently issued options in excess of the $100,000 limitation.

*Employment requirement*

To receive ISO treatment, the employee must have been an employee of the Company or a

subsidiary thereof from the date of grant of the option until at least within three (3) months of exercise of the option. If the employee were disabled, a one-year period would apply rather than a three-month period. For this purpose disabled means that the employee is unable to engage in any gainful employment by reason of physical or mental impairment which can be expected to result in death or last for a continuous period of at least 12 months.

**Example 11, employment test.** The employee is granted an ISO on December 16, 2002 to purchase 100 shares at $25 per share. On January 31, 2007, the employee retires from the company. On June 1, 2007, when the value of the stock is $95 per share, the employee exercises the ISO, paying the option price in cash. The employee recognizes ordinary income in the amount of $7,000 ($95 value less $25 option price times 100 shares). The exercise of the option does not comply with the ISO requirements because the option was not exercised within three months of the employee's termination of employment. The employee's basis in the shares is $9,500 ($25 option price plus $70 income times 100 shares).

### Holding periods

In order to receive ISO treatment, the employee must hold the stock both: i) for two years from the date of grant of the option, and ii) one year from the date the stock is transferred to the employee on exercise of the option. If the stock is disposed of before this time, the disposition is a disqualifying disposition and generally results in the employee recognizing ordinary income for the difference between the option price and value of the stock on the date of exercise, and capital gain for any increase in value after the date of exercise. For this purpose, stock is considered disposed of if it is sold, given away, or used to pay the option price on exercise of another ISO. (It may not be a disqualifying disposition for ISO stock to be used to pay the option price on an NQO. See Example 5.)

**Example 12, ISO disqualifying disposition by sale at a gain over value on date of exercise.** On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 1, 2004, the employee sells the stock on the stock exchange for $40 per share. The sale is a disqualifying disposition for two reasons. The stock was sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee recognizes ordinary income in the amount of $750 (the difference between the option price of $25 and the $30 value of the stock on the date of exercise, times 150 shares) and $1,500 of capital gains (the difference between the $40 sale price and the basis of $30 per share, which is the option price plus the amount of ordinary income recognized, times 150 shares). Both the ordinary income and the capital gain are recognized for the employee's 2004-tax year. The capital gain is short-term because the stock was not held for more than one year.

**Example 13, ISO disqualifying dispositions by sale at less than the stock value on date of exercise.** On December 16, 2002, an employee is granted an ISO. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On

December 1, 2004, the employee sells the stock on the stock exchange for $28 per share. The sale is a disqualifying disposition for two reasons. The stock was not sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee recognizes ordinary income in the amount of $450 (the difference between the option price of $25 and the $28 value of the stock on the date of sale, times 150 shares). He does not realize any capital gain because the employee's basis would be the same as the sale price. (The income would be limited to the amount that the sale price exceeded the exercise price because of a special rule that applies when the stock is disposed of in a transaction in which a loss would be recognized, such as a sale to a third party.)

If, however, the stock was disposed of in a transaction in which a loss would not be recognized, for example, the property was given away, sold to a spouse, or sold in a wash sale, the ordinary income amount would be equal to the spread between the option price and the value or the stock at the time of exercise ($30-$25). See Example 15. The income is recognized for the employee's 2004-tax year.

**Example 14, ISO disqualifying dispositions by sale at less than option prices.** On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 1, 2004, the employee sells the stock on the stock exchange for $23 per share. The sale is a disqualifying disposition for two reasons. The stock was sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee would not recognize any ordinary income since the sale price is less than the option price, and the employee would recognize a capital loss of $300, the difference between the option price paid for the shares and the sale price ($25 less $23 times 150 shares). No ordinary income was recognized because of a special rule that applies when the stock is disposed of in a transaction in which a loss would be recognized. If, on the other hand, the property were disposed of in a transaction on which a loss would not be recognized, for example, the property was given away, sold to a spouse, or sold in a wash sale, the ordinary income amount would be equal to the spread between the option price and the value at the time of exercise. See Example 15. The capital loss would be recognized for the employee's 2004-tax year.

**Example 15, ISO disqualifying disposition by gift.** On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 2, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 2, 2004, the employee gives the stock to his son. The gift constitutes a disqualifying disposition for two reasons. The stock was disposed of within two years of the grant of the option, and the stock was disposed of within one year from the exercise of the option and the transfer of the stock to the employee. The effect of the gift would be as follows:

i) If the value of the stock on the date of the gift were $40 per share, the employee would recognize ordinary income of $750 (the difference between the $30 value of the stock on the date of exercise of the option and the $25 exercise price). The son's basis in the stock would be the same as the employee's basis, $30 per share, the option price, plus the income recognized.

ii) If the value of the stock on the date of the gift were $20 per share, the employee would recognize ordinary income of $750 (the difference between the $30 value of the stock on the date of exercise of the option and the $25 exercise price). The employee's basis in the stock would be $30 per share. The employee would not be allowed to recognize a capital loss because the disposition was a gift. The son's basis in the stock would depend on subsequent circumstances. For determining gain on sale of the stock, the employee's basis of $30 per share would carry over and become the son's basis. For determining a loss on the sale of the stock, the son's basis would be $20 per share, the value of the stock on the date of the gift.

**Example 16, ISO exercise with pre-holding period ISO stock.** In November 2005, the value of the stock is $50 per share. The employee exercises an ISO granted in 2004 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) acquired in December 2004 for $25 per share by exercise of an ISO that had been granted in December 2003. In December 2004 the value of the stock was $30 per share. The two-year holding period would not be met for the 2003 ISO stock, and therefore there is a disqualifying disposition of the 2003 ISO stock. For tax purposes, two transactions will occur in 2000: the exchange of 80 old shares for 80 new shares, and the transfer of 20 additional new shares to the employee.

<u>Exchange of 80 shares.</u> A special rule applies in this case where and ISO is exercised with ISO stock that was not held for the ISO holding periods. Gain is recognized on the exchange of old ISO stock for new ISO stock, although a loss would not be recognized because of the wash sale rules. As a result, the employee recognizes gain in the amount of $2,000, the difference between his basis in the old stock ($25 times 80 shares equals $2,000) and the value of the new stock ($50 times 80 shares equals $4,000). This $2,000 gain consists of two elements:

i) $400 will be taxed as ordinary income, the difference between the option price for the old stock and the value of the stock on the date of exercise of the first option ($30 less $25 times 80 shares);

ii) $1,600 will be taxed as capital gain, the difference between the value of the stock on the date of exercise of the second option, and the sum of the employee's basis in the old stock and the ordinary income recognized on the exchange [$50 less ($25 plus $5) times 80 shares]. The capital gain would be short-term because the stock did not satisfy the more than one-year holding period.

The employee's basis in the 80 new shares will be $50 per share, reflecting his cost of $25 for the old shares, and the $25 of ordinary income and gain recognized on the exchange for the new shares. For the purpose of the more than one-year holding period required for the lower capital gains rates, the 80 exchanged shares will be considered to be acquired on the date the new shares are transferred to the employee.

<u>20 additional new shares.</u> The 20 additional new shares that the employee receives on

10

exercise of the second ISO will be eligible for ISO treatment. Therefore the employee will not recognize income at the time of exercise, and he will be eligible for capital gain treatment on the sale of the stock if the holding periods and employment tests are satisfied. The employee's basis in the 20 shares will be zero since he will have recognized no income with respect to the shares. For the purpose of the more than one-year period required for lower capital gain rates, the new 20 shares will be considered to be acquired on the date the shares are transferred to the employee.

**Example 17, ISO exercise with post holding period ISO stock.** In April 2005 the value of the stock is $50 per share. The employee exercises an ISO granted in 2003 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) acquired in December 2002 for $25 per share by exercise of an ISO that had been granted in December 2001. Because both holding periods are met for the 1995 ISO stock, use of the stock to pay the option price is not a disqualifying disposition. The employee will be treated as having exchanged 80 old shares for 80 new shares. This exchange is non-recognized as an exchange of common stock for common stock in the same corporation. The employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $25 per share ($2,000). The employee's basis in the other 20 shares is zero, because he did not recognize any income on exercise of the ISO. For the purpose of the more than one year holding period required for the lower capital gain rates, the 80 exchanged shares will be considered to be acquired on the date the old 80 shares were acquired, and the new 20 shares will be considered to be acquired on the date the shares are transferred to the employee.

**Example 18, ISO exercise with NQO stock.** The facts are the same as Example 17 except the stock used to pay the exercise price was acquired by exercise of a NQO. The result is the same as Example 17 except there is no issue of a disqualifying disposition because no ISO stock was used to pay the exercise price.

R. G. Martinell

N:\CAK\Stock Option File\Tax memo re stock options for 2004 PIP.doc





ANNETTE FREUND – VICE PRESIDENT, COMPENSATION, BENEFITS AND HR SUPPORTS

08CV3038                    TG

JUDGE DARRAH

January 15, 2008    MAGISTRATE JUDGE NOLAN

To:  Holders of Navistar International Corporation
     Stock Options

Re:  Stock Option Statement

Enclosed is your Navistar International Corporation (the "Company") Stock Option Statement as of December 31, 2007.

As you may already know, the Company is not current with its financial filings with the Securities and Exchange Commission.  As a result, there are certain limits on your ability to exercise your stock options.

In addition, some of your stock options may have expired or will expire in the near future.  We plan to address this issue but we are unable to do so now.  Once we file our Form 10-K for the 2006 fiscal year and the 2007 fiscal year, and become current with our quarterly reports for fiscal year 2008, our plan is to discuss this issue with our Board of Directors.  We cannot predict what, if any, action our directors will take, but we will communicate with you, no matter what the outcome, once that process is completed.

The attached page summarizes how certain stock option transactions will be handled until the Company becomes current with its financial reporting.

In the meantime, if you have any questions that are not answered here or if you plan to conduct any stock option transactions during this time, please contact Howard Kuppler at (630) 753-2149.

Sincerely,

*Annette*

Attachments

XOP1255NAV

## TRANSACTION SUMMARY

| Transaction Type | Action that Can be Taken |
|---|---|
| Cashless Exercise of Stock Options | NOT ALLOWED until the Company is current with its public filings. |
| Cash Exercise of Stock Options | Allowed if optionee exercising stock options is an accredited investor see below for definition of accredited investor), however shares issued would be restricted and any sale of the shares would be governed by Rule 144 (See Rule 144 below). |
| Stock Swap Exercise of Stock Options | Allowed if optionee exercising the options is an accredited investor (see below for definition of accredited investor), however shares issued would be restricted and any sale of the shares would be governed by Rule 144 (See Rule 144 below). |

1. Definition of Accredited Investor: (i) is a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of the purchase of the securities exceeds $1,000,000; or (ii) is a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

2. Summary of Rule 144: Shares can only be sold after 2 years if not an affiliate of the Company *or* until 1 year has passed and all of the Company's financial statement filings are current. Any sale must also comply with the other limitations of Rule 144.

XOP1255NAV

08CV4305
JUDGE BUCKLO
MAGISTRATE JUDGE ASHMAN
NF

# EXHIBIT #4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) | Case No. 08-cv-03038 |
| v. | ) ) | |
| NAVISTAR INTERNATIONAL CORPORATION, | ) ) ) | Judge John W. Darrah |
| | ) | Magistrate Judge Nan R. Nolan |
| Defendant. | ) | |

## MOTION TO DISMISS
## FOR LACK OF SUBJECT-MATTER JURISDICTION

Pursuant to Fed. R. Civ. P. 12(b)(1) and for the reasons that will be set forth more fully as necessary in a memorandum of law to be submitted in support of this motion, Defendant Navistar International Corporation ("Navistar") hereby moves to dismiss this action for lack of subject-matter jurisdiction. In support of this motion, Navistar states as follows:

1. The Class Action Fairness Act ("CAFA") was enacted by Congress in 2005 in response to perceived abuses of the class action device. See, e.g., Hart v. FedEx Ground Package Sys., Inc., 457 F.3d 675, 681 (7th Cir. 2006).

2. CAFA provides federal jurisdiction over certain class actions. See 28 U.S.C. §§ 1332(d)(2), 1332(d)(5)(B).

3. Plaintiff Ravi P. Rawat ("Plaintiff") purports to premise jurisdiction over this case under CAFA. See Plaintiff's Complaint at ¶ 2.

4. As the party alleging federal jurisdiction under CAFA, Plaintiff bears the burden of establishing that each of the jurisdictional criteria specified in the statute are satisfied. See, e.g., Brill v. Countrywide Home Loans, Inc., 427 F.3d 446, 447 (7th Cir. 2005).

5.      Jurisdiction under CAFA does not exist if "the number of members of all proposed plaintiff classes in the aggregate is less than 100." See 28 U.S.C. § 1332(d)(5)(B); see also, e.g., Brill, 427 F.3d at 447.

6.      The class proposed in Plaintiff's Complaint is defined as "All individuals whose vested options expired during Navistar's 'blackout period'." See Plaintiff's Complaint at ¶ 36. Fewer than seventy-five (75) persons, however, would be members of the proposed class if certified. See Declaration of Monica Stark, Ex. A hereto, at ¶ 6.

7.      The class proposed by Plaintiff consists of fewer than seventy-five (75) individuals. See Declaration of Monica Stark, Ex. A hereto, at ¶ 6. Therefore, subject-matter jurisdiction is lacking over Plaintiff's Complaint, and the Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).[1] See, e.g., Sprint Spectrum L.P. v. City of Carmel, 361 F.3d 998, 1001 (7th Cir. 2004).

WHEREFORE, Navistar respectfully requests that Plaintiff's Complaint be dismissed for lack of subject-matter jurisdiction. Navistar further requests whatever other relief the Court deems appropriate.

Dated:  June 26, 2008                    Respectfully submitted,


                                         /s/Cary R. Perlman_____
                                         One of the Attorneys for Defendant
                                         Navistar International Corporation

---

[1]      Even if Plaintiff were able to meet his burden of establishing each of the elements of CAFA, this case would still be properly dismissed for lack of subject-matter jurisdiction pursuant to one or more of the exceptions to CAFA jurisdiction enumerated in the statute. See 28 U.S.C. §§ 1332(d)(4)(A)-(B). Since Plaintiff cannot meet his initial burden, however, these exceptions need not be addressed at this time. See disc. supra at ¶¶ 6-7.

Laurence H. Levine
Maaike S. Almeida
LAURENCE H. LEVINE LAW OFFICES
190 South LaSalle Street, Suite 3120
Chicago, Illinois 60603
Phone: (312) 291-7000
Fax: (312) 291-7015

Cary R. Perlman
Mark S. Mester
Robin M. Hulshizer
Robert C. Levels
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, Illinois 60606
Phone: (312) 876-7700
Fax: (312) 993-9767

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 08-cv-03038 |
| v. | ) ) | Judge John W. Darrah |
| NAVISTAR INTERNATIONAL CORPORATION, | ) ) ) | Magistrate Judge Nan R. Nolan |
| Defendant. | ) ) | |

## DECLARATION OF MONICA STARK

Pursuant to 28 U.S.C. § 1746, Monica Stark, hereby declares and states as follows:

1.     I have been employed by Navistar for approximately six years.

2.     I am currently the Director, Corporate Compensation and Human Resources Policy at Navistar.

3.     I have personal knowledge of the facts set forth herein and am competent to testify with respect thereto.

4.     In my position at Navistar, I work on executive compensation including stock options.

5.     I have records of all individuals whose vested stock options expired during Navistar's trading restriction "blackout period," which began on April 6, 2006.

6.     There are fewer than 75 (and certainly far fewer than 100) employees and former employees whose vested stock options have expired from April 6, 2006 to the present date.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 26, 2008.

*Monica L. Stark*

Monica Stark

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) | Case No. 1:08-cv-03038 |
| v. | ) ) | Judge John W. Darrah |
| NAVISTAR INTERNATIONAL CORPORATION, | ) ) ) | Magistrate Judge Nan R. Nolan |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF NAVISTAR'S
<u>MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION</u>**

Defendant Navistar International Corporation ("Navistar" or the "Company") submits the

following memorandum of law in support of its motion to dismiss the Complaint filed by

Plaintiff Ravi P. Rawat ("Plaintiff" or "Rawat") for lack of subject-matter jurisdiction:

**I.      <u>INTRODUCTION</u>**

As reflected in Plaintiff's Complaint, federal jurisdiction over this case is premised

<u>exclusively</u> upon the Class Action Fairness Act ("CAFA"), enacted by Congress in 2005.

Jurisdiction exists under CAFA, however, <u>only</u> if the proposed class consists of more than one

hundred (100) persons.  In this case, the undisputed and indisputable evidence fully confirms that

Plaintiff's proposed class numbers far fewer than one hundred (100) persons.

The class proposed by Plaintiff and his counsel consists of "[a]ll individuals whose

vested options expired during Navistar's 'blackout period.'"  <u>See</u> Plaintiff's Complaint at ¶ 36.

As reflected in the declaration of Monica Stark, however, which was submitted with Navistar's

motion and is also included as Exhibit A to this memorandum, the vested options of fewer than

seventy-five (75) persons expired during the blackout period.  <u>See</u> Declaration of Monica Stark

("Stark Decl."), Ex. A hereto, at ¶ 6.  In fact, the exact number of individuals whose vested stock

options expired during the blackout period is fifty-six (56). <u>See</u> Supplemental Declaration of

Monica Stark ("Suppl. Stark Decl."), Ex. B hereto, at ¶ 9. While this fact should have been

apparent to Plaintiff's counsel if an adequate pre-filing inquiry had been conducted, the size of

Plaintiff's proposed class is not properly in dispute, and there is likewise no dispute that subject-

matter jurisdiction is lacking over this case. Accordingly, this case should be dismissed.

## II.    <u>FACTUAL BACKGROUND</u>

The factual background for this motion is set forth below. <u>See</u> disc. <u>infra</u> at 2-3.

### A.    Navistar

Navistar is a corporation organized under the laws of the State of Delaware. <u>See</u>

Plaintiff's Complaint at ¶ 6; <u>see also</u> Suppl. Stark Decl., Ex. B hereto, at ¶ 4. Navistar's

principal place of business is located in Warrenville, Illinois. <u>See</u> Plaintiff's Complaint at ¶ 6;

<u>see also</u> Suppl. Stark Decl., Ex. B hereto, at ¶ 5.

In certain circumstances, Navistar grants stock options to high-level executives and

senior members of management. <u>See</u> Suppl. Stark Decl., Ex. B hereto, at ¶ 7. As a result of not

being current with financial filings, however, there were certain limits on the ability of specified

individuals to exercise their vested stock options. <u>See</u> Jan. 15, 2008 Corresp. fr. A. Freund to

Holders of Navistar International Corporation Stock Options, Ex. 3 to Plaintiff's Complaint.

During this period when restrictions were in effect, the vested options of fewer than seventy-five

(75) individuals expired, with the actual number being fifty-six (56). <u>See</u> Stark Decl., Ex. A

hereto, at ¶ 6; Suppl. Stark Decl., Ex. B hereto, at ¶ 9.

### B.    Plaintiff's Complaint

Plaintiff filed his Complaint on May 23, 2008. <u>See</u> Plaintiff's Complaint at 1. Like

Navistar, Plaintiff is a citizen of the State of Illinois. <u>See</u> <u>id.</u> at ¶ 5. As reflected in the

Complaint, however, this Court's subject-matter jurisdiction is premised <u>exclusively</u> upon 28

2

U.S.C. § 1332(d) (i.e., CAFA). See id. at ¶ 2 ("This Court has jurisdiction over all claims

asserted herein pursuant to 28 U.S.C. §1332(d) . . .").

In the Complaint, Plaintiff and his counsel seek certification of a class of persons

pursuant to Fed. R. Civ. P. 23. See Plaintiff's Complaint at ¶ 35. The class proposed by Plaintiff

is defined in the Complaint as follows:

> All individuals whose vested options expired during Navistar's
> "blackout period."

Id. at ¶ 36; see also id. at ¶¶ 8-13. Plaintiff alleges two counts on behalf of the proposed class

and seeks money damages as well as injunctive relief. See id. at ¶¶ 43-53.

### III.    APPLICABLE LEGAL STANDARDS

"[F]ederal courts are courts of limited jurisdiction." See Owen Equipment & Erection

Co. v. Kroger, 437 U.S. 365, 374 (1978); see also Fed. R. Civ. P. 12(h)(3) ("If the court

determines at any time that it lacks subject matter jurisdiction, the court must dismiss the

action."). Accordingly, the burden of demonstrating jurisdiction lies with the proponent of

federal jurisdiction itself. See, e.g., Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375,

377 (1994); Sprint Spectrum L.P. v. City of Carmel, 361 F.3d 998, 1001 (7th Cir. 2004).

Moreover, the case law that has developed in the wake of CAFA makes clear that the party

asserting jurisdiction under CAFA has the burden of demonstrating that each of the prerequisites

of the statute are met. See, e.g., Fiddler v. AT & T Mobility, LLC, No. 08 C 416 (SDY), 2008

WL 2130436, at *1 (N.D. Ill. May 20, 2008); Bullard v. Burlington N. Santa Fe Ry. Co., No. 07

C 6883 (MFK), 2008 WL 2315852, at *1 (N.D. Ill. April 10, 2008).

On a motion brought pursuant to Fed. R. Civ. P. 12(b)(1), "[i]t is settled law that a federal

court determining whether it has jurisdiction may look beyond the face of the plaintiff's

complaint to resolve factual disputes." See Rennie v. Garrett, 896 F.2d 1057, 1057-58 (7th Cir.

1990). Thus, the court may "view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." See Grafon Corp. v. Hausermann, 602 F.2d 781, 783 (7th Cir. 1979); see also, e.g., Capitol Leasing Co. v. FDIC, 999 F.2d 188, 190 (7th Cir. 1993); Beam v. Gonzalez, No. 07 C 1227, 2008 U.S. Dist. LEXIS 17763, at *8 (N.D. Ill. March 7, 2008). Indeed, it is the "first duty of the court" to make certain that federal jurisdiction exists. See Sadat v. Mertes, 615 F.2d 1176, 1188 (7th Cir. 1980) (citing Hart & Wechsler's The Federal Courts and the Federal System 835 (2d ed. 1973)).

**IV.    SUBJECT-MATTER JURISDICTION IS LACKING UNDER CAFA BECAUSE THE PROPOSED CLASS HAS FAR FEWER THAN ONE HUNDRED MEMBERS**

The prerequisites for federal jurisdiction under CAFA are well-established in the statute and the case law. See, e.g., 28 U.S.C. § 1332(d); Hart v. FedEx Ground Package Sys., Inc., 457 F.3d 675, 679 (7th Cir. 2006). As the party seeking to invoke federal jurisdiction, Plaintiff bears the burden of proving that each of the following prerequisites of CAFA are satisfied: (1) any member of the proposed class is a citizen of a state different from any defendant (i.e., minimal diversity exists); (2) the proposed class consists of more than one hundred (100) members; and (3) the amount in controversy exceeds $5 million, aggregating all claims and exclusive of interests and costs. See 28 U.S.C. §§ 1332(d)(2), 1332(d)(5)(B); see also, e.g., Hart, 457 F.3d at 679; Brill v. Countrywide Home Loans, Inc., 427 F.3d 446, 447 (7th Cir. 2005).

This Court lacks subject-matter jurisdiction because the class proposed by Plaintiff consists of far fewer than one hundred (100) members. See 28 U.S.C. § 1332(d)(5)(B); Stark Decl., Ex. A hereto, at ¶ 6. Plaintiff defines the proposed class as "[a]ll individuals whose vested options expired during Navistar's 'blackout period.'" See Plaintiff's Complaint at ¶ 36. The number of individuals whose vested options actually expired during this time period, however, is fifty-six (56) and far fewer than one hundred (100), as established by the declarations of Monica

Stark, who is the Director of Corporate Compensation and Human Resources Policy at Navistar.
See Stark Decl., Ex. A hereto, at ¶¶ 2, 6; Suppl. Stark Decl., Ex. B hereto, at ¶¶ 2, 9.

Because the class proposed by Plaintiff and his counsel numbers far fewer than one hundred (100) individuals, the jurisdictional prerequisites of CAFA have not been and cannot be satisfied.  See, e.g., Bullard, 2008 WL 2315852, at *2 (holding that the proponent of jurisdiction has the burden to prove there are one hundred (100) or more class members).  Therefore, this case should be dismissed for lack of subject-matter jurisdiction.  See, e.g., Sprint Spectrum L.P., 361 F.3d at 1001.

It is worth noting, however, the gross disparity between the Complaint and reality.  See, e.g., Retired Chicago Police Ass'n v. Fireman's Annuity and Benefit Fund of Chicago, 145 F.3d 929, 934 (7th Cir. 1998) (Kanne, J.); 5 Herbert Newberg & Alba Conte, Newberg on Class Actions § 15:2, at 8-11 (4th ed. 2002).  Counsel's error is clear when one tries to reconcile the fact that the Complaint speciously alleges that the number of putative class members to be "in the thousands" (see Plaintiff's Complaint at ¶ 37), even though Mr. Rawat is undoubtedly aware that stock options are awarded by Navistar only to high-level executives and senior members of management, a group that scarcely numbers "in the thousands."  See id.; Suppl. Stark Decl., Ex. B hereto, at ¶ 7.  Indeed, Plaintiff's counsel apparently failed to even read the documents attached to Plaintiff's own Complaint, which unequivocally signal that the proposed class does not number "in the thousands."  See Navistar's 2004 Performance Incentive Plan, Ex. 1 to Plaintiff's Complaint, at 2.  For example, Navistar's 2004 Performance Incentive Plan Prospectus describes who is eligible to receive stock options:

> Management will, from time to time, select and recommend to the Committee employees of the Company and its subsidiaries who are to become participants in the 2004 Plan.  Such individuals will be selected from those who, in the opinion

5

of management, <u>have</u> <u>substantial</u> <u>responsibility</u> <u>in</u> <u>a</u> <u>managerial</u> <u>or</u> <u>professional</u> <u>capacity</u>.

Navistar's 2004 Performance Incentive Plan, Ex. 1 to Plaintiff's Complaint, at 2 (emphasis supplied).

For Plaintiff's counsel to allege in the Complaint that the proposed class numbers "in the thousands" given such language is telling. <u>Compare</u> Navistar's 2004 Performance Incentive Plan, Ex. 1 to Plaintiff's Complaint, at 2, <u>with</u> Plaintiff's Complaint at ¶ 37. In fact, it reflects a lack of a pre-filing inquiry and the filing of suit in the hope of taking discovery to see if a claim can somehow be found. <u>See</u>, <u>e.g.</u>, <u>Retired Chicago Police Ass'n</u>, 145 F.3d at <u>passim</u>. Discovery, however, is no substitute for complying with Rule 11 obligations, and this suit should be subject to summary dismissal. <u>See</u> <u>id.</u>; 28 U.S.C. § 1332(d)(5)(B); <u>Hart</u>, 457 F.3d at 679.

## V.    <u>CONCLUSION</u>

For the reasons stated above, Navistar respectfully request that this action be dismissed, pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction. Navistar further requests whatever other relief the Court deems appropriate.

Dated: July 9, 2008                     Respectfully submitted,

                                        /s/Mark S. Mester_____
                                        One of the Attorneys for Defendant
                                        Navistar International Corporation

Laurence H. Levine                      Cary R. Perlman
Maaike S. Almeida                       Mark S. Mester
LAURENCE H. LEVINE LAW OFFICES          Robin M. Hulshizer
190 South LaSalle Street, Suite 3120    Robert C. Levels
Chicago, Illinois 60603                 LATHAM & WATKINS LLP
Phone: (312) 291-7000                   Sears Tower, Suite 5800
Fax: (312) 291-7015                     233 South Wacker Drive
                                        Chicago, Illinois 60606
                                        Phone: (312) 876-7700
                                        Fax: (312) 993-9767

## INDEX OF EXHIBITS

**Exhibit A:**          **Declaration of Monica Stark**

**Exhibit B:**          **Supplemental Declaration of Monica Stark**

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 08-cv-03038 |
| v. | ) ) | |
| NAVISTAR INTERNATIONAL CORPORATION, | ) ) ) | Judge John W. Darrah |
| | ) | Magistrate Judge Nan R. Nolan |
| Defendant. | ) ) | |

## DECLARATION OF MONICA STARK

Pursuant to 28 U.S.C. § 1746, Monica Stark, hereby declares and states as follows:

1.     I have been employed by Navistar for approximately six years.

2.     I am currently the Director, Corporate Compensation and Human Resources Policy at Navistar.

3.     I have personal knowledge of the facts set forth herein and am competent to testify with respect thereto.

4.     In my position at Navistar, I work on executive compensation including stock options.

5.     I have records of all individuals whose vested stock options expired during Navistar's trading restriction "blackout period," which began on April 6, 2006.

6.     There are fewer than 75 (and certainly far fewer than 100) employees and former employees whose vested stock options have expired from April 6, 2006 to the present date.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 26, 2008.

                                    *Monica L. Stark*
                                      Monica Stark

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:08-cv-03038 |
| v. | ) ) | |
| NAVISTAR INTERNATIONAL CORPORATION, | ) ) ) | Judge John W. Darrah |
| | ) | Magistrate Judge Nan R. Nolan |
| Defendant. | ) ) | |

**SUPPLEMENTAL DECLARATION OF MONICA STARK**

Pursuant to 28 U.S.C. § 1746, Monica L. Stark, hereby declares and states as follows:

1.     I have been employed by Navistar, Inc., a wholly-owned and primary operating subsidiary of Navistar International Corporation ("Navistar") for approximately six years.

2.     I am currently the Director, Corporate Compensation and Human Resources Policy at Navistar, Inc.

3.     I have personal knowledge of the facts set forth herein and am competent to testify with respect thereto.

4.     Navistar is a corporation organized under the laws of the State of Delaware.

5.     Navistar's principal place of business is located in Warrenville, Illinois.

6.     In my position at Navistar, Inc., I work on executive compensation including stock options.

7.     In certain circumstances, Navistar grants stock options to high-level executives and senior members of management.

8.     I have reviewed Navistar's records pertaining to the individuals whose vested stock options expired during Navistar's trading restriction "blackout period" in effect while

Navistar was not current with its financial filings with the Securities and Exchange Commission ("SEC"), beginning in 2006.

9.     There are fifty-six (56) individuals whose vested stock options expired during the period when trading restrictions were in effect while Navistar was not current with its financial filings with the SEC, beginning in 2006.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 9, 2008.

