**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RAVI P. RAWAT, on behalf of himself and others similarly situated,** | ) ) ) | |
| | ) | **Case No. 08-cv-4305** |
| Plaintiff, | ) | |
| **v.** | ) | **Judge Elaine E. Bucklo** |
| | ) | |
| **NAVISTAR INTERNATIONAL CORPORATION,** | ) ) | **Magistrate Judge Martin C. Ashman** |
| | ) | |
| Defendant. | ) | |

**NAVISTAR INTERNATIONAL CORPORATION'S OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION *AND* PLAINTIFF'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

Dated:  July 30, 2008

Laurence H. Levine
Maaike S. Almeida
LAURENCE H. LEVINE LAW OFFICES
190 South LaSalle Street, Suite 3120
Chicago, Illinois 60603
Phone: (312) 291-7000
Fax: (312) 291-7015

Cary R. Perlman
Mark S. Mester
Robin M. Hulshizer
Robert C. Levels
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, Illinois 60606
Phone: (312) 876-7700
Fax: (312) 993-9767

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................1

II.    FACTUAL BACKGROUND...................................................................................4

       A.     Trading Restrictions Imposed While Navistar Became Current With Its
              Financial Reporting Obligations....................................................................4

       B.     Navistar's Offer To Provide Cash Payments To Holders Of Expired
              Options...........................................................................................................5

       C.     Plaintiff's Original Federal Complaint And Navistar's Extension Of Time ..........6

       D.     Judge Darrah Orders Supplemental Notice To The Putative Class And
              Finalizes August 1, 2008 Effective Date For Acceptance Of Navistar's
              Offer................................................................................................................7

       E.     Plaintiff Files Duplicative State Litigation And Seeks Relitigation Of
              Judge Darrah's Order.....................................................................................8

       F.     The False And Misleading Statements In Plaintiff's Motion For
              Preliminary Injunction ...................................................................................9

III.   ARGUMENT..........................................................................................................11

       A.     Plaintiff's Proposed Class Has An Adequate Remedy At Law And Will
              Suffer No Irreparable Harm...........................................................................11

       B.     Plaintiff Is Not Likely To Succeed On The Merits.......................................13

              1.     Judge Darrah's Decision Proves There Is No Likelihood of
                     Success on the Merits.........................................................................13

              2.     Navistar's June 20 Offer Was Proper .................................................14

              3.     Navistar's Offer Does Not Constitute Economic Duress ...................16

              4.     Navistar Provided Valid And Adequate Consideration For Its Offer........17

       C.     The Underlying Merits Of Plaintiff's Case Do Not Withstand Scrutiny.............17

              1.     There Was No Breach Of Contract And/Or There Were No
                     Damages..............................................................................................18

2.      The Illinois Wage Act Does Not Apply To Plaintiff's Stock
        Options ................................................................................................ 18

D.      Plaintiff Has Failed To Provide Notice To Putative Class Members Whose
        Rights Would Be Affected By The Preliminary Injunction ................................ 20

IV.    CONCLUSION ............................................................................................ 21

# TABLE OF AUTHORITIES

Page

**CASES**

*Abdulhafedh v. Secretary of State,*
   161 Ill. App. 3d 413 (1987) ...................................................................................19

*Affiliated Enterprises, Inc. v. Waller,*
   5 A.2d 257 (Del. Super. Ct. 1939) .......................................................................17

*Bakerman v. Sidney Frank Importing Co., Inc.,*
   No. Civ.A. 1844-N, 2006 WL 3927242, at *15 (Del. Ch. Oct. 10, 2006) ................16

*Bernina of Am., Inc. v. Fashion Fabrics Int'l, Inc.,*
   No. 01 C 585, 2001 WL 128164, at *1 (N.D. Ill. Feb. 9, 2001) ...............................11

*Birbalas v. Cuneo Printing Industries, Inc.,*
   140 F.2d 826 (7th Cir. 1944) ...............................................................................14

*Blue v. Chubb Group,*
   No. 03 C 6692, 2005 WL 1667794, at *17 (N.D. Ill. July 13, 2005)........................20

*Carlile v. Snap-on Tools,*
   648 N.E.2d 317 (Ill. App. Ct. 1995) .....................................................................17

*Christensen v. Kiewit-Murdock Inv. Corp.,*
   815 F.2d 206 (2d Cir. 1987) ..............................................................................5, 6

*Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.,*
   769 F. Supp. 671, 739 (D. Del. 1991) ..................................................................16

*Edge of the Woods v. Wilmington Savings Fund Society, FSB,*
   No. CIV.A.97C-09-281-JEB, 2001 WL 946521, at *4 (Del. Super. Ct. Aug. 16, 2001)...........16

*Eshelman v. OrthoClear Holdings, Inc.,*
   No. C 07-01429 JSW, 2007 WL 2572349, at *2-3 (N.D. Cal. Sept. 4, 2007) ...............2, 5, 6, 14

*Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Prods. Inc.,*
   545 F.2d 1096 (7th Cir. 1976) ..............................................................................11

*Fuentes v. Shevin,*
   407 U.S. 67 (1972) .............................................................................................20

*Gulf Oil Co. v. Bernard,*
   452 U.S. 89 (1981) .......................................................................................5, 9, 14

*IBM v. Bajorek*,
  191 F.3d 1033 (9th Cir. 1999) ....................................................................19

*In re Cendant Corp. Securities Litigation*,
  No. 04-3352, 2006 WL 1342808, at * 3 (3rd Cir. 2006)...............................18

*In re Comdisco, Inc.*,
  No. 02 C 7030, 02 C 7031, 2003 WL 685645, *2 (N.D. Ill. 2003 Feb. 27, 2003)...................20

*In re Gen. Motors Corp. Engine Interchange Litig.*,
  594 F.2d 1106 (7th Cir. 1979) ......................................................................5

*Jankousky v. Jewel Companies, Inc.*,
  182 Ill. App. 3d 763 (1st Dist. 1989)........................................................6, 14

*Jones v. Jeld-Wen, Inc.*,
  No. 07-22328-CIV-DIMITROULEAS/ ROSENBAUM, 2008 WL 2058517, at *9
  (S.D. Fla. May 9, 2008) ..........................................................................10, 15

*McDole v. Kingsley*,
  163 Ill. 433 (1896).......................................................................................14

*Metropolitan Distributors Inc. v. Illinois Dept. of Labor*,
  114 Ill. App. 3d 1090 (1983) .......................................................................19

*Palmer v. Great Dane Trailers*,
  No. 05 C 1410, 2005 WL 1528255, at *3 n.2 (N.D. Ill. June 28, 2005) ....................19

*Rakos v. Skytel Corp.*,
  954 F. Supp. 1234 (N.D. Ill. 1996)...............................................................20

*Roland Machinery v. Dresser Indus.*,
  749 F.2d 380 (7th Cir. 1984) ...........................................................11, 12, 13

*Schwalm Electronics, Inc. v. Electrical Products Corp.*,
  14 Ill. App. 3d 348 (1973) ...........................................................................19

*Shields v. Associated Volume Buyers*,
  No. 93 C 7620, 1994 U.S. Dist. LEXIS 3944, *3-4 (N.D. Ill. Mar. 30, 1994) ....................19

*Singh v. Batta Environmental Associates, Inc.*,
  No. Civ.A. 19627, 2003 WL 21309115, at *5 (Del. Ch. May 21, 2003) ....................17

*The Little Tykes Co. v. Kid Station Toys, Ltd.*,
  No. 08 C 1935, 2008 WL 1805379, at *3 (N.D. Ill. Apr. 18, 2008) ....................11

*Ty, Inc. v. Jones Group, Inc.*,
  237 F.3d 891 (7th Cir. 2001) ........................................................................11

*Underbrink v. Warrior Energy Servs. Corp.*,
    No. 2982-VCP, 2008 Del. Ch. LEXIS 65, at *37 (Del. Ch. May 30, 2008) ............................17

*Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l, Inc.*,
    455 F.2d 770 (2d Cir. 1972) ......................................................................................................6

*Williams v. McKeithen*,
    939 F.2d 1100 (5th Cir. 1991) ..................................................................................................20

## OTHER AUTHORITIES

Advisory Committee Note to 2007 Amendment of Fed. R. Civ. P. 65 ........................................20

Fed. R. Civ. P. 65(d)(2)................................................................................................................20

Defendant Navistar International Corporation ("Navistar" or the "Company") submits the following memorandum of law in opposition to Plaintiff's Motion for a Preliminary Injunction to Prevent Defendant from Accepting Releases or to Invalidate Releases Executed by Putative Class Members ("Motion for Preliminary Injunction"), as well as Plaintiff's Emergency Motion for a Temporary Restraining Order ("Emergency Motion II"). The asserted bases for the two motions are essentially the same.

## I.    <u>INTRODUCTION</u>

Plaintiff – or more precisely, Plaintiff's counsel – is fighting a lonely and wasteful battle against Navistar, the Honorable Judge John W. Darrah, and the putative class whose interests Plaintiff's counsel eventually hopes to represent. To that end, Plaintiff has filed two lawsuits, two "emergency" motions, and a motion for a preliminary injunction, all for the purpose of enjoining current and former members of Navistar's senior management from accepting cash offers aggregating millions of dollars in connection with certain expired stock options. In order for Plaintiff to succeed on his second round of "emergency" motions, he must demonstrate that there really is an emergency not of his own making, that there will be irreparable harm in the absence of an injunction, and that there is a likelihood of success on the merits. Plaintiff meets **none** of these requirements.

<u>First</u>, "success on the merits" is decidedly **<u>un</u>**likely here, in no small part because the merits of the injunction Plaintiff seeks already were adjudicated by Judge Darrah on June 26, 2008. On June 25, 2008, in response to the **exact same** June 20, 2008 letter offer that Plaintiff complains of in the two pending motions, Plaintiff filed an Emergency Motion for Protective Order ("Emergency Motion I") seeking the **exact same** relief – namely an order "barring Defendant from soliciting or obtaining further releases from class members" and "voiding all releases Defendant obtained from class members." *See* Emergency Motion I, Ex. 1 hereto, at 1.

1

In Emergency Motion I, Plaintiff asserted essentially the same claims presented in the pending

Motion for Preliminary Injunction and Emergency Motion II, including claims that Navistar's

offer was the coercive and misleading result of Navistar's "deceitful strategy."  *See id.* at *passim*.

Judge Darrah conducted a lengthy hearing the very next morning, and Judge Darrah **rejected** the

exact claims for relief presented in the pending motions.  *See* June 30, 2008 Order, Ex. 2 hereto;

June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 33.

In so ruling, the Court recognized the right of Navistar to communicate with its current

and former employees prior to class certification, *see*, *e.g.*, *Eshelman v. OrthoClear Holdings*,

*Inc.*, No. C 07-01429 JSW, 2007 WL 2572349, at *2-3 (N.D. Cal. Sept. 4, 2007), and the Court

specifically held as follows:

> I want to give all the putative class members an opportunity to consider the offer
> made by the defendant in light of an understanding of the nature of the suit that's
> been filed and the parties that are representing the putative class.  Those people
> that want to persist in their acceptance of [Navistar's] offer, after having that
> opportunity, ***can do so*** as long as they communicate that to [Navistar] before
> August 1st.

*See* June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 33 (emphasis supplied).  Given that Judge Darrah

already rejected Plaintiff's request for the exact same relief based on the exact same June 20

offer, the pending motions have **no** likelihood of success.

<u>Second</u>, there is no "emergency," and Plaintiff's conduct proves that.  No later than the

June 26 hearing before Judge Darrah, Plaintiff knew the precise content of the June 20 letter, the

precise language of the June 27, 2008, "corrective" letter that Judge Darrah ordered, and the

precise date when all of the releases returned by the offerees would be effective, *i.e.* August 1.

*See id.*  Emergency Motion II was filed over a **month** later.  If there really were an emergency –

and clearly there is not – Plaintiff's remedy was to ask Judge Darrah to reconsider his order, or to

file an appropriate motion 2-3 days later.  In choosing not to follow this course, Plaintiff waived

2

the right to cry "emergency."  In fact, the most reasonable assumption is that Plaintiff deliberately sat on his hands to manufacture an emergency in the hope that Navistar would not have an opportunity to respond and that Plaintiff's mischaracterizations would pass unnoticed by a new Judge unfamiliar with the record and the law.

Third, Plaintiff can demonstrate no **irreparable** harm because the only remedy Plaintiff seeks is money.  In the absence of an injunction preventing the putative class members from settling their claims, there are only two possible outcomes.  The first outcome is that the Court eventually will rule the releases are valid and enforceable, in which case denying the pending motions obviously will result in no harm whatsoever.  The second outcome is that the Court eventually will rule that the releases are void in which case these individuals will be free to take their chances in court.  If the money paid to individuals with subsequently voided releases enter proves to be too much or too little, the Court need only award money damages accordingly. Again, denial of the pending motions will result in no irreparable harm whatsoever.

Because Plaintiff meets none of the three requirements for securing a preliminary injunction or a temporary restraining order, the Court could and should summarily deny both motions.  Those three reasons, however, do not exhaust what is improper about the pending motions.  Mr. Rawat, the only plaintiff actually in front of the Court at this time and nominally the movant, has no use for the relief requested by the Motion for Preliminary Injunction or Emergency Motion II.  He has not signed a release, and presumably he has no intention of doing so before August 1.  Mr. Rawat has every right to choose the risks of litigation over the certainty of a substantial cash offer, but the over 90% of offerees who accepted Navistar's June 20 offer also have the right to make the opposite choice.  The preliminary injunction Plaintiff seeks, however, will enjoin the 90% who want to settle every bit as much as Navistar.

As such, and as noted above, Plaintiff's counsel is waging war not just against Navistar but against the class he hopes to represent.  Those individuals want their money, and they want no part of the uncertainty and contingency fees that Plaintiff's counsel offers instead.  Plaintiff's counsel seemingly cannot take "no" for an answer – not from Judge Darrah, and not from the putative class.  Navistar respectfully asks this Court to "just say no" a third time, and in terms that will relieve Navistar and the Court from the undue burden of further vexatious litigation and frivolous motions.

## II.    FACTUAL BACKGROUND

Very few "facts" are relevant to the pending motions.  The underlying dispute over the value Plaintiff places on expired stock options is not before the Court, only the question of whether Judge Darrah's previous order regarding the June 20 offer letter should be reversed.  Nevertheless, Navistar summarizes the key facts below in order to provide the Court with an **accurate** picture of what has transpired to date.

### A.    Trading Restrictions Imposed While Navistar Became Current With Its Financial Reporting Obligations

Plaintiff's state court Complaint, now removed, alleges that on April 6, 2006, Navistar informed holders of stock options that the Company was unable to file its Form 10-K Annual Report on time.  As a result, the Company was prevented from filing the SEC registration statements necessary to register shares of the Company's common stock that are acquired when employees exercise stock options.  *See* Compl. at ¶¶ 8-13.  To the extent appropriate, stock options were typically granted to a select group of executives and senior members of management.  *See* Stark Supp. Decl., Ex. A to Navistar's Mem. in Supp. of Its Mot. to Dismiss, Ex. 5 hereto, at ¶ 7.

**B.      Navistar's Offer To Provide Cash Payments To Holders Of Expired Options**

As Plaintiff also has acknowledged, on January 15, 2008 – months before any lawsuit was filed – Navistar sent a letter to the affected former option holders informing them that Navistar would address with the Board of Directors the issue of stock options that expired while trading restrictions were in effect.  *See* Compl. at ¶ 33-35; Jan. 15, 2008 Letter, Ex. B to Compl. Significantly, the January 2008 letter also specifically told the recipients that "[w]e cannot predict what action, if any, our directors will take, ***but we will communicate with you, no matter what the outcome, once that process is completed***."  *Id.* (emphasis supplied).  Although Plaintiff himself received this letter, instead of waiting for the promised communication, he filed his first complaint in federal court (the "Original, Federal Complaint") and served it on Navistar the very day that Navistar filed its 2007 Form 10-K.  *See* Original, Federal Complaint, Ex. 4 hereto.

As promised in its January letter, Navistar did address the issue of expired options with its Board of Directors.  *See* June 20, 2008 Letter and Payment & Release, Ex. 6 hereto.  The Board approved a cash payment offer to employees and former employees, and the Company communicated that offer and a release of claims relating to vested stock options on June 20. From the very beginning, the June 20 letter made clear that recipients had until August 1, 2008, to choose whether or not to accept the offer.  *See id.*

Importantly, as Judge Darrah correctly found after reviewing the decisional law identified for him by Navistar at the June 26 hearing, a defendant has a right to communicate with putative class members prior to class certification for the purpose of settling claims.  *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101-02 (1981) ; *Eshelman*, 2007 WL 2572349, at *2-3; *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1138 (7th Cir. 1979) ("[Defendant Company's] offer to settle, if accepted by individual class members, would not amount to a settlement of the class action itself."); *Christensen v. Kiewit-Murdock Inv. Corp.* , 815 F.2d 206, 213 (2d Cir.

1987) ("[A]t least prior to class certification, defendants do not violate Rule 23(e) by negotiating settlements with potential members of a class.").  This is true under Illinois law, as well as federal law.  *Compare Eshelman*, 2007 WL 2572349, at *2-3, *with Jankousky v. Jewel Cos., Inc.*, 182 Ill. App. 3d 763, 767, 538 N.E.2d 689, 691 (Ill. App. Ct. 1989) ("There is no prohibition against communications, negotiations, or settlements with persons who fall within the proposed class prior to class certification.").

> In an often cited opinion on this topic, Judge Friendly explained as follows:

> [E]ven if defendant should succeed in settling with so many [members of the putative class] that the court will be forced to deny class action status, plaintiff's complaint will remain untouched.  As we have, in essence, already noted, plaintiff has no legally protected right to sue on behalf of other[s] who prefer to settle; F.R.Civ.P. 23(e), requiring court approval of the dismissal or compromise of a class action, does not bar non-approved settlements with individual members which have no effect upon the rights of others.

*Christensen*, 815 F.2d at 213, *citing Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l, Inc.*, 455 F.2d 770, 775 (2d Cir. 1972).

### C.    Plaintiff's Original Federal Complaint And Navistar's Extension Of Time

Plaintiff's Original, Federal Complaint defined the proposed class as "[a]ll individuals whose vested options expired during Navistar's 'blackout period.'"  Original, Federal Complaint, Ex. 4 hereto, at ¶ 36.  Presumably foregoing any pre-filing investigation, Plaintiff alleged that "thousands" were affected.  *Id.* at ¶ 37.  As it turns out, however, there are only 56 individuals whose stock options expired during the "blackout period."  *See* Stark Supp. Decl., Ex. A to Navistar's Mem. in Supp. of Its Mot. to Dismiss, Ex. 5 hereto, at ¶ 9.  Consequently, though content to be in federal court if possible, Navistar was forced to recognize that no subject matter jurisdiction existed in federal court, because the Class Action Fairness Act requires 100 persons.  Navistar began to draft a motion to dismiss and requested an extension of time from Plaintiff's counsel to do so.  *See generally* Navistar's Mot. to Dismiss and Mem. in Supp., Ex. 5 hereto.

Although Plaintiff's counsel claims the requested extension of time was for the "sinister" purpose of facilitating the June 20 offer, *see* Mot. for Prelim. Inj. at 3, it is doubtful that Plaintiff really believes the request was "sinister" because Plaintiff's premise is so ridiculous.  As noted above, long **before** the Original, Federal Complaint was filed, Navistar promised the affected employees and former employees that it would communicate the Board's decision with respect to expired stock options, regardless of the outcome.  *See* Jan. 15, 2008 Letter, Ex. B to Compl. Navistar's ability to make good on that promise was completely unaffected by the date the answer to the Original, Federal Complaint was due.  The June 20 letter could have and would have been sent on June 20 whether Plaintiff's counsel agreed to a two-week extension, a two-year extension, or no extension at all.  The only thing "sinister" here is making up allegations when Plaintiff's counsel knows better.

### D.    Judge Darrah Orders Supplemental Notice To The Putative Class And Finalizes August 1, 2008 Effective Date For Acceptance Of Navistar's Offer

On June 25, 2008, Plaintiff filed Emergency Motion I seeking the exact relief it seeks in the two pending motions, including an order barring Navistar from obtaining releases from putative class members and invaliding releases accepted.  *See* Emergency Motion I, Ex. 1 hereto, at 12.  Relying on precedent cited by Navistar, Judge Darrah confirmed that it was proper for Navistar to communicate with proposed class members and refused to bar or invalidate the releases.  *See* June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 13, 21; June 30, 2008 Order, Ex. 2 hereto. Rather, Judge Darrah directed the parties to jointly draft a supplementary notice to those individuals that had received the June 20 letter (1) advising them of Ms. Krislov's contact information; (2) stating they may contact Mr. Krislov or a lawyer of their choosing in evaluating Navistar's offer; (3) providing that acceptances would be become effective August 1, 2008 (the same due date Navistar selected in the June 20 letter); and (4) stating that acceptances could be

withdrawn before that date.  *See* June 27, 2008 Letter, Ex. A to July 30, 2008 Order, Ex. 2 hereto.

Although Navistar respectfully disagrees that any corrective notice was required, Navistar, of course, complied with the Order and sent the letter to all of the persons who received the June 20 offer.  *See id.*  The significance of this second letter, in the context of the pending motions, is that long before August 1, 2008, all of the persons who chose to accept Navistar's offer not only knew the terms of the offer, they also had been sent a letter informing them that the offer "MAY AFFECT YOUR LEGAL RIGHTS," that a class action suit was pending, the nature of that class action suit, the lawyer representing the named plaintiff, the phone number and email address of Plaintiff's counsel, and that the recipients were free "to contact legal counsel of your choice."  *Id.*

**E.    Plaintiff Files Duplicative State Litigation And Seeks Relitigation Of Judge Darrah's Order**

On June 26, 2008, Navistar filed its motion to dismiss Plaintiff's Original, Federal Complaint for lack of subject matter jurisdiction, which is still pending.  *See* Mot. to Dismiss, Ex. 5 hereto.  Plaintiff did not – and still has not – voluntarily dismissed that case.  Instead, Plaintiff filed a new Complaint in Illinois state court on July 18, 2008.  *See* Compl. at *passim*.  In the state Complaint, Plaintiff defines his proposed class as "all Navistar employees and former employees whose stock options either expired or who were prevented from exercising their options during the [*sic.*] Navistar's 'blackout' period," a broader class than the one proposed in Plaintiff's Original, Federal Complaint.  *See* Compl. at ¶ 46.  Because Navistar's stock was trading at its highest level in years in the days after the "blackout" was lifted, the expanded proposed class consists of people who had the ability to exercise their options at the highest possible price.  *See* http://finance.yahoo.com/q/hp?s=NAV (reflecting Navistar's historical stock

prices, showing Navistar's stock closed at $78.99 on June 5, 2008, higher than any price achieved during the "blackout.").

On July 24, 2008, almost a month after he knew that the releases would be effective on August 1, Plaintiff filed his Motion for Preliminary Injunction asking the state court to do what Judge Darrah would not and enjoin Navistar and the putative class from settling. *See* Ex. 5 to Navistar's Not. of Removal. On July 29, 2008, Plaintiff filed Emergency Motion II, essentially duplicating the Motion for Preliminary Injunction. *See id.* On July 30, 2008, Plaintiff re-filed these motions in this Court.

> **F.     The False And Misleading Statements In Plaintiff's Motion For Preliminary Injunction**

Although Plaintiff's counsel may be forgiven for colorful adjectives that are wildly inconsistent with the events they purport to describe, there are a number of factual misstatements in the Motion for Preliminary Injunction that need to be exposed. First, contrary to Plaintiff's characterization, it is not true that "United States Judge Darrah *found* that the [June 20] letter was coercive and misleading." Mot. for Prelim. Inj. at 5-6. Judge Darrah actually held that "it's clear that precertification correspondence … is appropriate." *See* June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 13. Judge Darrah did not enter a *Gulf Oil* protective order invalidating the offers, but instead ordered a corrective letter be sent. *See* June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 29-31. Indeed, Judge Darrah held that "people that want to persist in their acceptance of [Navistar's] offer … *can do so* as long as they communicate that to [Navistar] before August 1st." *See* June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 33 (emphasis supplied). It is difficult to believe – indeed, Plaintiff does not believe – that Judge Darrah would green light acceptances of a "coercive and misleading" offer.

<u>Second</u>, it is not true that the putative class had "an extremely limited amount of time to return releases to the Company." *See* Mot. for Prelim. Inj. at 5. Putting aside that this very argument has already been rejected by Judge Darrah, it begs credulity to suggest that **six weeks** is an "extremely limited amount of time." *See id.*; June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 18; *c.f. Jones v. Jeld-Wen, Inc.,* No. 07-22328-CIV-DIMITROULEAS/ ROSENBAUM, 2008 WL 2058517, at *9 (S.D. Fla. May 9, 2008) (case **cited by Plaintiff** in Emergency Motion I (at 6 n.1), wherein the court agreed that **10 days** was sufficient for putative class members to respond to the settlement offer). This is particularly so when the recipients of the offer knew no later than January 2008 that a communication would be coming regarding their expired stock options. *See* Jan. 15, 2008 Letter, Ex. B to Compl.

<u>Third</u>, it is transparently untrue that that Navistar opposed Plaintiff's Emergency Motion I "solely based on the argument that the federal court lacked subject matter jurisdiction." *See* Mot. for Prelim. Inj. at 5. As the transcript readily reveals, Navistar opposed Plaintiff's Emergency Motion I on its merits, handed up a draft opposition memo, and cited a number of cases in opposition. *See* June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 3-4. Indeed, Judge Darrah based his ruling on the cases **Navistar** cited, finding Navistar's authority "remarkably close to the facts of this case and extremely instructive." *See id.* at 11-12.

<u>Finally</u>, Plaintiff deliberately and repeatedly misrepresents the Court's inquiry and the response of Navistar's counsel concerning the "one time offer." *See* Mot. for Prelim. Inj. at 20-21; Emergency Motion II at 10-11. Plaintiff egregiously distorts the record by arguing that Navistar purportedly admitted in open court that the "one-time opportunity" was a "misrepresentation." *See id.* In reality, Judge Darrah did not ask Navistar's counsel whether the June 20 offer was a one-time offer or not. Judge Darrah asked, "Could this [June 20] offer

10

preclude settlement of *this case* later on?"  June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 17.

Navistar's counsel truthfully responded that the releases did not preclude settlement of the class

action case later on, and that the topic had not been discussed with his client.  *See id.*  That is not

an "admission" that the June 20 offer contained a "misrepresentation."  That is an example of

counsel providing a straight answer to a direct question from the Court.

## III.  <u>ARGUMENT</u>

Granting a preliminary injunction is an "extremely far reaching power not to be indulged

in except in a case clearly warranting it."  *See Fox Valley Harvestore, Inc. v. A.O. Smith*

*Harvestore Prods. Inc.*, 545 F.2d 1096, 1097 (7th Cir. 1976).  A party seeking to obtain a

preliminary injunction must demonstrate: (1) a likelihood of success on the merits; (2) no

adequate remedy at law exists; and (3) that irreparable harm will result if the injunction is not

granted.[1]  *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).  Finally, the court

must consider the interests of non-parties in denying or granting the injunction.  *See id.*

### A.   Plaintiff's Proposed Class Has An Adequate Remedy At Law And Will Suffer No Irreparable Harm

"In every case in which the plaintiff wants a preliminary injunction he must show that he

has no adequate remedy at law, and … that he will suffer irreparable harm if the preliminary

injunction is not granted."  *Roland Machinery v. Dresser Indus.*, 749 F.2d 380, 386 (7th Cir.

1984).  "Where the only remedy sought at trial is damages, the two requirements – irreparable

harm, and no adequate remedy at law – merge.  The question is then whether the plaintiff will be

made whole if he prevails on the merits and is awarded damages."  *Id.*

---

[1]   The standards for a temporary restraining order are the same as those for a preliminary injunction.  *See*, *e.g.*, *The Little Tykes Co. v. Kid Station Toys, Ltd.*, No. 08 C 1935, 2008 WL 1805379, at *3 (N.D. Ill. Apr. 18, 2008); *Bernina of Am., Inc. v. Fashion Fabrics Int'l, Inc.*, No. 01 C 585, 2001 WL 128164, at *1 (N.D. Ill. Feb. 9, 2001).

As Plaintiff is seeking money damages in his lawsuit against Navistar, an irreparable harm and inadequate legal remedy would only exist if the Plaintiff could not be "made whole if he prevails on the merits" absent the preliminary injunction. *See Roland Machinery*, 749 F.2d at 386. However, Plaintiff has not even attempted to make any showing why there would be "irreparable" injury. [2] Instead, Plaintiff argues the harm to the class members is that "they will waive their rights on an uninformed basis" but Plaintiff fails to explain, even if true, why this purported harm is **irreparable**. *See* Mot. for Prelim. Inj. at 10-11; Emergency Motion II at 6-7. If Plaintiff believes that he can convince a court to "invalidate" the releases of people who prefer to settle, then the Court could grant that same remedy a month from now or a year from now. If Plaintiff is correct that the releases are invalid and "prevails on the merits," he can obtain whatever money is needed to make the putative class" whole" at that time. There is no need for such an extraordinary remedy such as a preliminary injunction. *See Roland Machinery*, 749 F.2d at 386.

Although the Court causes no harm to the putative class in refusing to enter the preliminary injunction, the putative class will suffer great harm if a preliminary injunction is entered. If Plaintiff obtains an injunction, Plaintiff's counsel will be acting against the manifested intent of the very parties he presumes to represent, unreasonably preventing the putative class members who desire to settle this matter from receiving literally millions of dollars. *See* Stark Decl., Ex. 2 to Notice of Removal, at ¶ 10. Moreover, granting the preliminary injunction would require countermanding the express orders of Judge Darrah. *See*

---

[2]    Damages awards are only insufficient to make a plaintiff whole in four limited circumstances: (1) where the award comes too late to save the plaintiff's business; (2) where the plaintiff would not be able to finance his lawsuit without business revenues threatened by defendant's acts; (3) where defendant may become insolvent before judgment; and (4) where the

June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 33.  Although not a "harm" in the traditional sense, an end run around the prior order would be a disservice to the Judge who accommodated Plaintiff's first "emergency."

**B.      Plaintiff Is Not Likely To Succeed On The Merits**

Plaintiff claims that he is likely to succeed on the underlying merits related to the value of the expired stock options.  *See* Mot. for Prelim. Inj. at 11-24; *but see* June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 33.  These arguments are not only wrong (*see infra*), however, they entirely miss the point.  Plaintiff is not seeking a Preliminary Injunction on the merits of his claims.  He is seeking a preliminary injunction on the issue of whether sophisticated senior members of management, with six weeks to decide **and** with notice of Plaintiff's lawsuit **and** after being provided with Mr. Krislov's phone number, should be barred from executing a release in exchange for large sums of money.  That issue already has been decided.

**1.      Judge Darrah's Decision Proves There Is No Likelihood of Success on the Merits**

This Court does not need to pause over Plaintiff's claim that the releases should be invalidated.  Judge Darrah already has decided that question, ruling that, following corrective notice, the releases **would** be effective on August 1.  *See* June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 33; June 30, 2008 Order, Ex. 2 hereto.  Specifically, Judge Darrah ruled as follows:

> I want to give all the putative class members an opportunity to consider the offer made by the defendant in light of an understanding of the nature of the suit that's been filed and the parties that are representing the putative class.  Those people that want to persist in their acceptance of [Navistar's] offer, after having that opportunity, ***can do so*** as long as they communicate that to you before August 1st.

*See* June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 33 (emphasis supplied).

---

nature of the lawsuit makes damages difficult to calculate.  *See Roland Machinery Co.*, 749 F.2d at 386.  None of these exceptions apply here.

Judge Darrah had the authority under *Gulf Oil* to prohibit Navistar from proposing settlement with proposed class members if he found Navistar's offer was coercive and misleading. *See Gulf Oil*, 452 U.S. at 101-02; *Eshelman*, 2007 WL 2572349, at *2-3. After reviewing Plaintiff's brief on that issue and affording him a hearing, Judge Darrah determined that it was proper for Navistar to make settlement offers to the proposed class. *See* June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 33. Indeed, the court found that individuals were free to settle. *See id.*

## 2.    Navistar's June 20 Offer Was Proper

In Illinois, public policy favors settlements, including settlements between putative class members and defendants. *Jankousky*, 182 Ill. App. 3d at 767-68, 538 N.E.2d 689, 691-92 (Ill. App. Ct. 1989) (citing *Birbalas v. Cuneo Printing Indus., Inc.*, 140 F.2d 826, 828 (7th Cir. 1944)). Settlements have long been recognized and enforced by the Illinois courts. *Jankousky*, 182 Ill. App. 3d at 768, 538 N.E.2d at 692 (citing *McDole v. Kingsley*, 163 Ill. 433, 436-37, 45 N.E. 281, 282-83 (1896)). Accordingly, putative class members have the right to settle their disputes with Navistar without unreasonable interference from Plaintiff. *See id.*; *Eshelman*, 2007 WL 2572349, at *3.

