IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RAVI P. RAWAT and ELLIOT LYONS, ) <br> on behalf of themselves and others ) <br> similarly situated, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> NAVISTAR INTERNATIONAL ) <br> CORPORATION, ) <br> ) <br> Defendant. ) <br> ) | Case No. 08 C 4305 <br><br> District Judge John W. Darrah <br><br> Magistrate Judge <br> Martin C. Ashman |

## MEMORANDUM OPINION AND ORDER

Ravi P. Rawat and Elliot Lyons ("Plaintiffs") sued Navistar International Corporation ("Navistar"), alleging breach of contract, breach of the covenant of good faith and fair dealing, violation of the Illinois Wage Payment and Collection Act, and violation of the Indiana Wage Payment and Collection Act. Plaintiffs also sought declaratory relief finding releases invalid. Currently before this Court is Plaintiffs' Motion to Compel Documents and Testimony Regarding Accounting Advice ("Plaintiffs' Motion" or "Motion") (Dckt. 103). This Court rules on this Motion under Judge John W. Darrah's referral of this Motion under Local Rule 72.1. For the reasons stated below, the Court grants the Motion in part and denies it in part.

### I. Background

The relevant facts begin in 2005 when, on January 31, Navistar reported it would restate its financials for 2002 and 2003 because of accounting discrepancies. (Def.'s Mem. In Opp'n to

Pls.' Mot. To Compel ("Def.'s Mem.") 2.) On February 15, 2005, Navistar filed its first financial restatement and reported that it had found weaknesses in its accounting and disclosure controls, and that the Securities and Exchange Commission ("SEC") had initiated an informal inquiry. (*Id.*) On March 17, 2005, Navistar informed the markets that the SEC had formalized its inquiry into Navistar's accounting practices related to the first restatement. (*Id.*) To respond to these issues, "Navistar hired a task force of lawyers, accountants, and consultants." (*Id.*)

During these events, Michael Northam, a shareholder of Navistar common stock, sent to Navistar a demand letter by his attorney dated March, 22, 2005 ("the Letter"). (*Id.*) The Letter made various accusations and called upon Navistar's Board of Directors ("the Board of Directors" or "the Board") to take various actions. (*Id.*) In response, Navistar retained a law firm to conduct an investigation related to these allegations. (*Id.*) The law firm concluded that the actions demanded by the Letter were unwarranted. (*Id.* at 2–3.) Mr. Northam eventually filed a lawsuit on March 7, 2008 (*Garza v. Navistar*, 08-cv-1387, (N.D. Ill.)). (*Id.* at 3.)

On April 6, 2006, Navistar suspended the ability of certain executives to execute cashless exercises of their stock options under certain employment benefit plans. (*Id.* at 4.) On April 7, 2006, Navistar announced it would again restate its financial results for 2002–2004, and also for the first nine months of the 2005 fiscal year. (*Id.* at 3.) Navistar then formed an independent committee of its Board of Directors and retained a law firm to investigate the accounting issues. (*Id.*) Lawyers involved sought to ensure compliance with the rules and regulations of the SEC. (*Id.*) Navistar claims its lawyers were aware of pending suits against other companies that had restated their financials. (*Id.*) Eventually, in February of 2007, Navistar securities were delisted from the New York Stock Exchange ("NYSE"). (*Id.* at 10.) Navistar also notes that it has been

sued in two other lawsuits relating to its restatements, one initiated on December 13, 2007 (*Norfold County Retirement Sys. v. Ustian*, 07-cv-7014, (N.D. Ill.)), and the other on March 7, 2008 (*Garza v. Navistar*, 08-cv-1387, (N.D. Ill.)). (*Id.*)

Among the issues raised by the financial restatements was "what to do about options that expired during the period in which federal law precluded most option holders from exercising their options." (*Id.* at 4.) The attorneys investigating this issue talked with several individuals to render legal advice, including Navistar employees Corporate Secretary Robert Perna, Senior Vice President and General Counsel Steven Covey, as well as outside counsel Charles Mulaney. (*Id.* at 4–5.) Also involved in some of these communications—indeed, all of the communications at issue in this Motion—was Howard Kuppler ("Kuppler"), who held the title of Manager, Office of Secretary & Stock Plan Administrator at Navistar. (*Id.* at 9.)

