UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAVI P. RAWAT and             )
ELLIOTT LYONS,                )
                              )
        Plaintiffs,           )
                              )
    v.                        )   Case No. 08-CV-04305
                              )
NAVISTAR INTERNATIONAL        )   Judge John W. Darrah
CORPORATION,                  )
                              )
        Defendant.            )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Ravi Rawat and Elliott Lyons are former employees of Defendant

Navistar International Corporation. Plaintiffs sued Defendant, alleging: (1) breach of

stock-option contracts; (2) breach of an implied covenant of good faith and fair dealing;

and (3) violations of Illinois and Indiana Wage Payment and Collection Acts. Plaintiffs

claim they were unable to exercise their stock options during a blackout period mandated

by the Securities and Exchange Commission ("SEC") during which Defendant was

required to file a restatement of its financial reporting. Plaintiffs' stock options expired

during this blackout period, and Plaintiffs were unable to exercise their Navistar stock

options.

Currently before the Court is Defendant's Motion for Summary Judgment.

Defendant moves for summary judgment on Plaintiff Rawat's remaining claims on the

First Amended Complaint: Count I, breach of contract; Count II, breach of the covenant

of good faith and fair dealing; and Count III, violation of the Illinois Wage Payment and

Collection Act. Defendant further moves for summary judgment on Plaintiff Elliott Lyons' claims in Counts III and V, which claim violations under the Illinois and Indiana Wage Payment and Collection Acts. For the reasons set forth below, the Motion for Summary Judgment is denied in part and granted in part.

## BACKGROUND

Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in its opponent's statement in the manner dictated by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Local Rule 56.1(b)(3)(C) permits additional material facts to be provided by the nonmoving party. Local Rule 56.1(a)(3) then allows the moving party to submit a concise reply to these additional facts. However, the Local Rules do not permit a moving party to provide a reply to a response submitted by the opposing party. To the extent Defendant included a reply to the Plaintiffs' response to Defendant's statement of facts, these replies will not be considered.[1] Furthermore, Rule 56.1 requires statements of facts

---

[1] It should also be noted that in addition to violating the Local Rules by submitting replies to their own statement of material facts, Defendant never requested leave from the Court to submit these replies.

to consist of short, numbered paragraphs. Inexplicably, Plaintiffs provided responses to the headings in Defendant's Material Facts, which are not numbered, short paragraphs. These headings will not be construed as Statements of Material Facts, nor will Plaintiffs' responses to these headings. To the extent that a Response to a Statement of Material Fact provides only extraneous or argumentative information, this will not constitute a proper denial of the fact, and the fact will be admitted. *See Graziana v. Village of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005).

The following is taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1. Plaintiff Rawat ("Rawat") is a citizen of the State of Illinois and was formerly employed by Navistar as Assistant General Manager of the Heavy Truck Group. Def. 56.1(a)(3) ¶ 1. Plaintiff Lyons ("Lyons") is a citizen of the State of Georgia and formerly worked as Director of Product Development in Navistar's Severe Service Vehicle Center and Global Export and Military in Indiana. *Id.* ¶ 2. Navistar is a Delaware corporation doing business in Cook County, Illinois, with its principal place of business located in Warrenville, Illinois. *Id.* ¶ 3.

Navistar's Performance Incentive Plan (the "Plan") provides for the issuance of stock options and other types of awards to "highly qualified personnel" and "key employees who hold positions of major responsibility," and employees at Levels 8 or higher in Navistar's organization structure were granted stock options. *Id.* ¶ 6. The purpose of the Plan is to:

> enable the Company and its subsidiaries to attract and retain highly qualified personnel and non-employee directors, and additionally provide key employees who hold positions of major responsibility the opportunity to earn incentive awards commensurate with the quality of individual

3

performance, the achievement of performance goals and ultimately the increase in shareowner value.

Pl. 56.1(b)(3)(C) ¶ 44. The Plan provides that "[t]he grant of an Award of a stock option or stock unit does not give [the employee] any rights of a shareowner of the Company with respect to the shares covered by [the] Award until [the employee] actually own[s] the shares." Def. 56.1(a)(3) ¶ 7. The Prospectus for the Plan provides:

> stock options granted to participants under the 2004 Plan will become exercisable in whole or in part . . . after the commencement of the second year of the term of the stock option, to the extent of one third of the shares, after commencement of the third year of the stock option, to the extent of one third of the shares; and after commencement of the fourth year of the stock option, to the extent of one third of the shares. [Furthermore, an employee terminated from Navistar] is covered by a different severance plan or agreement, then as defined in such plan or agreement, the three-month period shall not apply and the stock option shall cease to be exercisable and shall lapse as of the effective date of such employee participant's termination.