Monica L. Stark

08CV4305
JUDGE BUCKLO
MAGISTRATE JUDGE ASHMAN
NF

# EXHIBIT #5

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | |
| Plaintiff, | No. 08 CH 26042 |
| v. | |
| NAVISTAR INTERNATIONAL CORPORATION, | Judge Richard J. Billik Jr. |
| Defendant. | |

CORRECTED NOTICE OF MOTION

To:   All Counsel of Record
      (See Attached Service List)

PLEASE TAKE NOTICE that on July 30, 2008 at 9:30 a.m. or as soon thereafter as counsel may be heard, the undersigned will appear before the Honorable Richard J. Billik Jr., or any judge sitting in his stead, in the courtroom usually occupied by him in Room 2601 of the Richard J. Daley Center, Chicago, Illinois, and then and there present his **Motion for a Preliminary Injunction to Prevent Defendant from Accepting Releases or to Invalidate Releases Executed by Putative class members** a copy of which is attached.

Dated:   July 25, 2008

Respectfully submitted,

By: _____
      Attorney for Plaintiff

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 N. Wacker Dr., Suite 1350
Chicago, Illinois   60606
Tel.:   312-606-0500
Fax:   312-606-0207

## CERTIFICATE OF SERVICE

I, Jeffrey M. Salas, an attorney, state that I caused a copy of the **Motion for a Preliminary Injunction to Prevent Defendant from Accepting Releases or to Invalidate Releases Executed by Putative class members** to be delivered via the Hand Delivery and U.S. Mail on July 25, 2008 to the counsel below.

_____
Attorney for Plaintiff

SERVICE LIST:

Robin Hulshizer
Cary R. Perlman
Latham & Watkins LLP
233 South Wacker Drive
5800 Sears Tower
Chicago, IL 60606
(312) 876-7700

Laurence Harvey Levine
Laurence H. Levine Law Offices
190 South LaSalle
Suite 3120
Chicago, IL 60603
312 927 0625

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | |
| Plaintiff, | No. 08 CH 26042 |
| v. | |
| NAVISTAR INTERNATIONAL CORPORATION, | Judge Richard J. Billik Jr. |
| Defendant. | |

NOTICE OF FILING

To:    All Counsel of Record
       (See Attached Service List)

PLEASE TAKE NOTICE that on July 25, 2008 Plaintiff filed Exhibit G, which was unintentionally omitted, to his **Motion for a Preliminary Injunction to Prevent Defendant from Accepting Releases or to Invalidate Releases Executed by Putative class members** a copy of which is attached.

Dated:   July 25, 2008

Respectfully submitted,

By:_____
       Attorney for Plaintiff

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 N. Wacker Dr., Suite 1350
Chicago, Illinois  60606
Tel.:   312-606-0500
Fax:   312-606-0207

## CERTIFICATE OF SERVICE

I, Jeffrey M. Salas, an attorney, state that I caused a copy of the Exhibit G of Plaintiff's **Motion for a Preliminary Injunction to Prevent Defendant from Accepting Releases or to Invalidate Releases Executed by Putative class members** to be delivered via Hand Delivery and U.S. Mail on July 25, 2008 to the counsel below.

Attorney for Plaintiff

SERVICE LIST:

Robin Hulshizer
Cary R. Perlman
Latham & Watkins LLP
233 South Wacker Drive
5800 Sears Tower
Chicago, IL 60606
(312) 876-7700

Laurence Harvey Levine
Laurence H. Levine Law Offices
190 South LaSalle
Suite 3120
Chicago, IL 60603
312 927 0625

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>NAVISTAR INTERNATIONAL CORPORATION,<br><br>      Defendant. | No. 08 CH 26042<br><br>Judge Richard J. Billik Jr. |

NOTICE OF MOTION

To:    All Counsel of Record
       (See Attached Service List)

PLEASE TAKE NOTICE that on **7/30**, 2008 at **9:30** a.m. or as soon thereafter as counsel may be heard, the undersigned will appear before the Honorable Richard J. Billik Jr., or any judge sitting in his stead, in the courtroom usually occupied by him in Room 2601 of the Richard J. Daley Center, Chicago, Illinois, and then and there present his **Motion for a Preliminary Injunction to Prevent Defendant from Accepting Releases or to Invalidate Releases Executed by Putative class members** a copy of which is attached.

Dated:   July 24, 2008

                               Respectfully submitted,

                               By: *Clint Krislov*
                                   Attorney for Plaintiff

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 N. Wacker Dr., Suite 1350
Chicago, Illinois  60606
Tel.:    312-606-0500
Fax:    312-606-0207

## CERTIFICATE OF SERVICE

I, Jeffrey M. Salas, an attorney, state that I caused a copy of the foregoing Motion to be delivered via the Hand Delivery and U.S. Mail on July 24, 2008 to the counsel below.

Attorney for Plaintiff

SERVICE LIST:

Robin Hulshizer
Cary R. Perlman
Latham & Watkins LLP
233 South Wacker Drive
5800 Sears Tower
Chicago, IL 60606
(312) 876-7700

Laurence Harvey Levine
Laurence H. Levine Law Offices
190 South LaSalle
Suite 3120
Chicago, IL 60603
312 927 0625

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | |
| Plaintiff, | No. 08 CH 26042 |
| v. | Judge Richard J. Billik Jr. |
| NAVISTAR INTERNATIONAL CORPORATION, | |
| Defendant. | |

## MOTION FOR A PRELIMINARY INJUNCTION TO PREVENT DEFENDANT FROM ACCEPTING RELEASES OR TO INVALIDATE RELEASES EXECUTED BY PUTATIVE CLASS MEMBERS

NOW COMES Plaintiff Ravi P. Rawat on behalf of himself and those similarly situated, for his Motion for a Preliminary Injunction to Prevent Defendant from Accepting Releases or to Invalidate Releases Executed by Putative class members.

1.    Plaintiff asks this Court to preliminarily enjoin Defendant Navistar from accepting releases from putative class members or to invalidate any releases accepted.

2.    The reasons for this Motion are set forth in the attached Memorandum in Support.

WHEREFORE, Plaintiff asks this Court to grant the Motion for Preliminary Injunction and to Invalidate any Releases Accepted by Defendant Navistar.

Respectfully submitted,

Dated:  July 24, 2008

_Clinton A. Krislov_
Clinton A. Krislov

Clinton A. Krislov
Jeffrey M. Salas

KRISLOV & ASSOCIATES, LTD.
20 North Wacker Drive, Suite 1350
Chicago, Illinois 60606
Tel.: (312) 606-0500
Fax: (312) 606-0207

Law Offices of Mark Baiocchi
184 Shuman Blvd.
Suite 250
Naperville, IL 60563
Tel: (630) 983-4200
Fax: (630) 983-4223

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | |
| Plaintiff, | No. 08 CH 26042 |
| v. | Judge Richard J. Billik Jr. |
| NAVISTAR INTERNATIONAL CORPORATION, | |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION TO PREVENT DEFENDANT FROM ACCEPTING RELEASES OR TO INVALIDATE RELEASES EXECUTED BY PUTATIVE CLASS MEMBERS**

Plaintiff Ravi P. Rawat asks this Court to preliminarily, pending this litigation: 1) enjoin the Defendant from accepting releases sent by putative class members; or 2) hold or invalidate all releases received by Defendant Navistar International Corporation in connection with its June 20, 2008 offer of settlement.

**PRELIMINARY STATEMENT**

Navistar, after breaching their stock options contracts by rendering employee stock options unexercisable for over two years, was sued by employees whose options expired during Navistar's self-imposed blackout period. Navistar sought and obtained an extension of time to respond to the complaint, then used the period instead to solicit putative class members by a deceptive and coercive communication to coerce class members to release their claims and thwart the litigation. The releases are misleading, coercive and unsupported by valid consideration. Plaintiff asks this Court to enjoin Navistar's acceptance of and/or invalidate any executed releases.

BACKGROUND

This case is a refiling of a case filed in the Northern District of Illinois and is brought on behalf of current and former employees of Navistar whose stock options expired during the Navistar's "blackout period[1]." (in this context, a period during which employee stock options could not be exercised) Navistar's blackout period began on April 6, 2006 when the Company disclosed that its financials were materially misstated and the Company would have to go through a process to restate those financials. That process and the black out period continued for over two years until May 29, 2008 when Navistar finally filed its financial statements and brought its filings current.

During the blackout period, Navistar refused to permit employees and former employees to exercise their options, during which a large number of such options expired. Ex. A. By refusing to permit putative class members to exercise and enforce their option rights, Navistar breached its obligations under those option contracts.

Although the Company did nothing, prior to being sued, to remedy its resulting breach of the employees' right to exercise stock options, once the federal court action was filed the Company set upon a dishonest scheme to thwart the litigation and coercively obtain releases from the putative class members.

There are two, independent bases for this Court to invalidate the releases. First, the releases were solicited and signed under economic duress, by deceptive disclosures at an unfair price, supported by inadequate consideration. Second, under Illinois law, putative class members cannot release claims under the Illinois Wage Payment and Collection Act or any other action that seeks to recover owed compensation.

---

[1] A blackout period is a period where trading is restricted because Navistar was not up to date with its SEC filings.

*1.     Defendant's Scheme to Undermine the Litigation*

Mr. Rawat filed a lawsuit in the Northern District of Illinois on May 23, 2008, the federal class action complaint was served on May 29, 2008.  On June 11, 2008, Defendant's counsel Robin Hulshizer called merely purporting to introduce her firm and requested Plaintiff counsel's agreement to extend Navistar's time to respond to Plaintiff's complaint, representing that the extension was for "convenience of counsel," ascribed to weddings and vacations.  Based on Hulshizer's representations, and in the usual civility afforded opposing counsel, Plaintiff's counsel Krislov readily agreed to the extension.

Less than two weeks later, on June 24, 2008, the hearing date for Defendant's Motion to Extend time to respond, undersigned counsel Clinton A. Krislov learned that Defendant's purpose for extending time to respond to the complaint was far more sinister.

Krislov received an anonymous call inquiring about the case from a person claiming to be a putative class member who had received a communication from Navistar that asked the recipients to release their claims against the Company and covenant not to sue.  The same day, at 10:14 a.m. Krislov e-mailed Hulshizer with his concerns. An hour later, Hulshizer returned the call professing not to have seen the e-mail and confirmed that the letter was sent to all option holders not currently in litigation with the Company.

Indeed, the extension was not for convenience of counsel, but a subterfuge to allow the Defendant a sufficient opportunity to contact putative class members in an effort to thwart this litigation.

The June 20, 2008 Letter[2].  Review shows that the letter is indeed misleading and coerces class members into precipitously signing releases without the full information for

---

[2] Attached hereto as Exhibit B.

3

class members to make an informed decision. Rather than encouraging class members to seek their own counsel and tax advice, they were promised that if their signed releases are received before July 3, they will receive a payment by July 31. Releases received by August 1, to be paid by August 31. The releases explicitly preclude putative class members from participating in the federal or any other class action and direct any questions to the Company.

2.    *Navistar's Inadequate and Coercive Offer*

During the blackout period Navistar caused communications to be issued to option holders advising them that their stock options had expired and were not worthless. Employees/Former employees who inquired were told that the Company was considering doing "something" but could make no promises. Thus, Navistar's June 20, 2008, letter -- apparently sent to all employees and former employees whose options expired during the blackout period[3] other than Rawat improperly asks putative class members to release not only their current claims against the Company, but also asks putative class members sign a covenant not to sue and explicitly references this case. Importantly, the letter incentivizes class members to act before July 3, 2008 (but not after August 1, 2008) and channels any questions solely to Defendant Navistar.

The offered consideration. As consideration, Navistar offers the putative class members merely the difference between the: "closing price on the date your option expired and the exercise price for all of your options on the expiration date." *Id.*   In return, Navistar asks putative class members to release all claims to the expired options and "the claims described **in the putative class action complaint filed against the**

---

[3] Importantly, the recipients of the letter were all members of the putative class described in Plaintiff's Class Action Complaint.

4

Company by attorney Clinton A. Krislov on behalf of Mr. Ravi P. Rawat. . ." *Id.* (emphasis added) Navistar mandated that the putative class members must respond by August 1, 2008, and if class members respond as soon as July 3, 2008, the Company will accelerate the cash payment.

The deadlines to respond and secure rapid payment of the offer are rapidly approaching, making a protective order necessary. The putative class has an extremely limited amount of time to return the releases to the Company and the Company has added an incentive to class members to send those releases immediately.

3. *Judge Darrah's Determination That the Offer Was Coercive and Misleading*

On June 26, 2008, Plaintiff Rawat brought an emergency motion in the federal court to enjoin Defendants from contacting putative class members. (Ex. C, June 26, 2008, Transcript of Proceedings, Before Honorable John W. Darrah). Navistar opposed the motion solely based on the argument that the federal court lacked subject matter jurisdiction because the class was less than 100 class members as required by the Class Action Fairness Act.

Nonetheless, United States District Judge Darrah found that the letter was coercive and misleading and, prior to leaving the bench for the summer, enjoined Navistar from accepting releases until at least August 1, 2008, ordered a neutral corrective notice to the class, and allowed putative class members until August 1, 2008 to reconsider Navistar's offer. Ex. D. For the time being, Plaintiff, without the benefit of discovery, has no evidentiary basis to dispute Defendant's claim that there are less than 100 class members. Accordingly, he has filed this action in this Court to obtain relief where jurisdiction is uncontestable.

This Court should continue the injunction entered by Judge Darrah or invalidate the releases executed by putative class members.

In more than 33 years of practice, 25 years of class action practice, undersigned counsel Krislov has never previously experienced deceitful conduct of this sort. Irrefutably, the request to extend time to answer was a ruse to facilitate Defendant's scheme. Defendant's letter was an improper attempt to undermine the litigation by offering putative class members inadequate consideration for their claims against the Company.

### 4.    *The Unfairness of the Offered Value.*

The offer omits many disclosures, such as the adverse tax treatment of the payments. But it also omits information on the "market" for such offers made by other companies. Thus, although Navistar's offer to pay expiration date prices for the expired options (generally in the $20-$50 range with some getting more whose options expired during the shore timeframe where there was a spike to $70), the price being offered is based on market prices when the current financials were unavailable and with no time value improvement for as 2 years delay in payment.

Other companies who have had similar problems have agreed to either: 1) extend the exercise period for the length of the blackout period, essentially moving the exercise period for 90 days after public financials are current, (thus giving an efficient market price)(See, Ex. E); 2) paying expired option holders the amount representing the highest price during the blackout period (See, Ex. F); 3) paying option holders based on the price when the blackout ended, here it would be $75.90 for all class members.

Accordingly, Plaintiff asks this Court to preliminarily enjoin Navistar from

accepting any release and invalidating any releases sent to Defendant in consideration of Defendant's coercive offer.

## NATURE OF THE ACTION

Navistar's employees and former employees who received stock options pursuant to the Company's Stock Option Plan were denied the right to exercise their vested options from April 6, 2006 until May 29, 2008 (the "blackout period") because of the Company's malfeasance. Specifically, Navistar needed to restate its financials that were previously materially misstated.

By causing the blackout period and refusing to allow Navistar employee stock option holders to exercise their options – which are contracts[4] -- during this blackout period, Navistar breached the option contracts and its duty of good faith and fair dealing to the option holders.

All of the options were granted pursuant to and are governed by a single document: 2004 Performance Incentive Plan (the "Plan" or "Stock Option Plan"). The class consists of current and former Navistar employees who received -- but could not exercise -- their stock options. Class members were harmed because their options either expired or became less valuable during the blackout period, which was in effect from April 6, 2006 until May 29, 2008.

## PROCEDURAL BACKGROUND

On May 23, 2008, Plaintiff filed a class action complaint in the Northern District

---

[4] It is well settled that stock options are contracts. *Lamb v. Emhart Corp.*, 47 F.3d 551, 560 (2d Cir. 1995)("The issuance of stock options constitutes a contract between the employer and employee, supported by the consideration of the employee's subsequent continued employment."); *Scully v. U.S. Wats, Inc.*, 238 F.3d 497, 507 (3d Cir. 2001)(stating "an executive stock option is a contract"), *In re Allen*, 226 B.R. 857, 862 (N.D. Ill. 1998)(stating "A stock option is a contract for transfer of shares of stock, subject to the same rules of construction as any other contract")(citations omitted), *Owen v. Merts*, 405 S.W.2d 273, 277 (Ark. 1966), *Klusener v. Commissioner of Internal Revenue*, Nos. 5383-87, 6237-87, 1989 WL 14814 (Feb. 27, 1989 U.S. Tx. Ct.).

of Illinois on behalf of all employees and former employees whose options expired

during the Company's blackout period. Plaintiff properly served the Company on May

29, 2008. Navistar was scheduled to respond by June 18, 2008.

On June 11, 2008, Navistar's counsel contacted Plaintiff's counsel to secure an

extension, for convenience of counsel, to respond to Plaintiff's Class Action Complaint.

Plaintiff's counsel agreed to the extension based on Defendant's representations that it

could not respond by June 18, 2008, because of scheduling conflict.

On July 3, 2008, Defendant filed its Motion to Dismiss on the basis of subject

matter jurisdiction.

Plaintiff, without conceding that the federal court lacked subject matter

jurisdiction, filed this action in the Circuit Court of Cook County on July 18, 2008.

## LEGAL STANDARD

The purpose of a preliminary injunction is to preserve the status quo pending the

outcome of the full litigation of the issues involved in the underlying dispute. *New Light

Cemetery Ass'n v. Baumhardt*, 373 Ill. App. 3d 1013, 1017 (1st Dist. 2007)(citing,

*Illinois Housing Development Authority v. Arbor Trails Development*, 84 Ill. App. 3d 97,

102-03 (3d Dist. 1980).

The party seeking a preliminary injunction must establish by a preponderance of

the evidence (1) that he or she has no adequate remedy at law and will be irreparably

injured if the injunction is not granted; (2) that the threatened injury to him or her will be

immediate, certain and great if the injunction is denied, while the loss or inconvenience to

the opposing party will be comparatively small and insignificant if it is granted; (3) that

granting the preliminary injunction will not have an injurious effect upon the general

public; and (4) that he or she has a reasonable likelihood of prevailing on the merits of the case. *Id.*, citing, *Illinois Housing Development Authority*, 84 Ill. App. 3d at 103.

## ARGUMENT

Defendant contacted putative class members in order to persuade the class members to release their claims against the Company in exchange for a cash payment reflecting the difference between their options' exercise price and the Company's closing price on the day their options expired.

Plaintiff asks that this Court enjoin the Company from accepting any executed releases until this Court can adjudicate this case on the merits. If this injunction is not granted, putative class members will: 1) not have an adequate remedy at law because they will have released their claims; 2) suffer harm that is immediate, certain and great, while Navistar will not be harmed at all; 3) be denied relief in a matter where they have substantial likelihood of success.

There are two independent bases that void any releases sent to Defendant by class members: 1) Navistar's misleading and coercive solicitation wrongly coerced class members into signing away their legal rights under economic duress in return for inadequate compensation; and 2) those rights could not be released under the Illinois Wage Payment and Collection Act.

## I.    A PRELIMINARY INJUNCTION IS NEEDED BECAUSE CLASS MEMBERS WILL SUFFER IRREPARABLE HARM FOR INADEQUATE CONSIDERATION IF THEY RELEASE THEIR CLAIMS BEFORE A HEARING ON THE MERITS.

Plaintiff asks this Court to enjoin Navistar from accepting releases sent to putative class members that deceitfully and coercively asked class members to release any claims against Navistar in consideration for an inadequate offer, that did specify any tax

9

implications or any rights or claims that the putative class members may have.

### A.   Class Members Will Not have an Adequate Remedy at Law for Meritorious Claims

This Court will effectively decide whether class members may pursue meritorious claims against their employer or former employer. Preserving the status quo until the case can be decided on the merits is imperative. As of now, class members are deciding whether to release their claims or continue to be members of the class that seeks to pursue those claims for more favorable consideration.

### B.   Harm to Class Members is Certain and Great, Navistar Will Suffer No Harm

Currently, Navistar is barred by a federal court order from accepting releases until August 1, 2008. Plaintiff maintains that the solicitations for releases sent to putative class were executed under economic duress and are void as a matter of law. Preliminarily enjoining acceptance of the releases will preserve the status quo until the Court can make determination as to whether the releases are valid or void based on economic duress and the Illinois Wage law.

The harm to class members is that they will waive their rights on an uninformed basis at a price (mostly $20-$50 per share) determined at a time when the market information was incorrect, obsolete, and well below the $65-$75 per share range the sock has been trading at since public disclosures were brought current.

The harm to Navistar is nonexistent; it simply continues to have employees and former employees with claims against them, as they had for prior to sending the releases. Further, any harm to Navistar is of its own making, because it engaged in deceitful conduct to attempt to obtain a quick release of claims after this litigation commenced.

This Court can strike an even accord between the parties by preliminarily enjoining Navistar from accepting any releases from putative class members, and allowing more time or

**C.    Plaintiff and the Class has a Substantial Likelihood of Success Because Navistar Breached its Stock Option Contract Obligations and Violated the Illinois Wage Payment and Collection Act**

Exacerbating the problem of releases is that Navistar clearly breached its option contract obligations is offering a one-time only price that is not a fully informed market price and violated Illinois' Wage Payment and Collection law. In response to that misconduct, Navistar engaged on a deceitful and coercive plan to attempt to gain an advantage in this litigation. Further, the class claims are substantial and meritorious.

**1.    Plaintiff is Likely to Succeed on His Breach of Contract/Breach of Good Faith and Fair Dealing Claims**

The class' claims are fairly simple. Navistar's stock option plans formed a contract whereby Navistar would, in lieu of cash compensation, grant stock options to employees in consideration for their continued employment. From time to time, an employee would receive a stock option grant. An option grant is the right to purchase an option at a future date at the option's strike price, which is the price of Navistar's common stock on the date of the grant.

It is well settled that a stock option is a contract. *Lamb v. Emhart Corp.*, 47 F.3d 551, 560 (2d Cir. 1995)("The issuance of stock options constitutes a contract between the employer and employee, supported by the consideration of the employee's subsequent continued employment."); *Scully v. U.S. Wats, Inc.*, 238 F.3d 497, 507 (3d Cir. 2001)(stating "an executive stock option is a contract"), *In re Allen*, 226 B.R. 857, 862 (N.D.Ill. 1998)(stating "A stock option is a contract for transfer of shares of stock, subject

to the same rules of construction as any other contract")(citations omitted), *Owen v. Merts*, 405 S.W.2d 273, 277 (Ark. 1966), *Klusener v. Commissioner of Internal Revenue*, Nos. 5383-87, 6237-87, 1989 WL 14814 *1 (Feb. 27, 1989 U.S. Tx. Ct.).

Under Delaware law, by which this particular contract is governed, "[t]o prevail on a breach of contract claim, 'the plaintiff must demonstrate: first, the existence of a contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff.'" *Segovia v. Equities First Holdings, LLC*, No. 06-C-09-149-JRS, 2008 WL 2251218 *7 (Del Super. Ct. May 30, 2008).

Navistar's stock option plan, attached hereto as Ex. F, is an express contract. Navistar breached its obligation to the Plaintiff and the putative class, whereby Plaintiff and the class suffered damages.

### a.    Navistar's Stock Option Plan is a Contract

As stated earlier, a stock option is a contract that is supported by the consideration of an employee's continued employment. *Beard v. Elster*, 160 A.2d 731, 739-41 (Del. 1960)(holding that the provision in a Stock Option Agreement that the option could be exercised only while the optionee remained an employee of the Corporation was held to furnish the Corporation adequate assurance of receiving the contemplated consideration, i.e., the optionee's continued employment.)

### b.    Navistar Breached its Obligations Under that Contract

Under the contract, Navistar was obligated to allow employees and former employees to purchase stock in Navistar at a specific price. Even though the employee and former employees fully performed under this contract, *i.e.*, they continued their

employment until the time the stock options became exercisable, Navistar has refused, in bad faith, to honor their obligation.

     c.    **Plaintiff and the Class Suffered Damages and the "One-Time Only" Offer Coerced Waiver is at an Unfairly Low Price Because it Was Offered, *Inter alia*, When Navistar's Financials Were Not Current.**

Navistar's breach caused Plaintiff and the Class to suffer immense damages. By not allowing employees to exercise their options, Defendant denied the class members their owed and due compensation. As explained earlier, the Defendant's attempt to settle the claims of class members significantly undervalues and misrepresents their claims, shortchanging Plaintiff and Class members by thousands if not hundreds of thousands of dollars.

In short, the offer for each person is unfairly low because: 1) the class is not given the benefit of the intended equity award; and 2) the offer is a blackout period effected price (when current financials were unavailable and the Company's shares were unlisted the stock was generally traded between $20-$50 per share), much lower that the class member would realize if their exercise period were extended (see, ____.), or the Company offered the highest blackout period price or the price the date the blackout was lifted. ($75.90 per share).

    **2.**    **Navistar Violated the Illinois Wage Payment and Collection Act**

The Illinois Wage Payment and Collection Act applies to these claims. Under the Illinois Wage Payment and Collection Act, wages are defined "as any compensation owed an employee by an employer pursuant to an employment contract or contract between the 2 parties, whether the amount is determined on a time, task, piece, or any

other basis of calculation." *Shields v. Associated Volume Buyers, Inc.*, No. 93 C 7620, 1994 WL 110397 at *1 (N.D. Ill. March 31, 1994)(citing, 820 ILCS 115/2). Payment to separated employees is termed "final compensation" and is defined under the Act as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or contract between the 2 parties." *Id.*, citing, 820 ILCS 115/2.

The legislative intent of the Act was to include a broad class of compensation due employees. The Act's predecessor statute was interpreted by the Illinois Supreme Court to exclude vacation pay from the ambit of the statute. *Id.* The Act was amended, not only to expressly include vacation pay, but to define wages even more broadly to include any compensation due and owing an employee by an employer pursuant to an employment contract. *Id.* citing, *Metropolitan Distributors, Inc. v. Illinois Dept. of Labor*, 114 Ill. App. 3d 1090, 449 N.E.2d 1000 (1st Dist.1983). Based on this legislative intent, the Appellate Court for the First District in *Metropolitan Distributors*, 114 Ill. App. 3d 1090, 1094, found that severance pay provided in a collective bargaining contract constituted either wages or final compensation under the Act. *Id.*

Accordingly, stock options are covered by the Illinois Wage Payment and Collection Act. Specifically, the act covers:

> For all employees, other than separated employees, "wages" shall be defined as *any compensation* owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation.

> Payments to separated employees shall be termed "final

> compensation" and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and *any other compensation owed the employee* by the employer pursuant to an employment contract or agreement between the 2 parties.
>
> Where an employer is legally committed through a collective bargaining agreement or otherwise to make contributions to an employee benefit, trust or fund on the basis of a certain amount per hour, day, week or other period of time, the amount due from the employer to such employee benefit, trust, or fund shall be defined as "wage supplements", subject to the wage collection provisions of this Act.

820 ILCS 115/2 (emphasis added)

Thus, under the Illinois Wage Payment and Collection Act, *any compensation* is deemed to be wages and, therefore, covered by the act. Further for purposes of several wage acts (similar to the Illinois Wage Act), stock options are generally viewed as covered compensation. For instance, in *Scully v. US WATS Inc.*, 238 F.3d 497, 516 (3d Cir. 2001), the Third Circuit interpreted stock options to be covered under the Pennsylvania Wage Payment and Collection Law stating:

> "we are confident that the Pennsylvania Supreme Court would conclude that the stock option granted to Scully, essentially a call option, constitutes "wages or compensation" within the meaning of the WPCL."[5]

*Id.* at 517.

And, the Third Circuit held that "the 'call' option extended to Scully falls within the definition of fringe benefits or wage supplements because it represents an "amount

---

[5] The Pennsylvania law covers: "all earnings of an employe[e], regardless of whether determined on time, task, piece, commission or other method of calculation. The term "wages" *also includes fringe benefits or wage supplements* whether payable by the employer from his funds or from amounts withheld from the employe[e]s' pay by the employer. 43 Pa. Stat. Ann. § 260.2a (1992) (emphasis added)" *Id.*

to be paid pursuant to an agreement to the employee." *Id.* citing, *See Regier v. Rhone-Poulenc Rorer, Inc.*, No. Civ. A. 93-4821, 1995 WL 395948, at *4-7 (E.D.Pa. June 30, 1995) (WPCL covers call options); *Bowers v. NETI Technologies, Inc.*, 690 F.Supp. 349, 353 (E.D.Pa.1988) (employer's agreement to repurchase stock from employee subject to the WPCL).[6]

The same is true here. The Illinois Wage Payment and Collection Act covered compensation, as defined above, covers compensation "pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2. Plaintiff and the putative class' stock options were agreements for compensation in consideration for their service and continued service.[7]

Similarly, in *Montemayor v. Jacor Communications, Inc.*, 64 P.3d 916, 924 (Colo. App. 2002), the Colorado Appellate Court found that stock options were covered by the Colorado Wage Collection Act. The court stated that the fact that the Colorado statute, like the Illinois statute, covered vacation pay and bonuses militated in favor of finding that employee stock options wages. *Id.* Further, the court held that Incentive Stock

---

[6] Wage supplements, a term that is also included in the Illinois Act, was defined in the Pennsylvania law as "all monetary employer payments to provide benefits under any employe[e] benefit plan, as defined in section 3(3) of [ERISA], as well as separation, vacation, holiday, or guaranteed pay; reimbursement for expenses; union dues withheld from the employe[e]s' pay by the employer; *and any other amount to be paid pursuant to an agreement to the employe[e]*, a third party or fund for the benefit of employe[e]s. *Id.* (emphasis added) (citation and footnote omitted)" *Id.*

[7] *Scully* also states that: "concerning the more central issue, a stock option may qualify as earned compensation under the WPCL if the employer specifically agreed to deliver the option as employment compensation. *Id.*, citing *Keck v. Trifoods Intern., Inc.*, No. Civ. A. 96-3016, 1996 WL 665536, *4-5 (E.D.Pa. Nov. 12, 1996); *Harding*, 882 F.Supp. at 427-29. Scully presents exactly this situation. Stock options provide an incentive to an employee to work to increase the stock's value and thereby benefit the company. *See Safeway Stores*, 210 F.3d at 1243. The company benefits because the stock option lowers the amount of up-front compensation costs that must be paid directly to the employee, but the employee bears a considerable risk since his compensation will not increase unless the stock value increases. *See Id.* Thus, stock options are often termed "contingent compensation." *Id.* (internal quotations and citation omitted).

Options, as most of the options are here, are by nature "an option granted to an individual for any reason connected with his employment by a corporation. . ." *Id.*

Stock options are covered by a number of provisions of the Illinois Wage Payment and Collection Act, because the Act covers *any compensation pursuant to any agreement.* Navistar's stock option plan and stock options in general are an agreement for compensation.

Navistar's failure to honor its obligations and subsequent deceitful plan to shortchange its employees and former employees shows that the Act was clearly violated.