Plaintiff alleges that Navistar's offer was a misrepresentation because it stated that the June 20, 2008 offer was a "one time opportunity" and that "Navistar has no obligation to pay that amount." *See* Mot. for Prelim. Inj. at 19-20; Emergency Mot. II at 10. Judge Darrah already determined that these statements were not misleading, since he did not order that they be corrected in the supplementary notice to the class. *See* June 27, 2008 Letter, Ex. A to July 30, 2008 Order, Ex. 2 hereto. Plaintiff's main "proof" to the contrary consists of his deliberate misrepresentation of the Court's question to Navistar's counsel concerning the "one time offer." *See* Mot. for Prelim. Inj. at 20-21; Emergency Mot. II at 10-11. As discussed above at page 10-

11, nothing in the June 20 offer was misleading or a misrepresentation. Navistar's counsel did not "admit" otherwise. *See* disc. *supra* at 10-11.

Plaintiff also complains that Navistar's offer does not proffer tax advice to the putative class. *See* Mot. for Prelim. Inj. at 19-20; Emergency Mot. II at 10. For starters, this is misleading. The June 20 letter does state explicitly that the payment will be "subject to applicable withholding taxes." *See* June 20, 2008 Offer Letter & Payment & Release, Ex. 6 hereto. (Of course, the same is true of any judgment Plaintiff might secure.) The current and former executives and senior members of management who received the June 20 letter understand income taxes, and if they had any doubt or questions concerning the relative tax impacts of the June 20 offer versus the litigation option they had six weeks to consult with someone – even Mr. Krislov, if they chose. *See* June 30, 2008 Order, Ex. 2 hereto.

Given the foregoing, it is not surprising that Judge Darrah specifically **declined** to include tax "disclosure" information when Plaintiff's counsel explicitly requested information about tax advice be included in the corrective letter:

> MR. KRISLOV: I mean, is it feasible to put in – and I don't want to overreach, but we do think that the offer is inadequate and certainly doesn't spell out the tax ramifications to these people.
>
> THE COURT: I'll ask you not to do that.

June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 29.

Plaintiff also notes that the "deadline for signing the releases was only about five weeks." *See* Mot. for Prelim. Inj. at 22; Emergency Mot. II at 12. As Plaintiff is aware, courts have found as little as 10 days sufficient time for a putative class member to weigh a settlement offer. *See Jones*, 2008 WL 2058517, at *11 (providing 10 days for putative class members to accept defendant's offer, in a case cited by Plaintiff in Emergency Motion I before Judge Darrah). Moreover, Judge Darrah ordered that the offers be kept open until August 1st to provide putative

class members "an opportunity to consider the offer made by the defendant." June 26, 2008 Hrg. Tr., Ex. 3 hereto, at 33. Thus, there can be no question that putative class members had ample time to consider Navistar's offer. *See id.*

### 3. Navistar's Offer Does Not Constitute Economic Duress

Plaintiff's allegations that Navistar's "one time" offer constitutes economic duress are a flagrant distortion of the law. The very idea that presenting the executives and senior management who qualified for stock options with six weeks to decide whether or not to accept a cash offer or take their chances in court constitutes "duress" as a matter of law is laughable. Navistar's offer was not take it or get nothing. The offer was to take the money or litigate. Over 90% of the recipients chose to take the money, but everyone was free to follow Mr. Rawat's path.

Although Plaintiff properly states the elements of economic duress, he ignores their meaning as defined in case law. *See Edge of the Woods v. Wilmington Sav. Fund Soc'y, FSB*, No. CIV.A.97C-09-281-JEB, 2001 WL 946521, at *4 (Del. Super. Ct. Aug. 16, 2001) (duress renders a contract voidable where there is (1) a wrongful act which; (2) overcomes the free will of the person; (3) who has no adequate legal remedy to protect his interests). Under Delaware law of economic duress, "the 'wrongful act' is often the use of or threat to inflict immediate physical harm." *Bakerman v. Sidney Frank Importing Co., Inc.*, No. Civ.A. 1844-N, 2006 WL 3927242, at *15 (Del. Ch. Oct. 10, 2006). Plaintiff's own cases recognize that even "hard-bargaining business tactics" do not constitute economic duress, and Navistar's offer does not even come close to that. *See Edge of the Woods*, 2001 WL 946521, at *6 (finding no economic duress as a matter of law); *see also Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 769 F. Supp. 671, 739 (D. Del. 1991) (same). Duress exists only if a wrongful act "overcame the

16

will of the aggrieved party who was without adequate means to protect himself." *Singh v. Batta Envtl. Assocs., Inc.*, No. Civ.A. 19627, 2003 WL 21309115, at *5 (Del. Ch. May 21, 2003).

### 4.    Navistar Provided Valid And Adequate Consideration For Its Offer

Although Plaintiff implies otherwise by arguing the payments Navistar offered are "inadequate", Mot. for Prelim. Inj. at 19; Emergency Mot. II at 9, there is more than adequate consideration for the releases. First, the releases are supported by sufficient consideration because the plaintiffs are not "owed" anything by Navistar. The situation here is not one in which Navistar "had a preexisting duty to do everything [it was] to do under the modified arrangement …." *Carlile v. Snap-on Tools*, 271 Ill. App. 3d 833, 841, 648 N.E.2d 317, 323 (Ill. App. Ct. 1995) (citations omitted). Navistar did not have a preexisting duty to pay the holders of expired options, and to the extent that it had a duty to the putative class members the precise contours of that duty is a disputed and triable issue. *See* disc. *infra* at 18. Thus, Navistar's offered amount constituted sufficient consideration.

Second, courts have long held that the adequacy of consideration is not a proper subject for judicial scrutiny. *Underbrink v. Warrior Energy Servs. Corp.*, No. 2982-VCP, 2008 WL 2262316, at *10 (Del. Ch. May 30, 2008); *see also Affiliated Enters., Inc. v. Waller*, 5 A.2d 257, 260 (Del. 1939) ("[T]he adequacy of a consideration is not a question for judicial determination at all. That is a thing for the parties to settle. Upon this point of legal theory the law has never wavered.") (citations omitted).

### C.    The Underlying Merits Of Plaintiff's Case Do Not Withstand Scrutiny

Plaintiff makes several arguments concerning the underlying merits of his claims. As discussed above, Plaintiff is not seeking a Preliminary Injunction on the merits of his claims. He is seeking a preliminary injunction on the issue of whether sophisticated executives and senior members of management, with six weeks to decide **and** with notice of Plaintiff's lawsuit **and**

after being provided with Mr. Krislov's phone number, should be barred from executing a release in exchange for large sums of money. For all the reasons stated above, Plaintiff has plainly failed to meet the standard for obtaining a preliminary injunction. The underlying merits of Plaintiff's claims, however, are as deficient as Plaintiff's request for preliminary injunction.

### 1.     There Was No Breach Of Contract And/Or There Were No Damages

Plaintiff argues that his case is "simple" and that he is likely to win the underlying case. As noted above, that would be irrelevant to his request for preliminary injunction even if it were true. In America, people are free to settle strong claims as well as weak ones if they choose. In reality, however, Plaintiff cannot show a likelihood that Navistar breached any obligation under an option contract. *See In re Cendant Corp. Sec. Litig.*, No. 04-3352, 2006 WL 1342808, at * 3 (3d Cir. 2006).

In *Cendant*, the plaintiff acquired stock options while working for Cendant. *See id.* at *1. According to the stock option agreement, plaintiff was required to exercise the options within four months of her resignation. *See id.* During that time, "Cendant learned of problems with its accounting practices and retracted its financial statements from the SEC. The company further determined that federal law did not allow it to issue additional stock until it had filed new financials." *See id.* Plaintiff sued for breach of contract and breach of good faith and fair dealing. *Id.* The court determined that Cendant's refusal to allow plaintiff to exercise her options during the blackout was not a breach of contract. *See id.* at *2. The court supported this conclusion by noting that Cendant would be required to "violate federal law in order to comply with the terms of the plan" and permit plaintiff to exercise during the blackout period. *See id.*

### 2.     The Illinois Wage Act Does Not Apply To Plaintiff's Stock Options

For the reasons stated above, it is irrelevant whether Plaintiff might ultimately prevail on his Wage Act claim, but in point of fact that is not likely. Plaintiff cannot prove that he has a

"certain and clearly ascertainable" right under the Illinois Wage Payment and Collection Act

("IWPCA") to the stock option at issue, nor is he able to prove that he is likely to succeed on his

claims. *See Abdulhafedh v. Sec'y of State*, 161 Ill. App. 3d 413, 417, 514 N.E.2d 563, 565 (Ill.

App. Ct. 1987) (holding that plaintiff did not raise a fair question as to the likelihood of recovery,

and denying the request for a temporary restraining order); *Schwalm Elecs., Inc. v. Elec. Prods.*

*Corp.*, 14 Ill. App. 3d 348, 354, 302 N.E.2d 394, 399 (Ill. App. Ct. 1973) (upholding lower

court's denial of preliminary relief and stating that "[i]n order that an injunction be granted, it

should be clear that the plaintiff has a lawful right for which he seeks protection; his right must

be certain and clearly ascertained.").

No Illinois court has held that stock options such as Navistar's constitute "compensation"

or "wages" under the IWPCA – in fact, Illinois courts have yet to determine this issue. Plaintiff

cites no Illinois case law to support his contention that stock options are considered either

compensation or wages. *See* Mot. for Prelim. Inj. at 14-17 (citing only two Illinois cases, *Metro.*

*Distribs. Inc. v. Illinois Dep't of Labor*, 114 Ill. App. 3d 1090, 1091, 449 N.E.2d 1000, 1001 (Ill.

App. Ct. 1983) and *Shields v. Associated Volume Buyers*, No. 93 C 7620, 1994 WL 110397, at

*1-2 (N.D. Ill. Mar. 30, 1994), construing whether **severance pay** and a **contract salary**,

respectively, were considered compensation). Although Plaintiff cites case law from the Third

Circuit, interpreting Pennsylvania law, and the Colorado Court of Appeals to support his

argument, Plaintiff neglects to mention the countervailing law from other jurisdictions. *See*, *e.g.*,

*with IBM v. Bajorek*, 191 F.3d 1033, 1039 (9th Cir. 1999) (holding that stock options are not

wages under the state wage act).

Moreover, when evaluating whether the IWPCA applies, the focus is on the employer's

contractual obligations. *Palmer v. Great Dane Trailers*, No. 05 C 1410, 2005 WL 1528255, at

*3 n.2 (N.D. Ill. June 28, 2005). "The plain meaning of the IWPCA indicates that pay is only recoverable under the statute when the employer has breached contractual obligations." *Blue v. Chubb Group*, No. 03 C 6692, 2005 WL 1667794, at *17 (N.D. Ill. July 13, 2005) (*quoting Palmer*, 2005 WL 1528255, at *3). Thus, if there is no breach of contract, no recovery is available under the IWPCA. *See Rakos v. Skytel Corp.*, 954 F. Supp. 1234, 1239-40 (N.D. Ill. 1996) (finding that where there was no breach of contract regarding an incentive compensation plan, no recovery was available under the IWPCA); *In re Comdisco, Inc.*, No. 02 C 7030, 02 C 7031, 2003 WL 685645, *2 (N.D. Ill. 2003 Feb. 27, 2003) (finding no violation of the IWPCA where there was no contractual right to recover bonuses). In this case, for the reasons stated above in Part C.1., there was no breach of conduct regarding the exercise of stock options, and thus the IWPCA does not apply. *See id.*

### D. Plaintiff Has Failed To Provide Notice To Putative Class Members Whose Rights Would Be Affected By The Preliminary Injunction

In both state and federal courts, a preliminary injunction only may be issued on notice to the adverse party, or the party whose rights will be affected by such an order. The rules governing preliminary injunctions in the federal system were recently amended to clarify that a party must have actual notice of an injunction in order to be bound by it. *See* Fed. R. Civ. P. 65(d)(2); *see also* Advisory Committee Note to 2007 Amendment of Fed. R. Civ. P. 65. The requirements of procedural due process in this regard are "clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *Williams v. McKeithen*, 939 F.2d 1100, 1105 (5th Cir. 1991) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972)). This notice "'must be granted at a meaningful time and in a meaningful manner.'" *Id.*

Here, the holders of expired stock options, although not parties to the action, have rights that would be affected by the preliminary injunction.  These savvy, sophisticated senior managers and executives, whom Plaintiff's counsel seeks to represent as a class, would be enjoined every bit as much as Navistar by any order invalidating their release and payment agreements with Navistar.  They contracted with Navistar for payment on a certain date, and Plaintiff's preliminary injunction would interfere with their rights to settle claims with Navistar.  As such, under both Illinois and federal law, these senior managers and executives have a right to notice, and to avail themselves of the "fair opportunity" to oppose the preliminary injunction if they wish.  *See id.*

## IV.   CONCLUSION

For the reasons stated above, Navistar respectfully requests that the Court deny Plaintiff's Motion for Preliminary Injunction and Plaintiff's Emergency Motion II.  Navistar further requests whatever other relief the Court deems appropriate.

Dated:  July 30, 2008                    Respectfully submitted,


                                         /s/Robert C. Levels
                                         One of the Attorneys for Defendant
                                         Navistar International Corporation


Laurence H. Levine                    Cary R. Perlman
Maaike S. Almeida                     Mark S. Mester
LAURENCE H. LEVINE LAW OFFICES        Robin M. Hulshizer
190 South LaSalle Street, Suite 3120  Robert C. Levels
Chicago, Illinois 60603               LATHAM & WATKINS LLP
Phone: (312) 291-7000                 Sears Tower, Suite 5800
Fax: (312) 291-7015                   233 South Wacker Drive
                                      Chicago, Illinois 60606
                                      Phone: (312) 876-7700
                                      Fax: (312) 993-9767


CH\1043039.8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RAVI P. RAWAT, on behalf of himself** | ) | |
| **and others similarly situated,** | ) | |
| | ) | **Case No. 08-cv-4305** |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **Judge Elaine E. Bucklo** |
| **NAVISTAR INTERNATIONAL** | ) | |
| **CORPORATION,** | ) | **Magistrate Judge Martin C. Ashman** |
| | ) | |
| **Defendant.** | ) | |

**EXHIBIT INDEX TO NAVISTAR INTERNATIONAL CORPORATION'S**
**OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND**
**PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

Exhibit 1    Plaintiff's Emergency Motion for a Protective Order to Prevent Defendant from Contacting Putative Class Members and Soliciting Releases, filed June 25, 2008

Exhibit 2    June 30, 2008 Court Order with June 27, 2008 Notice Letter attached as Exhibit A

Exhibit 3    Transcript of Proceedings Before The Honorable John W. Darrah, dated June 26, 2008

Exhibit 4    Original, Federal Complaint, filed May 23, 2008

Exhibit 5    Navistar International Corporation's Motion to Dismiss and Memorandum in Support of Motion to Dismiss

Exhibit 6    Offer Letter & Payment and Release, dated June 20, 2008

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>NAVISTAR INTERNATIONAL CORPORATION,<br><br>        Defendant. | No. 08-3038<br><br>Honorable John W. Darrah |

**EMERGENCY MOTION FOR A PROTECTIVE ORDER TO PREVENT DEFENDANT FROM CONTACTING PUTATIVE CLASS MEMBERS AND SOLICITING RELEASES**

Plaintiff Ravi P. Rawat asks this Court to for an emergency protective order granting interim class certification and appointing interim class counsel, plus until the Court resolves the class issues, an order: (a) barring Defendant from making contacts and/or communications with class members regarding this case; (b) barring Defendant from soliciting or obtaining further releases from class members; (c) voiding all releases Defendant obtained from class members; (d) requiring Defendant to produce copies of all communications with putative class members regarding this case or their rights under the Company's Stock Option Plan; and (e) ordering a corrective Notice to be sent to all class members, at Defendant's expense.

**INTRODUCTION**

This case is brought on behalf of current and former employees of Navistar who se stock options expired during the Navistar's "blackout period." (in this context, a period during which employee stock options could not be exercised) Navistar's blackout period

began on April 6, 2006 when the Company announced that its financials were materially

misstated and the Company would have to go through a process to restate those

financials.  During the blackout period, Navistar refused to permit employees and former

employees to exercise their options, during which a large number of such options

expired.  By refusing to permit their exercise and enforce their option rights, Navistar

breached its obligations under those option contracts.

Although the Company previously did nothing to remedy its resulting breach of

the employees' right to exercise stock options, once this action was filed the Company set

upon a dishonest scheme to thwart this litigation and coercively obtain releases from the

putative class.

*I.*     ***Defendant's Scheme to Undermine this Litigation***

This case was filed on May 23, 2008 and served on May 23, 2008.  Declaration of

Clinton A. Krislov ¶ 2 (attached hereto as Ex. A).[1]  On June 11, 2008, Defendant's

counsel Robin Hulshizer called to introduce her firm and requested Plaintiff counsel's

agreement to extend Navistar's time to respond to Plaintiff's complaint, representing that

the extension was for "convenience of counsel," ascribed to weddings and vacations.

CAK Dec. ¶ 3.  Plaintiff's counsel Krislov readily agreed to the extension. CAK Dec. ¶ 3.

Less than two weeks later, on June 24, 2008, the hearing date for Defendant's

Motion to Extend time to respond, undersigned counsel Clinton A. Krislov received an

anonymous call inquiring about the case from a person claiming to be a putative class

member who has received a communication from Navistar that asked the recipients to

release their claims against the Company and covenant not to sue.  CAK Dec. ¶ 4.  The

same day, at 10:14 a.m. Krislov e-mailed Ms. Hulshizer with his concerns. CAK Dec. ¶

---

[1] References to the Krislov Declaration will appear "CAK Dec. ¶ __.")

5. (e-mail attached as Ex. B)  An hour later, Ms. Hulshizer returned the call professing

not to have seen the e-mail and confirmed that the letter was sent to all option holders not

currently in litigation with the Company.  CAK Dec. ¶ 6.

The Letter[2].  Review shows that the letter is indeed misleading and coerces class

members into precipitously signing releases (rather than encouraging class members to

seek their own counsel and tax advice, they are promised that releases received before

July 3 are promised check by July 31, with all other releases received by August 1,

promised a check by August 31) explicitly precluding them from participating in this

action, and directing any questions to the Company.  Indeed, the extension was not for

convenience of counsel, but a subterfuge to allow the Defendant a sufficient opportunity

to contact putative class members in an effort to undermine this litigation.

The best interests of the class are at stake.  Indeed, this Court's intervention is

necessary to protect putative class members from hastily signing away their rights for a

dubious payment with adverse tax consequences.  A defendant's *ex parte* communication

with putative class members for purposes of settlement is situation rife with conflicts and

abuse, especially where Defendant's communications coerce putative class members into

signing releases.

### 2. *Navistar's Inadequate and Coercive Offer*

More specifically, Navistar's June 20, 2008, letter -- apparently sent to all

employees and former employees whose options expired during the blackout period[3] who

were not in litigation with the Company (i.e., excepting only Mr. Rawat) -- improperly

---

[2] Attached hereto as Exhibit C.

[3] Importantly, the recipients of the letter were all members of the putative class described in
Plaintiff's Class Action Complaint.

asks putative class members to release not only their current claims against the Company, but also asks putative class members sign a covenant not to sue and explicitly references this case. Importantly, the letter incentivizes class members to act before July 3, 2008 (but not after August 1, 2008) and channels any questions solely to Defendant Navistar.

As consideration, Navistar offers the putative class members the difference between the: "closing price on the date your option expired and the exercise price for all of your options on the expiration date." *Id.* In return, Navistar asks putative class members to release all claims to the expired options and "the claims described **in the putative class action complaint filed against the Company by attorney Clinton A. Krislov on behalf of Mr. Ravi P. Rawat. . .**" *Id.* (emphasis added) Navistar mandated that the putative class members must respond by August 1, 2008, and if class members respond as soon as July 3, 2008, the Company will accelerate the cash payment.

The deadlines to respond and secure rapid payment of the offer are rapidly approaching, making a protective order necessary. The putative class has an extremely limited amount of time to return the releases to the Company and the Company has added an incentive to class members to send those releases immediately.

In more than 33 years of practice, 25 years of class action practice, undersigned counsel Krislov has never previously experienced conduct of this sort. Irrefutably, the request to extend time to answer was a ruse to facilitate Defendant's scheme -- this letter was an improper attempt to undermine the litigation by offering putative class members inadequate consideration for their claims against the Company.

### 3.    *Relief sought by Plaintiff*

Accordingly, Plaintiff asks this Court to grant interim class certification and

appoint interim class counsel and enter a protective order: (a) barring Defendant from

making contacts and/or communications with class members regarding this case; (b)

barring Defendant from soliciting or obtaining further releases from class members; (c)

voiding all releases Defendant obtained from class members; (d) requiring Defendant to

produce copies of all communications with putative class members regarding this case or

their rights under the Company's Stock Option Plan; and (e) ordering a corrective Notice

to be sent to all class members, at Defendant's expense.

## NATURE OF THE ACTION

Navistar's employees and former employees who received stock options pursuant

to the Company's Stock Option Plan were unable to exercise those vested options for an

indefinite period of time beginning April 6, 2006 (the "blackout period") because of the

Company's malfeasance. Specifically, Navistar needed to restate its financials that were

previously materially misstated.

By causing the blackout period and refusing to allow Navistar employee stock

option holders to exercise their options – which are contracts[4] -- during this blackout

period, Navistar breached the option contracts and its duty of good faith and fair dealing

to the option holders.

All of the options were granted pursuant to and are governed by a single

document: Navistar's Stock Option Plan. The class consists of current and former

---

[4] It is well settled that stock options are contracts. *Lamb v. Emhart Corp.*, 47 F.3d 551, 560 (2d Cir. 1995)("The issuance of stock options constitutes a contract between the employer and employee, supported by the consideration of the employee's subsequent continued employment."); *Scully v. U.S. Wats, Inc.*, 238 F.3d 497, 507 (3d Cir. 2001)(stating "an executive stock option is a contract"), *In re Allen*, 226 B.R. 857, 862 (N.D. Ill. 1998)(stating "A stock option is a contract for transfer of shares of stock, subject to the same rules of construction as any other contract")(citations omitted), *Owen v. Merts*, 405 S.W.2d 273, 277 (Ark. 1966), *Klusener v. Commissioner of Internal Revenue*, Nos. 5383-87, 6237-87, 1989 WL 14814 (U.S. Tx. Ct.).

Navistar employees who received -- but could not exercise -- their stock options. Class members were harmed because their options either expired or became less valuable during the blackout period.

## PROCEDURAL BACKGROUND

On May 23, 2008, Plaintiff filed this class action on behalf of all employees and former employees whose options expired during the Company's blackout period. Plaintiff properly served the Company on May 29, 2008. Navistar was scheduled to respond by June 18, 2008.

On June 11, 2008, Navistar's counsel contacted Plaintiff's counsel to secure an extension, for convenience of counsel, to respond to Plaintiff's Class Action Complaint. Plaintiff's counsel agreed to the extension based Defendant's representations that it could not respond by June 18, 2008, because of scheduling conflict.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 23(d)(3) and (5), it is well settled that courts may "impos[e] conditions on the representative parties or on intervenors ... [and] deal[] with similar procedural matters." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981)[5]. The Supreme Court, in *Gulf Oil*, recognized that class actions serve an important function in our system of civil justice, but present opportunities for abuse. *Id.* The Court further declared that courts have the power to restrict communications between defendants and putative class members before the class is even certified. *Id.* at 100. See

---

[5] Although *Gulf Oil* involved contact with a putative class by plaintiff's counsel, lower courts have applied the case to contact initiated by defendants and their counsel as well. *Jones v. Jeld-Wen, Inc.*, --- F.R.D. ---, 2008 WL 2058517 (S.D. Fla. 2008)(citing *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir.1985); *Great Rivers Cooperative of South-Eastern Iowa v. Farmland Industries, Inc.*, 59 F.3d 764 (8th Cir.1995); *Cox Nuclear Medicine v. Gold Cup Coffee Services, Inc.*, 214 F.R.D. 696 (S.D. Ala.2003)).

also, *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237 (S.D.N.Y. 2006)(stating that "a unilateral communications scheme . . . is rife with potential for coercion.")

Communications that undermine the purposes of Rule 23 include misleading communications and communications which affect a putative class members' decision to participate in the class action. *Id.* (citing *Hampton Hardware Inc. v. Cotter & Co. Inc.*, 156 F.R.D. 630, 632 (N.D. Tex. 1994)). Navistar's communication falls squarely within in this standard because it clearly attempts to undermine the litigation.

## ARGUMENT

Almost a month after the Defendant had been served with Plaintiff's Class Action Complaint, Defendant contacted putative class members[6] in order to persuade the class members to release their claims against the Company in exchange for a cash payment reflecting the difference between their options' exercise price and the Company's closing price on the day their options expired. It is imperative to the interests of the class that this Court halts this practice and allows Plaintiff's counsel access to the documents sent to the putative class members.

Plaintiff asks for a protective order under Fed. R. Civ. P. 23(d)(3) and (5): (a) barring Defendants from making contacts and/or communications with class members regarding this case; (b) barring Defendants from soliciting or obtaining further releases from class members; (c) voiding all release forms Defendants obtained from class members; (d) requiring Defendants to produce copies of all communications with putative class members regarding this case or their rights under the Company's Stock

---

[6] Notably, the putative class members' rights in this litigation were protected as of the filing date of the complaint. See, *Kahan v. Rosenstiel*, 424 F.2d 161, 169 (3d Cir. 1970).

Option Plan; and (e) ordering a corrective Notice to be sent to all class members, at Defendants' expense.

### A.    Defendant's Communication With Putative Class Members Is Improper

When a defendant contacts putative class members for the purpose of altering the status of a pending litigation, such communication is improper without judicial authorization. *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. at 253 (citing *Hampton Hardware*, 156 F.R.D. at 633). Quite obviously, the Company's offer is meant to materially prejudice this litigation.

Further, Defendant's offer to the putative class members fails to recognize that an employee who exercises a stock option has a choice: 1) to immediately sell his or her share on the open market; or 2) hold his or her share for investment and/or tax purposes and sell at a later date. Here, the offer assumes that each and every class member would have sold on the date that he or she exercised the option. Considering that Navistar's stock price traded between $27 (at the beginning of the blackout period) and $75 (currently), the price at which a class member could have – indeed could still -- sell his or her shares is significantly higher that what has been offered to the class.

### 1.    The communication is misleading and coercive

Even a cursory reading of the letter shows that Defendant is trying to settle this action's claims without involving class counsel. The letter coerces putative class members into accepting less consideration than the litigation seeks. In fact, the letter's content is a thinly veiled "take it or leave it" offer.[7] With consecutive sentences stating:

---

[7] The offer was sent to option holders that were both employees and non-employees. Courts have consistently held that "if the class and the class opponent are in an ongoing business relationship, communications from the class opponent to the class may be coercive." *Ralph Oldsmobile Inc. v.*

> ". . . The Company does not believe that it has an obligation to compensate individuals for the Expired Options or that the claims set forth in the Complaint are valid, and **we intend to vigorously contest all of the relief Mr. Rawat seeks**." Ex. C (emphasis added)

Followed by:

> "This **one-time opportunity** will be available until **August 1, 2008**. . ." *Id.* (emphasis added)

Even more coercively, Defendant guarantees an extra incentive for quick action:

> "If we receive the executed Payment and Release **on or before July 3, 2008**, unless you direct otherwise we will mail a check in the amount of your payment . . . on or before July 31, 2008." *Id.* (emphasis added)

Further, the letter does not outline the recipient's rights and encourages employees not to

contact putative class counsel, but the Company, stating:

> "If you have questions not answered in this letter, please contact Howard Kuppler at (630) 753-2149." *Id.*

This letter is a unilateral effort to influence putative class members' decisions to

participate in this litigation and the exact type of coercive communication that Courts

routinely curb.  See, *In re Currency*, 361 F. Supp. at 253 (holding that defendants'

unsupervised communications were improper because they sought to eliminate putative

class members' rights in the litigation). *In re  School Asbestos Litig.*, 842 F.2d 671, 683

(3d Cir. 1988)(condemning attempts in a communication to affect a class member's

decision to participate in the litigation) and *Hampton Hardware v. Cotter & Co.*, 156

F.R.D. 630, 634 (N.D. Tex. 1994)(stating "communications as to the instant litigation

must end.").

Finally, the Manual for Complex Litigation echoes the reasoning in *In re*

*General Motors Corp.*, 2001 WL 1035132 (S.D.N.Y.)(citing *Jenifer v. Delaware Solid Waste Auth.*, 1999 WL 117762 (D. Del.).

*Currency*, and *Hampton Hardware*, stating that: "Defendants and their counsel generally may communicate with potential class members in the ordinary course of business, including discussing settlement before certification, but may not give false, misleading, or intimidating information, conceal material information, or attempt to influence the decision about whether to request exclusion from a class certified under Rule 23(b)(3)." *Manual for Complex Litigation*, Fourth § 21.12 (2004).

Defendant's solicitation is not merely a communication sent in the ordinary course of business, but is in direct relation to the litigation and has improperly made a coercive and misleading offer to putative class members to avoid scrutiny by this Court.

Barring Defendant from communicating with the Class and voiding any releases sent by the class will allow the litigation proceed to for maximum benefit of the putative class, rather than the class being faced with a unilateral, coercive, offer.

### 2.    The offer to putative class members is inadequate

The offer to the putative class members seeks a release in consideration of a cash payment. The cash payment reflects the spread between his or her options' exercise price and the Navistar's trading price the day that the option expired. The offer, however, fails to disclose that class members may be entitled to a higher cash payment. If the putative class members exercised and held the options instead of immediately selling the options, they would receive a two-fold benefit: 1) Navistar's stock appreciated, making holding the stock more valuable than immediately selling the stock; and 2) holding the stock creates more favorable tax treatment than an immediate sale.

Indeed, Navistar's offer fails to acknowledge or disclose that fact in its offer, which radically undervalues the consideration.

**B.**    **This Court may void all releases sent to the Company**

Further, this Court may void the releases sent by putative class members to the coercive offer. *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1199 (11th Cir. 1985)(finding that a district court had the power to void "opt-outs" by class members that stemmed from defendant's improper communications with putative class members.") The misleading and coercive nature of the notice weighs in favor of voiding all releases sent to the Company.

**C.**    **The Court Should Allow Corrective Notice at Defendant's Expense**

Plaintiff also asks this Court to compel production of all communications sent to each individual class member, with each "Statement of Offer" attached thereto. Such information is needed to correct the misleading and coercive "offer." Exacerbating matters, putative class members have only days to respond to the offer before it expires, with an incentive to respond within two weeks, creating undue pressure on the class members to respond hastily. Corrective notice to the putative class is essential. Courts have continually found this measure appropriate to allow class members to have all available information to make informed decision about their rights. See *Ralph Oldsmobile Inc. v. General Motors Corp.*, 2001 WL 1035132 (S.D.N.Y.) and *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985).

**D.**    **Who's responsible?**

While Plaintiff will take Ms. Hulshizer's word that she was unaware, it is not believable that this was done without knowledge of Navistar's counsel, the Law Offices of Laurence H. Levine and Latham & Watkins LLP, and they should be compelled to explain this conduct.

**CONCLUSION**

Accordingly, because of Defendant's improper contact with putative class members in an effort to materially prejudice this litigation, Plaintiff asks this Court to certify an interim class and appoint interim class counsel and for an order: (a) barring Defendant from making contacts and/or communications with class members regarding this case; (b) barring Defendant from soliciting or obtaining further releases from class members; (c) voiding all releases Defendant obtained from class members; (d) requiring Defendant to produce copies of all communications with putative class members regarding this case or their rights under the Company's Stock Option Plan; and (e) ordering a corrective Notice to be sent to all class members, at Defendant's expense.

Dated:  June 25, 2008

Respectfully submitted,


   s/Clinton A. Krislov
   Clinton A. Krislov

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Drive, Suite 1350
Chicago, Illinois  60606
Tel.:  (312) 606-0500
Fax:  (312) 606-0207

## PROOF OF SERVICE

I, Jeffrey M. Salas, an attorney, state that I caused a copy of the foregoing Motion to be delivered via the Court's Electronic Case Filing System on Wednesday, June 25, 2008 to the counsel below.