Plaintiffs sued Navistar on May 23, 2008, refiling in the circuit court of Cook County on July, 18, 2008, before finally removing the suit to this Court. On December 4, 2009, Plaintiffs deposed Kuppler, who is a central figure in this dispute. Kuppler stated that he oversaw "the records management program," which entailed "provid[ing] guidance to the employees on how they need to manage corporate records that they're in possession of." (Kuppler Dep. 16:1-4, Dec. 4, 2009.) He testified that he could not recall anything more than "limited" discussions with members of the compensation committee (Kuppler Dep. 20:11-13), and that he was involved only in helping employees redeem their stock options after the Board granted them (Kuppler Dep. 17:8-11). He did not make, and was not involved in making, recommendations to the Board. (Kuppler Dep. 18:4-6.) Sometimes he provided factual information to certain individuals on the compensation committee, but he was never involved with the Board until after the Board

made its decision—i.e., someone from the compensation committee "might have called [him] or stopped by to let [him] know what the [Board of Directors'] decision was." (Kuppler Dep. 20:21-24–21:1-9.) Kuppler never made any presentations to Navistar's compensation committee or Board of Directors (Kuppler Dep. 22:3-6), and acknowledged that, although some information was provided by management to the Board of Directors, the Board made all the decisions (Kuppler Dep. 248:21-24–249:1-8).

Plaintiffs currently seek to compel the production of the following documents: 14, 15, 16, 17, 19, 20, 21, 22, 24, 25, 26, 51–60. Plaintiffs also seek the production following numbered documents: NAV00002011–2014, NAV00002074, NAV00002081, NAV00002083, NAV00002085, NAV00002087, NAV00002088, NAV00002111, NAV00002113, NAV00002115, NAV00002117, NAV00002119, NAV00002120, NAV00002121, NAV00002122, NAV00002149, NAV00002153, NAV00002155, NAV00002181, NAV00002185, and NAV00002348.

## II. Discussion

Under Federal Rule of Civil Procedure 26, parties are entitled to discover non-privileged matters. The issue here is whether the information in question is privileged.

### A. Illinois Accountant's Privilege

The first issue raised in Plaintiffs' Motion is the Illinois accountant's privilege. *See* 225 ILL. COMP. STAT. 450/27. Although Plaintiffs argue that the Illinois accountant's privilege does not apply, Navistar does not fully argue that point in its response brief. Instead, it claims in one

sentence that "[t]he accountant's privilege is . . . also applicable here." (Def.'s Opp'n 6 (citing 225 ILL. COMP. STAT. 450/27; *FMC Corp. v. Liberty Mutual Ins. Co.*, 603 N.E.2d 716, 718–19 (Ill. App. Ct. 1992). Navistar does make some fleeting references to an "accountant's privilege" in its factual argument and one footnote. (Def.'s Mem. 7 n.8.) With the exception of the footnote, these references really refer to the attorney-client privilege as explained by this Court in *Heriot v. Byrne*, 257 F.R.D. 645 (N.D. Ill. 2009). That is not sufficient. *United States v. Eddy*, 8 F.3d 577, 583 (7th Cir. 1993); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."). Thus, the Court finds that Navistar waived the argument of the Illinois accountant's privilege. Therefore, the Illinois accountant's privilege does not apply in this case.

### B.   Governing Law and Choice of Law for Attorney-Client Privilege

Both parties agree, correctly, that Illinois choice of law rules apply here, where the Court sits in diversity. *Sound of Music Co. v. Minn. Mining & Mfg. Co.*, 477 F.3d 910, 915 (7th Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). They disagree, however, over what those rules are and how they apply. When deciding the state law to apply in the context of attorney-client privilege, Illinois follows the Restatement (Second) of Conflict of Laws § 139 (1971) ("the Restatement"). *Allianz Ins. Co. v. Guidant Corp.*, 869 N.E.2d 1042, 1056–57 (Ill. App. Ct. 2007); *Sterling Fin. Mgmt., L.P. v. UBS PaineWebber, Inc.*, 782 N.E.2d

895, 904 (Ill. App. Ct. 2002). Section 139 of the Restatement explains when the privilege applies:

> (1) Evidence that *is not privileged* under the local law of the state which has the most significant relationship with the communication *will be admitted, even though it would be privileged under the local law of the forum,* unless the admission of such evidence would be contrary to the strong public policy of the forum.
>
> (2) Evidence that *is privileged* under the local law of the state which has the most significant relationship with the communication *but which is not privileged under the local law of the forum will be admitted* unless there is some special reason why the forum policy favoring admission should not be given effect.