Pl. 56.1(b)(3)(C) ¶ 46. The Plan Prospectus indicates that the exercise price for stock options is based on the fair market value of the stock, which takes into account "the average of the high and low prices of a share of stock on the Grant Date in the New York Stock Exchange." Pl. 56.1(b)(3)(C) ¶ 47.

The Plan also provides for Navistar's Committee on Compensation and Governance of the Board of Directors (the "Committee") to have the authority to determine certain terms relating to employee stock options, including the exercise period for stock options. Def. 56.1(a)(3) ¶ 8. The Committee can determine when employees may exercise their stock options and any conditions to exercise. *Id.* Before an employee can exercise a stock option, the Plan specifies: "the Committee must be satisfied that such exercise will not violate any securities law or other law or requirement of any

government authority." *Id.* ¶ 9. Award recipients are further advised that the "Company is subject to the informational requirements of the Exchange Act and files reports and other information with the Securities and Exchange Commission." *Id.* In the event of termination of employment, the Plan requires options to be exercised three months from the date of termination. *Id.* ¶ 10.

Rawat received Plan stock options in 1999, 2000, 2001, 2002, 2003, 2004, and 2005; Lyons received Plan stock options in 2002, 2003, and 2004. *Id.* ¶¶ 11-12. Each option grant form included an "Exercise Price Per Share." *Id.* On April 6, 2006, Navistar implemented restrictions on the exercise of employee stock options due to "the delay in filing [its] Form 10-K Annual Report for fiscal year 2005."[2] *Id.* ¶ 13. Navistar disclosed that a restatement was necessary due to material inaccuracies in its filed and publicized financials. Pl. 56.1(b)(3)(C) ¶ 49. Navistar announced the "blackout period" would continue until Navistar filed its Annual Report with the SEC. Def. 56.1(a)(3) ¶ 15. The partial blackout period was caused by Navistar's restatement. Pl. 56.1(b)(3)(C) ¶ 49. Navistar contacted individuals affected by the changes relating to the blackout period, informing them of the restrictions placed on Navistar stock offered under benefit plans and of the prohibitions placed on trading of Navistar stock for all executive officers and directors, with limited exceptions. Def. 56.1(a)(3) ¶ 14. All individuals holding options were affected during this blackout period, but the period ended for most employees on

---

[2] Plaintiffs agree Navistar implemented restrictions on the exercise of stock options but then attempt to deny this statement as incomplete by responding with an allegation that the delay was caused solely by Navistar. Plaintiffs' assertion is argumentative and provides no factual support as required by Local Rule 56.1; Plaintiffs' response is disregarded, and the fact is admitted.

May 29, 2008. *Id.* ¶¶ 16-17. The blackout period was "partial" because "accredited investors" were allowed to exercise their options during this restricted period. An "accredited investor" is either (i) "a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of the purchase of the securities exceeds $1,000,000.00"; or (ii) "a natural person who had an individual income in excess of $200,000.00 in each of the two most recent years or joint income with that person's spouse in excess of $300,000.00 in each of those years, and has a reasonable expectation of reaching the same income level in the current year." *Id.* ¶ 18. From approximately the date of the blackout until June 2008, Navistar did not decide how to resolve the issue of current and former employees' expiring stock options. Pl. 56.1(b)(3)(C) ¶ 51.

Prior to the blackout, Lyons could freely exercise options that had reached their "Exercisable On Or After" dates.[3] Around 2005, Lyons exercised some of his options, but he chose not to exercise his other options prior to the blackout. Def. 56.1(a)(3) ¶ 19. Before the blackout, Rawat could freely exercise options that had reached their "Exercisable On Or After" dates. Around 2002, Rawat exercised some of his options. He could have similarly exercised his other options until the day Navistar imposed the partial blackout, but he chose not to do so.[4] *Id.* ¶ 20.