**III.    THE RELEASES EXECUTED BY PUTATIVE CLASS MEMBERS ARE INVALID BECAUSE THE COMMUNICATION WAS MISLEADING, COERCIVE, AND UNSUPPORTED BY CONSIDERATION.**

"[A] release is valid and binding where the minds of the parties have met; where the release is supported by consideration; and where there has been no fraud, misrepresentation, mistake, duress or undue influence." *Delaware Lumber and Millwork, Inc. v. Anecon Const. Co., Inc.*, C.A. No. 96L-06-011, 1993 WL 562206 at *2 (Del. Super. Ct. Dec. 13, 1993).  Releases should not be used as instruments of fraud or oppression. *Carlile v. Snap-on Tools*, 271 Ill. App. 3d 833, 838 (4th Dist. 1995) citing, *Antal v. Taylor*, 146 Ill. App. 3d 863, 866-67, (1986).  Here, the releases were misleading, coercive and unsupported by adequate consideration.  Navistar's coercive letter to putative class members -- some of whom are currently employees that rely on Navistar for continued employment -- clearly puts the putative class members in a no-win situation.

Specifically, the letter coerces putative class members into accepting less consideration than the litigation seeks.  In fact, the letter's content is a thinly veiled

"take it or leave it" offer[8], with consecutive sentences stating:

> ". . . The Company does not believe that it has an obligation to compensate individuals for the Expired Options or that the claims set forth in the Complaint are valid, and **we intend to vigorously contest all of the relief Mr. Rawat seeks.**" Ex. B (emphasis added)

Followed by:

> "This **one-time opportunity** will be available until **August 1, 2008**. . ." *Id.* (emphasis added)

Even more coercively, Defendant guarantees an extra incentive for quick action:

> "If we receive the executed Payment and Release **on or before July 3, 2008**, unless you direct otherwise we will mail a check in the amount of your payment . . . on or before July 31, 2008." *Id.* (emphasis added)

This communication was the subject of an Emergency Motion in the federal court action. Even though the federal court ordered a "neutral" corrective notice, class members, by the size of the offer and tone of the letter have been coerced into releasing their claims against Navistar.

As United States District Judge Darrah has already correctly noted, the letter implies that if class members do not release their rights in exchange for a cash payment – in some cases thousands of dollars -- they will be left with nothing. Although the letter and the follow up corrective notice disclose a little more information, class members still are presented with an offer that undervalues their rights and puts them under a strict timeline to comply. Transcript 18:6-22.

Navistar's offer to class members is inadequate for three reasons. First, the consideration for release given to class members is currently due and owed under the

---

[8] The offer was sent to option holders that were both employees and non-employees. Courts have consistently held that "if the class and the class opponent are in an ongoing business relationship, communications from the class opponent to the class may be coercive." *Ralph Oldsmobile Inc. v. General Motors Corp.*, No. 99civ4567 (AGS), 2001 WL 1035132, at *3 (S.D.N.Y. Sept. 7, 2001)(citing *Jenifer v. Delaware Solid Waste Auth.*, 1999 WL 117762 (D. Del. Feb. 25, 1999).

contract, releasing claims for money already owed is not adequate consideration. Second, the cash payment reflects the spread between his or her options' exercise price and Navistar's common stock's trading price the day that the option expired. The offer, however, fails to disclose that class members may be entitled to a higher cash payment. Third, if the putative class members exercised and held the options instead of immediately selling the options, they would receive a two-fold benefit: 1) Navistar's stock appreciated significantly, making holding the stock more valuable than immediately selling the stock; and 2) holding the stock creates more favorable tax treatment than an immediate sale.

      a.      **The offer does not give sufficient notice to claims putative class members are releasing nor does it show the tax implications of the offer**

Also, the offer letter asks class members to release their claims against Navistar without disclosing material information. The communication makes two misrepresentations and omits two material facts. First, it claims that the cash offer was only a "one time opportunity" and that "Navistar had no obligation to pay that amount." Second, it does not disclose the adverse consequences of a cash offer, or, that companies in similar situations have offered much more generous packages.

Under Delaware law, fraud or misrepresentation is sufficient to invalidate a release. *Greenhouse v. BP Inc.*, C.A. 86-OC-159, 1989 WL 135704, at *2 (Del. Super. Ct. Oct. 26, 1989)(finding that release agreement was void based of fraud), citing, *Hicks v. Soroka*, Del. Super., 188 A.2d 133 (1963).

Although Plaintiff believes that these releases intentionally omitted or misrepresented material information, as a general rule *even an innocent*

*misrepresentation* by the releasee or his or her agent of a material fact, intended to be acted on by the releasor, and relied on by him or her, is effective to avoid a release induced thereby. 76 C.J.S. Release § 27, citing, *Bass v. Seaboard Air Line R. Co.*, 205 Ga. 458, 53 S.E.2d 895 (1949).;and *Kennedy v. Texas Emp. Ins. Ass'n*, 121 S.W.2d 434 (Tex. Civ. App. Dallas 1938), *judgment aff'd*, 135 Tex. 486, 143 S.W.2d 583 (Comm'n App. 1940).

Navistar's solicitation misrepresents that the offer is a "one-time opportunity", that Navistar is "not obligated to pay anything" and it omits that the cash payment, rather than allowing putative class members to exercise their options, would result in adverse tax consequences.  All three of these misrepresentations are material and would have induced potential class members to sign away their legal rights without full information.

In fact, Navistar admitted in open court that the "one-time opportunity" statement was a misrepresentation.  Transcript: 17:18-23. (The Court:  "The question is, have your clients absolutely precluded any settlement of this matter at a later time after August 1st?";  Mr. Perlman [Navistar's counsel]: "*Absolutely not*, your Honor.  We've had no discussions of that with our client, no such decision has been made.")(emphasis added)

     b.     **A release that is signed under economic duress is invalid**

In Delaware, duress can render a contract voidable where there is a (1) a wrongful act which (2) overcomes the free will of the person (3) who has no adequate legal remedy to protect his interests. *Edge of the Woods v. Wilmington Savings Fund Society, FSB*, N. C.A. 97C-09-281-JEB, 2001 WL 946521 (Del. Super.Ct. Aug. 16, 2001)  Economic duress is duress directed against a person's business interests, and is often referred to as "business compulsion." *Id.*, citing *Hanna Sys. Inc. v. Capano Group, L.P.*, C.A. No.

7408, 1985 WL 21128. at *3 (Del. Ch. Nov. 29, 1985). The test for determining whether the duress produced the asset is a subjective one that focuses on the state of mind of the "victim" of the duress. *Id.*, *Restatement (Second) of Contracts* § 175, comment c (1981). Loss of "free will" does not mean that no choice exists, rather, that the threatened person is compelled to choose between regretable [sic] alternatives. *Id.*, *Williston on Contracts* § 1602, at 651 (3d ed. 1967). The threatened party must be compelled to make a disproportionate exchange of value to protect his business with no adequate alternative legal remedy. *Id.* § 1617.

Indeed, the Restatement, which Delaware law relies on, shows that: clearly shows that the letter was a wrongful act, in this case a threat, because it gave class members no reasonable alternative because the payment was a "one time opportunity." Although the letter and the resulting corrective notice mentioned the litigation against the Company, Navistar cannot overcome the fact that it misrepresented the fact that it was a "one time opportunity," when it admitted as much at the June 26, 2008 hearing.

Putative class members were coerced into signing releases by the promise that this was the **only time** that they could be compensated for their **earned wages**. To make matters worse, the deadline for signing the releases was only about five weeks.

Class members have been forced to either give up their rights, or receive nothing.

c.    **The offer to putative class members is supported by inadequate consideration**

Delaware law recognizes that a release that is unsupported by consideration is void. *Sylvia CHAPMAN v. DUNN-Assoc., Ltd.*, C.A. No. 1988-04-120, 1988 WL 765407, at *1 (Del. Com. Pl. Sept. 22, 1988)(holding "the seller has done no more than insist upon the rights it contracted for with the purchaser. If an employee of the seller

made such a promise, it was unsupported by any valid consideration. Accordingly, such a promise is unenforceable."); *See also*, 66 Am. Jur. 2d Release § 11, stating ("Generally speaking, in order to be effective a release must be supported by consideration. In other words, the releasor must have received something of value to which he or she had no previous right. Stated another way where one party is under a pre-existing duty to do or pay to another party that duty will not constitute sufficient consideration so as to uphold a release.")(citations omitted) and *U.S. Fidelity and Guar. Co. v. Klein Corp.*, 190 Ill. App. 3d 250, 257 (1st Dist.,1990) ("A release requires an abandonment of a claim to the person against whom the claim existed, and must be backed by consideration.")(citation omitted)

No consideration exists here because Navistar ***already owed*** an amount higher than the payment made in exchange for the release.

The Illinois Appellate Court, in *Carlile*, also noted that "Professors White and Summers describe an individual who refuses to perform his contract duties unless he receives a concession as an extortionist. In non-Code cases the consideration doctrine could be used to police against extortion: 'You gave no new consideration for the concession and ***you had a preexisting duty to do everything you are to do under the modified arrangement, hence the concession is unenforceable.***'" *Carlile v. Snap-on Tools*, 271 Ill. App. 3d 833, 841 (4th Dist. 1995), citing, J. White & R. Summers, Uniform Commercial Code § 1-5, at 47 (2d ed. 1980)(emphasis added). *See also*, *Salvaggio v. Schafroth*, 133 Ill. App. 2d 811 (1971) (stating "[w]here there was no dispute that defendant owed plaintiffs at least the sum which defendant paid to them . . . release . . . against defendant arising out of plaintiffs' employment by defendant was unsupported by valid consideration and was unenforceable against plaintiffs who

endorsed check.")

Even though Navistar was contractually obligated to allow Plaintiff and the Class to exercise their options, the releases sent to putative class members are invalid because they present a "take it or leave it" offer that is only a "one time opportunity." The letter, as it is currently described, forces putative class members to choose between: 1) an inadequate cash payment (for which they will realize ordinary income tax); or 2) nothing.

Indeed, Navistar's offer fails to acknowledge or disclose that fact in its offer, which radically undervalues the owed compensation, which Defendant's lawyers admitted is not in fact "take it or leave it" offer, as it is presented.. Ex. A. Transcript 17:18-23.

## III.    RELEASES SENT TO PUTATIVE CLASS MEMBERS ARE VOID AS A MATTER OF LAW

As noted above, Stock Options are covered under the Illinois Wage Payment and Collection Act, ("IWPCA or Wage Act"), which mandates that employees and former employees recover owed compensation. Under the Wage Act, any release signed by an employee or former employee in connection with the owed compensation is void as a matter of law.

### A.    Putative Class Members Cannot Release Claims Under the Illinois Wage Payment and Collection Act or any other Action seeking Return of Compensation

Releases signed by putative class members are void as a matter of law. *O'Brien v. Encotech Construction Services, Inc.*, 183 F.Supp.2d 1047, 1052 (N.D. Ill. 2002) and *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2004 WL 1403007 *7 (N.D. Ill.). As described in *Ladegaard*, public policy favors the peaceful and voluntary resolution of claims and when there has been such resolution, a presumption of its

validity is created. *Ladegaard* 2004 WL 1403007, at * 3. citing *Blaylock v. Toledo, Peoria & Western R.R. Co.*, 43 Ill. App. 3d 35 (3d Dist. 1976). However, while recognizing the freedom to contract, it is also the rule in Illinois that agreements that are contrary to public policy as reflected in the laws of the state have a tendency to injure the public welfare are unenforceable. *Id.* citing *Holstein v. Grossman*, 246 Ill. App. 3d 719 (1st Dist. 1993). Because Illinois public policy precludes employees from contracting away their rights under the Illinois wages laws, (including the Illinois Wage Payment and Collection Act) any releases signed by employees are voidable.

Both *Ladegaard* and *O'Brien* are directly on point. In *Ladegaard*, employees brought a class action suit against their employer for violations of the Fair Labor Standards Act, the Illinois Minimum Wage Law, and, like here, the Illinois Wage Payment and Collection Act. *Id.* at *1. The *Ladegaard* defendants, like here, sent releases to the company's employees in offering them cash consideration for the release. *Id.* The court granted the plaintiff's motion to strike the releases and held that *releases under the Illinois Wage Payment and Collection Act are invalid as a matter of law.* *Id.* at *7.

Identically, in *O'Brien*, after the court originally rejected the argument that releases were void under the Illinois Wage Payment and Collection Act, Judge Gottschall, on reconsideration, adopted the analysis in *Ladegaard* in holding that the releases sent to plaintiffs were void as a matter of law. *Id.* at 1052. (agreeing with *Ladegaard* that under the Wage Act "the releases executed by . . . employees are void as a matter of law.")

# CONCLUSION

Accordingly, Plaintiff asks this Court to preliminarily, pending this litigation: 1) enjoin the Defendant from accepting releases sent by putative class members; or 2) hold or invalidate all releases received by Defendant Navistar International Corporation in connection with its June 20, 2008 offer of settlement.

Dated:  July 24, 2008

Respectfully submitted,

Clinton A. Krislov

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Drive, Suite 1350
Chicago, Illinois  60606
Tel.:  (312) 606-0500
Fax:  (312) 606-0207

Law Offices of Mark Baiocchi
184 Shuman Blvd.
Suite 250
Naperville, IL 60563
Tel: (630) 983-4200
Fax: (630) 983-4223

# **EXHIBIT A**

# Notice of Cancellation and Expiration of All Employee Stock Options – Ravi Rawat        Page 1 of 2

Post Dated: January 29, 2008

Sent By: Executive and Equity Plan Services, 1400 Merrill Lynch Drive, Mail Stop 04-03C; Pennington, NJ 08534

| Key Facts | | Navistar International Corporation | Prepared For: |
|---|---|---|---|
| Statement Period (MM/DD/YYYY) | 01/01/2007 to 12/31/2007 | NAVZ - $54.110000 | Stmt 166<br>RAVI P RAWAT<br>24714 CHAMPION DRIVE<br>PLAINFIELD, IL 60544 |
| Page 1 of 4 | | Market Price as of 12/31/2007 | |

## Option Balance

Potential Income @ $54.110000

| Grant Date | Option Price | Grant Type | Options Granted | Beginning Balance for Period | +/- Activity | Current Balance | Last Date to Exercise | Vest Date | Options Vesting | Options Vested | X | Income per Option | = | Total Income | Exercisable Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/31/1999 | $60.400000 | ISO | 2,241 | 2,241 | 2,241 | 0 | 04/05/2007 | | | 0 | | $0.000000 | | $0.00 | $0.00 |
| 12/31/1999 | $60.400000 | NQO | 659 | 659 | 659 | 0 | 04/05/2007 | | | 0 | | $0.000000 | | $0.00 | $0.00 |
| 12/12/2000 | $21.220000 | ISO | 2,133 | 2,133 | 1,067 | 0 | 04/05/2007 | | | 0 | | $0.000000 | | $0.00 | $0.00 |
| 12/12/2001 | $38.200000 | ISO | 3,202 | 3,202 | 3,202 | 0 | 04/05/2007 | | | 0 | | $0.000000 | | $0.00 | $0.00 |
| 12/12/2001 | $38.200000 | NQO | 98 | 98 | 98 | 0 | 04/05/2007 | | | 0 | | $0.000000 | | $0.00 | $0.00 |
| 12/10/2002 | $26.385000 | ISO | 2,982 | 2,982 | 2,982 | 0 | 04/05/2007 | | | 0 | | $0.000000 | | $0.00 | $0.00 |
| 12/10/2002 | $26.385000 | NQO | 918 | 918 | 918 | 0 | 04/05/2007 | | | 0 | | $0.000000 | | $0.00 | $0.00 |
| 12/09/2003 | $41.385000 | NQO | 282 | 282 | 282 | 0 | 04/05/2007 | | | 0 | | $0.000000 | | $0.00 | $0.00 |
| 12/09/2003 | $42.385000 | ISO | 2,218 | 2,218 | 2,218 | 0 | 04/05/2007 | | | 0 | | $0.000000 | | $0.00 | $0.00 |
| 12/14/2004 | $40.915000 | ISO | 2,500 | 2,500 | 2,500 | 0 | 04/05/2007 | | | 0 | | $0.000000 | | $0.00 | $0.00 |
| 10/18/2005 | $26.150000 | ISO | 2,500 | 2,500 | 2,500 | 0 | 04/05/2007 | | | 0 | | $0.000000 | | $0.00 | $0.00 |
| Total | | | 19,733 | 19,667 | 18,667 | 0 | | | | 0 | | | | $0.00 | |

Please log on to www.benefits.ml.com to view your equity award activity. If you have any questions, please contact a Merrill Lynch Representative at 1-877-767-2404. If you reside outside of the U.S., Canada or Puerto Rico, please contact a Merrill Lynch Representative at 1-609-818-8894.

Values within this statement utilize standard rounding; actual numbers may vary.

The data presented on this section of your statement is for record keeping purposes only. This section does not reflect the holding of securities, cash, or cash equivalents by Merrill Lynch, Pierce, Fenner & Smith Incorporated. Accordingly, the options referred to in this section of your statement are not subject to the provisions of the Securities Investor Protection Act of 1970, and brokerage account terms and conditions do not apply.

## Notice of Cancellation and Expiration of All Employee Stock Options – Ravi Rawat    Page 2 of 2

Post Dated: January 29, 2008
Sent By: Executive and Equity Plan Services, 1400 Merrill Lynch Drive, Mail Stop 04-03C; Pennington, NJ 08534

| Key Facts | Navistar International Corporation | Prepared For: |
|---|---|---|
| Statement Period (MM/DD/YYYY): 01/01/2007 to 12/31/2007<br>Page 2 of 4 | NAVZ - $54.100000<br><br>Market Price as of 12/31/2007 | Sent 165   2<br>RAVI P RAWAT<br>24714 CHAMPION DRIVE<br>PLAINFIELD, IL 60544 |

### Cancellations/Transfers

| Date | Grant Type | Grant Date | Number of Options/Shares/Units | Activity |
|---|---|---|---|---|
| 01/05/2007 | ISO | 12/14/2004 | 833 | Cancelled (Terminated) |
| 01/05/2007 | ISO | 12/16/2003 | 1,566 | Cancelled (Terminated) |
| 04/05/2007 | NQO | 12/14/1999 | 659 | Cancelled (Expired) |
| 04/05/2007 | ISO | 12/11/2001 | 98 | Cancelled (Expired) |
| 04/05/2007 | NQO | 12/11/2002 | 918 | Cancelled (Expired) |
| 04/05/2007 | ISO | 12/14/1999 | 2,241 | Cancelled (Expired) |
| 04/05/2007 | ISO | 12/09/2003 | 2,218 | Cancelled (Expired) |
| 04/05/2007 | ISO | 12/10/2002 | 2,982 | Cancelled (Expired) |
| 04/05/2007 | ISO | 12/11/2001 | 3,202 | Cancelled (Expired) |
| 04/05/2007 | ISO | 12/12/2000 | 1,067 | Cancelled (Expired) |
| 04/05/2007 | NQO | 12/09/2003 | 232 | Cancelled (Expired) |
| 04/05/2007 | ISO | 12/14/2004 | 1,667 | Cancelled (Expired) |
| 04/05/2007 | ISO | 10/18/2005 | 934 | Cancelled (Expired) |
| Total | | | 18,667 | |

The data presented on this section of your statement is for record keeping purposes only. This section does not reflect the holding of securities, cash, or cash equivalents by Merrill Lynch, Pierce, Fenner & Smith Incorporated. Accordingly, the options reflected on this section of your statement are not subject to the provisions of the Securities Investor Protection Act of 1970, and brokerage account terms and conditions do not apply.

# EXHIBIT B

Cary R. Perlman

# LATHAM & WATKINS LLP

Sears Tower, Suite 5800
233 S. Wacker Dr.
Chicago, Illinois 60606
Tel: +1.312.876.7700  Fax: +1.312.993.9767
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

File No. 010255-0330

**By Email and U.S. Mail**

June 24, 2008

Mr. Clinton A. Krislov
Krislov & Associates, Ltd.
20 North Wacker Drive, Suite 1350
Chicago, IL 60606

Re:     Rawat v. Navistar International Corporation

Dear Mr. Krislov:

Pursuant to our telephone call this morning, please find attached a courtesy copy of the form of letter and the form of release mailed last Friday to certain current and former employees of Navistar.

Sincerely,

Cary R. Perlman
of LATHAM & WATKINS LLP

cc: Robin Hulshizer

CH\1036042.1



Navistar, Inc.
4201 Winfield Road
Warrenville, IL 60555  USA

P : 630-753-3052
W : navistar.com

Annette M. Freund
Vice President,
Compensation, Benefits
and HR Support

June 20, 2008

Re:  Expired Stock Options

Dear _____:

As you know, until recently Navistar International Corporation (the "Company") has not been current with its Form 10-K filings with the Securities and Exchange Commission ("SEC").  During the time the Company was not current, there were limits on your ability to exercise your stock options.  The expiration date for certain stock options fell within the period when these limits were in effect.  In my letter to you of January 15, 2008, the Company identified the option expiration issue, informed you that we planned to address the issue with the Board of Directors, and promised to communicate with you again regarding the Board's decision.

On June 16, 2008, we raised these matters with the Board.  We are pleased to report that the Board has authorized us to extend to you a one-time opportunity to obtain a cash payment from the Company in resolution of any and all issues in connection with vested stock options that expired during the period when the above-described trading restrictions were in place (the "Expired Options").

The amount of your cash payment will be the difference between the closing price on the date your option expired and the exercise price for all of your options "in the money" on the option expiration date – *i.e.*, your payment will match the profit you would have made had you sold the shares at the end of the day the option expired, subject to applicable withholding taxes.  For example, if you had vested stock options exercisable at $25.00, and the stock closing price on the date those options expired was $65.00, we will pay you $40.00 times the number of Expired Options.  The payments available to **you** individually are set forth on the enclosed Statement of Offer (*Exhibit A*).  For your convenience, we have enclosed publicly available data reflecting the closing price of the Company's common stock on the option expiration date.

As consideration for the payment described in this letter, you must execute and return to the Company a release of claims in the form attached as *Exhibit B* to this letter ("Payment and Release").  The Payment and Release makes clear that your choice to accept the cash payment is a full and complete resolution of any and all claims you may have associated with the Expired Options.  Because the Payment and Release affects your rights and precludes litigation with the Company (including preclusion of your participation in the lawsuit described below), you should review it carefully before signing it.

On or about May 23, 2008, Mr. Ravi P. Rawat filed a putative class action complaint against the Company (the "Complaint") related to the option expiration issue. Mr. Rawat's Complaint was filed in the United States District Court for the Northern District of Illinois (Case No. 1:08-cv-03038), and it alleges that the Company breached stock option agreements with those who hold Expired Options. The Complaint also alleges that the Company breached "an implied covenant of good faith and fair dealing" in connection with the Expired Options. The Company does not believe that it has an obligation to compensate individuals for the Expired Options or that the claims set forth in the Complaint are valid, and we intend to vigorously contest all of the relief Mr. Rawat seeks.

This one-time opportunity will be available to you until August 1, 2008. If you choose to take advantage of this offer, the process will be as follows: *Execute the Payment and Release. Return it to Mr. Howard Kuppler, Navistar International Corporation, 4201 Winfield Road, P.O. Box 1488, Warrenville, IL 60555 no later than August 1, 2008. If we receive the executed Payment and Release on or before July 3, 2008, unless you direct otherwise we will mail a check in the amount of your payment, less applicable withholding taxes, to your home address on or before July 31, 2008. If we receive the executed Payment and Release on or before August 1, 2008, unless you direct otherwise we will mail a check in the amount of your payment, less applicable withholding taxes, to your home address on or before August 29, 2008.*

Your execution and return of the Payment and Release constitutes your acceptance of this offer.

If you have questions not answered in this letter, please contact Howard Kuppler at (630) 753-2149.

*Annette*

Attachments:

Exhibit A – Statement of Offer
Exhibit B – Payment and Release

Exhibit B

## PAYMENT AND RELEASE

Execution of this Payment and Release constitutes acceptance of the offer reflected in that certain letter dated June 20, 2008, from Annette Freund (the "Freund Letter").

**General Release.** For adequate and valuable consideration exchanged between the parties, the sufficiency of which is hereby acknowledged, _____ ("Releasor"), on behalf of Releasor and on behalf of Releasor's past, present and future respective predecessors, successors, heirs, assigns and any of the respective owners, members, managers, partners, principals, directors, officers, agents and employees of any of the foregoing, with full understanding of the contents and legal effect of this release, and having the right and opportunity to consult with counsel and a tax advisor, hereby releases and forever discharges Navistar International Corporation. (the "Company" or "Releasee") and its parents, subsidiaries, affiliates, related companies, agents, heirs, assigns, attorneys, lenders, and insurers, and any of the respective owners, members, managers, partners, principals, directors, officers, agents and employees of any of the foregoing, from any and all judgments, claims, demands, grievances, damages or causes of action of any kind or nature whatsoever, whether in contract (express or implied), covenant of good faith and fair dealing (express or implied), tort, statutory, or otherwise, whether legal or equitable, that Releasor has or may have in any way related to Releasor's stock options, whether in the money or out of the money, that expired during the period when there were certain limits on Releasor's ability to exercise Releasor's vested stock options ("Expired Options"), including but not limited to the claims described in the putative class action complaint filed against the Company by attorney Clinton A. Krislov on behalf of Mr. Ravi P. Rawat in the United States District Court for the Northern District of Illinois (Case No. 1:08-cv-03038), and as described in the Freund Letter.

**Covenant Not to Sue.** A "covenant not to sue" is a legal term which creates a promise not to file a lawsuit in court. It is different from the General Release of claims contained above. Besides waiving and releasing the claims covered by the General Release, Releasor further agrees never to sue the Company in any forum for any reason covered by the General Release language in the above paragraph. Notwithstanding this Covenant Not to Sue, Releasor may bring a claim against the Company to enforce this Payment and Release.

1

**Payment/Consideration.** In consideration for this Release, the Company shall pay Releasor a cash payment in the amount set forth in the Statement of Offer attached as Exhibit A to the Freund Letter, which Exhibit A is incorporated by reference as if fully set forth herein. Releasor acknowledges and agrees that the Company has no obligation to compensate Releasor for the Expired Options.

**Taxes.** Releasor agrees that all tax liability which may result from the payment of money as set forth herein rests with Releasor alone.

**Consultation With Legal Counsel, Advisors.** By signing this Release, Releasor expressly acknowledges that Releasor has had the opportunity to consult with legal counsel and a tax advisor of Releasor's choosing prior to signing this Release if Releasor so desires.

**Governing Law.** This Release will be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and/or to be performed in that State, without regard to any choice of law provisions thereof.

**Complete Agreement.** Except as provided herein, this Agreement supersedes all prior and contemporaneous agreements of any kind between the parties relating to the Expired Options.

**Severability.** If any provision of this Release is invalid or unenforceable, the balance of this Release will remain in effect, and if such provision is inapplicable to any person or circumstance, it will nevertheless remain applicable to all other persons and circumstances.

THIS IS A FULL AND FINAL RELEASE – I HAVE READ, UNDERSTOOD AND VOLUNTARILY AGREED TO THE TERMS OF THIS RELEASE BEFORE SIGNING.

Executed this _____ day of _____, 2008.


_____
Releasor

2

## TRANSACTION SUMMARY

| Transaction Type | Action that Can be Taken |
|---|---|
| Cashless Exercise of Stock Options | NOT ALLOWED until the Company is current with its public filings. |
| Cash Exercise of Stock Options | Allowed if optionee exercising stock options is an accredited investor see below for definition of accredited investor), however shares issued would be restricted and any sale of the shares would be governed by Rule 144 (See Rule 144 below). |
| Stock Swap Exercise of Stock Options | Allowed if optionee exercising the options is an accredited investor (see below for definition of accredited investor), however shares issued would be restricted and any sale of the shares would be governed by Rule 144 (See Rule 144 below). |

1. Definition of Accredited Investor: (i) is a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of the purchase of the securities exceeds $1,000,000; or (ii) is a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

2. Summary of Rule 144: Shares can only be sold after 2 years if not an affiliate of the Company *or* until 1 year has passed and all of the Company's financial statement filings are current. Any sale must also comply with the other limitations of Rule 144.

XOP1255NAV

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAVI P. RAWAT, on behalf of      )
himself and others similarly     )
situated,                        )
                                 )
                  Plaintiff,     )
                                 )   Case No. 08 C 3038
                                 )
-vs-                             )   Chicago, Illinois
                                 )   June 26, 2008
                                 )   9:30 o'clock a.m.
NAVISTAR INTERNATIONAL           )
CORPORATION,                     )
                                 )
                  Defendant.     )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN W. DARRAH

APPEARANCES:

For the Plaintiff:        KIRSLOV & ASSOCIATES, LTD.
                          MR. CLINTON A. KRISLOV
                          MR. JEFFREY MICHAEL SALAS
                          20 North Wacker Drive
                          Suite 1350
                          Chicago, Illinois 60606

For the Defendant:        LATHAM & WATKINS LLP
                          MR. CARY R. PERLMAN
                          MR. ROBERT C. LEVELS
                          MS. ROBIN M. HULSHIZER
                          233 South Wacker Drive
                          5800 Sears Tower
                          Chicago, Illinois 60606

Court Reporter:

                          Mary M. Hacker
                     Official Court Reporter
                  United States District Court
              219 South Dearborn Street, Suite 1426
                     Chicago, Illinois  60604
                  Telephone:  (312) 435-5564

1          THE CLERK:  08 C 3038, Rawat versus Navistar

2     International.

3          MR. SALAS:  Good morning, your Honor.  Jeff Salas

4     for the plaintiff, Rawat.

5          THE COURT:  Good morning, Mr. Salas.

6          MR. PERLMAN:  Good morning, your Honor.  Cary

7     Perlman, Robin Hulshizer and Robert Levels for the defendant

8     Navistar.

9          THE COURT:  Good morning, Mr. Perlman, Ms.

10    Hulshizer, Mr. Levels.

11          All right.  This matter comes on this morning on

12    plaintiff's emergency motion to prevent the defendant from

13    contacting the putative class members.

14          I read the motion and I read the communication that

15    purportedly has been sent to the employees, and I read that

16    release.  What do you have to say to this?

17          MR. PERLMAN:  Thank you, your Honor.

18          I have three things to say.  And I might be a

19    little more loquacious here than I would if we had a chance

20    to file these papers.  I would appreciate your indulgence.

21          First of all, let me --

22          THE COURT:  Hold it a second.  I mean, the reason

23    we're in here is because apparently without notice your

24    clients did this.

25          MR. PERLMAN:  Correct.

1          THE COURT:  I mean, unless we can claim that we

2    don't have enough time to respond.

3          MR. PERLMAN:  No, no -- well, I'm saying normally I

4    would have given you some background in -- let me start back

5    then.