/s/ Jeffrey M. Salas
Attorney for Plaintiff

Robin Hulshizer
Cary R. Perlman
Latham & Watkins LLP
233 South Wacker Drive
5800 Sears Tower
Chicago, IL 60606
(312) 876-7700

Laurence Harvey Levine
Laurence H. Levine Law Offices
190 South LaSalle
Suite 3120
Chicago, IL 60603
312 927 0625

13

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | |
| Plaintiff, | No. 08-3038 |
| v. | Honorable John W. Darrah |
| NAVISTAR INTERNATIONAL CORPORATION, | |
| Defendant. | |

## DECLARATION OF CLINTON A. KRISLOV IN SUPPORT TO PLAINTIFF'S EMERGENCY MOTION FOR A PROTECTIVE ORDER TO PREVENT DEFENDANT FROM CONTACTING PUTATIVE CLASS MEMBERS

I, CLINTON A. KRISLOV, declare as follows:

1.     I am an attorney duly licensed to practice before all of the courts of the States of Illinois and Michigan and am the principal of the law firm Krislov & Associates, Ltd.  I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.  I make this declaration in support of Plaintiff Ravi P. Rawat's Emergency Motion For a Protective Order to Prevent Defendant from Contacting Putative Class Members and Soliciting Releases.

2.     On May 23, 2008, Plaintiff Ravi P. Rawat filed the above-captioned action in the Northern District of Illinois.  The complaint was served on the Defendant on May 29, 2008.

3.     On June 11, 2008, Defendant's counsel Robin Hulshizer called me to introduce her firm, requested our agreement to extend Navistar's time to respond to Plaintiff's complaint, representing that the extension was for "convenience of counsel," ascribed to weddings and vacations. I told her that this was not likely to be a problem and confirmed this on June 13, 2008.

4.    On June 24, 2008, during the time set for hearing on Defendant's Unopposed Motion to Extend Time to Respond, I received an anonymous call inquiring about the case from a person claiming to be a putative class member who had received a communication from Navistar that asked the recipients to release their claims against the Company and covenant not to sue.

5.    Also on June 24, 2008, at 10:14 a.m., I e-mailed Ms. Hulshizer and demanded to see any such communication sent by Defendant.

6.    She called me back an hour later claiming not to have received my e-mail, but was ostensibly calling to advise me of a letter sent by Navistar and agreed to provide me a copy of that letter.

7.    Later that afternoon, we received the communication from Ms. Hulshizer's colleague, Cary R. Perlman.

8.    Mr. Perlman's cover letter and Navistar's June 20, 2008 letter is attached to Plaintiff's motion as Exhibit C.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of June, 2008, at Chicago, Illinois.

_____
Clinton A. Krislov

# EXHIBIT B

**Clint**

| | |
|---|---|
| **From:** | Clint |
| **Sent:** | Tuesday, June 24, 2008 10:14 AM |
| **To:** | 'robin.hulshizer@lw.com' |
| **Cc:** | 'Mark Baiocchi'; Jeff |
| **Subject:** | Navistar-When I extended you the courtesy of additional time to answer, I never imagined that it would be used in this fashion. |

Robin,

We have received notification that the company is contacting putative class members, asking them to agree to forego litigation over the options. While I agreed to extend you the courtesy of additional time to answer, which you asserted to be due to other lawyer's weddings or other litigation matters, I have never experienced it being used strategically to solicit putative class members to waive their rights. This is entirely inappropriate.

I demand that you immediately provide me with particulars of all such communications, identities of those who received them, and your assurance that all such actions will cease.

**Clint Krislov**
**Krislov & Associates, Ltd.**
**Civic Opera Building-Suite 1350**
**Chicago, IL   60606**
**312-606-0500**
**facsimile:312-606-0207**
**email:Clint@krislovlaw.com**
**website:www.krislovlaw.com**

1

# EXHIBIT C

Cary R. Perlman

# LATHAM&WATKINS LLP

Sears Tower, Suite 5800
233 S. Wacker Dr.
Chicago, Illinois 60606
Tel: +1.312.876.7700 Fax: +1.312.993.9767
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

File No. 010255-0330

**By Email and U.S. Mail**

June 24, 2008

Mr. Clinton A. Krislov
Krislov & Associates, Ltd.
20 North Wacker Drive, Suite 1350
Chicago, IL 60606

      Re:    Rawat v. Navistar International Corporation

Dear Mr. Krislov:

      Pursuant to our telephone call this morning, please find attached a courtesy copy of the form of letter and the form of release mailed last Friday to certain current and former employees of Navistar.

      Sincerely,

Cary R. Perlman
of LATHAM & WATKINS LLP

cc: Robin Hulshizer

CH\1036042.1



**Navistar, Inc.**
4201 Winfield Road
Warrenville, IL 60555 USA

P : 630-753-3052
W : navistar.com

**Annette M. Freund**
Vice President,
Compensation, Benefits
and HR Support

June 20, 2008

Re: Expired Stock Options

Dear _____ :

As you know, until recently Navistar International Corporation (the "Company") has not been current with its Form 10-K filings with the Securities and Exchange Commission ("SEC"). During the time the Company was not current, there were limits on your ability to exercise your stock options. The expiration date for certain stock options fell within the period when these limits were in effect. In my letter to you of January 15, 2008, the Company identified the option expiration issue, informed you that we planned to address the issue with the Board of Directors, and promised to communicate with you again regarding the Board's decision.

On June 16, 2008, we raised these matters with the Board. We are pleased to report that the Board has authorized us to extend to you a one-time opportunity to obtain a cash payment from the Company in resolution of any and all issues in connection with vested stock options that expired during the period when the above-described trading restrictions were in place (the "Expired Options").

The amount of your cash payment will be the difference between the closing price on the date your option expired and the exercise price for all of your options "in the money" on the option expiration date – *i.e.*, your payment will match the profit you would have made had you sold the shares at the end of the day the option expired, subject to applicable withholding taxes. For example, if you had vested stock options exercisable at $25.00, and the stock closing price on the date those options expired was $65.00, we will pay you $40.00 times the number of Expired Options. The payments available to **you** individually are set forth on the enclosed Statement of Offer (*Exhibit A*). For your convenience, we have enclosed publicly available data reflecting the closing price of the Company's common stock on the option expiration date.

As consideration for the payment described in this letter, you must execute and return to the Company a release of claims in the form attached as *Exhibit B* to this letter ("Payment and Release"). The Payment and Release makes clear that your choice to accept the cash payment is a full and complete resolution of any and all claims you may have associated with the Expired Options. Because the Payment and Release affects your rights and precludes litigation with the Company (including preclusion of your participation in the lawsuit described below), you should review it carefully before signing it.

On or about May 23, 2008, Mr. Ravi P. Rawat filed a putative class action complaint against the Company (the "Complaint") related to the option expiration issue. Mr. Rawat's Complaint was filed in the United States District Court for the Northern District of Illinois (Case No. 1:08-cv-03038), and it alleges that the Company breached stock option agreements with those who hold Expired Options. The Complaint also alleges that the Company breached "an implied covenant of good faith and fair dealing" in connection with the Expired Options. The Company does not believe that it has an obligation to compensate individuals for the Expired Options or that the claims set forth in the Complaint are valid, and we intend to vigorously contest all of the relief Mr. Rawat seeks.

This one-time opportunity will be available to you until August 1, 2008. If you choose to take advantage of this offer, the process will be as follows: *Execute the Payment and Release. Return it to Mr. Howard Kuppler, Navistar International Corporation, 4201 Winfield Road, P.O. Box 1488, Warrenville, IL 60555 **no later than August 1, 2008.** If we receive the executed Payment and Release on or before July 3, 2008, unless you direct otherwise we will mail a check in the amount of your payment, less applicable withholding taxes, to your home address on or before July 31, 2008. If we receive the executed Payment and Release on or before August 1, 2008, unless you direct otherwise we will mail a check in the amount of your payment, less applicable withholding taxes, to your home address on or before August 29, 2008.*

Your execution and return of the Payment and Release constitutes your acceptance of this offer.

If you have questions not answered in this letter, please contact Howard Kuppler at (630) 753-2149.

*Annette*

Attachments:

Exhibit A – Statement of Offer
Exhibit B – Payment and Release

## **PAYMENT AND RELEASE**

Execution of this Payment and Release constitutes acceptance of the offer reflected in that certain letter dated June 20, 2008, from Annette Freund (the "Freund Letter").

**General Release.**  For adequate and valuable consideration exchanged between the parties, the sufficiency of which is hereby acknowledged, _____ ("Releasor"), on behalf of Releasor and on behalf of Releasor's past, present and future respective predecessors, successors, heirs, assigns and any of the respective owners, members, managers, partners, principals, directors, officers, agents and employees of any of the foregoing, with full understanding of the contents and legal effect of this release, and having the right and opportunity to consult with counsel and a tax advisor, hereby releases and forever discharges Navistar International Corporation. (the "Company" or "Releasee") and its parents, subsidiaries, affiliates, related companies, agents, heirs, assigns, attorneys, lenders, and insurers, and any of the respective owners, members, managers, partners, principals, directors, officers, agents and employees of any of the foregoing, from any and all judgments, claims, demands, grievances, damages or causes of action of any kind or nature whatsoever, whether in contract (express or implied), covenant of good faith and fair dealing (express or implied), tort, statutory, or otherwise, whether legal or equitable, that Releasor has or may have in any way related to Releasor's stock options, whether in the money or out of the money, that expired during the period when there were certain limits on Releasor's ability to exercise Releasor's vested stock options ("Expired Options"), including but not limited to the claims described in the putative class action complaint filed against the Company by attorney Clinton A. Krislov on behalf of Mr. Ravi P. Rawat in the United States District Court for the Northern District of Illinois (Case No. 1:08-cv-03038), and as described in the Freund Letter.

**Covenant Not to Sue.**  A "covenant not to sue" is a legal term which creates a promise not to file a lawsuit in court.  It is different from the General Release of claims contained above. Besides waiving and releasing the claims covered by the General Release, Releasor further agrees never to sue the Company in any forum for any reason covered by the General Release language in the above paragraph.  Notwithstanding this Covenant Not to Sue, Releasor may bring a claim against the Company to enforce this Payment and Release.

**Payment/Consideration.**  In consideration for this Release, the Company shall pay Releasor a cash payment in the amount set forth in the Statement of Offer attached as Exhibit A to the Freund Letter, which Exhibit A is incorporated by reference as if fully set forth herein. Releasor acknowledges and agrees that the Company has no obligation to compensate Releasor for the Expired Options.

**Taxes.**  Releasor agrees that all tax liability which may result from the payment of money as set forth herein rests with Releasor alone.

**Consultation With Legal Counsel, Advisors.**  By signing this Release, Releasor expressly acknowledges that Releasor has had the opportunity to consult with legal counsel and a tax advisor of Releasor's choosing prior to signing this Release if Releasor so desires.

**Governing Law.**  This Release will be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and/or to be performed in that State, without regard to any choice of law provisions thereof.

**Complete Agreement.**  Except as provided herein, this Agreement supersedes all prior and contemporaneous agreements of any kind between the parties relating to the Expired Options.

**Severability.**  If any provision of this Release is invalid or unenforceable, the balance of this Release will remain in effect, and if such provision is inapplicable to any person or circumstance, it will nevertheless remain applicable to all other persons and circumstances.

THIS IS A FULL AND FINAL RELEASE – I HAVE READ, UNDERSTOOD AND VOLUNTARILY AGREED TO THE TERMS OF THIS RELEASE BEFORE SIGNING.

Executed this _____ day of _____, 2008.


_____
Releasor

2

# EXHIBIT 2

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 C 3038 | **DATE** | 6/30/2008 |
| **CASE TITLE** | Ravi B. Rawat vs. Navistar International Corp. | | |

**DOCKET ENTRY TEXT**

Plaintiff's emergency motion for a protective order [18] is granted in part and denied in part. Enter Order.

■ [ For further detail see separate order(s).]                                      Docketing to mail notices.

| | Courtroom Deputy Initials: | MF |
|---|---|---|

08C3038 Ravi B. Rawat vs. Navistar International Corp.                                      Page 1 of 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, )<br>)<br>) | |
| Plaintiff, ) | Case No. 08-cv-03038 |
| ) | |
| v. ) | Judge John W. Darrah |
| ) | |
| NAVISTAR INTERNATIONAL CORPORATION, )<br>) | Magistrate Judge Nan R. Nolan |
| Defendant. )<br>) | |

## ORDER

WHEREAS, having considered Ravi P. Rawat's Emergency Motion for a

Protective Order to Prevent Defendant from Contacting Putative Class Members and

Soliciting Releases, it is HEREBY ORDERED:

The motion is granted in part and denied in part. Defendant is to send corrective notice to

the putative class in the form attached hereto as Exhibit A.

SO ORDERED this 30th day of June, 2008.

John W. Darrah
United States District Court Judge

# EXHIBIT A



Navistar, Inc.
4201 Winfield Road
Warrenville, IL 60555  USA

P : 630-753-3052
W : navistar.com

Annette M. Freund
Vice President,
Compensation, Benefits
and HR Support

June 27, 2008

### NOTICE:  THIS MAY AFFECT YOUR LEGAL RIGHTS

To all recipients of the June 20, 2008 letter from Annette Freund, Vice President, Compensation, Benefits and HR Support of Navistar International Corporation:

Dear _____:

You received a letter offering a cash payment and soliciting your release of claims relating to Navistar Stock Options.

Releases sent to the Company before August 1, 2008 will not be effective until August 1, 2008.  Anyone who had previously sent releases to the Company may reconsider your release until August 1, 2008.  If you choose to reconsider, you have until August 1, 2008 to deliver a revocation to Mr. Howard Kuppler, Navistar International Corporation, 4201 Winfield Road, P.O. Box 1488, Warrenville, IL 60555.

A class action case, *Rawat v. Navistar Int'l Corp.*, 08cv3038 (N.D. Ill.), seeks to certify a class consisting of persons with vested stock options that expired during the period when trading restrictions were in place.  The lawsuit claims that Navistar is obligated to compensate you for any resulting harm because of your inability to exercise your options before they expired.

For any inquires regarding *Rawat v. Navistar Int'l Corp.*, you may contact the following counsel:

**Clinton A. Krislov, Esq.**
**KRISLOV & ASSOCIATES, LTD**
**Civic Opera Building**
**20 North Wacker Drive, Suite 1350**
**Chicago, IL 60606**
**Phone: (312) 606-0500**
**Fax:    (312) 606-0207**
clint@krislovlaw.com

You may also contact legal counsel of your choice.

# EXHIBIT 3

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
      RAVI P. RAWAT, on behalf of      )
 4    himself and others similarly     )
      situated,                        )
 5                                     )
                     Plaintiff,        )
 6                                     )  Case No. 08 C 3038
                                       )
 7    -vs-                             )  Chicago, Illinois
                                       )  June 26, 2008
 8                                     )  9:30 o'clock a.m.
      NAVISTAR INTERNATIONAL           )
 9    CORPORATION,                     )
                                       )
10                   Defendant.        )

11
                   TRANSCRIPT OF PROCEEDINGS
12         BEFORE THE HONORABLE JOHN W. DARRAH

13    APPEARANCES:

14    For the Plaintiff:        KIRSLOV & ASSOCIATES, LTD.
                                MR. CLINTON A. KRISLOV
15                              MR. JEFFREY MICHAEL SALAS
                                20 North Wacker Drive
16                              Suite 1350
                                Chicago, Illinois 60606
17
      For the Defendant:        LATHAM & WATKINS LLP
18                              MR. CARY R. PERLMAN
                                MR. ROBERT C. LEVELS
19                              MS. ROBIN M. HULSHIZER
                                233 South Wacker Drive
20                              5800 Sears Tower
                                Chicago, Illinois 60606
21
      Court Reporter:
22
                        Mary M. Hacker
23                  Official Court Reporter
                 United States District Court
24         219 South Dearborn Street, Suite 1426
                   Chicago, Illinois  60604
25             Telephone:  (312) 435-5564
```

2

1          THE CLERK:  08 C 3038, Rawat versus Navistar

2   International.

3          MR. SALAS:  Good morning, your Honor.  Jeff Salas

4   for the plaintiff, Rawat.

5          THE COURT:  Good morning, Mr. Salas.

6          MR. PERLMAN:  Good morning, your Honor.  Cary

7   Perlman, Robin Hulshizer and Robert Levels for the defendant

8   Navistar.

9          THE COURT:  Good morning, Mr. Perlman, Ms.

10  Hulshizer, Mr. Levels.

11         All right.  This matter comes on this morning on

12  plaintiff's emergency motion to prevent the defendant from

13  contacting the putative class members.

14         I read the motion and I read the communication that

15  purportedly has been sent to the employees, and I read that

16  release.  What do you have to say to this?

17         MR. PERLMAN:  Thank you, your Honor.

18         I have three things to say.  And I might be a

19  little more loquacious here than I would if we had a chance

20  to file these papers.  I would appreciate your indulgence.

21         First of all, let me --

22         THE COURT:  Hold it a second.  I mean, the reason

23  we're in here is because apparently without notice your

24  clients did this.

25         MR. PERLMAN:  Correct.

1          THE COURT:  I mean, unless we can claim that we

2     don't have enough time to respond.

3          MR. PERLMAN:  No, no -- well, I'm saying normally I

4     would have given you some background in -- let me start back

5     then.

6          My clients did send that message to --

7          THE COURT:  To how many employees?

8          MR. PERLMAN:  -- to 50, I believe, your Honor.

9          And let me say, starting back and then moving

10    forward, my clients sent that message because my clients have

11    a right to send that message.  The Seventh Circuit law is

12    absolutely clear that there is a right to send communications

13    to putative class members.

14          And as this Court, the Northern District of

15    Illinois, has recently noted, citing that Seventh Circuit

16    decision, a district court has limited power to restrict

17    communications between defendants and putative class members

18    before the class is even certified.

19          And, therefore, under both the Supreme Court

20    decision of Gulf Oil and the Seventh Circuit decision of

21    Williams v. Chartwell Financial Services -- that's a Seventh

22    Circuit decision from 2000, it's at 204 F3d 748 -- there is

23    nothing improper about contacting --

24          THE COURT:  Why don't you give me that cite again.

25    Do you have a paper there that you can provide me with, or is

4

1    that just your working notes?

2            MR. PERLMAN:  Well, I have a draft of the

3    opposition we're preparing.  I don't mind handing it up if

4    your Honor is willing to accept a draft.

5            THE COURT:  Sure.  Hand it up.

6            MS. HULSHIZER:  Here's a copy for you.  We were

7    working on it all night, your Honor, so it probably has

8    typos.

9            THE COURT:  Okay.

10        (Document tendered.)

11            THE COURT:  We will take a brief recess.

12            MR. PERLMAN:  I want to mention one other thing,

13    your Honor.

14            THE COURT:  Hold on a second.  I'll be right back.

15            MR. PERLMAN:  Sorry.

16        (Brief recess was taken.)

17            THE CLERK:  08 C 3038, Rawat versus Navistar

18    International Corporation.

19            THE COURT:  Sorry for the delay, folks.

20            MR. SALAS:  No problem, your Honor.

21            THE COURT:  Briefly, Counsel.  You can complete

22    your argument.

23            MR. PERLMAN:  Yes, your Honor.

24            Now that your Honor has had an opportunity to read

25    the draft, I'll be very, very brief.  I just wanted to make

1     two quick points in addition to the jurisdictional point,

2     which your Honor is already aware of.

3              What actually happened here, by way of facts, so

4     that you have an understanding of the context, is not that

5     our client, Navistar, tried to undercut anything in

6     connection with a putative class action case, which we

7     believe to be without basis, but, rather, the reverse.

8              As the attachments to the complaint revealed, the

9     company had already communicated with the 56 individuals who

10    this problem affected.  We knew that their stock options were

11    expiring, there was nothing to be done about it, or it was

12    not prudent to do anything about it until the company was

13    current with its accounting practices.

14              And we told the people, all of them, in January --

15              THE COURT:  I read the letter, I read the proposed

16    release.  I know what it says.

17              MR. PERLMAN:  Okay.  Thank you, your Honor.

18              And my only point is, after the board of directors

19    acted in June, we made good on the promise we made to these

20    people in January to communicate the result.

21              At that time --

22              THE COURT:  Say that again.

23              MR. PERLMAN:  I'm sorry.

24              THE COURT:  You made a promise to somebody in

25    January to communicate a result?  What --

1          MR. PERLMAN:  A result of the board of directors'

2    decision as to what they were going to do about the expired

3    stock option issue.

4          THE COURT:  And you made a promise to whom?

5          MR. PERLMAN:  To all of the people who were

6    affected by this.

7          THE COURT:  When did you make that promise?

8          MR. PERLMAN:  In January of '08.  I can pass it up.

9    It's a --

10         THE COURT:  When did the board meet?

11         MR. PERLMAN:  June 16th of '08.

12         THE COURT:  I see.

13         The board didn't meet between January and June, is

14   that right?

15         MR. PERLMAN:  Pardon, your Honor?

16         THE COURT:  Would you read that back?

17      (Record read.)

18         MR. PERLMAN:  The board did meet between January

19   and June, but until the company was current with its

20   accounting practices -- which happened on May 30th, is when

21   they filed, approximately, the 2007 annual report -- it

22   wasn't -- the company couldn't go to the board, or it wasn't

23   prudent to go to the board to take this step.

24          So the problems were, restatement required that

25   these blackouts be (unintelligible), people couldn't exercise

1   their options.  We told people in January --

2          THE COURT:  I'm not talking about that.  I'm

3   talking about a promise that you purportedly made to your

4   employees that you would go to the board, and you made that

5   promise in January.  And you're saying that it was the board

6   activity in June which triggered this letter.

7          MR. PERLMAN:  That is correct, your Honor.

8          THE COURT:  All right.  My question is, did the

9   board meet between January and June?  And if they did, why

10  didn't you advise your clients of the board's -- why didn't

11  the board consult and give you the wherewithal to advise the

12  employees prior to June?

13         MR. PERLMAN:  The answer to that, your Honor, is

14  because what we told the employees was that we'll go to the

15  board at the point that the 10Ks for 2006 fiscal year and

16  2007 fiscal year are current.  That didn't happen until May

17  30th.

18         The very next board meeting, after we promised we

19  would go to the board, was June 16th.  The board acted.  We

20  then made good on the promise we made in January of '08, five

21  months before the case was filed, that we would communicate

22  the result of that to the 56 affected people, and we did,

23  your Honor.

24         THE COURT:  All right.  Counsel?

25         MR. SALAS:  Yes, your Honor.

1       First, I'll take issue with the January letter.
2   The January letter was not a promise --
3           THE COURT:  Excuse me one second.
4       (Brief pause.)
5           THE COURT:  I'm sorry.
6           MR. SALAS:  Thank you, your Honor.
7       The January letter wasn't a promise but, rather, an
8   open-ended commitment to sometime raise this with the board.
9   Restatements often take years, four to five years at some
10  point.
11          And the company is under the obligation to pay for
12  these expired options now, whether the financials are current
13  --
14          THE COURT:  Why don't we address the issue -- I was
15  just curious, and the reason I questioned counsel about the
16  timing is that he apparently was suggesting that this letter
17  to the putative class members was a direct result of some
18  action by the board that could only have been taken by June.
19  That is or is not persuasive.
20          Why don't you address the issue of communication
21  with the putative class members by the defendant.
22          MR. SALAS:  Sure, your Honor.
23          We filed this complaint on May 23rd, 2008, and
24  served it six days later, on May 29th.  Around June 11th
25  counsel for the defendants called us and asked for an

1    extension of time.  They were due to respond July 18th.  I

2    believe they asked to respond by July 8th, which for

3    convenience of counsel we granted that response.

4         Two days ago, while their motion to extend time was

5    before this Court, we received notice from a putative class

6    member who received the letter that you've noted as Exhibit

7    -- or I've noted as Exhibit C and that you mentioned earlier.

8         THE COURT:  The June 20th letter?

9         MR. SALAS:  The June 20th letter.

10        And notably, this letter is two days after the time

11   to respond and after we had granted this extension.

12        Now, this letter is a coercive attempt for putative

13   class members to release the claims against the company,

14   specifically mentioning our case.

15        What happens is that -- not only that, it's a

16   sweepstakes offer:  Here is free money, we don't think we

17   have to pay you but we're going to if you send us back these

18   releases by August 1st, and we'll pay you sooner if you get

19   them back to us by July 3rd.  And that is before even the

20   time to respond to the complaint is due for the defendants.

21        So basically this was a coercive act to undermine

22   this litigation and try to cut the head off the litigation.

23        THE COURT:  I've read the cases that you have

24   provided.  The first case that counsel for the defense asked

25   me to look at is a Seventh Circuit opinion written by former

1    Chief Judge Flaum.  Among other things that the Court was

2    resolving in that case was an issue regarding the district

3    court's entrance of a protective order limiting the

4    plaintiffs from contacting the putative class members.

5            And Judge Flaum, in a typical scholarly opinion,

6    cites Gulf Oil, which shows up in both of your papers as a

7    somewhat seminal pronouncement by the United States Supreme

8    Court.  And it's 452 U.S. -- I've got the abbreviated cite,

9    at 100, and that part of the cite is used by Judge Flaum in

10   his opinion.

11           He says, quote, "The decision to grant a protective

12   order is a discretionary one to be used by the courts to

13   control the course of class action litigation.  The

14   discretion to issue such orders has been vested with trial

15   courts because it is well recognized that class actions

16   present opportunities for abuse as well as problems for

17   courts and counsel in the management of cases.  Because of

18   the potential for abuse, a district court has both the duty

19   and the broad authority to exercise control over a class and

20   enter appropriate orders governing conduct of counsels and

21   parties."

22           And then discussing the stay -- the protective

23   order, I should say, that was entered by the district court,

24   Judge Flaum goes on to say, quote, "The district court's

25   decision as to the protective order must involve a careful

1   balancing of potential for abuse created by the class action

2   and the right of the plaintiffs to contact potential class

3   members."

4         Now, again, let me emphasize that in that case

5   plaintiffs were precluded from contacting their own putative

6   clients, possible class members.

7         Back to the opinion, quote, "Because this balancing

8   is involved and because this area involves important

9   competing concerns, an order limiting discovery communication

10   between parties and potential class members should be based

11   on a clear record and specific findings that reflect a

12   weighing of the need for a limitation and the potential

13   interference with the rights of the parties."  And again,

14   citing Gulf Oil.

15         (Continuing:)  "The plaintiffs had challenged the

16   district court's protective order arguing that the order

17   unconstitutionally deprived them of relevant documents which

18   were also the subject of the protective order and put them at

19   a disadvantage in responding to a summary judgment motion."

20         So the district court erred in not setting out with

21   more specificity the reasons for protecting communication

22   with the putative class members and the matter was remanded

23   for further hearing on that issue.

24         Now, in this case -- pardon me.  And counsel for

25   the defense has also cited an opinion which is remarkably

1    close to the facts of this case and extremely instructive.

2    And that's Eshelman versus OrthoClear Holdings, and that can

3    be found at 2007 Westlaw 1429.  It's a district court opinion

4    from the Northern District of California.

5              In that case plaintiff sought to represent a class

6    consisting of persons and entities who had purchased or

7    otherwise acquired certain shares of stock by the defendant,

8    OrthoClear Holdings.

9              After the plaintiff filed the lawsuit, there was an

10   attempt by the plaintiff and the defendant to resolve the

11   issue through settlement discussions.  Settlement discussions

12   were then abandoned by the parties, and shortly thereafter

13   the defendant sent a package of information to potential

14   class members, similar to what we have here.  Although we

15   don't have any evidence that there was any attempt at

16   settlement, there was a hiatus in the proceedings requested

17   by the defendant.

18             Did the defendant ask for some brief continuance or

19   brief extension, or something of that nature?

20             MR. SALAS:  Yes.

21             THE COURT:  In the OrthoClear case, as I said,

22   there was some information, a package of information sent to

23   the putative class members with regard to the claim asserted

24   in the class action.  Plaintiffs thereafter moved to limit

25   the defendant's contact with the putative class.

1          Now, in that case the Court held that plaintiffs

2    had not met their burden to show that intervention was

3    warranted.  And again, they are citing Gulf Oil.

4          So it's clear that precertification correspondence

5    between the parties is appropriate but that right is not

6    unfettered.

7          To the extent that the communication of the class

8    members is misleading, coercive or attempted to assert undue

9    influence over the putative class members, restriction in

10   those kind of communications can be appropriately limited.

11         Now, in the OrthoClear case the district court

12   denied prohibiting communication between the defendant and

13   the putative class members because, as I said, the plaintiff

14   had failed to make a showing, admit their burden of proving

15   or persuading the Court that the information was potentially

16   misleading or intimidating and sealed material information or

17   attempted to influence the decision of the putative class

18   members.

19         They noted in that case that, first of all,

20   defendants represented that they were planning to extend a

21   deadline by which a potential class member could accept or

22   reject the offer, thus granting potential class members

23   additional time to consider the offer and consult with

24   counsel, or contact plaintiff's counsel if they chose.  Here

25   I note there is a deadline.  There's an August deadline, I

1    believe, is there not?

2         In addition, in the OrthoClear case, the putative

3    class members had contact information regarding plaintiff's

4    counsel.

5         Now, looking at the information that was sent to

6    the 50 or so employees that held the options, there's

7    language to this extent, quote, "This one-time opportunity

8    will be available to you until August 1st, 2008", end quote.

9    Now, that implies that no settlement at any other time in

10   this litigation will be available.

11        It refers to the lawsuit filed in the Northern

12   District of Illinois.  It does not identify the lawyers

13   representing plaintiffs, nor give any direction as to how

14   they could be contacted.  Although in the release there's a

15   statement, quote, "By signing this release, releasor

16   expressly acknowledges that releasor has had the opportunity

17   to consult with legal counsel and a tax advisor of releasor's

18   choosing prior to signing this release, if releasor so

19   desires."

20        In addition, there is a general release, extremely

21   broad, excusing Navistar -- or releasing Navistar from any

22   and all judgments, claims, demands, grievances, damages or

23   causes of action of any kind or nature whatsoever, whether in

24   contract, paren, expressed or implied, covenant of good faith

25   and fair dealing, expressed or implied, tort, statutory or

1    otherwise, whether legal or equitable, that releasor may have

2    in any way, in any way, related to releasor's stock options.

3            And then it goes on to say, "Including but not

4    limited to the claims described in the putative class action

5    filed against the company by Attorney Clinton A. Krislov on

6    behalf of Mr. Ravi P. Rawat."

7            Now, the plaintiffs in their papers make the

8    assertion that doesn't accurately set out the options of the

9    class holders; that, in fact, the value of the options may be

10   greater than what's being offered to settle the case.

11           MR. SALAS:  Yes, your Honor, absolutely.

12           THE COURT:  Do you want to speak to that?

13           MR. SALAS:  Absolutely, your Honor.

14           An employee stock option is the right to buy

15   company stock at a specific price, dated on the date of --

16   that's unrelated here but it's a larger issue.

17           So when an employee exercises that option, they can

18   hold -- they pay the price of, we'll say $10.  The employee

19   was granted a stock option on January 1st at $10.

20           Regardless of the price of the stock, whether it

21   goes up or down -- and Navistar's stock has continued to go

22   up.  I believe at the beginning of the blackout period it was

23   at about $28, and as soon as last week it was 75, between the

24   75 and $70 range.

25           And the employee has a way to exercise that option

1    and either hold the stock or sell the stock.  If he sells the

2    stock -- or he or she sells the stock, there's an instant tax

3    burden and cash gain.

4           So, for instance, you have an option at $10, you

5    exercise it at $10 and the stock happens to be at 20, there's

6    an immediate $10 gain.  If you sell that stock right away,

7    you have a $10 tax burden.  If you hold the stock, which in

8    this case if the putative class members would have exercised

9    the stock at anywhere between 20 and $30 and held, that stock

10   would be worth over $75 today, whereas the offer cuts it off

11   the day that particular option expired.

12          And that's not really the pertinent date, simply

13   because if the employee decided to hold that stock, it could

14   hold -- it could hold it forever, hold it until the company

15   is bought or ends or until that person dies and really reap

16   the benefits of the growth in the company, whereas here it's

17   basically giving cash off, or cutting off the date of which

18   the -- on the date of which the option expired, which could

19   be back in October, when the stock was trading at $45.

20          So it's an evidence to discount the claim, in other

21   words, without consulting class counsel, and just kind of --

22   and sometimes these are going to be substantial amounts of

23   money.  So people are going to be very coerced to take this

24   simply because it's a one-time offer.  You're never going to

25   get any more money, and it's going to be cash and we'll get

1    it to you as soon as possible.

2             THE COURT:  Could this offer preclude a settlement

3    of this case later on?

4             MR. PERLMAN:  Your Honor, I think the case law is

5    clear --

6             THE COURT:  I'm not asking about the case law.  I'm

7    asking regarding the intention of your client.  Is this it?

8    Must this matter be litigated if they don't take this offer?

9             MR. PERLMAN:  In no way has any determination been

10   made about that.  The only determination that's been made

11   about the merits of this case is that there's no subject

12   matter jurisdiction.

13            THE COURT:  Hold on.  We'll get to that in a

14   minute.  Right now I'm going to ask you to address the issue

15   that's before me.

16            MR. PERLMAN:  Sure.  I apologize.  If I didn't

17   answer the question, I -- it was not my intent to avoid it.

18            THE COURT:  The question is, have your clients

19   absolutely precluded any settlement of this matter at a later

20   time after August 1st?

21            MR. PERLMAN:  Absolutely not, your Honor.  We've

22   had no discussions of that with our client, no such decision

23   has been made.

24            THE COURT:  The second paragraph on the last page

25   says, "This one-time opportunity will be available to you

1  until August 1st, 2008."

2          MR. PERLMAN:  That is correct, your Honor.

3          THE COURT:  (Continuing:)  "If you choose to take

4  advantage of this offer, the process will be as follows", and

5  then you go on.

6          Do you think that fairly implies that there will

7  never be any settlement of this dispute, or there will never

8  be any offer made by your clients to resolve this other than

9  the one that terminates on August 1st?

10          MR. PERLMAN:  Respectfully, your Honor, I disagree

11  with that interpretation.

12          What it says is that the cash offer that we're

13  making now, which was the one that the board authorized us to

14  make and that we promised we would go to the board with at

15  the appropriate time, extends for six weeks, which is much

16  longer than the ten days that several courts found were

17  sufficient amounts of time to not be coercive.  We purposely

18  erred way on the other side because we weren't -- we didn't

19  want to be --

20          THE COURT:  What about the one-time offer?  Do you

21  think that might have a coercive or intimidating effect, or

22  no?

23          MR. PERLMAN:  I don't think so, your Honor.  I

24  think -- I mean, in every case that I've ever been in that

25  settled, people periodically make offers.  The other side is

1  always free to say, no, I want to litigate the case.  I want

2  to join up with Mr. Krislov, whose name we identified in the

3  release and the case that we identified in the release, and

4  they can take their chances litigating with us, if they

5  prefer.

6          THE COURT:  What about this:  What if I direct the

7  parties not to accept any offer before August 1st?

8          MR. PERLMAN:  Well --

9          THE COURT:  What if I direct the defendant not to

10  accept any offer until August 1st?

11          MR. PERLMAN:  I'm not sure what the basis would be

12  for your Honor --

13          THE COURT:  Well, you just represented that you're

14  keeping this offer open until August 1st, which is far longer

15  than the ten-day period that some courts have found to be

16  appropriate.

17          MR. PERLMAN:  Correct, your Honor.

18          THE COURT:  And that the parties will have the

19  benefit of almost a month to consult with counsel, tax

20  advisors and the like before making a decision.  And I

21  thought that was the import of the comment you just made

22  regarding the date for termination of acceptance as being

23  longer than a ten-day period.

24          Now, what if we then say that any offer transmitted

25  prior to August 1st cannot be accepted?

 1          MR. PERLMAN: Well, I guess what I'm missing, your

 2   Honor, is if --

 3          THE COURT: No. I'm the one that is missing

 4   something here.

 5          MR. PERLMAN: Okay. I'm sorry.

 6          THE COURT: I think I just said, do you think this

 7   would be coercive or intimidating, and you said, no, they've

 8   got 30 days in which to see professional people to get

 9   advice.

10          MR. PERLMAN: Yes, your Honor.

11          THE COURT: Well, what if we just then preclude you

12   from accepting any offer until that 30-day period has lapsed?

13          MR. PERLMAN: What that's doing is telling the

14   people who have chosen to accept the offer and want their

15   money, that we can't make good on the offer we have made.

16          THE COURT: No, we're not saying you can't make

17   good. We're saying that there's a court that has told you it

18   can't be accepted until August 1st.

19          And if you really want to say something, you say

20   the Court was concerned that maybe they should further

21   explore all their options and seek legal counsel before they

22   exercise their offer. I mean, that's what you just told me

23   you thought your client was doing by providing this 30-day

24   window.

25          MR. PERLMAN: Well, what we were doing, your Honor,

1    was making sure that we didn't skate close to any of the

2    cases that found these communications should be coercive or

3    inappropriate.  And I don't think we were close to any of

4    these cases.

5              THE COURT:  Okay.  What would be the harm, then, to

6    give everyone in the case, the putative class, everyone

7    that's received one of these letters, the opportunity to

8    fully consider this up to the termination date of August 1st?

9              MR. PERLMAN:  They all do have the opportunity to

10   consider up to August 1st.

11             THE COURT:  All right.  I think we'll make that

12   part of the order.

13             How many people are in the class?

14             MR. PERLMAN:  At the maximum, 56.

15             THE COURT:  So the cat's -- the cow is out of the

16   barn, or whatever metaphor is appropriate.  The letter has

17   already been sent.

18             I'm going to enter an order today -- do you want to

19   say anything further regarding release?

20             MR. SALAS:  Yes, your Honor.

21             Any corrective notice that goes out to the putative

22   class should also explain that they do have legal rights

23   under this putative class action.  Basically they just refer

24   to a case and say, oh, there's a case out there, you have to

25   release your -- you have to release your claims in that case,

1   but we're not going to tell you what it's about, what it's

2   regarding; that it alleges that the expired stock options is

3   a breach of contract and that you may be -- you are a part of

4   this case, when we don't even know if 56 people is the end

5   all-be all.  We're open to filing an amended complaint and

6   expanding the class, if that's possible.

7          And also, we don't know if -- you know, there's

8   other -- our client did not get one of these letters because

9   it only went to the parties who were not in litigation with

10  the company.

11         So we're not sure exactly of the lay of the land.

12  We're open to having discussions with the defendants.  But I

13  think that it should make clear that they would be part of

14  this putative class, and this is mainly the claims they are

15  releasing rather than all -- and all claims regarding stock

16  options are basically part of our case.

17         THE COURT:  I'm citing from Eshelman versus

18  OrthoClear -- let me read the full cite into the record.  The

19  OrthoClear case cites the Manual for Complex Litigation,

20  21.12, Fourth Edition, 2004.  I looked at that as well, and

21  then there's some federal court opinions currently also

22  addressing it.

23         That provision says, quote, "Defendants and their

24  counsel generally may communicate with potential class

25  members in the ordinary course of business, including

1    discussing settlement before certification, but may not give

2    false, misleading or intimidating information, conceal

3    material information or attempt to influence a decision about

4    whether to request exclusion from class certification under

5    Rule 23(b)(3)", end quote.

6          And based on the information that's been placed

7    here before me today, particularly the covering letter and

8    the release itself, as I said, the general nature of the

9    release, the statement in the covering letter regarding the

10   advantages to accepting the offer, as well as any meaningful

11   identification of counsel for the putative class,

12   particularly insofar as giving the putative class members the

13   wherewithal to communicate with counsel, I'm going to direct

14   the defendants not to accept any offer until -- when does the

15   offer period close, August 1st?

16          MR. LEVELS:  August 1st.

17          THE COURT:  -- August 1st.  And no offer received

18   before August 1st will be deemed to be accepted until further

19   order of court.

20          And I'll also authorize the plaintiffs to

21   communicate with the class members and convey to them that

22   the plaintiffs are representing the putative class, and that

23   the plaintiffs can be contacted at a certain address, e-mail

24   address and telephone number.

25          And borrowing from the language of OrthoClear, you

1    may tell the putative plaintiffs -- and I'll accept

2    suggestions from both sides.  I'm looking at Page 3 of the

3    Westlaw printout, and the language I'm focusing on,

4    "necessary to evaluate the offer and make an informed

5    decision as to whether or not to release their claims."

6            Any objection to that language?

7            MR. PERLMAN:  Other than my general objections of

8    process, I have no objection to the language.  I would only

9    point out that it obviously has to be fair in both contexts.

10            I mean, in order to not be misleading, the people

11    have to know that if they opt for litigation, that they're

12    litigating and that our position will be that they don't get

13    anything.  And if Mr. Krislov convinces them that's

14    inappropriate, then they will opt into the class, or at least

15    they would if there was enough people to have a class.

16            THE COURT:  Well, the other side of the coin is we

17    don't tell them that so they don't know that they have those

18    advantages.

19            MR. PERLMAN:  I'm not going to reargue it, your

20    Honor.  You've made your decision, so I don't think it's

21    worth --

22            THE COURT:  Well, I'm looking for direction from

23    you.

24        (Mr. Krislov approached the podium.)

25            MR. PERLMAN:  We identified for them that there was

1  a case, we identified the number, we identified Mr. Krislov

2  by name.  These are not a thousand people who spent an extra

3  quarter for suit.  These are senior executives of the company

4  who are entitled -- not entitled, but who have offers for

5  tens of thousands of dollars.

6            If they have the name of a person, they can dial,

7  you know, 411.  Indeed, not only could they do that, they did

8  do that.  People who wanted to talk to them, because we

9  identified them, apparently have already called them.

10  There's nothing misleading in the communication.

11            THE COURT:  How many people have called?

12            MR. KRISLOV:  We got -- sorry, your Honor.  Clint

13  Krislov.

14            I have been handling this IACLE panel the whole

15  day, and so I'm on a lunch break.

16            THE COURT:  Good morning, Mr. Krislov.

17            How many people called?

18            MR. KRISLOV:  The number of people that called were

19  -- there was the one mysterious caller who refused to give

20  his name --

21            THE COURT:  How many people have called?

22            MR. SALAS:  I think only one.

23            MR. KRISLOV:  I think only one.

24            THE COURT:  What information do you have that

25  several people have called?

1          MR. PERLMAN:  I don't think I said several.  If I

2     did, I misspoke.

3          The moving paper said that he had been contacted by

4     putative class members.  That's my basis for saying that.

5          MR. KRISLOV:  Your Honor, if we could draft a

6     fairly neutral letter --

7          THE COURT:  I'll ask you to meet and confer and

8     draft a letter that simply advises that the putative class --

9     that a lawsuit has been filed seeking to represent a class of

10    which the recipient may be a member, and that the attorneys

11    representing the lawsuit are, and then set out your names,

12    telephone number, business address and e-mail.  Why don't we

13    just leave it at that?

14         MR. SALAS:  Sure, your Honor.

15         One more thing.  And I'm not necessarily clear on

16    the --

17         THE COURT:  These people are all intelligent senior

18    CEO type people -- senior executives.  Being advised of the

19    name and address and e-mail account address of someone

20    representing the other side couldn't possibly do any harm,

21    could it?

22         MR. KRISLOV:  Well, they already have a contact --

23    they have already been told to contact Mr. Kuppler in the

24    letter.  So what we would draft is a letter saying what your

25    Honor has ruled, and that they can contact us if they wish,