(Emphases added.) The first question then becomes, what state has the most significant relationship with the communication? Comment *e* of the Restatement tells us that "[t]he state which has the most significant relationship with a communication will usually be the state where the communication took place, which, as used in the rule of this Section, is the state where an oral interchange between persons occurred, where a written statement was received or where an inspection was made of a person or thing." *Id.* § 139(2), cmt. e.

Once that determination is made, the Restatement then explains how the privilege works. To simplify things, let's assume that the state with the most significant relationship to the communication is "State R." Let's also assume that the forum state is "State F." If the communication is not privileged under the law of State R, it is admissible "unless the admission of such evidence would be contrary to the strong public policy of [State F]." *Id.* § 139(1). If, however, the communication is privileged under the law of State R, but not under the State F's law, the material is generally admissible "unless there is some special reason why the [State F's]

policy favoring admission should not be given effect." *Id.* § 139(2); *Allianz*, 869 N.E.2d at 1057. "In determining whether a "special reason" exists to exclude evidence, the forum will consider: (1) the number and nature of the contacts that the state of the forum has with the parties and with the transaction involved; (2) the relative materiality of the evidence that is sought to be excluded; (3) the kind of privilege involved; and (4) fairness to the parties." *Allianz*, 869 N.E.2d at 1058. (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 139, cmt. d (1971)).

That's the general framework the Court will be applying. Normally, before a court applies this analysis, it must determine if the laws of two different states conflict. *Sterling*, 782 N.E.2d at 899. If they don't, then there is no need for a choice of law analysis. *Id.* Here, however, the Court takes a slightly different path in an attempt to simply a rather complex set of legal issues. First, the Court reviews the substantive attorney-client privilege law of Illinois and Delaware. Next, instead of determining whether a conflict exists, it assumes that one does—i.e., that disclosure would be required under Illinois, but not Delaware, law. Given that assumption, the Court then analyzes whether the Restatement requires disclosure of the materials. This analysis requires the Court to assume that Delaware is the state with the most significant relationship to the communications.[1] Under this analysis, the Court finds that the law requires disclosure.

---

[1] If the Court assumed that Illinois was the state with the most significant relationship with the communications, the only question would be whether the privileged attached. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 139(1)–(2) (noting scenarios in which the forum state's law conflicts with that of the state with the most significant relationship with the communication). Since the Court finds, *infra*, that the attorney-client privilege does not apply under Illinois law in this case, such an analysis is unnecessary.

1. <u>Illinois and Delaware Law</u>

   i. *Illinois Law*

In Illinois, the attorney-client privilege applies "(1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived." *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991) (quoting *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983)); *Fischel & Kahn, Ltd. v. Van Straanten Gallery, Inc.*, 727 N.E.2d 240, 243 (Ill. 2000) (stating the privilege applies "where legal advice of any kind is sought from a professional legal advisor in his capacity as such, the communications relating to that purpose, made in confidence by the client, are protected from disclosure by himself or the legal adviser, except the protection be waived"). Of course, not all communications between the attorney and the client are privileged. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 388 (7th Cir. 2008). The privilege adheres "'only if [the communications] constitute legal advice, or tend directly or indirectly to reveal the substance of a client confidence.'" *Id.* (quoting *United States v. Defazio*, 899 F.2d 626, 635 (7th Cir. 1990)).

Where the invocation of the attorney-client privilege involves a corporation, Illinois applies the "control group" test. *Sterling*, 782 N.E.2d at 900; *see Dell v. Bd. of Educ., Twp. High Sch. Dist. 113*, 32 F.3d 1053, 1065 n.26 (7th Cir. 1994). Under this test, "the corporation attorney-client privilege applies only to those employees within the control group," which includes "top management" and any employee whose advice the top management typically seeks

- 8 -

in making decisions and whose "'opinion in fact forms the basis of any final decision by those with actual authority.'" *Sterling*, 782 N.E.2d at 900 (quoting *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill.2d 103, 120 (Ill. 1982)).