---

[3] Plaintiffs deny this point but provide no evidence for their statement that Navistar "imposed a variety of restrictions to exercising options" besides the other basic restrictions already entered in as statements of material facts. Plaintiffs fail to cite to any record evidence of a variety of restrictions; thus, Plaintiffs' denial is insufficient to create a genuine issue of fact. *See Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (*Serfecz*) (holding that if the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial.").

[4] *See supra* note 3.

Lyons voluntarily left Navistar in June 2006 for an employment opportunity with another company.[5]  *Id.* ¶ 22.  In accordance with the terms of the Plan, Lyons' remaining stock options were subject to the three-month exercise period from his termination date. *Id.* ¶ 23.  Rawat left Navistar on January 6, 2007, after declining to take a position with Navistar in India.  *Id.* ¶ 25.  Rawat, represented by counsel, negotiated with Navistar to obtain a severance agreement, which included a Waiver and Release Agreement.  *Id.* ¶ 26.

The Release Agreement, dated December 14, 2006, provides for a payment of $150,840.00, consisting of lump sums for separation pay, vacation pay, an annual incentive amount, and an additional lump sum of cash.  It also states that "the compensation, including but not limited to, wages, vacation pay and benefits, which he would be eligible for or entitled to if he were separated from employment with [Navistar] without signing this Agreement would not include the above consideration." *Id.* ¶ 27. The Agreement also included a waiver and release provision (the "Release"):

> By executing this Agreement, RAWAT releases and forever discharges . . . [Navistar] of and from any and all claims, grievances, demands, controversies, reckonings, responsibilities, accounts, promises, damages, actions and causes of action of whatsoever kind, nature or description, whether known or unknown, foreseen or unforeseen, direct or indirect, whether in contract, tort, or otherwise, whether legal or equitable, that RAWAT has or may have against [Navistar], arising on or before the date of execution of this Agreement and arising out of RAWAT's employment with [Navistar] or the resignation of RAWAT's employment with [Navistar], including, but not limited to claims under. . . any other state constitution, statute or local ordinance or the common law of any state, including any claims of mistreatment, discrimination, negligence,

---

[5] Plaintiffs deny this statement but do not provide evidence that Lyons did not leave voluntarily.  Plaintiffs' denial is insufficient to create a genuine issue of fact.  *See Serfecz* at 596.

malfeasance, wrongful discharge, breach of contract (express or implied), . . . or any other alleged wrongdoing or illegality by private agreement.

*Id.* ¶ 28.

Rawat's stock options expired unexercised on April 5, 2007, three months after his termination, in accordance with the Plan terms. *Id.* ¶ 29. Some stock options of 56 people, 55 of whom are current or former employees of Navistar, expired during the blackout period. *Id.* ¶ 30.

On February 26, 2007, more than two months after Rawat signed his Release Agreement, he emailed Navistar's Jeffrey Bowen and asked, "When I was leaving [Navistar], you had indicated that the issue of employee stock options would be taken up and decided by [Navistar's Board of Directors] in February. Any decision?" Bowen's response to Rawat contained no suggestion that his Release Agreement had released any claims to his options and instead directed others to provide Rawat with a response. Pl. 56.1(b)(3)(C) ¶ 58. The same day, in an internal email that inadvertently included Rawat as a recipient, Navistar's Greg Elliott also made no suggestion that Rawat's Release Agreement released any claim to his options. *Id.* ¶ 59. Navistar's Elliott emailed Rawat and stated that he, Elliott, didn't "want to give up hope that we may come up with a solution to how to handle the stock options for people who have separated from the organization." *Id.* ¶ 60. The next day, February 27, 2007, Rawat emailed Greg Elliott, stating, "[w]hen I [Rawat] was leaving [Navistar] the issue of stock options remained open." *Id.* On April 4, 2007, nearly four months after Rawat signed his Release, Greg Elliott emailed Rawat regarding the stock options and indicated Navistar was "working on this and it is [Elliott's] hope that [Navistar] will have an acceptable solution

8

. . . [o]ur team is making it a priority and we will do our best to bring this to closure as quickly as possible." *Id.* ¶ 63. None of Elliott's emails contained anything suggesting Rawat's Release Agreement released any claim to his options. *Id.* Greg Elliott proposed to Navistar's Compensation Committee that they amend stock option plans to extend the term of the options 30 days past the blackout period "in order to give [stock option holders with options nearing expiration in the blackout period] an opportunity to preserve the value in their in-the-money options." *Id.* ¶ 66. A Navistar employee, John Correnti, whose options had been amended to extend 30 days past the end of the blackout period, agreed with the Compensation Committee to cancel this amendment. *Id.* ¶ 68. At the time Navistar amended Correnti's Stock Option Award Agreement, on October 27, 2006, Navistar's stock price was $28.19. On April 16, 2007, when Correnti signed the acknowledgement of cancellation of the amendment, Navistar's stock price was $48.85, an increase of over $20.00 per share. *Id.* ¶ 70.