6          My clients did send that message to --

7          THE COURT:  To how many employees?

8          MR. PERLMAN:  -- to 50, I believe, your Honor.

9          And let me say, starting back and then moving

10   forward, my clients sent that message because my clients have

11   a right to send that message.  The Seventh Circuit law is

12   absolutely clear that there is a right to send communications

13   to putative class members.

14         And as this Court, the Northern District of

15   Illinois, has recently noted, citing that Seventh Circuit

16   decision, a district court has limited power to restrict

17   communications between defendants and putative class members

18   before the class is even certified.

19         And, therefore, under both the Supreme Court

20   decision of Gulf Oil and the Seventh Circuit decision of

21   Williams v. Chartwell Financial Services -- that's a Seventh

22   Circuit decision from 2000, it's at 204 F3d 748 -- there is

23   nothing improper about contacting --

24         THE COURT:  Why don't you give me that cite again.

25   Do you have a paper there that you can provide me with, or is

1    that just your working notes?

2            MR. PERLMAN:  Well, I have a draft of the

3    opposition we're preparing.  I don't mind handing it up if

4    your Honor is willing to accept a draft.

5            THE COURT:  Sure.  Hand it up.

6            MS. HULSHIZER:  Here's a copy for you.  We were

7    working on it all night, your Honor, so it probably has

8    typos.

9            THE COURT:  Okay.

10       (Document tendered.)

11           THE COURT:  We will take a brief recess.

12           MR. PERLMAN:  I want to mention one other thing,

13   your Honor.

14           THE COURT:  Hold on a second.  I'll be right back.

15           MR. PERLMAN:  Sorry.

16       (Brief recess was taken.)

17           THE CLERK:  08 C 3038, Rawat versus Navistar

18   International Corporation.

19           THE COURT:  Sorry for the delay, folks.

20           MR. SALAS:  No problem, your Honor.

21           THE COURT:  Briefly, Counsel.  You can complete

22   your argument.

23           MR. PERLMAN:  Yes, your Honor.

24           Now that your Honor has had an opportunity to read

25   the draft, I'll be very, very brief.  I just wanted to make

1    two quick points in addition to the jurisdictional point,

2    which your Honor is already aware of.

3         What actually happened here, by way of facts, so

4    that you have an understanding of the context, is not that

5    our client, Navistar, tried to undercut anything in

6    connection with a putative class action case, which we

7    believe to be without basis, but, rather, the reverse.

8         As the attachments to the complaint revealed, the

9    company had already communicated with the 56 individuals who

10   this problem affected.  We knew that their stock options were

11   expiring, there was nothing to be done about it, or it was

12   not prudent to do anything about it until the company was

13   current with its accounting practices.

14        And we told the people, all of them, in January --

15        THE COURT:  I read the letter, I read the proposed

16   release.  I know what it says.

17        MR. PERLMAN:  Okay.  Thank you, your Honor.

18        And my only point is, after the board of directors

19   acted in June, we made good on the promise we made to these

20   people in January to communicate the result.

21        At that time --

22        THE COURT:  Say that again.

23        MR. PERLMAN:  I'm sorry.

24        THE COURT:  You made a promise to somebody in

25   January to communicate a result?  What --

1          MR. PERLMAN:  A result of the board of directors'

2    decision as to what they were going to do about the expired

3    stock option issue.

4          THE COURT:  And you made a promise to whom?

5          MR. PERLMAN:  To all of the people who were

6    affected by this.

7          THE COURT:  When did you make that promise?

8          MR. PERLMAN:  In January of '08.  I can pass it up.

9    It's a --

10         THE COURT:  When did the board meet?

11         MR. PERLMAN:  June 16th of '08.

12         THE COURT:  I see.

13         The board didn't meet between January and June, is

14    that right?

15         MR. PERLMAN:  Pardon, your Honor?

16         THE COURT:  Would you read that back?

17    (Record read.)

18         MR. PERLMAN:  The board did meet between January

19    and June, but until the company was current with its

20    accounting practices -- which happened on May 30th, is when

21    they filed, approximately, the 2007 annual report -- it

22    wasn't -- the company couldn't go to the board, or it wasn't

23    prudent to go to the board to take this step.

24         So the problems were, restatement required that

25    these blackouts be (unintelligible), people couldn't exercise

1    their options.  We told people in January --

2              THE COURT:  I'm not talking about that.  I'm

3    talking about a promise that you purportedly made to your

4    employees that you would go to the board, and you made that

5    promise in January.  And you're saying that it was the board

6    activity in June which triggered this letter.

7              MR. PERLMAN:  That is correct, your Honor.

8              THE COURT:  All right.  My question is, did the

9    board meet between January and June?  And if they did, why

10   didn't you advise your clients of the board's -- why didn't

11   the board consult and give you the wherewithal to advise the

12   employees prior to June?

13             MR. PERLMAN:  The answer to that, your Honor, is

14   because what we told the employees was that we'll go to the

15   board at the point that the 10Ks for 2006 fiscal year and

16   2007 fiscal year are current.  That didn't happen until May

17   30th.

18             The very next board meeting, after we promised we

19   would go to the board, was June 16th.  The board acted.  We

20   then made good on the promise we made in January of '08, five

21   months before the case was filed, that we would communicate

22   the result of that to the 56 affected people, and we did,

23   your Honor.

24             THE COURT:  All right.  Counsel?

25             MR. SALAS:  Yes, your Honor.

 1              First, I'll take issue with the January letter.

 2    The January letter was not a promise --

 3              THE COURT:  Excuse me one second.

 4         (Brief pause.)

 5              THE COURT:  I'm sorry.

 6              MR. SALAS:  Thank you, your Honor.

 7              The January letter wasn't a promise but, rather, an

 8    open-ended commitment to sometime raise this with the board.

 9    Restatements often take years, four to five years at some

10    point.

11              And the company is under the obligation to pay for

12    these expired options now, whether the financials are current

13    --

14              THE COURT:  Why don't we address the issue -- I was

15    just curious, and the reason I questioned counsel about the

16    timing is that he apparently was suggesting that this letter

17    to the putative class members was a direct result of some

18    action by the board that could only have been taken by June.

19    That is or is not persuasive.

20              Why don't you address the issue of communication

21    with the putative class members by the defendant.

22              MR. SALAS:  Sure, your Honor.

23              We filed this complaint on May 23rd, 2008, and

24    served it six days later, on May 29th.  Around June 11th

25    counsel for the defendants called us and asked for an

1    extension of time.  They were due to respond July 18th.  I

2    believe they asked to respond by July 8th, which for

3    convenience of counsel we granted that response.

4         Two days ago, while their motion to extend time was

5    before this Court, we received notice from a putative class

6    member who received the letter that you've noted as Exhibit

7    -- or I've noted as Exhibit C and that you mentioned earlier.

8         THE COURT:  The June 20th letter?

9         MR. SALAS:  The June 20th letter.

10        And notably, this letter is two days after the time

11   to respond and after we had granted this extension.

12        Now, this letter is a coercive attempt for putative

13   class members to release the claims against the company,

14   specifically mentioning our case.

15        What happens is that -- not only that, it's a

16   sweepstakes offer:  Here is free money, we don't think we

17   have to pay you but we're going to if you send us back these

18   releases by August 1st, and we'll pay you sooner if you get

19   them back to us by July 3rd.  And that is before even the

20   time to respond to the complaint is due for the defendants.

21        So basically this was a coercive act to undermine

22   this litigation and try to cut the head off the litigation.

23        THE COURT:  I've read the cases that you have

24   provided.  The first case that counsel for the defense asked

25   me to look at is a Seventh Circuit opinion written by former

1   Chief Judge Flaum.  Among other things that the Court was

2   resolving in that case was an issue regarding the district

3   court's entrance of a protective order limiting the

4   plaintiffs from contacting the putative class members.

5       And Judge Flaum, in a typical scholarly opinion,

6   cites Gulf Oil, which shows up in both of your papers as a

7   somewhat seminal pronouncement by the United States Supreme

8   Court.  And it's 452 U.S. -- I've got the abbreviated cite,

9   at 100, and that part of the cite is used by Judge Flaum in

10  his opinion.

11      He says, quote, "The decision to grant a protective

12  order is a discretionary one to be used by the courts to

13  control the course of class action litigation.  The

14  discretion to issue such orders has been vested with trial

15  courts because it is well recognized that class actions

16  present opportunities for abuse as well as problems for

17  courts and counsel in the management of cases.  Because of

18  the potential for abuse, a district court has both the duty

19  and the broad authority to exercise control over a class and

20  enter appropriate orders governing conduct of counsels and

21  parties."

22      And then discussing the stay -- the protective

23  order, I should say, that was entered by the district court,

24  Judge Flaum goes on to say, quote, "The district court's

25  decision as to the protective order must involve a careful

1    balancing of potential for abuse created by the class action
2    and the right of the plaintiffs to contact potential class
3    members."
4        Now, again, let me emphasize that in that case
5    plaintiffs were precluded from contacting their own putative
6    clients, possible class members.
7        Back to the opinion, quote, "Because this balancing
8    is involved and because this area involves important
9    competing concerns, an order limiting discovery communication
10    between parties and potential class members should be based
11    on a clear record and specific findings that reflect a
12    weighing of the need for a limitation and the potential
13    interference with the rights of the parties."  And again,
14    citing Gulf Oil.
15        (Continuing:)  "The plaintiffs had challenged the
16    district court's protective order arguing that the order
17    unconstitutionally deprived them of relevant documents which
18    were also the subject of the protective order and put them at
19    a disadvantage in responding to a summary judgment motion."
20        So the district court erred in not setting out with
21    more specificity the reasons for protecting communication
22    with the putative class members and the matter was remanded
23    for further hearing on that issue.
24        Now, in this case -- pardon me.  And counsel for
25    the defense has also cited an opinion which is remarkably

1    close to the facts of this case and extremely instructive.

2    And that's Eshelman versus OrthoClear Holdings, and that can

3    be found at 2007 Westlaw 1429.  It's a district court opinion

4    from the Northern District of California.

5         In that case plaintiff sought to represent a class

6    consisting of persons and entities who had purchased or

7    otherwise acquired certain shares of stock by the defendant,

8    OrthoClear Holdings.

9         After the plaintiff filed the lawsuit, there was an

10   attempt by the plaintiff and the defendant to resolve the

11   issue through settlement discussions.  Settlement discussions

12   were then abandoned by the parties, and shortly thereafter,

13   the defendant sent a package of information to potential

14   class members, similar to what we have here.  Although we

15   don't have any evidence that there was any attempt at

16   settlement, there was a hiatus in the proceedings requested

17   by the defendant.

18        Did the defendant ask for some brief continuance or

19   brief extension, or something of that nature?

20        MR. SALAS:  Yes.

21        THE COURT:  In the OrthoClear case, as I said,

22   there was some information, a package of information sent to

23   the putative class members with regard to the claim asserted

24   in the class action.  Plaintiffs thereafter moved to limit

25   the defendant's contact with the putative class.

 1         Now, in that case the Court held that plaintiffs

 2    had not met their burden to show that intervention was

 3    warranted.  And again, they are citing Gulf Oil.

 4         So it's clear that precertification correspondence

 5    between the parties is appropriate but that right is not

 6    unfettered.

 7         To the extent that the communication of the class

 8    members is misleading, coercive or attempted to assert undue

 9    influence over the putative class members, restriction in

10    those kind of communications can be appropriately limited.

11         Now, in the OrthoClear case the district court

12    denied prohibiting communication between the defendant and

13    the putative class members because, as I said, the plaintiff

14    had failed to make a showing, admit their burden of proving

15    or persuading the Court that the information was potentially

16    misleading or intimidating and sealed material information or

17    attempted to influence the decision of the putative class

18    members.

19         They noted in that case that, first of all,

20    defendants represented that they were planning to extend a

21    deadline by which a potential class member could accept or

22    reject the offer, thus granting potential class members

23    additional time to consider the offer and consult with

24    counsel, or contact plaintiff's counsel if they chose.  Here

25    I note there is a deadline.  There's an August deadline, I

 1  believe, is there not?
 2          In addition, in the OrthoClear case, the putative
 3  class members had contact information regarding plaintiff's
 4  counsel.
 5          Now, looking at the information that was sent to
 6  the 50 or so employees that held the options, there's
 7  language to this extent, quote, "This one-time opportunity
 8  will be available to you until August 1st, 2008", end quote.
 9  Now, that implies that no settlement at any other time in
10  this litigation will be available.
11          It refers to the lawsuit filed in the Northern
12  District of Illinois.  It does not identify the lawyers
13  representing plaintiffs, nor give any direction as to how
14  they could be contacted.  Although in the release there's a
15  statement, quote, "By signing this release, releasor
16  expressly acknowledges that releasor has had the opportunity
17  to consult with legal counsel and a tax advisor of releasor's
18  choosing prior to signing this release, if releasor so
19  desires."
20          In addition, there is a general release, extremely
21  broad, excusing Navistar -- or releasing Navistar from any
22  and all judgments, claims, demands, grievances, damages or
23  causes of action of any kind or nature whatsoever, whether in
24  contract, paren, expressed or implied, covenant of good faith
25  and fair dealing, expressed or implied, tort, statutory or

1    otherwise, whether legal or equitable, that releasor may have

2    in any way, in any way, related to releasor's stock options.

3         And then it goes on to say, "Including but not

4    limited to the claims described in the putative class action

5    filed against the company by Attorney Clinton A. Krislov on

6    behalf of Mr. Ravi P. Rawat."

7         Now, the plaintiffs in their papers make the

8    assertion that doesn't accurately set out the options of the

9    class holders; that, in fact, the value of the options may be

10   greater than what's being offered to settle the case.

11        MR. SALAS:  Yes, your Honor, absolutely.

12        THE COURT:  Do you want to speak to that?

13        MR. SALAS:  Absolutely, your Honor.

14        An employee stock option is the right to buy

15   company stock at a specific price, dated on the date of --

16   that's unrelated here but it's a larger issue.

17        So when an employee exercises that option, they can

18   hold -- they pay the price of, we'll say $10.  The employee

19   was granted a stock option on January 1st at $10.

20        Regardless of the price of the stock, whether it

21   goes up or down -- and Navistar's stock has continued to go

22   up.  I believe at the beginning of the blackout period it was

23   at about $28, and as soon as last week it was 75, between the

24   75 and $70 range.

25        And the employee has a way to exercise that option

1   and either hold the stock or sell the stock.  If he sells the

2   stock -- or he or she sells the stock, there's an instant tax

3   burden and cash gain.

4        So, for instance, you have an option at $10, you

5   exercise it at $10 and the stock happens to be at 20, there's

6   an immediate $10 gain.  If you sell that stock right away,

7   you have a $10 tax burden.  If you hold the stock, which in

8   this case if the putative class members would have exercised

9   the stock at anywhere between 20 and $30 and held, that stock

10  would be worth over $75 today, whereas the offer cuts it off

11  the day that particular option expired.

12       And that's not really the pertinent date, simply

13  because if the employee decided to hold that stock, it could

14  hold -- it could hold it forever, hold it until the company

15  is bought or ends or until that person dies and really reap

16  the benefits of the growth in the company, whereas here it's

17  basically giving cash off, or cutting off the date of which

18  the -- on the date of which the option expired, which could

19  be back in October, when the stock was trading at $45.

20       So it's an evidence to discount the claim, in other

21  words, without consulting class counsel, and just kind of --

22  and sometimes these are going to be substantial amounts of

23  money.  So people are going to be very coerced to take this

24  simply because it's a one-time offer.  You're never going to

25  get any more money, and it's going to be cash and we'll get

1    it to you as soon as possible.

2         THE COURT:  Could this offer preclude a settlement

3    of this case later on?

4         MR. PERLMAN:  Your Honor, I think the case law is

5    clear --

6         THE COURT:  I'm not asking about the case law.  I'm

7    asking regarding the intention of your client.  Is this it?

8    Must this matter be litigated if they don't take this offer?

9         MR. PERLMAN:  In no way has any determination been

10   made about that.  The only determination that's been made

11   about the merits of this case is that there's no subject

12   matter jurisdiction.

13        THE COURT:  Hold on.  We'll get to that in a

14   minute.  Right now I'm going to ask you to address the issue

15   that's before me.

16        MR. PERLMAN:  Sure.  I apologize.  If I didn't

17   answer the question, I -- it was not my intent to avoid it.

18        THE COURT:  The question is, have your clients

19   absolutely precluded any settlement of this matter at a later

20   time after August 1st?

21        MR. PERLMAN:  Absolutely not, your Honor.  We've

22   had no discussions of that with our client, no such decision

23   has been made.

24        THE COURT:  The second paragraph on the last page

25   says, "This one-time opportunity will be available to you

1   until August 1st, 2008."

2           MR. PERLMAN:  That is correct, your Honor.

3           THE COURT:  (Continuing:)  "If you choose to take

4   advantage of this offer, the process will be as follows", and

5   then you go on.

6           Do you think that fairly implies that there will

7   never be any settlement of this dispute, or there will never

8   be any offer made by your clients to resolve this other than

9   the one that terminates on August 1st?

10          MR. PERLMAN:  Respectfully, your Honor, I disagree

11  with that interpretation.

12          What it says is that the cash offer that we're

13  making now, which was the one that the board authorized us to

14  make and that we promised we would go to the board with at

15  the appropriate time, extends for six weeks, which is much

16  longer than the ten days that several courts found were

17  sufficient amounts of time to not be coercive.  We purposely

18  erred way on the other side because we weren't -- we didn't

19  want to be --

20          THE COURT:  What about the one-time offer?  Do you

21  think that might have a coercive or intimidating effect, or

22  no?

23          MR. PERLMAN:  I don't think so, your Honor.  I

24  think -- I mean, in every case that I've ever been in that

25  settled, people periodically make offers.  The other side is

1    always free to say, no, I want to litigate the case.  I want

2    to join up with Mr. Krislov, whose name we identified in the

3    release and the case that we identified in the release, and

4    they can take their chances litigating with us, if they

5    prefer.

6            THE COURT:  What about this:  What if I direct the

7    parties not to accept any offer before August 1st?

8            MR. PERLMAN:  Well --

9            THE COURT:  What if I direct the defendant not to

10   accept any offer until August 1st?

11           MR. PERLMAN:  I'm not sure what the basis would be

12   for your Honor --

13           THE COURT:  Well, you just represented that you're

14   keeping this offer open until August 1st, which is far longer

15   than the ten-day period that some courts have found to be

16   appropriate.

17           MR. PERLMAN:  Correct, your Honor.

18           THE COURT:  And that the parties will have the

19   benefit of almost a month to consult with counsel, tax

20   advisors and the like before making a decision.  And I

21   thought that was the import of the comment you just made

22   regarding the date for termination of acceptance as being

23   longer than a ten-day period.

24           Now, what if we then say that any offer transmitted

25   prior to August 1st cannot be accepted?

1          MR. PERLMAN:  Well, I guess what I'm missing, your

2     Honor, is if --

3          THE COURT:  No.  I'm the one that is missing

4     something here.

5          MR. PERLMAN:  Okay.  I'm sorry.

6          THE COURT:  I think I just said, do you think this

7     would be coercive or intimidating, and you said, no, they've

8     got 30 days in which to see professional people to get

9     advice.

10          MR. PERLMAN:  Yes, your Honor.

11          THE COURT:  Well, what if we just then preclude you

12     from accepting any offer until that 30-day period has lapsed?

13          MR. PERLMAN:  What that's doing is telling the

14     people who have chosen to accept the offer and want their

15     money, that we can't make good on the offer we have made.

16          THE COURT:  No, we're not saying you can't make

17     good.  We're saying that there's a court that has told you it

18     can't be accepted until August 1st.

19          And if you really want to say something, you say

20     the Court was concerned that maybe they should further

21     explore all their options and seek legal counsel before they

22     exercise their offer.  I mean, that's what you just told me

23     you thought your client was doing by providing this 30-day

24     window.

25          MR. PERLMAN:  Well, what we were doing, your Honor,

1   was making sure that we didn't skate close to any of the

2   cases that found these communications should be coercive or

3   inappropriate.  And I don't think we were close to any of

4   these cases.

5           THE COURT:  Okay.  What would be the harm, then, to

6   give everyone in the case, the putative class, everyone

7   that's received one of these letters, the opportunity to

8   fully consider this up to the termination date of August 1st?

9           MR. PERLMAN:  They all do have the opportunity to

10  consider up to August 1st.

11          THE COURT:  All right.  I think we'll make that

12  part of the order.

13          How many people are in the class?

14          MR. PERLMAN:  At the maximum, 56.

15          THE COURT:  So the cat's -- the cow is out of the

16  barn, or whatever metaphor is appropriate.  The letter has

17  already been sent.

18          I'm going to enter an order today -- do you want to

19  say anything further regarding release?

20          MR. SALAS:  Yes, your Honor.

21          Any corrective notice that goes out to the putative

22  class should also explain that they do have legal rights

23  under this putative class action.  Basically they just refer

24  to a case and say, oh, there's a case out there, you have to

25  release your -- you have to release your claims in that case,

 1    but we're not going to tell you what it's about, what it's
 2    regarding; that it alleges that the expired stock options is
 3    a breach of contract and that you may be -- you are a part of
 4    this case, when we don't even know if 56 people is the end
 5    all-be all.  We're open to filing an amended complaint and
 6    expanding the class, if that's possible.
 7         And also, we don't know if -- you know, there's
 8    other -- our client did not get one of these letters because
 9    it only went to the parties who were not in litigation with
10    the company.
11         So we're not sure exactly of the lay of the land.
12    We're open to having discussions with the defendants.  But I
13    think that it should make clear that they would be part of
14    this putative class, and this is mainly the claims they are
15    releasing rather than all -- and all claims regarding stock
16    options are basically part of our case.
17         THE COURT:  I'm citing from Eshelman versus
18    OrthoClear -- let me read the full cite into the record.  The
19    OrthoClear case cites the Manual for Complex Litigation,
20    21.12, Fourth Edition, 2004.  I looked at that as well, and
21    then there's some federal court opinions currently also
22    addressing it.
23         That provision says, quote, "Defendants and their
24    counsel generally may communicate with potential class
25    members in the ordinary course of business, including

1    discussing settlement before certification, but may not give

2    false, misleading or intimidating information, conceal

3    material information or attempt to influence a decision about

4    whether to request exclusion from class certification under

5    Rule 23(b)(3)", end quote.

6           And based on the information that's been placed

7    here before me today, particularly the covering letter and

8    the release itself, as I said, the general nature of the

9    release, the statement in the covering letter regarding the

10   advantages to accepting the offer, as well as any meaningful

11   identification of counsel for the putative class,

12   particularly insofar as giving the putative class members the

13   wherewithal to communicate with counsel, I'm going to direct

14   the defendants not to accept any offer until -- when does the

15   offer period close, August 1st?

16           MR. LEVELS:  August 1st.

17           THE COURT:  -- August 1st.  And no offer received

18   before August 1st will be deemed to be accepted until further

19   order of court.

20           And I'll also authorize the plaintiffs to

21   communicate with the class members and convey to them that

22   the plaintiffs are representing the putative class, and that

23   the plaintiffs can be contacted at a certain address, e-mail

24   address and telephone number.

25           And borrowing from the language of OrthoClear, you

1    may tell the putative plaintiffs -- and I'll accept

2    suggestions from both sides.  I'm looking at Page 3 of the

3    Westlaw printout, and the language I'm focusing on,

4    "necessary to evaluate the offer and make an informed

5    decision as to whether or not to release their claims."

6              Any objection to that language?

7              MR. PERLMAN:  Other than my general objections of

8    process, I have no objection to the language.  I would only

9    point out that it obviously has to be fair in both contexts.

10             I mean, in order to not be misleading, the people

11   have to know that if they opt for litigation, that they're

12   litigating and that our position will be that they don't get

13   anything.  And if Mr. Krislov convinces them that's

14   inappropriate, then they will opt into the class, or at least

15   they would if there was enough people to have a class.

16             THE COURT:  Well, the other side of the coin is we

17   don't tell them that so they don't know that they have those

18   advantages.

19             MR. PERLMAN:  I'm not going to reargue it, your

20   Honor.  You've made your decision, so I don't think it's

21   worth --

22             THE COURT:  Well, I'm looking for direction from

23   you.

24        (Mr. Krislov approached the podium.)

25             MR. PERLMAN:  We identified for them that there was

1    a case, we identified the number, we identified Mr. Krislov

2    by name.  These are not a thousand people who spent an extra

3    quarter for suit.  These are senior executives of the company

4    who are entitled -- not entitled, but who have offers for

5    tens of thousands of dollars.

6              If they have the name of a person, they can dial,

7    you know, 411.  Indeed, not only could they do that, they did

8    do that.  People who wanted to talk to them, because we

9    identified them, apparently have already called them.

10   There's nothing misleading in the communication.

11             THE COURT:  How many people have called?

12             MR. KRISLOV:  We got -- sorry, your Honor.  Clint

13   Krislov.

14             I have been handling this IACLE panel the whole

15   day, and so I'm on a lunch break.

16             THE COURT:  Good morning, Mr. Krislov.

17             How many people called?

18             MR. KRISLOV:  The number of people that called were

19   -- there was the one mysterious caller who refused to give

20   his name --

21             THE COURT:  How many people have called?

22             MR. SALAS:  I think only one.

23             MR. KRISLOV:  I think only one.

24             THE COURT:  What information do you have that

25   several people have called?

1     MR. PERLMAN:  I don't think I said several.  If I

2     did, I misspoke.

3          The moving paper said that he had been contacted by

4     putative class members.  That's my basis for saying that.

5          MR. KRISLOV:  Your Honor, if we could draft a

6     fairly neutral letter --

7          THE COURT:  I'll ask you to meet and confer and

8     draft a letter that simply advises that the putative class --

9     that a lawsuit has been filed seeking to represent a class of

10    which the recipient may be a member, and that the attorneys

11    representing the lawsuit are, and then set out your names,

12    telephone number, business address and e-mail.  Why don't we

13    just leave it at that?

14         MR. SALAS:  Sure, your Honor.

15         One more thing.  And I'm not necessarily clear on

16    the --

17         THE COURT:  These people are all intelligent senior

18    CEO type people -- senior executives.  Being advised of the

19    name and address and e-mail account address of someone

20    representing the other side couldn't possibly do any harm,

21    could it?

22         MR. KRISLOV:  Well, they already have a contact --

23    they have already been told to contact Mr. Kuppler in the

24    letter.  So what we would draft is a letter saying what your

25    Honor has ruled, and that they can contact us if they wish,

1    but that they should contact -- they may wish to contact

2    their own independent counsel.

3          One of the problems is they're saying -- in the

4    releases they're saying that they've had an opportunity to

5    consult independent lawyers, counsel and tax advisors, which

6    clearly is not the case for people who sent it in by

7    July 3rd.  But --

8          THE COURT:  Have you received any releases?

9          MR. PERLMAN:  Yes, your Honor.

10          THE COURT:  How many?

11          MR. PERLMAN:  Four.

12          THE COURT:  What is your position in that regard?

13    Maybe I spoke too soon.

14          MR. KRISLOV:  We would like to know who the

15    releases are from, and we would like to --

16          THE COURT:  Originally -- I don't know if you were

17    in the room.  I originally was going to preclude any

18    acceptance of releases until the full period had run on

19    August 1st.  And based on defense counsel's comments, I

20    thought that would be reasonable.  I thought that's what you

21    were alluding to, that they had the full period of time to

22    consider it.  And I thought you were almost conceding that

23    you would keep that period open until --

24          MR. PERLMAN:  It is open.  I just thought -- I want

25    to make sure we weren't miscommunicating.

1      They have the ability, because of the payroll, to

2  get it -- if they get it to us by the beginning of June,

3  July, they can get their money the end of July or they can

4  wait until August.  Nobody has to reply before August 1st.

5  They have six weeks to consider this.

6      THE COURT:  Do you see any harm to preclude you

7  from accepting any offers until August 30th?

8      MR. PERLMAN:  Well, the harm, your Honor, is that

9  the people who, as you say, are sophisticated types and want

10  their money and already sent in an acceptance, are expecting

11  to get it in July and don't get it.

12      THE COURT:  Okay.  How can we communicate with them

13  and tell them that they have until August 1st to reconsider

14  their decision and here is the name of the person that's

15  representing the plaintiffs?  Maybe that's what you ought to

16  say.

17      MR. KRISLOV:  We'll do a very neutral letter for

18  your approval.

19      THE COURT:  You'll have to get it back here this

20  afternoon.

21      MR. KRISLOV:  Pardon?

22      THE COURT:  You'll have to get it back here this

23  afternoon.

24      MR. SALAS:  Sure, absolutely.

25      MR. PERLMAN:  Okay.

1          THE COURT:  Your point is a good one -- counsel, I
2     forgot your last name.  I'm sorry.
3          MR. PERLMAN:  Mr. Perlman.  That's quite all right,
4     your Honor.
5          THE COURT:  Mr. Perlman, your point is a good one.
6     If someone has made a decision to accept the offer that was
7     informed, that was based on material information and was not
8     unduly influenced, I agree with you, that they should have
9     the advantage of having their money in hand as soon as
10    possible.
11          I'll ask you to meet and confer and draft a letter
12    that advises them that they have up to the August 1st
13    deadline to reconsider, and here is plaintiff's counsel's
14    name, address, e-mail address, and that if they've made -- if
15    they have already accepted, that they still have until
16    August 1st to consider their decision, something of that
17    nature.
18          MR. KRISLOV:  I mean, is it feasible to put in --
19    and I don't want to overreach, but we do think that the offer
20    is inadequate and certainly doesn't spell out the tax
21    ramifications to these people.
22          THE COURT:  I'll ask you not to do that.
23          MR. PERLMAN:  May I ask for a very modest
24    modification of your proposed order, your Honor?
25          THE COURT:  Sure.

1          MR. PERLMAN:  The date that the checks would go out

2     for the people who accept by July 3rd, I believe, is

3     July 29th, which would still be over a month from now.  It

4     would be difficult for us to send the checks, then have

5     somebody say on July 31st they're reconsidering.  I would

6     suggest that we tell them they can reconsider up until

7     July 29th and notify us by then if they change it.

8          THE COURT:  All right.  I'll agree to that.

9          And if you would also put in there that if they

10     don't wish to reconsider, they can simply contact you -- to

11     contact you and that the check will be issued on the 29th of

12     June, something of that nature.

13          MR. KRISLOV:  Your Honor, I would object to -- I

14     mean, that's really not neutral.  That's almost encouraging

15     them to call them and tell them to go ahead and cut them the

16     check.

17          And they have not -- I mean, I think nobody could

18     have sent a release in at this point and had adequate tax

19     advice, because these people are going to pay ordinary income

20     tax on these amounts, and the offer we think is inadequate.