```
1    but that they should contact -- they may wish to contact
2    their own independent counsel.
3              One of the problems is they're saying -- in the
4    releases they're saying that they've had an opportunity to
5    consult independent lawyers, counsel and tax advisors, which
6    clearly is not the case for people who sent it in by
7    July 3rd.  But --
8              THE COURT:  Have you received any releases?
9              MR. PERLMAN:  Yes, your Honor.
10             THE COURT:  How many?
11             MR. PERLMAN:  Four.
12             THE COURT:  What is your position in that regard?
13   Maybe I spoke too soon.
14             MR. KRISLOV:  We would like to know who the
15   releases are from, and we would like to --
16             THE COURT:  Originally -- I don't know if you were
17   in the room.  I originally was going to preclude any
18   acceptance of releases until the full period had run on
19   August 1st.  And based on defense counsel's comments, I
20   thought that would be reasonable.  I thought that's what you
21   were alluding to, that they had the full period of time to
22   consider it.  And I thought you were almost conceding that
23   you would keep that period open until --
24             MR. PERLMAN:  It is open.  I just thought -- I want
25   to make sure we weren't miscommunicating.
```

1       They have the ability, because of the payroll, to

2   get it -- if they get it to us by the beginning of June,

3   July, they can get their money the end of July or they can

4   wait until August.  Nobody has to reply before August 1st.

5   They have six weeks to consider this.

6       THE COURT:  Do you see any harm to preclude you

7   from accepting any offers until August 30th?

8       MR. PERLMAN:  Well, the harm, your Honor, is that

9   the people who, as you say, are sophisticated types and want

10  their money and already sent in an acceptance, are expecting

11  to get it in July and don't get it.

12      THE COURT:  Okay.  How can we communicate with them

13  and tell them that they have until August 1st to reconsider

14  their decision and here is the name of the person that's

15  representing the plaintiffs?  Maybe that's what you ought to

16  say.

17      MR. KRISLOV:  We'll do a very neutral letter for

18  your approval.

19      THE COURT:  You'll have to get it back here this

20  afternoon.

21      MR. KRISLOV:  Pardon?

22      THE COURT:  You'll have to get it back here this

23  afternoon.

24      MR. SALAS:  Sure, absolutely.

25      MR. PERLMAN:  Okay.

1          THE COURT:  Your point is a good one -- counsel, I

2     forgot your last name.  I'm sorry.

3          MR. PERLMAN:  Mr. Perlman.  That's quite all right,

4     your Honor.

5          THE COURT:  Mr. Perlman, your point is a good one.

6     If someone has made a decision to accept the offer that was

7     informed, that was based on material information and was not

8     unduly influenced, I agree with you, that they should have

9     the advantage of having their money in hand as soon as

10    possible.

11         I'll ask you to meet and confer and draft a letter

12    that advises them that they have up to the August 1st

13    deadline to reconsider, and here is plaintiff's counsel's

14    name, address, e-mail address, and that if they've made -- if

15    they have already accepted, that they still have until

16    August 1st to consider their decision, something of that

17    nature.

18         MR. KRISLOV:  I mean, is it feasible to put in --

19    and I don't want to overreach, but we do think that the offer

20    is inadequate and certainly doesn't spell out the tax

21    ramifications to these people.

22         THE COURT:  I'll ask you not to do that.

23         MR. PERLMAN:  May I ask for a very modest

24    modification of your proposed order, your Honor?

25         THE COURT:  Sure.

1          MR. PERLMAN:  The date that the checks would go out

2     for the people who accept by July 3rd, I believe, is

3     July 29th, which would still be over a month from now.  It

4     would be difficult for us to send the checks, then have

5     somebody say on July 31st they're reconsidering.  I would

6     suggest that we tell them they can reconsider up until

7     July 29th and notify us by then if they change it.

8          THE COURT:  All right.  I'll agree to that.

9          And if you would also put in there that if they

10    don't wish to reconsider, they can simply contact you -- to

11    contact you and that the check will be issued on the 29th of

12    June, something of that nature.

13         MR. KRISLOV:  Your Honor, I would object to -- I

14    mean, that's really not neutral.  That's almost encouraging

15    them to call them and tell them to go ahead and cut them the

16    check.

17         And they have not -- I mean, I think nobody could

18    have sent a release in at this point and had adequate tax

19    advice, because these people are going to pay ordinary income

20    tax on these amounts, and the offer we think is inadequate.

21         And so, you know, we're willing -- we think it

22    makes sense to hold everything until at least the August 1st

23    deadline, and we'll have -- we'll be able to deal with these

24    issues -- well, I know you won't be here, but we'll be able

25    to deal with these in an appropriate timeframe after that.

1     And the fact that they might have to wait a month or so more

2     might actually wind up having them get a fair offer.

3                 THE COURT:  You can say -- no, I'm not going to do

4     that.

5                 You can say that a lawsuit has been filed and you

6     can think of some short, brief statement of your cause of

7     action if you're claiming thus and so.

8                 MR. KRISLOV:  Okay.

9                 THE COURT:  Simply that.

10                MR. KRISLOV:  Uh-huh.

11                THE COURT:  A brief statement of your cause of

12    action, that a lawsuit has been filed stating a cause of

13    action; that the attorneys representing this claim will be

14    moving to represent a class of people that are affected by

15    the claim, that would benefit from the claim.  That law firm

16    is, and then set the name down.

17                MR. KRISLOV:  Okay.

18                THE COURT:  Okay?

19                And then if you also advise them in there that

20    should they -- that no offer will be deemed to be -- that you

21    have up to -- what did you say, Mr. Perlman?

22                MR. PERLMAN:  July 29th.

23                THE COURT:  -- July 29th to consider the offer and

24    the offer will remain open to them.

25                MR. KRISLOV:  I think the offer is open to

 1   August 1st anyway.

 2          THE COURT:  Well, we're going to do it August --

 3          MR. KRISLOV:  It doesn't make any sense to shorten

 4   that time.

 5          THE COURT:  What if we say, if you communicate that

 6   you wish to accept the offer -- yes, you were going to keep

 7   it open until August 1st anyway.  You would have cut those

 8   checks for those people the next --

 9          MR. PERLMAN:  No, your Honor.  That's not what the

10   proposal is.  We were talking about the people who get us the

11   acceptances by July 3rd.  Those checks would have gone out on

12   or before July 31st.  So I need to know a couple days before

13   cutting those checks if somebody is going to reconsider.

14          After we send somebody a check for $56,000, I don't

15   want to find out on August 1st that, oh, actually they have

16   reconsidered and they want to be part of the class.

17          THE COURT:  What's wrong with cutting a check on

18   August 1st?

19          MR. PERLMAN:  That isn't when -- these are going to

20   go out with the regular payroll.  Payroll for the whole

21   company goes out at the end of the month.

22          THE COURT:  What's the harm of cutting five or six

23   checks, or whatever the amount is?  What is it, four right

24   now?

25          MR. PERLMAN:  There's four right now, as of last

1   night, yes, your Honor.

2          I can do that, your Honor.  I'm not going to --

3          THE COURT:  We'll let it stand at that.

4          MR. PERLMAN:  I'm not going to argue.  I understand

5   your concern.

6          THE COURT:  Okay.

7          My concern is this:  I want to give all the

8   putative class members an opportunity to consider the offer

9   made by the defendant in light of an understanding of the

10  nature of the suit that's been filed and the parties that are

11  representing the putative class.  Those people that want to

12  persist in their acceptance of your offer, after having that

13  opportunity, can do so as long as they communicate that to

14  you before August 1st.

15         MR. PERLMAN:  Understood, your Honor.

16         THE COURT:  Okay.

17         MR. KRISLOV:  Can we have the list of all the

18  people, both current and former employees, that are in the

19  class?  Because as I understand it, there --

20         THE COURT:  You will not communicate to anybody

21  else until we resolve this.  Do you intend on doing that?

22         MR. PERLMAN:  Other than the letter that you're

23  talking about, your Honor?

24         THE COURT:  Other than this letter, Mr. Perlman.

25         MR. PERLMAN:  The only issue that I can identify is

1    that the offer identifies not a lawyer but somebody in the HR

2    Department for the people to call if they have any questions.

3    I can't stop them from calling.  I can instruct that person,

4    per your Honor's suggestion, to make sure that they identify

5    -- that any call received, that they identify Mr. Krislov and

6    his phone number.  But to go beyond -- you know, the

7    opportunity to consult seems to me to be going way further

8    than any of the cases suggest.

9         THE COURT:  You're not contemplating sending

10   another letter out?

11        MR. PERLMAN:  We were not, your Honor.

12        THE COURT:  Okay.  I will ask you not to do that

13   until you advise the Court.

14        MR. KRISLOV:  The problem that we have is they're

15   going to be calling up -- is it Kuppler?

16        MR. PERLMAN:  That is correct, Howard Kuppler.

17        MR. KRISLOV:  They're going to be calling up Howard

18   Kuppler and we don't want any -- he is an inadequate person

19   to give them their full and fair explanation.

20        THE COURT:  Well, let's get the word out as to the

21   nature of your claim, very short, very brief statement, and

22   the parties to whom they should direct their contact.

23        MR. KRISLOV:  And can they turn over to us the

24   names of anybody --

25        THE COURT:  We'll get to that.  That's not before

1   me now.

2           Off the record.

3        (Discussion had off the record.)

4           MR. PERLMAN:  Thank you, your Honor.

5           For the record, we will be filing momentarily the

6    motion to dismiss that I described, along with, by the end of

7    the day, the affidavit of someone who can verify that the

8    putative class is probably less than 100 people.

9           THE COURT:  Okay.

10           MR. PERLMAN:  Thank you, your Honor.

11           THE COURT:  Thank you all.

12           MR. KRISLOV:  Thank you, your Honor.

13        (Which were all the proceedings heard.)

14                    CERTIFICATE

15        I certify that the foregoing is a correct transcript

16    from the record of proceedings in the above-entitled matter.

17

18    _____          _7-1-08_____
      Mary M. Hacker                   Date
19    Official Court Reporter

20

21

22

23

24

25

# EXHIBIT 4

## IN THE UNITED STATES COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated,<br><br>       Plaintiff,<br><br>v.<br><br>NAVISTAR INTERNATIONAL CORPORATION,<br><br>       Defendant. | No.   FILED: MAY 23, 2008<br>      08CV3038       TG<br>      JUDGE DARRAH<br>      MAGISTRATE JUDGE NOLAN |

### CLASS ACTION COMPLAINT

Plaintiff Ravi P. Rawat on behalf of himself and those similarly situated, for his class action complaint based upon the investigation of his counsel, alleges as follows on information and belief:

### NATURE OF THE ACTION

1.　　This action is brought on behalf of employees and former employees of Navistar International who were unable to exercise their vested stock options due to a "blackout" period imposed by Navistar. Navistar's "blackout" period as the result of management malfeasance led to Navistar's having to restate its financials. By allowing options to expire and prohibiting former employees from exercising their vested options pursuant to the option contract, Navistar breached the option contract and its implied covenant of good faith and fair dealing.

## JURISDICTION AND VENUE

2.    <u>Jurisdiction</u>: This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(d), because diversity exists between members of the Plaintiff Class and defendants, and the amount in controversy exceeds $5,000,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

3.    This Court retains general jurisdiction over each named defendant who is a resident of Illinois. Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with Illinois to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Defendants' conduct arose out of Illinois, where Navistar International maintains its corporate headquarters. Finally, exercising jurisdiction over the named non-resident defendants is reasonable.

4.    <u>Venue</u> is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this complaint, including the defendants' primary participation in the wrongful acts detailed herein, breach of contract, breach of implied obligation of good faith and fair dealing occurred in substantial part in this District. Finally, defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

5.      Plaintiff <u>Ravi P. Rawat</u> is a citizen of Illinois and is a former Assistant

General Manager of the heavy truck group of Navistar International Corporation.

6.      <u>Defendant Navistar International Corporation</u> is a Delaware Corporation

with its principal place of business located at 4201 Winfield Road, Warrenville, Illinois

60555.

**BACKGROUND OF THE WRONGDOING**

7.      Plaintiff began working for Defendant Navistar in January 1989.

Throughout his tenure at Navistar, Plaintiff was granted stock options on seven

occasions.

8.      On April 6, 2006, Navistar announced that as a result of its failure to file

with the Securities and Exchange Commission (the "SEC") its Annual Report for the

fiscal year ended October 31, 2005 (the Annual Report), the shares of the Company's

common stock that were acquired pursuant to the employee benefit plans set forth below

would not be available for use until the Annual Report is filed with the SEC.

9.      The Company also announced that it intended to file its Annual Report

with the SEC as soon as possible but could not estimate the date such report would be

filed.

10.     Because of the Company's prior conduct and the fact that the Company

had to restate its financials, it suspended purchases of its shares by participants and

beneficiaries in the United States in the following plans: (1) International Truck and

Engine Corporation 401(k) Retirement Savings Plan; (2) International Truck and Engine

Corporation Retirement Accumulation Plan; (3) International Truck and Engine

Corporation 401(k) Plan for Represented Employees; and (4) the IC Corporation 401(k)
Plan (collectively, the 401(k) Plans).

11.    According to the Company, the blackout only prevented participants and
beneficiaries from making additional investments in the company's common stock
through the 401(k) Plans.

12.    Further, the Company sent a notice to its directors and executive officers
informing them that a blackout period would begin on April 6, 2006 and would end at
4:00 pm Central Time on the day on which the Annual Report was filed with the SEC.

13.    The Company's directors and executive officers would generally be
prohibited from directly or indirectly acquiring, disposing of, or transferring any equity
securities of the company acquired by them in connection with their service and/or
employment with the company in such capacities. The notice was allegedly sent to ensure
compliance with Section 306(a) of the Sarbanes Oxley Act of 2002.

14.    As of the date of this filing, Navistar has not filed its Annual Report with
the SEC.

### NAVISTAR'S STOCK OPTION PLANS

15.    According to a recent press release, Navistar is a holding company whose
wholly owned subsidiaries produce International ® brand commercial trucks,
MaxxForce brand diesel engines, IC brand school buses, and Workhorse brand chassis
for motor homes and step vans. It also is a private-label designer and manufacturer of
diesel engines for the pickup truck, van and SUV markets. The company also provides
truck and diesel engine parts and services.

16.    According to the Plan document:

4

"The purpose of the Plan is to enable the Corporation and its subsidiaries to attract and retain highly qualified Employees, Consultants, and Non-Employee Directors, and additionally to provide key Employees who hold positions of major responsibility the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value."

(Ex. A).

17.    An option gives the holder a contractual right to purchase one share of stock (per option) at a set price, called the strike price. If the stock's market price rises above the strike price, the employee can exercise the option, buying stock at the strike price. The employee can then sell the stock back at the market price and benefit from the difference.

18.    Employees typically have ten years to exercise their options once they are vested. After the ten years, the options expire.

19.    According to Navistar's Stock Option Plan, when employees leave Navistar, they have 90 days to exercise his or her options at the strike price, which is determined on the day of the option grant.

20.    Plaintiff and the Class received options pursuant to Navistar's Stock Option Plan.

21.    Navistar's Stock Option Plan provides:

"The **_Committee will document the terms of the Stock Option in an Award Agreement to include the Grant Date and Exercise Price, as well as any other terms that it may desire_**. The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Options fixed by the Committee shall not be modified."

5

\*\*\*

> "Unless otherwise determined by the Committee, a Stock
> Option granted under the Plan *will become exercisable in
> whole or in part after the commencement of the second
> year of the term of the Stock Option* to the extent of one
> third of the shares, to the extent of one third of the shares
> after commencement of the third year, and to the extent of
> one third of the shares after commencement of the fourth
> year."

\*\*\*

## SUBSTANTIVE ALLEGATIONS

22.    Plaintiff Rawat was the Assistant General Manager of the heavy truck

group at Navistar's Cantera facility in Naperville, Illinois.

23.    Throughout the time he was employed by Navistar, he was granted options

pursuant to the Stock Option Plan on a yearly basis, starting in 1998.

24.    Mr. Rawat separated from Navistar, effective January 5, 2007, while the

"blackout" was in effect.

25.    Navistar's 1994 Performance Incentive Plan (as amended December 11,

2001) provides that the Company can grant two types of options.  Incentive Stock

Options, defined as:

> "*a right, as evidenced by an agreement between the participant and the
> Company* in a form approved by the Committee, to purchase a certain number
> of shares of Common Stock at Fair Market Value for a period of ten (10)
> years from the date of grant which options are designed to the meet the
> requirements set out under Section 422 of the Internal Revenue Code."

The Plan also provides for Nonqualified Stock Options, defined as:

> "*a right, as evidenced by an agreement between the participant and the
> Company* in a form approved by the Committee, to purchase a certain number
> of shares of Common Stock at Fair Market Value for a period of ten (10)
> years from the date of grant  on which options are stated not to be qualified as
> incentive stock options under Section 422 of the Internal Revenue Code."

6

The difference between these options is merely the tax treatment between the options, and for purposes of this action, the options – as in the stock option plan[1] – should be treated identically.

26.    At the time of his resignation Mr. Rawat had vested options that, according to the Stock Option Plan, were a contractual right and exercisable within 90 days from the date of his effective resignation. The 90 days time period ended on April 5, 2007. The Navistar common stock closed at $48.10.

27.    However, the Company's self-imposed blackout period continued from the time of Mr. Rawat's resignation until the 90 day period ending on April 5, 2007.

28.    During the 90 days between January 5, 2007 and April 5, 2007, Mr. Rawat and his representatives had numerous discussions with Navistar in an attempt for Mr. Rawat to rightfully exercise his vested options.

29.    Ultimately, the Company refused to allow Mr. Rawat to exercise his options and breached the option contract.

30.    The table below shows Mr. Rawat's option status as of his date of resignation:

| Grant Date | Strike Price | No. of Vested Options | Loss as of April 5, 2007 close @ 48.10 |
|---|---|---|---|
| 12/14/1999 | $40.41 | 2900 | $22,311.73 |
| 12/12/2000 | $21.22 | 2133 | $57,335.04 |
| 12/11/2001 | $38.20 | 3300 | $32,670 |
| 12/10/2002 | $26.39 | 3900 | $84,688.50 |
| 12/9/2003 | $42.89 | 1501.5 | $7,830.32 |
| 12/14/2004 | $40.92 | 750.75 | $5,394.14 |
| **Total** | | **14485.25** | **$210,229.73** |

---

[1] The 1994 Stock Option Plan also provides that the term "Stock Option" mean either an Incentive Stock Option or a Nonqualified Stock Option.

31.    The table shows Mr. Rawat's unexercised, yet vested options at the time

of his resignation, the strike price of those options, and what the options would have been

worth at the end of the 90 days expiration period.

32.    On January 15, 2008, Navistar sent a letter to "Holders of Navistar

International Corporation Stock Options." (Ex. B)

33.    The letter stated that "the Company is not current with its financial filing

with the Securities and Exchange Commission.  As a result, there are certain limits on

your ability to exercise your stock options."

34.    The letter further stated that ". . . some of your stock options may have

expired or will expire in the near future.  We plan to address this issue but we are unable

to do so now. . . [o]ur plan is to discuss this issue with our Board of Directors.  We

cannot predict what, if any, action our directors will take, but we will communicate with

you, not matter what the outcome. . ."

### CLASS ALLEGATIONS

35.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of

Civil Procedure.

36.    <u>Class Definition</u>.  The proposed class ("the Class") so represented by

Plaintiff in this action, and of which the Plaintiff is a member is tentatively defined as:

>    All individuals whose vested options expired during
>    Navistar's "blackout period."

<u>The Rule 23(a) Criteria are all met.</u>

37.    <u>Numerosity</u>.  While the exact number of the members of the Class herein

defined and described is unknown to Plaintiff at this time, employees whose stock

options expired during the blackout period is in the thousands.  The Class is so numerous

that joinder is rendered impracticable.

38.    <u>Commonality</u>.  Questions of law or fact exist arising from the Defendants=

breach of contract and breach of implied duty of good faith and fair dealing.  Such

questions are common to all class members and predominate over any questions

affecting only individual members of the Class.  The myriad of questions of law or fact

common to the Class includes, *inter alia*:

> (a)    Whether the blackout period was necessary for non-executive
> employees under the Sarbanes-Oxley Act.
>
> (b)    Whether Defendants' denial of Plaintiffs' vested contractual right
> was a breach of contract.
>
> (c)    Whether Defendants' conduct constituted a breach of the implied
> duty of good faith and fair dealing.

39.    <u>Typicality</u>.  Plaintiff=s claims are typical of the Class.  Each class member

has suffered damages as a result of the Defendants= conduct.

40.    <u>Adequacy of Representation</u>.  Plaintiff will fairly and adequately protect

the interests of the Class.  Plaintiff=s interest in obtaining declaratory and injunctive

relief for the restrictions on his contractual rights is consistent with and not antagonistic

to the interests of any member of the Class.  Plaintiff is committed to the vigorous

prosecution of this action and his proposed class counsel is experienced in class actions

and complex litigation.

41.    <u>The Rule 23(b) Categories</u>.  Additionally, because all employees who have

vested options that expired within the blackout period, common questions predominate

over any individual questions.

**JURY DEMAND**

9

42.    Plaintiff and the Class demand a jury trial on all issues so triable.

## COUNT I
### Breach of Contract

43.    Plaintiff hereby incorporates all of the foregoing paragraphs.

44.    Plaintiff and the Class and Defendants were parties to Stock Option Agreements pursuant to which Defendants agreed to permit Plaintiff and the Class to purchase Navistar shares of stock before the stock options expired, including a 90 day period after termination of employment.

45.    Plaintiff and the Class performed all conditions, covenants and promises to be performed on their part in accordance with the contracts.

46.    Defendants breached the Stock Option Agreements with Plaintiff and the Class by failing to permit them to exercise their options and purchase shares during the term of the option.

47.    As a result of Defendants' breach of the Stock Option Agreements, Plaintiff and the Class have suffered economic losses and other general, consequential and specific damages, including the amounts they would have received from exercising their stock options.

## COUNT II
### Breach of the Covenant of Good Faith and Fair Dealing

48.    Plaintiff hereby incorporates all of the foregoing paragraphs.

49.    The Stock Option Agreements entered into between Plaintiff and the Class and Defendants are contracts that contain an implied covenant of good faith and fair dealing, which obligated Defendants to perform the terms and conditions of the contracts fairly and in good faith and to refrain from doing any act that would prevent or impede

Plaintiff and the Class from performing any or all conditions of the contracts that they

agreed to perform, or any acts that would deprive Plaintiff and the Class of their benefits.

50.    Plaintiff and the Class performed all conditions, covenants and promises

to be performed on their part in accordance with the contracts.

51.    Defendants knew Plaintiff and the Class fulfilled all their duties and

conditions under the contracts.

52.    Defendants breached the implied covenant of good faith and fair dealing

under the contracts by engaging in the conduct complained of herein and by engaging in

the conduct that led to the Company's blackout period and thereafter.  While the

blackout was no fault of the Plaintiff, the Company refused to extend the exercise period

beyond the blackout so that Plaintiff could have a meaningful opportunity to exercise

their contractual rights conferred upon them by option grants, thereby preventing

Plaintiff from exercising their stock options.

53.    As a result of Defendants' breach of the implied covenant of good faith

and fair dealing, Plaintiff and the Class have suffered economic losses and other general,

consequential and specific damages, including the amounts they would have received

from exercising their options.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for judgment as

follows:

A.    Declaring this action to be a proper class action pursuant to Federal

Rule of Civil Procedure 23 on behalf of the Class defined herein, and declaring the

Plaintiff to be a proper Class representative, and Plaintiff's counsel as counsel for the Class;

        B.     Declaring that the Stock Option Plan's 90 day expiration period for former employees is tolled by the blackout period;

        C.     Awarding Plaintiff and Class members compensatory damages and exemplary damages in an amount to be proven at trial;

        D.     Awarding Plaintiff and the Class pre-judgment interest, as well as reasonable fees and costs; and

        E.     Awarding such other relief as this Court may deem just and proper.

Dated: May 23, 2008

                       Respectfully submitted,

                          /s/Clinton A. Krislov
                          Attorney for the Plaintiff

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Dr., Ste. 1350
Chicago, IL 60606
Tel: (312) 606-0500
Fax: (312) 606-0207

Law Offices of Mark Baiocchi
184 Shuman Blvd.
Suite 250
Naperville, IL 60563
Tel: (630) 983-4200
Fax: (630) 983-4223

08CV3038                    TG
JUDGE DARRAH
MAGISTRATE JUDGE NOLAN



# NAVISTAR INTERNATIONAL CORPORATION

### 2004 Performance Incentive Plan
### Prospectus and Stock Option Information

**March 24, 2004**

# NAVISTAR INTERNATIONAL CORPORATION
## DOCUMENTS CONSTITUTING A SECTION 10(a) PROSPECTUS PURSUANT TO A FORM S-8 REGISTRATION STATEMENT

### THIS DOCUMENT CONSTITUTES PART OF A PROSPECTUS COVERING SECURITIES THAT HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED

---

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.

---

Solely the information included under Tabs 1.0 through 2.0 shall constitute this prospectus. The information and documentation included under Tab 3.0 shall not, nor shall be construed in any manner to, constitute a part of this prospectus.

---

Neither the delivery of this prospectus nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the company since the date hereof. No person has been authorized to give any information or to make any representations, other than those contained in this prospectus, and, if given or made, such other information or representations must not be relied upon as having been authorized by the company. This prospectus does not constitute an offer to sell or solicitation of an offer to buy by anyone in any jurisdiction in which it is unlawful to make such offer or solicitation.

---

Solely the information contained under Tabs 1.0 through 2.0 constitutes a prospectus covering securities that have been registered under the Securities Act of 1933, as amended.

# PROSPECTUS

**Navistar International Corporation**

General Information
Regarding the

**2004 Performance Incentive Plan**

This prospectus describes but does not set forth the terms and conditions of Navistar International Corporation's 2004 Performance Incentive Plan.   In the event of any conflict between the terms and conditions of the 2004 Performance Incentive Plan and the information contained in this prospectus, the terms and conditions of the 2004 Performance Incentive Plan shall prevail.   No person has been authorized to give any information or to make any representations other than those contained in this prospectus in connection with the 2004 Performance Incentive Plan and the offering described in this prospectus, and if given or made, such other information or representations may not be relied upon as having been authorized by Navistar International Corporation.

**This document constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933, as amended.**

**The date of this prospectus is March 24, 2004**

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Introduction | -1- |
| What is the Company's purpose in providing the 2004 Plan? | -2- |
| Who is eligible to participate in the 2004 Plan? | -2- |
| How do I benefit under the 2004 Plan? | -2- |
| What does an Award consist of under the 2004 Plan? | -2- |
| What are the general terms of my Award under the 2004 Plan? | -3- |
| Will the Company provide me periodic reports concerning my Awards under the 2004 Plan? | -6- |
| How do I exercise my Award and pay for the shares that I buy under the 2004 Plan? | -6- |
| Can I sell or transfer my Award to someone else? | -6- |
| Can I sell the shares I acquire by exercising my Award? | -7- |
| Can the Company reprice or discount stock options granted under the 2004 Plan? | -8- |
| How would my Award be affected by a future change in the capitalization of the Company? | -8- |
| How would my restricted stock, stock units and stock options be treated in the event of a change in control of the Company? | -8- |
| Does the grant of an Award or ownership of shares give me any special rights? | -8- |
| Under what circumstances can the 2004 Plan or my Award Agreement be modified or termination? | -9- |
| What exactly is the Restoration Stock Option program and how does it work? | -9- |
| What is the Federal Income Tax treatment of an Award? | -9- |
| Risk Factors and Certain Investment Considerations | -12- |
| Additional Information. | -13- |

i

This prospectus provides information concerning awards granted under the Navistar International Corporation 2004 Performance Incentive Plan (the "2004 Plan"), primarily in question and answer format. The information contained herein is qualified in its entirety by the text of the 2004 Plan.

**Introduction.**

*Principal Office and Telephone Number.* The principal executive office of Navistar International Corporation (the "Company") is located at 4201 Winfield Road, Warrenville, Illinois 60555, and the Company's telephone number is (630) 753-5000.

*The 2004 Performance Incentive Plan.* The 2004 Plan was approved by the Board of Directors (the "Board") and the independent Compensation and Governance Committee (the "Committee") of the Company on October 21, 2003 and by the shareowners of the Company on February 17, 2004. A total of 3,250,000 shares of Common Stock of the Company are reserved for awards under the 2004 Plan. As of February 17, 2004, no awards have been made in respect of any shares of Common Stock reserved for issuance under the 2004 Plan. The 2004 Plan replaces the Company's 1994 Performance Incentive Plan (which expired December 16, 2003), the 1998 Supplemental Stock Plan and accompanying Restoration Stock Option Program (which both expired on December 16, 2003) and the 1998 Non-Employee Director Stock Option Plan (which the Company terminated on February 17, 2004). The 2004 Plan expires on February 16, 2014. The 2004 Plan is governed by and interpreted in accordance with the laws of the State of Delaware. Any cause of action a participant may have in respect of the 2004 Plan must be brought within the three year period set forth in the 2004 Plan or such claim will be barred in accordance with the terms and conditions of the 2004 Plan.

The number of shares authorized and available for issuance under the 2004 Plan will be increased by shares of stock subject to an option or award under the 2004 Plan, or any other plan, including, the 1994 Performance Incentive Plan, the 1998 Supplemental Stock Plan or the 1998 Non-Employee Director Stock Option Plan, that is cancelled, expired, forfeited, settled in cash or otherwise terminated without a delivery of shares to the participant of such plan, including shares used to pay the stock option exercised price of a stock option issued under the 2004 Plan or any other plan or to pay taxes with respect to such stock option.

Unless otherwise specified, a reference herein to the "2004 Plan" refers to the 2004 Performance Incentive Plan. Awards granted under the 2004 Plan may consist of annual incentive awards, stock options, restricted stock, stock units, stock appreciation rights or any other type of award granted by the Committee under the 2004 Plan and such awards may herein after be referred to as an "Award" or collectively as "Awards."

*Administration.* The 2004 Plan is administered by the Committee. All Committee members are non-employee directors of the Company and are appointed to the Committee by the Board for a one-year term and may be removed by the same. All decisions of the Committee will be final, conclusive and binding upon all parties. In administering the 2004 Plan, the Committee's discretionary authority includes, without limitation, determinations as to (1) the approval of participants in the plan, (2) the amount and nature of the Awards and (3) the performance levels at which different percentages of the Awards would be earned and adjusted. For further information about the 2004 Plan, please refer to the 2004 Plan or contact the Company's Corporate Secretary at the Company's principal executive office.

*ERISA and Certain Tax Provisions Not Applicable.* The 2004 Plan is not subject to any provisions of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") and is not qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code").

**What is the Company's purpose in providing the 2004 Plan?**

The purpose of the 2004 Plan is to enable the Company and its subsidiaries to attract and retain highly qualified personnel and non-employee directors, and additionally to provide key employees who hold positions of major responsibility in the Company the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value.

**Who is eligible to participate in the 2004 Plan?**

Management will, from time to time, select and recommend to the Committee employees of the Company and its subsidiaries who are to become participants in the 2004 Plan. Such individuals will be selected from those who, in the opinion of management, have substantial responsibility in a managerial or professional capacity. Non-employee directors are also eligible to participate in the 2004 Plan. Non-employee directors participating in the 2004 Plan shall be limited to receiving Awards of non-qualified stock options, restricted stock and stock units under the 2004 Plan.

**How do I benefit under the 2004 Plan?**

You benefit by an Award of cash or stock-based compensation under the 2004 Plan. The grant of a stock-based Award gives you the opportunity to benefit from possible appreciation in the market price of the Company's Common Stock.