### ii. Delaware Law

In Delaware, the attorney-client privilege is based on Delaware Uniform Rule of Evidence 502 ("Delaware Rule 502"), which reads:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, (2) between the lawyer and the lawyer's representative, (3) by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

"Paraphrasing the language of Rule 502(b) as it applies to alternative number (1), the privilege extends to a (1) communication, (2) which is confidential, (3) which was made for the purpose of facilitating the rendition of professional legal services to the client, (4) between the client and it's attorney." *Ramada Inns, Inc. v. Dow Jones & Co., Inc.*, 523 A.2d 968, 970 (Del. Super. Ct. 1986). The *Ramada* court also noted that the attorney-client privilege is subject to numerous exceptions. *Id.* at 969 n.2 (citing DEL. R. EVID. 502(d)). In this respect, Delaware's attorney-client privilege is identical to Illinois. Thus, there is no conflict of law as to the attorney-client privilege generally.

As to the application of this privilege to corporations, Delaware has indicated it follows the Supreme Court's decision in *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981), which "refused to allow the corporate lawyer-client privilege to be limited by the application of tests like the 'control group' test." *Deutsch v. Cogan*, 580 A.2d 100, 106 (Del. Ch. 1990) (citing *Upjohn*, 449 U.S. at 390). In other words, the attorney-client privilege applies fully to corporation clients. *Zirn v. VLI Corp*, 621 A.2d 773, 781 (Del. 1993). The Delaware Supreme Court, however, has held that the privilege is curtailed in a shareholder derivative action, which creates "an inevitable conflict." *Id.* In such a case, "[t]he corporation may only [*sic*] assert the privilege through its agents, *i.e.*, its officers and directors, who must 'exercise the privilege in a manner consistent with their fiduciary duty to act in the best interests of the corporation and not of themselves as individuals.'" *Id.* (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985)). Thus, Delaware follows the "control group" test in a shareholder derivative suit. Delaware courts, however, have not explicitly commented on the attorney-client privilege in context of non-derivative shareholder suits, the context in which this case arises. For the purposes of this Opinion, the Court assumes—for Navistar's benefit—that Delaware would not follow the control group test in a non-derivative shareholder suit.

2.  Application of Illinois and Delaware Law

With the substantive state-law analysis out of the way, the Court can now focus on whether the privilege applies under the Restatement.[2] Assuming that Delaware is the state with

---

[2] Note that if Delaware and Illinois law were identical, then the control group test would govern and the Court's conclusion would remain the same: no attorney-client privilege applies to
(continued...)

the most significant relationship with the communications,[3] the Court finds that the attorney-client privilege does not apply. If Delaware is the state with the most significant relationship with the communications, § 139(2) of the Restatement governs. That section states that communications, although protected by Delaware law, "*will be admitted* [if they are not privileged under Illinois law,] unless there is some special reason why [Illinois'] policy favoring admission should not be given effect." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 139(2) (emphasis added). Thus, the relevant questions are twofold: Would, under Illinois law, the communications be privileged? Second, if the answer is "yes," has the party asserting privilege shown any "special reason" for non-disclosure?

The first question raises issues as to Kuppler, who Plaintiffs contend is not part of the control group and thus subject to the attorney-client privilege. The Court finds that, under Illinois law, Kuppler is not a member of the control group. Kuppler stated that he oversaw "the records management program," which entailed "provid[ing] guidance to the employees on how they need to manage corporate records that they're in possession of." (Kuppler Dep. 16:1-4.) In other words, he was there to provide "general guidance" to employees on how to handle their records. (Kuppler Dep. 9:1–22:24.) He testified that he could not recall anything more than "limited"

---

[2](...continued)
communications involving Kuppler. *See infra.*

[3] As previously noted, the Court's conclusion would remain the same even if it assumed that Illinois was the state with the most significant relationship with the communications. The reason is that § 139(a) states that, if the document is not privileged under the law of the state with the most significant relationship, it is admissible. Since the Court finds, *infra*, that the communications with Kuppler are not privileged under Illinois law, § 139(a) allows their disclosure where Illinois is the state with the most significant relationship with the communications.