On January 15, 2008, Navistar sent a letter to current and former employees whose stock options had expired, informing them that the issue of the expired options would be addressed with the Board of Directors and that recipients would receive more information once a decision was made. Def. 56.1(a)(3) ¶¶ 31-32. On May 29, 2008, Navistar became current with its financial statements. *Id.* ¶ 33. At the next regularly-scheduled meeting of the Compensation Committee of Navistar's Board of Directors, the Compensation Committee approved the recommendation of Navistar's management, namely, a cash offer to all current and former employees whose options had expired during the blackout period. *Id.* ¶ 34.

On May 23, 2008, Rawat filed a putative class-action complaint against Navistar in a case captioned *Rawat v. Navistar*, Case No. 1:08:cv-03038 (N.D. Ill.). Rawat asserted claims for (1) a breach of contract and (2) a breach of the covenant of good faith and fair dealing. A subsequently amended complaint filed in the present case added Lyons and Nick Matich as plaintiffs and asserted additional claims for violations of the Illinois Wage Payment and Collection Act and the Indiana Wage Payment and Collection Act. Def. 56.1(a)(3) ¶ 35. The proposed class in Plaintiffs' amended complaint consisted of "all Navistar employees and former employees whose stock options either expired or who were prevented from exercising their options during the Navistar's 'blackout' period (April 6, 2006 – May 29, 2008)." *Id.* ¶ 36.

On June 20, 2008, Navistar sent a letter to its current and former employees whose stock options had expired during the blackout period, explaining that the Board of Directors had approved a cash payment offer to current and former employees. *Id.* ¶ 37. The offer was a cash payment based on the difference between the closing price on the date the option expired and the exercise price for those options, and recipients had until August 1, 2008, to accept the offer. *Id.* ¶¶ 38-39. Fifty-two current and former employees out of the fifty-five members of the proposed class accepted Navistar's offer and signed the release and covenant not to sue. *Id.* ¶ 40. However, Plaintiffs Rawat and Lyons did not accept the settlement offer from Navistar, and they did not sign the release included with the 2008 letter. *Id.* ¶¶ 41-42. The remaining individual who did not accept the settlement offer chose not to pursue any action against Navistar for the expired stock options. *Id.* ¶ 43.

On January 20, 2011, the Court denied Plaintiffs' Motion for Class Certification,

finding, among other things, that Rawat and Lyons did not have standing to challenge the

option agreements of the putative class members because those individuals "expressly

released the very claims plaintiffs wish to assert on their behalf." Plaintiffs have since

proceeded in the matter as individual plaintiffs. *Id.* ¶ 44.

## LEGAL STANDARD

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d),

because, at the initial time of filing and removal to federal court, minimal diversity

existed between members of the proposed class of Plaintiffs and Defendant and the

amount in controversy exceeded $5,000,000.

Summary judgment is proper "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The moving party bears the initial responsibility of informing the court of the basis for its

motion and identifying the evidence it believes demonstrates the absence of a genuine

issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the

moving party meets this burden, the nonmoving party cannot rest on conclusory

pleadings but "must present sufficient evidence to show the existence of each element of

its case on which it will bear the burden at trial." *Serfecz*, 67 F.3d 591, 596 (7th Cir.

1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86

(1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary

judgment, nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*,

200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

Based on the analysis below, Defendant's Motion for Summary Judgment on Rawat's claims of breach of contract, breach of an implied covenant of good faith and fair dealing, and violation of the Illinois Wage Act (Counts I, II, and III) is denied. Defendant's Motion for Summary Judgment on Lyons' claims under the Illinois and Indiana Wage Acts (Counts III and V of the First Amended Complaint) is granted.