21          And so, you know, we're willing -- we think it

22     makes sense to hold everything until at least the August 1st

23     deadline, and we'll have -- we'll be able to deal with these

24     issues -- well, I know you won't be here, but we'll be able

25     to deal with these in an appropriate timeframe after that.

1    And the fact that they might have to wait a month or so more

2    might actually wind up having them get a fair offer.

3              THE COURT:  You can say -- no, I'm not going to do

4    that.

5              You can say that a lawsuit has been filed and you

6    can think of some short, brief statement of your cause of

7    action if you're claiming thus and so.

8              MR. KRISLOV:  Okay.

9              THE COURT:  Simply that.

10             MR. KRISLOV:  Uh-huh.

11             THE COURT:  A brief statement of your cause of

12   action, that a lawsuit has been filed stating a cause of

13   action; that the attorneys representing this claim will be

14   moving to represent a class of people that are affected by

15   the claim, that would benefit from the claim.  That law firm

16   is, and then set the name down.

17             MR. KRISLOV:  Okay.

18             THE COURT:  Okay?

19             And then if you also advise them in there that

20   should they -- that no offer will be deemed to be -- that you

21   have up to -- what did you say, Mr. Perlman?

22             MR. PERLMAN:  July 29th.

23             THE COURT:  -- July 29th to consider the offer and

24   the offer will remain open to them.

25             MR. KRISLOV:  I think the offer is open to

1    August 1st anyway.

2         THE COURT:  Well, we're going to do it August --

3         MR. KRISLOV:  It doesn't make any sense to shorten

4    that time.

5         THE COURT:  What if we say, if you communicate that

6    you wish to accept the offer -- yes, you were going to keep

7    it open until August 1st anyway.  You would have cut those

8    checks for those people the next --

9         MR. PERLMAN:  No, your Honor.  That's not what the

10   proposal is.  We were talking about the people who get us the

11   acceptances by July 3rd.  Those checks would have gone out on

12   or before July 31st.  So I need to know a couple days before

13   cutting those checks if somebody is going to reconsider.

14        After we send somebody a check for $56,000, I don't

15   want to find out on August 1st that, oh, actually they have

16   reconsidered and they want to be part of the class.

17        THE COURT:  What's wrong with cutting a check on

18   August 1st?

19        MR. PERLMAN:  That isn't when -- these are going to

20   go out with the regular payroll.  Payroll for the whole

21   company goes out at the end of the month.

22        THE COURT:  What's the harm of cutting five or six

23   checks, or whatever the amount is?  What is it, four right

24   now?

25        MR. PERLMAN:  There's four right now, as of last

1    night, yes, your Honor.

2            I can do that, your Honor.  I'm not going to --

3            THE COURT:  We'll let it stand at that.

4            MR. PERLMAN:  I'm not going to argue.  I understand

5    your concern.

6            THE COURT:  Okay.

7            My concern is this:  I want to give all the

8    putative class members an opportunity to consider the offer

9    made by the defendant in light of an understanding of the

10    nature of the suit that's been filed and the parties that are

11    representing the putative class.  Those people that want to

12    persist in their acceptance of your offer, after having that

13    opportunity, can do so as long as they communicate that to

14    you before August 1st.

15            MR. PERLMAN:  Understood, your Honor.

16            THE COURT:  Okay.

17            MR. KRISLOV:  Can we have the list of all the

18    people, both current and former employees, that are in the

19    class?  Because as I understand it, there --

20            THE COURT:  You will not communicate to anybody

21    else until we resolve this.  Do you intend on doing that?

22            MR. PERLMAN:  Other than the letter that you're

23    talking about, your Honor?

24            THE COURT:  Other than this letter, Mr. Perlman.

25            MR. PERLMAN:  The only issue that I can identify is

1    that the offer identifies not a lawyer but somebody in the HR

2    Department for the people to call if they have any questions.

3    I can't stop them from calling.  I can instruct that person,

4    per your Honor's suggestion, to make sure that they identify

5    -- that any call received, that they identify Mr. Krislov and

6    his phone number.  But to go beyond -- you know, the

7    opportunity to consult seems to me to be going way further

8    than any of the cases suggest.

9         THE COURT:  You're not contemplating sending

10   another letter out?

11        MR. PERLMAN:  We were not, your Honor.

12        THE COURT:  Okay.  I will ask you not to do that

13   until you advise the Court.

14        MR. KRISLOV:  The problem that we have is they're

15   going to be calling up -- is it Kuppler?

16        MR. PERLMAN:  That is correct, Howard Kuppler.

17        MR. KRISLOV:  They're going to be calling up Howard

18   Kuppler and we don't want any -- he is an inadequate person

19   to give them their full and fair explanation.

20        THE COURT:  Well, let's get the word out as to the

21   nature of your claim, very short, very brief statement, and

22   the parties to whom they should direct their contact.

23        MR. KRISLOV:  And can they turn over to us the

24   names of anybody --

25        THE COURT:  We'll get to that.  That's not before

1   me now.

2       Off the record.

3      (Discussion had off the record.)

4       MR. PERLMAN:  Thank you, your Honor.

5       For the record, we will be filing momentarily the

6   motion to dismiss that I described, along with, by the end of

7   the day, the affidavit of someone who can verify that the

8   putative class is probably less than 100 people.

9       THE COURT:  Okay.

10      MR. PERLMAN:  Thank you, your Honor.

11      THE COURT:  Thank you all.

12      MR. KRISLOV:  Thank you, your Honor.

13     (Which were all the proceedings heard.)

14          CERTIFICATE

15    I certify that the foregoing is a correct transcript

16  from the record of proceedings in the above-entitled matter.

17

18  _____  _____

  Mary M. Hacker       Date

19  Official Court Reporter

20

21

22

23

24

25

# EXHIBIT D

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 08 C 3038 | DATE | 6/30/2008 |
| CASE TITLE | Ravi B. Rawat vs. Navistar International Corp. | | |

**DOCKET ENTRY TEXT**

Plaintiff's emergency motion for a protective order [18] is granted in part and denied in part. Enter Order.

■ [ For further detail see separate order(s).]          Docketing to mail notices.

| | Courtroom Deputy Initials: | MF |
|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAVI P. RAWAT, on behalf of himself
and others similarly situated,

          Plaintiff,

v.

NAVISTAR INTERNATIONAL
CORPORATION,

          Defendant.

)
)
)
)  Case No. 08-cv-03038
)
)
)  Judge John W. Darrah
)
)  Magistrate Judge Nan R. Nolan
)
)
)
)
)

## ORDER

WHEREAS, having considered Ravi P. Rawat's Emergency Motion for a

Protective Order to Prevent Defendant from Contacting Putative Class Members and

Soliciting Releases, it is HEREBY ORDERED:

The motion is granted in part and denied in part. Defendant is to send corrective notice to

the putative class in the form attached hereto as Exhibit A.

SO ORDERED this 30th day of June, 2008.

John W. Darrah
United States District Court Judge

EXHIBIT A

 Navistar, Inc.
4201 Winfield Road
Warrenville, IL 60555  USA

P : 630-753-3052
W : navistar.com

Annette M. Freund
Vice President,
Compensation, Benefits
and HR Support

June 27, 2008

## NOTICE:  THIS MAY AFFECT YOUR LEGAL RIGHTS

To all recipients of the June 20, 2008 letter from Annette Freund, Vice President, Compensation, Benefits and HR Support of Navistar International Corporation:

Dear _____:

You received a letter offering a cash payment and soliciting your release of claims relating to Navistar Stock Options.

Releases sent to the Company before August 1, 2008 will not be effective until August 1, 2008.  Anyone who had previously sent releases to the Company may reconsider your release until August 1, 2008.  If you choose to reconsider, you have until August 1, 2008 to deliver a revocation to Mr. Howard Kuppler, Navistar International Corporation, 4201 Winfield Road, P.O. Box 1488, Warrenville, IL 60555.

A class action case, *Rawat v. Navistar Int'l Corp.*, 08cv3038 (N.D. Ill.), seeks to certify a class consisting of persons with vested stock options that expired during the period when trading restrictions were in place.  The lawsuit claims that Navistar is obligated to compensate you for any resulting harm because of your inability to exercise your options before they expired.

For any inquires regarding *Rawat v. Navistar Int'l Corp.*, you may contact the following counsel:

**Clinton A. Krislov, Esq.**
**KRISLOV & ASSOCIATES, LTD**
**Civic Opera Building**
**20 North Wacker Drive, Suite 1350**
**Chicago, IL 60606**
**Phone: (312) 606-0500**
**Fax:    (312) 606-0207**
clint@krislovlaw.com

You may also contact legal counsel of your choice.

# EXHIBIT E

McAfee® - about - McAfee, Inc. Extends Stock Options Exercise Pe...    http://www.mcafee.com/us/about/press/corporate/2007/2﹍070108_2...

# McAfee®

## McAfee Inc. Extends Stock Options Exercise Period Due to Trading Blackout

SANTA CLARA, Calif., Jan. 8 /PRNewswire-FirstCall/ McAfee, Inc. (NYSE: MFE) today announced that on January 7, 2007, the Board of Directors of McAfee, Inc. ("McAfee" or the "Company") took the actions described below regarding stock options granted to certain current and former employees and a current director that have either expired or would otherwise expire during the period in which the Company is not current in its reporting obligations under the Securities Exchange Act of 1934, as amended (the "1934 Act"). In effect, the Company has extended (subject to certain exclusions and limitations) the post-termination exercise period for stock options until such time as the Company becomes current in its reporting obligations under the 1934 Act. In addition to the actions described below, McAfee may take additional actions with respect to stock options.

The Board approved an amendment (the "Amendment") to certain unexpired stock option agreements (the "Applicable Agreements") issued pursuant to any of the Company's employee or director stock option plans (except for stock option agreements of current or former Section 16 officers and directors, other than Robert Dutkowsky, a director who will be resigning from the Board no later than January 31, 2007) where the optionee's employment or service with the Company terminates or has terminated and whose ability to exercise the vested portion of outstanding options to purchase Company common stock would otherwise expire before, or within 89 days after, the Company again becomes current in its reporting obligations under the 1934 Act. During such time that the Company is not current in its reporting obligations under the 1934 Act, the Company has suspended the issuance and sale of shares of its common stock pursuant to its registration statements on Forms S-8 filed with the Securities and Exchange Commission. The Amendment provides that the post- termination exercise period set forth in the Applicable Agreements shall be extended such that the optionee may exercise the vested portion of his or her option until 90 calendar days following the date upon which the Company again becomes current in its reporting obligations under the 1934 Act. However, in no event will any optionee whose option term has been extended be permitted to exercise his or her option later than the expiration of the term of the option or December 31, 2007.

The Board also approved an amendment to the stock option agreements of the Company's former chief executive officer, George Samenuk. This amendment provides that the post-termination exercise period set forth in the applicable agreements of Mr. Samenuk shall be extended for 30 days from January 7, 2007.

With respect to stock options of certain former employees that expired on or before January 7, 2007 who are not eligible for an extension of the post- termination exercise period (except for stock options held by certain former senior executive officers and current or former Section 16 officers and directors), the Board approved a plan to provide cash consideration for such expired options. The cash payment will occur subsequent to the Company becoming current in its reporting obligations under the 1934 Act and will be based upon an average closing price of the Company's common stock.

As a result of the aforementioned actions, the Company expects to record charges for stock-based compensation expense within an estimated range of $25 million to $45 million on a pre-tax basis. The substantial majority of these charges are non-cash in nature, and will affect several periods commencing with the fourth quarter of 2006. The above estimates are subject to a number of assumptions and actual results may differ, perhaps materially. The exact amount of the charge, and the resulting tax and accounting implications, are subject to final review by the Company and its independent auditors.

As previously disclosed on December 22, 2006, McAfee took action to unilaterally amend certain stock options granted to former executive officers and current directors. McAfee took the corrective actions to address certain findings from the Company's stock option review and the related potential 2006 tax consequences arising from Internal Revenue Code Section 409A. In the case of the former executive officers, the exercise prices of the unexercised portion of their grants were adjusted upward to match the stock price on the date Compensation Committee approval was obtained or employment commenced.

Subsequent to McAfee's unilateral action on December 22, 2006 to reprice Mr. Samenuk's option grants, the Company and Mr. Samenuk executed an addendum to his stock option agreements regarding the actions described below.



McAfee® - about - McAfee, Inc. Extends Stock Options Exercise Pe...    http://www.mcafee.com/us/about/press/corporate/2007/20070108_2...

A stock option covering 300,000 shares of common stock granted on May 4, 2004, to Mr. Samenuk with an exercise price of $16.57 per share was amended to increase the exercise price on the unexercised portion of such stock option (46,250 shares) to $16.75 per share, an amount equal to the fair market value of the underlying shares of common stock on the revised measurement date of July 21, 2004, the date on which the Compensation Committee approval was obtained.

A stock option covering 420,000 shares of common stock granted on January 16, 2002, to Mr. Samenuk with an exercise price of $25.43 per share was amended to increase the exercise price to $27.19 per share, an amount equal to the fair market value of the underlying shares of common stock on the revised measurement date of January 15, 2002, the date on which Compensation Committee approval was obtained.

## Forward-Looking Statements:

This press release contains forward-looking statements regarding actions to be taken with respect to the expired stock options of certain former employees, the nature, timing and expected amounts of the charges that will be taken related to the extension and cashing out of stock options held by certain current and former employees and directors and future actions which may be taken with respect to stock options. These forward looking statements are subject to risks and uncertainties and actual results could vary, perhaps materially, from those anticipated. These risks and uncertainties include that the charges that McAfee may ultimately take may be taken during different periods or may be larger than currently anticipated. The forward-looking statements contained in this report are also subject to other risks and uncertainties, including those more fully described in McAfee's filings with the SEC including its annual report on Form 10-K for the year ended December 31, 2005, and its quarterly report for the first quarter of 2006 filed on Form 10-Q.

## About McAfee, Inc.

McAfee Inc., the leading dedicated security technology company, headquartered in Santa Clara, California, delivers proactive and proven solutions and services that secure systems and networks around the world. With its unmatched security expertise and commitment to innovation, McAfee empowers home users, businesses, the public sector, and service providers with the ability to block attacks, prevent disruptions, and continuously track and improve their security. www.mcafee.com

NOTE: All product and company names herein may be trademarks of their respective owners. McAfee, VirusScan, AntiSpyware and Avert are registered trademarks of McAfee, Inc. and/or its affiliates in the US and/or other countries. McAfee Red in connection with security is distinctive of McAfee brand products. All other registered and unregistered trademarks herein are the sole property of their respective owners.

SOURCE McAfee, Inc.

Rate this page

\ \

# EXHIBIT F

8-K 1 body8k.htm 8-K

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report: **September 28, 2007**
(Date of earliest event reported)

# MAXIM

# Maxim Integrated Products, Inc.
*(Exact name of registrant as specified in its charter)*

| **Delaware** | **0-16538** | **94-2896096** |
|---|---|---|
| *(State of other jurisdiction of incorporation)* | *(Commission File Number)* | *(I.R.S. Employer Identification Number)* |

**120 San Gabriel Drive**
**Sunnyvale, California    94086**
*(Address of principal executive offices including zip code)*

**(408) 737-7600**
*(Registrant's telephone number, including area code)*

**Not Applicable**
*(Former Name or Former Address, if Changed Since Last Report)*

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))



**Item 5.02     Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

Maxim Integrated Products, Inc. (the "Company") suspended stock option exercises starting September 23, 2006 as a result of not having timely filed its periodic reports on Form 10-K and Form 10-Q with the Securities and Exchange Commission (the "Commission") under the Securities Exchange Act of 1934, as amended, because of the previously-announced Special Committee inquiry into certain past stock option grants and granting practices, as well as the Company's need to restate certain historical financial statements to record additional stock-based compensation expense as a result of that inquiry. The Company will continue to prohibit the exercise of stock options until the Company completes its financial restatement and becomes current in its reporting obligations with the Commission.

During the period which the exercise of stock options has been and will be suspended, stock options held by current and former employees have expired and will expire due to the expiration of their 10-year terms. The Company has implemented a program to provide cash payments to individuals who hold options granted from September 1996 through March 1998 that expire due to their maximum 10-year terms. This program will terminate following the completion of the financial restatement and the Company becoming current in its reporting obligations with the Commission.

Under this program, the Company will make a cash payment to the holder of a stock option that expires as a result of reaching its 10-year term during the period that stock options may not be exercised. For options expiring on or before September 30, 2007, the cash payment will equal $33.06 minus the exercise price of the option multiplied by the number of shares, less applicable tax withholding. For options expiring after September 30, 2007, the cash payment will be based on the amount the "calculated value" of the option exceeds the exercise price multiplied by the number of shares, less applicable tax withholding. For this purpose, the "calculated value" is equal to the price at which 10% of the daily close prices of the Company's common stock fall above this price for trading days from August 7, 2006 through the expiration date of the option. The cash payment will be subject to the option holder executing a release of all claims relating to the option. Approximately 525 individuals will be eligible for this program, and the aggregate payments are expected to total approximately $98 million, subject to adjustment as a result of future changes in the Company's stock price until the program terminates. The Company expects that stock options covering approximately 5,153,753 shares will expire as a result of reaching their 10-year term and such options will no longer be outstanding. The Company expects to incur a compensation expense equal to the amount of cash paid out under the program.

Named executive officers of the Company hold stock options that are eligible to participate in the program and they will participate on the same terms and conditions that apply to all other program participants. The following table sets forth the estimated cash payments that the Company expects to make under the program to its named executive officers:

2

| Option Holder Name | Option Grant Date | Option Expiration Date | Option Exercise Price | Number of Expired Options (a) | Cash Payment Amount before applicable tax witholding |
|---|---|---|---|---|---|
| Tunç Doluca | November 19, 1996 | November 19, 2006 | $9.50 | 69,476 | $1,636,854.56(b) |
| | October 27, 1997 | October 27, 2007 | $14.5313 | 193,120 | $3,578,262.54(c) |
| Rich Hood | November 19, 1996 | November 19, 2006 | $9.50 | 117,928 | $2,778,383.68(b) |
| | October 27, 1997 | October 27, 2007 | $14.5313 | 153,120 | $2,837,114.54(c) |
| Pirooz Parvarandeh | October 27, 1997 | October 27, 2007 | $14.5313 | 160,000 | $2,964,592.00(c) |
| Vijay Ullal | November 19, 1996 | November 19, 2006 | $9.50 | 69,476 | $1,636,854.56(b) |
| | October 27, 1997 | October 27, 2007 | $14.5313 | 160,000 | $2,964,592.00(c) |

a. These options expired in accordance with their terms on the tenth (10th) anniversary of the grant date in accordance with the Company's 1996 Stock Incentive Plan and applicable stock option agreement.
b. The cash payment amount equals $33.06 less the exercise price of the option multiplied by the number of shares.
c. The cash payment amount is estimated because it is dependent upon the closing price of the Company's common stock until the date the option expires as more fully described in the third paragraph of above. For this purpose, the cash payment amount assumes that it is equal to $33.06 less the exercise price of the option multiplied by the number of shares.

The form of release of claims applicable to all individuals who receive a cash payment, including the named executive officers, is attached hereto as Exhibit 10.1 and is incorporated herein by reference.

3

**Item 9.01.   Financial Statements and Exhibits.**

(d) Exhibits.

The following exhibit is filed herewith:

08CV4305
JUDGE BUCKLO
MAGISTRATE JUDGE ASHMAN
NF

| Exhibit No. | Description |
|---|---|
| 10.1 | The form of release of claims applicable to all individuals who receive a cash payment, including the named executive officers. |

(All other items on this report are inapplicable.)

4

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

MAXIM INTEGRATED PRODUCTS, INC.

By:  /s/ Bruce Kiddoo

Bruce Kiddoo

*Vice President of Finance*

Date: October 4, 2007

5

# EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 10.1 | The form of release of claims applicable to all individuals who receive a cash payment, including the named executive officers.    PDF |

6

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

|  |  |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>NAVISTAR INTERNATIONAL CORPORATION,<br><br>　　　　　　Defendant. | No. 08 CH 26042<br><br>Judge Richard J. Billik Jr. |

NOTICE OF MOTION

To:    All Counsel of Record
       (See Attached Service List)

       PLEASE TAKE NOTICE that on **7/30**, 2008 at **9:30** a.m. or as soon thereafter as counsel may be heard, the undersigned will appear before the Honorable Richard J. Billik Jr., or any judge sitting in his stead, in the courtroom usually occupied by him in Room 2601 of the Richard J. Daley Center, Chicago, Illinois, and then and there present his **Motion for Class Certification** a copy of which is attached.

Dated:   July 24, 2008

                                        Respectfully submitted,

                                        By:_____
                                              Attorney for Plaintiff

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 N. Wacker Dr., Suite 1350
Chicago, Illinois   60606
Tel.:   312-606-0500
Fax:    312-606-0207

## CERTIFICATE OF SERVICE

I, Jeffrey M. Salas, an attorney, state that I caused a copy of the foregoing Motion to be delivered via the Hand Delivery and U.S. Mail on July 24, 2008 to the counsel below.

_Attorney for Plaintiff_

SERVICE LIST:

Robin Hulshizer
Cary R. Perlman
Latham & Watkins LLP
233 South Wacker Drive
5800 Sears Tower
Chicago, IL 60606
(312) 876-7700

Laurence Harvey Levine
Laurence H. Levine Law Offices
190 South LaSalle
Suite 3120
Chicago, IL 60603
312 927 0625

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | |
| Plaintiff, | No. 08 CH 26042 |
| v. | Judge Richard J. Billik Jr. |
| NAVISTAR INTERNATIONAL CORPORATION, | |
| Defendant. | |

## MOTION FOR CLASS CERTIFICATION

NOW COMES Plaintiff Ravi P. Rawat on behalf of himself and those similarly

situated, for his Motion for Class Certification.

1.    Plaintiff asks this Court to certify a class on behalf of:

all Navistar employees and former employees whose stock
options either expired or who were prevented from
exercising their options during the Navistar's "blackout"
period. (April 6, 2006 – May 29, 2008).

2.    Plaintiff also asks this Court to appoint Ravi P. Rawat lead plaintiff and

Krislov & Associates Ltd. class counsel.

3.    The reasons for this Motion are set forth in the attached Memorandum in

Support.

WHEREFORE, Plaintiff asks this Court to grant his Motion for Class

Certification.

Dated:  July 24, 2008

Respectfully submitted,

Clinton A. Krislov

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Drive, Suite 1350
Chicago, Illinois  60606
Tel.:  (312) 606-0500
Fax:  (312) 606-0207

Law Offices of Mark Baiocchi
184 Shuman Blvd.
Suite 250
Naperville, IL 60563
Tel: (630) 983-4200
Fax: (630) 983-4223

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>NAVISTAR INTERNATIONAL CORPORATION,<br><br>        Defendant. | No. 08 CH 26042<br><br>Judge Richard J. Billik Jr. |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiff Ravi P. Rawat moves for certification of a class and to appoint interim class counsel pursuant to 735 ILCS 5/2-801.

### PRELIMINARY STATEMENT

This case is ideal for class treatment because the claims are based on a single contract (Navistar's Stock Option Plan) and a uniform course of conduct. (Navistar's refusal to allow class members to exercise their stock options, followed by its lowball offer whose terms are identical for all class members and is it is soliciting releases of these claims by members having identical misleading communications with coercive terms and unsupported by adequate consideration.) Plaintiff asks that this Court certify the class of employees and former employees whose options expired during this "blackout period" (April 6, 2006 – May 29, 2008).

### NATURE OF THE ACTION

This case is a refiling of a case filed in the Northern District of Illinois and is brought on behalf of current and former employees of Navistar whose stock options

expired during the Navistar's "blackout period[1]." (in this context, a period during which employee stock options could not be exercised)  Navistar's blackout period began on April 6, 2006 when the Company disclosed that its financials were materially misstated and the Company would have to go through a process to restate those financials.  That process and the black out period continued for over two years until May 29, 2008 when Navistar finally filed its financial statements and brought its filings current.

During the blackout period, Navistar refused to permit employees and former employees to exercise their options, during which a large number of such options expired.   By refusing to permit putative class members to exercise and enforce their option rights, Navistar breached its obligations under those option contracts.

Although the Company did nothing, prior to being sued, to remedy its resulting breach of the employees' right to exercise stock options, once the federal court action was filed the Company set upon a dishonest scheme to thwart the litigation and coercively obtain releases from the putative class members.

## LEGAL STANDARD

Under 735 ILCS §2-801, an Illinois Court will certify a class if four preliminary requirements: (1) Numerosity: the class is so numerous that joinder of all members is impracticable; (2) Commonality: common questions of fact or law exist and predominate over individual questions; (3) Adequacy: the representative parties will fairly and adequately represent the interests of the class; and (4) Appropriateness: a class action is an appropriate method for fairly and efficiently resolving the controversy.  735 ILCS 5/2-801; *Gordon v. Boden*, 224 Ill.App.3d 195 (1st Dist. 1991).  *Clark v. TAP*

---

[1] A blackout period is a period where trading is restricted because Navistar was not up to date with its SEC filings.

2

*Pharmaceutical Products, Inc.,* 343 Ill.App.3d 538, 545 (5th Dist. 2003).

In determining whether to certify the case to proceed for the class, the substantive allegations of the complaint should be taken as true. *TAP Pharmaceutical Products, Inc.,* 343 Ill.App.3d at 545, *citing, Johns v. DeLeonardis,* 145 F.R.D. 480, 482 (N.D.Ill.1992); *Heastie v. Community Bank of Greater Peoria,* 125 F.R.D. 669 (N.D. Ill. 1989).

Indeed, the Appellate Court has noted that the trial court should err *in favor* of maintaining class actions. *TAP Pharmaceutical Products, Inc.,* 343 Ill.App.3d at 545, *citing, King v. Kansas City Southern Industries, Inc.,* 519 F.2d 20, 26 (7th Cir.1975).

Here, the facts are undisputed. Navistar created contract rights for option holders, caused the situation that triggered the blackout period, imposed a blackout period on all exercises, then made identical lowball offers to all class members.

As demonstrated below, this is an ideal case for a class action. Each Section 2-801 prerequisite is clearly satisfied.

## GROUNDS FOR CLASS CERTIFICATION

I.    **Class Certification is appropriate because all putative class members received identical options pursuant to the Company's Stock Option Plan(s) and suffered identical damage, differing only by arithmetic computation.**

Plaintiff asks this Court to certify a class of:

> all Navistar employees and former employees whose stock options either expired or who were prevented from exercising their options during the Navistar's blackout period. (April 6, 2006 – May 29, 2008).

The putative class meets all the requirements for certification under 735 ILCS 5/2-801, as shown below.

Because the stock options at issue were all granted pursuant to a standard document – Navistar's 2004 Performance Incentive Plan or "Stock Option Plan" this case

presents the "classic case for treatment of a class action." *Peterson v. H & R Block Tax Services, Inc.*, 174 F.R.D. 78, 82 (N.D. Ill. 1997)(certifying class of taxpayers who were misled by a standard document)(citing *Haroco Inc. v. American Nat'l Bank & Trust Co.*, 121 F.R.D. 664, 669 (N.D. Ill. 1988)(certifying class of borrowers that were charged a higher interest rate than advertised.)

### THE PROPOSED CLASS

Plaintiff brings this case for himself and for the following class:

> all Navistar employees and former employees whose stock options either expired or were unable to exercise options during the Company's blackout period. (April 6, 2006 – May 29, 2008).

The Class satisfies all the prerequisites for certification under 735 ILCS 5/2-801.

**A.      The Class is so Numerous that Joinder is Impracticable**

Under 735 ILCS 2-801, a class must be so numerous that joinder is impracticable. As the Illinois Appellate Court pointed out, there is no "magic number" below which there cannot be a class, but above which there can. *Wood River Area Development Corp. v. Germania Federal Sav. and Loan Ass'n*, 198 Ill.App.3d 445, 450 (5th Dist.1990). In *Wood River Area Development*, the Court followed the principle that:

> "***If the class has more than forty people in it, numerosity is satisfied***; if the class has less than twenty-five people in it, numerosity probably is lacking; if the class has between twenty-five and forty, there is no automatic rule and other factors, * * * * become relevant." *Miller*, An Overview of Federal Class Actions: Past, Present, and Future, Federal Judicial Center, at 22 (1977).

*Id.* (emphasis added).

Here, Defendant has conceded that there are at least 56 Class members. It is

reasonable to conclude that the Class is so numerous and dispersed that joinder of all

class members would be impracticable. Accordingly, the numerosity requirement of

Section 2-801(1) is satisfied.

> **B.**    **Commonality Exists and Predominates: Plaintiff is a Former Employee who was Prohibited from Exercising his Vested Stock Options.**

Commonality is met and predominates here because the damage to Plaintiff and

the Class is the result of Navistar's uniform conduct. Specifically, Navistar breached its

option contracts when it prohibited employees and former employees to exercise their

stock options during the Company's blackout period.

A class action can properly be prosecuted where the defendants allegedly acted

wrongfully in the same basic manner as to an entire class; and in such circumstances, the

common class questions predominate the case; and the class action is not defeated. *TAP*

*Pharmaceutical Products, Inc.*, 343 Ill.App.3d at 548-549 *citing, Gordon v. Boden*, 224

Ill.App.3d at 201. The commonality requirement is satisfied if there is a common

question linking the class members that is substantially related to the outcome of the

litigation. *Purcell & Wardrope, Chartered v. Hertz Corp.*, 175 Ill.App.3d 1069, 1074

(1st Dist. 1988). "A common question may be shown when the claims of the individual

members of the class are based on the common application of a statute or they were

aggrieved by the same or similar misconduct." *McCarthy v. LaSalle National Bank &*

*Trust Co.*, 230 Ill.App.3d 628, 634 (1st Dist. 1992), *appeal denied*, 146 Ill. 2d 631(1992),

*citing Miner v. Gillete Co.*, 87 Ill.2d 7(1981) *cert. granted*, 456 U.S. 914 (1982), *cert.*

*dismissed*, 459 U.S. 86 (1982).

In *Lee v. Allstate Life Ins. Co*, 361 Ill.App.3d 970, 975 (2d Dist. 2005), a breach

of contract action where Allstate intentionally misled its policyholders regarding the

justification for a price increase, the Illinois Appellate Court agreed that the class should

be certified because "all of the proposed class members entered into the same type of

Allstate insurance contract with the same terms in question and that all of the proposed

class members potentially became subject to the same type of . . . rate increase after the

same federal tax law change in 1990, despite varying explanations for the increase and

varied losses by the class members." Specifically, the Appellate Court, *Lee* noted that:

> In *P.J.'s Concrete*, we held that where a defendant is alleged to have acted wrongfully in the same basic manner toward an entire class, the trial court reasonably could find that there are common questions of law or fact that predominate over questions affecting only individual members. *P.J.'s Concrete*, 345 Ill.App.3d at 1003, We cited the well-known rule that satisfaction of the prerequisite pertaining to predominating common questions of fact or law necessitates a showing that successful adjudication of the purported class representatives' individual claims will establish a right of recovery or resolve a central issue on behalf of the class members. P.J.'s Concrete, 345 Ill.App.3d at 1003; see also *Weiss v. Waterhouse Securities, Inc.*, 208 Ill.2d 439, 452 (2004).