**What does an Award consist of under the 2004 Plan?**

Under the 2004 Plan, the Committee may award: (1) annual incentive awards to participants, consisting of awards of cash approved by the Committee based on the level of achievement attained against annual performance goals approved by the Committee within the first ninety days of the applicable fiscal year; (2) stock option awards to employee participants, consisting of either nonqualified stock options or incentive stock options; (3) non-qualified stock option awards to non-employee director participants; (4) restricted stock awards to participants; (5) stock unit awards to participants; (6) stock appreciation right awards to employee participants, whether granted in connection with a related stock option or independent thereof; (7) any other type of Award granted by the Committee under the 2004 Plan; or (8) any combination of the foregoing Awards. All such Awards may be made, subject to the terms of the 2004 Plan, in such amounts (if any) and at such times (if at all) as the Committee may approve; provided, however, that in order to provide a limitation on the number of shares of Common Stock of the Company that may be issued in respect of a particular Award under the 2004 Plan, no more than 1,000,000 shares of Common Stock of the Company may be granted as stock options, restricted stock, stock units, SARs or any other Award under the 2004 Plan; provided, further, that such limitation shall not apply to any Award which is a non-qualified stock option granted to non-director employee participants.

**What are the general terms of my Award under the 2004 Plan?**

*General.* The principal terms of your Award will be contained in an award agreement between you and the Company (an "Award Agreement"), which you will enter into, upon the grant to you by the Company of an Award under the 2004 Plan. These terms will include the general nature of the Award, including the number of shares subject to each Award (in the case of a stock-based Award), the number of Awards granted to you, the date each Award is granted and other terms and conditions not expressly provided for in the 2004 Plan.

*Annual Incentive Awards.* If your Award is an annual incentive award, you will be eligible to receive a cash payment from the Company based upon the performance measures (as defined in the 2004 Plan) established by the Committee and set forth in your Award Agreement within the first ninety days of the applicable fiscal year. Only employee participant under the 2004 Plan are eligible to receive annual incentive awards and no participant who is not an employee at the end of the Company's fiscal year shall be entitled to such Award unless the Committee determines otherwise. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your annual incentive award.

*Stock Options.* If your Award is a stock option, the Committee will have the authority to determine certain terms relating to your stock option, including the grant date, the exercise price (which will be the fair market value of the stock on the date of grant of the stock option, as determined by the Committee), the exercise period, the number of shares that may be exercised at any given time, when you may exercise your stock option, any conditions to the exercise of your stock option, any restrictions on your right to sell the shares you purchase through the exercise of your stock option and whether the stock option is intended to be an incentive stock option under Section 422 of the Code. (Please remember that non-employee director participants are not eligible to receive incentive stock option Awards under the 2004 Plan.) Unless otherwise determined by the Committee and set forth in your Award Agreement, stock options granted to participants under the 2004 Plan will become exercisable in whole or in part as follows: after the commencement of the second year of the term of the stock option, to the extent of one third of the shares; after the commencement of the third year of the stock option, to the extent of one third of the shares; and after commencement of the fourth year of the stock option, to the extent of one third of the shares. Generally, except as otherwise provided in the 2004 Plan (see discussion regarding death, total and permanent disability or qualified retirement below), no outstanding stock option may be exercised by a participant unless such participant is an employee or non-employee director of the Company, as the case may be, at the time of exercise; provided, however, that in the event of termination of such relationship (other than on account of death, total and permanent disability or qualified retirement), such participant may exercise the stock option at any time within three months after such termination (but not after the expiration of the term of the grant) to the extent of the number of shares which were exercisable at the date of such termination; provided, further, that with respect to any employee participant, if such employee participant is terminated for cause as defined the International Truck and Engine Corporation Income Protection Plan or if the employee participant is covered by a different severance plan or agreement, then as defined in such plan or agreement, the three-month period shall not apply and the stock option shall cease to be exercisable and shall lapse as of the effective date of such employee participant's termination.

3

You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your stock option.

*Restricted Stock.* If your Award is restricted stock, you will receive shares of Common Stock of the Company that are restricted with an appropriate legend as to sale or transfer and subject to forfeiture pursuant to terms established by the Committee at the time of issuance. You will be entitled to all dividends paid with respect to all restricted stock granted to you under the 2004 Plan and you will be entitled to vote all such restricted stock granted to you under the 2004 Plan. Restricted stock may be granted to employee participants under the 2004 Plan for meeting their stock ownership requirements as described in the Company's Executive Stock Ownership Program, as amended from time to time (the "ESOP"), or for any other purpose. Restricted stock shall vest, in full or in installments, upon satisfaction of the conditions specified in your Award Agreement. In no event will an Award of restricted stock granted under the 2004 Plan vest in full prior to the commencement of the third anniversary of the grant date. A participant who quits or is involuntarily separated from the Company will forfeit any unvested restricted stock granted under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your restricted stock grant.

*Stock Units.* If your Award is stock units, you will receive without payment units representing shares of Common Stock of the Company. Such units will be restricted as to sale or transfer and subject to forfeiture pursuant to terms established by the Committee at the time of issuance. You will not be entitled to any dividends paid with respect to such stock units granted to you under the 2004 Plan and you will not be entitled to vote any such stock units granted to you under the 2004 Plan until such time as your stock units are converted into shares of Common Stock of the Company. Stock units may be granted to employee participants under the 2004 Plan for meeting their stock ownership requirements as described in the ESOP, or for any other purpose. Stock units shall vest, in full or in installments, upon satisfaction of the conditions specified in your Award Agreement. At the time that you leave the Company, you will receive such number of shares of unrestricted Common Stock of the Company equivalent to the number of vested stock units held by you as of such date (see the discussion regarding death, total and permanent disability or qualified retirement below). In no event will an Award of stock units granted under the 2004 Plan vest in full prior to the commencement of the third anniversary of the grant date. A participant who quits or is involuntarily separated from the Company will forfeit any unvested stock units granted under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your stock units.

*Stock Appreciation Rights or SARs.* If your Award is a stock appreciation right or SAR, the Committee will have the authority to determine certain terms relating to your SAR, including the grant date, the exercise price (which will be, for freestanding SARs, the fair market value of one share of Common Stock of the Company on the date of the grant of the SAR, as determined by the Committee, and for a SAR granted in tandem with a stock option, it will be the exercise price of the related stock option), the exercise period of the SAR (which shall not exceed a term of 10 years), the number of SARs that may be exercised at any given time, when you may exercise your SAR and any conditions to the exercise of your SAR. Upon the exercise of a SAR, you shall be entitled to receive payment in an amount equal to the excess of the fair market value of one share of Common Stock of the Company on the date of exercise over the exercise price of the SAR, multiplied by the number of shares of Common Stock of the Company for which the SAR is exercised. At the discretion of the Committee, the payment due to you upon exercise of the SAR may be in cash, Common Stock of the Company or any combination thereof. Please

4

remember that non-employee director participants are not eligible to receive SARs under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your SARs.

*Death, Total and Permanent Disability or Qualified Retirement.* In the case of outstanding stock options, if a participant (i) dies, the stock option may be exercised by a legatee, or by the personal representatives or distributees of such participant at any time within a period of two years after such participant's death, but not after the expiration of the term of the stock option grant, (ii) becomes total and permanently disabled (as defined under the Company's long term disability programs for employee participants or as determined by the Committee for non-employee director participants), such participant may exercise the stock option (to the extent it is or becomes exercisable under its terms) at any time within three years after termination or, if later, the date on which the stock option becomes exercisable with respect to such shares, but not after expiration of the term of the stock option grant, or (iii) retires pursuant to a qualified retirement (as defined in the 2004 Plan), such participant may exercise the stock option (to the extent it is or becomes exercisable under its terms) at any time during the term of the stock option grant; provided, however, that no stock option which is not exercisable at the time of qualified retirement shall become exercisable after such qualified retirement if, without the written consent of the Company, such participant engages in a business which is competitive to the business of the Company or its affiliates.

In the case of restricted stock or stock units, if a participant (i) dies while serving the Company or following a total and permanent disabled or qualified retirement, any such previously granted restricted stock or stock units shall vest as of the date of such participant's death and all restrictions thereon shall lapse and the restricted stock or stock units shall be immediately transferable to the name beneficiary or to such participant's estate, (ii) becomes totally and permanently disability or retires from the Company, such restricted stock or stock units will continue to vest according to the terms of grant or (iii) otherwise terminates employment (in the case of an employee participant) or service (in the case of a non-employee director participant), then any restricted stock or stock units not vested as of such date will be forfeited to the Company.

*Award Expiration Date.* The expiration date of your Award will be specified in your Award Agreement. The expiration date for incentive stock options and stock appreciation rights shall be no more than ten years from the date of grant. The expiration date for nonqualified stock options shall be no more than ten years from the date of grant. The effective date of the grant of a stock option will be, unless the Committee expressly determines otherwise, the business day on which the Committee approves the grant of such stock option.

*Charges and Deductions.* No charges or deductions (aside from tax or other withholdings) may be made against a participant of the 2004 Plan, or against the securities or assets of the 2004 Plan, nor may any lien be created against any of the funds, securities or other property held by participants under the 2004 Plan.

5

**Will the Company provide me periodic reports concerning my Awards under the 2004 Plan?**

Although no participant will be provided with periodic or other reports concerning the status of their accounts under the 2004 Plan, the Company will supply information to such participants in response to inquiries addressed to the Corporate Secretary of the Company.

**How do I exercise my Award and pay for the shares that I buy under the 2004 Plan?**

*General.* The Committee has the authority to determine the procedures you must follow to exercise your Award and pay for any shares you acquire under the 2004 Plan. The following description of payment procedures is qualified in its entirety by reference to the 2004 Plan for a full description of such procedures:

*Withholding Taxes.* Subject to certain limitations, including limitations applicable to officers and directors subject to Section 16(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), a participant may elect to pay any withholding tax due on an Award granted pursuant to the 2004 Plan either in cash (including a personal check), or by delivery at "fair market value" (as defined in the 2004 Plan) of unrestricted Common Stock already owned by such participant, or by a combination of the foregoing. In addition, a participant settling an Award granted pursuant to the 2004 Plan may elect to have the Company withhold a portion of the shares of Common Stock of the Company otherwise to be issued upon settlement of the Award equal in value to the minimum required withholding taxes.

*Exercise Price of Stock Options.* Stock options can be exercised in whole or in part through cashless exercises or other arrangements through agents (including stock brokers) established by the Company by paying the amounts required by instructions issued by the Company's Corporate Secretary. If an exercise is not covered by such instructions, the purchase price, subject to certain limitations, is to be paid in full to the Company upon exercise of a stock option either in cash (including a personal check), or by delivery at "fair market value" of unrestricted Common Stock already owned by such participant (which Common Stock, if acquired from the Company, must have been held for at least six months), or by a combination of the foregoing. In no event may successive simultaneous pyramiding be used to exercise a stock option.

*Other Limitations on Exercise.* Before you can exercise your Award, the Committee must be satisfied that such exercise will not violate any securities laws or other law or requirement of any government authority.

**Can I sell or transfer my Award to someone else?**

Awards under the 2004 Plan may not be assigned or alienated. In case of a participant's death, the amounts distributable to the deceased participant under the 2004 Plan with respect to which a designation of beneficiary has been made (to the extent it is valid and enforceable under applicable law) shall be distributed in accordance with the 2004 Plan to the designated beneficiary or beneficiaries. The amount distributable to a participant upon death and not subject to such a designation shall be distributed to such participant's estate. If there is any question as to the right of any beneficiary to receive a distribution under the 2004 Plan, the amount in question may be paid to the estate of such participant, in which event the Company will have no

further liability to anyone with respect to such amount.

**Can I sell the shares I acquire by exercising my Award?**

*General.* Any shares of Common Stock of the Company you acquire under the 2004 Plan, including shares acquired by exercising your right to purchase shares under your Award, can be sold or transferred only as permitted by the 2004 Plan and/or your Award Agreement and subject to any securities law restrictions.

*Securities Law Restrictions.* The Company filed a registration statement under the Securities Act of 1933, as amended (the "Securities Act"), which became effective on March 24, 2004 (the "Effective Date"), pursuant to which the Company registered the Common Stock issued after the Effective Date to participants under the 2004 Plan (the "Registration Statement"). Subject to the terms of the 2004 Plan and applicable Award Agreements, participants who are not Affiliates (as defined below) of the Company and who acquire the Common Stock under the 2004 Plan after the Effective Date generally will be entitled to resell such Common Stock in the public market without restrictions under the Securities Act. An "Affiliate" of an entity is defined in Rule 144 under the Securities Act as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with" such entity. An employee of the Company who is not an executive officer or director of the Company generally would not be deemed to be an Affiliate of the Company.

Resales by participants who are Affiliates of the Company or who acquired Common Stock under the 2004 Plan prior to the Effective Date of the Registration Statement are not covered by this prospectus (such participants are herein collectively referred to as "Restricted Participants"). Resales by such Restricted Participants are subject to certain restrictions under the Securities Act. An Affiliate of the Company may not offer or resell any shares of Common Stock acquired by them under the 2004 Plan (whether acquired before or after the Effective Date of the Registration Statement) unless the offer and resale of such shares are registered by the Company under the Securities Act or unless an exemption from registration is available. Participants who acquired shares of Common Stock under the 2004 Plan prior to the Effective Date of the Registration Statement (such shares being herein referred to as "Subject Shares") may not offer or resell the Subject Shares unless the offer and resale of the Subject Shares are registered by the Company under the Securities Act or unless an exemption from registration is available. In the absence of an effective registration statement, Affiliates may resell the Common Stock acquired under the 2004 Plan and participants holding Subject Shares may resell such Subject Shares only by complying with the requirements and limitations of Rule 144 under the Securities Act or other available exemption. Under Rule 144 offers or resales by Restricted Participants may be made without registration under the Securities Act where certain limitations are met as to the number of shares which may be sold over specified periods of time, the selling price thereof, the manner in which sales may be made and the minimum period of time which the shares must have been held (except that the holding period will not be applicable to Affiliates with respect to Common Stock acquired by them under the 2004 Plan after the Effective Date of the Registration Statement).

Executive officers and directors of the Company and holders of 10% or more of the outstanding Common Stock are also subject to the provisions of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder, which, among other things, permit recovery by or on behalf of the Company of so-called "short-swing" profits arising from

purchases and sales (or sales and purchases) of the Common Stock by such persons within any six-month period.

The foregoing is not intended to be a complete statement of applicable law, and participants, particularly executive officers and directors of the Company, should consult their own counsel for information regarding restrictions on resale of the Common Stock acquired pursuant to the 2004 Plan under the Securities Act and the Exchange Act.

### Can the Company reprice or discount stock options granted under the 2004 Plan?

No stock option issued under the 2004 Plan may be amended or modified in any way that changes the exercise price of the stock option, and no stock option may be issued with an exercise price that is less than the fair market value (as defined in the 2004 Plan) of one share of the Common Stock of the Company on the grant date of the stock option, or in any other way discounted. Such limitation, however, shall not apply to any future changes in the capitalization of the Company as discussed below.

### How would my Award be affected by a future change in the capitalization of the Company?

The Award Agreements may contain such provisions as the Committee may determine to be appropriate for the adjustment of the number and class of shares subject to each outstanding stock option or SAR, the exercise price in the event of changes in, or distributions with respect to, the outstanding Common Stock of the Company by reason of stock dividends, recapitalizations, mergers, consolidations, split-ups, combinations or exchanges of shares, spinoffs and the like.

### How would my restricted stock, stock units and stock options be treated in the event of a change in control of the Company?

In the event of a "Change in Control" (as defined the 2004 Plan) all awarded restricted stock and stock units will immediately be free of all restrictions and fully earned, and all outstanding stock options will be immediately exercisable and shall continue to be exercisable for a period of three years from the date of the Change in Control regardless of the original term or employment status (except that the term of any incentive stock option shall not be extended beyond ten years from the date of grant).

### Does the grant of an Award or ownership of shares give me any special rights?

Neither the grant of an Award by the Company nor ownership of shares by you obligates the Company or any of its subsidiaries to retain you as an employee, officer or director. The Company and its subsidiaries reserve the same right to terminate your employment or service as existed before the establishment of the 2004 Plan or the grant of any Awards under the 2004 Plan.

The grant of an Award of a stock option or stock unit does not give you any rights of a shareowner of the Company with respect to the shares covered by your Award until you actually own the shares. The grant of an Award of restricted stock will during the period of restriction

8

entitle you to all dividends paid with respect to such restricted stock and to vote such restricted stock.

**Under what circumstances can the 2004 Plan or my Award Agreement be modified or terminated?**

Under the terms of the 2004 Plan, the Committee may modify, amend, or terminate the 2004 Plan at any time; provided, however, that unless the requisite approval of the shareowners of the Company is obtained, no amendment shall be effective if such amendment would (i) increase the number of shares of Common Stock of the Company available for issuance under the 2004 Plan or increase the limits applicable to Awards under the 2004 Plan (except as in the case of a change in the capitalization of the Company as discussed above), (ii) lower the exercise price of a stock option or SAR grant value below 100% of the fair market value of one share of Common Stock of the Company on the grant date (except as in the case of a change in the capitalization of the Company as discussed above), (iii) remove the repricing restrictions set forth in the 2004 Plan, or (iv) require shareowner approval as a matter of law or under rules of the New York Stock Exchange. No 2004 Plan amendment shall, without the affected participant's consent, terminate or adversely affect any right or obligation under any Award previously granted under the Plan. The Committee may terminate the 2004 Plan at any time.

**What exactly is the Restoration Stock Option program and how does it work?**

The Restoration Stock Option program is a feature of the 2004 Plan available to employee participants who have been granted a non-qualified stock option under the 2004 Plan. In essence, the Restoration Stock Option program allows employee participants to exercise vested non-qualified stock options by presenting shares of Common Stock of the Company that (1) either (i) have been held for at least six months if such shares were obtained from the Company or (ii) have been purchased in the open market and (2) have a total market value equal to the exercise price of the stock option times the number of stock options being exercised. To account for the withholding of federal, state and local income taxes and Social Security taxes liabilities on the stock option gain, shares of Common Stock may be withheld from the stock option exercise. Restoration stock options are then granted to the employee participant at the market price of the Common Stock of the Company in an amount equal to the number of mature shares of Common Stock of the Company that were used to exercise the original stock option, plus the number of shares of Common Stock of the Company that are withheld for the tax liability on the stock option gain. For more information on this subject, please refer to the 2004 Plan.

**What is the Federal Income Tax treatment of an Award?**

*The following is a brief summary of the principal federal income tax consequences to participants in the 2004 Plan and does not purport to address all aspects of Federal income tax treatment. You should consult your tax advisor because the specific federal, state and local tax treatment will vary depending upon your individual circumstances. In addition, the following discussion is limited to United States federal income tax laws applicable to participants who are both citizens and residents of the United States. The United States federal income tax treatment of Awards granted to a participant who is not both a citizen and resident of the United States may differ. The tax laws of other countries may provide for different tax consequences to*

*participants who are subject to such laws. In addition, the tax laws of the United States are subject to change and such changes could apply retroactively.*

*Annual Incentive Awards.* Annual incentive awards granted under the 2004 Plan would generally be taxable to you as ordinary income in the year paid. The current maximum federal income tax rate for ordinary income is 35%. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

*Stock Options.* Stock options granted under the 2004 Plan may be either nonqualified stock options ("NQOs") or Incentive Stock Options ("ISOs") for federal income tax purposes; provided, however, that non-employee director participants are not eligible to receive ISOs under the 2004 Plan.

*NQOs.* Generally, if you are awarded a NQO you do not recognize any taxable income for federal income tax purposes at the time of grant. Upon exercise of your NQO, the excess of the fair market value of the Common Stock of the Company on the date of exercise over the NQO exercise price will be taxable to you as ordinary income. You will have a capital gain (or loss) upon the subsequent sale of the Common Stock of the Company in an amount equal to the sale price reduced by the fair market value of the Common Stock of the Company on the date you exercised your NQO. The holding period for purposes of determining whether the capital gain (or loss) is a long- or short-term gain (or loss) will commence on the date you exercise your NQO. The capital gain will be long-term or short-term depending on whether you have held the shares of Common Stock you acquired upon the exercise of your NQO for more than one year after the exercise date. Short-term capital gains are generally subject to the same federal income tax rate as ordinary income (the current maximum rate is 35%), while long-term capital gains are generally subject to a maximum rate of 15%. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

*ISOs.* If the stock option is intended to qualify as an ISO, the Award Agreement will state it is for an ISO. If you are awarded an ISO you do not recognize any taxable income for federal income tax purposes at the time of grant or exercise. If you hold the stock for the ISO holding periods of two years from the date of the grant and one year from the date of exercise, and if you exercise the stock option while you are employed by the Company or within three months of termination of employment, any gain realized on the sale (measured by the difference between the stock option price paid for the stock and the amount received on the sale), will be taxed as capital gain. If the stock was held for the long-term capital gain holding period, which is currently more than one year from the date of exercise, the capital gain will be long-term gain eligible for the maximum 15% rate. If the stock is disposed of before the expiration of the ISO holding periods, you will recognize ordinary income to the extent the value of the stock on the date of exercise exceeds the stock option exercise price and the Company will generally be entitled to take a deduction for such amount. Upon exercise of your ISO, the excess of the fair market value of the shares you acquire over the exercise price of the stock option will be included in your alternative minimum taxable income and may cause or increase a liability for alternative minimum tax. There is an annual $100,000 limitation on the amount of stock options that can qualify as ISOs. Each calendar year is tested separately. All stock options held by an employee that first become exercisable in the year are tested. Stock options cannot qualify as ISOs to the extent that the value of the stock covered by

10

the stock options exceeds $100,000. The value of the stock for this purpose is the value of the stock on the date of the grant of the stock option.

*Effect of Section 16(b) of the Exchange Act.* The tax consequences upon the exercise of either NQOs or ISOs may vary for those directors and executive officers who are subject to liability under Section 16(b) of the Exchange Act. In general, such participants will not recognize income on the Common Stock acquired under the 2004 Plan until they are no longer subject to liability under Section 16(b) with respect to the disposition of such Common Stock. However, a participant may elect to be taxed based on the fair market value of the shares on the exercise date (and have a holding period beginning on the exercise date) by filing an election under Section 83(b) of the Code within thirty days of the exercise date. If such participant later sells such shares, he or she will recognize capital gain or loss on the difference between the selling price and the exercise price.

*Restricted Stock.* If you are awarded Common Stock of the Company that is subject to restrictions on transfer and is subject to a "substantial risk of forfeiture" as defined in Section 83 of the Code, you may make a Section 83(b) election to have your Award taxed as ordinary income at the time of grant on the excess of the fair market value of the shares on the grant date over the amount you paid for the shares. If you do not make a timely Section 83(b) election, the Award will generally be taxed as ordinary income at the date(s) that the restrictions creating the risk of forfeiture expire. The amount of tax on each such date will equal the fair market value of such shares on such date less the amount paid by you for the shares. During any period when a participant is subject to liability under Section 16(b) of the Exchange Act with respect to the disposition of Common Stock acquired under the 2004 Plan, such Common Stock is treated as subject to a restriction on transfer and a substantial risk of forfeiture. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

*Stock Units.* If you are awarded stock units under the 2004 Plan you generally would have no federal income tax consequence at the time of grant. At the time your stock units are converted into unrestricted shares of Common Stock of the Company (i.e., the shares are not subject to a "substantial risk of forfeiture"), then, at such time, you will generally recognize ordinary income to the extent of the excess of the fair market value of the stock on the date of conversion over the cost for such stock, if any. The Company is generally entitled to a deduction at the time and in the amount taxed to you as ordinary income.

*SAR and Other Awards.* If you are awarded stock appreciation rights under the 2004 Plan you generally would have no federal income tax consequence at the time of grant. Upon exercise of the SAR, the amount of cash or other property received by you will generally be subject to ordinary income tax in the year of receipt and the Company will generally be entitled to a deduction at the time and in the amount taxed to you as ordinary income.

*Withholding Taxes.* Because the amount you realize upon the exercise of your Award may be treated as compensation subject to applicable withholding or federal, state and local income taxes and Social Security taxes, the Company or one of its subsidiaries may make other arrangements with you to pay the amount required to be withheld by the Company or such subsidiary before delivering any shares to you purchased under the 2004 Plan. These arrangements may include withholding the amount of any withholding or other tax due and/or withholding a certain number of shares issuable under the 2004 Plan. The Company will defer

11

delivery under your Award until arrangements are made to its satisfaction with respect to withholding and other taxes.

**Risk Factors and Certain Investment Considerations.**

This prospectus and the information incorporated by reference in this prospectus may include forward-looking statements within the meaning of Section 27A of the Securities Act, Section 21E of the Exchange Act, and the Private Securities Litigation Reform Act of 1995 that are subject to risks and uncertainties. You should not place undue reliance on those statements because they are subject to numerous uncertainties and factors relating to our operations and business environment, all of which are difficult to predict and many of which are beyond our control. Such forward-looking statements only speak as of the date of this prospectus and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which the statement is made or to reflect the occurrence of unanticipated events. Forward-looking statements include information concerning our possible or assumed future results of operations, including descriptions of our business strategy. These statements often include words such as "believe," "expect," "anticipate," "intend," "plan," "estimate" or similar expressions. These statements are based on assumptions that we have made in light of our experience in the industry as well as our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. As you read and consider this prospectus, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties and assumptions. Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results or results of operations and could cause actual results to differ materially from those in the forward-looking statements. Some of these factors include:

- The markets in which we compete are subject to considerable cyclicality.

- We operate in the highly competitive North American truck market.

- Our business may be adversely impacted by work stoppages and other labor relations matters.

- The loss of business from Ford Motor Company, or "Ford," our largest customer, could have a negative impact on our business, financial condition and results of operations.

- The costs associated with complying with environmental and safety regulations could lower our margins.

- Our liquidity position may be adversely affected by a continued downturn in our industry.

- Our business could be negatively impacted in the event Navistar Financial Corporation, our financing subsidiary, is unable to access sufficient capital to engage in its financing activities.

- We have significant underfunded postretirement obligations.

- Our manufacturing operations are dependent upon third-party suppliers, making us vulnerable to a supply shortage.

- Our ability to use net operating loss carryovers to reduce future tax payments if there is a change in ownership of the Company.

- We are exposed to political, economic and other risks that arise from operating a multinational business.

- Our substantial debt could require us to use a significant portion of our cash flow to satisfy our debt obligations and may limit our operating flexibility.

Other factors and assumptions not identified above are also relevant to the forward-looking statements, and if they prove incorrect, could also cause actual results to differ materially from those projected. For a further and more detailed description of these factors, please refer to Exhibit 99.1 to our Form 10-K. Participants should carefully consider all of these factors before making an investment in the stock offered under the 2004 Plan.

In addition, the market price of our Common Stock may fluctuate from time to time. For this reason, the value of any stock-based Awards granted under the 2004 Plan may decrease or increase in value depending upon the market price of our Common Stock.

**Additional Information.**

The Company is subject to the informational requirements of the Exchange Act and files reports and other information with the Securities and Exchange Commission (the "Commission"). Such reports and information can be inspected and copied at the public reference facility maintained by the Commission located at 450 Fifth Street, N.W., Room 1024, Washington, D.C. 20549. Please call the Commission at 1-800-SEC-0330 for further information on the public reference room. Copies of such material can also be accessed electronically by means of the Commission's home page on the Internet at www.sec.gov. Our Common Stock is listed on the New York Stock Exchange, The Chicago Stock Exchange and The Pacific Exchange, and such reports and other information can also be inspected and copied at the offices of the New York Stock Exchange, Inc., at 20 Broad Street, New York, NY 10005, the Chicago Stock Exchange, Inc., at One Financial Plaza, 440 South LaSalle Street, Chicago, IL, 60605, and the Pacific Exchange, Inc., at 301 Pine Street, San Francisco, CA, 94104.