- 11 -

discussions with members of the compensation department (Kuppler Dep. 20:11-13), and that he was involved only in helping employees redeem their stock options after the Board granted them (Kuppler Dep. 17:8-11). He admitted he did not make, and was not involved in making, recommendations to the Board. (Kuppler Dep. 18:4-6.) Although he provided some factual information to certain individuals, he testified his only involvement with respect to the Board came after the Board made its decision; at this point, someone "might have called [him] or stopped by to let [him] know what the [Board's] decision was." (Kuppler Dep. 20:21-24–21:1-9.) Kuppler never made any presentations to Navistar's compensation committee (Kuppler Dep. 22:3-6), and acknowledged that, although some information was provided by management to the Board, the Board made all the decisions (Kuppler Dep. 248:21-24–249:1-8).[4] Thus, the documents that Kuppler received or sent are not subject to the attorney-client privilege under Illinois law.

This means that, unless Navistar can show a "special reason" for non-disclosure, the law compels disclosure. *Allianz*, 869 N.E.2d at 1058; RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 139(2). Here, Navistar has not offered any "special reason" or even examined the factors necessary for determining whether such a reason exists. As a result, the Court finds that Navistar has failed to show a special reason exists and, therefore, under § 139(b),[5] the communications involving Kuppler are not privileged and should be disclosed.

---

[4] In view of these facts, the Court is not convinced by Kuppler's conclusory statement that the information he provided to Navistar Management "was essential to their decisionmaking process." (Kuppler Dep. 249: 14–17.)

[5] The Court also found, *supra*, that under a § 139(a) analysis, the communications would not be privileged.

Kuppler was listed as a recipient or author of the documents numbered 14, 15, 16, 17, 19, 20, 21, 22, 24, 25, 26, 51–60. Therefore, they are not protected by the attorney-client privilege and are discoverable. For the same reason, the attorney-client privilege does not cover documents NAV00002011–2014, NAV00002074, NAV00002081, NAV00002083, NAV00002085, NAV00002087, NAV00002088, NAV00002111, NAV00002113, NAV00002115, NAV00002117, NAV00002119, NAV00002120, NAV00002121, NAV00002122, NAV00002149, NAV00002153, NAV00002155, NAV00002181, NAV00002185, and NAV00002348.

### B. Work-Product

Navistar also asserts that its documents are protected work product. (Def.'s Mem. 8–16.) Plaintiffs claim that work product does not apply because the documents were not prepared in anticipation of litigation. (Pl.'s Mot. 13–16.) This Court previously discussed the work-product doctrine in *Heriot*, 257 F.R.D. at 663:

> The Federal Rules of Civil Procedure offer protection for work product: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." FED. R. CIV. P. 26(b)(3)(A) ("Rule 26(b)"). Stated another way, materials produced in the ordinary course of business are not protected work product. *Equity Residential v. Kendall Risk Mgmt., Inc.*, 246 F.R.D. 557, 564 (N.D. Ill. 2007). Thus, a party asserting the privilege must establish work-product protection, *Allendale [Mut. Ins. Co. v. Bull Data Sys., Inc.*, 152 F.R.D. 132, 137 (N.D. Ill. 1993)], and can do so by showing that the party or its representative created the document primarily because it anticipated future litigation. *Equity*, 246 F.R.D. at 564. While litigation need not have been ongoing at the time of creation, the "primary motivating purpose" behind the

documents' creation must be to aid possible future litigation. *Id.*; *see Allendale*, 152 F.R.D. at 136. Additionally, the party asserting privilege must "prove the existence of objective facts establishing an identifiable resolve to litigate." *Equity*, 246 F.R.D. at 564.

The real question here is whether Navistar has shown that it created the documents "in anticipation of litigation." That, in turn, requires the Court to determine whether Navistar's "primary motivating purpose" behind the documents' creation was to "aid possible future litigation."[6] Navistar contends that, in March 2005, the SEC investigation "pos[ed] a distinct threat of litigation." (Def.'s Opp'n 9.) It also claims that a 2005 shareholder demand letter, and its February 2007 delisting on the NYSE, created a distinct threat of litigation, as evidenced by Navistar's hiring "law firms, consultants[,] and accountants" to ensure compliance with SEC rules. (Def.'s Opp'n 9–10.) Navistar also cites *Jaffe Pension Plan v. Household Int'l, Inc.*, 244 F.R.D. 412 (N.D. Ill. 2006), to support the statement that "work-product [can] be created for 'investigatory purposes.'" (Def.'s Opp'n 10.)