### *Rawat's Release in His Separation Agreement*

Rawat claims in Count I of the First Amended Complaint that Defendant breached the terms of the stock option agreements and claims in Count II that Defendant breached the implied covenant of good faith and fair dealing under the stock option agreements. Defendant moves for summary judgment on Counts I and II, arguing Rawat's claims are barred by the Release Agreement he signed in conjunction with his employment separation agreement.

12

The Release is to be construed in accordance with the laws of the State of Illinois, according to Paragraph 13 of the Release. See Def. 56.1(a)(3) Ex. 18. The Release further provides:

> Rawat releases and forever discharges . . . [Navistar] of and from any and all claims, grievances, demands, controversies, reckonings, responsibilities, accounts, promises, damages, actions, and causes of action of whatsoever kind, nature or description, whether known or unknown, foreseen or unforeseen, direct or indirect, whether in contract, tort or otherwise, whether legal or equitable, that Rawat has or may have against [Navistar], arising on or before the date of execution of this Agreement and arising out of Rawat's employment with [Navistar] or the resignation of Rawat's employment with [Navistar] . . .

Rawat Waiver and Release Agreement, Def. 56.1(a)(3) Ex. 18. In the Release entered into by Rawat, Defendant agreed to provide Rawat with: (1) severance payable under the Navistar Income Protection Plan; (2) three months of separation pay; (3) a lump sum payment equal to five weeks of vacation pay; (4) 30 percent of Rawat's final base salary as of the date of separation; and (5) an additional lump sum of $45,000.00. *Id.* The amount payable to Rawat for consideration under the Release Agreement totaled $150,840.00. *Id.* The Release further states "Rawat understands and agrees that the consideration listed above is in addition to anything of value, including, but not limited to, wages, vacation pay and benefits, to which he is already entitled." *Id.* It is unclear from the terms of the Release whether or not the consideration paid to Rawat was intended to include his stock options.

"A release is a contract, and therefore is governed by contract law." *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill.2d 440, 447 (1991) (*Whitlock*). Under Illinois law, a release "is subject to the traditional rules of contract interpretation . . .

[T]he intention of the parties, thus, controls the scope and effect of the release, and this intent is discerned from the release's express language as well as the circumstances surrounding the agreement." *Hoseman v. Weinschneider*, 322 F.3d 468, 473 (7th Cir. 2003) (citing *Doctor's Assocs., Inc. v. Duree,* 745 N.E.2d 1270, 1281-82 (Ill. App. Ct. 2001)).

Defendant argues Rawat's claims regarding his stock options are barred under his Release as they arose out of Rawat's employment with Navistar and arose on or before the date the Release was executed. It is obvious Rawat's claims of breach arose out of his employment with Navistar. But for his employment with Navistar, he would not have had any Navistar stock options granted to him.

The Release was executed on December 28, 2006. Rawat had three months from the date of his termination to exercise his stock options. On April 5, 2007, Rawat's stock options expired unexercised. During the three months between Rawat's termination date and the date the options expired, the blackout period was in full effect. Rawat could not exercise his stock options during this three-month period. Rawat did not have a cognizable injury until the stock options expired on April 5, 2007. Had Rawat filed a claim prior to April 5, 2007, his claim would have been premature; he could not have shown that injury occurred until *after* his stock options expired. *See Myers v. Health Specialists, S.C.*, 225 Ill.App.3d. 68, 75 (Ill. App. Ct. 1992) (*Myers*). In *Myers*, the plaintiff signed a release applying only to claims arising on or before January 2, 1980. The plaintiff suffered no injury from the alleged breach until 1987, and "[w]ithout such

injury, or a real threat thereof, no justiciable claim arose from defendant's non-performance of the employment agreement." *Id.* at 75.

Rawat argues he could not show an injury or justiciable claim against Defendant until *after* the stock options expired without his being able to exercise them. Furthermore, the blackout period could have been lifted during the three-month period after Rawat's termination, which would have mooted Rawat's claims. Therefore, Rawat contends, these claims of breach could only occur after the expiration of the unexercised options. Thus, Rawat's claims did not exist until *after* the execution of the Release, which only covered claims arising on or before the execution of the Release Agreement.