*Id.*, citing *P.J.'s Concrete Pumping Service, Inc. v. Nextel West Corp.*, 345 Ill.App.3d 992, 1002, (2004).

Here, like *Lee*, this Court is presented with a situation where each class member

was entitled to the same contractual rights to exercise their stock options before those

options expired. Defendant's practice of allowing, instituting and maintaining a blackout

period whereby class members could not exercise his or her options is the only factual

inquiry in this case. Further, as described in Plaintiff's Motion for a Preliminary

Injunction, the class has received solicitations that deceitfully asked class members to

release their claims.

"So long as questions of fact or law common to the class predominate over questions affecting only individual members of the class, the statutory requisite is met." *TAP Pharmaceutical Products, Inc.*, 343 Ill.App.3d at 548-549 *citing, Steinberg v. Chicago Medical School,* 69 Ill.2d 320, 338 (1977).

"[A] class action will not be defeated solely because of some factual variations among class members' grievances.'" *TAP Pharmaceutical Products, Inc.*, 343 Ill.App.3d at 548-549, And, individual questions of injury and damages do not defeat class certification. *TAP Pharmaceutical Products, Inc.*, 343 Ill.App.3d 538 at 548-549.

There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including whether:

(a)     Navistar was obligated to institute a blackout period;

(b)     the blackout period option exercise denial was appropriately imposed on all option holders;

(c)     Navistar breached its contractual obligations under the Stock Option contracts;

(d)     Navistar breached its duty of good faith and fair dealing in connection with the Stock Option contracts;

(e)     Navistar's communication to putative class members was coercive and misleading; and

(f)     Navistar is liable to the Plaintiff and the Class in this action, as alleged in the Complaint.

All common questions are able to be resolved through the same factual occurrences as specifically and/or generally alleged herein.

### C.    Plaintiff is an Adequate Class Representative.

This prerequisite requires that "the representative parties will fairly and adequately represent the interest of the class." Section 2-801(3).  The purpose of the adequate representation requirement is merely to ensure that all class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim." *Gordon v. Boden*, 224 Ill.App.3d at 203, *citing Purcell & Wardrope, Chartered v. Hertz Corp.*, 175 Ill.App.3d 1069, 1078 (1st Dist. 1988).  Thus, there must be no conflicts of interest between the class representatives and the class members they seek to represent.  *Slimack v. Country Life Insurance Co.*, 227 Ill.App.3d 287, 299 (5th Dist. 1992), *appeal denied*, 146 Ill.2d 652 (1992).  Additionally, the named plaintiff's attorneys must be competent and qualified to prosecute the action on behalf of the class. *Garcia v. Rush-Presbyterian-St. Luke's Medical Center*, 80 F.R.D 254 (N.D. Ill 1978). Both of these requirements are satisfied.

Plaintiff and each class member were victimized by and sustained similar practices.  Plaintiff has no interests antagonistic to the interests of the Class.  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no claims antagonistic to those of the Class.  Plaintiff has retained competent and experienced counsel in complex class actions, including shareholder, mass tort and products liability litigation.  Counsel is committed to the vigorous prosecution of this action.

### D.    Class Action Treatment is Appropriate and Necessary to Protect the Class' Interests

To satisfy the "appropriate method" requirement, the plaintiff must demonstrate that the class action (1) can best secure the economies of time, effort, and expense and promote a uniformity of decision or (2) can accomplish the other ends of equity and justice that class actions seek to obtain. *TAP Pharmaceutical Products, Inc.*, 343 Ill.App.3d at 552. A class action is not only a superior method of adjudicating this controversy, it is for all practical purposes the only appropriate method.

Moreover, class members are in need of protection. Class members are predominately mid-level manages and employees who have been deceptively conditioned to view their options as worthless, making them vulnerable to Navistar's lowball offer. It is only because class certification has not yet been ordered that Defendant claims the right to continue dealing direction with the class members.

Many of the class members are current employees or have significant relationships with Navistar and would be dissuaded from bringing this action for fear of retaliation by Navistar. And, should individual actions be brought, a multiplicity of lawsuits would result and cause undue hardship and expense for the Court and the litigants. Class action treatment of this case will minimize the potential for duplication of resources and effort, as well as the possibility of multiple, inconsistent judgments.

Certification of a class in this case will best secure economies of time, effort, and expense and ensure uniformity of decisions, and protect class members from Defendant's overreaching.

The prosecution of separate actions by the Plaintiff and individual members of the Class against the Defendant would create a risk of inconsistent or varying adjudications on the common issues of law and fact related to this action. A class action is superior to

all other available methods for the fair and efficient adjudication of this controversy. The expense and burden of litigation would substantially impair the ability of the Class members to pursue individual cases in order to initiate their rights. In the absence of a class action, the Defendant will retain the benefits of its wrongdoing.

## CONCLUSION

Plaintiff, for himself and for all others similarly situated, prays for an Order determining that this action is a proper class action under 735 ILCS 5/2-801 certifying an appropriate plaintiff Class, and appointing Plaintiff Class representative and his counsel as counsel for the Class.

Dated: July 24, 2008

Respectfully submitted,

Attorney for Plaintiff

Clinton A. Krislov
Jeffrey M. Salas
Krislov & Associates, Ltd.
20 North Wacker Drive, Suite 1350
Chicago, Illinois 60606
(312) 606-0500
clint@krislovlaw.com
jeff@krislovlaw.com

Law Offices of Mark Baiocchi
184 Shuman Blvd.
Suite 250
Naperville, IL 60563
Tel: (630) 983-4200
Fax: (630) 983-4223

# Krislov & Associates, Ltd.

20 North Wacker Drive, Suite 1350
Chicago, Illinois  60606
Telephone: 312-606-0500
Facsimile:  312-606-0207

### Notice of Complaint and Request for Waiver of Formal Service

To:    Navistar International Corporation
       c/o Cary Perlman
       Sears Tower, Suite 5800
       233 South Wacker Drive
       Chicago IL 60606
       312.876.7700 Phone
       312.993.9767 Fax


       Case Title:   Rawat v. Navistar International Corporation, et al.
       Docket No.:   08 CH 26042
       Court: In the Circuit Court of Cook County, Illinois, Chancery Division


       A lawsuit has been commenced against you (or the individuals on whose behalf you are addressed) in the above-titled action.  A copy of the complaint is attached to this notice.

       This is not a formal summons or notification from the court, but rather my request that you sign and return the enclosed waiver of service in order to save the cost of serving you with a judicial summons and an additional copy of the complaint.  The cost of service will be avoided if we receive a signed copy of the waiver within 30 days after the date designated below as the date on which this Notice and Request is sent.  We have enclosed a stamped and addressed envelope for your use.  An extra copy of the waiver is also attached for your records.

       If you comply with this request and return the signed waiver, it will be filed with the court and no summons will be served on you.  The action will then proceed as if you had been served on the date the waiver is filed, except that you will not be obligated to appear or serve an answer to the complaint until 60 days from the date designated below as the date on which this request for waiver of service was sent.

       Further, your compliance with this request does not thereby waive any objection to the venue or to the jurisdiction of the court over your person.  You may refuse to waive service of this summons.  Summons will be served upon you if you do not return the enclosed waiver.

       I affirm that this request is being sent to you on behalf of the plaintiff, this _24_ day of **July, 2008**.


### KRISLOV & ASSOCIATES, LTD.

By: _____

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Drive
Suite 1350
Chicago, IL 60606
(312) 606-0500

F:\CASES\NAVISTAR\WAIVER OF SERVICE NAVISTAR.DOC

To:    Krislov & Associates, Ltd.
       20 North Wacker Drive, Suite 1350
       Chicago, Illinois  60606

Re:    Case Title:  Rawat v. Navistar Int'l Corporation
       Docket No.:  08 CH 26042
       Court: In the Circuit Court of the Cook County, Illinois, Chancery Division

### Acknowledgment of Receipt of Complaint and Waiver of Service

I acknowledge receipt of your request that I waive service of a summons in the above-titled action.

I have received a copy of the complaint in the action via messenger, two copies of this instrument, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service of summons and an additional copy of the complaint in this lawsuit by not requiring that Named Defendant, **Navistar International Corporation** be served with judicial process.

**Navistar International Corporation** will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against **Navistar International Corporation** if an answer or appropriate motion is not served upon you within 60 days after the date this request was sent, **July**____, **2008**.


**Named Defendant**_____


_____    by _____
**Date**                        Signature


**Printed / Typed name:**

_____

**Title:** _____

F:\CASES\NAVISTAR\WAIVER OF SERVICE OF SUMMONS.DOC

To:    Krislov & Associates, Ltd.
       20 North Wacker Drive, Suite 1350
       Chicago, Illinois   60606

Re:    Case Title:  <u>Rawat v. Navistar Int'l Corporation</u>
       Docket No.:   <u>08 CH 26042</u>
       Court:  <u>In the Circuit Court of the Cook County, Illinois, Chancery Division</u>

### Acknowledgment of Receipt of Complaint and Waiver of Service

I acknowledge receipt of your request that I waive service of a summons in the above-titled action.

I have received a copy of the complaint in the action via messenger, two copies of this instrument, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service of summons and an additional copy of the complaint in this lawsuit by not requiring that Named Defendant, **Navistar International Corporation** be served with judicial process.

**Navistar International Corporation** will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against **Navistar International Corporation** if an answer or appropriate motion is not served upon you within 60 days after the date this request was sent, **July      , 2008**.

**Named Defendant**_____

_____        by _____
**Date**                          Signature

**Printed / Typed name:**

_____

**Title:** _____

F:\CASES\NAVISTAR\WAIVER OF SERVICE OF SUMMONS.DOC

(This form replaces CCM 0009)                          CCG N009-200M-6/5/03(                    )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY _____ DEPARTMENT/Chancery _____ DISTRICT

FILED - 2

2008 JUL 18 PM 3 07

CIRCUIT COURT OF COOK
COUNTY, ILLINOIS No.
CHANCERY DIV.

DOROTHY BROWN

08CH26042

Ravi P. Rawat, et al.

_____
                            Plaintiff

                    v.

Navistar International Corporation.

_____
                            Defendant

Claimed $: _____

Return Date: _____

Court Date: _____

Room No.: _____

_____
        Address of Court District for Filing

## APPEARANCE AND JURY DEMAND*

☑ **General Appearance**    ☑ 0900 - Fee Paid          ☐ 0909 - No Fee
                            ☐ 0904 - Fee Waived        ☐ 0908 - Trial Lawyers Appearance - No Fee

☑ **Jury Demand***          ☐ 1900 - Appearance and Jury Demand/Fee Paid
                            ☐ 1909 - Appearance and Jury Demand/No Fee Paid

The undersigned enters the appearance of:    ☑ **Plaintiff**    ☐ **Defendant**

Ravi P. Rawat
_____
        (Insert Litigant's Name)

_____
                        Signature

☑ **Initial Counsel of Record**    ☐ Pro Se (Self-represented)
☐ **Additional Appearance**        ☐ Substitute Appearance

☑ **ATTORNEY NO.:** 91198          ☐ **PRO SE:** 99500

(Please complete the following contact information.)

Name: Krislov & Associates, Ltd.

Atty. for: Plaintiff

Address: 20 North Wacker Drive, Suite 1350

City/State/Zip: Chicago, IL 60606

Telephone: 312.606.0500

*Strike demand for trial by jury if not applicable.

I certify that a copy of the within instrument was served on all parties who have appeared and have not heretofore been found by the Court to be in default for failure to plead.

> ### *Important*
>
> *Once this Appearance form is filed, photocopies of this form must be sent to all other parties named in this case (or to their attorneys) using either regular mail, facsimile transmission (fax) or personal delivery. (See Illinois Supreme Court Rules 11 and 13 for more information.)*

_____
                            Attorney for

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

(Rev. 12/4/00)  CCCH 0623

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT /CHANCERY DIVISION

FILED - 2

2008 JUL 18 PM 3: 5

CIRCUIT COURT OF COOK
COUNTY, ILLINOIS
CHANCERY DIV.

DOROTHY BROWN    CLER

# 08CH26042

Ravi P. Rawat et al.
_____
                                        Plaintiff

        v.                                                  Case No. _____

Navistar International Corporation
_____
                                        Defendant

## CHANCERY DIVISION CIVIL COVER SHEET

A Chancery Division Civil Cover Sheet shall be filed with the initial complaint in all actions filed in the Chancery Division.  The information contained herein is for Administrative purposes only and shall not be introduced into evidence.  Please check the box in front of the appropriate category which best characterizes your action being filed.

005  _____    **Administrative Review**
006  _____    **Change of Name**
001  ✓          **Class Action**
002  _____    **Declaratory Judgment**
004  _____    **Injunction**
008  _____    **Mechanic's Lien**
003  _____    **Mortgage Foreclosure**

007  _____    **General Chancery**
     _____    **Accounting**                         _____    **Partition**
     _____    **Arbitration Awards**              _____    **Quiet Title**
     _____    **Certiorari**                             _____    **Quo Warranto**
     _____    **Dissolution of Corporation**    _____    **Redemption Rights**
     _____    **Dissolution of Partnership**     _____    **Reformation of a Contract**
     _____    **Equitable Lien**                     _____    **Rescission of a Contract**
     _____    **Interpleader**                        _____    **Specific Performance**
     _____    **Mandamus**                          _____    **Trust Construction**
     _____    **Ne Exeat**                             _____    **Other**

                                                By: _____
                                                        Attorney                         Pro Se

Atty. No.: _91198_____

Name:  _Clinton A. Krislov, Krislov & Associates, Ltd.___

Atty. for:  _Ravi P. Rawat_____

Address:  _20 N. Wacker Drive, Suite 1350_____

City/State/Zip:  _Chicago, IL 60606_____

Telephone:  _(312) 606-0500_____

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated,<br><br>        Plaintiff,<br>v.<br><br>NAVISTAR INTERNATIONAL CORPORATION,<br><br>        Defendant. | No. 08 CH 26042<br><br>Judge Richard J. Billik Jr. |

### [PROPOSED] ORDER

On the motion of plaintiff Ravi P. Rawat and it appearing to the Court that there is good cause for so doing, it is therefore ORDERED, ADJUDGED and DECREED that The July 28, 2008 Plaintiff's Motion to Appoint a Special Process Server is:

1.    GRANTED

2.    The Court appoints Jack King of Cadillac Investigations, Inc., 77 West Washington Street, Suite 705, Chicago, IL 60602 ID # 115-000924, as special process server to serve Navistar International Corporation at the office of its registered agent, CT Corporation System, is located at 208 South LaSalle Street, Chicago, IL 60604.

SIGNED this ___ day of _____ 2008.

Clinton A. Krislov
KRISLOV & ASSOCIATES, LTD
20 North Wacker Drive, Suite 1350
Chicago, IL 60606
312.606.0500

_____
Hon. Richard J. Billik Jr.
Circuit Court, Cook County,
County Department, Chancery Division

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>NAVISTAR INTERNATIONAL CORPORATION,<br><br>    Defendant. | No. 08 CH 26042<br><br>Judge Richard J. Billik Jr. |

NOTICE OF EMERGENCY MOTION

To: All Counsel of Record
   (See Attached Service List)

  PLEASE TAKE NOTICE that on July 30, 2008 at 9:30 a.m. or as soon thereafter as counsel may be heard, the undersigned will appear before the Honorable Richard J. Billik Jr., or any judge sitting in his stead, in the courtroom usually occupied by him in Room 2601 of the Richard J. Daley Center, Chicago, Illinois, and then and there present his Emergency Motion for a Temporary Restraining Order to Temporarily Prevent Defendant from Accepting Releases or To Invalidate the Releases Executed by Putative Class Members Until the Court Can Adjudicate Plaintiff's Motion for a Preliminary Injunction a copy of which is attached.

Dated: July 29, 2008

          Respectfully submitted,

          By:_____
            Attorney for Plaintiff

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 N. Wacker Dr., Suite 1350
Chicago, Illinois  60606
Tel.:   312-606-0500
Fax:   312-606-0207

## CERTIFICATE OF SERVICE

I, Jeffrey M. Salas, an attorney, state that I caused a copy of the Emergency Motion for a Temporary Restraining Order to Temporarily Prevent Defendant from Accepting Releases or To Invalidate the Releases Executed by Putative Class Members Until the Court Can Adjudicate Plaintiff's Motion for a Preliminary Injunction to be delivered via the Hand Delivery on July 29, 2008 to the counsel below.

_____
Attorney for Plaintiff

SERVICE LIST:

Robin Hulshizer
Cary R. Perlman
Latham & Watkins LLP
233 South Wacker Drive
5800 Sears Tower
Chicago, IL 60606
(312) 876-7700

Laurence Harvey Levine
Laurence H. Levine Law Offices
190 South LaSalle
Suite 3120
Chicago, IL 60603
312 927 0625

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | |
| Plaintiff, | No. 08 CH 26042 |
| v. | Judge Richard J. Billik Jr. |
| NAVISTAR INTERNATIONAL CORPORATION, | |
| Defendant. | |

NOTICE OF MOTION

To:   All Counsel of Record
      (See Attached Service List)

PLEASE TAKE NOTICE that on July 30, 2008 at 9:30 a.m. or as soon thereafter as counsel may be heard, the undersigned will appear before the Honorable Richard J. Billik Jr., or any judge sitting in his stead, in the courtroom usually occupied by him in Room 2601 of the Richard J. Daley Center, Chicago, Illinois, and then and there present his Motion for an Order Nunc Pro Tunc Allowing Plaintiff to File Brief in Excess of Page Limit a copy of which is attached.

Dated:   July 29, 2008

Respectfully submitted,

By: _____
         Attorney for Plaintiff

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 N. Wacker Dr., Suite 1350
Chicago, Illinois  60606
Tel.:   312-606-0500
Fax:   312-606-0207

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | |
| Plaintiff, | No. 08 CH 26042 |
| v. | Judge Richard J. Billik Jr. |
| NAVISTAR INTERNATIONAL CORPORATION, | |
| Defendant. | |

## MOTION FOR AN ORDER *NUNC PRO TUNC* ALLOWING PLAINTIFF TO FILE BRIEF IN EXCESS OF PAGE LIMIT

NOW COMES Ravi P. Rawat, by and through his attorneys and on behalf of those similarly situated to file a brief in excess of the page limit and states:

1.    Plaintiff Ravi P. Rawat filed his Motion for a Preliminary Injunction on July 24, 2008.

2.    Plaintiff's brief is in excess of the thirteen page limit set forth in this Court's January 12, 2007 Standing Order.

3.    Plaintiff's counsel was unaware of the Court's thirteen page limit prior to the brief's original filing.

4.    Plaintiff's Memorandum of Support of His Motion for a Preliminary Injunction is in support of a motion asking for two separate types of relief, to wit, to preliminarily enjoin Defendant from accepting releases and to invalidate or those releases. If Plaintiff would have known of the page limit, he would have separated the motion into two distinct motions. For efficiency purposes, Plaintiff included both requests for relief in a single motion.

WHEREFORE, Plaintiff asks for an order nunc pro tunc allowing Plaintiff leave to file a brief in excess of thirteen pages.

Pursuant to 735 ILCS 5/1-109, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 29, 2008

Respectfully submitted,

_____
Clinton A. Krislov

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Drive, Suite 1350
Chicago, Illinois 60606
Tel.: (312) 606-0500
Fax: (312) 606-0207

Law Offices of Mark Baiocchi
184 Shuman Blvd.
Suite 250
Naperville, IL 60563
Tel: (630) 983-4200
Fax: (630) 983-4223

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | |
| Plaintiff, | No. 08 CH 26042 |
| v. | Judge Richard J. Billik Jr. |
| NAVISTAR INTERNATIONAL CORPORATION, | |
| Defendant. | |

## MOTION FOR AN ORDER *NUNC PRO TUNC* ALLOWING PLAINTIFF TO FILE BRIEF IN EXCESS OF PAGE LIMIT

NOW COMES Ravi P. Rawat, by and through his attorneys and on behalf of those similarly situated to file a brief in excess of the page limit and states:

1.      Plaintiff Ravi P. Rawat filed his Motion for a Preliminary Injunction on July 24, 2008.

2.      Plaintiff's brief is in excess of the thirteen page limit set forth in this Court's January 12, 2007 Standing Order.

3.      Plaintiff's counsel was unaware of the Court's thirteen page limit prior to the brief's original filing.

4.      Plaintiff's Memorandum of Support of His Motion for a Preliminary Injunction is in support of a motion asking for two separate types of relief, to wit, to preliminarily enjoin Defendant from accepting releases and to invalidate or those releases. If Plaintiff would have known of the page limit, he would have separated the motion into two distinct motions. For efficiency purposes, Plaintiff included both requests for relief in a single motion.

WHEREFORE, Plaintiff asks for an order *nunc pro tunc* allowing Plaintiff leave to file a brief in excess of thirteen pages.

Pursuant to 735 ILCS 5/1-109, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 29, 2008

Respectfully submitted,

Clinton A. Krislov

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Drive, Suite 1350
Chicago, Illinois 60606
Tel.: (312) 606-0500
Fax: (312) 606-0207

Law Offices of Mark Baiocchi
184 Shuman Blvd.
Suite 250
Naperville, IL 60563
Tel: (630) 983-4200
Fax: (630) 983-4223

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>NAVISTAR INTERNATIONAL CORPORATION,<br><br>    Defendant. | No. 08 CH 26042<br><br>Judge Richard J. Billik Jr.<br><br>Calendar No. 2 |

## EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER TO TEMPORARILY PREVENT DEFENDANT FROM ACCEPTING RELEASES OR TO INVALIDATE RELEASES EXECUTED BY PUTATIVE CLASS MEMBERS UNTIL THE COURT CAN ADJUDICATE PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

NOW COMES Ravi P. Rawat, by and through his attorneys and on behalf of those similarly situated to file a brief in excess of the page limit and states:

1.  Plaintiff Ravi P. Rawat filed his Motion for a Preliminary Injunction and his Motion for Class Certification on July 24, 2008.

2.  Also on July 24, 2008 Plaintiff served copies of those motions, as well as a copy of the complaint in this action on Defendant's counsel in Plaintiff's federal court case against Navistar.

3.  Defendant's counsel claims that they do not have authority to waive the service of summons in this case and the Cook County Sheriff's Department advised Plaintiff's counsel that the complaint could not be served for at least 15 days.

4.  Plaintiff's counsel filed a Motion to Appoint a Special Process Server with this Court July 28, 2008.

5.    The current federal court injunction freezing the releases expires on August 1, 2008.

6.    The purpose of this Motion is to preserve the status quo until this Court rules on Plaintiff's Motion for a Preliminary Injunction and Plaintiff's Motion for Class Certification.

7.    Plaintiff's Memorandum of Support of His Motion for a Temporary Restraining Order is attached hereto.

WHEREFORE, Plaintiff asks for a Temporary Restraining Order preventing Defendant from accepting releases until this Court has decided Plaintiff's Motion for a Preliminary Injunction and Motion for Class Certification.

Dated:  July 29, 2008

Respectfully submitted,

Clinton A. Krislov

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Drive, Suite 1350
Chicago, Illinois  60606
Tel.: (312) 606-0500
Fax: (312) 606-0207

Law Offices of Mark Baiocchi
184 Shuman Blvd.
Suite 250
Naperville, IL 60563
Tel: (630) 983-4200
Fax: (630) 983-4223

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | |
| Plaintiff, | No. 08 CH 26042 |
| v. | Judge Richard J. Billik Jr. |
| NAVISTAR INTERNATIONAL CORPORATION, | Calendar No. 2 |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER TO TEMPORARILY PREVENT DEFENDANT FROM ACCEPTING RELEASES OR TO INVALIDATE RELEASES EXECUTED BY PUTATIVE CLASS MEMBERS UNTIL THE COURT CAN ADJUDICATE PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff Ravi P. Rawat asks this Court to temporarily: 1) enjoin the Defendant from accepting releases sent by putative class members; or 2) hold or invalidate all releases received by Defendant Navistar International Corporation in connection with its June 20, 2008 offer of settlement, until this Court has the opportunity to rule on the validity of the coercive waivers and releases being sought by Navistar.

## PRELIMINARY STATEMENT

This case is a refiling of a case originally filed in the Northern District of Illinois, titled *Rawat v. Navistar Int'l Corp.*, 08-3038 (N.D. Ill.). Defendant has moved to dismiss that case for lack of subject matter jurisdiction. Plaintiff refiled in this Court, where jurisdiction is uncontestable. Consistent with its conduct in the federal court litigation[1], Navistar's counsel has refused to accept service on behalf of its client for the sole purpose of thwarting the Plaintiff's Motion for Preliminary Injunction. Plaintiff asks this Court to temporarily prevent Defendant from accepting releases from putative class members until Plaintiff's preliminary injunction motion and motion for class certification are decided.

Navistar, after breaching their stock options contracts by rendering employee stock options unexercisable for over two years, was sued by employees whose options expired during Navistar's self-caused blackout period. Different from other companies who have either: a) extended current and former employees' rights to exercise for the duration of the blackout period; or b) offered settlements at market prices when financial information is brought current, Navistar did nothing for the entire blackout period.

After Plaintiff filed an action in the Northern District of Illinois, Navistar sought and obtained an extension of time to respond to the complaint, then used the period

---

[1] Described in Plaintiff's Memorandum in Support of a Preliminary Injunction.

instead to solicit putative class members to waive their claims by a deceptive and coercive communication to coerce class members to release their claims on incomplete and misleading information and at less than fair value and thwart the litigation. The releases are misleading, coercive and unsupported by valid consideration. Plaintiff asks this Court to temporarily enjoin Navistar's acceptance of and/or invalidate any executed releases, until this court can ascertain the rights of class members. Indeed, the stakes are large and based on information obtained from class members, the shortfall in consideration totals hundreds of thousands of dollars for some class members who have been conditioned by Navistar to view their claims as worthless.

## BACKGROUND

The background of Defendant's scheme to thwart this litigation and United States District Judge Darrah's findings can be found on pp. 2-6 of Plaintiff's Memorandum of Support his Motion for a Preliminary Injunction.

## NATURE OF THE ACTION

Navistar's employees and former employees who received stock options pursuant to the Company's Stock Option Plan were denied the right to exercise their vested options from April 6, 2006 until May 29, 2008 (the "blackout period") because of the Company's malfeasance. Specifically, Navistar needed to restate its financials that were previously materially misstated.

By causing the blackout period and refusing to allow Navistar employee stock option holders to exercise their options – which are contracts[2] -- during this blackout

---

[2] It is well settled that stock options are contracts. *Lamb v. Emhart Corp.*, 47 F.3d 551, 560 (2d Cir. 1995)("The issuance of stock options constitutes a contract between the employer and employee, supported by the consideration of the employee's subsequent continued employment."); *Scully v. U.S. Wats, Inc.*, 238 F.3d 497, 507 (3d Cir. 2001)(stating "an executive stock option is a contract"), *In re Allen*, 226 B.R. 857,

3

period. Navistar breached the option contracts and its duty of good faith and fair dealing to the option holders.

Moreover, by refusing to accept service, Defendant seeks to avoid addressing these issues honestly and directly.

## LEGAL STANDARD

A TRO is an emergency remedy issued to maintain the status quo until the case is disposed of on the merits. *Bradford v. Wynstone Property Owners' Ass'n* 355 Ill.App.3d 736, 823 N.E.2d 1166 (2d Dist. 2005), citing, *Wilson v. Hinsdale Elementary School District 181*, 349 Ill.App.3d 243, 248, 284 Ill. Dec. 847, 810 N.E.2d 637 (2004). A trial court's order granting or denying a TRO is reviewed for an abuse of discretion. *Id.* citing, *Wilson*, 349 Ill.App.3d at 248, 284 Ill.Dec. 847, 810 N.E.2d 637. "A party seeking a TRO must establish, by a preponderance of the evidence, that (1) he or she possesses a certain and clearly ascertainable right needing protection, (2) he or she has no adequate remedy at law, (3) he or she would suffer irreparable harm without the TRO, and (4) he or she has a likelihood of success on the merits." *Wilson*, 349 Ill.App.3d at 248, 284 Ill.Dec. 847, 810 N.E.2d 637.

## ARGUMENT

Defendant's counsel refuses to accept releases on behalf of Navistar, despite its representation of Navistar in Plaintiff's federal court action.  Plaintiff asks this Court for a Temporary Restraining Order preventing Defendants from accepting releases from putative class members until Plaintiff's Motion for a Preliminary Injunction releases until

---

862 (N.D. Ill. 1998)(stating "A stock option is a contract for transfer of shares of stock, subject to the same rules of construction as any other contract")(citations omitted), *Owen v. Merts*, 405 S.W.2d 273, 277 (Ark. 1966), *Klusener v. Commissioner of Internal Revenue*, Nos. 5383-87, 6237-87, 1989 WL 14814 (Feb. 27, 1989 U.S. Tx. Ct.).

4

this Court can adjudicate the Motion for a Preliminary Injunction and Motion for Class Certification. If this injunction is not granted, putative class members: 1) possess an ascertainable right; 2) do not have an adequate remedy at law because they will have released their claims; 3) will suffer harm irreparable harm; and 4) be denied relief in a matter where they have substantial likelihood of success.

Defendant contacted putative class members in order to persuade the class members to release their claims against the Company in exchange for a cash payment reflecting the difference between their options' exercise price and the Company's closing price on the day their options expired.

Indeed, there are two independent bases that void any releases sent to Defendant by class members: 1) Navistar's misleading and coercive solicitation wrongly coerced class members into signing away their legal rights under economic duress in return for inadequate compensation; and 2) those rights could not be released under the Illinois Wage Payment and Collection Act.

I.    A TEMPORARY RESTRAINING ORDER IS NECESSARY BECAUSE NAVISTAR HAS ASKED CLASS MEMBERS TO RELEASE THEIR CLAIMS, FOR INADEQUATE CONSIDERATION, THAT WAS INADEQUATELY DESCRIBED.

Plaintiff asks this Court to enjoin Navistar from accepting releases sent to putative class members that deceitfully and coercively asked class members to release any claims against Navistar in consideration for an inadequate offer, that did specify any tax implications or any rights or claims that the putative class members may have.