This prospectus constitutes part of the Registration Statement filed with the Commission. The Registration Statement and this prospectus incorporate by reference certain documents, including the Company's Annual Report on Form 10-K and all documents subsequently filed by the Company with the Commission under the Exchange Act. These documents, as well as other documents required to be delivered to you upon your request pursuant to Rule 428(b) of the Securities Act, will be provided to you without charge upon your written or oral request. In general, Rule 428(b) requires that participants receive, concurrently with this prospectus, a copy of either the Company's latest annual report to shareowners, Annual Report on Form 10-K or prospectus containing audited financial statements, and that you receive annually copies of all reports, proxy statements and other materials distributed to shareowners. Requests for any of these documents should be directed to the Company, 4201 Winfield Road, Warrenville, Illinois 60555 Attention: Corporate Secretary (telephone number (630) 753-5000).

The information in this prospectus will be updated regularly by a supplement, a revised prospectus or by including information in the most recent annual report to shareowners or the most recent proxy statement of the Company. If a significant period of time has elapsed from the date of publication of this prospectus, you should obtain and refer to all supplements. If you receive a supplement after you receive this prospectus, you should keep it with this prospectus and refer to it whenever you refer to this prospectus.

## NAVISTAR INTERNATIONAL CORPORATION

## 2004 PERFORMANCE INCENTIVE PLAN

### SECTION I

### ESTABLISHMENT OF THE PLAN

The Board of Directors of Navistar International Corporation approved the establishment of the Navistar International Corporation 2004 Performance Incentive Plan ("Plan") on October 21, 2003, subject to approval by the Stockholders at the Corporation's annual meeting to be held on February 17, 2004, or any adjournment thereof. The Plan replaces the Navistar 1994 Performance Incentive Plan and the Navistar 1998 Supplemental Stock Plan, each of which terminate December 16, 2003 under the terms of the plans, and the Plan will replace and supercede the Navistar 1988 Non-Employee Directors Stock Option Plan.

### SECTION II

### PURPOSE OF THE PLAN

The purpose of the Plan is to enable the Corporation and its subsidiaries to attract and retain highly qualified personnel and non-employee directors, and additionally to provide key employees who hold positions of major responsibility the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value.

### SECTION III

### DEFINITIONS

For the purposes of the Plan, the following words and phrases shall have the meanings described below in this Section III unless a different meaning is plainly required by the context.

(1) "Annual Incentive Award" means an award of cash determined by the Committee after the end of the Fiscal Year.

(2) "Award" means an award made under the Plan.

(3) "Award Agreement" means an agreement entered into by the Corporation and a Participant setting forth the terms and provisions applicable to an Award granted to a Participant.

(4) "Board of Directors" means the Board of Directors of Navistar International Corporation.

(5) "Change in Control" shall be deemed to have occurred if (i) any "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934), other than employee or retiree benefit plans or trusts sponsored or established by the Corporation or International Truck and Engine Corporation, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934), directly or indirectly, of securities of the Corporation representing 25% or more of the combined voting power of the Corporation's then outstanding securities, (ii) the following individuals cease for any reason to constitute more than three-fourths of the number of directors then serving on the Board of Directors of the Corporation: individuals who, on the date hereof, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Corporation) whose appointment or election by the Board or nomination for election by the Corporation's stockholders was approved by the vote of at least two-thirds (2/3) of the directors then still in office or whose appointment, election or nomination was previously so approved or recommended; (iii) any dissolution or liquidation of the Corporation or International Truck and Engine Corporation or sale or disposition of all or substantially all (more than 50%) of the assets of the Corporation or International Truck and Engine Corporation occurs; or (iv) as the result of, or in connection with, any cash tender offer, exchange offer, merger or other business combination, sale of assets, proxy or consent solicitation, contested election or substantial stock accumulation (a "Control Transaction"), the members of the Board of Directors of the Corporation immediately prior to the first public announcement relating

to such Control Transaction shall immediately thereafter, or with two (2) years, cease to constitute a majority of the Board of Directors of the Corporation. Notwithstanding the foregoing, the sale or disposition of any or all of the assets or stock of Navistar Financial Corporation shall not be deemed a Change in Control.

(6) "Code" or "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time.

(7) "Committee" means the Committee on Compensation and Governance of the Board of Directors.

(8) "Common Stock" means the common stock of the Corporation.

(9) "Corporation" means Navistar International Corporation.

(10) "Employee" means a person regularly employed by the Corporation or any subsidiary of the Corporation, including its officers.

(11) "Exercise Price" means the amount for which one share of Common Stock may be purchased upon exercise of a Stock Option, as specified in the applicable Award Agreement.

(12) "Fair Market Value" means the average of the high and the low prices of a share of Common Stock on the Grant Date as set forth in the New York Stock Exchange — Composite Transactions listing published in the Midwest Edition of *The Wall Street Journal* or equivalent financial publication.

(13) "Fiscal Year" means the fiscal year of the Corporation.

(14) "Freestanding SAR" means any SAR that is granted independently of any Stock Option.

(15) "Grant Date" means, as determined by the Board or authorized Committee, (i) the date as of which the Board or such Committee approves an Award, or (ii) such other date as may be specified by the Board or such Committee. The Grant Date of a Stock Option will, unless the Committee expressly determines otherwise, be the business day on which the Committee approves the grant of such Stock Option.

(16) "Incentive Stock Option" means a right, as evidenced by an Award Agreement to purchase a certain number of shares of Common Stock at Fair Market Value for a period of no longer than ten (10) years from the date of grant which options are designed to meet the requirements set out under Section 422 of the Code.

(17) "Non-Employee Director" means as of the Grant Date of an Award an individual who is a director of the Corporation and not an employee of the Corporation or any of its subsidiaries.

(18) "Nonqualified Stock Option" means a right, as evidenced by an Award Agreement to purchase a certain number of shares of Common Stock at Fair Market Value for a period of not more than ten (10) years which options are stated not to be Incentive Stock Options under the Code.

(19) "Participant" means an Employee selected by the Corporation for participation in the Plan and, with respect to Stock Options, Restricted Stock and Stock Units, a Non-Employee Director.

(20) "Performance-Based Exception" means the performance-based exception from the tax deductibility limitation imposed by Code Section 162(m) as set forth in Section 162(m)(4)(C).

(21) "Performance Measure" means the performance measurement provided by Section VI.

(22) "Performance Period" means the period during which performance goals must be met for purposes of the Performance Measure.

(23) "Plan" means the Navistar International Corporation 2004 Performance Incentive Plan as set forth herein and as it may be amended hereafter from time to time.

2

(24) "Qualified Retirement" means with respect to an Employee a termination from employment from the Corporation or any of its subsidiaries that occurs after the Employee attains age 55 and at the time of the termination the Employee has either: (i) 10 or more years of continuous service, or (ii) 10 or more years of service that would constitute credited service under the definition contained in the International Truck and Engine Corporation Retirement Plan for Salaried Employees ("RPSE"). Qualified Retirement for a Non-Employee Director means retirement under a retirement policy of the Board for Non-Employee Directors.

(25) "Restoration Stock Option" means a Nonqualified Stock Option granted pursuant to Section VII(7) and which is awarded upon the exercise of a Stock Option earlier awarded under the Plan or any other plan of the Corporation, including an earlier awarded Restoration Stock Option (an "Underlying Option").

(26) "Restricted Stock" means a right to acquire one or more shares of Common Stock, as evidenced by an Award Agreement, that is restricted as to sale or transfer and subject to forfeiture.

(27) "Stock Appreciation Right" or "SAR" means an Award, granted either alone or in connection with a related Stock Option, pursuant to the terms of Section X of the Plan.

(28) "Stock Option" means either an Incentive Stock Option or a Nonqualified Stock Option.

(29) "Stock Units" mean units for Restricted Stock granted pursuant to Section XI.

(30) "Tandem SAR" means an SAR granted with respect to a share pursuant to Section X hereof in connection with a related Stock Option, under which: (a) the exercise of the SAR with respect to the share shall cancel the right to purchase such share under the related Stock Option, and (b) the purchase of the share under the related Stock Option shall cancel the right to exercise the SAR with respect to such share.

## SECTION IV

## ELIGIBILITY

Management will, from time to time, select and recommend to the Committee Employees who are to become Participants in the Plan. Such Employees will be selected from those who, in the opinion of management, have substantial responsibility in a managerial or professional capacity. Non-Employee Directors shall also be Participants in the Plan for the purpose of Nonqualified Stock Option Awards, Restricted Stock and Stock Units.

## SECTION V

## ANNUAL INCENTIVE AWARDS

(1) As soon as practical following the end of the Fiscal Year, the Committee will certify performance achieved against the performance criteria established at the beginning of the Fiscal Year. The performance criteria shall be determined in the discretion of the Committee considering all factors relevant to the management of the Corporation, provided that an Award under this Section that is intended to qualify for the Performance-Based Exception shall satisfy the Performance Measures and the requirements of Section 162(m) of the Internal Revenue Code.

(2) The Committee, in its sole discretion, may reduce or eliminate any Award otherwise earned based on an assessment of individual performance, but in no event may any such reduction result in an increase of the Award. The Committee shall determine the amount of any such reduction by taking into account such factors as it deems relevant including, without limitation: (a) performance against other financial or strategic objectives; (b) its subjective assessment of the Participant's overall performance for the year; and (c) prevailing levels of total compensation among similar companies.

(3) Performance criteria for Annual Incentive Awards will not be increased or decreased within a Fiscal Year except for extraordinary circumstances approved by the Committee.

(4) Payment of an Annual Incentive Award will be made in cash to the Participant as soon as practicable after an Annual Incentive Award determination has been made by the Committee. A Participant who is not an Employee at the end of a Fiscal Year will not be entitled to an Award for that Fiscal Year unless the Committee determines otherwise.

3

(5) The Committee may permit the deferral of any Award and may permit payment on deferrals to be made subject to rules and procedures it may establish. These rules may include provisions crediting interest on deferred cash accounts.

(6) The Committee shall set the performance criteria for each year's Annual Incentive Awards no later than the first 90 days of the Fiscal Year.

(7) Its shall be presumed unless the Committee determines to the contrary, that all Awards to Employees under this Section are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rules of Section 162(m) of the Internal Revenue Code, the maximum Award under this Section of the Plan to any one Employee during any one Fiscal Year shall not exceed $4,000,000.

## SECTION VI

## PERFORMANCE MEASUREMENT

(1) Unless and until the Corporation's stockholders approve a change in the general Performance Measures set forth in this Section VI, the attainment of which may determine the degree of payout and/or vesting with respect to Awards that are designed to qualify for the Performance-Based Exception, the Performance Measures to be used for purposes of such Awards may be measured at the Corporation level, at a subsidiary level, or at an operating unit level and shall be chosen from among: (a) income measures (including, but not limited to, gross profits, operation income, earnings before or after taxes, earnings per share, cost reductions); (b) return measures (including, but not limited to, return on assets, capital, investment, equity, or sales); (c) cash flow, cash flow return on investments, which equals net cash flows divided by owners equity; (d) gross revenues from operations; (e) total revenue; (f) cash value added; (g) economic value added; (h) share price (including, but not limited to, growth measures and total shareholder return); (i) sales growth; (j) market share; (k) the achievement of certain quantitatively and objectively determinable non-financial performance measures (including, but not limited to, growth strategies, strategic initiatives, product development, product quality, corporate development, and leadership development); and (l) any combination of, or a specified increase in, any of the foregoing.

(2) The Committee shall set the Performance Measures for each year's Annual Incentive Awards no later than the first 90 days of the Fiscal Year.

(3) The Committee shall have the discretion to adjust the determination of the degree of attainment of the preestablished goals; provided that the Awards that are designated to qualify for Performance-Based Exception may not be adjusted upward (although the Committee shall retain the discretion to adjust such Awards downward).

(4) In the case of any Award that is granted subject to the condition that a specific Performance Measure be achieved, no payment under such Award shall be made prior to the time the Committee certifies in writing that that the Performance Measure has been achieved. For this purpose, approved minutes of the Committee meeting at which the certification is made shall be treated as a written certification. No such certification is required, however, in the case of an Award that is based solely on an increase in the value of a share of Common Stock from the date the Award is made.

## SECTION VII

## STOCK OPTIONS FOR EMPLOYEES

(1) The Committee may grant Nonqualified Stock Options or Incentive Stock Options or a combination of both to Employee Participants in the amount and at the time that the Committee approves. In order to provide a limitation on the number of shares as provided for in Section 162(m) of the Internal Revenue Code and the regulations thereunder, Stock Option grants shall be limited to a maximum of 1,000,000 shares per year for any Participant.

(2) The Committee will document the terms of the Stock Option in an Award Agreement to include the Grant Date and Exercise Price, as well as any other terms that it may desire. The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Options fixed by the Committee shall not be modified.

4

(3) Unless otherwise determined by the Committee, a Stock Option granted under the Plan will become exercisable in whole or in part after the commencement of the second year of the term of the Stock Option to the extent of one third of the shares, to the extent of one third of the shares after commencement of the third year, and to the extent of one third of the shares after commencement of the fourth year.

(4) A Stock Option granted under the Plan will be exercisable during such period as the Committee may determine, and will be subject to earlier termination as hereinafter provided. In no event, however, may a Stock Option governed by the Plan be exercised after the expiration of its term. Except as provided herein, no Stock Option may be exercised at any time unless the Participant who holds the Stock Option is then an Employee. The option can be exercised in whole or in part through cashless exercises or other arrangements through agents, including stockbrokers, under arrangements established by the Corporation by paying the amounts required by instructions issued by the Secretary of the Corporation for the exercise of the Stock Options. If an exercise is not covered by instructions issued by the Corporate Secretary, the purchase price is to be paid in full to the Corporation upon the exercise of a Stock Option either (i) by cash including a personal check made payable to the Corporation, (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant, for six months or more if acquired from the Corporation, or (iii) by any combination of cash and unrestricted Common Stock, and in either case, by payment to the Corporation of any withholding tax. In no event may successive simultaneous pyramiding be used to exercise a Stock Option. Shares which otherwise would be delivered to the holder of a Stock Option may be delivered, at the election of the holder, to the Corporation in payment of federal, state and/or local withholding taxes payable in connection with an exercise.

(5) The Participant who holds a Stock Option will have none of the rights of a shareowner with respect to the shares subject to a Stock Option until such shares are issued upon the exercise of a Stock Option.

(6) Neither the Corporation nor any subsidiary may directly or indirectly lend money to any Participant for the purpose of assisting the individual to acquire shares of Common Stock issued upon the exercise of Stock Options granted under the Plan.

(7) Provisions for Restoration Stock Options may be contained in the terms of options granted under the Plan. Restoration Stock Options may be granted under the Plan pursuant to the following terms: (a) Restoration Stock Options may be granted if the Participant elects to make a restoration option exercise of an Underlying Option, pays the exercise price by transferring to the Corporation Common Stock of the Corporation held by the Participant, for six months or more if acquired from the Corporation, and pays the withholding tax by transferring Common Stock or cash. The number of Restoration Stock Options that will be granted is equal to the number of shares used to pay the exercise price and the number of shares with value equal to the tax liability; (b) The Restoration Stock Options will have a term equal to the remaining term of the Underlying Option, will have an Exercise Price equal to the Fair Market Value of the stock on the date of grant of the Restoration Option, and will become exercisable in six months after grant (or, if sooner, one month before the end of the term of the Underlying Option), and otherwise will have the same general terms and conditions Nonqualified Stock Options granted by the Corporation; (c) The shares that represent the difference between the Exercise Price of the Underlying Option and the value of the shares on the date of exercise, less withholding taxes, generally cannot be transferred for a period of three (3) years; and (d) At the election of the Participant delivery of the shares may be deferred.

(8) In the event of the termination of the employment of a Participant who holds an outstanding Stock Option, other than by reason of death, total and permanent disability or a Qualified Retirement, the Participant may (unless the Stock Option shall have been previously terminated) exercise the Stock Option at any time within three (3) months after such termination, but not after the expiration of the term of the grant, to the extent of the number of shares which were exercisable at the date of the termination of employment. Stock Options governed by the Plan will not be affected by any change of employment so long as the Participant continues to be an Employee. Provided, however, if the Participant is terminated for cause as defined in the International Truck and Engine Corporation Income Protection Plan, or if the Participant is covered by a different severance plan or agreement, then as defined in such plan or agreement, the three-month period provided by this subsection shall not apply and the Stock Option shall cease to be exercisable and shall lapse as of the effective date of the termination of the Employee.

(9) Except as provided in Section VII(12), in the event of a Qualified Retirement a Participant who holds an outstanding Stock Option may exercise the Stock Option to the extent the option is exercisable or becomes exercisable under its terms, at any time during the term of the option grant.

(10) In the event of a total and permanent disability, as defined by the Corporation's long term disability programs, a Participant who holds an outstanding Stock Option may exercise the Stock Option, to the extent the Stock Option is exercisable or becomes exercisable under its terms, at any time within three (3) years after such termination or, if later, the date on which the option becomes exercisable with respect to such shares, but not after the expiration of the term of the option grant.

(11) In the event of the death of a Participant who holds an outstanding Stock Option, the Stock Option may be exercised by a legatee, or by the personal representatives or distributees, at any time within a period of two (2) years after death, but not after the expiration of the term of the grant. If death occurs while employed by the Corporation or a subsidiary, or after a Qualified Retirement, or during the three- year period specified in Section VII(10), Stock Options may be exercised to the extent of the remaining shares covered by Stock Options whether or not such shares were exercisable at the date of death. If death occurs during the three-month period specified in Section VII(8), Stock Options may be exercised to the extent of the number of shares that were exercisable at the date of death.

(12) Notwithstanding the other provisions of Sections VII(9) or VII(11), no Stock Option which is not exercisable at the time of a Qualified Retirement shall become exercisable after such Qualified Retirement if, without the written consent of the Corporation, a Participant engages in a business, whether as owner, partner, officer, employee, or otherwise, which is in competition with the Corporation or one of its affiliates, and if the Participant's participation in such business is deemed by the Corporation to be detrimental to the best interests of the Corporation. The determination as to whether such business is in competition with the Corporation or any of its affiliates, and whether such participation by such person is detrimental to the best interests of the Corporation, shall be made by the Corporation in its absolute discretion, and the decision of the Corporation with respect thereto, including its determination as to when the participation in such competitive business commenced, shall be conclusive.

## SECTION VIII

### STOCK OPTIONS NON-EMPLOYEE DIRECTORS

(1) The Committee may grant Nonqualified Stock Options to Non-Employee Directors.

(2) The Committee will document the terms of the Stock Option to include the Grant Date and Exercise Price, as well as any other terms that it may desire. The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Stock Options fixed by the Committee shall not be modified.

(3) Unless otherwise determined by the Committee, a Stock Option granted under this Section of the Plan will become exercisable in whole or in part after the commencement of the second year of the term of the Stock Option to the extent of one third of the shares, to the extent of one third of the shares after commencement of the third year, and to the extent of one third of the shares after commencement of the fourth year.

(4) A Stock Option granted this Section of the Plan will be exercisable during such period as the Committee may determine, and will be subject to earlier termination as hereinafter provided. In no event, however, may a Stock Option governed by the Plan be exercised after the expiration of its term.

(5) Except as provided herein, no Stock Option granted under this Section of the Plan may be exercised at any time unless the Participant who holds the Stock Option is then a Non-Employee Director.

(6) A Stock Option granted under this Section of the Plan can be exercised in whole or in part through cashless exercises or other arrangements through agents, including stockbrokers, under arrangements established by the Corporation by paying the amounts required by instructions issued by the Secretary of the Corporation for the exercise of the options. If an exercise is not covered by instructions issued by the Corporate Secretary, the purchase price is to be paid in full to the Corporation upon the exercise of a Stock Option either (i) by cash including a personal check made payable to the Corporation; (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant, for six months or more if acquired from the Corporation, or (iii) by any combination of cash and unrestricted Common Stock, and in either case, by payment to the Corporation of any withholding tax. In no event may successive simultaneous pyramiding be used to exercise a Stock Option. Shares which otherwise would be delivered to the holder of a Stock Option may be delivered, at the election of the holder, to the Corporation in payment of federal, state and/or local withholding taxes payable in connection with an exercise.

(7) The Non-Employee Director who holds a Stock Option will have none of the rights of a shareowner with respect to the shares subject to a Stock Option until such shares are issued upon the exercise of a Stock Option.

(8) Neither the Corporation nor any subsidiary may directly or indirectly lend money to any Non-Employee Director for the

purpose of assisting the individual to acquire shares of Common Stock issued upon the exercise of Stock Options granted under the Plan.

(9) In the event of the termination of service as a Non-Employee Director, other than by reason of death, total and permanent disability or a Qualified Retirement, a Non-Employee Director who holds an outstanding Stock Option may (unless the Stock Option shall have been previously terminated) exercise the Stock Option at any time within three (3) months after such termination, but not after the expiration of the term of the grant, to the extent of the number of shares which were exercisable at the date of the termination of service.

(10) Except as provided in Section VII(13), in the event of Qualified Retirement a Non-Employee Director who holds an outstanding Stock Option may exercise the Stock Option to the extent the Stock Option is exercisable or becomes exercisable under its terms, at any time during the term of the option grant.

(11) In the event of a total and permanent disability, as determined by the Committee, a Non-Employee Director who holds an outstanding Stock Option may exercise the Stock Option, to the extent the option is exercisable or becomes exercisable under its terms, at any time within three (3) years after such termination or, if later, the date on which the Stock Option becomes exercisable with respect to such shares, but not after the expiration of the term of the option grant.

(12) In the event of the death of a Non-Employee Director who holds an outstanding Stock Option, the Stock Option may be exercised by a legatee, or by the personal representatives or distributees, at any time within a period of two (2) years after death, but not after the expiration of the term of the grant. If death occurs while the Participant is serving as a Non-Employee Director, or after a Qualified Retirement, or during the three-year period specified in Section VIII(11), Stock Options may be exercised to the extent of the remaining shares covered by the Stock Options whether or not such shares were exercisable at the date of death. If death occurs during the three-month period specified in Section VIII(9), Stock Options may be exercised to the extent of the number of shares that were exercisable at the date of death.

(13) Notwithstanding the other provisions of Sections VIII(10) or VIII(12), no option which is not exercisable at the time of a Qualified Retirement shall become exercisable after such Qualified Retirement if, without the written consent of the Corporation, a Non-Employee Director engages in a business, whether as owner, partner, officer, employee, or otherwise, or serves as a director for such business, which is in competition with the Corporation or one of its affiliates, and if the Non-Employee Director's participation in such business is deemed by the Corporation to be detrimental to the best interests of the Corporation. The determination as to whether such business is in competition with the Corporation or any of its affiliates, and whether such participation by such person is detrimental to the best interests of the Corporation, shall be made by the Corporation in its absolute discretion, and the decision of the Corporation with respect thereto, including its determination as to when the participation in such competitive business commenced, shall be conclusive.

## SECTION IX

### PROHIBITION ON REPRICING AND DISCOUNTED OPTIONS

Notwithstanding any other provision in the Plan, no Stock Option issued under the Plan may be amended or modified in any way that changes the Exercise Price of the Stock Option, and no Stock Option may be issued with an Exercise Price that is less than the Fair Market Value of one share of Common Stock on the Grant Date of the Stock Option or in any other way discounted. This provision shall not limit any adjustments provided by Section XII relating to adjustments upon changes in capitalization.

## SECTION X

### STOCK APPRECIATION RIGHTS AND OTHER AWARDS

(1) Subject to the terms of the Plan, the Committee may grant any types of Awards other than Stock Options provided for in Sections VII and VIII, and Restricted Stock provided for in Section XI, including but not limited to SARs. The Committee shall determine the terms and conditions of such Awards.

(2) The Committee may, subject to the terms of the Plan, grant SARs to Employee Participants at any time and from time to time as shall be determined by the Committee. The Committee may grant Freestanding SARs, Tandem SARs, or any combination thereof. The Committee shall have complete discretion in determining the number of SARs, subject to the terms of the Plan, and to determine

the terms of the SARs. The grant price of a Freestanding SAR shall equal the Fair Market Value of one share of Common Stock on the Grant Date. The Exercise Price of Tandem SARs shall equal the Exercise Price of the related Stock Option.

(3) Tandem SARs may be exercised for all or part of the shares subject to the related Stock Option upon the surrender of the right to exercise the equivalent portion of the related Stock Option. A related Stock Option is then exercisable.

(4) Notwithstanding any other provision of the Plan to the contrary, with respect to a Tandem SAR granted in connection with an Incentive Stock Option: (a) The Tandem SAR shall expire no later than the expiration than the expiration of the Incentive Stock Option; (b) The value of the payout with respect to the Tandem SAR shall not exceed the excess of the fair market value of the shares subject to Incentive Stock Option at the time the Tandem SAR is exercised over the Exercise Price under the Incentive Stock Option; and (c) The Tandem SAR may be exercised only when the Fair Market Value of the shares subject to the Incentive Stock Option exceed the Exercise Price of the Incentive Stock Option.

(5) Freestanding SARs may be exercised upon whatever terms and conditions the Committee, in its discretion, impose upon them, subject, however, to the terms of the Plan.

(6) The term of SARs shall be determined by the Committee, in its discretion; provided that such term shall not exceed 10 years.

(7) Upon exercise of a SAR, a Participant shall be entitled to receive payment from the Corporation in an amount determined by multiplying: (a) the excess of fair market value of one share of Common Stock on the date of exercise over the Exercise Price, by (b) the number of shares with respect to which the SAR is exercised. At the discretion of the Committee, the payment upon exercise of a SAR may be in cash, in share equivalent fair market value, or in a combination thereof.

(8) Its shall be presumed unless the Company determines to the contrary, that all awards to Employees under this Section are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to an Employee to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rule of Section 162(m) of the Internal Revenue Code, the number of SARs that can be granted to any one Employee in any Fiscal Year shall not exceed 1,000,000 shares, less the number of stock options grant to such Employee during the year. Any Award the value of which is not solely dependent on value of the stock on which the award is based shall not exceed $4,000,000 for any Employee for the year.

SECTION XI

RESTRICTED STOCK

(1) Restricted Stock, or Stock Units, may be granted during a Fiscal Year or at any time thereafter. Awards under the Plan may be granted in the form of Restricted Stock, in the form of Stock Units, or in any combination of both. Restricted Stock or Stock Units may also be awarded in combination with Stock Options, and such an Award may provide that the Restricted Shares or Stock Units will be forfeited in the event that the terms of the Award Agreement are not fulfilled.

(2) Awards of Restricted Stock or Stock Units may be made under the Plan to Participants for meeting the stock ownership requirements as described in the Navistar Executive Stock Ownership Program, as may be amended from time to time by the Board of Directors, in their sole discretion, or for any other purpose.

(3) Each Award of Restricted Stock or Stock Units shall become vested, in full or in installments, upon satisfaction of the conditions specified in the Award Agreement. In no event will an Award of Restricted Stock or Stock Units granted under the Plan vest in full prior to the commencement of the third year anniversary of the Grant Date.

(4) The Participant will be entitled to all dividends paid with respect to all Restricted Stock awarded under the Plan during the period of restriction and will not be required to return any such dividends to the Corporation in the event of the forfeiture of the Restricted Stock. The Participant also will be entitled to vote Restricted Stock during the period of restriction.

(5) All Restricted Stock certificates awarded under the Plan are to be delivered to the Participant with an appropriate legend imprinted on the certificate.

(6) In the event a Participant dies while employed by or as serving as a Non-Employee-Director of the Corporation or following a

Qualified Retirement or total or permanent disability, the Restricted Stock or Stock Units will vest as of the date of death and all restrictions shall lapse and the Restricted Stock or Stock Units will be immediately transferable to the named beneficiary or to the Participant's estate. Any Restricted Stock or Stock Units that becomes payable after the Participant's death shall be distributed to the Participant's beneficiary or beneficiaries. A beneficiary designation may be changed by filing the prescribed form with the Secretary of the Corporation at any time before the Participant's death. If no beneficiary was designated or if no designated beneficiary survives the Participant, then any Restricted Stock or Stock Units that becomes payable after the Participant's death shall be distributed to the Participant's estate.

(7) In the event a Participant who holds unvested Restricted Stock or Stock Units, terminates employment or service as a Non-Employee Director with the Corporation by reason of Qualified Retirement or total and permanent disability, the Restricted Stock or Stock Units will continue to vest according to the terms of the Restricted Stock.

(8) In the event a Participant otherwise terminates employment or service as a Non-Employee Director, any Restricted Stock or Stock Units that is not vested forfeits to the Corporation.

(9) Its shall be presumed unless the Committee determines to the contrary, that all awards to Employees under this Section of the Plan are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to an Employee to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rules of Section 162(m) of the Internal Revenue Code, the maximum Award under this Section of the Plan to any one Employee during any one Fiscal Year shall not exceed 1,000,000 shares.