Navistar's argument is misplaced. In *Jaffe*, the court found the documents constituted work product because the corporation created the documents *after it had been sued* and also was on notice that it was about to be sued again. 244 F.R.D. at 424. Here, by contrast, Navistar had not been sued by anyone when it created the majority of the documents in question. These include documents 14, 15, 16, 17, 19, 20, 21, 22, 24, 25, 26, 51–56, 59–60, as well as NAV00002011–2014, NAV00002074, NAV00002081, NAV00002083, NAV00002085, NAV00002087, NAV00002088, NAV00002111, NAV00002113, NAV00002115, NAV00002117, NAV00002119, NAV00002120, NAV00002121, NAV00002122,

---

[6] The Court treats this inquiry as the same as asking whether Navistar created the documents "because of" the prospect of litigation.

NAV00002149, NAV00002153, NAV00002155, NAV00002181, NAV00002185, and NAV00002348.

Indeed, during the creation of these documents, Navistar was complying with an investigation to bring its financials up to snuff; it was not fighting a lawsuit. On the contrary, Navistar was attempting to "ensure" (Def.'s Opp'n 3) compliance with SEC rules and regulations. Just because the SEC makes a request, a shareholder issues a demand letter, or the company is not in compliance with SEC regulations does not mean a lawsuit will result. As such, Navistar did not possess an "identifiable resolve to litigate."

That conclusion is reinforced here because the burden is on Navistar to show that the documents are privileged. Although Navistar points out that the Seventh Circuit has hinted that work-product privilege, once attached, does not dissolve in a subsequent litigation (Def.'s Supp. Brief in Opp'n 2 (citing *Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir. 2006)), it did not adequately explain how the privilege attached in the first place. The Court already has noted that most of the documents in question were created *before* the March 2008 lawsuit, which Navistar claims stems from the demand letter. Furthermore, Navistar failed to detail the contents of the demand letter and, thus, did not explain how the demand letter triggered the creation of the documents at issue. Indeed, all of the documents—except for 57 and 58—were created prior to the first lawsuit (December 13, 2007) Navistar claims arose from the restatements of its financials—a lawsuit the details of which Navistar does not explain. Thus, Navistar has not adequately explained how these documents, all of which were created prior to the lawsuit stemming from the demand letter, are work product. For these reasons, the Court finds that

Navistar has failed to show the aforementioned documents are covered by the work-product doctrine. Therefore, they can be disclosed.

Nevertheless, Navistar created some of the documents after the lawsuit filed in 2007, which put Navistar on notice that it would be sued for actions related to its restatements.[7] After that lawsuit, Navistar—having already attempted to comply with the SEC's inquiry and the shareholder demand Letter—was aware that it could be sued nevertheless, and thus the documents created thereafter are protected by the work-product doctrine. These documents are 57 and 58, both of which were created after December 17, 2007.

### III. Conclusion

For the foregoing reasons, the Court grants Plaintiffs' Motion to Compel in part and denies it in part. Navistar must produce to Plaintiffs within fourteen (14) days documents 14, 15, 16, 17, 19, 20, 21, 22, 24, 25, 26, 51–56, 59–60, and documents NAV00002011–2014, NAV00002074, NAV00002081, NAV00002083, NAV00002085, NAV00002087, NAV00002088, NAV00002111, NAV00002113, NAV00002115, NAV00002117, NAV00002119, NAV00002120, NAV00002121, NAV00002122, NAV00002149,

---

[7] In reaching this decision, the Court does not find that work-product protection arises only after a lawsuit has been filed. That is not the law. Here, Navistar did not explain the events that put it on notice of the two lawsuits filed prior to this one. Without evidence of whether it was aware of the prospect of litigation prior to being sued, the Court cannot find that work-product protection applies.

NAV00002153, NAV00002155, NAV00002181, NAV00002185, and NAV00002348. Navistar need not produce documents 57 and 58.

**ENTER ORDER:**

*[signature: Martin C. Ashman]*

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: April 7, 2010.