At the very least, the express language of the Release does not unambiguously demonstrate Rawat's intent to release the claims alleged in the Amended Complaint. Under Illinois law, a contract is deemed "ambiguous when its terms are reasonably capable of interpretation in more than one way." *Thompson v. Amoco Oil Co.*, 903 F.2d 1118, 1120 (7th Cir. 1990) (quoting *UIDC Management, Inc. v. Sears Roebuck & Co.,* 490 N.E.2d 164, 166 (Ill. App. Ct. 1986)). To the extent that a contract is ambiguous, the court may consider extrinsic evidence. *RIV VIL, Inc. v. Tucker*, 979 F.Supp. 645, 651 (N.D. Ill. 1997). When a "party files a motion for summary judgment requiring interpretation of a contract, the district court must determine (1) if the contract is ambiguous or unambiguous and (2) if it is ambiguous, whether after consideration of the extrinsic evidence, there are any triable issues of fact." *Id.* at 651 (citing *Hickey v. A.E. Staley Mfg.,* 995 F.2d 1385, 1389 (7th Cir.1993) (*Hickey*)). Thus, summary judgment may be granted only when it is determined the contract is not ambiguous or, if it is

ambiguous, the extrinsic evidence presented resolves the ambiguity without raising any genuine issues of material fact. *See Hickey*, 995 F.2d at 1385. In the case at bar, the extrinsic evidence provided in the Statement of Facts appears to demonstrate the ongoing communications between Rawat and Defendant regarding his stock option rights after the Release was executed. As set out above, Rawat was told by the company not "to give up hope that we may come up with a solution to [sic] how to handle the stock options for people who have separated from the organization" more than two months after Rawat signed the Release. Pl. 56.1(a)(3) ¶ 60. Months later, in August 2007, Rawat was informed by Navistar that with respect to the stock options, "we don't have a resolution yet, but we are still investigating avenues to address it." Pl. 56.1(a)(3) ¶ 69. These communications regarding the resolution of his stock options between Rawat and Defendant after the Release was executed serve to raise issues of material fact regarding whether or not it was the intention of either party of the Release to release or bar claims relating to Rawat's stock options.

A genuine issue of fact remains with regards to the intentions of the parties to the Release; summary judgment is therefore denied on Defendant's Motion as to Rawat's Counts I and II.

### Rawat's Illinois Wage Act Claim

In Count III of the Plaintiffs' First Amended Complaint, Rawat claims Defendant violated the Illinois Wage Payment and Collection Act, 820 ILCS 115/4, alleging Defendant failed to pay wages as required by the statute. Defendant argues the claim in

Count III fails because stock options are not considered "final compensation" or "wages" as defined by the statute.

The Illinois Wage Act requires employers to "pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILCS 115/5 (2006). The statute defines "final compensation" as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employee contract or agreement between the 2 parties." *Id.* at 115/2.

To find that the stock options are not "wages" under the Illinois Wage Act would be inconsistent with the legislative intent of the Act. "The legislative intent of the Act was to include a broad class of compensation due employees." *Shields v. Associated Volume Buyers, Inc.*, No. 93 C 7620, 1994 WL 110397 at *1 (N.D. Ill. Mar. 31, 1994). Moreover, the Illinois Wage Act has been amended to define wages more broadly. *Id.* (citing *Metropolitan Distributors, Inc. v. Ill. Dept. of Labor,* 114 Ill.App.3d. 1090, 1094 (1983) (explaining the original Act was found by "the Illinois Supreme Court to exclude vacation pay from the ambit of the statute. The Act was amended, not only to expressly include vacation pay, but to define wages even more broadly to include any compensation due and owing an employee by an employer pursuant to an employment contract.")). The Seventh Circuit has noted the purpose of the Wage Act is to "protect employees in Illinois from being stiffed by their employers." *Glass v. Kemper Corp.*, 133

F.3d 999, 1000 (7th Cir. 1998) (declining to extend protection of the Illinois Wage Act to employees abroad)(*Glass*).