A.    Plaintiff's Have an Ascertainable Legal Right to Their Owed Wages

Plaintiff's agreement with Navistar for vested stock options created a legal right to that compensation.  Navistar's refusal to honor its stock option obligations to Plaintiff

5

and the Class was a breach of contract and in violation of the Illinois Wage Payment and Collection Act.

**B.     Class Members Will Not have an Adequate Remedy at Law for Meritorious Claims**

This Court will effectively decide whether class members may pursue meritorious claims against their employer or former employer.  Preserving the status quo until the case can be decided on the merits is imperative.  As of now, class members are deciding whether to release their claims or continue to be members of the class that seeks to pursue those claims for more favorable consideration.

**C.     Harm to Class Members is Substantial and Irreparable because Many Will Have Unknowingly Released Meritorious Claims for Substantial Sums of Money**

Currently, Navistar is barred by a federal court order from accepting releases until August 1, 2008.  Plaintiff maintains that the solicitations for releases sent to putative class were executed under economic duress and are void as a matter of law.  Preliminarily enjoining acceptance of the releases will preserve the status quo until the Court can make determination as to whether the releases are valid or void based on economic duress and the Illinois Wage law.

The harm to class members is that they will waive their rights on an uninformed basis at a price (mostly $20-$50 per share) determined at a time when the market information was incorrect, obsolete, and well below the $65-$75 per share range the stock has been trading at since Navistar's public financial disclosures were brought current.

The harm to Navistar is nonexistent; it simply continues to have employees and former employees with claims against them, as they had for prior to sending the releases.

6

Further, any harm to Navistar is of its own making, because it ignored these claims for over two years then engaged in deceitful conduct attempting to obtain a quick release of claims after this litigation commenced. This Court can strike an even accord between the parties by preliminarily enjoining Navistar from accepting any releases from putative class members, and allowing more time or

> **D.    Plaintiff and the Class has a Substantial Likelihood of Success Because Navistar Breached its Stock Option Contract Obligations and Violated the Illinois Wage Payment and Collection Act**

Plaintiff's discussion of this likelihood of success on the underlying merits is on pp. 11-17 of Plaintiff's Memorandum of Law In Support of his Motion for a Preliminary Injunction.

## II.    THE RELEASES EXECUTED BY PUTATIVE CLASS MEMBERS ARE INVALID BECAUSE THE COMMUNICATION WAS MISLEADING, COERCIVE, AND UNSUPPORTED BY CONSIDERATION.

Also, the subject of the Preliminary Injunction motion, the releases sent by putative class members, is also likely to succeed because: "[A] release is valid and binding where the minds of the parties have met; where the release is supported by consideration; and where there has been no fraud, misrepresentation, mistake, duress or undue influence." *Delaware Lumber and Millwork, Inc. v. Anecon Const. Co., Inc.*, C.A. No. 96L-06-011, 1993 WL 562206 at *2 (Del. Super. Ct. Dec. 13, 1993). Releases should not be used as instruments of fraud or oppression. *Carlile v. Snap-on Tools*, 271 Ill. App. 3d 833, 838 (4th Dist. 1995) citing, *Antal v. Taylor*, 146 Ill. App. 3d 863, 866-67, (1986). Here, the releases were misleading, coercive and unsupported by adequate consideration. Navistar's coercive letter to putative class members -- some of whom are currently employees that rely on Navistar for continued employment -- clearly puts the

7

putative class members in a no-win situation.   Rather than providing honest and

complete information, Navistar previously sent out letters conditioning class members to

view their claims as worthless and now sends out "one-time" offers at lowball prices,

without disclosing the adverse tax treatment nor that other companies in the same

situation have either agreed to extend the exercise period past the end of the blackout

period or priced the options much higher, at least prices that reflect the common stock

when public financials became current.

Specifically, the letter coerces putative class members into accepting less

consideration than the litigation seeks.   In fact, the letter's content is a thinly veiled

"take it or leave it" offer[3], with consecutive sentences stating:

> ". . . The Company does not believe that it has an obligation to compensate
> individuals for the Expired Options or that the claims set forth in the Complaint
> are valid, and **we intend to vigorously contest all of the relief Mr. Rawat
> seeks.**" Ex. A (emphasis added)

Followed by:

> "This **one-time opportunity** will be available until **August 1, 2008**. . ." *Id.*
> (emphasis added)

Even more coercively, Defendant guarantees an extra incentive for quick action:

> "If we receive the executed Payment and Release **on or before July 3, 2008**,
> unless you direct otherwise we will mail a check in the amount of your payment .
> . . on or before July 31, 2008." *Id.* (emphasis added)

This communication was the subject of an Emergency Motion in the federal court

action. Even though the federal court ordered a "neutral" corrective notice, class

members, by the size of the offer and tone of the letter have been coerced into releasing

---

[3] The offer was sent to option holders that were both employees and non-employees.  Courts have
consistently held that "if the class and the class opponent are in an ongoing business relationship,
communications from the class opponent to the class may be coercive." *Ralph Oldsmobile Inc. v. General
Motors Corp.*, No. 99civ4567 (AGS), 2001 WL 1035132, at *3 (S.D.N.Y. Sept. 7, 2001)(citing *Jenifer v.
Delaware Solid Waste Auth.*, 1999 WL 117762 (D. Del. Feb. 25, 1999).

their claims against Navistar.

As United States District Judge Darrah has already correctly noted, the letter implies that if class members do not release their rights in exchange for a cash payment – in some cases thousands of dollars -- they will be left with nothing.  Although the letter and the follow up corrective notice disclose a little more information, class members still are presented with an offer that undervalues their rights and puts them under a strict timeline to comply.  Transcript 18:6-22, attached as Ex. B.

Navistar's offer to class members is inadequate for three reasons.  First, the consideration for release given to class members is currently due and owed under the contract, releasing claims for money already owed is not adequate consideration.  Second, the cash payment reflects the spread between his or her options' exercise price and Navistar's common stock's trading price the day that the option expired.  The offer, however, fails to disclose that class members may be entitled to a higher cash payment.  Third, if the putative class members exercised and held the options instead of immediately selling the options, they would receive a two-fold benefit: 1) Navistar's stock appreciated significantly, making holding the stock more valuable than immediately selling the stock; and 2) holding the stock creates more favorable tax treatment than an immediate sale.

        a.      **The offer does not give sufficient notice to claims putative class members are releasing nor does it show the tax implications of the offer**

Also, the offer letter asks class members to release their claims against Navistar without disclosing material information.  The communication makes two misrepresentations and omits two material facts.  First, it claims that the cash offer was

only a "one time opportunity" and that "Navistar had no obligation to pay that amount." Second, it does not disclose the adverse consequences of a cash offer, or, that companies in similar situations have offered much more generous packages.

Under Delaware law, fraud or misrepresentation is sufficient to invalidate a release. *Greenhouse v. BP Inc.*, C.A. 86-OC-159, 1989 WL 135704, at *2 (Del. Super. Ct. Oct. 26, 1989)(finding that release agreement was void based of fraud), citing, *Hicks v. Soroka*, Del. Super., 188 A.2d 133 (1963).

Although Plaintiff believes that these releases intentionally omitted or misrepresented material information, as a general rule *even an innocent misrepresentation* by the releasee or his or her agent of a material fact, intended to be acted on by the releasor, and relied on by him or her, is effective to avoid a release induced thereby. 76 C.J.S. Release § 27, citing, *Bass v. Seaboard Air Line R. Co.*, 205 Ga. 458, 53 S.E.2d 895 (1949).;and *Kennedy v. Texas Emp. Ins. Ass'n*, 121 S.W.2d 434 (Tex. Civ. App. Dallas 1938), *judgment aff'd*, 135 Tex. 486, 143 S.W.2d 583 (Comm'n App. 1940).

Navistar's solicitation misrepresents that the offer is a "one-time opportunity", that Navistar is "not obligated to pay anything" and it omits that the cash payment, rather than allowing putative class members to exercise their options, would result in adverse tax consequences. All three of these misrepresentations are material and would have induced potential class members to sign away their legal rights without full information.

In fact, Navistar admitted in open court that the "one-time opportunity" statement was a misrepresentation. Transcript: 17:18-23. (The Court: "The question is, have your clients absolutely precluded any settlement of this matter at a later time after August

10

1ˢᵗ?"; Mr. Perlman [Navistar's counsel]: *"Absolutely not,* your Honor. We've had no discussions of that with our client, no such decision has been made.")(emphasis added)

**b.    A release that is signed under economic duress is invalid**

In Delaware, duress can render a contract voidable where there is a (1) a wrongful act which (2) overcomes the free will of the person (3) who has no adequate legal remedy to protect his interests. *Edge of the Woods v. Wilmington Savings Fund Society, FSB*, N.C.A. 97C-09-281-JEB, 2001 WL 946521 (Del. Super.Ct. Aug. 16, 2001)  Economic duress is duress directed against a person's business interests, and is often referred to as "business compulsion." *Id.*, citing *Hanna Sys. Inc. v. Capano Group, L.P.*, C.A. No. 7408, 1985 WL 21128, at *3 (Del. Ch. Nov. 29, 1985).  The test for determining whether the duress produced the asset is a subjective one that focuses on the state of mind of the "victim" of the duress. *Id.*, *Restatement (Second) of Contracts* § 175, comment c (1981). Loss of "free will" does not mean that no choice exists, rather, that the threatened person is compelled to choose between regretable [sic] alternatives. *Id.*, *Williston on Contracts* § 1602, at 651 (3d ed. 1967). The threatened party must be compelled to make a disproportionate exchange of value to protect his business with no adequate alternative legal remedy. *Id.* § 1617.

Indeed, the Restatement, which Delaware law relies on, shows that:  clearly shows that the letter was a wrongful act, in this case a threat, because it gave class members no reasonable alternative because the payment was a "one time opportunity." Although the letter and the resulting corrective notice mentioned the litigation against the Company, Navistar cannot overcome the fact that it misrepresented the fact that it was a "one time opportunity," when it admitted as much at the June 26, 2008 hearing.

11

Putative class members were coerced into signing releases by the promise that this was the *only time* that they could be compensated for their *earned wages*. To make matters worse, the deadline for signing the releases was only about five weeks.

Class members have been forced to either give up their rights, or receive nothing.

  c.  **The offer to putative class members is supported by inadequate consideration**

Delaware law recognizes that a release that is unsupported by consideration is void. *Sylvia CHAPMAN v. DUNN-Assoc., Ltd.*, C.A. No. 1988-04-120, 1988 WL 765407, at *1 (Del. Com. Pl. Sept. 22, 1988)(holding "the seller has done no more than insist upon the rights it contracted for with the purchaser. If an employee of the seller made such a promise, it was unsupported by any valid consideration. Accordingly, such a promise is unenforceable."); *See also*, 66 Am. Jur. 2d Release § 11, stating ("Generally speaking, in order to be effective a release must be supported by consideration. In other words, the releasor must have received something of value to which he or she had no previous right. Stated another way where one party is under a pre-existing duty to do or pay to another party that duty will not constitute sufficient consideration so as to uphold a release.")(citations omitted) and *U.S. Fidelity and Guar. Co. v. Klein Corp.*, 190 Ill. App. 3d 250, 257 (1st Dist.,1990) ("A release requires an abandonment of a claim to the person against whom the claim existed, and must be backed by consideration.")(citation omitted)

No consideration exists here because Navistar *already owed* an amount higher than the payment made in exchange for the release.

The Illinois Appellate Court, in *Carlile*, also noted that "Professors White and Summers describe an individual who refuses to perform his contract duties unless he receives a concession as an extortionist. In non-Code cases the consideration doctrine

12

could be used to police against extortion: 'You gave no new consideration for the concession and *you had a preexisting duty to do everything you are to do under the modified arrangement, hence the concession is unenforceable.*'" *Carlile v. Snap-on Tools*, 271 Ill. App. 3d 833, 841 (4th Dist. 1995), citing, J. White & R. Summers, Uniform Commercial Code § 1-5, at 47 (2d ed. 1980)(emphasis added). *See also*, *Salvaggio v. Schafroth*, 133 Ill. App. 2d 811 (1971) (stating "[w]here there was no dispute that defendant owed plaintiffs at least the sum which defendant paid to them . . . release . . . against defendant arising out of plaintiffs' employment by defendant was unsupported by valid consideration and was unenforceable against plaintiffs who endorsed check.")

Even though Navistar was contractually obligated to allow Plaintiff and the Class to exercise their options, the releases sent to putative class members are invalid because they present a "take it or leave it" offer that is only a "one time opportunity." The letter, as it is currently described, forces putative class members to choose between: 1) an inadequate cash payment (for which they will realize ordinary income tax); or 2) nothing.

Indeed, Navistar's offer fails to acknowledge or disclose that fact in its offer, which radically undervalues the owed compensation, which Defendant's lawyers admitted is not in fact "take it or leave it" offer, as it is presented. Transcript 17:18-23.[4]

## CONCLUSION

Accordingly, Plaintiff asks this Court to preliminarily, pending this litigation: 1) enjoin the Defendant from accepting releases sent by putative class members; or 2) hold

---

[4] In addition, releases accepted by Navistar are void on the basis that Plaintiffs cannot release claims under the Illinois Wage Payment and Collection Act. See, Memorandum of Law in Support of Preliminary Injunction pp. 23-24 , citing *O'Brien v. Encotech Construction Services, Inc.*, 183 F.Supp.2d 1047, 1052 (N.D. Ill. 2002)(holding releases invalid under Illinois Wage Payment and Collection Act) and *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2004 WL 1403007 *7 (N.D. Ill.)(same).

13

or invalidate all releases received by Defendant Navistar International Corporation in connection with its June 20, 2008 offer of settlement.

Dated:  July 29, 2008

Respectfully submitted,

_____
Clinton A. Krislov

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Drive, Suite 1350
Chicago, Illinois  60606
Tel.:  (312) 606-0500
Fax:  (312) 606-0207

Law Offices of Mark Baiocchi
184 Shuman Blvd.
Suite 250
Naperville, IL 60563
Tel: (630) 983-4200
Fax: (630) 983-4223

14

Cary R. Perlman

Sears Tower, Suite 5800
233 S. Wacker Dr.
Chicago, Illinois 60606
Tel: +1.312.876.7700  Fax: +1.312.993.9767
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

__By Email and U.S. Mail__

June 24, 2008

File No. 010255-0330

Mr. Clinton A. Krislov
Krislov & Associates, Ltd.
20 North Wacker Drive, Suite 1350
Chicago, IL 60606

Re:    Rawat v. Navistar International Corporation

Dear Mr. Krislov:

Pursuant to our telephone call this morning, please find attached a courtesy copy of the form of letter and the form of release mailed last Friday to certain current and former employees of Navistar.

Sincerely,

Cary R. Perlman
of LATHAM & WATKINS LLP

cc:  Robin Hulshizer

CH\1036042.1



Navistar, Inc.
4201 Winfield Road
Warrenville, IL 60555  USA

P : 630-753-3052
W : navistar.com

Annette M. Freund
Vice President,
Compensation, Benefits
and HR Support

June 20, 2008

Re:  Expired Stock Options

Dear _____:

As you know, until recently Navistar International Corporation (the "Company") has not been current with its Form 10-K filings with the Securities and Exchange Commission ("SEC"). During the time the Company was not current, there were limits on your ability to exercise your stock options. The expiration date for certain stock options fell within the period when these limits were in effect.  In my letter to you of January 15, 2008, the Company identified the option expiration issue, informed you that we planned to address the issue with the Board of Directors, and promised to communicate with you again regarding the Board's decision.

On June 16, 2008, we raised these matters with the Board.  We are pleased to report that the Board has authorized us to extend to you a one-time opportunity to obtain a cash payment from the Company in resolution of any and all issues in connection with vested stock options that expired during the period when the above-described trading restrictions were in place (the "Expired Options").

The amount of your cash payment will be the difference between the closing price on the date your option expired and the exercise price for all of your options "in the money" on the option expiration date – *i.e.*, your payment will match the profit you would have made had you sold the shares at the end of the day the option expired, subject to applicable withholding taxes.  For example, if you had vested stock options exercisable at $25.00, and the stock closing price on the date those options expired was $65.00, we will pay you $40.00 times the number of Expired Options.  The payments available to **you** individually are set forth on the enclosed Statement of Offer (*Exhibit A*).  For your convenience, we have enclosed publicly available data reflecting the closing price of the Company's common stock on the option expiration date.

As consideration for the payment described in this letter, you must execute and return to the Company a release of claims in the form attached as *Exhibit B* to this letter ("Payment and Release").  The Payment and Release makes clear that your choice to accept the cash payment is a full and complete resolution of any and all claims you may have associated with the Expired Options.  Because the Payment and Release affects your rights and precludes litigation with the Company (including preclusion of your participation in the lawsuit described below), you should review it carefully before signing it.

On or about May 2., 2008, Mr. Ravi P. Rawat filed a putative class action complaint against the Company (the "Complaint") related to the option expiration issue. Mr. Rawat's Complaint was filed in the United States District Court for the Northern District of Illinois (Case No. 1:08-cv-03038), and it alleges that the Company breached stock option agreements with those who hold Expired Options. The Complaint also alleges that the Company breached "an implied covenant of good faith and fair dealing" in connection with the Expired Options. The Company does not believe that it has an obligation to compensate individuals for the Expired Options or that the claims set forth in the Complaint are valid, and we intend to vigorously contest all of the relief Mr. Rawat seeks.

This one-time opportunity will be available to you until August 1, 2008. If you choose to take advantage of this offer, the process will be as follows: *Execute the Payment and Release. Return it to Mr. Howard Kuppler, Navistar International Corporation, 4201 Winfield Road, P.O. Box 1488, Warrenville, IL 60555 no later than August 1, 2008. If we receive the executed Payment and Release on or before July 3, 2008, unless you direct otherwise we will mail a check in the amount of your payment, less applicable withholding taxes, to your home address on or before July 31, 2008. If we receive the executed Payment and Release on or before August 1, 2008, unless you direct otherwise we will mail a check in the amount of your payment, less applicable withholding taxes, to your home address on or before August 29, 2008.*

Your execution and return of the Payment and Release constitutes your acceptance of this offer.

If you have questions not answered in this letter, please contact Howard Kuppler at (630) 753-2149.

*Annette*

Attachments:

Exhibit A – Statement of Offer
Exhibit B – Payment and Release

Exhibit B

PAYMENT AND RELEASE

Execution of this Payment and Release constitutes acceptance of the offer reflected in that certain letter dated June 20, 2008, from Annette Freund (the "Freund Letter").

**General Release.** For adequate and valuable consideration exchanged between the parties, the sufficiency of which is hereby acknowledged, _____ ("Releasor"), on behalf of Releasor and on behalf of Releasor's past, present and future respective predecessors, successors, heirs, assigns and any of the respective owners, members, managers, partners, principals, directors, officers, agents and employees of any of the foregoing, with full understanding of the contents and legal effect of this release, and having the right and opportunity to consult with counsel and a tax advisor, hereby releases and forever discharges Navistar International Corporation. (the "Company" or "Releasee") and its parents, subsidiaries, affiliates, related companies, agents, heirs, assigns, attorneys, lenders, and insurers, and any of the respective owners, members, managers, partners, principals, directors, officers, agents and employees of any of the foregoing, from any and all judgments, claims, demands, grievances, damages or causes of action of any kind or nature whatsoever, whether in contract (express or implied), covenant of good faith and fair dealing (express or implied), tort, statutory, or otherwise, whether legal or equitable, that Releasor has or may have in any way related to Releasor's stock options, whether in the money or out of the money, that expired during the period when there were certain limits on Releasor's ability to exercise Releasor's vested stock options ("Expired Options"), including but not limited to the claims described in the putative class action complaint filed against the Company by attorney Clinton A. Krislov on behalf of Mr. Ravi P. Rawat in the United States District Court for the Northern District of Illinois (Case No. 1:08-cv-03038), and as described in the Freund Letter.

**Covenant Not to Sue.** A "covenant not to sue" is a legal term which creates a promise not to file a lawsuit in court. It is different from the General Release of claims contained above. Besides waiving and releasing the claims covered by the General Release, Releasor further agrees never to sue the Company in any forum for any reason covered by the General Release language in the above paragraph. Notwithstanding this Covenant Not to Sue, Releasor may bring a claim against the Company to enforce this Payment and Release.

1

**Payment/Consideration.** In consideration for this Release, the Company shall pay Releasor a cash payment in the amount set forth in the Statement of Offer attached as Exhibit A to the Freund Letter, which Exhibit A is incorporated by reference as if fully set forth herein. Releasor acknowledges and agrees that the Company has no obligation to compensate Releasor for the Expired Options.

**Taxes.** Releasor agrees that all tax liability which may result from the payment of money as set forth herein rests with Releasor alone.

**Consultation With Legal Counsel, Advisors.** By signing this Release, Releasor expressly acknowledges that Releasor has had the opportunity to consult with legal counsel and a tax advisor of Releasor's choosing prior to signing this Release if Releasor so desires.

**Governing Law.** This Release will be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and/or to be performed in that State, without regard to any choice of law provisions thereof.

**Complete Agreement.** Except as provided herein, this Agreement supersedes all prior and contemporaneous agreements of any kind between the parties relating to the Expired Options.

**Severability.** If any provision of this Release is invalid or unenforceable, the balance of this Release will remain in effect, and if such provision is inapplicable to any person or circumstance, it will nevertheless remain applicable to all other persons and circumstances.

THIS IS A FULL AND FINAL RELEASE – I HAVE READ, UNDERSTOOD AND VOLUNTARILY AGREED TO THE TERMS OF THIS RELEASE BEFORE SIGNING.

Executed this _____ day of _____, 2008.


_____
Releasor

2

## TRANSACTION SUMMARY

| Transaction Type | Action that Can be Taken |
|---|---|
| Cashless Exercise of Stock Options | NOT ALLOWED until the Company is current with its public filings. |
| Cash Exercise of Stock Options | Allowed if optionee exercising stock options is an accredited investor see below for definition of accredited investor), however shares issued would be restricted and any sale of the shares would be governed by Rule 144 (See Rule 144 below). |
| Stock Swap Exercise of Stock Options | Allowed if optionee exercising the options is an accredited investor (see below for definition of accredited investor), however shares issued would be restricted and any sale of the shares would be governed by Rule 144 (See Rule 144 below). |

1. Definition of Accredited Investor: (i) is a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of the purchase of the securities exceeds $1,000,000; or (ii) is a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

2. Summary of Rule 144: Shares can only be sold after 2 years if not an affiliate of the Company *or* until 1 year has passed and all of the Company's financial statement filings are current. Any sale must also comply with the other limitations of Rule 144.

XOP1255NAV

1

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3
        RAVI P. RAWAT, on behalf of        )
4       himself and others similarly       )
        situated,                          )
5                                          )
                        Plaintiff,         )
6                                          )   Case No. 08 C 3038
                                           )
7       -vs-                               )   Chicago, Illinois
                                           )   June 26, 2008
8                                          )   9:30 o'clock a.m.
        NAVISTAR INTERNATIONAL             )
9       CORPORATION,                       )
                                           )
10                      Defendant.         )

11
                TRANSCRIPT OF PROCEEDINGS
12       BEFORE THE HONORABLE JOHN W. DARRAH

13   APPEARANCES:

14   For the Plaintiff:      KIRSLOV & ASSOCIATES, LTD.
                             MR. CLINTON A. KRISLOV
15                           MR. JEFFREY MICHAEL SALAS
                             20 North Wacker Drive
16                           Suite 1350
                             Chicago, Illinois 60606
17
     For the Defendant:      LATHAM & WATKINS LLP
18                           MR. CARY R. PERLMAN
                             MR. ROBERT C. LEVELS
19                           MS. ROBIN M. HULSHIZER
                             233 South Wacker Drive
20                           5800 Sears Tower
                             Chicago, Illinois 60606
21
     Court Reporter:
22
                         Mary M. Hacker
23                    Official Court Reporter
                   United States District Court
24          219 South Dearborn Street, Suite 1426
                    Chicago, Illinois  60604
25                 Telephone:  (312) 435-5564

1      THE CLERK:  08 C 3038, Rawat versus Navistar

2  International.

3      MR. SALAS:  Good morning, your Honor.  Jeff Salas

4  for the plaintiff, Rawat.

5      THE COURT:  Good morning, Mr. Salas.

6      MR. PERLMAN:  Good morning, your Honor.  Cary

7  Perlman, Robin Hulshizer and Robert Levels for the defendant

8  Navistar.

9      THE COURT:  Good morning, Mr. Perlman, Ms.

10  Hulshizer, Mr. Levels.

11      All right.  This matter comes on this morning on

12  plaintiff's emergency motion to prevent the defendant from

13  contacting the putative class members.

14      I read the motion and I read the communication that

15  purportedly has been sent to the employees, and I read that

16  release.  What do you have to say to this?

17      MR. PERLMAN:  Thank you, your Honor.

18      I have three things to say.  And I might be a

19  little more loquacious here than I would if we had a chance

20  to file these papers.  I would appreciate your indulgence.

21      First of all, let me --

22      THE COURT:  Hold it a second.  I mean, the reason

23  we're in here is because apparently without notice your

24  clients did this.

25      MR. PERLMAN:  Correct.

1      THE COURT:  I mean, unless we can claim that we
2  don't have enough time to respond.
3      MR. PERLMAN:  No, no -- well, I'm saying normally I
4  would have given you some background in -- let me start back
5  then.
6      My clients did send that message to --
7      THE COURT:  To how many employees?
8      MR. PERLMAN:  -- to 50, I believe, your Honor.
9      And let me say, starting back and then moving
10  forward, my clients sent that message because my clients have
11  a right to send that message.  The Seventh Circuit law is
12  absolutely clear that there is a right to send communications
13  to putative class members.
14      And as this Court, the Northern District of
15  Illinois, has recently noted, citing that Seventh Circuit
16  decision, a district court has limited power to restrict
17  communications between defendants and putative class members
18  before the class is even certified.
19      And, therefore, under both the Supreme Court
20  decision of Gulf Oil and the Seventh Circuit decision of
21  Williams v. Chartwell Financial Services -- that's a Seventh
22  Circuit decision from 2000, it's at 204 F3d 748 -- there is
23  nothing improper about contacting --
24      THE COURT:  Why don't you give me that cite again.
25  Do you have a paper there that you can provide me with, or is

1   that just your working notes?

2          MR. PERLMAN:  Well, I have a draft of the

3   opposition we're preparing.  I don't mind handing it up if

4   your Honor is willing to accept a draft.

5          THE COURT:  Sure.  Hand it up.

6          MS. HULSHIZER:  Here's a copy for you.  We were

7   working on it all night, your Honor, so it probably has

8   typos.

9          THE COURT:  Okay.

10      (Document tendered.)

11         THE COURT:  We will take a brief recess.

12         MR. PERLMAN:  I want to mention one other thing,

13  your Honor.

14         THE COURT:  Hold on a second.  I'll be right back.

15         MR. PERLMAN:  Sorry.

16      (Brief recess was taken.)

17         THE CLERK:  08 C 3038, Rawat versus Navistar

18  International Corporation.

19         THE COURT:  Sorry for the delay, folks.

20         MR. SALAS:  No problem, your Honor.

21         THE COURT:  Briefly, Counsel.  You can complete

22  your argument.

23         MR. PERLMAN:  Yes, your Honor.

24         Now that your Honor has had an opportunity to read

25  the draft, I'll be very, very brief.  I just wanted to make

1    two quick points in addition to the jurisdictional point,

2    which your Honor is already aware of.

3            What actually happened here, by way of facts, so

4    that you have an understanding of the context, is not that

5    our client, Navistar, tried to undercut anything in

6    connection with a putative class action case, which we

7    believe to be without basis, but, rather, the reverse.

8            As the attachments to the complaint revealed, the

9    company had already communicated with the 56 individuals who

10   this problem affected.  We knew that their stock options were

11   expiring, there was nothing to be done about it, or it was

12   not prudent to do anything about it until the company was

13   current with its accounting practices.

14           And we told the people, all of them, in January --

15           THE COURT:  I read the letter, I read the proposed

16   release.  I know what it says.

17           MR. PERLMAN:  Okay.  Thank you, your Honor.

18           And my only point is, after the board of directors

19   acted in June, we made good on the promise we made to these

20   people in January to communicate the result.

21           At that time --

22           THE COURT:  Say that again.

23           MR. PERLMAN:  I'm sorry.

24           THE COURT:  You made a promise to somebody in

25   January to communicate a result?  What --

1    MR. PERLMAN:  A result of the board of directors'

2    decision as to what they were going to do about the expired

3    stock option issue.

4    THE COURT:  And you made a promise to whom?

5    MR. PERLMAN:  To all of the people who were

6    affected by this.

7    THE COURT:  When did you make that promise?

8    MR. PERLMAN:  In January of '08.  I can pass it up.

9    It's a --

10   THE COURT:  When did the board meet?

11   MR. PERLMAN:  June 16th of '08.

12   THE COURT:  I see.

13   The board didn't meet between January and June, is

14   that right?

15   MR. PERLMAN:  Pardon, your Honor?

16   THE COURT:  Would you read that back?

17   (Record read.)

18   MR. PERLMAN:  The board did meet between January

19   and June, but until the company was current with its

20   accounting practices -- which happened on May 30th, is when

21   they filed, approximately, the 2007 annual report -- it

22   wasn't -- the company couldn't go to the board, or it wasn't

23   prudent to go to the board to take this step.

24   So the problems were, restatement required that

25   these blackouts be (unintelligible), people couldn't exercise

1    their options.  We told people in January --

2              THE COURT:  I'm not talking about that.  I'm

3    talking about a promise that you purportedly made to your

4    employees that you would go to the board, and you made that

5    promise in January.  And you're saying that it was the board

6    activity in June which triggered this letter.

7              MR. PERLMAN:  That is correct, your Honor.

8              THE COURT:  All right.  My question is, did the

9    board meet between January and June?  And if they did, why

10   didn't you advise your clients of the board's -- why didn't

11   the board consult and give you the wherewithal to advise the

12   employees prior to June?

13             MR. PERLMAN:  The answer to that, your Honor, is

14   because what we told the employees was that we'll go to the

15   board at the point that the 10Ks for 2006 fiscal year and

16   2007 fiscal year are current.  That didn't happen until May

17   30th.

18             The very next board meeting, after we promised we

19   would go to the board, was June 16th.  The board acted.  We

20   then made good on the promise we made in January of '08, five

21   months before the case was filed, that we would communicate

22   the result of that to the 56 affected people, and we did,

23   your Honor.