## SECTION XII

## ADJUSTMENTS UPON CHANGES IN CAPITALIZATION

Notwithstanding any other provision of the Plan, the Award Agreements may contain such provisions as the Committee determines to be appropriate for the adjustment of the number and class of shares, subject to each outstanding Stock Option or SAR, the exercise prices in the event of changes in, or distributions with respect to, the outstanding Common Stock by reason of stock dividends, recapitalizations, mergers, consolidations, split-ups, combinations or exchanges of shares, spinoffs and the like, and, in the event of any such changes in, or distribution with respect to, the outstanding Common Stock, the aggregate number and class of shares available under the Plan and the limits applicable to Awards under the Plan, in each case, shall be appropriately adjusted by the Committee, whose determination shall be conclusive.

## SECTION XIII

## ADMINISTRATION OF THE PLAN

Full power and authority to construe, interpret and administer the Plan is vested in the Committee. Decisions of the Committee will be final, conclusive and binding upon all parties, including the Corporation, shareowners, Non-Employee Directors and Employees. The foregoing will include, but will not be limited to, all determinations by the Committee as to (a) the approval of Employees and Non-Employee Directors for participation in the Plan, (b) the amount of the Awards, (c) the performance levels at which different percentages of the Awards would be earned and all subsequent adjustments to such levels and (d) the determination of all Awards. Any person who accepts any Award hereunder agrees to accept as final, conclusive and binding all determinations of the Committee. The Committee will have the right, in the case of Employees not employed in the United States, or Non-Employee Directors not resident in the United States, to vary from the provision of the Plan to the extent the Committee deems appropriate in order to preserve the incentive features of the Plan.

## SECTION XIV

## NON-ASSIGNMENT

Awards under the Plan may not be assigned or alienated. In case of a Participant's death, the amounts distributable to the deceased Participant under the Plan with respect to which a designation of beneficiary has been made (to the extent it is valid and enforceable under applicable law) shall be distributed in accordance with the Plan to the designated beneficiary or beneficiaries. The amount distributable to a Participant upon death and not subject to such a designation shall be distributed to the Participant's estate. If there is

9

any question as to the right of any beneficiary to receive a distribution under the Plan, the amount in question may be paid to the estate of the Participant, in which event the Corporation will have no further liability to anyone with respect to such amount.

## SECTION XV

### WITHHOLDING TAXES

A Participant may elect, subject to the provisions of the applicable Sections of the Plan and the terms of the Award, to pay any withholding tax due in connection with the exercise of any Stock Option or SAR or upon the vesting of Restricted Stock or the settlement of any other Award either (i) by cash including a personal check made payable to the Corporation or (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant and if acquired from the Corporation owned for at least six months, or (iii) by any combination of cash or unrestricted Common Stock. The Committee may provide, in the Award Agreement, that in the event that a Participant is required to pay to the Corporation any amount to be withheld in connection with the exercise, vesting or settlement of an Award denominated in shares, the Participant may satisfy such obligation (in whole or in part) by electing to have the Corporation withhold a portion of the shares of Common Stock otherwise to be issued upon exercise, vesting or settlement of such Award equal in value to the minimum amount required to be withheld. The value of the shares to be withheld shall be the Fair Market Value on the date that the amount of tax to be withheld is determined.

## SECTION XVI

### RIGHTS OF PARTICIPANT

To the extent that any Participant, beneficiary or estate acquires a right to receive payments or distributions under the Plan, such right will be no greater than the right of a general unsecured creditor of the Corporation. All payments and distributions to be made hereunder will be paid from the general assets of the Corporation. Nothing contained in the Plan, and no action taken pursuant to its provisions, shall create or be construed to create any contracted right or trust of any kind or fiduciary relationship between the Corporation and any Participant, beneficiary or estate.

## SECTION XVII

### MODIFICATION, AMENDMENT OR TERMINATION

The Committee may modify, amend, or terminate the Plan at any time, provided that, unless the requisite approval of stockholders is obtained, no amendment shall be made to the Plan if such amendment would (i) increase the number of shares of Common Stock available for issuance under the Plan or increase the limits applicable to Awards under the Plan, in each case, except as provided in Section XII; (ii) lower the Exercise Price of the Stock Option or SAR grant value below 100% of the Fair Market Value of one share of Common Stock on the Grant Date, except as provided in Section XII; (iii) remove the repricing restriction set forth in Section IX; or (iv) require stockholder approval as a matter of law or under rules of the New York Stock Exchange. No Plan amendment shall, without the affected Participant's consent, terminate or adversely affect any right or obligation under any Stock Option or other Award previously granted under the Plan.

## SECTION XVIII

### RESERVATION OF SHARES

(1) The total number of shares of Common Stock reserved and available for delivery pursuant to this Plan is 3,250,000 shares of Common Stock. The number of shares authorized and available shall be increased by shares of Common Stock subject to an option or award under this Plan or any other plan, including the Navistar 1994 Performance Incentive Plan, the Navistar 1998 Supplemental Stock Plan, or the 1998 Non-Employee Director Stock Option Plan, that is cancelled, expired, forfeited, settled in cash or otherwise terminated without a delivery of shares to the Participant of the plan, including shares used to pay the option exercise price of an option issued under the Plan or any other plan or to pay taxes with respect to such an option.

(2) In order to provide a limitation on the number of shares that may be issued as Incentive Stock Options as provided by the Code, no more than 1,000,000 shares of Common Stock, or if less the number of shares that may be issued under the Plan, shall be granted as Incentive Stock Options in any calendar year. Such shares may be in whole or in part, as the Board of Directors shall from time to time determine, authorized and unissued shares of Common Stock or issued shares of Common Stock which shall have been

reacquired by the Corporation.

(3) In order to provide a limitation on the number of shares that may be issued as Restricted Stock, Stock Units, SARs, and Awards other than Stock Options, no more than 1,000,000 shares of Common Stock that may be issued under the Plan shall be granted as Restricted Stock, Stock Units, SARs, or Awards other than Stock Options.

## SECTION XIX

## RIGHTS OF EMPLOYEES

Status as an Employee shall not be construed as a commitment that any one or more Awards will be made under this Plan to an Employee or to Employees generally. Status as a Participant shall not entitle the Participant to any additional future Awards. Nothing in the Plan will confer on any Employee or Participant any right to continue in the employ of the Corporation or any of its subsidiaries or interfere with or prevent in any way the right of the Corporation or any of its subsidiaries to terminate an Employee or Participant's employment at any time for any reason.

## SECTION XX

## CHANGE IN CONTROL

Notwithstanding any provision contained herein to the contrary, in the event of a Change in Control, all awarded Restricted Stock and Stock Units will immediately be free of all restrictions and performance contingencies and will be deemed fully earned and not subject to forfeiture and all outstanding Stock Options governed by the Plan will be immediately exercisable and shall continue to be exercisable for a period of three (3) years from the date of the Change in Control regardless of the original term or employment status, except that the term of any Incentive Stock Option shall not be extended beyond ten (10) years from the date of grant.

## SECTION XXI

## LIMITATION OF ACTIONS

Every right of action by or on behalf of the Corporation or any shareowner against any past, present or future member of the Board of Directors, officer or Employee arising out of or in connection with the Plan will, irrespective of the place where action may be brought and irrespective of the place of residence of any such director, officer or employee, cease and be barred by the expiration of three (3) years from whichever is the later of (a) the date of the act or omission in respect of which such right of action arises or (b) the first date upon which there has been made generally available to shareowners an annual report of the Corporation and a proxy statement for the annual meeting of shareowners following the issuance of such annual report, which annual report and proxy statement alone or together set forth, for the related period, the aggregate amount of Awards under the Plan during such period; and any and all right of action by an Employee or Non-Employee Director (past, present or future) against the Corporation arising out of or in connection with the Plan shall, irrespective of the place where action may be brought, cease and be barred by the expiration of three (3) years from the date of the act or omission in respect of which such right of action arises.

## SECTION XXII

## GOVERNING LAW

The Plan will be governed by and interpreted pursuant to the laws of the State of Delaware, the place of incorporation of the Corporation, without giving effect to the principals of conflict of laws.

## SECTION XXIII

## EFFECTIVE DATE

The effective date of the Plan shall be February 17, 2004 (the "Effective Date"), subject to approval by the stockholders at the Corporation's Annual Meeting to be held on February 17, 2004, or any adjournment thereof. The Plan shall continue in effect for ten (10) years from the Effective Date, expiring February 16, 2014. No Awards may be granted under the Plan subsequent to February 16, 2014, but Awards theretofore granted may extend beyond that date in accordance with their terms.

## TAXATION OF NAVISTAR STOCK OPTIONS
### (February 2004)

*Summary*

The Company grants two types of stock options to employees, non-qualified stock options ("NQO") and incentive stock options ("ISO"). ISOs may be eligible for more favorable tax treatment because more of the income is potentially eligible for long-term capital gain treatment. Only non-qualified options are granted to Non-Employee Directors, and these are generally tax the same as non-qualified options granted to employees, except that directors are independent contractors and therefore not subject to FICA or general income tax withholding by the Company.

Stock options granted under the Restoration Program are non-qualified stock options. However, the Company's restoration stock option program can provide for the deferral of the delivery of the shares in a restoration type exercise. In this case the income is recognized for tax purposes at the time the shares are delivered, and the amount of the income is determined bases on the value of the stock on the date of delivery.

When ordinary income is realized on a stock option, the income is taxable at the employee's marginal tax rate. The highest federal tax rate is currently 35%, after the reductions made by the recent tax legislation. Hospital insurance tax at 1.45% also applies, since there is no wage base limitation as there is for the Social Security tax of 6.2%. Long-term capital gains, on the other hand, are generally taxable at a maximum federal rate that has been reduced from 20% to 15%. Capital gains are now considered long term if the stock was held for more than one year. The rate reductions apply for a limited number of years under the current law, however it is assumed in this memorandum the reduced rates will continue indefinitely.

Several years ago the IRS took the position that ISOs would not be subject to FICA tax or income tax withholding pending review by the IRS. The IRS has maintained the position that ISOs are not subject to FICA or withholding and indicated it would not impose FICA on ISO before the second taxable year after final regulations were adopted. It is generally assumed that the IRS will request that Congress adopt legislation to deal with FICA and withholding on ISOs. At this time there is no FICA or required withholding on ISO and likely will not be at least through 2004.

**NQOs.** When an employee exercises a NQO, the spread (the difference between the exercise price and the value of the stock on the date of exercise) is taxable as ordinary income. If the employee holds the stock for more than one year, any gain realized on the subsequent sale of the stock will be eligible for the 20% long-term capital gain rate. (If an officer could not sell the stock because of the insider trading rules under Section 16b, he would not recognize income during the Section 16b period, unless he filed an election to recognize income under §83(b) of the Code.)

**ISOs.** If an employee exercises an ISO and continues to hold the stock, no income is recognized at the time of the exercise. When the employee subsequently sells the stock, he will generally be eligible for the 15% long-term capital gain rate on all of the gain, both the spread that existed at the time of exercise and any increase in value after the exercise. To get the 15% rate, the

employee must hold the stock for two years from the date of the grant or the option, he most hold the stock for more than one year from the date of exercise of the option, and the employee most exercise the option within three (3) months of retirement or other termination of employment from the Company (one year in the case of disability). The employee needs to consider the alternative minimum tax implications of holding ISO stock. The spread (the excess of the value of the stock over the option price) at the time of exercise is a tax preference, and some employees could incur a minimum tax liability, which may require the payment of tax to the IRS. Generally when the employee sells the stock there is a negative adjustment to income for ATM purposes and this usually will entitle the employee to get the AMT back for the year in which he sells the stock.

**Exchange of shares.** If an employee uses Company stock that he owns to pay the exercise price of a stock option, generally he will not recognize gain on his use of the old stock. He will be treated as having exchanged old shares of Company stock for an equal number of new shares of Company stock. He does not recognize gain on the exchange and his basis and holding period will carryover to the new stock. (There are limitations on using ISO stock for this purpose.)

**The details.** Stock options are often subject to tax planing opportunities because the employee has some control over the timing and method of exercise and the holding of disposition of the stock. The tax rules are often complex. Some of the rules are summarized in this memorandum. Employees are advised to consult their tax and financial advisors to review the considerations involved in holding or exercising stock options.

## CAPITAL GAINS TAXATION

The Jobs and Growth Tax Relief Reconciliation Act of 2003 (the "Act") reduced the potential tax rate that applies to long-term capital gain. Generally the maximum federal rate was reduced from 20% to 15%. The Act also accelerated ordinary income tax rate reductions that had previously been adopted during the Bush Administration. The maximum federal rate is generally 35% and each person must consider what his marginal rate is based on his income for income tax purposes. The differential in tax rates could affect the relative value of ISOs compared to NQOs. It may also affect the relative advantage of using restoration options since the future gain on the shares acquired through a restoration option exercise is potentially eligible for capital gain treatment. Generally, stock acquire by exercise of an ISO or otherwise must be held for <u>more than one year</u> to be taxed at the lower long-term capital gains rates.

As discussed in the ISO section of this memorandum, there is a one-year and a two-year holding period that must be met for favorable tax treatment of an ISO. These holding periods are in addition to the capital gains holding period rules.

## NON-QUALIFIED STOCK OPTIONS

Options granted under the Company's 2004 Performance Incentive Plan will state whether the options are intended to be NQOs or ISOs. All options that will be granted as restoration options will be NQOs.

2

Income is recognized at the time of exercise of the option. (If a Section 16(b) holding period applied under the Securities laws, the income would be recognized at the end of the 16(b) period, unless the employee elected to recognize the income at the time of exercise by filing a section 83(b) election). The amount of the income is the difference between the option price paid to the Company to exercise the option and the market value of the stock. This difference between the price and value is often referred to as the spread. The income is taxable as ordinary income. The employee's basis in the stock received is equal to the sum of the amount paid for the shares and the amount of income recognized. Gain or loss on the subsequent sale of the stock is capital gain or loss. The rate that applies to the capital gain depends on the length of the period for which the stock was held from the date of exercise. Generally, the stock must be held for more than one year to qualify for the 15% long-term capital gains rate. If previously owned stock is used to pay the exercise price (as it would be if a restoration option exercise is made), gain or loss on the old stock is not recognized, and the basis of the new stock is adjusted for the non-recognized gain or loss.

The income realized on a NQO is subject to FICA taxes.

**Example 1, NQO cash exercise.** The employee exercises an option to purchase 150 shares at $25 per share. He pays the option price in cash using a cashless exercise program the company established with a stockbroker. Under the cashless exercise program the employee does not have to advance any part of the option price. The value of the stock at the time of exercise is $30. The employee recognizes income of $750, which is taxed as ordinary income at the employee's marginal rate. The employee's basis in the stock would be $4,500, the price paid at $25 per share times 150 shares plus the income recognized of $750. If the stock were sold in two years at $40 per share, there would be a capital gain of $10 per share, or $1,500. The capital gain would be long-term because the stock was held for more than one year. Any net long-term gain would be taxed at a maximum rate of 15%.

**Example 2, NQO exercised with previously owned stock held at a gain.** In April 2004 the value of the stock is $50 per share. The employee exercises an option granted in 2003 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) previously acquired in the market for $25 per share. The employee will be treated as having exchanged 80 old shares for 80 new shares. This exchange is non-recognized for tax purposes. The transaction is not recognized because a special rule of the Internal Revenue Code provides that an exchange of common stock for common stock in the same corporation is not recognized (§1036). Gain or loss is not recognized and the taxpayer's basis carries over. As a result, the employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $25 per share ($2,000). The employee's basis in the other 20 shares is $1,000, or $50 per share. This is the amount of income recognized on the exercise of the 100 options ($50 less $40 times 100 shares). On the subsequent sale of the 80 shares or the 20 shares, the employee will recognize gain to the extent the sale price exceeds the basis. For the purpose of the holding period required for long-term capital gain treatment, the 80 exchanged shares will be considered to be acquired on the date the old 80 shares were acquired, and the new 20 shares will be considered to be acquired on the date the shares are transferred to the

3

employee.

**Example 3, NQO exercised with previously acquired NQO stock held at a gain.** The facts are the same as in Example 2 except that the employee uses stock acquired by exercise of a NQO to pay the option price. The results are the same as in Example 2 in that the gain on the old shares is non-recognized.

**Example 4, NQO exercised with previously acquired ISO post-holding period stock held at a gain.** The facts are the same as in Example 2, except that the employee uses stock acquired by exercise of an ISO and the employee held the stock for the ISO holding periods (two years from grant, one year from transfer on exercise, as described in Example 12). The result is the same as in Example 2 in that the gain on the old stock is not recognized. However, in this Example 4 the non-recognized gain is likely to be larger because the gain includes the non-recognized gain that was realized on exercise of the ISO (see Examples 9 and 17) regarding exercise of an ISO).

**Example 5, NQO exercised with previously acquired ISO pre-holding period stock held at a gain.** The facts are the same as in Example 2, except that the employee uses stock acquired by exercise of an ISO, and the employee had not held that stock for the ISO holding periods (two years from grant, one year from transfer on exercise, as described in Example 12). The result is the same as in Example 2 in that gain on the 80 old shares will not be recognized. However, there are two differences. The non-recognized gain is likely to be larger because the gain includes the non-recognized gain that was realized on exercise of the ISO (see Examples 9 and 17 regarding exercise of an ISO). Secondly, there are special disqualifying disposition rules that apply when ISO stock is disposed of before the two-year and one-year holding periods are satisfied. These requirements will carry over to the new 80 shares of stock. These rules are described in Example 12. To illustrate, if the employee sold the new 80 shares within two years from the grant of the ISO, or within one year from the transfer of the ISO stock on exercise of the ISO, the gain recognized would be taxable as ordinary income to the extent that the market value of the ISO stock on the date of the grant of the ISO exceeded the ISO option price.

**Example 6, NQO exercised with previously owned stock held at a loss.** In April 2004 the value of the stock is $50 per share. The employee exercises an option granted in 2003 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) previously acquired in the market for $75 per share. The employee will be treated as having exchanged 80 old shares for 80 new shares. This exchange is non-recognized as an exchange of common stock for common stock in the same corporation. The employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $75 per share ($6,000). The employee's basis in the other 20 shares is $1,000 or $50 per share. This is the amount of income recognized on the exercise of the 100 options ($50 - $40 times 100 shares). For the purpose of the more than one year holding period required for lower capital gains rates, the 80 exchanged shares will be considered to be acquired on the date the 80 old shares were acquired, and the 20 new shares will be considered to be acquired on the date the shares are transferred to the employee.

4

**Example 7, NQO, cash exercise with proceeds from sale of old shares sold at a loss, wash sale.** The facts are the same as in Example 6 except instead of transferring the old shares to the company to pay the exercise price, the employee sells 80 old shares on the stock market for $50 per shares, and on the settlement date pays the proceeds to the company to pay the option price. Under the wash sale rules, the employee is not allowed to recognize the capital loss on the shares because he purchased identical shares within 30 days of the sale. His basis in the old shares will carry over and become his basis in the 80 new shares. If he sold the old shares more than 30 days before, or more than 30 days after, the exercise of the option, he would be allowed a capital loss on the sale. In general, a capital loss can be used to offset capital gain, and a net loss can be deducted, subject to a $3,000 per year limitation. A capital loss not used in a year can be carried over and used in subsequent years.

## INCENTIVE STOCK OPTIONS (ISO)

### *ISO requirements*

An option must meet certain requirements to qualify as an incentive stock option. Each option that will be issued by the Company under the Company's 2004 Performance Incentive Plan will state whether the option is intended to qualify as an ISO, or is intended to be a non-qualified option. Generally, the requirements for an ISO include that the option price is not less than the value of the stock on the date of grant, the option is non-transferable, the term is not longer than 10 years, the plan under which the options are granted is approved by the shareowners, and the option does not contain a statement that it is intended to be a non-qualified option.

If the option qualifies as an ISO, and if certain requirements are met, the employee will receive ISO tax treatment. In general, these requirements are that the amount of stock covered by the option is within the annual limitation, the stock is held for the required ISO holding period, and the employment test is met.

If the requirements for ISO treatment are met, no income is recognized on exercise of the option (except for the purpose of the AMT). The employee's basis in the acquired stock is equal to the price paid for the stock. On the subsequent sale of the stock, the employee recognizes gain to the extent that the amount received exceeds his basis in the stock. The gain is taxed as capital gain. The capital gain rate that applies depends on the holding period. If the stock is held for more than one year from the date of exercise, the gain will be taxed at 15%.

**Example 8, ISO cash exercise.** On December 15, 2003, the employee is granted an ISO to purchase 150 shares at $25 per share. On December 16, 2004, the employee exercises the ISO for 150 shares, which are transferred to him on that date, and he pays the option price of $25 per share in cash. The market value of the stock at the time of exercise is $30. On January 20, 2006, the employee sells the stock for $40 per share. The employee does not recognize income at the time of exercise (except for the purpose of the AMT). His basis in the shares is $25, the price he paid. On the sale of the stock he recognizes gain of $15 per share ($40 sale price less $25 basis). The total gain of $2,250 ($15 per share times 150 shares) is taxable as a long-term capital gain at the 15% rate

5

because the stock was held for more than one year.

### Example 9 (Omitted)

*Alternative Minimum Tax (AMT)*

The alternative minimum tax or AMT is tax policy affected by schizophrenia. If a taxpayer would pay too little income tax because of the use of special tax provisions that provide favorable treatment of expenses or income items, the taxpayer might incur a liability under the AMT. The AMT is intended to prevent Congress from being embarrassed by newspaper reports of high-income taxpayers paying little of no tax. To prevent this, the AMT provides an overriding tax structure that applies if it produces a higher tax in any year than the regular tax. The 2003 tax legislation increases the exemption amount for some taxpayers.

The concept is this. The taxpayer computes his income in the regular way and than computes his regular income tax. He then computes his alternative minimum taxable income by adjusting his regular income for special items, sometimes called tax preferences. Then he computes his alternative minimum tax by applying the special AMT rates. To the extent that the AMT exceeds the regular tax, the taxpayer must pay the excess. However, he can get the AMT payment back in later years; he can claim a credit for the AMT payment in a subsequent year to the extent that the regular tax exceed the AMT in the subsequent year. Further, there may be offsetting adjustments to income in a subsequent year.

For the purpose of the AMT, the spread on an ISO (the difference between the option price and value of the stock on the date of exercise of the option) is an item of tax preference. This means that in computing alternative minimum taxable income for the year of exercise of an ISO, the taxpayer must include in income for AMT purposes the amount of the spread. However, in the case of the ISO preference, an offsetting adjustment will occur when the taxpayer sells the stock he acquired by exercising the ISO. More particularly, in the year of sale, for the purpose of computing the alternative minimum taxable income, the taxpayer increases his basis in the stock by the amount of the spread that was include in income as a preference, and takes a negative adjustment to alternative minimum taxable income for the year of sale. This will tend to make ATM less than the regular tax in the year of sale, thus supporting the taxpayer taking a credit in the year of sale for any AMT that was paid in the year of exercise of the option.

Whether the employee will incur an AMT liability in the year of exercise, and when he will be able to recover any AMT that had to be paid, depends on numerous factors affecting the returns for the year involved. It is often difficult to predict the outcome without reviewing all of the facts. Preparing pro-forma AMT calculations to show the amount of liability for the tax and the timing of the expected recover of any AMT payments is often helpful. Even if some AMT tax is incurred and it not recoverable for a period of time, there may still be substantial overall saving to an employee by exercising an ISO and holding the stock for the requisite holding period.

As a generalization, among the items includable in alternative minimum taxable income are

state taxes and ISO spread. There is an exempt amount which functions as a deduction against alternative minimum taxable income. The exempt amount varies with marital status and phases out as income exceeds specified levels. The tax rates for the AMT are 26% stepping up to 28%, with a 15% rate on long-term gains. Factors that help to avoid the AMT are low levels of preferences, lower income levels that preserve the exempt amount, or higher regular income tax rates that cause the total to exceed the AMT.

## *Annual limitation*

There is an annual $100,000 limitation on the amount of options that can qualify as ISOs. Each calendar year is tested separately. All options held by an employee that first become exercisable in the year are tested. Options cannot qualify as ISOs to the extent that the value of the stock covered by the options exceeds $100,000. The value of the stock for this purpose is the value of the stock on the date of the grant of the option.

The $100,000 limitation is applied separately for each year, but it is applies to all options regardless of when the option was granted, if the option first becomes exercisable in the testing year for all or any portion of the stock covered by the option. For example, a company granted an option in year one for 3,000 shares at $25, which is exercisable for 1,000 shares in year 2, 1,000 shares in year 3, and 1,000 shares in year 4. In year 2 the company granted an option for 3,000 shares at $30 which is exercisable for 1,000 shares in year 3, 1,000 shares in year 4, and 1,000 shares in year 5. In applying the $100,000 limitation, in year 2 there would be 1,000 shares valued at $25 for which the options first became exercisable ($25,000). In year 3 there would be would be two relevant options: i) the year 1 option that becomes exercisable for 1,000 shares at $25 ($25,000), and ii) the year 2 options that becomes exercisable for 1,000 share valued at $30 ($30,000), for a total for year 3 of $55,000.

**Example 10, $100,000 limitation.** To simplify this example, it is assumed the options become exercisable for all shares one year after the grant, rather than one third of the shares become exercisable each year. The company issues options meeting the ISO requirements to an employee in December 2003 covering $75,000 in stock valued as of December 2003. In December 2004 the 1998 options first become exercisable under the terms of the options that provide for exercise one year after grant. In December 2004 the Company issues options to the same employee covering $100,000 of stock, valued as of December 2004. In December 2004 there is a change of control of the company that causes the 2004 options to become immediately exercisable. As a result, $175,000 of purported ISOs would first become exercisable in 2004. The limitation would provide that the 2003 options covering $75,000 of stock continue to be eligible for ISO treatment. Only $25,000 of the 2004 options qualifies for ISO treatment. The $75,000 of excess 2004 options is treated as non-qualified options. The same result would occur if the company inadvertently issued options in excess of the $100,000 limitation.

## *Employment requirement*

To receive ISO treatment, the employee must have been an employee of the Company or a

subsidiary thereof from the date of grant of the option until at least within three (3) months of exercise of the option. If the employee were disabled, a one-year period would apply rather than a three-month period. For this purpose disabled means that the employee is unable to engage in any gainful employment by reason of physical or mental impairment which can be expected to result in death or last for a continuous period of at least 12 months.

**Example 11, employment test.** The employee is granted an ISO on December 16, 2002 to purchase 100 shares at $25 per share. On January 31, 2007, the employee retires from the company. On June 1, 2007, when the value of the stock is $95 per share, the employee exercises the ISO, paying the option price in cash. The employee recognizes ordinary income in the amount of $7,000 ($95 value less $25 option price times 100 shares). The exercise of the option does not comply with the ISO requirements because the option was not exercised within three months of the employee's termination of employment. The employee's basis in the shares is $9,500 ($25 option price plus $70 income times 100 shares).

*Holding periods*

In order to receive ISO treatment, the employee must hold the stock both: i) for two years from the date of grant of the option, and ii) one year from the date the stock is transferred to the employee on exercise of the option. If stock is disposed of before this time, the disposition is a disqualifying disposition and generally results in the employee recognizing ordinary income for the difference between the option price and value of the stock on the date of exercise, and capital gain for any increase in value after the date of exercise. For this purpose, stock is considered disposed of if it is sold, given away, or used to pay the option price on exercise of another ISO. (It may not be a disqualifying disposition for ISO stock to be used to pay the option price on an NQO. See Example 5.)

**Example 12, ISO disqualifying disposition by sale at a gain over value on date of exercise.** On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 1, 2004, the employee sells the stock on the stock exchange for $40 per share. The sale is a disqualifying disposition for two reasons. The stock was sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee recognizes ordinary income in the amount of $750 (the difference between the option price of $25 and the $30 value of the stock on the date of exercise, times 150 shares) and $1,500 of capital gains (the difference between the $40 sale price and the basis of $30 per share, which is the option price plus the amount of ordinary income recognized, times 150 shares). Both the ordinary income and the capital gain are recognized for the employee's 2004-tax year. The capital gain is short-term because the stock was not held for more than one year.

**Example 13, ISO disqualifying dispositions by sale at less than the stock value on date of exercise.** On December 16, 2002, an employee is granted an ISO. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On

8

December 1, 2004, the employee sells the stock on the stock exchange for $28 per share. The sale is a disqualifying disposition for two reasons. The stock was sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee recognizes ordinary income in the amount of $450 (the difference between the option price of $25 and the $28 value of the stock on the date of sale, times 150 shares). He does not realize any capital gain because the employee's basis would be the same as the sale price. (The income would be limited to the amount that the sale price exceeded the exercise price because of a special rule that applies when the stock is disposed of in a transaction in which a loss would be recognized, such as a sale to a third party.)

If, however, the stock was disposed of in a transaction in which a loss would not be recognized, for example, the property was given away, sold to a spouse, or sold in a wash sale, the ordinary income amount would be equal to the spread between the option price and the value or the stock at the time of exercise ($30-$25). See Example 15. The income is recognized for the employee's 2004-tax year.