Additionally, restricted stock has been treated as compensation under the Illinois Wage Act. *See Kim v. Citigroup, Inc., et al.*, 856 N.E.2d 639 (Ill. App. Ct. 2006) (finding restricted stock was considered a portion of plaintiff's compensation); *Spaulding v. Abbott Labs.*, 2010 WL 4822894 (N.D. Ill. 2010) (stating the Wage Act includes the grant of restricted stock). Defendant argues the treatment of restricted stock is distinguishable from the stock options in the present case because in the aforementioned cases, the restricted stock was elected to substitute portions of cash compensation. However, Defendant seeks summary judgment on the Illinois Wage Act claims primarily by arguing the Wage Act does not include stock options as wages, despite the fact the Act was written to include "*any other compensation.*" 820 ILCS 115/2 (emphasis added). In order to comport with the broad intent of the statute, it must be found that stock options fall under the notion of "any other compensation." To find otherwise would only serve to narrow the terms of the statute, and no case law presented would support this view. Therefore, Defendant's Motion for Summary Judgment as to Rawat's Count III is denied.

<em>Lyons' Illinois Wage Act Claim</em>

The Illinois Wage Act applies only to "employers and employees in this State." 820 ILCS 115/1. Lyons is a citizen of the State of Georgia and formerly worked in Navistar's Severe Service Vehicle Center in Indiana. As Lyons was not an employee living or working in the State of Illinois, his Illinois Wage Act claim must fail. "[A]n employee must be in Illinois to be able to invoke the Wage Act." *Glass*, 920 F. Supp.

928, 931 (N.D. Ill. 1996), *affirmed* 133 F.3d 999, 1000 (7th Cir. 1998). Thus, Defendant's Motion for Summary Judgment on Count III as to Lyons' Illinois Wage Act Claim is granted.

*Lyons' Indiana Wage Act Claim*

The Indiana Wage Payment and Collection Act provides "[w]henever any employer separates any employee from the pay-roll, the unpaid wages or compensation of such employee shall become due and payable at regular pay day for pay period in which separation occurred." Ind. Code § 22-2-9-2 (2005). The Indiana Wage Act defines wages more narrowly than the Illinois statute: "[t]he term "wages" means all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or in any other method of calculating such amount." Ind. Code § 22-2-9-1 (2005). The language of the Indiana Act indicates that wages are paid in exchange for a labor or service rendered. *Id.* This language is narrower than the Illinois Wage Act, which includes in its definition of final compensation "any other compensation owed the employee by the employer pursuant to an employee contract or agreement between the 2 parties." 820 ILCS 115/2. The analysis of the Indiana Wage Act differs from the foregoing Illinois Wage Act analysis because Indiana courts have ruled more clearly as to the treatment of compensation like stock options.

Under Indiana law, a payment is considered a wage if it is "compensation for time worked and is not linked to a contingency such as the financial success of the company." *Highhouse v. Midwest Orthopedic Inst., P.C.*, 807 N.E.2d 737, 740 (Ind. 2004) (ruling a

19

bonus is not a wage because it is linked to the success of the employer company); *see also Pyle v. Nat'l. Wine & Spirits Corp.*, 637 N.E.2d 1298, 1300 (Ind. Ct. App. 1994) (finding a bonus not to be a wage when it was contingent on the financial success of the company and not the amount of work done by an employee). Notably, Lyons' stock options were granted to him not because of a specific amount of work he completed, but because he had reached a certain level of seniority in his position. *See* Def. 56.1(a)(3) ¶ 6, explaining "[e]mployees at Levels 8 or higher under Navistar's organization structure were granted stock options." Furthermore, each of Lyons' stock options had an "Exercise Price Per Share," meaning the stock option would have no value if the price of a share of Navistar stock fell below this Exercise Price. *See* Def. 56.1(a)(3) ¶¶ 11, 12. Clearly, Lyons' stock options had a value directly tied to the financial success of the company; as such, these would not be considered wages under the Indiana Wage Act. Because the view of wages under the Indiana Wage Act is construed more narrowly under the law than the Illinois Wage Act, summary judgment as to Lyons' Indiana Wage Act claim, identified as Count V of the Plaintiffs' Amended Complaint, is granted.

## CONCLUSION

In light of the foregoing analysis, Defendant's Motion for Summary Judgment on Rawat's claims of breach of contract, breach of an implied covenant of good faith and fair dealing, and violation of the Illinois Wage Act (Counts I, II, and III) is denied. Defendant's Motion for Summary Judgment on Lyons' claims under the Illinois and Indiana Wage Acts (Counts III and V of the First Amended Complaint) is granted.

Date: _January 4, 2012_

JOHN W. DARRAH
United States District Court Judge