24             THE COURT:  All right.  Counsel?

25             MR. SALAS:  Yes, your Honor.

1          First, I'll take issue with the January letter.
2    The January letter was not a promise --
3          THE COURT:  Excuse me one second.
4       (Brief pause.)
5          THE COURT:  I'm sorry.
6          MR. SALAS:  Thank you, your Honor.
7          The January letter wasn't a promise but, rather, an
8    open-ended commitment to sometime raise this with the board.
9    Restatements often take years, four to five years at some
10   point.
11         And the company is under the obligation to pay for
12   these expired options now, whether the financials are current
13   --
14         THE COURT:  Why don't we address the issue -- I was
15   just curious, and the reason I questioned counsel about the
16   timing is that he apparently was suggesting that this letter
17   to the putative class members was a direct result of some
18   action by the board that could only have been taken by June.
19   That is or is not persuasive.
20         Why don't you address the issue of communication
21   with the putative class members by the defendant.
22         MR. SALAS:  Sure, your Honor.
23         We filed this complaint on May 23rd, 2008, and
24   served it six days later, on May 29th.  Around June 11th
25   counsel for the defendants called us and asked for an

1    extension of time.  They were due to respond July 18th.  I

2    believe they asked to respond by July 8th, which for

3    convenience of counsel we granted that response.

4         Two days ago, while their motion to extend time was

5    before this Court, we received notice from a putative class

6    member who received the letter that you've noted as Exhibit

7    -- or I've noted as Exhibit C and that you mentioned earlier.

8         THE COURT:  The June 20th letter?

9         MR. SALAS:  The June 20th letter.

10        And notably, this letter is two days after the time

11   to respond and after we had granted this extension.

12        Now, this letter is a coercive attempt for putative

13   class members to release the claims against the company,

14   specifically mentioning our case.

15        What happens is that -- not only that, it's a

16   sweepstakes offer:  Here is free money, we don't think we

17   have to pay you but we're going to if you send us back these

18   releases by August 1st, and we'll pay you sooner if you get

19   them back to us by July 3rd.  And that is before even the

20   time to respond to the complaint is due for the defendants.

21        So basically this was a coercive act to undermine

22   this litigation and try to cut the head off the litigation.

23        THE COURT:  I've read the cases that you have

24   provided.  The first case that counsel for the defense asked

25   me to look at is a Seventh Circuit opinion written by former

1    Chief Judge Flaum.  Among other things that the Court was

2    resolving in that case was an issue regarding the district

3    court's entrance of a protective order limiting the

4    plaintiffs from contacting the putative class members.

5            And Judge Flaum, in a typical scholarly opinion,

6    cites Gulf Oil, which shows up in both of your papers as a

7    somewhat seminal pronouncement by the United States Supreme

8    Court.  And it's 452 U.S. -- I've got the abbreviated cite,

9    at 100, and that part of the cite is used by Judge Flaum in

10   his opinion.

11           He says, quote, "The decision to grant a protective

12   order is a discretionary one to be used by the courts to

13   control the course of class action litigation.  The

14   discretion to issue such orders has been vested with trial

15   courts because it is well recognized that class actions

16   present opportunities for abuse as well as problems for

17   courts and counsel in the management of cases.  Because of

18   the potential for abuse, a district court has both the duty

19   and the broad authority to exercise control over a class and

20   enter appropriate orders governing conduct of counsels and

21   parties."

22           And then discussing the stay -- the protective

23   order, I should say, that was entered by the district court,

24   Judge Flaum goes on to say, quote, "The district court's

25   decision as to the protective order must involve a careful

1   balancing of potential for abuse created by the class action

2   and the right of the plaintiffs to contact potential class

3   members."

4        Now, again, let me emphasize that in that case

5   plaintiffs were precluded from contacting their own putative

6   clients, possible class members.

7        Back to the opinion, quote, "Because this balancing

8   is involved and because this area involves important

9   competing concerns, an order limiting discovery communication

10  between parties and potential class members should be based

11  on a clear record and specific findings that reflect a

12  weighing of the need for a limitation and the potential

13  interference with the rights of the parties."  And again,

14  citing Gulf Oil.

15       (Continuing:)  "The plaintiffs had challenged the

16  district court's protective order arguing that the order

17  unconstitutionally deprived them of relevant documents which

18  were also the subject of the protective order and put them at

19  a disadvantage in responding to a summary judgment motion."

20       So the district court erred in not setting out with

21  more specificity the reasons for protecting communication

22  with the putative class members and the matter was remanded

23  for further hearing on that issue.

24       Now, in this case -- pardon me.  And counsel for

25  the defense has also cited an opinion which is remarkably

1    close to the facts of this case and extremely instructive.

2    And that's Eshelman versus OrthoClear Holdings, and that can

3    be found at 2007 Westlaw 1429.  It's a district court opinion

4    from the Northern District of California.

5            In that case plaintiff sought to represent a class

6    consisting of persons and entities who had purchased or

7    otherwise acquired certain shares of stock by the defendant,

8    OrthoClear Holdings.

9            After the plaintiff filed the lawsuit, there was an

10   attempt by the plaintiff and the defendant to resolve the

11   issue through settlement discussions.  Settlement discussions

12   were then abandoned by the parties, and shortly thereafter

13   the defendant sent a package of information to potential

14   class members, similar to what we have here.  Although we

15   don't have any evidence that there was any attempt at

16   settlement, there was a hiatus in the proceedings requested

17   by the defendant.

18           Did the defendant ask for some brief continuance or

19   brief extension, or something of that nature?

20           MR. SALAS:  Yes.

21           THE COURT:  In the OrthoClear case, as I said,

22   there was some information, a package of information sent to

23   the putative class members with regard to the claim asserted

24   in the class action.  Plaintiffs thereafter moved to limit

25   the defendant's contact with the putative class.

1    Now, in that case the Court held that plaintiffs

2    had not met their burden to show that intervention was

3    warranted.  And again, they are citing Gulf Oil.

4    So it's clear that precertification correspondence

5    between the parties is appropriate but that right is not

6    unfettered.

7    To the extent that the communication of the class

8    members is misleading, coercive or attempted to assert undue

9    influence over the putative class members, restriction in

10    those kind of communications can be appropriately limited.

11    Now, in the OrthoClear case the district court

12    denied prohibiting communication between the defendant and

13    the putative class members because, as I said, the plaintiff

14    had failed to make a showing, admit their burden of proving

15    or persuading the Court that the information was potentially

16    misleading or intimidating and sealed material information or

17    attempted to influence the decision of the putative class

18    members.

19    They noted in that case that, first of all,

20    defendants represented that they were planning to extend a

21    deadline by which a potential class member could accept or

22    reject the offer, thus granting potential class members

23    additional time to consider the offer and consult with

24    counsel, or contact plaintiff's counsel if they chose.  Here

25    I note there is a deadline.  There's an August deadline, I

1   believe, is there not?

2        In addition, in the OrthoClear case, the putative

3   class members had contact information regarding plaintiff's

4   counsel.

5        Now, looking at the information that was sent to

6   the 50 or so employees that held the options, there's

7   language to this extent, quote, "This one-time opportunity

8   will be available to you until August 1st, 2008", end quote.

9   Now, that implies that no settlement at any other time in

10  this litigation will be available.

11       It refers to the lawsuit filed in the Northern

12  District of Illinois.  It does not identify the lawyers

13  representing plaintiffs, nor give any direction as to how

14  they could be contacted.  Although in the release there's a

15  statement, quote, "By signing this release, releasor

16  expressly acknowledges that releasor has had the opportunity

17  to consult with legal counsel and a tax advisor of releasor's

18  choosing prior to signing this release, if releasor so

19  desires."

20       In addition, there is a general release, extremely

21  broad, excusing Navistar -- or releasing Navistar from any

22  and all judgments, claims, demands, grievances, damages or

23  causes of action of any kind or nature whatsoever, whether in

24  contract, paren, expressed or implied, covenant of good faith

25  and fair dealing, expressed or implied, tort, statutory or

1     otherwise, whether legal or equitable, that releasor may have

2     in any way, in any way, related to releasor's stock options.

3          And then it goes on to say, "Including but not

4     limited to the claims described in the putative class action

5     filed against the company by Attorney Clinton A. Krislov on

6     behalf of Mr. Ravi P. Rawat."

7          Now, the plaintiffs in their papers make the

8     assertion that doesn't accurately set out the options of the

9     class holders; that, in fact, the value of the options may be

10    greater than what's being offered to settle the case.

11         MR. SALAS:  Yes, your Honor, absolutely.

12         THE COURT:  Do you want to speak to that?

13         MR. SALAS:  Absolutely, your Honor.

14         An employee stock option is the right to buy

15    company stock at a specific price, dated on the date of --

16    that's unrelated here but it's a larger issue.

17         So when an employee exercises that option, they can

18    hold -- they pay the price of, we'll say $10.  The employee

19    was granted a stock option on January 1st at $10.

20         Regardless of the price of the stock, whether it

21    goes up or down -- and Navistar's stock has continued to go

22    up.  I believe at the beginning of the blackout period it was

23    at about $28, and as soon as last week it was 75, between the

24    75 and $70 range.

25         And the employee has a way to exercise that option

1    and either hold the stock or sell the stock.  If he sells the

2    stock -- or he or she sells the stock, there's an instant tax

3    burden and cash gain.

4         So, for instance, you have an option at $10, you

5    exercise it at $10 and the stock happens to be at 20, there's

6    an immediate $10 gain.  If you sell that stock right away,

7    you have a $10 tax burden.  If you hold the stock, which in

8    this case if the putative class members would have exercised

9    the stock at anywhere between 20 and $30 and held, that stock

10   would be worth over $75 today, whereas the offer cuts it off

11   the day that particular option expired.

12        And that's not really the pertinent date, simply

13   because if the employee decided to hold that stock, it could

14   hold -- it could hold it forever, hold it until the company

15   is bought or ends or until that person dies and really reap

16   the benefits of the growth in the company, whereas here it's

17   basically giving cash off, or cutting off the date of which

18   the -- on the date of which the option expired, which could

19   be back in October, when the stock was trading at $45.

20        So it's an evidence to discount the claim, in other

21   words, without consulting class counsel, and just kind of --

22   and sometimes these are going to be substantial amounts of

23   money.  So people are going to be very coerced to take this

24   simply because it's a one-time offer.  You're never going to

25   get any more money, and it's going to be cash and we'll get

1    it to you as soon as possible.

2    THE COURT:  Could this offer preclude a settlement

3    of this case later on?

4    MR. PERLMAN:  Your Honor, I think the case law is

5    clear --

6    THE COURT:  I'm not asking about the case law.  I'm

7    asking regarding the intention of your client.  Is this it?

8    Must this matter be litigated if they don't take this offer?

9    MR. PERLMAN:  In no way has any determination been

10   made about that.  The only determination that's been made

11   about the merits of this case is that there's no subject

12   matter jurisdiction.

13   THE COURT:  Hold on.  We'll get to that in a

14   minute.  Right now I'm going to ask you to address the issue

15   that's before me.

16   MR. PERLMAN:  Sure.  I apologize.  If I didn't

17   answer the question, I -- it was not my intent to avoid it.

18   THE COURT:  The question is, have your clients

19   absolutely precluded any settlement of this matter at a later

20   time after August 1st?

21   MR. PERLMAN:  Absolutely not, your Honor.  We've

22   had no discussions of that with our client, no such decision

23   has been made.

24   THE COURT:  The second paragraph on the last page

25   says, "This one-time opportunity will be available to you

1     until August 1st, 2008."

2           MR. PERLMAN:  That is correct, your Honor.

3           THE COURT:  (Continuing:)  "If you choose to take

4     advantage of this offer, the process will be as follows", and

5     then you go on.

6           Do you think that fairly implies that there will

7     never be any settlement of this dispute, or there will never

8     be any offer made by your clients to resolve this other than

9     the one that terminates on August 1st?

10          MR. PERLMAN:  Respectfully, your Honor, I disagree

11    with that interpretation.

12          What it says is that the cash offer that we're

13    making now, which was the one that the board authorized us to

14    make and that we promised we would go to the board with at

15    the appropriate time, extends for six weeks, which is much

16    longer than the ten days that several courts found were

17    sufficient amounts of time to not be coercive.  We purposely

18    erred way on the other side because we weren't -- we didn't

19    want to be --

20          THE COURT:  What about the one-time offer?  Do you

21    think that might have a coercive or intimidating effect, or

22    no?

23          MR. PERLMAN:  I don't think so, your Honor.  I

24    think -- I mean, in every case that I've ever been in that

25    settled, people periodically make offers.  The other side is

1    always free to say, no, I want to litigate the case.  I want

2    to join up with Mr. Krislov, whose name we identified in the

3    release and the case that we identified in the release, and

4    they can take their chances litigating with us, if they

5    prefer.

6           THE COURT:  What about this:  What if I direct the

7    parties not to accept any offer before August 1st?

8           MR. PERLMAN:  Well --

9           THE COURT:  What if I direct the defendant not to

10   accept any offer until August 1st?

11          MR. PERLMAN:  I'm not sure what the basis would be

12   for your Honor --

13          THE COURT:  Well, you just represented that you're

14   keeping this offer open until August 1st, which is far longer

15   than the ten-day period that some courts have found to be

16   appropriate.

17          MR. PERLMAN:  Correct, your Honor.

18          THE COURT:  And that the parties will have the

19   benefit of almost a month to consult with counsel, tax

20   advisors and the like before making a decision.  And I

21   thought that was the import of the comment you just made

22   regarding the date for termination of acceptance as being

23   longer than a ten-day period.

24          Now, what if we then say that any offer transmitted

25   prior to August 1st cannot be accepted?

1            MR. PERLMAN:  Well, I guess what I'm missing, your

2     Honor, is if --

3            THE COURT:  No.  I'm the one that is missing

4     something here.

5            MR. PERLMAN:  Okay.  I'm sorry.

6            THE COURT:  I think I just said, do you think this

7     would be coercive or intimidating, and you said, no, they've

8     got 30 days in which to see professional people to get

9     advice.

10           MR. PERLMAN:  Yes, your Honor.

11           THE COURT:  Well, what if we just then preclude you

12    from accepting any offer until that 30-day period has lapsed?

13           MR. PERLMAN:  What that's doing is telling the

14    people who have chosen to accept the offer and want their

15    money, that we can't make good on the offer we have made.

16           THE COURT:  No, we're not saying you can't make

17    good.  We're saying that there's a court that has told you it

18    can't be accepted until August 1st.

19           And if you really want to say something, you say

20    the Court was concerned that maybe they should further

21    explore all their options and seek legal counsel before they

22    exercise their offer.  I mean, that's what you just told me

23    you thought your client was doing by providing this 30-day

24    window.

25           MR. PERLMAN:  Well, what we were doing, your Honor,

1    was making sure that we didn't skate close to any of the

2    cases that found these communications should be coercive or

3    inappropriate.  And I don't think we were close to any of

4    these cases.

5              THE COURT:  Okay.  What would be the harm, then, to

6    give everyone in the case, the putative class, everyone

7    that's received one of these letters, the opportunity to

8    fully consider this up to the termination date of August 1st?

9              MR. PERLMAN:  They all do have the opportunity to

10   consider up to August 1st.

11             THE COURT:  All right.  I think we'll make that

12   part of the order.

13             How many people are in the class?

14             MR. PERLMAN:  At the maximum, 56.

15             THE COURT:  So the cat's -- the cow is out of the

16   barn, or whatever metaphor is appropriate.  The letter has

17   already been sent.

18             I'm going to enter an order today -- do you want to

19   say anything further regarding release?

20             MR. SALAS:  Yes, your Honor.

21             Any corrective notice that goes out to the putative

22   class should also explain that they do have legal rights

23   under this putative class action.  Basically they just refer

24   to a case and say, oh, there's a case out there, you have to

25   release your -- you have to release your claims in that case,

1    but we're not going to tell you what it's about, what it's

2    regarding; that it alleges that the expired stock options is

3    a breach of contract and that you may be -- you are a part of

4    this case, when we don't even know if 56 people is the end

5    all-be all.  We're open to filing an amended complaint and

6    expanding the class, if that's possible.

7           And also, we don't know if -- you know, there's

8    other -- our client did not get one of these letters because

9    it only went to the parties who were not in litigation with

10   the company.

11          So we're not sure exactly of the lay of the land.

12   We're open to having discussions with the defendants.  But I

13   think that it should make clear that they would be part of

14   this putative class, and this is mainly the claims they are

15   releasing rather than all -- and all claims regarding stock

16   options are basically part of our case.

17          THE COURT:  I'm citing from Eshelman versus

18   OrthoClear -- let me read the full cite into the record.  The

19   OrthoClear case cites the Manual for Complex Litigation,

20   21.12, Fourth Edition, 2004.  I looked at that as well, and

21   then there's some federal court opinions currently also

22   addressing it.

23          That provision says, quote, "Defendants and their

24   counsel generally may communicate with potential class

25   members in the ordinary course of business, including

1   discussing settlement before certification, but may not give

2   false, misleading or intimidating information, conceal

3   material information or attempt to influence a decision about

4   whether to request exclusion from class certification under

5   Rule 23(b)(3)", end quote.

6           And based on the information that's been placed

7   here before me today, particularly the covering letter and

8   the release itself, as I said, the general nature of the

9   release, the statement in the covering letter regarding the

10  advantages to accepting the offer, as well as any meaningful

11  identification of counsel for the putative class,

12  particularly insofar as giving the putative class members the

13  wherewithal to communicate with counsel, I'm going to direct

14  the defendants not to accept any offer until -- when does the

15  offer period close, August 1st?

16          MR. LEVELS:  August 1st.

17          THE COURT:  -- August 1st.  And no offer received

18  before August 1st will be deemed to be accepted until further

19  order of court.

20          And I'll also authorize the plaintiffs to

21  communicate with the class members and convey to them that

22  the plaintiffs are representing the putative class, and that

23  the plaintiffs can be contacted at a certain address, e-mail

24  address and telephone number.

25          And borrowing from the language of OrthoClear, you

1    may tell the putative plaintiffs -- and I'll accept

2    suggestions from both sides.  I'm looking at Page 3 of the

3    Westlaw printout, and the language I'm focusing on,

4    "necessary to evaluate the offer and make an informed

5    decision as to whether or not to release their claims."

6              Any objection to that language?

7              MR. PERLMAN:  Other than my general objections of

8    process, I have no objection to the language.  I would only

9    point out that it obviously has to be fair in both contexts.

10             I mean, in order to not be misleading, the people

11   have to know that if they opt for litigation, that they're

12   litigating and that our position will be that they don't get

13   anything.  And if Mr. Krislov convinces them that's

14   inappropriate, then they will opt into the class, or at least

15   they would if there was enough people to have a class.

16             THE COURT:  Well, the other side of the coin is we

17   don't tell them that so they don't know that they have those

18   advantages.

19             MR. PERLMAN:  I'm not going to reargue it, your

20   Honor.  You've made your decision, so I don't think it's

21   worth --

22             THE COURT:  Well, I'm looking for direction from

23   you.

24        (Mr. Krislov approached the podium.)

25             MR. PERLMAN:  We identified for them that there was

1   a case, we identified the number, we identified Mr. Krislov

2   by name.  These are not a thousand people who spent an extra

3   quarter for suit.  These are senior executives of the company

4   who are entitled -- not entitled, but who have offers for

5   tens of thousands of dollars.

6           If they have the name of a person, they can dial,

7   you know, 411.  Indeed, not only could they do that, they did

8   do that.  People who wanted to talk to them, because we

9   identified them, apparently have already called them.

10  There's nothing misleading in the communication.

11          THE COURT:  How many people have called?

12          MR. KRISLOV:  We got -- sorry, your Honor.  Clint

13  Krislov.

14          I have been handling this IACLE panel the whole

15  day, and so I'm on a lunch break.

16          THE COURT:  Good morning, Mr. Krislov.

17          How many people called?

18          MR. KRISLOV:  The number of people that called were

19  -- there was the one mysterious caller who refused to give

20  his name --

21          THE COURT:  How many people have called?

22          MR. SALAS:  I think only one.

23          MR. KRISLOV:  I think only one.

24          THE COURT:  What information do you have that

25  several people have called?

1    MR. PERLMAN:  I don't think I said several.  If I

2    did, I misspoke.

3        The moving paper said that he had been contacted by

4    putative class members.  That's my basis for saying that.

5        MR. KRISLOV:  Your Honor, if we could draft a

6    fairly neutral letter --

7        THE COURT:  I'll ask you to meet and confer and

8    draft a letter that simply advises that the putative class --

9    that a lawsuit has been filed seeking to represent a class of

10   which the recipient may be a member, and that the attorneys

11   representing the lawsuit are, and then set out your names,

12   telephone number, business address and e-mail.  Why don't we

13   just leave it at that?

14       MR. SALAS:  Sure, your Honor.

15       One more thing.  And I'm not necessarily clear on

16   the --

17       THE COURT:  These people are all intelligent senior

18   CEO type people -- senior executives.  Being advised of the

19   name and address and e-mail account address of someone

20   representing the other side couldn't possibly do any harm,

21   could it?

22       MR. KRISLOV:  Well, they already have a contact --

23   they have already been told to contact Mr. Kuppler in the

24   letter.  So what we would draft is a letter saying what your

25   Honor has ruled, and that they can contact us if they wish,

1    but that they should contact -- they may wish to contact
2    their own independent counsel.
3            One of the problems is they're saying -- in the
4    releases they're saying that they've had an opportunity to
5    consult independent lawyers, counsel and tax advisors, which
6    clearly is not the case for people who sent it in by
7    July 3rd.  But --
8            THE COURT:  Have you received any releases?
9            MR. PERLMAN:  Yes, your Honor.
10           THE COURT:  How many?
11           MR. PERLMAN:  Four.
12           THE COURT:  What is your position in that regard?
13   Maybe I spoke too soon.
14           MR. KRISLOV:  We would like to know who the
15   releases are from, and we would like to --
16           THE COURT:  Originally -- I don't know if you were
17   in the room.  I originally was going to preclude any
18   acceptance of releases until the full period had run on
19   August 1st.  And based on defense counsel's comments, I
20   thought that would be reasonable.  I thought that's what you
21   were alluding to, that they had the full period of time to
22   consider it.  And I thought you were almost conceding that
23   you would keep that period open until --
24           MR. PERLMAN:  It is open.  I just thought -- I want
25   to make sure we weren't miscommunicating.

1      They have the ability, because of the payroll, to

2    get it -- if they get it to us by the beginning of June,

3    July, they can get their money the end of July or they can

4    wait until August.  Nobody has to reply before August 1st.

5    They have six weeks to consider this.

6          THE COURT:  Do you see any harm to preclude you

7    from accepting any offers until August 30th?

8          MR. PERLMAN:  Well, the harm, your Honor, is that

9    the people who, as you say, are sophisticated types and want

10   their money and already sent in an acceptance, are expecting

11   to get it in July and don't get it.

12         THE COURT:  Okay.  How can we communicate with them

13   and tell them that they have until August 1st to reconsider

14   their decision and here is the name of the person that's

15   representing the plaintiffs?  Maybe that's what you ought to

16   say.

17         MR. KRISLOV:  We'll do a very neutral letter for

18   your approval.

19         THE COURT:  You'll have to get it back here this

20   afternoon.

21         MR. KRISLOV:  Pardon?

22         THE COURT:  You'll have to get it back here this

23   afternoon.

24         MR. SALAS:  Sure, absolutely.

25         MR. PERLMAN:  Okay.

 1          THE COURT:  Your point is a good one -- counsel, I

 2     forgot your last name.  I'm sorry.

 3          MR. PERLMAN:  Mr. Perlman.  That's quite all right,

 4     your Honor.

 5          THE COURT:  Mr. Perlman, your point is a good one.

 6     If someone has made a decision to accept the offer that was

 7     informed, that was based on material information and was not

 8     unduly influenced, I agree with you, that they should have

 9     the advantage of having their money in hand as soon as

10     possible.

11          I'll ask you to meet and confer and draft a letter

12     that advises them that they have up to the August 1st

13     deadline to reconsider, and here is plaintiff's counsel's

14     name, address, e-mail address, and that if they've made -- if

15     they have already accepted, that they still have until

16     August 1st to consider their decision, something of that

17     nature.

18          MR. KRISLOV:  I mean, is it feasible to put in --

19     and I don't want to overreach, but we do think that the offer

20     is inadequate and certainly doesn't spell out the tax

21     ramifications to these people.

22          THE COURT:  I'll ask you not to do that.

23          MR. PERLMAN:  May I ask for a very modest

24     modification of your proposed order, your Honor?

25          THE COURT:  Sure.

1    MR. PERLMAN:  The date that the checks would go out

2    for the people who accept by July 3rd, I believe, is

3    July 29th, which would still be over a month from now.  It

4    would be difficult for us to send the checks, then have

5    somebody say on July 31st they're reconsidering.  I would

6    suggest that we tell them they can reconsider up until

7    July 29th and notify us by then if they change it.

8    THE COURT:  All right.  I'll agree to that.

9    And if you would also put in there that if they

10   don't wish to reconsider, they can simply contact you -- to

11   contact you and that the check will be issued on the 29th of

12   June, something of that nature.

13   MR. KRISLOV:  Your Honor, I would object to -- I

14   mean, that's really not neutral.  That's almost encouraging

15   them to call them and tell them to go ahead and cut them the

16   check.

17   And they have not -- I mean, I think nobody could

18   have sent a release in at this point and had adequate tax

19   advice, because these people are going to pay ordinary income

20   tax on these amounts, and the offer we think is inadequate.

21   And so, you know, we're willing -- we think it

22   makes sense to hold everything until at least the August 1st

23   deadline, and we'll have -- we'll be able to deal with these

24   issues -- well, I know you won't be here, but we'll be able

25   to deal with these in an appropriate timeframe after that.

1   And the fact that they might have to wait a month or so more

2   might actually wind up having them get a fair offer.

3          THE COURT:  You can say -- no, I'm not going to do

4   that.

5          You can say that a lawsuit has been filed and you

6   can think of some short, brief statement of your cause of

7   action if you're claiming thus and so.

8          MR. KRISLOV:  Okay.

9          THE COURT:  Simply that.

10          MR. KRISLOV:  Uh-huh.

11          THE COURT:  A brief statement of your cause of

12   action, that a lawsuit has been filed stating a cause of

13   action; that the attorneys representing this claim will be

14   moving to represent a class of people that are affected by

15   the claim, that would benefit from the claim.  That law firm

16   is, and then set the name down.

17          MR. KRISLOV:  Okay.

18          THE COURT:  Okay?

19          And then if you also advise them in there that

20   should they -- that no offer will be deemed to be -- that you

21   have up to -- what did you say, Mr. Perlman?

22          MR. PERLMAN:  July 29th.

23          THE COURT:  -- July 29th to consider the offer and

24   the offer will remain open to them.

25          MR. KRISLOV:  I think the offer is open to

1  August 1st anyway.

2          THE COURT: Well, we're going to do it August --

3          MR. KRISLOV: It doesn't make any sense to shorten

4  that time.

5          THE COURT: What if we say, if you communicate that

6  you wish to accept the offer -- yes, you were going to keep

7  it open until August 1st anyway. You would have cut those

8  checks for those people the next --

9          MR. PERLMAN: No, your Honor. That's not what the

10 proposal is. We were talking about the people who get us the

11 acceptances by July 3rd. Those checks would have gone out on

12 or before July 31st. So I need to know a couple days before

13 cutting those checks if somebody is going to reconsider.

14         After we send somebody a check for $56,000, I don't

15 want to find out on August 1st that, oh, actually they have

16 reconsidered and they want to be part of the class.

17         THE COURT: What's wrong with cutting a check on

18 August 1st?

19         MR. PERLMAN: That isn't when -- these are going to

20 go out with the regular payroll. Payroll for the whole

21 company goes out at the end of the month.

22         THE COURT: What's the harm of cutting five or six

23 checks, or whatever the amount is? What is it, four right

24 now?

25         MR. PERLMAN: There's four right now, as of last

 1  night, yes, your Honor.

 2          I can do that, your Honor.  I'm not going to --

 3          THE COURT:  We'll let it stand at that.

 4          MR. PERLMAN:  I'm not going to argue.  I understand

 5  your concern.

 6          THE COURT:  Okay.

 7          My concern is this:  I want to give all the

 8  putative class members an opportunity to consider the offer

 9  made by the defendant in light of an understanding of the

10  nature of the suit that's been filed and the parties that are

11  representing the putative class.  Those people that want to

12  persist in their acceptance of your offer, after having that

13  opportunity, can do so as long as they communicate that to

14  you before August 1st.

15          MR. PERLMAN:  Understood, your Honor.

16          THE COURT:  Okay.

17          MR. KRISLOV:  Can we have the list of all the

18  people, both current and former employees, that are in the

19  class?  Because as I understand it, there --

20          THE COURT:  You will not communicate to anybody

21  else until we resolve this.  Do you intend on doing that?

22          MR. PERLMAN:  Other than the letter that you're

23  talking about, your Honor?

24          THE COURT:  Other than this letter, Mr. Perlman.

25          MR. PERLMAN:  The only issue that I can identify is

1    that the offer identifies not a lawyer but somebody in the HR

2    Department for the people to call if they have any questions.

3    I can't stop them from calling.  I can instruct that person,

4    per your Honor's suggestion, to make sure that they identify

5    -- that any call received, that they identify Mr. Krislov and

6    his phone number.  But to go beyond -- you know, the

7    opportunity to consult seems to me to be going way further

8    than any of the cases suggest.

9            THE COURT:  You're not contemplating sending

10    another letter out?

11            MR. PERLMAN:  We were not, your Honor.

12            THE COURT:  Okay.  I will ask you not to do that

13    until you advise the Court.

14            MR. KRISLOV:  The problem that we have is they're

15    going to be calling up -- is it Kuppler?

16            MR. PERLMAN:  That is correct, Howard Kuppler.

17            MR. KRISLOV:  They're going to be calling up Howard

18    Kuppler and we don't want any -- he is an inadequate person

19    to give them their full and fair explanation.

20            THE COURT:  Well, let's get the word out as to the

21    nature of your claim, very short, very brief statement, and

22    the parties to whom they should direct their contact.

23            MR. KRISLOV:  And can they turn over to us the

24    names of anybody --

25            THE COURT:  We'll get to that.  That's not before

1   me now.

2            Off the record.

3        (Discussion had off the record.)

4            MR. PERLMAN:  Thank you, your Honor.

5            For the record, we will be filing momentarily the

6   motion to dismiss that I described, along with, by the end of

7   the day, the affidavit of someone who can verify that the

8   putative class is probably less than 100 people.

9            THE COURT:  Okay.

10           MR. PERLMAN:  Thank you, your Honor.

11           THE COURT:  Thank you all.

12           MR. KRISLOV:  Thank you, your Honor.

13       (Which were all the proceedings heard.)

14                        CERTIFICATE

15       I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18   _____        _7/23/08_____

19   Mary M. Hacker                   Date
     Official Court Reporter

20

21

22

23

24

25