**Example 14, ISO disqualifying dispositions by sale at less than option prices.** On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 1, 2004, the employee sells the stock on the stock exchange for $23 per share. The sale is a disqualifying disposition for two reasons. The stock was sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee would not recognize any ordinary income since the sale price is less than the option price, and the employee would recognize a capital loss of $300, the difference between the option price paid for the shares and the sale price ($25 less $23 times 150 shares). No ordinary income was recognized because of a special rule that applies when the stock is disposed of in a transaction in which a loss would be recognized. If, on the other hand, the property were disposed of in a transaction on which a loss would not be recognized, for example, the property was given away, sold to a spouse, or sold in a wash sale, the ordinary income amount would be equal to the spread between the option price and the value at the time of exercise. See Example 15. The capital loss would be recognized for the employee's 2004-tax year.

**Example 15, ISO disqualifying disposition by gift.** On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 2, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 2, 2004, the employee gives the stock to his son. The gift constitutes a disqualifying disposition for two reasons. The stock was disposed of within two years of the grant of the option, and the stock was disposed of within one year from the exercise of the option and the transfer of the stock to the employee. The effect of the gift would be as follows:

   i) If the value of the stock on the date of the gift were $40 per share, the employee would recognize ordinary income of $750 (the difference between the $30 value of the stock on the date of exercise of the option and the $25 exercise price). The son's basis in the stock would be the same as the employee's basis, $30 per share, the option price, plus the income recognized.

9

ii) If the value of the stock on the date of the gift were $20 per share, the employee would recognize ordinary income of $750 (the difference between the $30 value of the stock on the date of exercise of the option and the $25 exercise price). The employee's basis in the stock would be $30 per share. The employee would not be allowed to recognize a capital loss because the disposition was a gift. The son's basis in the stock would depend on subsequent circumstances. For determining gain on sale of the stock, the employee's basis of $30 per share would carry over and become the son's basis. For determining a loss on the sale of the stock, the son's basis would be $20 per share, the value of the stock on the date of the gift.

**Example 16, ISO exercise with pre-holding period ISO stock.** In November 2005, the value of the stock is $50 per share. The employee exercises an ISO granted in 2004 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) acquired in December 2004 for $25 per share by exercise of an ISO that had been granted in December 2003. In December 2004 the value of the stock was $30 per share. The two-year holding period would not be met for the 2003 ISO stock, and therefore there is a disqualifying disposition of the 2003 ISO stock. For tax purposes, two transactions will occur in 2000: the exchange of 80 old shares for 80 new shares, and the transfer of 20 additional new shares to the employee.

<u>Exchange of 80 shares.</u> A special rule applies in this case where and ISO is exercised with ISO stock that was not held for the ISO holding periods. Gain is recognized on the exchange of old ISO stock for new ISO stock, although a loss would not be recognized because of the wash sale rules. As a result, the employee recognizes gain in the amount of $2,000, the difference between his basis in the old stock ($25 times 80 shares equals $2,000) and the value of the new stock ($50 times 80 shares equals $4,000). This $2,000 gain consists of two elements:

i) $400 will be taxed as ordinary income, the difference between the option price for the old stock and the value of the stock on the date of exercise of the first option ($30 less $25 times 80 shares);

ii) $1,600 will be taxed as capital gain, the difference between the value of the stock on the date of exercise of the second option, and the sum of the employee's basis in the old stock and the ordinary income recognized on the exchange [$50 less ($25 plus $5) times 80 shares]. The capital gain would be short-term because the stock did not satisfy the more than one-year holding period.

The employee's basis in the 80 new shares will be $50 per share, reflecting his cost of $25 for the old shares, and the $25 of ordinary income and gain recognized on the exchange for the new shares. For the purpose of the more than one-year holding period required for the lower capital gains rates, the 80 exchanged shares will be considered to be acquired on the date the new shares are transferred to the employee.

<u>20 additional new shares.</u> The 20 additional new shares that the employee receives on

10

exercise of the second ISO will be eligible for ISO treatment. Therefore the employee will not recognize income at the time of exercise, and he will be eligible for capital gain treatment on the sale of the stock if the holding periods and employment tests are satisfied. The employee's basis in the 20 shares will be zero since he will have recognized no income with respect to the shares. For the purpose of the more than one-year period required for lower capital gain rates, the new 20 shares will be considered to be acquired on the date the shares are transferred to the employee.

   **Example 17, ISO exercise with post holding period ISO stock.** In April 2005 the value of the stock is $50 per share. The employee exercises an ISO granted in 2003 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) acquired in December 2002 for $25 per share by exercise of an ISO that had been granted in December 2001. Because both holding periods are met for the 1995 ISO stock, use of the stock to pay the option price is not a disqualifying disposition. The employee will be treated as having exchanged 80 old shares for 80 new shares. This exchange is non-recognized as an exchange of common stock for common stock in the same corporation. The employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $25 per share ($2,000). The employee's basis in the other 20 shares is zero, because he did not recognize any income on exercise of the ISO. For the purpose of the more than one year holding period required for the lower capital gain rates, the 80 exchanged shares will be considered to be acquired on the date the old 80 shares were acquired, and the new 20 shares will be considered to be acquired on the date the shares are transferred to the employee.

   **Example 18, ISO exercise with NQO stock.** The facts are the same as Example 17 except the stock used to pay the exercise price was acquired by exercise of a NQO. The result is the same as Example 17 except there is no issue of a disqualifying disposition because no ISO stock was used to pay the exercise price.

                                                        R. G. Martinell

N:\CAK\Stock Option File\Tax memo re stock options for 2004 PIP.doc

INTERNATIONAL TRUCK AND ENGINE CORPORATION
Case 1:08-cv-03038   Document 1-4   Filed 05/23/2008   Page 1 of 2
T 630-753-3052
F 630-753-3156

ANNETTE FREUND – VICE PRESIDENT, COMPENSATION, BENEFITS AND HR SUPPORTS

08CV3038                    TG
JUDGE DARRAH
January 15, 2008    MAGISTRATE JUDGE NOLAN

To: Holders of Navistar International Corporation
     Stock Options

Re: Stock Option Statement

Enclosed is your Navistar International Corporation (the "Company") Stock Option Statement as of December 31, 2007.

As you may already know, the Company is not current with its financial filings with the Securities and Exchange Commission. As a result, there are certain limits on your ability to exercise your stock options.

In addition, some of your stock options may have expired or will expire in the near future. We plan to address this issue but we are unable to do so now. Once we file our Form 10-K for the 2006 fiscal year and the 2007 fiscal year, and become current with our quarterly reports for fiscal year 2008, our plan is to discuss this issue with our Board of Directors. We cannot predict what, if any, action our directors will take, but we will communicate with you, no matter what the outcome, once that process is completed.

The attached page summarizes how certain stock option transactions will be handled until the Company becomes current with its financial reporting.

In the meantime, if you have any questions that are not answered here or if you plan to conduct any stock option transactions during this time, please contact Howard Kuppler at (630) 753-2149.

Sincerely,

*Annette*

Attachments

XOP1255NAV

## TRANSACTION SUMMARY

| Transaction Type | Action that Can be Taken |
|---|---|
| Cashless Exercise of Stock Options | NOT ALLOWED until the Company is current with its public filings. |
| Cash Exercise of Stock Options | Allowed if optionee exercising stock options is an accredited investor see below for definition of accredited investor), however shares issued would be restricted and any sale of the shares would be governed by Rule 144 (See Rule 144 below). |
| Stock Swap Exercise of Stock Options | Allowed if optionee exercising the options is an accredited investor (see below for definition of accredited investor), however shares issued would be restricted and any sale of the shares would be governed by Rule 144 (See Rule 144 below). |

1. Definition of Accredited Investor:  (i) is a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of the purchase of the securities exceeds $1,000,000; or (ii) is a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

2. Summary of Rule 144:  Shares can only be sold after 2 years if not an affiliate of the Company *or* until 1 year has passed and all of the Company's financial statement filings are current.  Any sale must also comply with the other limitations of Rule 144.

XOP1255NAV

EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) | Case No. 08-cv-03038 |
| v. | ) ) | Judge John W. Darrah |
| NAVISTAR INTERNATIONAL CORPORATION, | ) ) | Magistrate Judge Nan R. Nolan |
| Defendant. | ) ) ) | |

MOTION TO DISMISS
FOR LACK OF SUBJECT-MATTER JURISDICTION

Pursuant to Fed. R. Civ. P. 12(b)(1) and for the reasons that will be set forth more fully as

necessary in a memorandum of law to be submitted in support of this motion, Defendant

Navistar International Corporation ("Navistar") hereby moves to dismiss this action for lack of

subject-matter jurisdiction. In support of this motion, Navistar states as follows:

1.      The Class Action Fairness Act ("CAFA") was enacted by Congress in 2005 in

response to perceived abuses of the class action device. See, e.g., Hart v. FedEx Ground

Package Sys., Inc., 457 F.3d 675, 681 (7th Cir. 2006).

2.      CAFA provides federal jurisdiction over certain class actions. See 28 U.S.C.

§§ 1332(d)(2), 1332(d)(5)(B).

3.      Plaintiff Ravi P. Rawat ("Plaintiff") purports to premise jurisdiction over this case

under CAFA. See Plaintiff's Complaint at ¶ 2.

4.      As the party alleging federal jurisdiction under CAFA, Plaintiff bears the burden

of establishing that each of the jurisdictional criteria specified in the statute are satisfied. See,

e.g., Brill v. Countrywide Home Loans, Inc., 427 F.3d 446, 447 (7th Cir. 2005).

5.    Jurisdiction under CAFA does not exist if "the number of members of all proposed plaintiff classes in the aggregate is less than 100." See 28 U.S.C. § 1332(d)(5)(B); see also, e.g., Brill, 427 F.3d at 447.

6.    The class proposed in Plaintiff's Complaint is defined as "All individuals whose vested options expired during Navistar's 'blackout period'." See Plaintiff's Complaint at ¶ 36. Fewer than seventy-five (75) persons, however, would be members of the proposed class if certified. See Declaration of Monica Stark, Ex. A hereto, at ¶ 6.

7.    The class proposed by Plaintiff consists of fewer than seventy-five (75) individuals. See Declaration of Monica Stark, Ex. A hereto, at ¶ 6. Therefore, subject-matter jurisdiction is lacking over Plaintiff's Complaint, and the Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).[1] See, e.g., Sprint Spectrum L.P. v. City of Carmel, 361 F.3d 998, 1001 (7th Cir. 2004).

WHEREFORE, Navistar respectfully requests that Plaintiff's Complaint be dismissed for lack of subject-matter jurisdiction. Navistar further requests whatever other relief the Court deems appropriate.

Dated:  June 26, 2008                    Respectfully submitted,

                                         /s/Cary R. Perlman
                                         One of the Attorneys for Defendant
                                         Navistar International Corporation

---

[1]    Even if Plaintiff were able to meet his burden of establishing each of the elements of CAFA, this case would still be properly dismissed for lack of subject-matter jurisdiction pursuant to one or more of the exceptions to CAFA jurisdiction enumerated in the statute. See 28 U.S.C. §§ 1332(d)(4)(A)-(B). Since Plaintiff cannot meet his initial burden, however, these exceptions need not be addressed at this time. See disc. supra at ¶¶ 6-7.

Laurence H. Levine
Maaike S. Almeida
LAURENCE H. LEVINE LAW OFFICES
190 South LaSalle Street, Suite 3120
Chicago, Illinois 60603
Phone: (312) 291-7000
Fax: (312) 291-7015

Cary R. Perlman
Mark S. Mester
Robin M. Hulshizer
Robert C. Levels
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, Illinois 60606
Phone: (312) 876-7700
Fax: (312) 993-9767

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | ) ) ) | |
| | ) | Case No. 08-cv-03038 |
| Plaintiff, | ) ) | |
| v. | ) ) | Judge John W. Darrah |
| NAVISTAR INTERNATIONAL CORPORATION, | ) ) ) | Magistrate Judge Nan R. Nolan |
| Defendant. | ) ) | |

**DECLARATION OF MONICA STARK**

Pursuant to 28 U.S.C. § 1746, Monica Stark, hereby declares and states as follows:

    1.      I have been employed by Navistar for approximately six years.

    2.      I am currently the Director, Corporate Compensation and Human Resources Policy at Navistar.

    3.      I have personal knowledge of the facts set forth herein and am competent to testify with respect thereto.

    4.      In my position at Navistar, I work on executive compensation including stock options.

    5.      I have records of all individuals whose vested stock options expired during Navistar's trading restriction "blackout period," which began on April 6, 2006.

    6.      There are fewer than 75 (and certainly far fewer than 100) employees and former employees whose vested stock options have expired from April 6, 2006 to the present date.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 26, 2008.

_Monica L. Stark_
Monica Stark

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RAVI P. RAWAT, on behalf of himself and others similarly situated,** | ) ) | |
| | ) | **Case No. 1:08-cv-03038** |
| **Plaintiff,** | ) ) | |
| v. | ) | **Judge John W. Darrah** |
| | ) | |
| **NAVISTAR INTERNATIONAL CORPORATION,** | ) ) | **Magistrate Judge Nan R. Nolan** |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM IN SUPPORT OF NAVISTAR'S
MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION**

Defendant Navistar International Corporation ("Navistar" or the "Company") submits the following memorandum of law in support of its motion to dismiss the Complaint filed by Plaintiff Ravi P. Rawat ("Plaintiff" or "Rawat") for lack of subject-matter jurisdiction:

## I.    INTRODUCTION

As reflected in Plaintiff's Complaint, federal jurisdiction over this case is premised exclusively upon the Class Action Fairness Act ("CAFA"), enacted by Congress in 2005. Jurisdiction exists under CAFA, however, only if the proposed class consists of more than one hundred (100) persons. In this case, the undisputed and indisputable evidence fully confirms that Plaintiff's proposed class numbers far fewer than one hundred (100) persons.

The class proposed by Plaintiff and his counsel consists of "[a]ll individuals whose vested options expired during Navistar's 'blackout period.'" See Plaintiff's Complaint at ¶ 36. As reflected in the declaration of Monica Stark, however, which was submitted with Navistar's motion and is also included as Exhibit A to this memorandum, the vested options of fewer than seventy-five (75) persons expired during the blackout period. See Declaration of Monica Stark ("Stark Decl."), Ex. A hereto, at ¶ 6. In fact, the exact number of individuals whose vested stock

options expired during the blackout period is fifty-six (56).  See Supplemental Declaration of

Monica Stark ("Suppl. Stark Decl."), Ex. B hereto, at ¶ 9.  While this fact should have been

apparent to Plaintiff's counsel if an adequate pre-filing inquiry had been conducted, the size of

Plaintiff's proposed class is not properly in dispute, and there is likewise no dispute that subject-

matter jurisdiction is lacking over this case.  Accordingly, this case should be dismissed.

## II.    FACTUAL BACKGROUND

The factual background for this motion is set forth below.  See disc. infra at 2-3.

### A.    Navistar

Navistar is a corporation organized under the laws of the State of Delaware.  See

Plaintiff's Complaint at ¶ 6; see also Suppl. Stark Decl., Ex. B hereto, at ¶ 4.  Navistar's

principal place of business is located in Warrenville, Illinois.  See Plaintiff's Complaint at ¶ 6;

see also Suppl. Stark Decl., Ex. B hereto, at ¶ 5.

In certain circumstances, Navistar grants stock options to high-level executives and

senior members of management.  See Suppl. Stark Decl., Ex. B hereto, at ¶ 7.  As a result of not

being current with financial filings, however, there were certain limits on the ability of specified

individuals to exercise their vested stock options.  See Jan. 15, 2008 Corresp. fr. A. Freund to

Holders of Navistar International Corporation Stock Options, Ex. 3 to Plaintiff's Complaint.

During this period when restrictions were in effect, the vested options of fewer than seventy-five

(75) individuals expired, with the actual number being fifty-six (56).  See Stark Decl., Ex. A

hereto, at ¶ 6; Suppl. Stark Decl., Ex. B hereto, at ¶ 9.

### B.    Plaintiff's Complaint

Plaintiff filed his Complaint on May 23, 2008.  See Plaintiff's Complaint at 1.  Like

Navistar, Plaintiff is a citizen of the State of Illinois.  See id. at ¶ 5.  As reflected in the

Complaint, however, this Court's subject-matter jurisdiction is premised exclusively upon 28

U.S.C. § 1332(d) (i.e., CAFA). See id. at ¶ 2 ("This Court has jurisdiction over all claims

asserted herein pursuant to 28 U.S.C. §1332(d) . . .").

In the Complaint, Plaintiff and his counsel seek certification of a class of persons

pursuant to Fed. R. Civ. P. 23. See Plaintiff's Complaint at ¶ 35. The class proposed by Plaintiff

is defined in the Complaint as follows:

> All individuals whose vested options expired during Navistar's
> "blackout period."

Id. at ¶ 36; see also id. at ¶¶ 8-13. Plaintiff alleges two counts on behalf of the proposed class

and seeks money damages as well as injunctive relief. See id. at ¶¶ 43-53.

### III.     APPLICABLE LEGAL STANDARDS

"[F]ederal courts are courts of limited jurisdiction." See Owen Equipment & Erection

Co. v. Kroger, 437 U.S. 365, 374 (1978); see also Fed. R. Civ. P. 12(h)(3) ("If the court

determines at any time that it lacks subject matter jurisdiction, the court must dismiss the

action."). Accordingly, the burden of demonstrating jurisdiction lies with the proponent of

federal jurisdiction itself. See, e.g., Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375,

377 (1994); Sprint Spectrum L.P. v. City of Carmel, 361 F.3d 998, 1001 (7th Cir. 2004).

Moreover, the case law that has developed in the wake of CAFA makes clear that the party

asserting jurisdiction under CAFA has the burden of demonstrating that each of the prerequisites

of the statute are met. See, e.g., Fiddler v. AT & T Mobility, LLC, No. 08 C 416 (SDY), 2008

WL 2130436, at *1 (N.D. Ill. May 20, 2008); Bullard v. Burlington N. Santa Fe Ry. Co., No. 07

C 6883 (MFK), 2008 WL 2315852, at *1 (N.D. Ill. April 10, 2008).

On a motion brought pursuant to Fed. R. Civ. P. 12(b)(1), "[i]t is settled law that a federal

court determining whether it has jurisdiction may look beyond the face of the plaintiff's

complaint to resolve factual disputes." See Rennie v. Garrett, 896 F.2d 1057, 1057-58 (7th Cir.

3

1990).  Thus, the court may "view whatever evidence has been submitted on the issue to

determine whether in fact subject matter jurisdiction exists."  See Grafon Corp. v. Hausermann,

602 F.2d 781, 783 (7th Cir. 1979); see also, e.g., Capitol Leasing Co. v. FDIC, 999 F.2d 188, 190

(7th Cir. 1993); Beam v. Gonzalez, No. 07 C 1227, 2008 U.S. Dist. LEXIS 17763, at *8 (N.D.

Ill. March 7, 2008).  Indeed, it is the "first duty of the court" to make certain that federal

jurisdiction exists.  See Sadat v. Mertes, 615 F.2d 1176, 1188 (7th Cir. 1980) (citing Hart &

Wechsler's The Federal Courts and the Federal System 835 (2d ed. 1973)).

## IV.    SUBJECT-MATTER JURISDICTION IS LACKING UNDER CAFA BECAUSE THE PROPOSED CLASS HAS FAR FEWER THAN ONE HUNDRED MEMBERS

The prerequisites for federal jurisdiction under CAFA are well-established in the statute

and the case law.  See, e.g., 28 U.S.C. § 1332(d); Hart v. FedEx Ground Package Sys., Inc., 457

F.3d 675, 679 (7th Cir. 2006).  As the party seeking to invoke federal jurisdiction, Plaintiff bears

the burden of proving that each of the following prerequisites of CAFA are satisfied: (1) any

member of the proposed class is a citizen of a state different from any defendant (i.e., minimal

diversity exists); (2) the proposed class consists of more than one hundred (100) members; and

(3) the amount in controversy exceeds $5 million, aggregating all claims and exclusive of

interests and costs.  See 28 U.S.C. §§ 1332(d)(2), 1332(d)(5)(B); see also, e.g., Hart, 457 F.3d at

679; Brill v. Countrywide Home Loans, Inc., 427 F.3d 446, 447 (7th Cir. 2005).

This Court lacks subject-matter jurisdiction because the class proposed by Plaintiff

consists of far fewer than one hundred (100) members.  See 28 U.S.C. § 1332(d)(5)(B); Stark

Decl., Ex. A hereto, at ¶ 6.  Plaintiff defines the proposed class as "[a]ll individuals whose vested

options expired during Navistar's 'blackout period.'"  See Plaintiff's Complaint at ¶ 36.  The

number of individuals whose vested options actually expired during this time period, however, is

fifty-six (56) and far fewer than one hundred (100), as established by the declarations of Monica

4

Stark, who is the Director of Corporate Compensation and Human Resources Policy at Navistar. See Stark Decl., Ex. A hereto, at ¶¶ 2, 6; Suppl. Stark Decl., Ex. B hereto, at ¶¶ 2, 9.

Because the class proposed by Plaintiff and his counsel numbers far fewer than one hundred (100) individuals, the jurisdictional prerequisites of CAFA have not been and cannot be satisfied. See, e.g., Bullard, 2008 WL 2315852, at *2 (holding that the proponent of jurisdiction has the burden to prove there are one hundred (100) or more class members). Therefore, this case should be dismissed for lack of subject-matter jurisdiction. See, e.g., Sprint Spectrum L.P., 361 F.3d at 1001.

It is worth noting, however, the gross disparity between the Complaint and reality. See, e.g., Retired Chicago Police Ass'n v. Fireman's Annuity and Benefit Fund of Chicago, 145 F.3d 929, 934 (7th Cir. 1998) (Kanne, J.); 5 Herbert Newberg & Alba Conte, Newberg on Class Actions § 15:2, at 8-11 (4th ed. 2002). Counsel's error is clear when one tries to reconcile the fact that the Complaint speciously alleges that the number of putative class members to be "in the thousands" (see Plaintiff's Complaint at ¶ 37), even though Mr. Rawat is undoubtedly aware that stock options are awarded by Navistar only to high-level executives and senior members of management, a group that scarcely numbers "in the thousands." See id.; Suppl. Stark Decl., Ex. B hereto, at ¶ 7. Indeed, Plaintiff's counsel apparently failed to even read the documents attached to Plaintiff's own Complaint, which unequivocally signal that the proposed class does not number "in the thousands." See Navistar's 2004 Performance Incentive Plan, Ex. 1 to Plaintiff's Complaint, at 2. For example, Navistar's 2004 Performance Incentive Plan Prospectus describes who is eligible to receive stock options:

> Management will, from time to time, select and recommend to the Committee employees of the Company and its subsidiaries who are to become participants in the 2004 Plan. Such individuals will be selected from those who, in the opinion

of management, have substantial responsibility in a managerial or professional capacity.

Navistar's 2004 Performance Incentive Plan, Ex. 1 to Plaintiff's Complaint, at 2 (emphasis supplied).

For Plaintiff's counsel to allege in the Complaint that the proposed class numbers "in the thousands" given such language is telling. Compare Navistar's 2004 Performance Incentive Plan, Ex. 1 to Plaintiff's Complaint, at 2, with Plaintiff's Complaint at ¶ 37. In fact, it reflects a lack of a pre-filing inquiry and the filing of suit in the hope of taking discovery to see if a claim can somehow be found. See, e.g., Retired Chicago Police Ass'n, 145 F.3d at passim. Discovery, however, is no substitute for complying with Rule 11 obligations, and this suit should be subject to summary dismissal. See id.; 28 U.S.C. § 1332(d)(5)(B); Hart, 457 F.3d at 679.

## V.     CONCLUSION

For the reasons stated above, Navistar respectfully request that this action be dismissed, pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction. Navistar further requests whatever other relief the Court deems appropriate.

Dated:  July 9, 2008

Respectfully submitted,

/s/Mark S. Mester
One of the Attorneys for Defendant
Navistar International Corporation

Laurence H. Levine
Maaike S. Almeida
LAURENCE H. LEVINE LAW OFFICES
190 South LaSalle Street, Suite 3120
Chicago, Illinois 60603
Phone: (312) 291-7000
Fax: (312) 291-7015

Cary R. Perlman
Mark S. Mester
Robin M. Hulshizer
Robert C. Levels
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, Illinois 60606
Phone: (312) 876-7700
Fax: (312) 993-9767

## INDEX OF EXHIBITS

**Exhibit A:**               **Declaration of Monica Stark**

**Exhibit B:**               **Supplemental Declaration of Monica Stark**

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 08-cv-03038 |
| v. | ) ) | |
| NAVISTAR INTERNATIONAL CORPORATION, | ) ) ) | Judge John W. Darrah |
| | ) | Magistrate Judge Nan R. Nolan |
| Defendant. | ) ) | |

### DECLARATION OF MONICA STARK

Pursuant to 28 U.S.C. § 1746, Monica Stark, hereby declares and states as follows:

1.      I have been employed by Navistar for approximately six years.

2.      I am currently the Director, Corporate Compensation and Human Resources Policy at Navistar.

3.      I have personal knowledge of the facts set forth herein and am competent to testify with respect thereto.

4.      In my position at Navistar, I work on executive compensation including stock options.

5.      I have records of all individuals whose vested stock options expired during Navistar's trading restriction "blackout period," which began on April 6, 2006.

6.      There are fewer than 75 (and certainly far fewer than 100) employees and former employees whose vested stock options have expired from April 6, 2006 to the present date.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 26, 2008.

_Monica L. Stark_
Monica Stark

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAVI P. RAWAT, on behalf of himself        )
and others similarly situated,             )
                                           )
                                           )        Case No. 1:08-cv-03038
                              Plaintiff,   )
                                           )
        v.                                 )
                                           )        Judge John W. Darrah
NAVISTAR INTERNATIONAL                     )
CORPORATION,                               )        Magistrate Judge Nan R. Nolan
                                           )
                              Defendant.   )

## SUPPLEMENTAL DECLARATION OF MONICA STARK

Pursuant to 28 U.S.C. § 1746, Monica L. Stark, hereby declares and states as follows:

1.      I have been employed by Navistar, Inc., a wholly-owned and primary operating

subsidiary of Navistar International Corporation ("Navistar") for approximately six years.

2.      I am currently the Director, Corporate Compensation and Human Resources

Policy at Navistar, Inc.

3.      I have personal knowledge of the facts set forth herein and am competent to

testify with respect thereto.

4.      Navistar is a corporation organized under the laws of the State of Delaware.

5.      Navistar's principal place of business is located in Warrenville, Illinois.

6.      In my position at Navistar, Inc., I work on executive compensation including

stock options.

7.      In certain circumstances, Navistar grants stock options to high-level executives

and senior members of management.

8.      I have reviewed Navistar's records pertaining to the individuals whose vested

stock options expired during Navistar's trading restriction "blackout period" in effect while

Navistar was not current with its financial filings with the Securities and Exchange Commission ("SEC"), beginning in 2006.

9.      There are fifty-six (56) individuals whose vested stock options expired during the period when trading restrictions were in effect while Navistar was not current with its financial filings with the SEC, beginning in 2006.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 9, 2008.

_Monica L. Stark_
Monica L. Stark

2

# EXHIBIT 6



**Navistar, Inc.**
4201 Winfield Road
Warrenville, IL 60555  USA

P : 630-753-3052
W : navistar.com

**Annette M. Freund**
Vice President,
Compensation, Benefits
and HR Support

June 20, 2008

Re:  Expired Stock Options

Dear _____;

As you know, until recently Navistar International Corporation (the "Company") has not been current with its Form 10-K filings with the Securities and Exchange Commission ("SEC").  During the time the Company was not current, there were limits on your ability to exercise your stock options.  The expiration date for certain stock options fell within the period when these limits were in effect.  In my letter to you of January 15, 2008, the Company identified the option expiration issue, informed you that we planned to address the issue with the Board of Directors, and promised to communicate with you again regarding the Board's decision.

On June 16, 2008, we raised these matters with the Board.  We are pleased to report that the Board has authorized us to extend to you a one-time opportunity to obtain a cash payment from the Company in resolution of any and all issues in connection with vested stock options that expired during the period when the above-described trading restrictions were in place (the "Expired Options").

The amount of your cash payment will be the difference between the closing price on the date your option expired and the exercise price for all of your options "in the money" on the option expiration date – *i.e.*, your payment will match the profit you would have made had you sold the shares at the end of the day the option expired, subject to applicable withholding taxes.  For example, if you had vested stock options exercisable at $25.00, and the stock closing price on the date those options expired was $65.00, we will pay you $40.00 times the number of Expired Options.  The payments available to **you** individually are set forth on the enclosed Statement of Offer (*Exhibit A*).  For your convenience, we have enclosed publicly available data reflecting the closing price of the Company's common stock on the option expiration date.

As consideration for the payment described in this letter, you must execute and return to the Company a release of claims in the form attached as *Exhibit B* to this letter ("Payment and Release").  The Payment and Release makes clear that your choice to accept the cash payment is a full and complete resolution of any and all claims you may have associated with the Expired Options.  Because the Payment and Release affects your rights and precludes litigation with the Company (including preclusion of your participation in the lawsuit described below), you should review it carefully before signing it.

On or about May 23, 2008, Mr. Ravi P. Rawat filed a putative class action complaint against the Company (the "Complaint") related to the option expiration issue. Mr. Rawat's Complaint was filed in the United States District Court for the Northern District of Illinois (Case No. 1:08-cv-03038), and it alleges that the Company breached stock option agreements with those who hold Expired Options. The Complaint also alleges that the Company breached "an implied covenant of good faith and fair dealing" in connection with the Expired Options. The Company does not believe that it has an obligation to compensate individuals for the Expired Options or that the claims set forth in the Complaint are valid, and we intend to vigorously contest all of the relief Mr. Rawat seeks.

This one-time opportunity will be available to you until August 1, 2008. If you choose to take advantage of this offer, the process will be as follows: *Execute the Payment and Release. Return it to Mr. Howard Kuppler, Navistar International Corporation, 4201 Winfield Road, P.O. Box 1488, Warrenville, IL 60555 **no later than August 1, 2008**. If we receive the executed Payment and Release on or before July 3, 2008, unless you direct otherwise we will mail a check in the amount of your payment, less applicable withholding taxes, to your home address on or before July 31, 2008. If we receive the executed Payment and Release on or before August 1, 2008, unless you direct otherwise we will mail a check in the amount of your payment, less applicable withholding taxes, to your home address on or before August 29, 2008.*

Your execution and return of the Payment and Release constitutes your acceptance of this offer.

If you have questions not answered in this letter, please contact Howard Kuppler at (630) 753-2149.

*Annette*

Attachments:

Exhibit A – Statement of Offer
Exhibit B – Payment and Release

Exhibit B

## **PAYMENT AND RELEASE**

Execution of this Payment and Release constitutes acceptance of the offer reflected in that certain letter dated June 20, 2008, from Annette Freund (the "Freund Letter").

**General Release.** For adequate and valuable consideration exchanged between the parties, the sufficiency of which is hereby acknowledged, _____ ("Releasor"), on behalf of Releasor and on behalf of Releasor's past, present and future respective predecessors, successors, heirs, assigns and any of the respective owners, members, managers, partners, principals, directors, officers, agents and employees of any of the foregoing, with full understanding of the contents and legal effect of this release, and having the right and opportunity to consult with counsel and a tax advisor, hereby releases and forever discharges Navistar International Corporation. (the "Company" or "Releasee") and its parents, subsidiaries, affiliates, related companies, agents, heirs, assigns, attorneys, lenders, and insurers, and any of the respective owners, members, managers, partners, principals, directors, officers, agents and employees of any of the foregoing, from any and all judgments, claims, demands, grievances, damages or causes of action of any kind or nature whatsoever, whether in contract (express or implied), covenant of good faith and fair dealing (express or implied), tort, statutory, or otherwise, whether legal or equitable, that Releasor has or may have in any way related to Releasor's stock options, whether in the money or out of the money, that expired during the period when there were certain limits on Releasor's ability to exercise Releasor's vested stock options ("Expired Options"), including but not limited to the claims described in the putative class action complaint filed against the Company by attorney Clinton A. Krislov on behalf of Mr. Ravi P. Rawat in the United States District Court for the Northern District of Illinois (Case No. 1:08-cv-03038), and as described in the Freund Letter.

**Covenant Not to Sue.** A "covenant not to sue" is a legal term which creates a promise not to file a lawsuit in court. It is different from the General Release of claims contained above. Besides waiving and releasing the claims covered by the General Release, Releasor further agrees never to sue the Company in any forum for any reason covered by the General Release language in the above paragraph. Notwithstanding this Covenant Not to Sue, Releasor may bring a claim against the Company to enforce this Payment and Release.

1

**Payment/Consideration.**  In consideration for this Release, the Company shall pay Releasor a cash payment in the amount set forth in the Statement of Offer attached as Exhibit A to the Freund Letter, which Exhibit A is incorporated by reference as if fully set forth herein. Releasor acknowledges and agrees that the Company has no obligation to compensate Releasor for the Expired Options.

**Taxes.**  Releasor agrees that all tax liability which may result from the payment of money as set forth herein rests with Releasor alone.

**Consultation With Legal Counsel, Advisors.**  By signing this Release, Releasor expressly acknowledges that Releasor has had the opportunity to consult with legal counsel and a tax advisor of Releasor's choosing prior to signing this Release if Releasor so desires.

**Governing Law.**  This Release will be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and/or to be performed in that State, without regard to any choice of law provisions thereof.

**Complete Agreement.**  Except as provided herein, this Agreement supersedes all prior and contemporaneous agreements of any kind between the parties relating to the Expired Options.

**Severability.**  If any provision of this Release is invalid or unenforceable, the balance of this Release will remain in effect, and if such provision is inapplicable to any person or circumstance, it will nevertheless remain applicable to all other persons and circumstances.

THIS IS A FULL AND FINAL RELEASE – I HAVE READ, UNDERSTOOD AND VOLUNTARILY AGREED TO THE TERMS OF THIS RELEASE BEFORE SIGNING.

Executed this _____ day of _____, 2008.


_____
Releasor

2